UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL
701 E. MARSHALL STREET
WEST CHESTER, PA 19380,

PLAINTIFF

v.

INDEPENDENCE BLUE CROSS
1901 MARKET STREET
PHILADELPHIA, PA 19103

QCC INSURANCE COMPANY
1901 MARKET STREET
PHILADELPHIA, PA 19103

CIVIL ACTION NO.

KEYSTONE HEALTH PLAN EAST
1901 MARKET STREET
PHILADELPHIA, PA 19103

KEYSTONE MERCY HEALTH PLAN
200 STEVENS DRIVE
SUITE 350
PHILADELPHIA, PA 19113

DEFENDANTS

# COMPLAINT

## Introduction

Plaintiff The Chester County Hospital (hereinafter “The Hospital") files this Complaint against Independence Blue Cross (hereinafter referred to as “IBC”) and its subsidiaries and/or affiliates QCC

Insurance Company, Keystone Health Plan East and Keystone Mercy Health Plan (such subsidiaries and affiliates, together with IBC, are collectively referred to herein as the "IBC Group") for violation of Sections 1 and 2 of the Sherman Act, common law restraint of trade, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and reformation/recission of unconscionable contracts.

The Hospital has provided a charitable, independent community resource for health care services to the citizens and neighbors of Chester County for over a century. This long-standing institution remains the last hospital in Chester County to be owned and governed by the local community. However, this essential community asset is at risk as a result of the defendants' antitrust violations.

As detailed herein, the defendants illegally have used anticompetitive tactics and agreements to amass and secure monopoly and monopsony power in the sale of health benefits and in the purchase of hospital services. The defendants unlawfully have acquired and maintained an exceedingly high market share and market power in the relevant market(s) and now provide coverage or health insurance benefits for three quarters of the population of the Philadelphia area and most of the commercially insured patients of the Hospital. Rather than acting in the best interests of consumers and the community that the Hospital serves, the defendants have abused their monopoly and monopsony power by unconscionably suppressing reimbursement to the Hospital while at the same time forcing consumers and employers to pay higher premiums.

Even though the Hospital has lower costs than many hospitals in Southeastern Pennsylvania, the defendants have engaged in intimidation tactics and imposed unconscionable “take it or leave it” pricing terms upon the Hospital that fall short of even covering the Hospital’s costs of providing services to the defendants’ subscribers and members. These antitrust violations have enhanced and entrenched the defendants’ market power, harmed competition in the relevant markets, and have caused and continue to cause substantial damage to the Hospital and the community.

**The Parties**

1. The Hospital is a Pennsylvania Nonprofit Corporation that operates a charitable community hospital principally serving patients residing in the borough of West Chester and the area including and surrounding Chester County, Pennsylvania. The Hospital’s principal place of business is located at 701 East Marshall Street, West Chester, Pennsylvania 19380.

2. IBC is a Pennsylvania Nonprofit Hospital Plan Corporation with a principal place of business at 1901 Market Street, Philadelphia, Pennsylvania. It provides hospital benefits to subscribers in combination with medical benefits provided by Highmark, Inc., doing business as Pennsylvania Blue Shield. Its service area is Bucks, Chester, Delaware, Montgomery and Philadelphia counties in Pennsylvania ("Southeastern Pennsylvania"). IBC has numerous subsidiaries and corporate affiliates that also provide or administer health benefits.

3. QCC Insurance Company (“QCC”) is a subsidiary of IBC, incorporated in the Commonwealth of Pennsylvania, with a principal place of business at 1333 Chestnut Street Philadelphia, Pennsylvania 19107 and with a mailing address at 1901 Market Street, Philadelphia,

Pennsylvania, 19103. QCC provides managed care health insurance and benefits products, including the IBC Personal Choice preferred provider organization benefit product, in Southeastern Pennsylvania.

4. Keystone Health Plan East, Inc. ("KHPE") is a subsidiary of IBC. KHPE is incorporated in the Commonwealth of Pennsylvania with a principal place of business at 200 Stevens Drive, Philadelphia, Pennsylvania 19113. KHPE is licensed as a health maintenance organization ("HMO") and markets traditional HMO benefit plans and HMO-based "point of service" benefit plans in Southeastern Pennsylvania. Its programs include an HMO program for Medicare beneficiaries under the Medicare + Choice program. Until 1997, KHPE was a joint venture of IBC and Delaware Valley HMO, Inc., an affiliate of Pennsylvania Blue Shield (now Highmark, Inc.). In 1997, IBC acquired full ownership of KHPE.

5. Keystone Mercy Health Plan ("Keystone Mercy") is a Pennsylvania corporation that operates a managed care health plan in Southeastern Pennsylvania. It serves approximately 240,000 Medicaid beneficiaries. Keystone Mercy is incorporated in the Commonwealth of Pennsylvania with a principal place of business at 200 Stevens Drive, Philadelphia, Pennsylvania 19113. It operated as a subsidiary of the Mercy Health System until a 1996 corporate restructuring. Its corporate parent partners now are Mercy Health System and KHPE. As a result of the 1996 transaction, IBC, through KHPE, has a 50% interest in Keystone Mercy.

