## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CHESTER COUNTY HOSPITAL, <br> 701 E. MARSHALL STREET <br> WEST CHESTER, PA  19380 | : <br> : <br> : <br> : | CIVIL ACTION NO.  02-2746 |
| PLAINTIFF <br> v. | : <br> : <br> : <br> : | |
| INDEPENDENCE BLUE CROSS <br> 1901 MARKET STREET <br> PHILADELPHIA, PA  19103 | : <br> : <br> : <br> : | |
| QCC INSURANCE COMPANY <br> 1902 MARKET STREET <br> PHILADELPHIA, PA  19103 | : <br> : <br> : <br> : | |
| KEYSTONE HEALTH PLAN EAST <br> 1901 MARKET STREET <br> PHILADELPHIA, PA  19103 | : <br> : <br> : <br> : | |
| KEYSTONE MERCY HEALTH PLAN <br> 200 STEVENS DRIVE <br> SUITE 350 <br> PHILADELPHIA, PA  19113 | : <br> : <br> : <br> : <br> : | |
| DEFENDANTS | : | |

## ANSWER AND AFFIRMATIVE DEFENSES OF THE CHESTER COUNTY HOSPITAL TO THE COUNTERCLAIMS OF DEFENDANTS

Plaintiff, The Chester County Hospital (hereinafter the "Hospital"), through its counsel Duane Morris LLP and Boies, Schiller & Flexner LLP submits the following Answer and Affirmative Defenses in response to the counterclaims (hereinafter referred to as the "Counterclaim") of Defendants.

1.   Denied.  The Hospital incorporates herein by reference the allegations of its Complaint.

2-3, inclusive. Denied. The allegations contained in Paragraphs 2 and 3 of the Counterclaim are conclusions of law to which no responsive pleading is required.

4-7, inclusive. Denied. The Hospital incorporates herein by reference the allegations of Paragraphs 2 through 5, inclusive, of its Complaint.

8. Denied. The Hospital incorporates herein by reference the allegations of Paragraph 1 of its Complaint.

9. Denied. The Hospital incorporates herein by reference the allegations of Paragraphs 11 through 13, inclusive, of its Complaint.

10. Denied.

11. Denied.

12. Denied that the allegation contained in Paragraph 12 is an illustration of mismanagement. By way of further response, in January of 2001, the Hospital opened a new Maternal/Infant Health Unit adjacent to the existing NICU. The maternal/infant health project was undertaken because the Hospital had an existing large and active obstetrics service with 13 obstetricians on its active staff who performed more than 2,000 deliveries in the year 2000. The project was used to replace facilities that had been in use since 1924. This upgraded 26,000 square foot unit contained 40 beds with 12 private rooms, complete with sleep chairs for expecting fathers. Included in the 40 beds are four beds in dedicated antepartum rooms for high-risk mothers. Complementing the aforesaid unit is a new Caesarian-section suite with a three-bed recovery area, a triage area for maternal assessment and a secure well baby nursery to accommodate 20 infants. The project cost $6,000,000.

13.  Denied.

14.  Denied.  Based in part on an independently prepared assessment of community need and service opportunities (which found, among other things, that more than 400 patients who came to the Hospital's emergency room during the period 1999-2000 for cardiac services were transferred to another facility outside of Chester County), the Hospital approved the construction and implementation of a $14.7 million interventional cardiac services program. This project was the first such facility in Chester County and allowed the Hospital to perform emergent interventional cardiology procedures in support of the Hospital's emergency department. The new cardiac facility has two operating rooms, a six-bed "one stop" post-operative cardiovascular unit and two new cardiac catheterization laboratories.

15.  Denied.

16.  Denied.  Prior to 2001 the Hospital maintained a ten-bed inpatient oncology unit accredited by the American College of Surgeons' Commission on Cancer.  Hematology and oncology accounted for 547 patient admissions in 2000.  The unit utilized a 15-year-old linear accelerator, which was in imminent danger of failure.  Had the unit failed, the Hospital would have been unable to provide a full schedule of treatment to radiation therapy patients.  In order to meet the growing demand for cancer services in Chester County and to replace the Hospital's older generation cancer treatment technology, the Hospital spent approximately $4.9 million for a new facility, housing technically advanced replacement equipment, including a dual energy linear accelerator with multi leaf collimator, three-dimensional treatment planning system and computerized tomography simulator allowing doctors to more precisely target cancer tumors thereby improving patient outcomes while minimizing the risk of complications.  The newly

constructed area included additional examination rooms, a waiting area and patient changing rooms for the enhanced comfort and convenience of patients and their families.

