## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CHESTER COUNTY HOSPITAL | : | CIVIL ACTION |
| | : | NO. 02-2746 |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS, | : | |
| QCC INSURANCE COMPANY, | : | |
| KEYSTONE HEALTH PLAN EAST, and | : | |
| KEYSTONE MERCY HEALTH PLAN | : | |

### PLAINTIFF'S MEMORANDUM OF LAW IN
### OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS

Plaintiff The Chester County Hospital ("the Hospital"), by its undersigned attorneys, submits this memorandum in opposition to Defendants Independence Blue Cross ("IBC"), QCC Insurance Company, Keystone Health Plan East and Keystone Mercy Health Plans' (collectively the "Defendants") Motion For Sanctions Pursuant To Rule 11 (hereinafter the "Motion").

## I.    INTRODUCTION

In its Complaint, the Hospital details in 82 paragraphs and nearly 30 pages serious substantive allegations arising out of Defendants' violation of the federal antitrust laws. These allegations arise from the Defendants' illegal acquisition, maintenance and exercise of monopoly and monopsony power in Chester County and Southeastern Pennsylvania. Among other things, the Complaint alleges that the defendants have engaged in predatory and anticompetitive conduct by: 1) their anti-competitive use of "most favored nations" (or "prudent buyer") contract provisions; 2) their anticompetitive use of all products and bundled rate requirements; 3) their anti-competitive use of minimum participation requirements; 4) their forcing the Hospital and other hospitals to accept reimbursement contracts which they knew would not cover the costs for

providing service to IBC subscribers; and 5) illegal acquisitions and combinations. Defendants have chosen not to challenge the legal sufficiency of these allegations through a motion to dismiss the Complaint. Instead, they filed Defendants' Answer, Affirmative Defenses, and Counterclaim, and brought the present Motion.

Though this litigation is at an early stage - mandatory disclosure under Rule 26 has not even taken place - it is plain that all of the Hospital's allegations have substantial evidentiary support.

First, Defendants publicly admit that they are the dominant health insurer and managed care enterprise in Southeastern Pennsylvania and in the service area of the Hospital. <u>See</u> <u>www.ibx.com;</u> Complaint ¶ 10.

Second, in their Answer, Defendants admit that they bundled the rate packages offered to the Hospital in 2000, including "one set of rates that applied to all of the managed care products and a separate set of rates applicable to the traditional indemnity products." Answer ¶ 38.

Third, correspondence between IBC and the Hospital confirms that IBC insists on "most favored nation" provisions. <u>See</u> Letter of John C. Zamzow to H.L. Perry Pepper, dated August 3, 1999, attached to the affidavit of Lewis R. Olshin (the "Olshin Affidavit") as Exhibit A. Pursuant to these provisions, the Hospital has been required to certify to IBC that it is not contracting with any managed care company to receive a lower rate of reimbursements than it receives from the Defendants. <u>See</u> Letter of H.L. Perry Pepper to John C. Zamzow, dated August 16, 1999, attached to the Olshin Affidavit as Exhibit B.

Fourth, IBC's own Application For Group Insurance requires that an employer must agree that it will enroll at least 75% of its employees in Defendants' plans. <u>See</u> Olshin Affidavit,

Exhibit C.  This practice is anti-competitive because many employers and other group purchasers

of health care benefits often wish to offer multiple benefit options to their plan participants, but it

is not economical for other providers to compete for 25% or less of a workforce.

Fifth, as detailed more fully below, ample correspondence between the parties shows that

IBC has forced the hospital to accept contracts which IBC knew would not cover the Hospital's

costs for providing service to IBC's subscribers.

Sixth, in their Answer, Defendants admit many of the acquisitions challenged in the

Complaint, including the acquisition of Keystone Health Plan East, Personal Choice, Vista

Health Plan and arrangements with Highmark.  Answer ¶ 45.

