IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHESTER COUNTY HOSPITAL<br><br>v.<br><br>INDEPENDENCE BLUE CROSS,<br>QCC INSURANCE COMPANY,<br>KEYSTONE HEALTH PLAN EAST, and<br>KEYSTONE MERCY HEALTH PLAN | NO. 02-CV-2746 |

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM

### Introduction

Defendants, Independence Blue Cross ("IBC"), QCC Insurance Company ("QCC"), Keystone Health Plan East ("Keystone") and Keystone Mercy Health Plan (the "KMHP"), (collectively, "Defendants") submit the following answer, affirmative defenses, and counterclaim in response to the amended complaint (the "Complaint") of Plaintiff Chester County Hospital ("CCH").

CCH has been so mismanaged that it must resort to this baseless, contradictory litigation to attempt to find its way out of debt. CCH has squandered its resources on a capital expansion plan that could not possibly succeed and has, in fact, failed miserably. When IBC refused to have its members foot the bill for CCH's bad business decisions—by refusing CCH's repeated demands for reimbursement above and beyond CCH's costs in providing the care—CCH sued.

CCH has charged that Defendants are using the "monopolistic power" they allegedly have over all hospitals in Southeastern Pennsylvania to force those institutions to provide care at prices that are below cost for even the most efficient and cost conscious of the hospitals. Thus,

435957

CCH in effect alleges that Defendants seek to drive every hospital in Southeastern Pennsylvania out of business. As Defendants rely on those hospitals for their existence, CCH has alleged that Defendants seek to drive themselves out of business. In addition, CCH has alleged that even though Defendants' reimbursement rates do not cover CCH's costs, were it not for Defendants' "monopolistic power," CCH would improve its failing financial performance by negotiating even lower reimbursement rates with Defendants' competitors.

Even more significant, CCH knows that it has premised its Complaint upon falsehoods: in marketing the bonds used to finance its capital expansion program, CCH lauded its contracts with Defendants, stating that they would make money for the Hospital.

Whether this baseless litigation is related to the imprudent business decisions of CCH, or is, in fact, part of a wider effort to attack Defendants, will be determined through discovery. For the present, as described below, it is painfully apparent that CCH has, in bringing this suit, acted in bad faith, betraying not only the law, but its own patients as well.

Finally, it is apparent that CCH's bad faith in negotiating and performing its various Agreements with Defendants has effectively terminated those Agreements.

## The Parties

1.      Admitted, except with regard to the allegation that CCH principally draws its patients from the borough of West Chester and Chester County, Pennsylvania, which allegation is denied.

2.      IBC is a Hospital Plan Corporation operating pursuant to the Hospital Plan Corporation Act, 40 Pa. C.S.A. §6101 et seq. with offices located at 1901 Market Street in Philadelphia, Pennsylvania. IBC provides health care financing services within the greater-Philadelphia metropolitan area. To the extent paragraph 2 of the Complaint conflicts with the

above, it is denied.  The remaining allegations in this paragraph are ambiguous and are, therefore, denied.

3.    QCC is a Pennsylvania stock life insurance company and wholly owned subsidiary of Amerihealth, Inc. that underwrites certain products including, *inter alia*, Personal Choice, to compliment existing health insurance products offered by IBC.  QCC Insurance Company maintains offices at 1901 Market Street, Philadelphia, Pennsylvania 19103.  To the extent paragraph 3 of Plaintiff's Complaint conflicts with the above, it is denied.

4.    Keystone is a corporation and a wholly owned subsidiary of Amerihealth HMO, Inc., organized and existing pursuant to the Health Maintenance Organization Act, 40 P.S. 1551 et seq. with its principal place of business at 1901 Market Street, Philadelphia, Pennsylvania 19103.  Keystone is licensed as a Health Maintenance Organization ("HMO") in Pennsylvania and is federally qualified to provide HMO services to, *inter alia*, Medicare beneficiaries under the Medicare + Choice program.  To the extent paragraph 4 of the Complaint conflicts with the above, it is denied.

5.    KMHP is a partnership between Keystone Benefits, Inc., a wholly owned subsidiary of Keystone, and Mercy Health Plan, each owning 50% of KMHP.  Mercy Health Plan is a Pennsylvania nonprofit corporation wholly owned by the Mercy Health System. Through an integrated delivery system agreement, Keystone delegates to KMHP management responsibilities under Keystone's Southeast HealthChoices mandatory agreement with the Pennsylvania Department of Public Welfare.  KMHP is not a licensed managed care organization in Pennsylvania.  To the extent paragraph 4 of the Complaint conflicts with the above, it is denied.

**Jurisdiction and Venue**

6.     The allegations contained in this paragraph of the Complaint are conclusions of law to which no responsive pleading is required.

