## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHESTER COUNTY HOSPITAL     : | |
|     : | |
| v.     : | |
|     : | **NO. 02-CV-2746** |
| INDEPENDENCE BLUE CROSS,     : | |
| QCC INSURANCE COMPANY     : | |
| KEYSTONE HEALTHPLAN EAST, and     : | |
| KEYSTONE MERCY HEALTH PLAN     : | |

## ORDER

      **NOW,** this ____ day of June, 2003, in consideration of Non-Party Aetna Inc.'s

("Aetna") Motion to Intervene and for a Protective Order and Memorandum in support

thereof, and any responses thereto filed by the parties to this action, **IT IS HEREBY**

**ORDERED THAT:**

     1.      Aetna's Motion to Intervene and for a Protective Order (Docket No. _____)

is hereby **GRANTED**. Aetna is permitted to intervene solely for the purpose

of seeking a protective order with respect to its proprietary and confidential

information that may be subject to production by Aetna or Chester County

Hospital ("CCH") in the above captioned case.

     2.      Aetna, who as noted above is a non-party to this action, will suffer irreparable

and incalculable harm if its confidential and proprietary information,

including but not limited to its contracts, rates and documents detailing its

negotiations with CCH are disclosed to in-house counsel for Independence

Blue Cross ("IBC") or Plaintiff's counsel, Duane Morris.

3.    In light of the foregoing, the January 24, 2003 Protective Order entered by the Court is hereby modified with respect to the protections afforded to Aetna's confidential and proprietary information.    Any information designated "AETNA-Highly Confidential" shall <u>only</u> be disclosed to: 1) Boies Schiller and Flexner ("Boies firm") attorneys for Plaintiff; 2) attorneys for the Defendants from Obermayer Rebmann Maxwell & Hippel ("Obermayer firm") and 3) any expert designated by the parties for the purposes of opining on the relevant market for purposes of anti-trust violations in the above captioned litigation or the alleged effects of IBC's practices upon the same (subject to the restrictions contained in the January 24, 2003 Protective Order);

4.    The parties shall, consistent with Paragraph 10(g) of the January 24, 2003 Protective Order entered by the Court,  provide Aetna with ten (10) business day notice of their intent to utilize documents that Aetna has designated "AETNA-Highly Confidential" at deposition or trial so Aetna may: a) attempt to agree with the parties on a mutually agreeable redaction to such documents, b) provide other publicly available information that could be used to prove the matter at issue, or c) in the event the parties cannot agree on the foregoing, seek Court intervention to protect such confidential and proprietary information;

5.    The parties shall strictly adhere to the restrictions imposed by Paragraph 11 of the January 24, 2003 Protective Order and file all Aetna documents designated "AETNA-Highly Confidential" with the caption of this case and the notation

"Filed Under Seal," together with a motion for leave to file such document or information under seal, which motion shall clearly state that the party is filing said motion under seal consistent with the provisions of this Order;

6.    Upon termination, settlement or other resolution of the above captioned litigation, attorneys from the Boies and Obermayer firms shall return all Aetna documents to Aetna's counsel with an affidavit individually certifying that each party complied with the provisions of this Order, including those relating to disclosure.

_____
Magistrate Judge Charles B. Smith

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHESTER COUNTY HOSPITAL | : |
| | : |
| vi. | : |
| | : NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS, | : |
| QCC INSURANCE COMPANY | : |
| KEYSTONE HEALTHPLAN EAST, and | : |
| KEYSTONE MERCY HEALTH PLAN | : |

## NON-PARTY AETNA INC'S MOTION TO INTERVENE
## AND FOR A PROTECTIVE ORDER

Pursuant to Federal Rules of Civil Procedure 24, 26 and 45(c)(3)(B)(i), non-party Aetna Inc. ("Aetna") hereby moves this Court to intervene in this action for the limited purpose of seeking a protective order prohibiting the disclosure of certain information requested in a subpoena served upon Chester County Hospital ("CCH") by Independence Blue Cross ("IBC"), including contracts, rate schedules, payment rates or other financial terms of contracts between Plaintiff and non-party Aetna (or any subsidiary, affiliate, or acquired corporation of Aetna, including but not limited to Prudential Healthcare). The requested relief is necessary and appropriate because the document requests seek the disclosure of highly confidential, proprietary and trade secret information to in-house counsel for Aetna's direct competitor, IBC as well as counsel for the Hospital and Healthsystem Association of Pennsylvania.

In further support of the Motion, Aetna incorporates by reference the accompanying Memorandum of Law.

Respectfully submitted,

OF COUNSEL:

ELLIOTT REIHNER SIEDZIKOWSKI
& SIEDZIKOWSKI & EGAN, P.C.

JOHN M. ELLIOTT
JAMES C. CRUMLISH III
JOHN P. ELLIOTT
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
P.O. Box 3010
Blue Bell, PA 19422
(215) 977-1000
Counsel for Non-party
Aetna Inc.