**Jurisdiction and Venue**

6. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1337(a) in that the plaintiff's claims arise under Sections 1 and 2 of the Sherman Act and Section 4 of the Clayton Act.

7. Supplemental jurisdiction over plaintiff's interrelated claims for money damages and other relief under State law is conferred by 28 U.S.C. § 1367(a).

8. Venue is proper in the Eastern District by virtue of 28 U.S.C. § 1391(b)(1) and (2) in that each defendant resides in the Eastern District of Pennsylvania within the meaning of 28 U.S.C. § 1391(c) and/or a substantial part of the events and omissions giving rise to the claim occurred in the Eastern District of Pennsylvania.

**Factual Background**

9. Established in 1892, the Hospital has grown from a ten-bed dispensary to a 234-bed, independently operated charitable acute care hospital governed by a local community board. It provides inpatient services at its main hospital campus, and provides outpatient services at its central campus location and a number of satellite locations. The Hospital's operating costs are lower than those of most other hospitals in Southeastern Pennsylvania. It has a reputation for quality service and patient care. The Hospital's primary service area is located wholly within Chester County, Pennsylvania.

10. The IBC Group is the self admitted dominant health insurer and managed care enterprise in Southeastern Pennsylvania and in the service area of the Hospital. See www.ibx.com. On information and belief, IBC and its affiliates provide coverage or health benefits services for between 70-85% of the commercially insured persons in Southeastern Pennsylvania. Overall, the IBC Group serves approximately 75% of Southeastern Pennsylvania's population - more than 2.8 million of the 3.7

million residents. Its two leading programs, the Personal Choice PPO and Keystone Health Plan East HMO, each serve over 1 million residents in the relevant geographic market. The IBC Group dwarfs its shrinking competition.

11. The IBC Group provides coverage or services to individuals, government entities, Medicare and Medicaid beneficiaries, multiple employer trusts, self-funded employers and other group purchasers of health care (collectively, "covered persons and entities").

12. The IBC Group contracts with the Hospital and other hospitals and physicians to render care to covered persons and entities on agreed upon reimbursement terms. For inpatient services, this reimbursement is usually a per diem or per case payment for all, or almost all, of the care a patient receives during his or her hospital stay. For outpatient services, the reimbursement is pursuant to a fee schedule or schedule of rates.

13. The IBC Group arranges for the provision of inpatient and outpatient services to covered persons and entities through a series of programs or products provided, arranged and/or administered by IBC or one of the other IBC Group members. The IBC Group provides coverage for inpatient and outpatient services through both traditional indemnity plans and through managed care plans operating under the names Keystone Health Plan East, QCC Insurance Company and others. The IBC Group offers inpatient and outpatient services to individuals eligible for Medicaid through Keystone Mercy.

14. The Hospital is heavily dependent for its financial viability on the IBC Group. Patients with IBC Group coverage account for an increasingly high proportion of the patients served by the Hospital. Overall, the IBC Group is the primary payor for 44.1% of the Hospital's acute inpatient

admissions and 50.2% of the Hospital's outpatient volume. In addition, through its Medicare supplement (or Medigap) programs the IBC Group is the secondary payor for a large proportion of the fee-for-service Medicare patients treated at the Hospital. Excluding government payors such as Medicare and Medicaid, the IBC Group accounts for 61.6% of the Hospital's commercial inpatient admission volume and 60.5% of its outpatient volume. On information and belief, the proportion of patients and hospital utilization represented by the IBC Group in Southeastern Pennsylvania is significantly higher as compared to other markets in the country.

15. Because of the design of the health benefits provided by the IBC Group to its covered persons, patients are unlikely to obtain services from a hospital that does not contract with the IBC Group to be a participating provider. Except for emergencies, individuals with traditional HMO coverage are not covered if they seek services from a non-participating provider. Individuals with PPO or HMO "point of service" coverage face significant financial disincentives to use non-participating providers. In addition, the IBC Group normally refuses to pay benefits directly to non-participating providers, so that even where benefits are available to the patient for services of a non-participating provider, the non-participating provider must seek to collect payment directly from patients or their family members who must then await reimbursement from IBC. This is an additional obstacle to non-participating status. In addition, because IBC's share of the patient population in the relevant market(s) is so high and patients will normally travel only a limited distance for hospital services, the Hospital faces obstacles to attracting patients served by physicians who have not practiced at the Hospital or in the communities surrounding the Hospital. Thus, it is not likely that the Hospital could replace IBC Group covered persons with other patients in the event the Hospital were to lose significant utilization by IBC

Group covered persons. Finally, while a manufacturer can stockpile unsold product for later sale to other customers, a hospital cannot. For the foregoing reasons, the Hospital could not operate viably without access to patients covered by the IBC Group. Other hospitals in Southeastern Pennsylvania face similar obstacles to non-participation with the IBC Group.

16. To operate in a fiscally sound manner, the Hospital must cover its costs of providing care. Apart from IBC Group patients, participants in government programs, such as Medicare and Medical Assistance constitute the majority of the balance of patients serviced at the Hospital. The non-IBC Group patients, including government program participants, other commercially insured patients, and charity patients, do not provide sufficient revenues to the Hospital to subsidize or offset the significant operating losses incurred by the Hospital from providing services to IBC Group patients. The amounts the Hospital can charge and collect for services to fee-for-service Medicare and Medicaid patients are fixed by law. Revenues from services to non-IBC Group commercial patients are only a small percentage of the Hospital's revenues.