17.     Denied.

18.     Denied.  Because the emergency room volume that existed through the year 2000 (in excess of 31,000 visits) placed significant demands on the Hospital's facility, the Hospital redesigned the emergency room.  The expansion was designed to provide a fast-track system to assure that area residents could receive prompt emergency care.  The new design separated acute and walk-in traffic and provided an expanded triage area.  The project cost $4.2 million.

19.     Denied.  The downgrading by Moody's is set forth in a writing, which speaks for itself.  By way of further answer, Moody's reported on the disparity between the cost of the care provided by the Hospital to IBC subscribers and the level of reimbursement provided by IBC to the Hospital.

20.     Denied.

## COUNT I

### BREACH OF DUTIES AND NEGOTIATING GOOD FAITH

21.     The Hospital incorporates by reference its answers to Paragraphs 1 through 20, inclusive, as fully as though the same were set forth herein at length.

22.     Denied.  The Hospital is without knowledge or information sufficient to form a belief as to the Defendants' state of mind.

23. Denied that the Hospital made any representation as alleged. Rather, the Hospital always approached the Defendants in "good faith" with the goal of discussing appropriate rates that would reimburse the Hospital for the cost of the services the Hospital provided to the Defendants' subscribers. However, in 1999 the Hospital was provided with a take it or leave it offer that placed the Hospital in the position of losing several hundred dollars on every IBC patient or no longer being an IBC participating provider. Moreover, it was the Hospital that had previously relied upon Defendants' representation that the June 1996 Agreement Letter between the parties was still in effect and that Defendants intended to respond in good faith to the fact that the Hospital was being reimbursed approximately 30 percent below its costs by Defendants.

24. Denied. By way of further response, the Hospital incorporates by reference its answer to Paragraph 23 of the Counterclaim.

25. Admitted in part; denied in part. The Hospital admits only so much of the allegations of Paragraph 25 as alleges that the Hospital was compelled to accept a one year contract with rates approximately 20 percent below the Hospital's costs. The remaining allegations contained in Paragraph 25 of the Counterclaim are denied.

26. Denied. By way of further response, the Hospital's President wrote to Mr. John C. Zamzow on August 16, 1999. A copy of that letter is attached hereto as Exhibit "A" and incorporated herein by reference.

27. Denied. After reasonable investigation, the Hospital is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Counterclaim. By way of further response, as set forth in Exhibit "A," the reimbursement rate by Blue Cross was approximately 20 percent below the Hospital's cost.

28.   Denied.  By way of further response, the Hospital incorporates herein by reference Exhibit "A."

29.   Admitted in part; denied in part.  The Hospital admits only so much of the allegations contained in Paragraph 29 as alleges that the parties entered into the agreements set forth in Paragraph 24(a) through (c), inclusive, of the Complaint.  The remaining allegations contained in Paragraph 29 of the Counterclaim are denied.  The Hospital incorporates herein by reference the allegations of Paragraphs 22 and 23 of its Complaint as fully as though the same were set forth herein at length.

30.   Denied.  The Agreements between the parties are writings, the terms of which speak for themselves.  By way of further response, some or all of the allegations contained in Paragraph 30 contain conclusions of law to which no responsive pleading is required.

31.   Denied.

32-35, inclusive.   Admitted in part; denied in part.  The Hospital admits only so much of the allegations contained in Paragraphs 32 through 35, inclusive, as alleges that the <u>Chester County Health and Education Facilities Authority Hospital Revenue Bonds</u> is a writing that speaks for itself (hereinafter the "prospectus").  The remaining allegations are denied.  By way of further response, the selective portions of statements attributed to the prospectus by the Counterclaim in Paragraphs 32 and 34 were taken out of context and extracted from a voluminous document (in excess of 100 pages) that also contains the following statements:

> No assurance can be given as to whether revenues received by the Hospital under existing or future contractual arrangements will be sufficient to cover its patient care costs. (Prospectus at A-27).

In addition, the prospectus contains the following statement:

> Enrollment in managed care programs has increased, and managed care programs are expected to have a greater influence on the manner in which health care services are delivered and paid for in the future.  Managed care programs are expected to continue efforts to reduce significantly the utilization of healthcare services, and in-patient service in particular.  In addition, some managed care organizations have been delaying reimbursements to hospitals, thereby affecting the Hospital's cash flows.  The Hospital's financial condition may be adversely affected by these trends. (Prospectus at A-30).