Instead of challenging the legal sufficiency of the Complaint, which they cannot do, the

Defendants have filed their present Motion based on excerpts of just four of the Complaint's 82

paragraphs.  These excerpts together total less than seven sentences and pertain to just one of the

five anti-competitive practices detailed in the Complaint, namely the allegations with respect to

IBC's forcing the Hospital to accept below-cost reimbursement contracts.  Despite this limited

scope, Defendants represent to the Court that on the basis of the alleged contradiction of these

selected excerpts to a document that is not relevant to the substance of this litigation, the

Hospital's entire lawsuit is sanctionably "frivolous."  Motion at 7.  Defendants' contesting at this

preliminary stage a few selected factual allegations is a blatant misuse of Rule 11 and constitutes

further evidence of the bad faith and simple intimidation with which they have conducted

themselves in their dealings with the Hospital.[1]

---

[1]Defendants' lack of good faith is also demonstrated by their behavior during the 21 day
"safe harbor" period, during which a party against whom a Rule 11 motion is contemplated is

(continued...)

The crux of Defendants' Motion is that a few factual assertions in the Complaint are allegedly contradicted by statements contained in disclosure material provided in conjunction with the Chester County Health and Education Facilities Authority Hospital Revenue Bond offering of January, 2001 (the "Bond Document"). Defendants do not contend that the Bond Document or the bond offering itself are in any way related to this litigation. Rather, they maintain that the Hospital's allegations that IBC refused to agree to rates which would cover the Hospital's costs, and that IBC forced the Hospital to accept contracts which IBC knew would not cover the Hospital's costs for providing service to IBC's subscribers, are contradicted in the Bond Document. Motion at 4-5. In particular, Defendants argue that the excerpts of the following four paragraphs of the Complaint are contradicted by statements made in the Bond Document:

> 23. For the contract beginning November 1, 2000, the Hospital proposed new rates to IBC that would have helped to stabilize the Hospital's fiscal condition. IBC refused the proposed increase and would only agree to a five year contract providing for an increase in inpatient and outpatient rates in the first year of only about one third of what the Hospital requested. . . . Facing the alternative of immediate financial disaster if the Hospital refused to contract with the [Defendants], the Hospital had no choice but to accept the terms imposed by IBC.

> 43. IBC has used . . . [its] market power . . . to impose 'take it or leave it' pricing terms in its agreements with . . . the Hospital, thereby affording compensation that is below fair market rates and below the Hospital's costs, in some cases even their variable costs. . . . In November 2000, for example, the Hospital had no meaningful choice but to sign

---

[1](...continued)
allowed to consider the merits of the proposed motion and the sufficiency of the complaint against which sanctions are contemplated, with an eye to withdrawing or correcting the complaint if such a course seems necessary. It is inconsistent with the spirit of this "cooling off" period, to say the least, to make statements to the press regarding the possibility of sanctions, as Defendants did. See Josh Goldstein, Blue Cross: Hospital Suit Is Cash Grab, Philadelphia Inquirer, June 18, 2002, at D1, attached to the Olshin Affidavit as Exhibit D.

contracts with the IBC Group on a 'take it or leave it' basis on compensation terms that are oppressive.

65. [T]he [Defendants have] caused injury to the Hospital, through, among other things, use of the resulting market power to insist on pricing terms that do not cover plaintiff's costs, [and] that threaten its viability. . . .

82. [T]he Hospital had no meaningful choice as to the pricing terms of the Agreements, they are so one-sided as to be oppressive, and . . . the Agreements are unconscionable and contrary to the public interest and should be reformed or rescinded.

Motion at 4.

The three statements from the Bond Document that Defendants claim contradict the

above excerpts - three statements from a document that runs well over 130 pages with appendices

- are the following:

Over the past two years, the Hospital has **successfully negotiated significant increases** in its two largest managed care contracts. In November 1999, the Hospital signed a renegotiated six-year agreement with Aetna. In October 2000, the Hospital entered into a new five-year contract with Blue Cross. . . . **Based on the contracts renegotiated to date, management expects that managed care reimbursement will be slightly at or above current costs for care.**

Downward pressure on reimbursement rates as the result of competition among providers for managed care contracts has decreased substantially in recent years.