7.     The allegations contained in this paragraph of the Complaint are conclusions of law to which no responsive pleading is required.

8.     The allegations contained in this Paragraph 8 of the Complaint are conclusions of law to which no responsive pleading is required.

**Factual Background**

9.     Denied.  Any financial difficulties suffered by CCH are the result of imprudent business decisions and mismanagement.  Further, CCH's primary service area is much broader than Chester County, Pennsylvania.

10.     Denied, except that Defendants admit that they provide health insurance coverage for approximately three million members.

11.     Denied as stated.  It is admitted that Defendants provide health care coverage and third party administrator services to individuals, government entities, Medicare and Medicaid beneficiaries, multiple employer trusts, self-funded employers and other group purchasers of health care.

12.     Denied, except that Defendants admit that they contract with numerous hospitals, including CCH, on agreed-upon reimbursement terms that apply to services rendered by those hospitals to members in Defendants' products.

13.     Denied as stated.  Defendants provide health care financing that pays, depending on the design of the health benefit package,  for medical services that are provided to

Defendants' members.   To the extent that the remaining allegations in this paragraph of the Complaint conflict with the above, these allegations are denied.

14.    Denied.

15.    Denied as stated.  Like any HMO product, the HMO products offered by Defendants limit non-emergency coverage to participating providers, with some provisions for exceptions.  Defendants create incentives for members to use participating providers.  CCH's alleged inability to attract or retain patients or doctors has nothing to do with Defendants' state-approved and federally-qualified health benefit plans.   The remaining allegations set forth in this paragraph of the Complaint are denied.

16.    Denied, except that Defendants admit that CCH is responsible for prudently managing itself so that it can cover its necessary costs of providing care, and that the amounts CCH can charge certain classes of Medicare and Medicaid members is fixed by law.

17.    Denied.

18.    Denied.

19.    Denied, except that Defendants admit that vast distances do not usually separate provider networks and enrollees in managed care health plans.

20.    Denied, except that Defendants admit that, although some managed care competitors have left the area, others have entered and/or re-entered it.  Defendants have not prevented and cannot prevent any managed care competitor from entering or re-entering the market.  It is admitted that Personal Choice enrollment has increased over the past five years and presently has over 1.1 million members; however, it is denied that all of these members are located solely within Southeastern Pennsylvania.  IBC's Annual Statement is a writing that speaks for itself and any characterization of it is denied.  IBC's surplus is a product both of

governmental regulation and requirements of the national Blue Cross Blue Shield Association.

Any allegation that Defendants share monopoly or monopsony power is denied. It is admitted

that Defendants have some ventures outside of the Commonwealth of Pennsylvania. Any other

allegations contained in this paragraph are denied.

21.    Denied.

22.    Denied, except that it is admitted only that IBC negotiated a five (5) year hospital

agreement with CCH which became effective on December 1, 2000 and that QCC, KHPE and

Amerihealth HMO, Inc. negotiated a five (5) year managed care agreement with CCH which

became effective November 1, 2000.

23.    Denied, except that it is admitted that the agreements with CCH entered into in

November and December of 2000 had one set of rates that applied to all of the managed care

products and a separate set of rates applicable to the traditional indemnity products.

24.    Denied. By way of further answer, this paragraph of the Complaint, purports to

characterize a writing that speaks for itself.

25.    Denied. By way of further answer, this paragraph of the Complaint, purports to

characterize a writing that speaks for itself.

26-28. Denied as stated. Defendants incorporate their response from paragraphs 20, 22

and 23, above and 39 below to the extent that those responses are applicable to the allegations of

these paragraphs. By way of further response, Defendants have not "forced" any contracts on

CCH, have not "oppressed" CCH, and have not engaged in improper or illegal anti-competitive

practices. On the contrary, as set forth above and below, CCH has negotiated its contracts with

Defendants at arms length, albeit in bad faith.

## Relevant Markets

29.    Denied.  To the contrary, the relevant geographic market extends into New Jersey and Delaware.

30.    Denied.

31.    Denied, except that Defendants admit that, although some managed care competitors have left the area, others have entered and/or re-entered it.  Defendants have not prevented and cannot prevent any managed care competitor from entering or re-entering the market.

## Interstate Commerce

32.    The allegations contained in paragraph 32 of the Complaint are conclusions of law to which no responsive pleading is required.

33.    Denied.

34.    Denied.

35.    Denied.  This paragraph of the Complaint is, in effect, an attempt to explain away a fundamentally fatal flaw in CCH's allegations regarding MFN clauses (which have not been in use since 1997).  CCH is alleging both that Defendants are putting it out of business by not paying enough for its product and that Defendants are putting it out of business by preventing others from paying even less.   To state this allegation is to refute it.