DATED:  May 30, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE CHESTER COUNTY HOSPITAL** : | |
| : | |
| **vii.** : | |
| : | **NO. 02-CV-2746** |
| **INDEPENDENCE BLUE CROSS,** : | |
| **QCC INSURANCE COMPANY** : | |
| **KEYSTONE HEALTHPLAN EAST, and** : | |
| **KEYSTONE MERCY HEALTH PLAN** : | |
| : | |

**NON-PARTY AETNA INC'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO INTERVENE AND FOR A PROTECTIVE ORDER**

Non-party Aetna Inc. ("Aetna"), by and through its undersigned counsel, hereby submits this Memorandum of Law in support of its Motion to Intervene and for a Protective Order. Aetna seeks, pursuant to Federal Rules of Civil Procedure 24, 26 and 45(c)(3)(B)(i), to protect the disclosure of its confidential and proprietary information, including but not limited to its contracts and rate and fee schedules, from its primary competitor in the Southeastern Pennsylvania market, Independence Blue Cross ("IBC") and the Hospital and Healthsystem Association of Pennsylvania ("HAP"), which is represented by Plaintiff's counsel, Duane Morris LLP ("Duane Morris").[1] Aetna, a non-party to this litigation, faces substantial and irreparable harm if this information is provided to IBC and HAP. Although Aetna recognizes that the Court has already entered a protective order albeit exparte to Aetna, in the above captioned case, the protections afforded by that Order are not sufficient in that they do not protect Aetna's confidential and proprietary information from disclosure to in-house counsel of IBC or members of

---

[1] As all Defendants in the above captioned litigation are related to IBC, Aetna refers to all of the Defendants as IBC, consistent with the January 24, 2003 Protective Order entered by the Court. See January 24, 2003 Protective Order at ¶ 10(b).

Duane Morris who represent HAP. Intentionally or not, IBC's in-house counsel and counsel representing HAP will inevitably be placed in the position of providing advice to IBC and HAP personnel on business issues, such as contract negotiations or future litigation, where Aetna's confidential and proprietary information will be used to Aetna's economic and competitive detriment.

## I.    **INTRODUCTION**

On November 8, 2003, Plaintiff served a subpoena upon Aetna seeking, *inter alia*, Aetna's contracts with hospitals, containing highly sensitive contract terms, rate schedules and documents detailing negotiations between CCH and Aetna, considered uniformly in Aetna's industry to be confidential and proprietary and the reimbursement rates negotiated between Aetna and those hospitals. On November 25, 2002, Aetna, through the undersigned counsel, objected to the disclosure of such information pursuant to the Federal Rules of Civil Procedure based upon, *inter alia*, the confidential and proprietary nature of the information.[2] Aetna carbon copied Defendant's counsel on its November 25, 2002 objection letter. Although both parties had notice of Aetna's substantive objections, including its concerns relating to the confidential and proprietary nature of the information the parties were seeking in discovery, the parties did not provide Aetna with any notice that they intended to seek a Protective Order from the Court. The failure to notify Aetna of their intent to move for a protective order deprived it of the opportunity to advise the Court of *Aetna's* legitimate and appropriate confidentiality objections to the subpoena and the extent to which Aetna would suffer

---

[2] Aetna also objected to Plaintiff's subpoena based upon, among other things, deficiencies in the subpoena and the over breadth and burdensome nature of the subpoena. Although the issues relating to CCH's subpoena upon Aetna are not directly to the issue of the Aetna's confidential and proprietary documents CCH intends to produce to IBC, Aetna reserves its right to pursue those objections if continuing negotiations with Plaintiff's counsel regarding those issues cannot be satisfactorily resolved.

irreparable harm as a result of the disclosure of its highly sensitive information.    On January 24, 2003, without Aetna present, without notice to the Court of Aetna's concerns, the Court entered a Protective Order in the above captioned litigation.

The January 24, 2003 Protective Order (the "Protective Order") entered by the Court allows for the disclosure of materials designated "Highly Confidential" to, among others, in-house counsel for Defendants and "outside counsel for parties who have filed an appearance in this matter and who agree not to represent the Delaware Valley Health Counsel of the Hospital and Health System Association of Pennsylvania . . . in the contract negotiations by IBC of health care provider reimbursement rates . . ." January 24, 2003 Protective Order at ¶¶ 10(a) and 10(b).  On its face, the restrictions contained in Paragraph 10(a) of the Protective Order apply to negotiations against IBC.[3]

As noted on Plaintiff's counsel's web site, the co-chair of Duane Morris' Health Law Practice Group is also General Counsel to HAP.  See Exhibit "A" hereto. Accordingly, the Protective Order, as entered, facially does not appear to preclude dissemination of Aetna's confidential and proprietary information to other members of Duane Morris, who may then directly or indirectly utilize such documents to non-party Aetna's competitive and financial detriment, including but not limited to contract negotiations with Aetna or future litigation against Aetna.

As noted in the affidavit of Robert Franzoi, attached hereto as Exhibit "B," IBC operates a managed care company in the Commonwealth of Pennsylvania that directly

---

[3] The Court imposed the restrictions contained in Paragraph 10(a) of the Protective Order for a period of eighteen (18) months. Id.  This temporal restriction is predicated upon the scheduled renegotiation of IBC's contract(s) in 2005.  Because Aetna's contracts do not expire simultaneously with IBC's, and to the contrary many of Aetna's contracts are self-renewing, the temporal restrictions contained in Paragraph 10(a) are not sufficient to protect Aetna from inappropriate use, unrelated to this litigation, of its confidential and proprietary information to its detriment.

competes with Aetna. In fact, Plaintiff alleges in the Amended Complaint, and Defendants cannot in good faith deny, that IBC and Aetna are direct competitors. See e.g. HealthLeaders Research, "Pennsylvania Health Plan Data – 2 – HMO Financials (January 1,– September 20, 2002) copyright 2003 HealthLeaders, Inc. As Aetna's direct competitor, IBC also engages in contracting with providers and hospitals. If Aetna's independently negotiated rates with these hospitals are disclosed to IBC, "it could use that information to negotiate more favorable rates, and undermine Aetna's negotiating strategies." See Exhibit "B" at ¶ 6. Accordingly, Aetna always provides for the confidentiality of its contract terms and rates in its contracts and prohibits the dissemination of any such material to any third party except for a third-party administrator designated by Aetna. Id. at ¶ 8.

After the Protective Order was entered, Aetna continued to negotiate in good faith with Plaintiff's counsel at the Boies firm in relation to the subpoena CCH served on Aetna. In addition to discussions relating to the scope of CCH's subpoena, Aetna also drafted a Confidentiality Stipulation that addressed the issues relevant to this Motion. According to Plaintiff, IBC would not agree to the protections sought by Aetna.