17. Due to the market dominance of the IBC Group, providers, including, the Hospital are required to accept reimbursement rates from the IBC Group for inpatient and outpatient services that are less than the costs of providing those services. All of the IBC Group's programs provide levels of reimbursement to the Hospital that are less than the Hospital's costs of providing the services. On information and belief, the same is true for other hospitals in Southeastern Pennsylvania.

18. The IBC Group imposes financial and other terms that effectively require the Hospital and most other hospitals in Southeastern Pennsylvania to contract for the provision of services under all IBC Group products. Because of the market dominance of the IBC Group, the Hospital has had no

choice but to accept the rates and terms demanded by the IBC Group. Not to accept the IBC Group demands as to rates and terms would eventually result in the Hospital closing its doors and abandoning its charitable mission to the community it serves.

19. Managed care companies establish provider networks in the areas where their enrollees live and work. The relevant geographic markets in which health benefits and managed care plans compete are generally no larger than the local areas within which plan enrollees seek access to providers.

20. Until recently, a larger number of health insurers and managed care companies served Southeastern Pennsylvania. In recent years the IBC Group has expanded market share, while competitive choice for consumers and providers has diminished. IBC's Personal Choice PPO increased its enrollment by 80% in five years, to over 1.1 million subscribers in Southeastern Pennsylvania. The enrollment of Aetna/U.S. Healthcare, IBC's largest competitor, has fallen by over 100,000 subscribers. Other managed care competitors have left the market, restricted their operations to small niche segments, or been liquidated. The IBC Group is by far the dominant provider of health insurance and health benefits products in Southeastern Pennsylvania. The IBC Annual Statement for the year ending December 31, 2001 reflects net premium income of $430,145,591. IBC maintains a surplus of over $600,000,000, and it has generated funds which it has chosen to invest in for-profit ventures outside of the community served by the Hospital and other providers from which those surpluses were generated. Indeed, some of those ventures are outside of the Commonwealth.

21. In 1999, IBC effectively forced the Hospital to enter into a contract that was 20% below its costs. The alternative of having no contract to provide services for IBC Group patients would have been even more disastrous.

22. In July of 2000, IBC and the Hospital discussed the renewal of the Hospital's IBC Group provider contracts which were due to expire on October 31, 2000. The Hospital showed IBC cost data demonstrating that the Hospital's operating costs were below the median costs for hospitals in Southeastern Pennsylvania in all categories. The Hospital also explained to IBC that the Hospital was incurring significant operating losses on the services it provided to IBC Group patients. The Hospital's operating loss on services to IBC Group patients in fiscal year 1999 was determined at year end to be $5.8 million.

23. For the contract beginning November 1, 2000, the Hospital proposed new rates to IBC that would have helped to stabilize the Hospital's fiscal condition. IBC refused the proposed increase and would only agree to a five year contract providing for an increase in inpatient and outpatient rates in the first year of only about one third of what the Hospital requested, and increases for subsequent years that were not tied to local market indices and were inadequate to address the costs incurred by the Hospital for providing services to IBC subscribers. One set of rates was to apply for IBC's traditional indemnity health plan, and a separate set of rates to all IBC Group managed care plans, including Keystone Health Plan East's HMO programs, QCC's Personal Choice PPO programs, and Keystone Mercy. Facing the alternative of immediate financial disaster if the Hospital refused to contract with the IBC Group, the Hospital had no choice but to accept the terms imposed by IBC. For fiscal year 2001 the Hospital received approximately $34 million in revenue from the IBC Group, but nevertheless

sustained operating losses on IBC Group patients exceeding $8.5 million, forcing the Hospital into a negative operating position. For fiscal year 2002, the Hospital is experiencing similar losses. On information and belief, other hospitals in Southeastern Pennsylvania were similarly coerced into accepting rates from the IBC Group that do not meet their operating costs.

24. The Hospital was forced to enter into the following three agreements, copies of which are not attached to this Complaint since the originals are in the possession of IBC:

a. An IBC Member Hospital Agreement (the "Member Hospital Agreement") which provides for, inter alia, the terms and conditions for the provision of defined inpatient and outpatient hospital services to subscribers covered under a traditional benefit subscriber contract, i.e., subscribers not participating in an IBC managed care program.

b. A Managed Care Participating Hospital Agreement (the "Managed Care Agreement") which provided for, inter alia, the terms and conditions for the provision of defined inpatient and outpatient covered services to beneficiaries enrolled in an IBC affiliated managed care program (e.g., a health maintenance organization (HMO), a preferred provider organization (PPO), or a point of service plan (POS)). Pursuant to Section 21.2 of the Managed Care Agreement, the Payment Provisions set forth in Exhibit A to the Managed Care Agreement apply to services provided to enrollees of Keystone Mercy if the separate agreement between the Hospital and Keystone Mercy terminates.

c. A Managed Care Ancillary Facility Agreement for HMO Capitated Imaging Services and HMO Capitated Physical Therapy Services Programs (hereinafter the "Capitated Services Agreement").