Moreover, the prospectus further stated:

> The healthcare industry has been in the process of rapid and fundamental change, triggered in part by the growing national strength of managed care plans…  In Pennsylvania, consolidation among provider organizations and the development of integrated delivery systems has been observed in response to pressures to achieve additional cost savings.  This may further increase competitive pressures on acute care hospitals, including the Hospital." (Appendix at A-30-31).

      36.    Admitted in part; denied in part. The Hospital admits only so much of the allegations of Paragraph 36 as alleges that the Hospital forwarded a letter to Defendants.  The letter itself is a writing, the terms and conditions of which speak for themselves.  By way of further answer, the issues raised in the letter are similar to the issues raised by the Hospital in 1999.  For instance, on March 25, 1999, the Hospital wrote Defendants stating:  "Over the course of the last three years, the average cost per day for treating IBC subscribers has increased at a consistently higher rate than our annual adjustment despite the fact that our FTE's per occupied bed have declined….  As a result, existing IBC reimbursement is significantly below our cost for providing care."  A June 24, 1999, follow-up letter from the Hospital advised Defendants that the Hospital was being reimbursed by IBC at a rate that approximated only 70 percent of its costs.  Notwithstanding the requested 20 percent  increase in rates just to mitigate the Defendants' below-cost reimbursement, the Hospital was forced to accept IBC's proposal of an eight percent

rate increase. Additionally, on July 27, 2000, the Hospital sent a letter to IBC stating that: "the rates provided for in the 1999 contract present serious problems for the hospital, and they are not sufficient even to cover the costs we incur in providing treatment to subscribers of IBC and its affiliated companies." The Hospital requested a 17 percent rate increase in the first year "to close a gap that continues to exist between the cost for care and current rates." IBC responded to this request by indicating that the Hospital's request was unreasonable and required the Hospital to accept rates that were approximately one-third of what the Hospital had indicated was necessary to reimburse costs.

37. Admitted in part; denied in part. The Hospital admits only so much of the allegations contained in Paragraph 37 of the Counterclaim as alleges that representatives of the Hospital met with John Zamzow and advised him of the dire economic situation of the Hospital. The remaining allegations set forth in Paragraph 37 are denied.

38. Admitted in part; denied in part. The Hospital admits only so much of the allegations contained in Paragraph 38 of the Counterclaim as alleges that Moody's Investors Service published a rating update. The remaining allegations are denied since the Moody's Investors Service update is a writing which speaks for itself.

39. Denied. The Moody's Investment Service report is a writing, which speaks for itself.

40. Admitted in part; denied in part. The Hospital admits only so much of the allegations contained in Paragraph 40 as alleges that a second meeting was scheduled between IBC and the Hospital. The remaining allegations contained in Paragraph 40 are denied.

41.   Denied.

42.   Admitted in part; denied in part. The Hospital admits only so much of the allegations contained in Paragraph 42 as alleges that the Defendants forwarded to the Hospital a specific set of questions to which the Defendants required an answer. The remaining allegations are denied.

43.   Admitted in part; denied in part. The Hospital admits only so much of the allegations contained in Paragraph 43 of the Counterclaim as alleges that IBC and the Hospital entered into a Confidentiality Agreement, the terms of which speak for themselves. The Confidentiality Agreement was entered into after IBC had expressed an interest in restructuring the contractual arrangements with the Hospital. The remaining allegations contained in Paragraph 43 are denied.

44-49, inclusive.   Denied.

50.   Denied. By way of further response, after reasonable investigation, the Hospital is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 relating to the expenditure of high-level management resources. Moreover, some or all of the allegations contained in Paragraph 50 contain conclusions of law to which no responsive pleading is required.

51-54, inclusive.   Denied.

WHEREFORE, plaintiff demands judgment in its favor and against Defendants on the Counterclaim.

## COUNT II

## BREACH OF CONTRACT

55. The Hospital incorporates herein by reference its answers to Paragraphs 1 through 54, inclusive, as fully as though the same were set forth herein at length.

56. Denied. The Managed Care Participating Hospital Agreement and the Independent Blue Cross Member Hospital Agreement are writings, the terms and conditions of which speak for themselves.