In recent years the Hospital has experienced slight increases in inpatient utilization, more significant growth in outpatient and ancillary services and a small reduction in its average length of stay ("ALOS"). Pressure on third-party rates of reimbursement, particularly for inpatient services, has constrained revenue growth from higher patient volumes. These pressures emanate from the Balanced Budget Act of 1997 ("BBA") and its impact on Medicare reimbursement and from efforts by managed care organizations, who principally reimburse the Hospital for inpatient services to subscribers on a per diem basis, to limit admissions and reduce the length of stay through concurrent utilization review and other measures.

Motion at 5 (emphasis supplied by Defendants).

What Defendants neglect to consider is that the statement in the Bond Document pertaining to <u>all</u> managed care contracts is not inconsistent with the Hospital's claim regarding <u>only</u> the IBC contract.  Further, the Defendants fail to point out that the Bond Document, taken as a whole, does not contradict the Complaint since it also contains other information which must be considered in order to obtain a true assessment of the Hospital's financial condition at the time of the Bond Document.  For instance, as set forth more fully below, the Bond Document specifically warns that "no assurance can be given as to whether revenues received by the Hospital under existing or future contractual arrangements will be sufficient to cover its patient costs," and further states that "in recent years, the Hospital has recorded deficiencies of revenues over expenses and decreases in unrestricted assets."  Bond Document at 27, 29.  Defendants fail to bring these and other statements in the Bond Document to the Court's attention.

As demonstrated below, Defendants' Motion is without merit.  First, the excerpts Defendants cite from the Complaint and the Bond Document simply are not in contradiction as Defendants contend, a fact which alone requires the denial of their Motion.  Notwithstanding Defendants' selective quotation, mischaracterization, and distortion of the contents of the Bond Document, a proper reading of the statements made in that document demonstrates that it does not contradict the Complaint.  Moreover, even were Defendants' characterization of the Bond Document somehow accurate, Rule 11 sanctions would still be inappropriate because Defendants have not even tried to show that there is insufficient evidentiary support for the claims that are actually made in the Complaint, a necessary finding for sanctions under Rule 11.  For these reasons, Defendants' Motion must be denied in its entirety, and this Court should award the Hospital its fees and costs incurred in responding to the Motion pursuant to Rule 11(c)(1)(A).

II.   **ARGUMENT**

Federal Rule of Civil Procedure 11(c) permits a court to sanction an attorney or a party

for a violation of representations made in Rule 11(b), namely representations "that pleadings: (1)

are not presented for an improper purpose; (2) do not contain legally frivolous and unsupportable

claims; and (3) do not contain unsupportable factual allegations." Robert S. v. City of

Philadelphia, Civ. No. 97-6710, 2001 U.S. Dist. Lexis 13485 at *15 (E.D.Pa. August 28, 2001).[2]

"Courts rarely use Rule 11," imposing sanctions only in "sufficiently extraordinary

circumstances." In re: Arthur O. Armstrong, Civ. No. 2001MC130, 2001 U.S. Dist. Lexis 9769

at *10-11 (E.D.Pa. July 10, 2001). Sanctions are proper only where "a claim or motion is

patently unmeritorious or frivolous," Gress v. PNC Bank, et al., Civ. No. 99-2028, 2001 U.S.

Dist. Lexis 5540 (E.D.Pa. March 12, 2001), (citing Doering v. Union County Bd. of Chosen

Freeholders, 857 F.2d 191, 194 (3d Cir. 1988)), and "are appropriate 'only if the filing of a

complaint constitutes abusive litigation or misuse of the Court's process.'" Furman & Halpern v.

Nexgen Software Corp., Civ. No. 93-2788, 1994 U.S. Dist. Lexis 8686 (E.D.Pa. June 28, 1994),

(citing CTC Imports and Exports v. Nigerian Petroleum Corp., 951 F.2d 573, 579 (3d Cir. 1991),

cert. denied sub nom., Aham-Neze v. Sohio Supply Co., 118 L. Ed. 2d 554, 112 S. Ct. 1950

(1992)). Defendants' contention that the Complaint meets the foregoing standards cannot be

maintained in good faith, and their Motion must therefore be denied.