36.    Denied.

37.    Denied.

### Allegations of All Products and Bundled Rate Requirements

38.     Denied, except that it is admitted that the agreements with CCH entered into in the fall of 2000 had one set of rates that applied to all of the managed care products and a separate set of rates applicable to the traditional indemnity products.

39.     Denied. CCH's economic theories are denied because they are neither valid nor fully comprehensible. Defendants expressly deny that CCH was forced to participate in any of Defendants programs. On the contrary, CCH has negotiated its contracts with Defendants at arms length, albeit in bad faith. All allegations of anti-competitive activities are denied.

40.     Denied.

### Allegation of Coerced Minimum Participation Rates.

41.     Denied. Defendants do not have sufficient knowledge or information to determine the accuracy of CCH's allegations concerning the beliefs and desires of group purchasers of health care benefits and, therefore denies the allegations concerning those beliefs and desires. All allegations of anti-competitive activities are denied. All allegations of coercion or intimidation are denied. Any allegation that any employer or group purchaser had no option but to deal with Defendants is denied.

42.     Denied. CCH's alleged economic theories are invalid and not fully comprehensible. All allegations of anti-competitive activities are denied. All allegations of coercion or intimidation are denied. Any allegation that any employer or group purchaser had no option but to deal with Defendants is denied.

**Allegations of Predatory Hospital Reimbursement**

43.    Denied.  Although Defendants believed they had negotiated arms-length contracts

with CCH, as set out below, CCH negotiated its agreements with Defendants in bad faith.

44.    Denied.  By way of further answer, this paragraph of the Complaint further

illustrates the illogical nature upon which the Complaint is based.  CCH actually pleads that,

*because* Defendants pay too little for CCH's services, CCH cannot charge IBC's competitors

even less.  Defendants submit that the mere stating of CCH's argument is sufficient to

demonstrate that it is made in bad faith.

45.    Denied.

a.    Denied as stated.  It is admitted only that KMHP is a partnership between

Keystone Benefits, Inc., a wholly owned subsidiary of Keystone, and Mercy Health Plan, each

owning 50% of KMHP.  Mercy Health Plan is a Pennsylvania nonprofit corporation wholly

owned by the Mercy Health System.  Through an integrated delivery system agreement,

Keystone delegates to KMHP management responsibilities under Keystone's Southeast

HealthChoices mandatory agreement with the Pennsylvania Department of Public Welfare.

KMHP is not a licensed managed care organization in Pennsylvania. The remainder of the

allegations of this paragraph are denied.

b.    Denied, except that IBC and Pennsylvania Blue Shield are the sole voting

members of Inter-County Health Plan, Inc. ("IC Health Plan"), a Medical Services Plan

established by statute and a Pennsylvania non-profit corporation.

c.    Denied, except that it is admitted that IBC acquired total control of KHPE

and the Personal Choice PPO program in 1997.  The remaining allegations of this paragraph are

denied.

d.      Denied as stated.  It is admitted that IBC acquired Vista Health Plan, a health maintenance organization in September 1990.  The allegations characterizing Vista Health Plan as a competitor are conclusions of law to which no further response is required.

46.      Denied except that it is admitted only that IBC and Highmark jointly market, offer and underwrite traditional major medical insurance and a comprehensive major medical insurance plan in the five county Philadelphia area.   By way of further response, Highmark is not authorized to market or offer hospitalization benefits under Highmark's branded Blue Cross license in the five county Philadelphia area.

47.      The allegations of paragraph 47 of the Complaint are conclusions of law to which no responsive pleading is required.

48.      Denied as stated.  It is admitted only that IBC controls subsidiaries using the brand "AmeriHealth," and that the Blue Cross Blue Shield Association ("BCBSA") regulates the use of the Blue Cross Blue Shield trademarks.

49.      Denied as stated.  It is admitted only that Defendants do not offer Blue branded health insurance products to groups domiciled outside the five county Philadelphia area.

50.      Denied.  Defendants do not have sufficient knowledge or information to determine the accuracy of this allegation.