On Friday, May 23, 2003, Aetna received, *via* Federal Express, a letter dated May 22, 2003 from Lewis Olshin of Duane Morris and attached documents that CCH represented that it intended to produce. Mr. Olshin's letter stated "[w]e understand that you objected to the production of these documents pursuant to the Protective Order. IBC has raised the issue with the Court and we have been advised to inform you that in the event that you fail to file a motion with the United States District Court for the Eastern District of Pennsylvania by May 30, 2003, we will be required to produce the attached

4

documents to IBC." <u>See</u> Exhibit "C" hereto.[4]    Although Mr. Oshlin represented that "the documents which we intend to produce have all been marked 'highly confidential,'" over one-hundred and fifty of those documents, containing, *inter alia*, Aetna's contracts and rates and bates stamped CCH 0029906-CCH 0029962 and CCH 0030212-CCH 0030329 contained <u>no confidentiality designation whatsoever</u>, further highlighting the dangers Aetna faces if a revised Protective Order is not entered.

The documents that CCH intends to produce pursuant to its May 22, 2003 letter "are among Aetna's most sensitive, confidential and proprietary information." <u>See</u> Exhibit "B" hereto at ¶ 4-5.   These documents include: Aetna's Hospital Service Agreement with CCH, numerous Ancillary Service Agreements (e.g. relating to Diagnostic Radiology and Imaging Services), correspondence between Aetna and CCH relating to the negotiation and status of such contracts, CCH's internal analysis of the economic effects of its contracts with Aetna (including specific analyses of the rates contained in those contracts), CCH's internal analyses of the potential effect of Aetna contract proposals (including specific analyses of the rates proposed by Aetna), spreadsheets detailing rates paid for treating Aetna patients (with the patient names redacted), Addendum's to existing contracts between CCH and Aetna with revised rate schedules, and a July 15, 1999 analysis (with attached supporting documentation) listing

---

[4] Any production of documents by CCH over Aetna's objections would be in direct violation the express contractual obligations it assumed in its contracts with Aetna.  Apparently rather than honoring those contractual obligations, CCH agreed to produce the documents attached to Mr. Olshin's May 22, 2003 letter to Aetna thus placing the onus and expense of pursuing this Motion to Intervene and for a Protective Order on non-party Aetna.  This course of conduct illustrates the inherent conflict of interest between CCH's contractual obligations and its economic interests as a party to this litigation.

IBC's rates, Aetna's rates and a column captioned "% of Difference" detailing the difference between IBC's rates and Aetna's rates.[5]

Accordingly, as more fully set forth below, Aetna respectfully requests that it be permitted to intervene and that a protective order be issued prohibiting disclosure of Aetna's confidential and proprietary information to IBC's in-house counsel or to attorneys for Duane Morris, who also represents HAP.

## II.    LEGAL ARGUMENT

### A.    Aetna Is Entitled To Intervene In This Matter For The Limited Purpose Of Protecting Its Confidential And Proprietary Information From Disclosure.

Federal Rules of Civil Procedure 24(a)(2) and 24(b) entitle Aetna to intervene in this matter for the limited purpose of protecting its confidential and proprietary trade secret information from disclosure, even though it is not a party to the litigation. Rule 24(a)(2) provides that a non-party has a *right* to intervene "when the [non-party] claims an interest relating to the property or transaction which is the subject matter of the action and the [non-party] is so situated that the disposition of the action may as a practical matter impair or impede the [non-party's] ability to protect that interest, unless the [non-party's] interest is adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). The threshold for establishing an interest is fairly low, because:

> [t]o bar intervention for collateral discovery issues merely because they do not concern the subject matter of the overall action would in many cases defeat the general purpose of intervention...Without the right to intervene in discovery proceedings, a third party with a claim of privilege in otherwise discoverable materials could suffer

---

[5] In recognition that these documents, Bates Numbered CCH 0029260 through CCH 0029265, contain IBC's confidential and proprietary information (as well as Aetna's), the undersigned counsel has retained exclusive control over these documents and has <u>not</u> provided them to Aetna's in-house counsel for review.

> the obvious injustice of having his claim erased or impaired
> by the court's adjudication without even being heard.

642 F.2d 1285, 1292 (D.C.Cir.1980)(citations omitted).    Courts thus interpret Rule 24(a)(2) as providing a non-party the right "to intervene for the limited purpose of protecting [its] interest in the confidentiality requested" by a party during discovery. Blum v. Schlegel, 150 F.R.D. 38, 39 (W.D.N.Y.1993)(non-party had right to intervene to protect from disclosure confidential information sought from party to litigation through discovery); see also H.L. Hayden of N.Y. Inc. v. Siemens Med. Sys., Inc. 797 F.2d 85 (2d Cir.1986)(non-party has right to intervene pursuant to Rule 24(a)(2) to protect from disclosure its own confidential information or work product in which only the litigants possess an interest); American Telephone & Telegraph Co., 542 F.2d at 1291(non-party had right to intervene to protect from disclosure to party-competitor information that non-party claimed was its work product, where party competitor sought information during discovery from other party to litigation); Formulabs, Inc. v. Hartley Pen Co., 275 F.2d 52 (9th Cir.1960)(non-party had right to intervene in discovery stage of a case to prevent disclosure of its trade secret information which party to litigation possessed).