Hereinafter, the Member Hospital Agreement, the Managed Care Agreement and the Capitated Services Agreement are collectively referred to as the "Agreements."

25. In addition, IBC required that the rates under the Managed Care Agreement would also be applicable to Keystone Mercy for the provision of services to Medicaid beneficiaries under the Commonwealth of Pennsylvania's HealthChoices program.

26. Due to the IBC Group's market dominance, beginning in at least 1999 the Hospital was not able to negotiate at arms length its contracts with the IBC Group. The Hospital had no meaningful or realistic choice as to the pricing terms of its agreements with the IBC Group in 1999 and 2000, and no realistic opportunity to bargain. It would have been futile for the Hospital to reject IBC's insufficient reimbursement terms and seek to operate without participating status with the IBC Group.

27. IBC squashed the Hospital's freedom of choice by offering only "all products" contracts with bundled pricing that left the Hospital with "take it or leave it" contracts for, not just one, but the full range of IBC's available products. For the Hospital, rejecting IBC's terms altogether would have meant closing its doors, first to IBC subscribers, and eventually to all patients entirely, and would have forced the Hospital to abandon its mission of providing access to quality health care for patients in the community. The Hospital was thus forced to acquiesce to IBC's inadequate reimbursement terms.

28. The reimbursement provisions of the 1999 and 2000 Agreements were so one-sided as to be oppressive to the Hospital and unreasonably favorable to the IBC Group. IBC dictated pricing

terms that do not meet the Hospital's costs of providing care, even though the Hospital is one of the least expensive hospitals in the region. As the IBC Group enrollee population increases, the resultant financial deficit to the Hospital increases and the risk to the Hospital's charitable mission dramatically increases.

**Relevant Markets**

29. For purposes of this action, a relevant geographic market is the greater Philadelphia area, including Bucks, Chester, Delaware, Montgomery and Philadelphia counties in Pennsylvania. The service area of the Hospital within Chester County or another area within the greater Philadelphia area is also a relevant geographic market or submarket.

30. For purposes of this action, relevant product markets are the provision of private health care financing products for employers and other purchasers, or sub-markets thereof, and the purchase of hospital health care services by private health care financing entities, or submarkets thereof.

31. In the relevant market(s), there are significant barriers to entry and/or expansion by new or smaller managed care and health benefits companies that might seek to compete with the IBC Group. This is evidenced by the liquidation, exit from the market, or retrenchment of Oxford Health Plans, Horizon Health Plan, Health Plans of Pennsylvania, HRM Health Plans of Pennsylvania, QualMed Plans for Health and HIP Health Plans, the continued marginal status of other firms, and the reduced presence of the IBC's largest competitor, Aetna.

**Interstate Commerce**

32. IBC and the IBC Group are engaged in, and the acts and practices described herein, are in and affect, interstate commerce, including payments to the Hospital and other hospitals across

state lines, the purchase of health care items and services across state lines, and the payment of health care claims and insurance premiums across state lines.

**The Anticompetitive Conduct**

**Most Favored Nation Clauses**

33. In its contracts with most hospitals in the relevant geographic market(s), IBC on behalf of the IBC Group employed over a period of years up to and including at least 1997 a "prudent buyer" clause (also called "most favored nation" ("MFN") clause) that required hospitals to extend to the entire IBC Group the lowest price the hospital afforded to any payor. The effect of these clauses was to discourage and deter hospitals in the relevant market(s) from entering into agreements with other managed care companies on terms that would permit those companies to compete effectively with the IBC Group. Under pressure from regulatory authorities, IBC temporarily retreated from expressly imposing MFN clauses in its contracts. However, the harmful effects on competition from their prior imposition are continuing. Moreover, IBC continues to demand from hospitals, including the Hospital, assurances that they are not affording any other payors lower prices than the IBC Group, thereby continuing its "most favored nation" pricing requirements on a de facto basis. On information and belief, IBC may again be including MFN clauses in contracts with hospitals in the relevant market(s).

34. The IBC Group's leading product is the Personal Choice PPO product, which affords access to a broad network of health care providers. Other payors' HMO benefit packages, and some preferred provider organizations ("PPOs"), generally tend to provide a narrower provider panel. The tighter provider panel provides the participating provider with the prospect of additional incremental volume or steerage from within the managed care companies' enrolled population, since the panel

breadth is restricted. Some hospitals are therefore willing to provide greater discounts to an HMO or other managed care network with a more limited panel. This phenomenon permits group purchasers and individuals access to a product that may afford less choice of provider, but may have lower prices. Also, in a normally competitive market, hospitals will in some instances agree to afford lower prices to a smaller payor so as to help prevent such an imbalance of enrollment arising in the marketplace that providers will become unduly beholden to any single payor. In addition, some managed care companies' contracts with hospitals employ risk-sharing or incentive provisions that can foster increased quality of care or cost accountability. Net compensation depends on the hospital meeting defined quality or cost efficiency standards. Once net compensation is determined at the end of the year, these contracts might in some instances appear to involve lower rates of payment per service rendered than under the IBC Group contracts.