57. Denied. The agreements in force in 1999 are writings, the terms and conditions of which speak for themselves. By way of further response, Section 12.1 of the Independence Blue Cross Member Hospital Agreement actually provides as follows: "Hospital shall give IBC written notice fifteen (15) days after the occurrence of any of the following events: . . . (d) any material adverse change in the financial condition, business or prospects of Hospital."

58. Denied. The agreements in force starting in 2000 are writings, the terms and conditions of which speak for themselves. By way of further response, Section 12.1 of the 2000 Independence Blue Cross Member Hospital Agreement actually provides: "each party shall give the other party written notice within fifteen (15) days after the occurrence of any of the following events: . . . (d) receipt of any written or oral notice of any adverse action, occurrence or situation which might materially interfere with, modify or alter performance of any party's duties or obligations under this Agreement."

59. Denied. By way of further response, some or all of the allegations contained in Paragraph 59 contain conclusions of law which are denied.

60. Denied.

61. Denied. Some or all of the allegations contained in Paragraph 61 contain conclusions of law to which no responsive pleading is required.

62-63, inclusive. Denied. By way of further response, some or all of the allegations contained in Paragraphs 62 and 63 contain conclusions of law to which no responsive pleading is required.

WHEREFORE, the Hospital demands judgment in its favor and against the Defendants on the Counterclaim.

## COUNT III

## DECLARATORY JUDGMENT

64. The Hospital incorporates herein by reference its answers to Paragraphs 1 through 63, inclusive, as fully as though the same were set forth herein at length.

65. Denied.

66. Admitted. By way of further response the Hospital incorporates by reference the allegations of the Complaint.

67. Denied. By way of further response, some or all of the allegations contained in Paragraph 67 contain conclusions of law to which no responsive pleading is required.

68. Denied. By way of further response, the Hospital incorporates herein by reference its answers to Paragraphs 55 through 63, inclusive, of the Counterclaim.

69. Denied.

70. Denied.

71. Denied. The allegations of Paragraph 71 contain conclusions of law to which no responsive pleading is required.

WHEREFORE, plaintiff requests judgment in its favor and against Defendants on the Counterclaim.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Counterclaim fails to state a claim for which relief can be granted.

### SECOND DEFENSE

The Defendants have waived and/or are estopped from proceeding with the Counterclaim.

### THIRD DEFENSE

The Defendants are prohibited from seeking the remedies in the Counterclaim as alleged in the Complaint.

### FOURTH DEFENSE

Some or all of the Counterclaim is barred by the applicable statutes of limitations.

## FIFTH DEFENSE

At all times relevant to the allegations in the Complaint and the Counterclaim IBC had actual knowledge of the financial condition of the Hospital based on exchanges of information that occurred since at least 1999, access of the representatives of IBC who were present at the Hospital's facilities, and the use of IBC's corporate counsel as counsel for the underwriters on the bond issue.

## SIXTH DEFENSE

Some or all of the Counterclaim is barred by a failure and/or lack of consideration.

## SEVENTH DEFENSE

Some or all of the Counterclaim is barred by the integration clauses of the applicable agreements.

## EIGHTH DEFENSE

The Defendants lack standing to raise some or all of the Counterclaim.

-14-

                                                    _____
Lewis R. Olshin
Wayne A. Mack
J. Manly Parks
Duane Morris LLP
One Liberty Place
Philadelphia, Pennsylvania 19103-7396

Richard A. Feinstein
Daniel A. Kotchen
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Attorneys for
THE CHESTER COUNTY HOSPITAL

## CERTIFICATE OF SERVICE

I, LEWIS R. OLSHIN, ESQUIRE, hereby certify that a true and correct copy of the foregoing Answer and Affirmative Defenses of the Chester County Hospital to the Counterclaims of Defendants, has been served upon the following counsel by first class mail, postage pre-paid, on July 15, 2002:

>Thomas A. Leonard, Esquire
>Paul S. Diamond, Esquire
>William J. Leonard, Esquire
>Obermayer, Rebmann, Maxwell & Hippel, LLP
>One Penn Center, 19th Floor

>John DeQ. Briggs, II, Esquire
>James G. Kress, Esquire
>Kenneth W. Donnelly, Esquire
>Howrey, Simon, Arnold & White LLP
>1299 Pennsylvania Avenue, N.W.
>Washington, DC  20004-2402

_____
Lewis R. Olshin