---

[2]Defendants' assertion that an attorney makes different representations to a court when
signing a document is explained by the fact that they rely on cases which analyze an obsolete
version of Rule 11. See Motion at 2 (citing Garr v. U.S. Healthcare, 22 F.3d 1274 (3d Cir. 1994)
(analyzing Rule 11 prior to the 1993 amendments)). This defect applies to the majority of the
authorities cited in Defendants' memorandum.

**A.    The Excerpts Cited By Defendants Refute The Argument
That The Bond Document And The Complaint Are Contradictory**

Defendants' contention that the Bond Document and the Complaint are in contradiction does not bear even the mildest scrutiny.  For instance, the Motion obviously misrepresents a plain statement in the Bond Document regarding Hospital management's expectations for reimbursement under *all* contracts as being a statement about management's expectations regarding reimbursement under the IBC contract alone.  As quoted above, the first excerpt from the Bond Document concludes with the sentence "Based upon the contracts renegotiated to date, management expects that managed care reimbursement will be slightly at or above current costs for care."  Motion at 5.

In their Motion, Defendants inexcusably attempt to portray the Hospital's statement regarding total reimbursement under all contracts as being a statement regarding reimbursements under the IBC contract alone. Coming as it does at the end of a paragraph that discusses all of the Hospital's contracts with its managed care organizations, this summary sentence obviously refers to management's expectations under all such contracts.  The paragraph reads in its entirety:

> The Hospital has contracted broadly with substantially all of the managed care organizations that enroll individuals who live and/or are employed in the Hospital's service area.  Downward pressure on reimbursement rates as the result of competition among providers for managed care contracts has decreased substantially in recent years. Over the past two years, the Hospital has successfully negotiated significant increases in its two largest managed care contracts.  In November 1999, the Hospital signed a renegotiated six-year agreement with Aetna.  In October 2000, the Hospital entered into a new five-year contract with Blue Cross.  The Hospital expects to renegotiate its third largest contract, with Cigna Healthcare of Pennsylvania ("Cigna"), prior to March, 2001. Blue Cross (including all affiliates), Aetna, and Cigna accounted for approximately 40%, 18% and 2%, respectively, of the Hospital's gross patient service revenue in 2000.  Based on the contracts renegotiated to date, management expects that managed care reimbursement will be slightly at or above current costs for care.

Bond Document at 26.

Given this context, Defendants' attempt to argue that the last sentence relates only to management's expectations with regard to the IBC contract is inexcusable and inconsistent with the obligations placed on them pursuant to Rule 11. The statement that "management expects that managed care reimbursement will be slightly at or above current costs for care" clearly does not refer to the actual experience of the Hospital under the IBC contract, but to the Hospital's expectations for total revenues to be generated from *all* managed care reimbursement at the Hospital. The fact that management may have projected that total managed care reimbursement received from all payers would be at or above cost in a particular year is not in any way inconsistent with the Hospital's contention that IBC reimbursement was actually below cost. The Hospital made absolutely no representation in the Bond Document that it projected that the IBC contract would cover its costs for providing services to IBC subscribers. In fact, quite the opposite was true. The only statement in the Bond Document regarding management's expectations with respect to IBC stated that the Hospital had contracted to provide care to certain Medicaid patients "at Blue Cross HMO rates, which are at or slightly below the Hospital's per diem costs required to provide the service." Bond Document at 27.[3]

---

[3]Defendants also appear to suggest that the statement that "the Hospital has successfully negotiated significant increases in its two largest managed care contracts" contradicts statements made in the Complaint, though they do not specify what those statements may be. Motion at 5. However, even the implication that this contradicts the Complaint is refuted by paragraph 23 of the Complaint, which Defendants quote in their Motion. As quoted by the Defendants, paragraph 23 states in part:

For the contract beginning November 1, 2000, the Hospital proposed new rates to IBC that would have helped to stabilize the Hospital's fiscal condition. IBC refused the proposed increase and would only agree to a five year contract providing for an increase in inpatient and outpatient rates in the first year of only about one third of what the

(continued...)