51. .     Denied

52.      Admitted.

53.      Denied.  It is admitted only that IBC and Highmark jointly market, offer and underwrite traditional major medical insurance and a comprehensive major medical insurance plan in the five county Philadelphia area. By way of further answer, this paragraph of the Complaint purports to characterize a writing that speaks for itself.  Defendants incorporate their

response to paragraphs 51 and 52 above. All allegations of anti-competitive activities are denied. With respect to the allegations concerning IC Health Plan and Inter-County Hospitalization Plan, Inc. ("IC Hospital Plan"), these allegations are denied as stated. IC Health Plan is a Medical Services Plan established by statute and, therefore, not "jointly owned" by IBC and Highmark. IC Hospital Plan is a Hospital Plan Corporation established by statute and, therefore, not "jointly owned" by IBC and Highmark. It is admitted only that IC Health Plan and IC Hospital Plan are jointly controlled by IBC and Highmark. IBC/PBS Caring Foundation for Children d/b/a Independence Blue Cross and Pennsylvania Blue Shield Caring Foundation for Children (the "Caring Foundation") is a Pennsylvania not-for-profit, 501(c)(3), corporation that develops and supports programs designed to improve quality and availability of health care for economically disadvantaged children. The Caring Foundation is jointly controlled by IBC and Highmark. It is denied that these relationships unlawfully eliminate or discourage competition.

54. Denied as stated. Because plaintiff has not defined specifically "Agency Agreements and a Participation Plan," answering Defendants are without sufficient knowledge or information to admit or deny these allegations.

55. Denied.

### Allegations of an Effect on Competition

56. Denied.

57. Denied.

### Alleged Injury to Hospital

58. Denied. To the contrary, on information and belief, any financial losses suffered by CCH are the result of incompetent management.

**Allegations of Abusive Reimbursement Practices**

**The Discharge Program**

59.      Denied, except that it is admitted only that the parties specifically negotiated the inclusion of KMHP in the managed care rates in the 2000 Managed Care Agreement, which benefited CCH.

60.      Denied.

61.      Denied.  By way of further answer, this paragraph of the Complaint, purports to characterize a writing that speaks for itself.

62.      Denied. By way of further answer, this paragraph of the Complaint, purports to characterize a writing that speaks for itself.

63.      Denied.

**Reimbursement for Emergency Room Care**

64.      Denied.  By way of further answer, this paragraph of the Complaint, purports to characterize a writing that speaks for itself.

65.      Denied as stated.   It is admitted that Defendants utilize an electronic claims submission and payment system which links the initial reimbursement amounts for emergency services to the diagnosis provided by the health care provider.  It is denied that CCH, or any other provider, is prohibited from submitting any and all documentation necessary to substantiate the claim for reimbursement.  On the contrary, the electronic claim form specifically requests that providers provide "admitting diagnosis/patient's reason for visit."  Moreover, even after a health care provider is initially reimbursed the "triage" rate, Defendants afford the health care provider the opportunity to submit additional documentation concerning the emergency room encounter if the health care provider believes the reimbursement should have been provided for a

higher level of care.  To the extent that the remaining allegations of this paragraph conflict with the above, they are denied.

66.    Denied.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of this paragraph and, therefore, same are denied.

67.    Denied.

68.    Denied.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of this paragraph and, therefore, same are denied.  By way of further response, but not in derogation of the foregoing, Defendants incorporate their response to paragraph 65 as though same were set forth herein at length.  To the extent that CCH did not comply with the requests for additional documentation substantiating the higher level of reimbursement, CCH, as opposed to Defendants, is solely responsible for any alleged shortfall in emergency room reimbursements.

## Violations Charged

### First Claim for Relief—Monopolization v. IBC Group

69.    Defendants hereby incorporate their responses to paragraphs 1 through 68 of the Complaint.

70.    The allegations in this paragraph of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

### Second Claim for Relief—Attempted Monopolization v. IBC Group

71.    Defendants hereby incorporate their responses to paragraphs 1 through 70 of the Complaint.

72-73.  The allegations in these paragraphs of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

### Third Claim for Relief—Agreement in Restraint of Trade v. IBC Group

74.    Defendants hereby incorporate their responses to paragraphs 1 through 73 of the Complaint.

75.    The allegations in this paragraph of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

### Fourth Claim for Relief—Common Law Restraint of Trade v. IBC Group

76.    Defendants hereby incorporate their responses to paragraphs 1 through 75 of the Complaint.

77.    The allegations in this paragraph of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

### Fifth Claim for Relief – Breach of Contract v. IBC Group and Keystone Mercy

78.    Defendants hereby incorporate their responses to paragraphs 1 through 77 of the Complaint.

79-81.  The allegations in these paragraphs of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

### Sixth Claim for Relief – Breach of Contract v. IBC and Keystone Mercy

82.    Defendants hereby incorporate their responses to paragraphs 1 through 81 of the Complaint.

83-84.  The allegations in these paragraphs of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

**Seventh Claim for Relief –**
**Breach of the Covenant of Good Faith and Fair Dealing v. IBC Group**

85.      Defendants hereby incorporate their responses to paragraphs 1 through 84 of the Complaint.

86-88.  The allegations in these paragraphs of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