Under Rule 24(b), a court *may permit* non-party intervention when a non-party's "claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b).    "The permissive intervention rule is to be construed liberally, with all doubts resolved in favor or permitting intervention." Koprowski v. Wistar Inst. Of Anatomy and Biology, 1993 WL 332061 at *2 (E.D.Pa.  Aug. 19, 1993).  When a non-party seeks to intervene only for the purposes of challenging discovery-related matters, and not in an effort to become a party to the litigation, courts especially "should relax the requirement of a common question of law or fact..." in favor of permitting limited

7

intervention. <u>United States v. Dentsply Int'l, Inc.</u>, 187 F.R.D. 152, 157 (D.Del.1999) (holding that non-party met "common question" requirement merely by challenging the validity of the Order of Confidentiality entered in the litigation) (citing <u>Pansy v. Borough of Stroudsburg</u>, 23 F.3d 772, 778 (3d Cir.1994); <u>see also Videon Chevrolet Inc. v. General Motors Corp.</u>, 19995 WL 395925, No. 91-4202 at *1 (E.D. Pa. June 28, 1995)("The proper method for a non-party to seek modification of a protective order is through permissive intervention under Fed. R. Civ. P. 24(b).")(citing <u>Pansy, supra</u>.) Courts accordingly have applied Rule 24 (b) to allow non-parties to intervene in order to safeguard confidential and proprietary information from disclosure in the course of litigation. <u>See, e.g., Dentsply</u>, 187 F.R.D. at 157-58 (allowing non-party seeking to protect its confidential and proprietary information from disclosure "to intervene for purposes of bringing to the Court's attention its view with respect to what should be contained in the protective order.")

**B.    AUSHC Is Entitled To A Protective Order Prohibiting Plaintiff From Obtaining The Requested Information.**

The Federal Rules of Civil Procedure provide for the issuance of a protective order upon a movant's showing of good cause. <u>See</u> Fed.R.Civ.P. 26(c). Indeed, a Court is specifically authorized to enter a protective order "that a trade secret or other confidential research, development, or commercial information not be revealed...." Fed.R.Civ.P.26(c); <u>see</u> Aetna's Memorandum at Sections II.B.1, 2 and 3, <u>infra</u>. While the party seeking a protective order bears the burden of establishing good cause for its issuance, courts will issue protective orders to restrict the disclosure of materials that, if released, would place the party at a competitive disadvantage. <u>See Essex Wire Corp. v. Eastern Electric Sales Co.</u>, 48 F.R.D. 308, 310 (E.D.Pa. 1969). Indeed, courts have

8

prohibited discovery into "financial information when it may be revealed to business rivals, especially when the information would be collateral and not direct proof of the plaintiff's claims." United States of America v. Federation of Physician and Dentists, 63 F.Supp.2d 475, 479 (D.Del.1999); see Miles v. Boeing Corp., 154 F.R.D. 112, 114 (E.D.Pa.1994) (emphasis added)("Competitive disadvantage is a type of harm cognizable under Rule 26, **and it is clear that a court may issues a protective order restricting disclosure of discovery materials to protect a party from being put at a competitive disadvantage.**"); Ball Memorial Hospital Inc. v. Mutual Hosp. Ins., 784 F.2d 1325, 1345 (7th Cir.1986)(insurance provider's data on prices bid by hospitals and the calculations the insurance provider performed was confidential for fear that the hospitals could use the comparative price information to raise their prices or collude in future years.)  In the instant case, Aetna has clearly demonstrated that "good cause" exists for the issuance of a Protective Order precluding disclosure of Aetna's confidential and proprietary information to IBC's in-house counsel and Duane Morris attorneys, who represent HAP. The disclosure of this closely guarded and highly confidential information to its competitor, IBC and HAP, who represents the hospitals' interests, will clearly place Aetna at a competitive disadvantage.

Where sensitive, confidential business information is sought in discovery, the party opposing the protective order bears the burden of establishing substantial need for the material that cannot be met without undue hardship.  Act, Inc. v. Sylvan Learning Sys. Inc., 1999 U.S. Dist. LEXIS 7055 at *8 (E.D.Pa.  May 14, 1999)(O'Neill, J.)  (no discovery of confidential business information where disclosure would expose to serious

commercial harm and disadvantage); see also AT&T Corp. v. Universal Communs. Network, Inc., 1999 U.S. Dist. LEXIS 5651 (E.D.Pa. April 14, 1999)(Fullam, Sr. J.).

As set forth below, there can be no dispute that the information sought by IBC is Aetna's confidential business information and of the type that is protected from disclosure by the Federal Rules of Civil Procedure and controlling case law. It is clear beyond peradventure that IBC can establish no substantial need for its in-house counsel to have access to its confidential and proprietary information. As Aetna's information is only relevant to the antitrust claims at issue in this matter, such information is not subject to factual or legal issues on which IBC's in-house counsel may need to provide guidance. Rather, the resolution of these antitrust issues will be decided by the credibility of the parties' experts.[6] IBC is represented by the Obermayer firm, a firm with significant litigation and health care experience. There is no reason why the Obermayer firm cannot, without the aid of IBC's in-house counsel, competently prepare and present an antitrust expert for trial. Similarly, CCH is represented by both Duane Morris and the Boies firm. Given the potential for disclosure of Aetna's confidential and proprietary information to HAP, whether intentionally or inadvertently (such as the disclosure of IBC's rates to the undersigned), there is no substantial justification not to limit Plaintiff's preparation and presentation of its expert to the Boies firm, which also has significant litigation experience. Accordingly, a protective order prohibiting IBC's in-house counsel and Duane Morris attorneys' access to this information is necessary and appropriate.

---

[6] In recognition that the parties' experts may need access to Aetna's confidential and proprietary information in order to formulate opinions relating to the validity, or lack thereof, of CCH's antitrust claim, Aetna agrees, subject to execution of an appropriate non-disclosure agreement by any expert, to allow the parties' experts, designated for the purposes of opining on the relevant market relating to alleged antitrust violations in the above captioned litigation or the alleged effects of IBC's alleged practices upon the same, access to this highly sensitive information.