35. By requiring that hospitals not provide lower prices to other payors unless they provide those same prices to the IBC Group, IBC has greatly magnified the impact of a provider offering a low price to a competing plan with a smaller market share. Hospitals were and have thereby been deterred from affording advantageous or innovative pricing arrangements to health plans competing with the IBC Group where market forces would have justified a lower price. The effect, therefore, of these MFN clauses and ongoing MFN requirements was and has been to distort the market, to obstruct and hamper entry and expansion of competing health plans, and to undermine the ability of smaller payors to compete with the IBC Group.

36. IBC Group hospital contracts exempted hospital contracts with Keystone Health Plan East and IBC's other HMO affiliates from the most favored nation requirements. In other words, a

lower price afforded to Keystone Health Plan East did not have to be passed along to IBC for its traditional indemnity plan. Thus, Keystone and other IBC HMO affiliates would be able to negotiate rates even lower than those paid by IBC for its indemnity plan, while competing HMOs and other managed care companies would not be able to, unless the hospital were prepared to extend the same prices to IBC. If Keystone Health Plan East or Keystone Mercy obtained rates lower than IBC, it would be virtually guaranteed that no competitor could secure provider services at comparable rates. This exclusionary practice gave and is giving Keystone Health Plan East unfair advantage over other competitors, while the overall MFN clause initiative has insulated IBC itself from competition as well.

37. On information and belief, IBC has also employed coercion and threats of nonparticipation or reduced compensation to deter hospital sponsorship of competing commercial sector managed care programs in competition with the IBC Group.

**All Products and Bundled Rate Requirements**

38. IBC bundles its rate packages for the Hospital and other hospitals in Southeastern Pennsylvania so that most hospitals face severe financial penalties if they do not agree to participate in all IBC Group product lines. For example, IBC has insisted that the Hospital participate in and accept the same rates for all IBC Group managed care programs, including commercial HMO, HMO point-of-service, Medicare HMO, commercial PPO, and Keystone Mercy Medicaid HMO programs. This requirement is reflected in the Managed Care Agreement. The Hospital is threatened with even lower reimbursement rates, or no contract at all, if it declines to accept these bundled “all products” arrangements.

39. When providers are forced by a dominant insurance or managed care company to participate in all of the payor's lines of business, or else either forfeit dealing with that payor altogether or suffer additional rate erosion, providers, including the Hospital, becomes even more "captive" to its relationship with the payor. For example, since the Hospital is highly dependent on IBC Group patients, if the Hospital decided it did not want to contract to provide services for IBC's Medicare HMO program, it would have to forfeit all IBC Group participation. This would have such a devastating impact on the Hospital's patient base that it would be forced – against its will – to contract with the IBC Medicare HMO.

40. In addition, IBC is able to employ its bundled rate contracts and all managed care products requirements to ensure that its Keystone Health Plan East and Keystone Mercy affiliates can secure provider participation, pricing and other terms that they might not otherwise be able to secure in an open competitive market. This has afforded these IBC Group companies an unfair, non-level playing field advantage over any firm that might seek to compete with them.

**Coerced Minimum Participation Requirements**

41. Many employers and other group purchasers of health care benefits believe it is essential that they offer coverage from one or more IBC Group affiliates and/or subsidiaries as an option for their employees because of the market dominance of the IBC Group. Many of these companies desire to offer multiple benefit options to their plan participants. Examples are dual option programs, offering the participant the choice of an HMO and a PPO program, or the choice of two different PPO options. Such dual option programs create an opportunity for competition with the IBC Group by managed care companies that some employers may be reluctant to use as a sole source of health

benefits. However, to discourage this competition, and retard opportunities for less well established managed care companies, IBC has coerced and intimidated employers to agree that they will enroll at least 75% of their employees in IBC Group plans or else forfeit access to any IBC Group plans at all. The IBC Group has also coerced and intimidated purchaser groups by threatening to withhold, and withholding, IBC Group coverage altogether unless the purchasing groups agree to purchase health benefits from the IBC Group exclusively. On information and belief, the foregoing practices have left many employer customers with no practical choice, and effectively suppressed competitive opportunities for other health care companies that did not offer products with sufficient breadth or popularity that the affected employers would rely upon them on a "full replacement" basis for their entire workforce. Employer/purchasers therefore are coerced or intimidated not to offer other plans to their employees, for fear that they would not be able to meet these coercive minimum participation requirements, and therefore would not be able to offer employees access to any IBC coverage or effectively recruit new employees.

42. If an employer wants to offer IBC's Preferred Choice PPO product, enrollment in Keystone Health Plan East or another IBC affiliated HMO will count toward these coercive minimum participation requirements, but enrollment in a competing HMO will not. This has further advantaged Keystone Health Plan East and other IBC Group affiliates, while disadvantaging competitors.