Defendants' mischaracterization of the Bond Document's statements with respect to various pressures on reimbursement rates is, if anything, even more blatant. The Motion states that the Bond Document "told investors" that the downward pressure on reimbursement rates was "largely statutory." Motion at 5. However, the paragraph from the Bond Document cited as support for this statement, which Defendants quote in their Motion, makes plain that statutory pressure impacted only the rate the United States government paid for Medicare reimbursements, and that the downward pressure exerted by managed care organizations was due to entirely different causes:

> Pressure on third-party rates of reimbursement, particularly for inpatient services, has constrained revenue growth from higher patient volumes. These pressures emanate from the Balanced Budget Act of 1997 ("BBA") and its impact on Medicare reimbursement and from efforts by managed care organizations, who principally reimburse the Hospital for inpatient services to subscribers on a per diem basis, to limit admissions and reduce the length of stay through concurrent utilization review and other measures.

Motion at 5; Bond Document at 20. It could not be more plain from this passage that the Bond Document cites two separate causes for "pressure on third-party rates of reimbursement": one statutory, which applies to the government's Medicare reimbursements alone, and one resulting from business decisions made by managed care organizations such as Defendants. Defendants have persisted with their obvious misreading of the Bond Document even after counsel for the

---

[3](...continued)
Hospital requested. . . . Facing the alternative of immediate financial disaster if the Hospital refused to contract with the [Defendants], the Hospital had no choice but to accept the terms imposed by IBC.
Motion at 4. As this makes clear, the Hospital does not dispute that there was an increase in the reimbursement rate under the contract signed with IBC in the fall of 2000. But, as paragraph 23 also makes clear, the increase was only about a third of what the Hospital required. There is no contradiction between the statement in the Bond Document that there was an increase in the reimbursement rate in the November 2000 IBC contract and the assertion in the Complaint that that reimbursement rate was nonetheless inadequate.

Hospital brought it to their attention.  See Letter of Lewis R. Olshin to Thomas A. Leonard dated

June 26, 2002, attached to the Olshin Affidavit as Exhibit E, at 4.

**B.  Defendants Have Omitted Significant
Information Contained In The Bond Document**

Beyond misinterpreting the sections of the Bond Document they cite in their Motion,

Defendants further distort that document by omitting many passages which, when taken together,

give a more complete picture of the nature of the information provided in the Bond Document.

For instance, Defendants claim that in the Bond Document the Hospital "described itself as a

successful, thriving, solvent institution."  Motion at 5.  No citation to the Bond Document is

given to support this assertion.  However, contrary to the Defendants' assertion, the Bond

Document clearly states that "there is no assurance that the revenues of the Hospital can be

increased sufficiently to match increased costs that may be incurred.  In recent years, the Hospital

has recorded deficiencies of revenues over expenses and decreases in unrestricted net assets."

Bond Document at 29 (emphasis added).  Likewise, with respect to the issue of whether the

pricing granted by IBC covered the Hospital's costs, the Motion totally omits the critical

concluding statement at the end of the section Defendants cite.  The Bond Document specifically

warned that "no assurance can be given as to whether revenues received by the Hospital under

existing or future contractual arrangements will be sufficient to cover its patient costs."  Bond

Document at 27 (emphasis added).

Furthermore, with respect to Defendants' assertion that the Bond Document states that

the Hospital was under "less pressure than before" to agree to contracts with lower

reimbursement rates, Defendants omit the following statements:

-11-

The health care industry has been in the process of rapid and fundamental change, triggered in part by the growing national strength of managed care plans. . . . In Pennsylvania, consolidation among provider organizations and the development of integrated delivery systems has been observed in response to pressures to achieve additional cost savings.  This may further increase competitive pressure on acute care hospitals, including the Hospital.  (Bond Document at 29-30)

Enrollment in managed care programs has increased, and managed care programs are expected to have a greater influence on the manner in which health care services are delivered and paid for in the future.  Managed care programs are expected to continue efforts to reduce significantly the utilization of health care services, and in-patient service in particular.  In addition, some managed care organizations have been delaying reimbursements to hospitals, thereby affecting the Hospital's cash flows.  <u>The Hospital's financial condition may be adversely affected by these trends</u>.  (Bond Document at 30) (emphasis added)

In short, the selective references to the Bond Document contained in Defendants' Motion seriously distort the description of the Hospital and its financial condition set forth in the Bond Document.  A full assessment of the Bond Document makes plain that it does not contradict the allegations of the Complaint.