**Eighth Claim for Relief – Unjust Enrichment v. IBC Group**

89.      Defendants hereby incorporate their responses to paragraphs 1 through 88 of the Complaint.

90.      The allegations in this paragraph of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

**Ninth Claim for Relief—Reformation of Unconscionable Contract v. IBC Group**

91.      Defendants hereby incorporate their responses to paragraphs 1 through 90 of the Complaint.

92.      The allegations in this paragraph of the Complaint are legal conclusions to which no response is required.  Defendants deny CCH's factual allegations respecting its Agreements with IBC.  Thus, Defendants vigorously deny that those Agreements are "one-sided," "oppressive," "unconscionable," "contrary to the public interest," or in any way improper. Defendants believe, however, that CCH's bad faith and dishonesty in the way it induced, negotiated, and performed the Agreements has effectively terminated the Agreements.

435957

### Tenth Claim for Relief—Anticompetitive Acquisitions and Combinations v. IBC Group

93.    Defendants hereby incorporate their responses to paragraphs 1 through 92 of the Complaint.

94.    The allegations in this paragraph of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

**WHEREFORE**, Defendants, Independence Blue Cross, QCC Insurance Company, Keystone Health Plan East, and Keystone Mercy Health Plan hereby respectfully request that this Court enter judgment in their favor and against Plaintiff, The Chester County Hospital, with regard to all claims in the present action.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.    The Complaint fails to state a claim for which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

2.    CCH lacks standing to pursue claims under either the Clayton Act or the Sherman Antitrust Act because it has suffered no antitrust harm, it is too remote from any such harm, or it is not the best plaintiff to pursue relief for such harm.

### THIRD AFFIRMATIVE DEFENSE

3.     CCH may not pursue its antitrust claims against Defendants because of the

McCarran-Ferguson exemption for insurance.

### FOURTH AFFIRMATIVE DEFENSE

4.     CCH is estopped from proceeding with this Complaint as a result of CCH's bad

faith in instituting the suit, knowing that the allegations of coercion and intimidation are untrue

and having negotiated with Defendants and entered into the contract underlying this action with

Defendants in bad faith.

### FIFTH AFFIRMATIVE DEFENSE

5.     CCH is prohibited from seeking any equitable remedies, including all of the

injunctive requests contained in the Complaint, because of "unclean hands."

### SIXTH AFFIRMATIVE DEFENSE

6.     All or some of CCH's claims are barred by the applicable statutes of limitation.

### SEVENTH AFFIRMATIVE DEFENSE

7.     All or some of CCH's claims are barred by the doctrine of laches.

### COUNTERCLAIMS

### JURY TRIAL DEMANDED

1.     CCH has, by invoking terms like "monopoly" and "monopsony," sought to

transform its own managerial incompetence and bad faith into claims for monetary relief.  Yet,

neither the Sherman Antitrust Act nor any other law compels Defendants to fund excessive

hospital costs caused by management incompetence.  As set out below, CCH brought this lawsuit

only when its bad faith efforts to negotiate confiscatory contracts with Defendants failed.

Defendants submit that CCH's actions warrant the imposition of damages and termination of

their contract with Defendants.

### Jurisdiction and Venue

2.      This Court has jurisdiction over Defendants' Counterclaims, pursuant to

Fed.R.Civ.P. 13 (a) and (b) and 28 U.S.C. § 1367 (a).

3.      Venue is proper in the Eastern District of Pennsylvania because these   are

counterclaims, filed pursuant to Fed.R.Civ.P. 13, to a cause of action where venue is proper in

this district under 28 U.S.C. § 1931(b).  Moreover, the Counterclaims arose in substantial part

through events in this district.

### The Parties

4.      IBC is a Hospital Plan Corporation operating pursuant to the Hospital Plan

Corporation Act, 40 Pa. C.S.A. §6101 et seq. with offices located at 1901 Market Street in

Philadelphia, Pennsylvania.  IBC provides health care financing services within the greater-

Philadelphia metropolitan area.

5.      QCC is a Pennsylvania stock life insurance company and wholly owned

subsidiary of Amerihealth, Inc. that underwrites certain products including, *inter alia*, Personal

Choice, to compliment existing health insurance products offered by IBC.  QCC Insurance

Company maintains offices at 1901 Market Street, Philadelphia, Pennsylvania 19103.

6.      Keystone is a corporation and a wholly owned subsidiary of Amerihealth HMO,

Inc., organized and existing pursuant to the Health Maintenance Organization Act, 40 P.S. 1551

et seq. with its principal place of business at 1901 Market Street, Philadelphia, Pennsylvania 19103. Keystone is licensed as a Health Maintenance Organization ("HMO") in Pennsylvania and is federally qualified to provide HMO services to, *inter alia*, Medicare beneficiaries under the Medicare + Choice program.