1.  **Under Pennsylvania Law and Third Circuit Precedent, Aetna's Contracts, Rates and Documents Detailing the Negotiations of the Same are Trade Secrets For Which Aetna is Entitled to Protection Via an Appropriate Protective Order.**

Recently, the Pennsylvania Superior Court concluded that a HMO's financial and other confidential and proprietary information are entitled to protection as trade secrets. Dibble v. Penn State Geisenger Clinic Inc. et al, 806 A.2d 866, 872 (Pa. Super 2002). In Dibble, HMO appealed the trial court's denial, via a "general housekeeping order," HMO's Petition for a Confidentiality Order. The Superior Court, relying on Restatement of Torts § 757, which was adopted by the Pennsylvania Supreme Court, held that the relevant factors supported HMO's entitlement to an appropriate protective order.[7]

In analyzing whether information qualifies as a trade secret under Pennsylvania law, some of the factors that a court may consider include:

> (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated by others.

Dibble, 806 A.2d at 870 (citing Tyson Metal Products, Inc v. McCann, 546 A.2d 119, 121 (Pa. Super. 1998) (quoting SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1266 (3d Cir. 1985). As in Dibble, application of the above factors mandate the conclusion that the documents at issue in the instant matter qualify as trade secrets and,

---

[7] Specifically, the Dibble Court stated: "[t]he Pennsylvania Supreme Court has adopted the definition of 'trade secret' that is set forth in comment b to section 757 of the Restatement of Torts:
> "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and gives him an opportunity to obtain an advantage over competitors who do not know or use it."

Dibble, 806 A.2d at 870; (citing Femlee v. Lockett, 466 Pa. 1, 9 (1976), quoting Restatement of Torts § 757 cmt. b.) (other citations omitted).

therefore, are entitled to protection from Aetna's competitors and other entities with which Aetna must negotiate contractual rates.

The <u>Dibble</u> court first analyzed one issue of whether an HMO had taken appropriate steps to safeguard the information at issue.[8]  In the instant case, Aetna has clearly taken the utmost precautions to protect the information from disclosure to third-parties.  First, Aetna and CCH negotiated a strict confidentiality and non-disclosure clause in the contracts at issue that precludes the distribution of these documents to third-parties.  <u>See</u> Exhibit "B," at ¶8;11.  Moreover, as in <u>Dibble</u>, Aetna "has undertaken legal measures and incurred expenses in its attempt to prevent disclosure of the documents and to keep their secrecy intact." <u>Dibble</u>, 806 A.2d at 870.  Aetna has been seeking to protect this and other similar information from such disclosure since November of 2002.

The fourth factor also weighs in Aetna's favor.  As the Superior Court noted, "the documents contain information of great value to appellant HMO which would also be of great value to its competitors." <u>Id.</u>  Here, the documents CCH intends to produce contain Aetna's negotiated rates for numerous services and other documents that detail those negotiations and also contain Aetna's rate information.  If such information is disclosed to IBC, IBC can use that information to negotiate better rates for itself and thereby undermine Aetna's negotiating strategy.  <u>See</u> Exhibit "B" at ¶6.  Similarly, HAP can utilize such information to formulate a strategy for hospitals to negotiate with Aetna.  <u>Id.</u> at ¶7.  Clearly, such information "would be valuable to a competing managed care company seeking to" negotiate with CCH.  <u>Dibble</u>, 860 A.2d at 870.  In fact, IBC and CCH will be renegotiating their contract in 2005.

---

[8]In <u>Dibble</u>, HMO's documents were stamped "Confidential."  However, these documents had been produced, and therefore so designated, during the course of litigation.

With regard to the first and second factors, the information CCH intends to disclose is not known outside of Aetna's business. Aetna maintains the confidentiality of its rates by insisting on confidentiality provisions in its contracts with hospitals and other providers. As Robert Franzoi's attached affidavit demonstrates, Aetna's rate schedules "are among Aetna's most sensitive, confidential and proprietary information" and such information is uniformly considered to be proprietary and confidential. See Exhibit "B" at ¶5. This information is not generally known to the public. Id. at ¶¶4-9. Accordingly, Aetna's contractual terms and rates are not generally known outside of Aetna. Id.

Finally, Aetna has developed its rate schedules and contracting strategies in Southeastern Pennsylvania over decades of negotiations with hospitals and providers. The nature of the suit between CCH and IBC demonstrates that Aetna's rates are not easily duplicated. If such information was readily duplicated, eventually every HMO would, utilizing each others' rates, negotiate virtually identical rates.

The Dibble court concluded, consistent with the facts of the instant case,

> "that the documents contain formulas and compilations of data and information which unmistakably reflect their intended secrecy and value to the HMO and that the information could create a competitive disadvantage for the HMO if disclosed to other managed care companies or the public. Moreover, the HMO has clearly taken numerous measures to safeguard the information and has closely held the information to itself. We conclude that the subject documents are confidential and must remain so."

Dibble, 806 A.2d at 872.

Similarly, in the instant case, the documents CCH intends to produce, when analyzed under Pennsylvania law, constitute trade secrets that should be subject to the provisions of an appropriate Protective Order.