**Predatory Hospital Reimbursement**

43. IBC has used the market power resulting from the above anticompetitive practices to impose "take it or leave it" pricing terms in its agreements with hospitals, including the Hospital, thereby affording compensation that is below fair market rates and below the hospitals' costs, in some cases

even their variable costs. Specifically, the IBC Group's anticompetitive practices further expanded the IBC Group's power as a purchaser of hospital services and seller of health benefits products. As the IBC Group depressed competition from alternative purchasers of hospital services and increased its own market share and market power, it increased the dependence of the Hospital and other hospitals on the IBC Group as a source of payment for patient care. This has undermined the ability of hospitals to negotiate at arm's length the terms and conditions of contracts with the IBC Group. In November, 2000, for example, the Hospital had no meaningful choice but to sign contracts with the IBC Group on a "take it or leave it" basis on compensation terms that are oppressive. Because of the IBC Group's market dominance in the Hospital's service area, there is simply not an adequate supply of non-IBC patients to which the Hospital could turn in the event it terminated its contract with IBC.

44. Moreover, this exploitation of purchasing power by the IBC Group creates additional barriers to competition from other insurers and managed care companies that are deterred and hindered from competing since they are not likely to be able to secure comparable input costs. As a result of the IBC Group paying the Hospital and other hospitals below their operating costs, hospitals, including plaintiff, face pressure **not** to provide discounted rates to other purchasers to avoid further drains on hospital funds. Other purchasers do not account for enough patients to permit expanded output by the hospitals to their enrollees to offset operating losses from services to IBC Group patients. The use of monopsonistic purchasing power by the IBC Group to force below cost reimbursement on hospitals has enhanced and will enhance the IBC Group's market power as a seller of health benefit services. It also threatens to diminish the availability of services provided by the Hospital and other hospitals in the relevant market(s), thereby reducing output to the detriment of patients and the community. This will

result in less value to consumers and employers for their health care premium dollars, meaning higher effective consumer costs for health benefits and services and a reduction in the value of their health benefits.

**Acquisitions and Combinations with Health Plans**

45. IBC engaged in the following acquisitions and combinations:

a. IBC entered into a partnership with an existing Philadelphia HMO, Mercy Health Plan. IBC currently has a 50% controlling interest in the plan, now known as Keystone Mercy Health Plan. Keystone Mercy Health Plan, while not wholly controlled by IBC, does not compete with IBC either in dealings with health care providers or in identifying market segments to which to expand. This combination has prevented and continues to prevent Keystone Mercy Health Plan from operating as a competitor of IBC and its wholly owned subsidiaries in the Medicaid and other markets, enhancing the IBC Group's power as a purchaser of hospital services and in sales to purchasers of health benefits programs in the relevant market(s).

b. IBC acquired a 50% interest in Intercounty Health Plan, which operated competing managed care programs. Highmark, Inc., has the remaining 50% interest.

c. IBC acquired total control of Keystone Health Plan East and the Personal Choice PPO program. This acquisition eliminated actual and potential competition in the relevant market(s), enhancing IBC's power as a purchaser of

hospital services and in sales to purchasers of health benefits programs.

d. IBC acquired Vista Health Plan, a health maintenance organization competitor in the relevant market.

e. IBC continues to operate its indemnity hospital benefits program in combination with medical benefits offerings of Highmark, Inc., operating as Pennsylvania Blue Shield, notwithstanding the capability of IBC's QCC Insurance Company affiliate to provide medical benefits coverage. Maintenance of this joint arrangement with Highmark discourages competition in Southeastern Pennsylvania by Highmark, which is certified by the Commonwealth of Pennsylvania to offer hospital as well as medical benefits under its health plan licensure.

**Effect on Competition**

46. The above practices, individually and in combination, have been intended to enhance and entrench, and have had the effect of enhancing and entrenching, the power of the IBC Group in the purchase of hospital and other health care services and in the sale of health benefits programs to employers and other purchasers, and have extended the IBC Group's power in the indemnity and PPO benefits sector and the HMO portion of the industry. These practices have been adopted and pursued with the intention, and with the tendency and effect, of lessening competition in the above-described markets. IBC has been and is now employing this improperly acquired power to injure the Hospital and to further increase and entrench its market power.

47. As a result of the agreements and conduct described above and other acts and practices not currently known, there has been a reduction in competition in the markets and sub-markets described above. The impact of the IBC Group's anticompetitive agreements and conduct includes, but is not limited to the following:

a. Competitors of the IBC Group have been and will be hindered and obstructed in their ability to compete in the relevant market(s), as the IBC Group activities have been intended to increase and have had the effect of increasing rivals' costs.

b. The pricing by hospitals and providers of health care to other managed care companies has been artificially maintained so as to prevent competition with the IBC Group through innovative or cost-effective managed care products. The Hospital, in turn, has fewer alternative outlets for sale of its health care services, and employers and consumers have fewer choices.

c. Employers and other purchasers of managed health care have been and will be denied the opportunity to select the programs that offer the most desirable health care products and to select alternative pricing mechanisms.

d. The Hospital has been forced to service IBC Group patients to the exclusion of other patients.

e. The Hospital has been and will be forced to provide its services to the IBC Group at rates severely below the Hospital's costs of operation and below fair market prices, as a direct result of the market power secured by the IBC Group as a purchaser of hospital services through anticompetitive conduct and agreements in restraint of trade.

f. The IBC Group has been and will be able to exploit its unlawfully secured market power by engaging in exploitative and unfair practices in its reimbursement to the Hospital and other hospitals, because the hospitals cannot afford to terminate their IBC contracts.

g. The IBC Group, facing greatly reduced competition, has been and will be able to exercise market power in its pricing and delivery of services to employers, individual consumers and other customers.

h. The availability of health care services at the Hospital and other hospitals to IBC Group and other patients will be diminished, resulting in reduced output of hospital services and higher

effective costs of health benefits and health services for employers, government purchasers and consumers.