### C. Defendants Have Produced No Evidence On The Only Issue Presented By Their Rule 11 Motion, Namely Whether There Is Evidentiary Support For The Allegations In The Complaint

As made plain by the text of Rule 11 itself, in signing a pleading, "[t]he certification is that there is (or likely will be) "evidentiary support" for the allegation, not that the party will prevail with respect to its contention regarding the fact."  Fed. R. Civ. P. 11 advisory committee's note; <u>see</u> <u>also</u> Rule 11(b)(3).  The only issue relevant to a motion for sanctions pursuant to Rule 11 is whether the allegations in the complaint can be supported by evidence.

Despite this basic point, in their Motion Defendants make no suggestion - nor could they - that any allegations in the Complaint lack evidentiary support. This is fatal to their Rule 11 Motion.[4]

Defendants are fully aware that there is significant evidentiary support behind the Hospital's allegations that IBC refused to agree to rates which would cover the Hospital's costs, and that IBC forced the Hospital to accept contracts which IBC knew would not cover the Hospital's costs for providing service to IBC's subscribers. Defendants were aware of much of this evidence well before they contemplated their current Motion, as it is contained in correspondence between the Hospital and IBC. Moreover, portions of the evidence sufficient to show that a Rule 11 motion was meritless were reiterated in the Olshin letter of June 26, in an attempt to illustrate to Defendants the baselessness of their proposed Motion. See Exhibit E at 4-5. The Olshin letter also specifically offered "to share this exchange of letters between our clients . . . at this time, rather than await a formal discovery request, so we can put this matter behind us and move forward with the litigation." Id. at 5. Despite this offer, Defendants chose to proceed with their present Motion.

Since Defendants have filed their Motion well before the beginning, let alone the close, of discovery, the Hospital at this stage merely highlights some of the evidence of which Defendants are undisputedly aware that supports the allegations of the Complaint. Discovery will develop further evidence for these allegations. However, the information set out below is more than sufficient to defeat a Rule 11 motion.

---

[4]In a properly conducted litigation, Defendants' argument that there is evidence tending to contradict factual assertions in the Complaint is an argument to be presented, if at all, on a motion for summary judgment after full discovery has been taken.

The inadequacy of the reimbursement rates provided by IBC existed prior to the current contract, and further explains the financial effect of IBC's market dominance. On March 25, 1999, the Hospital wrote IBC, plainly stating that IBC's reimbursement was not sufficient to cover the Hospital's costs:

> Over the course of the last three years, the average cost per day of treating IBC subscribers has increased at a consistently higher rate than our annual adjustment despite the fact that our FTE's per occupied bed have declined. . . . As a result, existing IBC reimbursement is significantly below our costs for providing care.

See Letter from Kenneth E. Flickinger to Robert A. McKeown, dated March 25, 1999, attached to the Olshin Affidavit as Exhibit F.

Likewise, on June 24, 1999, H.L. Perry Pepper, president of the Hospital, wrote John Zamzow of IBC advising that the Hospital was being reimbursed by IBC "at a rate that approximates only 70% of our cost." In that Letter, the Hospital requested a 20% increase in rates just to cover its costs, but IBC refused to grant the necessary increase. In order to continue to provide service to a very substantial number of IBC subscribers in the community, the Hospital was forced to accept IBC's proposal of 8%, which was some 60% less than the Hospital indicated was necessary to cover its costs. See Letter from H.L. Perry Pepper to John C. Zamzow, dated June 24, 1999, attached to the Olshin Affidavit as Exhibit G.

On August 16, 1999, Perry Pepper again wrote John Zamzow advising IBC that the Hospital was being forced into accepting the take-it-or-leave-it offer:

> Given the global statements you made in your last letter, it seems quite clear that Blue Cross has taken a regional approach to the market and is unwilling to move further in the direction of meeting the specific needs of our Hospital than when we met with Mr. DiBona. While our Board feels this is short sighted as it overlooks the strategic importance of this marketplace for you, it leaves us with no choice but to take or leave your last offer.