7.    KMHP is a partnership between Keystone Benefits, Inc., a wholly owned subsidiary of Keystone, and Mercy Health Plan, each owning 50% of KMHP. Mercy Health Plan is a Pennsylvania nonprofit corporation wholly owned by the Mercy Health System. Through an integrated delivery system agreement, Keystone delegates to KMHP management responsibilities under Keystone's Southeast HealthChoices mandatory agreement with the Pennsylvania Department of Public Welfare. KMHP is not a licensed managed care organization in Pennsylvania.

8.    CCH is a Pennsylvania Nonprofit Corporation that operates a hospital with a principal place of business located at 701 East Marshall Street, West Chester, PA 19380.

## Background

9.    Defendants negotiate contracts with providers of medical services that, in part, set forth the prices that those providers will charge Defendants, for medical services covered under the members' health benefit plans. These contracts are hereinafter referred to as "provider agreements."

10.    On information and belief, sometime in the late 1990's, CCH embarked on an ill-conceived and imprudent plan of capital expansion that is responsible for the poor financial condition in which CCH presently finds itself.

11.    On information and belief, at least four specific capital projects illustrate this mismanagement:

12.    First, CCH recently spent six million dollars to open a new, 26,000 square foot Maternal/Infant Health Unit with 40 beds, 12 private rooms with sleep-chairs for fathers-to-be, new labor/delivery/recovery rooms, new postpartum rooms, and a new cesarean section unit.

13.    On information and belief CCH has had difficulties with regard to its obstetrics utilization trends since undertaking the enormously expensive, above-described, expansion.

14.    Second, CCH spent nearly 15 million dollars building a new interventional cardiac services program, including, *inter alia*, two new operating rooms, a six bed post-operative cardiovascular unit and two new cardiac catherization units.

15.    On information and belief, at the time the center was built, the region was already saturated with cardiac care units, such that the above heart center was destined to be grossly underutilized.

16.    Third, CCH recently spent nearly 5 million dollars for a new oncology facility with a new linear accelerator, additional examination rooms, a waiting area and patient changing rooms for the enhanced comfort and convenience of patients and their families.

17.    On information and belief, at the time the above oncology facility was built, the region was already saturated with oncology facilities, such that the above facility was destined to be grossly underutilized.

18.    Fourth, CCH recently spent over four million dollars re-designing its Emergency Department.

19.    On information and belief, the mismanagement of CCH has resulted in a down grading of its debt by Moody's.

20.      Instead of acknowledging its errors and attempting to find an honest way out of its self-inflicted financial predicament, CCH has undertaken the present extortive campaign of sham litigation and public defamation against Defendants.

## COUNT I

### BREACH OF DUTY TO NEGOTIATE IN GOOD FAITH

21.      IBC hereby incorporates paragraphs 1 through 20 above as though fully set forth herein.

22.      In early 1999, Defendants sought to negotiate new long-term provider agreements with CCH .

23.      CCH represented to Defendants that it would negotiate in good faith to reach long-term agreements that it intended to abide by, allowing both parties to enjoy the stability provided by long-term agreements.

24.      In reasonable reliance on CCH's representations Defendants invested substantial resources, including high-level management resources, in the process of negotiating new agreements with CCH.

25.      Ultimately, however, Defendants offered a one-year contract that would provide CCH with a substantial increase over the prior rates.

26.      Despite Defendants' reluctance to enter into one year agreements because they allow for back-to-back price negotiations that can quickly spiral out of control, Defendants, nevertheless, agreed to such an arrangement on a one-time basis in exchange for CCH's expressed willingness to continue to negotiate in good faith toward the execution of long-term agreements.

27.    At that time, the increase given to CCH over one year was the largest IBC had ever given to any hospital provider.

28.    Based on CCH's continued representations to Defendants that it would negotiate in good faith to reach long-term agreements that it intended to abide by, Defendants, in reasonable reliance on those representations, continued to invest substantial resources, including high-level management resources, in the process of negotiating new agreements with CCH.

29.    During the summer and early fall of 2000, after arms length negotiations, the parties entered into a five-year agreement that provided for an immediate additional substantial increase in 2000 with subsequent smaller increases such that the total cumulative compounded increase from 1999 to the end on the contract period was dramatic.

30.    The above rate increases were agreed to by Defendants in consideration for CCH remaining in Defendants' provider network and meeting all of the other requirements of a provider under the provider agreements, including those requirements that can be implied by necessity.

31.    CCH believed it got a very good deal when it "successfully negotiated" its 2000-2005 provider agreement.

32.    To that effect, CCH stated:

> Over the past two years, the Hospital has successfully negotiated increases in its two largest managed care contracts .. . . In October 2000, the Hospital entered into a new five year contract with Blue Cross.. . . Based upon the contracts negotiated to date, management expects that managed care reimbursement will be at or above current costs of care."