> **2.    The Documents and Information Sought is Confidential and Proprietary Business Information.**

Aetna and its affiliates have invested substantial resources to develop a network of providers that supply medical services to Aetna members.   The rate schedules, contracts and other financial information concerning Aetna contracts that CCH intends to produce are some of the most closely guarded confidential and proprietary business information that the company possesses.  Exhibit "B" at ¶ 5.  These rate schedules are the result of individually negotiated contracts with providers, and disclose what Aetna agrees to pay CCH for certain medical services rendered.   Exhibit "B" at ¶ 4.   If such information is disclosed to competitors, such as IBC, or even potential competitors, the information could aid them in their efforts to compete with Aetna, negotiate rates that are more favorable and thereby undermine Aetna's negotiating strategies.  Exhibit "B" at ¶ 6.  This is especially true where, as here, CCH intends to produce documents detailing CCH's negotiations with Aetna.  Further, if other hospitals, through HAP, for example, learned of rates Aetna had negotiated with other providers, that information could be used to negotiate financial terms from Aetna that are more favorable to each hospital.  Id. at ¶ 7.  Such a disclosure of Aetna's confidential and proprietary information would clearly harm Aetna and place it at a significant competitive disadvantage.  Id. at ¶¶ 6, 7, 12.

Because of the highly competitive nature of the health care industry, and the sensitivity of the rate schedules and other financial information, Aetna takes stringent steps to safeguard the confidentiality of its financial arrangements with providers, to

reduce the potential for others to exploit such information to Aetna's competitive disadvantage. Id. at ¶¶ 5, 8, 9. Thus, Aetna restricts the dissemination of such information by, *inter alia*, requiring medical care providers and hospitals to execute confidentiality agreements, and prohibiting direct or indirect disclosure of such information. Id. at ¶¶ 5, 8, 9. Indeed, in the contract between Aetna and Plaintiff, it is specifically acknowledged that disclosure of the rate and other financial information contained in their contract would cause irreparable harm for which money damages would not be adequate. Id. at ¶ 12.

Aetna has a particular interest in preventing disclosure of its commercially sensitive information to IBC and HAP, as there is a possibility that IBC and HAP could use this information for their competitive advantage. Like Aetna, IBC operates an HMO in the Commonwealth of Pennsylvania. Aetna individually contracts with the hospitals HAP purports to represent.

### 3.    Aetna's Trade Secrets Must Not Be Disclosed to IBC's In-House Counsel.

Typically, in cases involving discovery disputes <u>between parties to a litigation</u>, courts examine whether in-house counsel is involved in competitive decision making,[9] such as counseling to IBC's business personnel, to determine whether in-house counsel should have access to confidential and proprietary information produced in that litigation. <u>U.S. Steel Corp. v. U.S.</u>, 730 F2d 1465 (Fed Cir 1984), <u>Brown Bag Software v. Symantec</u>

---

[9] The <u>Dentsply</u> Court noted that: "'competitive decision making'[constitutes] activities in which counsel participates and advises 'in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." <u>United States v. Dentsply International, Inc.</u>, 187 F.R.D. 152, 160 (D. Del 1999)(quoting <u>U.S. Steel Corp.</u>, <u>supra</u>.).

Corp., 960 F2d 1465, (9th Cir. 1992).[10]   In the instant case, however, Aetna is not a party

to this litigation.   Courts analyzing similar situations, where a non-party seeks to

intervene to preclude disclosure of its confidential and proprietary information to a direct

competitor's in-house counsel, have held that the competitor's in-house counsel should

be denied access to such proprietary information.

In United States v. Dentsply International, Inc., 187 F.R.D. 152 (D. Del 1999), the

government filed an antitrust action against Dentsply.  Schein, a non-party competitor of

Dentsply, moved to intervene for the purpose of protecting its proprietary and

confidential information that Dentsply was seeking from the government in discovery.

Dentsply, 187 F.R.D. at 155.  In analyzing whether to apply the "decision maker" test,

the District Court stated:

> Counsel have not cited any case in which the "competitive
> decision making" standard has been applied, **where, as
> here, proprietary information is that of a nonparty
> produced** under governmental compulsion.   The Court is
> concerned about applying the competitive decision making
> standard to confidential information to hapless nonparties.
> While some nonparties may rejoice in the Justice
> Department's antitrust investigation, others doubtless
> consider the risk inherent in sharing extremely sensitive
> information too high a price to pay for curing the alleged
> unlawful anticompetitive activity.   These nonparties have
> produced or will produce information because they are law-
> abiding entities with severely limited options.    Their
> information will be shared not because they are a litigant
> seeking redress or an accused wrongdoer defending a

---

[10] In the event this Court determines that the "decision maker" test is the appropriate standard of review, Aetna will seek to depose any IBC in-house counsel so designated to determine the scope of IBC's in-house counsel's duties.  To allow IBC to designate a "non-decision maker" by simply, for example, submitting an affidavit to that effect deprives Aetna of the right to determine the validity of such assertions. See Dentsply, 187 F.R.D. at 161 (finding contrary to Dentspy's in-house counsel's affidavit and precluding disclosure to in-house counsel).  Allowing such a result would be akin to allowing the fox into the hen house on the basis of a general statement detailing no ill-will to the hens.  Moreover, given that Aetna has no means of monitoring IBC's negotiations with hospitals and providers, it would be virtually impossible for Aetna to determine whether or not Aetna's confidential and proprietary information had been disclosed to other IBC personnel, or to rectify such a disclosure, after such information had already been disclosed.

> lawsuit, but because they have valuable information which may or may not shed light on whether Dentsply has engaged in proscribed anticompetitive activity.

Dentsply, 187 F.R.D. at 160 (emphasis added). Similarly, Aetna's confidential and proprietary information is not being produced voluntarily, but in response to legal process. As the instant motion demonstrates, Aetna considers the price of disclosing its confidential and proprietary information to a direct competitor "too high a price to pay" to cure any alleged unlawful anticompetitive activity, if any such activity exists.[11] It is very possible that IBC could prevail over CCH and the instant litigation, thereby winning not only this case, but access to Aetna's highly confidential and sensitive information.