**Injury to the Hospital**

48. The Hospital has suffered and is continuing to suffer financial losses as a direct and proximate result of defendants' anticompetitive conduct and agreements.

**Abusive Reimbursement Practices**

**The Discharge Program**

49. In its discussions with the Hospital, IBC stated that it had authority to represent and was representing the IBC Group, including Keystone Mercy.

50. IBC provided to the Hospital a letter dated October 17, 2000 which attached an October 16, 2000 fax describing a proposed Enhanced Discharge Planning Program ("the Discharge Program"). A contract term related to these documents was subsequently provided for in Section 5.3 of the Managed Care Agreement.

51. That section provides as follows:

> All Inpatient Days shall be subject to a concurrent review of Medical Necessity, and Hospital shall comply with Independence's or its designee's concurrent review procedures, including on-site review at Hospital's facilities. Concurrent review shall be performed in accordance with the Enhanced Discharge Planning Program description furnished to Hospital and mutually agreed upon by the Hospital and Independence.

52. The Discharge Program, if properly implemented, would avoid retrospective denials of coverage for services by the Hospital with the associated expenditure of resources and loss of revenue to the Hospital.

53. IBC agreed that the Discharge Program would be used for all managed care patients, including Keystone Mercy enrollees. However, even though Keystone Mercy was part of the IBC Group, it refused to comply with the Discharge Program.

**Reimbursement for Emergency Room Care**

54. Pursuant to the definition of the term Emergency as set forth in the Agreements, and as mandated by state law, IBC is required to reimburse the Hospital for emergency services provided to its subscribers and beneficiaries. The Agreements each similarly define the term "EMERGENCY" as follows:

> The sudden onset of a medical or psychiatric condition manifesting itself in acute symptoms of sufficient severity or severe pain, such that **a prudent layperson** who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:
>
> 1. placing the Beneficiary's health, or in the case of a pregnant Beneficiary, the health of the Beneficiary or unborn child, in jeopardy:
> 2. serious impairment to bodily functions; or
> 3. serious dysfunction of any bodily organ or part.

(Emphasis added).

55. The IBC Group utilizes a proprietary software system that automatically pays the Hospital for emergency room services based on the **discharge** diagnosis of the patient, as opposed to the "prudent layperson" standard required by the contract. When enrollees, who as "prudent laypersons" believe they need emergency room services, are unilaterally determined by the IBC Group

to only need non-emergent care, the IBC Group provides reimbursement of only $38.00 to the Hospital for the services rendered. This amount is substantially below the Hospital's costs for appropriate diagnostic evaluation.

56. In addition, as a result of the failure of Keystone Mercy to utilize the Discharge Program, Keystone Mercy has denied or reduced payment for 14% of all Hospital patient claims resulting in damages as of March 31, 2002 totaling $325,167.

57. In breach of the Agreements, IBC improperly reduces payments for emergency room services to the Hospital utilizing its proprietary software system.

58. Further, as a result of the improper use of the IBC proprietary software system, the IBC Group has reduced and continues to reduce payment for 14% of all emergency room claims submitted by the Hospital to a triage rate of $38.00, amounting to date in wrongful underpayments in excess of $119,000, which amount continues to increase as services are provided on a daily basis. Of this amount, it has to date been determined that the IBC proprietary software system mischaracterized 60% of the emergency claims submitted by the Hospital and, in each of those cases, the original classification of emergency services designated by the Hospital has been upheld, but only after a lengthy and onerous appeal process conducted by IBC.

## Violations Charged

### First Claim for Relief – Monopolization vs. IBC Group

59. The Hospital hereby incorporates herein by reference Paragraphs 1 through 58, inclusive, of the Complaint.

60. The IBC Group has engaged in the previously described anticompetitive conduct, and other acts and practices not currently known, to secure and maintain monopoly and monopsony power in the relevant markets. As a result of the anticompetitive conduct, the IBC Group has achieved the power to control prices and/or willfully to exclude competition within the relevant market(s) in violation of Section 2 of the Sherman Act, resulting in injury to the market and to the Hospital as alleged herein.

**Second Claim for Relief – Attempted Monopolization v. IBC Group**

61. The Hospital hereby incorporates herein by reference Paragraphs 1 through 60, inclusive, of the Complaint.

62. By engaging in the acts described above, and other acts and practices not currently known, the IBC Group has engaged in predatory, anticompetitive conduct with the specific intent to acquire monopoly power in the relevant market(s), in violation of Section 2 of the Sherman Act.

63. There is a dangerous probability that, if left unchecked, the IBC Group will further achieve a monopoly position in the relevant market(s).