-14-

> Unfortunately, this offer places our Hospital in the position of losing several
> hundred dollars on every Blue Cross patient or no longer being a Blue Cross
> participating provider.  Because of Blue Cross' dominance in the market, the latter
> option would quickly result in the closure of this low cost charitable Hospital, while
> the former option only guarantees a slightly slower demise as we discontinue
> services and erode community assets.  Frankly, if we took our mission to our
> community less seriously, this would be a letter of termination, for what you have
> proposed is surely a very bad business proposition for the people of our county.

<u>See</u> Exhibit B.

Furthermore, on July 27, 2000, the Hospital sent a letter to IBC reiterating that "the rates provided for in the 1999 contract present serious problems for the hospital, and they are not sufficient even to cover the costs we incur in providing treatment to subscribers of IBC and its affiliated companies."  As a result, the Hospital requested a 17% rate increase in the first year "to close a gap that continues to exist between our costs for care and current rates." <u>See</u> Letter from R. Evan Fox to Robert A. McKeown, dated July 27, 2000, attached to the Olshin Affidavit as Exhibit H.  On August 17, 2000, IBC responded to the Hospital's letter by indicating that the Hospital's request for a 17% increase was "unreasonable."  <u>See</u> Letter from Robert A. McKeown to Kenneth E. Flickinger, dated August 17, 2000, attached to the Olshin Affidavit as Exhibit I.  On September 5, 2000, the Hospital provided IBC with detailed information supporting its position that the requested rate increase was necessary to address the shortfall the Hospital was experiencing in treating IBC's subscribers.  On September 25, 2000, IBC sent a letter to the Hospital in which it acknowledged the Hospital's revenue shortfall.  However, IBC stated that it could not "eliminate your revenue shortfall immediately" and offered an increase that was about 33% of what the Hospital had indicated was necessary.  <u>See</u> Letter of Robert A. McKeown to H.L. Perry Pepper, dated September 25, 2000, attached to the Olshin Affidavit as Exhibit J.  Given IBC's market dominance, the Hospital had no choice but to accept the below-cost rates dictated by IBC.

Due to the preliminary stage of this litigation and the fact that discovery has not even begun, the foregoing is just a portion of the evidence that the Hospital anticipates will be developed to support the allegations which are the subject of this Motion. However, even this brief survey is more than sufficient to defeat Defendants' Rule 11 Motion, as it details evidence of which both parties are plainly aware that supports the Hospital's allegations. Defendants' Motion must therefore be denied.

### D.    The Hospital Should Be Awarded Its Reasonable Attorney's Fees And Expenses Incurred In Opposing Defendants' Motion

Rule 11(c)(1)(A) provides that "[i]f warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion." Because, as demonstrated above, Defendants' Rule 11 Motion is baseless, because Defendants knew before they filed their Motion that it was baseless, because Defendants have improperly filed their Rule 11 Motion as a substitute for a motion under Rule 12(b)(6) or Rule 56, and because Defendants have made no showing on the one question put in issue by their Motion - whether there is evidence to support the Hospital's allegations regarding IBC's refusal to provide rates sufficient to cover the Hospital's costs - this Court should grant to the Hospital its reasonable attorney's fees and expenses pursuant to Rule 11(c)(1)(A).

Defendants' Motion is precisely the sort of misuse of Rule 11 that the Advisory Committee warned against:

> Rule 11 motions should not be . . . employed as a discovery device or to test the legal sufficiency of allegations in the pleadings. . . . Nor should Rule 11 motions be prepared to emphasize the merits of a party's position, to exact an unjust settlement, [or] to intimidate an adversary into withdrawing contentions that are fairly debatable . . . .

Fed. R. Civ. P. 11 advisory committee's note.