435957                                              22

33.    Indeed, in January of 2001, CCH told its potential investors that it was able it to take on an additional 23 million dollars in debt largely because of the favorable contracts it had negotiated.

34.    To that effect, CCH stated:

> The slightly higher inpatient and significantly greater outpatient and ancillary volumes and **improved contractual rates of payment from third party payers** for approximately two-thirds of the year resulted in an **increase** of $5,032,000 (6.1%) in net patient services revenue from 1999-2000. ... Greater patient volumes and **increased rates of reimbursement from third party payers** resulted in **increases** of $1,461,000 (5.1%) in net patient service revenue for the four-month period ended October 31, 2000 over the comparable prior year period. ... Higher patient volumes and **improved contractual rates of payment from third party payers** resulted in an **increase** of $3,131,000 (4.0%) in net patient service revenue from 1998 to 1999.

35.    The above-described statements were set forth in audited financial documents and integrated disclosure statements—signed by H. L. Perry Pepper as President of CCH in January 2001 -- memorializing a $23 million dollar Hospital Revenue Bond, the proceeds of which were used to fund the above described capital expansions.

36.    Remarkably, in January of 2002, Defendants received a letter from CCH declaring that there were "new issues" threatening CCH's ability to service Defendants' members.  Apparently CCH was again unable to meet its costs and wanted additional concessions from Defendants to make up for this shortfall.

37.    In response to the above letter, Defendants and CCH met and discussed various financial issues raised by CCH.

38.    On March 8, 2002 Moody's Investors Service published a rating update that downgraded the debt of CCH.

39.    The report stated that CCH blamed Defendants for its financial woes, accusing Defendants of paying less than CCH's costs for the treatment of Defendants' members.

40.    In the meantime, discussions continued between Defendants and CCH, and a second meeting was scheduled between IBC and CCH.

41.    On information and belief, the real causes of CCH's financial complaints are not Defendants' rates, but CCH's mismanagement.

42.    Defendants made inquiries into the basis for CCH's claim for higher reimbursement rates.

43.    In the hope of obtaining a useful level of detail with regard to CCH's allegations, Defendants entered into a confidentiality agreement with CCH in consideration for receiving such detailed information immediately prior to a meeting scheduled for April 15, 2002.

44.    On information and belief, the confidentiality agreement was demanded by CCH in bad faith to attempt to prevent Defendants from using facts regarding CCH's self created financial difficulties and extortionate demands in response to the complaint CCH no doubt had already substantially drafted at the time it demanded the confidentiality agreement.

45.    Defendants reviewed the information provided and prepared for a meaningful meeting with CCH.  However, Defendants were given a list of demands from CCH accompanied by thinly-veiled threats of what would happen if Defendants did not simply accede to CCH's demands.

46.    Most remarkably, CCH demanded a huge capital investment not even remotely related to operational costs.

47.    When Defendants didn't immediately accede to the above demands, CCH filed their extortionate complaint on May 8, 2002.

48.    In retrospect, CCH's representations to Defendants contained suggestions and innuendos that were incorporated into CCH's antitrust complaint and were obviously created for that purpose.

49.    On information and belief, the negotiations between CCH and Defendants were not transacted in good faith by CCH, but were mere pretext on the part of CCH to set the stage for the false and extortive Complaint.

50.    In consideration for CCH's repeated promises to negotiate in good faith, Defendants expended considerable high level management resources and granted CCH terms and prices that it would never have otherwise offered with regard to the 1999 and 2000 provider agreements.

51.    Rather than receive the benefit of the CCH's promises to negotiate in good faith (i.e. for a contract that CCH intended to live with for the stated contract period such that Defendants would enjoy the benefits of the bargain with CCH) Defendants received extortive demands followed by an extortive, bad faith, lawsuit.

52.    CCH was deceptively setting the stage for CCH's present bad faith litigation. All of CCH's representations of good faith negotiating were known to be false when made.

53.    As a direct result of CCH's breach of the duty to negotiate in good faith, Defendants suffered damages, including but not limited to the value of management resources expended in the above negotiations, in excess of $75,000.00.

54.    As a direct result of CCH's breach of its duty to negotiate in good faith, Defendants suffered a variety of damages including the loss of the benefit of the 2000 provider agreements with CCH. More significantly, CCH's dishonest actions have made it impossible for Defendants to continue their business relationships with CCH. Defendants went to considerable

time and expense in negotiating their agreements with CCH. Within a matter of months of the execution of those contracts, however, CCH sought to amend key provisions of those agreements. When Defendants refused, CCH began this lawsuit. As a result, Defendants cannot enjoy the most basic benefit of their contracts with CCH—reliance on specific prices for specific services for a definite period.