Because the parties in Dentsply agreed to the applicability of the "decision maker" test, the court analyzed the affidavit of Dentsply's in-house counsel and determined that, weighing the interests of Schein and the Government against Dentsply's, Dentsply's in-house counsel should be denied access to Schein's confidential and proprietary information. Id. at 162.[12] Just as in Dentsply, IBC's in-house counsel must be denied access to non-party Aetna's sensitive and highly protected information. Indeed, analyzing U.S. Steel Corp, the Dentsply court noted that "the Federal Circuit Court of Appeals first held 'that status as in house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access.'" It then instructed that a district court must examine the particular

---

[11] Indeed, the consequence of disclosure could directly and indirectly cause catastrophic economic injury to Aetna's lawful rights to ongoing arms-length negotiated contract rates and cause the resultant increase of healthcare costs to the consumer and also wreak havoc on the competitive marketplace for many years to come.

[12] See also Sullivan Marketing Inc. v. Valasis Communications Inc. 1994 WL 177795 (S.D.N.Y. 1994)(holding that a general counsel could be barred from reviewing confidential material because he was involved in managing corporate departments, international expansion and drafting and reviewing contracts, despite the fact that the general counsel had no involvement in setting prices or terms of sale).

17

counsel's relationship and activities to determine an appropriate protective order." Id. at 159 (quoting and citing U.S. Steel Corp. v. U.S., 730 F2d at 1468, 1469) (internal citations omitted).

In the instant case, IBC's refusal to agree to Aetna's proposals to revise the Protective Order, which precluded disclosure to IBS's in-house counsel, demonstrates that IBC's in-house counsel wants access to Aetna's confidential and proprietary information. This is not surprising given the sensitive nature of this information and the competitive advantage that such information would provide to IBC. Exhibit "B" at ¶6. Moreover, as noted above, the confidential and proprietary information of Aetna that the parties seek is only relevant in the context of allowing the parties' experts to opine about IBC's alleged antitrust activity. There is no reason that IBC's retained counsel, the Obermayer firm, cannot manage the preparation and presentation of IBC's expert.

## III.    CONCLUSION

Accordingly, Aetna respectfully submits that this Court must enter a protective order prohibiting the disclosure of Aetna's confidential and proprietary information to IBC's in-house counsel and to Plaintiff's and HAP's counsel, Duane Morris.

OF COUNSEL:

ELLIOTT REIHNER SIEDZIKOWSKI
  & SIEDZIKOWSKI & EGAN, P.C.

Respectfully submitted,

JOHN M. ELLIOTT
JAMES C. CRUMLISH III
JOHN P. ELLIOTT
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
P.O. Box 3010
Blue Bell, PA 19422
(215) 977-1000
Counsel for Non-party
Aetna Inc.

DATED:  May 30, 2003

18

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day a copy of the foregoing is being served upon the person and in the manner indicated below:

### VIA FIRST CLASS MAIL

**Attorneys for The Chester County Hospital**

Lewis R. Olshin, Esquire
Duane, Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396

Daniel A. Kotchen, Esquire
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

**Attorneys for Independence Blue Cross,
QCC Insurance Company, Keystone Health Plan East, and Keystone Mercy Health
Plan**

William J. Leonard, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895

Howard T. Rosenblatt, Esquire
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

**Attorneys for Capital Blue Cross**

Mark J. Oberstaedt, Esquire
Archer & Greiner PC
One S. Broad Street
Suite 1620
Philadelphia, PA 19107

**Attorneys for Highmark, Inc.**

Natalie Chetlin Moritz, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA  15219

**Attorneys for Blue Cross of Northeastern Pennsylvania**

Melanie A. Miller, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103-3508

**Attorneys for Wellspan Health System**

Neil C. Schur, Esquire
Stevens & Lee
111 N. 6th Street
P. O. Box 679
Reading, PA 19603

JAMES C. CRUMLISH, III

DATED:    May 30, 2003

2

Exhibit A

Case 2:02-cv-02746-JP     Document 56     Filed 05/30/2003     Page 27 of 33

 Duane Morris People

**David E. Loder**
**Partner**
Phone: (215) 979-1834
Fax: (215) 979-1020
Email: deloder@duanemorris.com
Duane Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396



**David E. Loder** is co-chair of the firm's Health Law Practice Group. He focuses his practice on hospital governance, accreditation, credentialing, litigation reimbursement issues, managed care arrangements and Medicaid and Medicare programs. He represents numerous for-profit and nonprofit organizations in the healthcare industry.

Mr. Loder serves as general counsel to the Hospital and Healthsystem Association of Pennsylvania. He is also general counsel to Health Partners of Philadelphia, a leading provider of healthcare services to the Medicaid population, and to Pennsylvania Trauma Systems Foundation, an organization that establishes standards and accredits trauma centers in the commonwealth of Pennsylvania.

A member of the American, Pennsylvania and Philadelphia bar associations, the American Society of International Law and the Pennsylvania Society of Healthcare Attorneys, he is a 1982 graduate of the London School of Economics (LL.M., international law), a 1981 graduate of the University of Pennsylvania Law School and a graduate of Wesleyan University.

## *Professional Activities*

- Advisory Council Member, "Non-Profits at the Millennium," Philadelphia Health Management Corporation
- American Bar Association
- Pennsylvania Bar Association
- Philadelphia Bar Association
- American Society of International Law
- Pennsylvania Society of Healthcare Attorneys

## *Admissions*

- Pennsylvania
- United States Court of Appeals for the Third Circuit
- United States District Court for the Eastern District of Pennsylvania
- Supreme Court of Pennsylvania

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                                  |   |                |
|--------------------------------------------------|---|----------------|
| THE CHESTER COUNTY HOSPITAL                      | : |                |
|                                                  | : |                |
| v.                                               | : |                |
|                                                  | : | NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS,                         | : |                |
| QCC INSURANCE COMPANY                            | : |                |
| KEYSTONE HEALTHPLAN EAST, and                    | : |                |
| KEYSTONE MERCY HEALTH PLAN                       | : |                |

## DECLARATION OF ROBERT J. FRANZOI

Pursuant to 28 U.S.C. § 1746, I, Robert J. Franzoi, declare the following:

1.  My name is Robert J. Franzoi. I have been employed for the last 17 years with Aetna Inc. ("Aetna"), and presently act as Regional Manager for Health Care Delivery in Aetna's Mid-Atlantic Region. In that capacity, my responsibilities include overseeing the establishment and maintenance of contractual relationships with medical care providers.