**Third Claim for Relief --- Agreement in Restraint of Trade v. IBC Group**

64. The Hospital hereby incorporates herein by reference Paragraphs 1 through 63, inclusive, of the Complaint.

65. In violation of Section 1 of the Sherman Act, the IBC Group has entered into contracts, combinations or conspiracies in restraint of trade including the following: "most favored nation" contract requirements and "understandings" with hospitals; coerced "all products" participation and bundled rate requirements; predatory compensation terms of hospital agreements; coerced agreements with employers and other customers that require at least 75%, or exclusive, participation of the customers'

employees in IBC Group products or access to all IBC Group products will be forfeited; and combinations with and acquisitions of other health benefits and managed care companies. By engaging in the aforementioned acts, and other acts and practices not currently known, the IBC Group has caused injury to the Hospital, through, among other things, use of the resulting market power to insist on pricing terms that do not cover plaintiff's costs, that threaten its viability, that degrade the services provided by the Hospital and reduce its output, and by engaging in abusive payment practices.

**Fourth Claim for Relief – Common Law Restraint of Trade v. IBC Group**

66. The Hospital hereby incorporates by reference Paragraphs 1 through 65, inclusive, of the Complaint.

67. Through the foregoing conduct, the IBC Group has via contract, combination or conspiracy, and via its own actions, illegally restrained trade in violation of Pennsylvania common law.

**Fifth Claim for Relief - Breach of Contract v. IBC Group and Keystone Mercy**

68. The Hospital hereby incorporates herein by reference Paragraphs 1 through 67, inclusive, of the Complaint.

69. The Hospital has performed all conditions, covenants and promises it was required to perform under the terms and conditions of the Agreements, except for those conditions, covenants and promises the performance of which have been frustrated, hindered, excused or prevented by the conduct of the IBC Group.

70. The IBC Group has breached the Agreements by refusing and/or failing to reimburse properly the Hospital for emergency room care.

71. As a result of the breaches of the Agreements by the IBC Group, the Hospital has suffered damages in an amount to be determined at trial, but in excess of $75,000.00 plus interest. The Hospital's damages are ongoing.

**Sixth Claim for Relief: Breach of Contract v. IBC and Keystone Mercy**

72. The Hospital incorporates by reference Paragraphs 1 through 71, inclusive, of the Complaint.

73. Keystone Mercy and/or IBC have breached their contractual obligations by failing to implement the contractually required Discharge Program for claims submitted to Keystone Mercy.

74. As a result of such breach, the Hospital has suffered damages in an amount to be determined at trial, but in excess of $75,000 plus interest.

**Seventh Claim for Relief: Breach of the Covenant of Good Faith and Fair Dealing v. IBC Group**

75. The Hospital incorporates herein by reference Paragraphs 1 through 74, inclusive, of the Complaint.

76. There is implied in the Agreements a covenant of good faith and fair dealing wherein the IBC Group would, in good faith and in the exercise of fair dealing, deal with the Hospital fairly and honestly, and would do nothing to impair, interfere with, hinder or potentially injure the rights of the Hospital to receive the benefits of the Agreements.

77. The IBC Group has breached the covenant of good faith and fair dealing by unreasonably interpreting and applying the Agreements in the manner described above, including but not limited to:

a. refusing or delaying the implementation of the Discharge Program for Keystone Mercy;

b. improperly denying or reducing reimbursement for emergency room care.

78. The IBC Group's breach of the covenant of good faith and fair dealing implied in the Agreements has damaged the Hospital in an amount to be determined at trial, but in excess of $75,000.00.

**Eighth Claim for Relief: Unjust Enrichment v. IBC Group**

79. The Hospital incorporates herein by reference Paragraphs 1 through 78, inclusive, of the Complaint.

80. The IBC Group has financially benefited from the improper acts and practices described above and has been unjustly enriched.

**Ninth Claim for Relief – Reformation or Recission of Unconscionable Contract v. IBC Group**

81. The Hospital incorporates herein by reference Paragraphs 1 through 80, inclusive, of the Complaint.

82. Insofar as the Hospital had no meaningful choice as to the pricing terms of the Agreements, they are so one-sided as to be oppressive, and require diversion of the charitable assets of

the Hospital to the IBC Group the Agreements are unconscionable and contrary to the public interest and should be reformed or rescinded.

## Demand for Relief

The Hospital demands the following relief:

1. Actual damages in excess of $20,000,000;
2. Treble damages;
3. Punitive damages;
4. Such other damages as are deemed appropriate;
5. Reform of the pricing terms of the Agreements, or rescission of the Agreements;
6. Divestitures and discontinuance of anticompetitive combinations so as to restore and foster competition in the relevant market(s); and
7. Injunctive relief and such other relief as the Court deems just and appropriate.

## Demand for Trial by Jury

The Hospital hereby demands a trial by jury.

____________________________________

Lewis R. Olshin
Wayne A. Mack
J. Manly Parks
Duane Morris LLP
One Liberty Place

Philadelphia, Pennsylvania 19103-7396

Arthur N. Lerner
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

Attorneys for
THE CHESTER COUNTY HOSPITAL

PH2\651767.1