-16-

By proceeding in their procedurally inappropriate fashion, the Defendants have attempted to use Rule 11 to short-circuit the summary judgment process and prejudice the Court against the Hospital's claims before discovery is commenced, by presenting an inaccurate, incomplete and misleading description of one document (the Bond Document) out of hundreds, if not thousands, that may someday become evidence in this case.  The Motion violates the very rule that Defendants have accused the Hospital of violating, and therefore the Hospital should be awarded its costs and fees incurred in responding.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion For Sanctions Pursuant To Rule 11 should be denied, and reasonable costs and attorney's fees incurred in opposing the Motion should be awarded to the Hospital.

Respectfully Submitted,

DUANE MORRIS LLP

Dated: July 24, 2002                 By:_____
                                     Lewis R. Olshin, Esq.
                                     Wayne A. Mack, Esq.
                                     J. Manly Parks, Esq.
                                     One Liberty Place
                                     Philadelphia, PA  19103

                                     Richard A. Feinstein
                                     Daniel A. Kotchen
                                     Boies, Schiller & Flexner LLP
                                     5301 Wisconsin Avenue, N.W.
                                     Washington, D.C. 20015

                                     **Attorneys for Plaintiff The Chester County Hospital**

-17-

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CHESTER COUNTY HOSPITAL | : | CIVIL ACTION |
| | : | NO. 02-2746 |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS, | : | |
| QCC INSURANCE COMPANY, | : | |
| KEYSTONE HEALTH PLAN EAST, and | : | |
| KEYSTONE MERCY HEALTH PLAN | : | |

Commonwealth of Pennsylvania      )
                                  )
County of Philadelphia            )

LEWIS R. OLSHIN, being duly sworn, deposes and says:

1.  I am an attorney admitted to practice in the courts of the Commonwealth of Pennsylvania and am a partner with the firm of Duane Morris, LLP, counsel for plaintiff The Chester County Hospital (the "Hospital"). This affidavit is made in support of the Hospital's Opposition to Defendants' Motion For Sanctions Pursuant to Rule 11.

2.  Attached hereto as Exhibit A is a true and correct copy of a letter from John C. Zamzow to H.L. Perry Pepper, dated August 3, 1999.

3.  Attached hereto as Exhibit B is a true and correct copy of a letter from H.L. Perry Pepper to John C. Zamzow, dated August 16, 1999.

4.  Attached hereto as Exhibit C is a true and correct copy of Independence Blue Cross's Application For Group Insurance.

5.  Attached hereto as Exhibit D is a true and correct copy of an article from the Philadelphia Inquirer, dated June 18, 2002.

5.  Attached hereto as Exhibit E is a true and correct copy of a letter from Lewis R. Olshin to Thomas A. Leonard, dated June 26, 2002.

6.  Attached hereto as Exhibit F is a true and correct copy of a letter from Kenneth E. Flickinger to Robert A. McKeown, dated March 25, 1999.

7.  Attached hereto as Exhibit G is a true and correct copy of a letter from H.L. Perry Pepper to John C. Zamzow, dated June 24, 1999.

8.  Attached hereto as Exhibit H is a true and correct copy of a letter from R. Evan Fox to Robert A. McKeown, dated July 27, 2000.

9.  Attached hereto as Exhibit I is a true and correct copy of a letter from Robert A. McKeown to Kenneth E. Flickinger, dated August 17, 2000.

10. Attached hereto as Exhibit J is a true and correct copy of a letter from Robert A. McKeown to H.L. Perry Pepper, dated September 25, 2000.

_____
                    Lewis R. Olshin

Sworn to before me this
_____ day of July, 2002.

## <u>CERTIFICATE OF SERVICE</u>

_____I hereby certify that I caused to be served a true and correct copy of the attached

Plaintiff's Memorandum in Opposition to Defendants' Motion for Sanctions Pursuant to Rule 11

and the Affidavit of Lewis R. Olshin by over-night courier on the 24th day of July, 2002.

Thomas A. Leonard, Esq.
Obermayer Rebmann Maxwell & Hippel LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103

John DeQ. Briggs, Esq.
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004


DUANE MORRIS LLP


By: _____
Lewis R. Olshin
Attorney for Plaintiff The Chester
County Hospital

PH2\666368.1