    **WHEREFORE**, Defendants demand judgment in their favor and against CCH for compensatory damages resulting from CCH's breach of the duty to negotiate in good faith in an amount in excess of $75,000.00, exclusive of interest, attorney's fees, and costs.

### COUNT II

### BREACH OF CONTRACT

55.    Defendants hereby incorporate paragraphs 1 through 54 inclusive above as though fully set forth.

56.    The one year provider agreement entered into in 1999 and the five year provider agreement entered into in 2000, are each comprised of two principal contracts: a Managed Care Participating Hospital Agreement ("PHA") and an Independence Blue Cross Member Hospital Agreement ("MHA").

57.    Pursuant to the terms of the agreements in force starting in 1999, CCH was obligated to inform Defendants of "any material adverse change in the financial condition in the business or prospects of [CCH]" within 15 days of becoming aware of such an event or circumstance.

58.    Pursuant to the terms of the agreements in force starting in 2000, CCH was obligated to inform Defendants of "any adverse action, occurrence or situation which might

materially interfere with, modify or alter performance of any party's duties or obligations under [the agreement]," within 15 days of becoming aware of such adverse action occurrence or situation.

59.    CCH should have been aware of such adverse changes when it undertook its disastrous capital expansion campaign.

60.    CCH must have been fully aware of such adverse changes as soon as the bills for its disastrous capital expansion campaign came due.

61.    Despite the above, CCH never provided the required notice in the required time frame and then only made useless and vague claims of supposedly low costs being greater than the relatively high level of compensation it received from Defendants.

62.    On information and belief, CCH materially breached its duties as set forth in the above paragraphs of the provider agreements, at first to hide evidence of management's incompetence and then to bide time and maneuver Defendants in preparation for CCH's present bad faith litigation.

63.    CCH's breach of the attached provider agreements resulted in the above-described harm to Defendants.

**WHEREFORE**, Defendants demand judgment in their favor and against CCH for compensatory and damages resulting from CCH's material breach of the contract in an amount in excess of $75,000.00, exclusive of interest, attorney's fees, and costs and termination of the contract.

## COUNT III

### DECLARATORY JUDGMENT

64.    Defendants hereby incorporate paragraphs 1 through 69 inclusive above as though fully set forth.

65.    CCH has made multiple, distinct, positive, unequivocal statements of its inability to perform its obligations under the provider agreements it signed with Defendants in October 2000.

66.    There is an actual controversy between the parties regarding the contracts.

67.    Under these conditions, the contracts may be declared breached and terminated prior to CCH's actual non-performance of terms of the contracts.

68.    CCH has materially breached the provider agreements as set forth in paragraphs 55-63 above.

69.    Notice of said breach is provided through these counterclaims.

70.    The breach is of such nature and kind as to be incapable of being cured.

71.    Chapter 151 of the United States Code, governing declaratory judgments states, in relevant part:

> In a case of actual controversy within its jurisdiction … any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration … Any such declaration shall have the force and effect of a final judgment or decree …

28 U.S.C. §2201.

435957

28

**WHEREFORE**, Defendants are entitled to an Order declaring that the provider agreements between Defendants and CCH are deemed canceled and terminated upon the date of said Order.

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

BY: _Thomas A. Leonard_

THOMAS A. LEONARD
PAUL S. DIAMOND
WILLIAM J. LEONARD
WILLIAM K. PELOSI
H. DAVID SEIDMAN
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103
(215) 665-3000

Attorneys for Defendants,
Independence Blue Cross,
Keystone Health Plan East,
QCC Insurance Company, and
Keystone Mercy Health Plan


JOHN DeQ BRIGGS
HOWARD T. ROSENBLATT
ERIK T. KOONS
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 383-7015

Attorneys for Defendants,
Independence Blue Cross,
Keystone Health Plan East,
QCC Insurance Company, and
Keystone Mercy Health Plan

435957

## CERTIFICATE OF SERVICE

I, H. DAVID SEIDMAN, ESQUIRE, attorney for Defendants, hereby certify that on

March 7, 2003, a true and correct copy of the foregoing Defendants' Answer to Amended

Complaint with Affirmative Defenses and Counterclaim was served as follows:

**VIA HAND DELIVERY**
Lewis R. Olshin, Esquire
Duane Morris LLP
One Liberty Place, Suite 4200
Philadelphia, PA  19102

**VIA FACSIMILE &**
**FIRST CLASS MAIL**
Richard A. Feinstein, Esquire
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015


_____
H. DAVID SEIDMAN

442179