2.  Aetna administers health benefits to individuals throughout the country through, for example, health maintenance organizations ("HMOs"). Aetna's Mid-Atlantic Regional headquarters are located in King of Prussia, Pennsylvania, and it does a substantial amount of business in this area.

3.  To administer health benefits to its members, Aetna maintains a network of medical care providers such as doctors, hospitals, and physician specialists, which provide medical services to eligible members. This network is created by contracts entered into by Aetna (and/or its subsidiaries and affiliates) with each medical care provider.

4.  Aetna's contracts with medical care providers typically include a schedule of rates that Aetna agrees to pay a provider for particular medical services rendered. Such rate schedules are individually negotiated and are among the central financial terms of such contracts.

5.  Aetna's rate schedules with medical care providers are among Aetna's most sensitive, confidential and proprietary information. I can attest to the fact that in Aetna's industry, information such as rate schedules are uniformly considered to be proprietary and confidential.

6.  If Aetna provider rate schedules were disclosed to Aetna's competitors or potential competitors, such information could aid such companies in their efforts to compete against Aetna. If a competitor knew the financial terms negotiated by Aetna with

providers, it could use that information to negotiate more favorable rates, and undermine Aetna's negotiating strategies.

7.    Moreover, if providers learned of the rates that Aetna had negotiated elsewhere, that information could be used by medical care providers against Aetna in its efforts to negotiate favorable financial terms.

8.    Because such information is confidential and proprietary, Aetna always includes in its provider contracts provisions as to Confidentiality and Non-Disclosure, prohibiting direct or indirect disclosure to any third parties of, specifically, the rate schedules or other financial terms of such contracts.

9.    Because such information is so sensitive, Aetna will typically not reveal this information to third parties, directly or indirectly, unless required to do so under law.

10.    I have been informed that in the above-captioned matter, Independence Blue Cross has sought to have Chester County Hospital ("CCH") disclose contract terms, rate schedules and documents detailing negotiations between CCH and Aetna.

11.    I can confirm that Aetna contracts with CCH. That contract and its financial terms, including specifically the rate schedules, are covered by express Confidentiality and Non-Disclosure provisions, as described above, prohibiting CCH from disclosing such information to third parties such as IBC, in recognition of the fact that such information is sensitive, proprietary, and confidential.

12.    In recognition of the harm that would occur due to a breach of the confidentiality provisions in their contract, CCH and Aetna agreed that breach of such provisions would cause irreparable harm, for which money damages would not be adequate to remedy.

13.    I have been informed that CCH's request for this information may also encompass rate schedules negotiated between Prudential Healthcare and CCH. I can attest to the fact that in 1999, Aetna acquired the operations of Prudential Healthcare. I can also attest to the fact that, like Aetna, Prudential included in its provider contracts provisions that prohibited disclosure of the financial terms of those arrangements, including rate schedules, in recognition of the sensitive and proprietary nature of these financial terms.

14.    Finally, I can attest to the fact that IBC, like Aetna, operates an HMO in the Commonwealth of Pennsylvania.

I declare under the penalty of perjury that the foregoing is true and correct.

ROBERT J. FRANZOI

Exhibit C

DUANE MORRIS

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
CHICAGO
HOUSTON
PHILADELPHIA
SAN FRANCISCO
BOSTON
WASHINGTON, DC
ATLANTA
MIAMI
NEWARK
ALLENTOWN
WILMINGTON
CHERRY HILL
HARRISBURG
BANGOR
PRINCETON
PALM BEACH
WESTCHESTER

LEWIS R. OLSHIN
DIRECT DIAL: 215.979.1129
E-MAIL: Olshin@duanemorris.com

www.duanemorris.com

May 22, 2003

**Via Federal Express**

James C. Crumlish, Esquire
Elliott Reihner Siedzikowski Egan, P.C.
Union Meeting Corporate Center V
P.O. Box 3010
925 Harvest Drive
Blue Bell, PA 19422

Re:     **The Chester County Hospital v. Independence Blue Cross, et al.**
        **Civil Action No. 02-CV-2746**

Dear Mr. Crumlish:

As we previously advised you, the Chester County Hospital has been served with a Request for Production of Documents which requires us to produce to Independence Blue Cross (IBC) the documents attached to this letter. We have previously advised you that the Court has entered a Protective Order in this case and the documents which we intend to produce have all been marked "highly confidential" in accordance with that Protective Order.

We understand that you object to the production of these documents pursuant to the Protective Order. IBC has raised this issue with the Court and we have been advised to inform you that in the event that you fail to file a motion with the United States District Court for the Eastern District of Pennsylvania by May 30, 2003, we will be required to produce the attached documents to IBC. In addition, we are redacting the small number of documents which contain not only your confidential information but also that of other insurers. We will federal express those documents to you tomorrow.

James C. Crumlish, Esquire
May 22, 2003
Page 2


Accordingly, if you do not seek protection from the Court, the Chester County Hospital will have no choice concerning the release of this information. We would appreciate it if you would inform us of your decision prior to May 30, 2003.

Counsel for IBC is being sent a copy of this correspondence, but is <u>not</u> being provided with the enclosures.


Very truly yours,

Lewis R. Olshin

LRO:jl:PH2\732382.2
Enclosures
cc: Paul Diamond, Esquire