EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,                    NO. 02-CV-2746
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

FILED JAN 2 4 2003

## PROTECTIVE ORDER

This cause having come before the Court upon motion of all parties to the above-captioned action, and the Court having determined that there is good cause therefor, it is

ORDERED that the provisions of this Protective Order ("Order") shall apply to all Litigation Materials, which are defined to include all documents and information produced by any party or persons or entities not a party to this Action in response to any discovery request promulgated under the Federal Rules of Civil Procedure in this Action. Litigation Materials shall also include all documents or information derived from Litigation Materials, all copies, excerpts or summaries thereof, and all deposition and hearing transcripts. The procedures for handling Litigation Materials at the time a summary judgment motion is filed and at the time of trial in this matter are not within the scope of this Order and will be addressed in a future Order of the Court.

1. Pursuant to Fed.R.Civ.P. 26(c)(2) and (7), if, in the course of this litigation, any party or non-party undertakes or is caused to disclose (the "Disclosing Entity") what the Disclosing Entity contends is "confidential information" or "highly confidential information," the

ENTERED
JAN 2 4 2003
CLERK OF COURT

426839 v.4

procedures set forth herein shall be employed and the disclosure thereof shall be subject to this Order, except insofar as a court orders additional or different protections pursuant to a non-party's motion.

### Litigation Materials Eligible For Designation As "Confidential" And Persons To Whom Such Information May Be Disclosed

2. . For purposes of this Order, the term "confidential information" shall mean any information, or the contents of any document (including copies, transcripts, videos, and computer stored information), (a) which is within one or more of the categories of information described on Exhibit A hereto, (b) which the Disclosing Entity contends is confidential patient or member information, or (c) which counsel for the Disclosing Entity believes in good faith could be used to the detriment of the Disclosing Entity, by any competitor, supplier, purchaser or other relevant industry participants for a competitive advantage outside of this litigation.

3. Confidential information shall not consist of any information which at any time has been: (a) produced, disclosed or made available to the public or otherwise available for public access; and/or (b) disclosed in connection with any governmental public filing or securities offering and which documents or information could not reasonably be assumed to be or have been intended to be kept confidential; provided, however, that confidential compilations of information shall not be deemed to have been so produced or disclosed merely because some or all of the component data have been so produced or disclosed other than in such compilation. Any information that has not been preserved or maintained in a manner calculated to preserve its confidentiality may not be designated as confidential.

4. Counsel for the Disclosing Entity must initially designate documents or information as confidential information prior to actual production of the document or information by placing

the notation "CONFIDENTIAL" on every page of each document so designated or, in the case of confidential information disclosed in a non-paper medium, (e.g., video tape, audio tape, computer disks, etc.), the notation "CONFIDENTIAL" shall be affixed to the outside of the medium or its container. To the extent a person to whom confidential information is disclosed copies, summarizes, or paraphrases the confidential information, or creates any other document from which the confidential information could be derived, the confidential information embodied in those copies, summaries or other documents shall remain confidential and subject to the provisions of this Order. Notwithstanding the provisions of this Protective Order, counsel may, for the purpose of conducting meaningful, court-supervised settlement negotiations, orally inform their clients of their conclusions and the conclusions reached by experts or consultants retained in this matter, provided however, that counsel shall not disclose any highly confidential documents on which any such conclusions may be based in whole or in part.

5. Confidential information may be disclosed only by counsel for a party and only to the following persons:

    a.    outside counsel for the parties and such counsel's professional, paraprofessional, secretarial, clerical and support personnel;

    b.    in-house counsel employed by the parties, including paralegals and secretarial and clerical personnel of such in-house counsel;

    c.    officers, directors or employees of the Disclosing Entity;

    d.    authors, addressees, recipients or persons who otherwise can be shown to know the confidential information;

    e.    testifying consultants and experts retained by counsel to assist in the preparation and trial of this action, provided that such persons shall be given a copy of this Order, advised that they are bound by it, and sign Exhibit B;

f.    non-testifying consultants and experts retained to assist in the preparation and trial of this action, provided that (1) counsel for the party that desires to make such disclosure believes in good faith that disclosure of confidential information is necessary or appropriate for such preparation; (2) the confidential information is only used in connection with preparation and trial in this case; and (3) the consultants or experts are given a copy of this Order, advised that they are bound by it, and sign Exhibit B.

g.    witnesses at a deposition or pretrial hearing, provided that (1) counsel for the opposing party desiring to use confidential information identifies the confidential information for the witnesses and counsel for the witnesses at least ten (10) business days before the deposition or hearing so that witnesses who would otherwise be precluded from seeing the confidential information by the terms of this Protective Order will have an opportunity to prepare for the deposition or hearing; (2) the confidential information is only used in connection with the preparation and examination of the witnesses; and (3) the witnesses are first provided with a copy of this Order, advised that they are bound by it, and sign Exhibit B.

h.    the Court and any persons employed by it; and

i.    court reporters, including stenographers and video technicians; and copy and computer service personnel for purposes of copying, imaging, or indexing documents.

6.  In addition to those persons or entities listed in paragraph 5, each party may select four (4) employees (the "Selected Employees") to whom confidential information may be disclosed. Each party shall provide to all other parties its list of Selected Employees within twenty (20) days of entry of this Protective Order. No confidential information may be shown to the Selected Employees unless they are first provided with a copy of this Order, advised that they are bound by it, and sign Exhibit B.

**Discovery Material Eligible To Be Designated As "Highly Confidential" And Persons To Whom Such Material May Be Disclosed**

7.     For purposes of this Order, the term "highly confidential" information shall mean any information or the contents of any document (including copies, transcripts, videos, and computer stored information) which satisfies the criteria of paragraph 3, and (a) which the Disclosing Entity contends is either proprietary or a trade secret, or (b) which reveals health care provider reimbursement rates or the negotiation of such reimbursement rates with health care providers.

8.     Counsel for the Disclosing Entity must initially designate documents or information as highly confidential prior to actual production of the document or information by placing the notation "HIGHLY CONFIDENTIAL – DISTRIBUTION AND COPYING RESTRICTED" on every page of each document so designated or, in the case of highly confidential information disclosed in non-paper medium (e.g., video tape, audio tape, computer discs, etc.), the notation "HIGHLY CONFIDENTIAL – DISTRIBUTION AND COPYING RESTRICTED" shall be affixed to the outside of the medium or its container. To the extent a person, to whom highly confidential information is disclosed, copies (as restricted in paragraph 9), summarizes, or paraphrases the highly confidential information, or creates any other document from which the highly confidential information could be derived, the highly confidential information embodied in those copies, summaries or other documents shall remain highly confidential and subject to the provisions of this Order.

9.     A party receiving highly confidential information shall make no more than six (6) copies of the highly confidential information for each law firm requesting it (but no more than twelve (12) copies in total), excluding copies for court filings and for exhibits at

depositions and hearings. Application for relief from this restriction against copying may be made to the Court with notice to counsel so designating the information.

      10.    Highly confidential information may be disclosed only by counsel for a party and only to the following persons:

      a.    outside counsel for the parties who have filed an entry of appearance in this matter and who agree not to represent the Delaware Valley Health Care Council of the Hospital and Health System Association of Pennsylvania, area hospitals (other than Chester County Hospital in the above-captioned case) in the contract negotiations by IBC of health care provider reimbursement rates or health care insurers that compete with defendants in any matter involving health care reimbursement rates for a period of eighteen (18) months from the date they last worked on this matter. This will not preclude such outside counsel from representing health care insurers that compete with defendants in litigation in which such information would be discoverable and otherwise disclosed. This will not preclude such outside counsel from representing area hospitals or insurers that compete with defendants in connection with any audit, investigation, or prosecution initiated by federal or state government. It will also not preclude such outside counsel from representing any insurer that competes with defendants in connection with any dispute or litigation between the insurer and any physicians or physician practice group respecting reimbursement rates.

      b.    for defendants: in-house counsel; and, for plaintiff: Paul Vanore (but only the actual hospital reimbursement rates in contracts negotiated by defendants applicable to calendar year 2000 and no other highly confidential information) Mr. Vanore will not participate in negotiations with any of the defendants (hereafter "IBC") in the above-captioned matter respecting the renewal, continuation, or commencement of any contracts with IBC in 2005 ("the 2005 contracts"). Mr. Vanore's duties with respect to the 2005 contracts will be limited to providing Chester County Hospital with his normal financial projections and analyses of proposals made by IBC. Mr. Vanore will also be required to

execute an affidavit in the form of Exhibit B prior to receiving any highly confidential information.

c.   officers, directors or employees of the Disclosing Entity;

d.   authors, addressees, recipients, or persons who otherwise can be shown to know the highly confidential information;

e.   testifying consultants and experts retained by counsel to assist in the preparation and trial of this action, provided that such persons shall be given a copy of this Order, advised that they are bound by it, and sign Exhibit B;

f.   non-testifying consultants and experts retained to assist in the preparation and trial of this action, provided that (1) counsel for the party that desires to make such disclosure believes in good faith that disclosure of highly confidential information is necessary or appropriate for such preparation; (2) the highly confidential information is only used in connection with preparation and trial in this case; and (3) the consultants or experts are given a copy of this Order, advised that they are bound by it, and sign Exhibit B;

g.   witnesses at a deposition or pretrial hearing, provided that (1) counsel for the opposing party desiring to use highly confidential information identifies the highly confidential information for the witnesses and counsel for the witnesses at least ten (10) business days before the deposition or hearing so that witnesses who would otherwise be precluded from seeing the confidential information by the terms of this Protective Order will have an opportunity to prepare for the deposition or hearing; (2) the witnesses are members of the class of persons defined in subparagraphs 10(b), (c), (d) or (e); or (3) counsel believes in good faith that such use is necessary or appropriate; and (4) the highly confidential information is only used in connection with the preparation and examination of the witnesses; and (5) the witnesses are first provided with a copy of this Order, advised they are bound by it, and sign Exhibit B;

h.   the Court and any persons employed by it; and

i.    court reporters, including stenographers and video
technicians; and copy and computer service personnel
for purposes of copying, imaging, or indexing
documents.

## Filing and Use

11.    No party shall submit to the Court any documents or information designated as

confidential or highly confidential except in a separate envelope, sealed and labeled with the

caption of this case and the notation "Filed Under Seal," together with a motion for leave to file

such document or information under seal, which motion shall clearly set forth the need for filing

the same. The filing of such a motion shall not constitute an acknowledgement by the moving

party of, or a waiver of its right to challenge, the appropriateness of any confidentiality

designation made by any other Disclosing Entity.  For purposes of setting and meeting deadlines,

documents submitted to the Court for filing in the above fashion shall be deemed filed on the day

they are delivered to the Clerk of Court.

12.    All documents and information designated as "confidential" or "highly

confidential" shall be used solely in this case or appeal therefrom, or for any alternative dispute

resolution proceeding mutually agreed upon by the parties, and for no other purpose whatsoever.

## Objections to Confidential or Highly Confidential Designations

13.    Any party may contest the designation as confidential or highly confidential of

any information or documents by providing written notice to the Disclosing Entity (with a copy

thereof to any other party) of the specific designations contested and the specific reasons

therefore.  The addressee of such notice may, within ten (10) business days after receipt thereof

(or such longer period as may be agreed or the Court may order), file a motion for protective

order with respect to some or all such information or documents either in this Court or by a non-

party in the district court from which the subpoena issued or within the jurisdiction of which

such non-party supplied such information or documents. Unless otherwise agreed in writing between the issuer of the notice and the addressee, failure of the addressee to file such a motion within such time shall be deemed a waiver of the designation.

## Disclosure of Confidential and Highly Confidential Information to Non-Testifying Experts and Witnesses

14. A party wishing to disclose confidential or highly confidential information to the persons specified in paragraph 5(f), or paragraph 10(f), shall give notice to counsel for the Disclosing Entity at least ten (10) business days prior to such disclosure of its intent to use confidential or highly confidential information. Such notice shall include the name of the person to whom disclosure is to be made, the type of information to be disclosed, i.e., confidential or highly confidential information, and sufficient other information to permit the Disclosing Entity to make an informed decision regarding whether to object to such disclosure. A party objecting to such disclosure shall have the burden of persuading the Court that disclosure should not occur and, provided the objection is made with five (5) business days of such notice, the confidential or highly confidential information shall not be disclosed to the person in question until the Court rules on the objection.

15. Witnesses shall not retain or copy confidential or highly confidential information, except (a) non-party witnesses who are shown documents that were marked confidential or highly confidential by the non-party entity they are representing, or (b) witnesses who are the authors, addressees or recipients of confidential or highly confidential information or who otherwise can be shown to know the confidential or highly confidential information.

16. Each non-testifying expert and consultant shall make no more than three (3) copies of confidential or highly confidential information and shall retain confidential or highly confidential information only until the conclusion of their retention in this matter. The

provisions of paragraph 20 (relating to the handling of confidential or highly confidential information at the conclusion of this case) shall apply to non-testifying experts or consultants at the conclusion of their retention in this matter, but shall under no circumstances extend beyond the conclusion of this case.

### Witness/Deposition Practice

17.    The witness, counsel for the witness, and counsel for any party shall have the right to exclude from oral depositions, other than the deponent and the deponent's counsel, any person who is not authorized by this Order to receive documents or information designated as confidential information. Such right of exclusion shall be applicable only during periods of examination or testimony directed to or comprising confidential information.

18.    Not later than sixty (60) days after the receipt of a written transcript of such deposition, the witness, counsel for the witness, or counsel for any of the parties in this action may notify counsel for the parties in writing that the deposition transcript, including exhibits, or any portion thereof is confidential or highly confidential as provided by this Order. Unless otherwise agreed, between the time of the deposition and until the end of the sixty (60) day period following receipt of the written transcript of the deposition, the entire transcript shall be deemed highly confidential as provided by this Order.

19.    Persons who are shown documents or information designated as confidential or highly confidential at a deposition pursuant to paragraph 5.g. or 10.g. shall be bound to maintain the documents or information in confidence in accordance with the terms of this Order. Witnesses shall not retain or copy portions of the transcripts of their depositions involving confidential or highly confidential information.

## Confidential or Highly Confidential Information In The
## Possession of Persons That Cease to Be Engaged In This Matter

20.     In the event that any person or party ceases to be engaged in the preparation for trial or trial of this action, such person's or party's access to documents, testimony and information designated as confidential or highly confidential information shall be terminated and they shall immediately return or destroy all confidential or highly confidential information received in this litigation. Said persons may return the confidential or highly confidential information to the attorneys for the party that retained them. Those attorneys shall then return or destroy the confidential or highly confidential information in accordance with this Order. The provisions of this Order shall remain in full force and effect as to any person or party who has obtained access to documents, testimony or other information designated as confidential or highly confidential information hereunder, except as may be specifically ordered by the Court or consented to by the producing party.

### Reservation of Rights

21.     The terms of this Order shall in no way affect the right of a Disclosing Entity (a) to withhold information on grounds of immunity from discovery such as, for example, attorney/client privilege or work product; (b) to raise or assert any objections heretofore or hereafter raised or asserted, including but not limited to defenses or objections with respect to the use, relevance or admissibility at trial, or discoverability of any information of materials; or (c) to reveal or disclose documents or information designated by the Disclosing Entity as confidential or highly confidential information.

22.     The inadvertent disclosure of any document or information shall not operate as a waiver of any discovery privilege or exception, including without limitation the attorney-client

privilege or the work product exemption, if the party or person producing the documents or information requests return of the documents or information within thirty (30) days after discovery of the inadvertent disclosure. A party that has received inadvertently disclosed documents or information subject to a privilege shall, immediately upon discovery of the same, return or (with respect to any such documents or information which have been altered or incorporated into other documents in a privileged manner) destroy all documents constituting the same or incorporating such information and shall make no use thereof.

23.    The terms of this Order shall in no way affect the right of a Disclosing Entity from continuing to use information or documents designated as confidential or highly confidential as it would in the normal course of its business.

24.    The parties' agreement to produce documents or furnish information is conditioned upon the confidential treatment of them as provided herein. Nothing in this Order shall be construed to create rights in any person not a party to this litigation except to the extent such person is a Disclosing Entity hereunder.

### Subpoena By A Third Party

25.    In the event that any person having possession, custody or control of any document or information produced in this action and designated as confidential or highly confidential receives a subpoena or other process or order to produce such document or information in another matter or proceeding, such person shall promptly notify the Disclosing Entity, shall furnish such Disclosing Entity with a copy of said subpoena or other process or order, and shall keep confidential such information and documents until the subpoena, process or order shall have become final and incontestable. The Disclosing Entity shall have the burden of defending against such subpoena or other process or order.

## Conclusion of Action

26.    Within 90 days after the conclusion of this action in its entirety, all parties and persons having received confidential or highly confidential information either shall return such material and all copies thereof to counsel for the party that produced it and shall certify that fact by affidavit, or shall destroy all confidential or highly confidential information in a manner that ensures that such material will not be disclosed to other persons and shall certify the method and manner in which such confidential or highly confidential information was destroyed by affidavit to the producing party.  In the case of confidential or highly confidential information furnished by a party to a testifying or consulting expert, counsel for that party shall have the responsibility of insuring that all such discovery material, including abstracts and summaries thereof, is returned to counsel for the party which produced such materials, or destroyed.  All materials returned to the parties or their counsel by the Court likewise shall be disposed of in accordance with this paragraph.  "Conclusion of this action" means that period of time after all appeal periods have expired or after the execution of a settlement agreement among all the parties finally disposing of this action.  Nothing contained in this Protective Order shall prevent counsel from retaining files of the correspondence, pleadings, memoranda, and transcripts from this proceeding at the conclusion of this matter, provided, however, that this Protective Order shall remain in full force and effect with respect to the handling or use of any confidential or highly confidential information contained in those files.

27.    The Court retains jurisdiction during and after final disposition of this action to enforce this Order and to make such amendments, modifications, deletions, and additions to this Order as the Court may from time to time deem appropriate or as may be requested by the parties.

ORDERED, this 24 day of January , 2003:

_____

John R. Padova.
UNITED STATES DISTRICT JUDGE

## EXHIBIT A

Categories of information subject to designation under paragraph 2 of the Protective Order.

1.    Non-public pricing or cost information.

2.    Non-public premium or rate information.

3.    Non-public financial data.

4.    Non-public information regarding the financial, marketing or other aspects of any service, product, procedure at issue in this litigation.

5.    Business plans.

6.    Marketing information and sales information (including plans, studies, strategies, proposals, research, market penetration analyses and goals).

7.    Non-public information relating to the guidelines, manuals, operating procedures and systems of any party to this litigation.

8.    Non-public competitor information (including assessments and evaluations).

9.    Information identifying customers or members, including but not limited to information regarding medical histories of individuals.

10.    Information in the possession of a person or party under an express agreement of confidentiality between that person or party and the person from whom the information was obtained.

11.    Information required by law to be maintained in confidence (including information maintained in employees' personnel files).

EXHIBIT B

AGREEMENT CONCERNING INFORMATION COVERED BY PROTECTIVE

ORDER

I, _____, hereby acknowledge that:

     a)    I have received a copy of the Protective Order ("Order") entered in this action by the United States District Court for the Eastern District of Pennsylvania,

     b)    I have either read the Order and/or have had the terms of the Order explained to me by an attorney,

     c)    I understand the terms of the Order and agree to comply with and to be bound by such terms,

     d)    I may receive documents or information designated as confidential or highly confidential and understand that such documents and information are provided to me pursuant to the terms and restrictions of the Order,

     e)    I agree to hold in confidence any documents and information disclosed to me pursuant to the terms of the Order and to only use such documents and information for the purpose of the legal proceeding in which they were produced

     f)    I hereby submit myself to the jurisdiction of the United States District Court for the Eastern District of Pennsylvania for resolution of any matters pertaining to the Order, and

     g)    I understand that, in the event I fail to abide by the terms of the Order, I may be subject to sanctions, including sanctions by way of contempt imposed by the Court.

My address is:


My present employer is:


Signature: _____

    Date:


426839

EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHESTER COUNTY HOSPITAL,          :         NO. 2:02-cv-02746-JRP
                Plaintiff         :
                                  :
      VS.                         :         **FILED**
                                  :
INDEPENDENCE BLUE CROSS, et al., :          JUL - 7 2003
                Defendants        :
                                            MICHAEL E. KUNZ, Clerk
                                            By _____ Dep. Clerk
                  O R D E R

        AND NOW, this 7th day of July, 2003, upon consideration

of the Motion to Intervene and for Protective Order by Multiplan,

Inc. (Doc. No. 54), the Motion for Protective Order by CIGNA (Doc.

No. 55), the Motion to Intervene and for Protective Order by Aetna,

Inc. (Doc. No. 56), the Motion to Intervene and for Protective Order

by Coventry Healthcare of Delaware (Doc. No. 66), the Motion to

Intervene and for Protective Order by Health Net of the Northeast,

Inc. (Doc. No. 67), the Motion to Intervene, for Protective Order and

to Quash by MultiPlan, Inc. (Doc. No. 83), the Motion to Modify

Protective Order by Plaintiff Chester County Hospital (Doc. No. 57),

and all Responses thereto, it is hereby ORDERED that:

        1.  The Protective Order entered between the parties in this

matter and signed by the Court on January 24, 2003, is hereby

MODIFIED as follows:

                A.  Documents that include proprietary and trade secret
                    information from third-party insurers (the
                    "Insurers") shall be marked "highly confidential
                    information" by the Disclosing Entity;

                B.  Paragraph 10 of the Protective Order shall be
                    modified as follows:

                    j.  The only IBC employee or officer to whom highly

confidential information may be disclosed is
Joseph Nolan. The only Chester County Hospital
employee or officer to whom highly confidential
information may be disclosed is Paul Vanore.
Neither Mr. Nolan nor Mr. Vanore will be
involved in "competitive decision making" for
a period of two years from the date of this
Order.    For purposes of this paragraph,
"competitive decision making" shall mean
participating or advising in any or all of
IBC's or Chester County Hospital's decisions
made in light of information about a
competitor.   Both Mr. Nolan and Mr. Vanore
shall submit an affidavit within five (5) days
from the date of this Order stating that they
shall use the highly confidential information
in no way other than for purposes of the
current litigation.

C.   With regards to the Insurers, their strategic
     business plans and hospital contracts shall be
     considered "highly confidential" under the Order;

D.   Material designated as highly confidential by the
     Insurers may not be disclosed to IBC, orally or
     otherwise, except under the conditions set forth
     under paragraph (b) above, irrespective of
     settlement negotiations;

E.   The protections of Paragraph 10(a) shall apply with
     equal force to the Insurers, including CIGNA, Aetna,
     MultiPlan, Coventry and Health Net;

F.   Paragraph 11 of the current protective order,
     addressing the filing of confidential and highly
     confidential information under seal, shall apply to
     any summary judgment motions;

G.   The Insurers shall have the same notice and
     opportunity to object to the disclosure of
     confidential and highly confidential information to
     (1) deponents, (2) pre-trial hearing and trial
     witnesses, and (3) non-testifying consultants and
     experts;

H.   Counsel for each party shall maintain a list of all
     persons to whom any third party confidential or
     highly confidential information is disclosed and the
     agreements signed by such persons, and shall provide
     counsel for a Disclosing Entity upon request with a
     copy of the list and signed agreements;

I.   In the event that a party objects to an Insurer's
     good faith designation of confidential or highly
     confidential information, the procedural burden of
     moving the Court for relief shall be placed on the

party-litigant;

J.    Any outside counsel to whom an Insurer's highly
      confidential information is to be disclosed shall be
      provided with a copy of the Order (as modified), and
      be advised, and agree, that they are bound by the
      Order;

K.    The Insurers shall receive forty-eight hours advance
      notice regarding any subpoenas issued by either
      party seeking the Insurers' highly confidential
      information.

L.    No more than six (6) copies shall be made of
      documents produced by the Insurers without the
      Insurers' express consent;

M.    At the conclusion of this litigation, the parties
      shall either destroy or return to the Insurers all
      documents produced by the Insurers, and confirm in
      writing that as to those documents the Order has
      been abided;

N.    Any notices that are to be provided to Aetna under
      the Order shall be sent via facsimile and 1st Class
      mail to: James C. Crumlish III, Elliott Reihner
      Siedzikowski & Egan P.C., 925 Harvest Drive, Suite
      300, Blue Bell, PA 19422; Facsimile Number:   (215)
      977-1099.

2.    Plaintiff's Motion to Compel Return of Confidential
Documents Inadvertently Disclosed to Aetna is DENIED AS MOOT;

3.    The aforementioned Motions to Intervene and for Protective
Orders filed by the non-party Insurers are DENIED by reason of the
relief already afforded by this Order.

It is so ORDERED.

**ENTERED**

JUL - 8 2003

CLERK OF COURT

BY THE COURT:

_____
CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHESTER COUNTY HOSPITAL,      :     NO. 2:02-cv-02746-JRP
          Plaintiff        :
                         :
    VS.                :
                         :
INDEPENDENCE BLUE CROSS, et al., :
          Defendants      :

**FILED**

**JUL - 7 2003**

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

O R D E R

AND NOW, this 7th day of *July*, 2003, upon consideration of Health Net of the Northeast, Inc.'s Uncontested Application for Admission of Attorney Pro Hac Vice (Doc. No. 84), it is hereby ORDERED that Katie A. Gummer, Esq., is admitted to the practice of law before the United States District Court for the Eastern District of Pennsylvania, pro hac vice, for all purposes in connection with the above-referenced action.

It is so ORDERED.

BY THE COURT:

CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

7/7/03 Copy via fax to:
See attached list

**ENTERED**

JUL - 8 2003

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHESTER COUNTY HOSPITAL,  :       NO. 2:02-cv-02746-JRP
            Plaintiff     :
                          :
      VS.                 :
                          :      **FILED**
INDEPENDENCE BLUE CROSS, et al., :
            Defendants    :       JUL - 7 2003


MICHAEL E. KUNZ, Clerk
                                                     Dep. Clerk
        O R D E R              By _____

AND NOW, this 7th day of July, 2003, upon consideration
of the Motion to Compel of Plaintiff Chester County Hospital ("CCH")
(Doc. No. 62) and the Response of Defendant Independence Blue Cross
("IBC"), it is hereby ORDERED as follows:

1.   With respect to CCH's request for documents concerning
IBC's financial performance in states and territories other than
Pennsylvania, New Jersey and Delaware:

     a.   IBC shall produce documents reflecting its annual
financial performance in Texas, Florida and Puerto Rico; and

     b.   CCH's request for documents reflecting IBC's reasons
for entering or exiting those areas is denied as they bear a highly
attenuated relationship to the case at bar;

2.   With respect to the redacted documents, CCH's motion is
denied without prejudice.  Should CCH make a more specific showing
in the future that it is entitled to the redacted portions of the
documents at issue, the Court shall reconsider this ruling;

3.   With respect to CCH's request for IBC's annual budgets
since 1994, the Court shall withhold ruling on this portion of the
motion pending notice from IBC regarding its good faith efforts to

obtain a limited set of documents reflecting its basis for its annual
budgets;

4.    With respect to CCH's request for documents relating to
IBC's annual employee incentive programs, its motion is denied;

5.    With respect to CCH's request for documents created in the
course of merger discussions with Highmark, its motion is denied as
moot.

It is so ORDERED.

BY THE COURT:

CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

7/7/03 Copy via fax to:
See attached list

ENTERED

JUL - 8 2003

CLERK OF COURT

EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHESTER COUNTY HOSPITAL,
           Plaintiff           :     NO. 2:02-cv-02746-JRP

      VS.                  :     **F I L E D**

INDEPENDENCE BLUE CROSS, et al.,  :     JUL 16 2003
           Defendants      :

                            MICHAEL E. KUNZ, Clerk
            O R D E R      By _____ Dep, Clerk

AND NOW, this *16th* day of *July,* 2003, the Court clarifies
its July 7, 2003 Order in this matter as follows:

    10(j).   The only IBC employee or officer to whom highly
confidential information of insurers other than IBC may be
disclosed is Joseph Nolan. The only Chester County Hospital
employee or officer to whom highly confidential information of
insurers other than IBC may be disclosed is Paul Vanore.
Neither Mr. Nolan nor Mr. Vanore will be involved in
"competitive decision making" for a period of two years from the
date of this Order. For purposes of this paragraph,
"competitive decision making" shall mean participating or
advising in any or all of IBC's or Chester County Hospital's
decisions made in light of information about a competitor. Both
Mr. Nolan and Mr. Vanore shall submit an affidavit within five
(5) days from the date of this Order stating that they shall use
the highly confidential information in no way other than for
purposes of the current litigation. The restrictions in
paragraph 10(b) otherwise remain unchanged.

    It is so ORDERED.

                                **E N T E R E D**

BY THE COURT:          JUL 16 2003

                             CLERK OF COURT

                          CHARLES B. SMITH
        UNITED STATES MAGISTRATE JUDGE

EXHIBIT "D"

DUANE MORRIS

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
CHICAGO
HOUSTON
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BOSTON
WASHINGTON, DC
ATLANTA
MIAMI
NEWARK
ALLENTOWN
WILMINGTON
CHERRY HILL
HARRISBURG
BANGOR
PRINCETON
PALM BEACH
WESTCHESTER

LEWIS R. OLSHIN
DIRECT DIAL: 215.979.1129
E-MAIL: Olshin@duanemorris.com

www.duanemorris.com

July 16, 2003

**Via Hand Delivery**

The Honorable Charles B. Smith
United States District Court for the E.D. Pa.
3006 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

> Re:    **The Chester County Hospital v. Independence Blue Cross, et al.**
>        **Civil Action No.  02-CV-2746**

Dear Magistrate Judge Smith:

Our firm represents the interests of Chester County Hospital.  We received a copy of Your Honor's Order as a result of the Motion to Modify the Protective Order.  We wanted to advise Your Honor and counsel for the insurers other than IBC, that counsel for Chester County Hospital has determined that it will <u>not</u> provide access to any highly confidential documents designated by insurers other than IBC to Paul Vanore.  Accordingly, we will not be providing an affidavit for Mr. Vanore.

Respectfully submitted,

Lewis R. Olshin

LRO/jl
cc:    Christopher T. Koegel, Esquire
       James Kress, Esquire
       James Crumlish, III, Esquire
       James Becker, Esquire
       Robert Hayes, Esquire
       Katie Gummer, Esquire
       Brian Must, Esquire
       William J. Leonard, Esquire

DUANE MORRIS LLP

EXHIBIT "E"



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL            :
                                       :
                    v.                 :
                                       :     NO. 02-CV-2746
INDEPENDENCE BLUE CROSS,               :
QCC INSURANCE COMPANY                  :
KEYSTONE HEALTHPLAN EAST, and          :
KEYSTONE MERCY HEALTH PLAN             :
                                       :

## DECLARATION OF ROBERT J. FRANZOI

Pursuant to 28 U.S.C. § 1746, I, Robert J. Franzoi, declare the following:

1.    My name is Robert J. Franzoi. I have been employed for the last 17 years with Aetna
      Inc. ("Aetna"), and presently act as Regional Manager for Health Care Delivery in
      Aetna's Mid-Atlantic Region. In that capacity, my responsibilities include overseeing the
      establishment and maintenance of contractual relationships with medical care providers.

2.    Aetna administers health benefits to individuals throughout the country through, for
      example, health maintenance organizations ("HMOs"). Aetna's Mid-Atlantic Regional
      headquarters are located in King of Prussia, Pennsylvania, and it does a substantial
      amount of business in this area.

3.    To administer health benefits to its members, Aetna maintains a network of medical care
      providers such as doctors, hospitals, and physician specialists, which provide medical
      services to eligible members. This network is created by contracts entered into by Aetna
      (and/or its subsidiaries and affiliates) with each medical care provider.

4.    Aetna's contracts with medical care providers typically include a schedule of rates that
      Aetna agrees to pay a provider for particular medical services rendered. Such rate
      schedules are individually negotiated and are among the central financial terms of such
      contracts.

5.    Aetna's rate schedules with medical care providers are among Aetna's most sensitive,
      confidential and proprietary information. I can attest to the fact that in Aetna's industry,
      information such as rate schedules are uniformly considered to be proprietary and
      confidential.

6.    If Aetna provider rate schedules were disclosed to Aetna's competitors or potential
      competitors, such information could aid such companies in their efforts to compete
      against Aetna. If a competitor knew the financial terms negotiated by Aetna with

jcc: 58611v1

providers, it could use that information to negotiate more favorable rates, and undermine Aetna's negotiating strategies.

7.    Moreover, if providers learned of the rates that Aetna had negotiated elsewhere, that information could be used by medical care providers against Aetna in its efforts to negotiate favorable financial terms.

8.    Because such information is confidential and proprietary, Aetna always includes in its provider contracts provisions as to Confidentiality and Non-Disclosure, prohibiting direct or indirect disclosure to any third parties of, specifically, the rate schedules or other financial terms of such contracts.

9.    Because such information is so sensitive, Aetna will typically not reveal this information to third parties, directly or indirectly, unless required to do so under law.

10.    I have been informed that in the above-captioned matter, Independence Blue Cross has sought to have Chester County Hospital ("CCH") disclose contract terms, rate schedules and documents detailing negotiations between CCH and Aetna.

11.    I can confirm that Aetna contracts with CCH. That contract and its financial terms, including specifically the rate schedules, are covered by express Confidentiality and Non-Disclosure provisions, as described above, prohibiting CCH from disclosing such information to third parties such as IBC, in recognition of the fact that such information is sensitive, proprietary, and confidential.

12.    In recognition of the harm that would occur due to a breach of the confidentiality provisions in their contract, CCH and Aetna agreed that breach of such provisions would cause irreparable harm, for which money damages would not be adequate to remedy.

13.    I have been informed that CCH's request for this information may also encompass rate schedules negotiated between Prudential Healthcare and CCH. I can attest to the fact that in 1999, Aetna acquired the operations of Prudential Healthcare. I can also attest to the fact that, like Aetna, Prudential included in its provider contracts provisions that prohibited disclosure of the financial terms of those arrangements, including rate schedules, in recognition of the sensitive and proprietary nature of these financial terms.

14.    Finally, I can attest to the fact that IBC, like Aetna, operates an HMO in the Commonwealth of Pennsylvania.

I declare under the penalty of perjury that the foregoing is true and correct.

ROBERT J. FRANZOI

joc: 58611v1

EXHIBIT "F"

DUANE MORRIS

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
CHICAGO
HOUSTON
PHILADELPHIA
SAN FRANCISCO
BOSTON
WASHINGTON, DC
ATLANTA
MIAMI
NEWARK
ALLENTOWN
WILMINGTON
CHERRY HILL
HARRISBURG
BANGOR
PRINCETON
PALM BEACH
WESTCHESTER

LEWIS R. OLSHIN
DIRECT DIAL: 215.979.1129
E-MAIL: Olshin@duanemorris.com

www.duanemorris.com

May 22, 2003

Via Federal Express

James C. Crumlish, Esquire
Elliott Reihner Siedzikowski Egan, P.C.
Union Meeting Corporate Center V
P.O. Box 3010
925 Harvest Drive
Blue Bell, PA  19422

Re:    The Chester County Hospital v. Independence Blue Cross, et al.
       Civil Action No.  02-CV-2746

Dear Mr. Crumlish:

As we previously advised you, the Chester County Hospital has been served with a Request for Production of Documents which requires us to produce to Independence Blue Cross (IBC) the documents attached to this letter. We have previously advised you that the Court has entered a Protective Order in this case and the documents which we intend to produce have all been marked "highly confidential" in accordance with that Protective Order.

We understand that you object to the production of these documents pursuant to the Protective Order. IBC has raised this issue with the Court and we have been advised to inform you that in the event that you fail to file a motion with the United States District Court for the Eastern District of Pennsylvania by May 30, 2003, we will be required to produce the attached documents to IBC. In addition, we are redacting the small number of documents which contain not only your confidential information but also that of other insurers. We will federal express those documents to you tomorrow.

James C. Crumlish, Esquire
May 22, 2003
Page 2


Accordingly, if you do not seek protection from the Court, the Chester County Hospital will have no choice concerning the release of this information. We would appreciate it if you would inform us of your decision prior to May 30, 2003.

Counsel for IBC is being sent a copy of this correspondence, but is not being provided with the enclosures.


Very truly yours,

Lewis R. Olshin


LRO:jl:PH2\732382.2
Enclosures
cc: Paul Diamond, Esquire

EXHIBIT "G"

LAW OFFICES

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

ONE PENN CENTER - 19TH FLOOR

1617 JOHN F. KENNEDY BOULEVARD

PHILADELPHIA, PA 19103-1895

(215) 665-3000
FAX (215) 665-3165

PAUL S. DIAMOND
DIRECT DIAL (215) 665-3224
EMAIL PAUL.DIAMOND@OBERMAYER.COM

June 19, 2003

**VIA FACSIMILE**

The Honorable Charles B. Smith
UNITED STATES DISTRICT COURT
U.S. Courthouse, Room 3006
601 Market Street
Philadelphia, PA 19106

Re:    **Chester County Hospital v. Independence Blue Cross et al.**
          **Case No. 02-CV-2746**

Dear Judge Smith:

I represent defendants in the above-captioned matter. As Your Honor knows, five third-party insurers have sought to modify the Protective Order in this matter, based on their objections to IBC's in-house counsel seeing rate and other proprietary information. I have communicated with counsel to four of the insurers (Aetna, CIGNA, Multi-Plan, and Health Net) and proposed to them a compromise by which their proprietary information would not be disclosed to any IBC in-house counsel. (I have been unable to reach Coventry's counsel). All counsel agreed to review my proposal with their clients. None has yet told me that his client has accepted or rejected the proposal. I believe a conference with the Court would be extremely helpful in resolving this open issue. Defendants' answer to the Aetna, CIGNA, and Multi-Plan Motions is currently due on Monday, June 23rd. Our answer to the Health Net and Coventry Motions is currently due on June 27th. With the Court's permission, defendants propose to file our answer to all the outstanding Motions promptly after the conference if the conference is not successful.

465597

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

The Honorable Charles B. Smith
Page 2
June 19, 2003


        Accordingly, on behalf of defendants I respectfully request a conference with the Court to
resolve without the need for further litigation the outstanding Motions to Modify.  Lewis Olshin,
counsel for plaintiff, Chester County Hospital, joins in this request for a conference.  For the
Court's convenience, I have attached a form of Order.


                                        Respectfully,

                                        Paul S. Diamond

                                        PAUL S. DIAMOND

PSD/jrm
cc:     Honorable John R. Padova (facsimile.)
        Lewis R. Olshin, Esquire (facsimile)
        James C. Crumlish, III, Esquire (facsimile)
        Brian T. Must, Esquire (facsimile)
        Richard A. Feinstein, Esquire (facsimile)
        Kevin C. McClay, Esquire (facsimile)
        Katie A. Gummer, Esquire (facsimile)
        Robert W. Hayes, Esquire (facsimile)

465597

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,              CIVIL ACTION NO. 02-CV-2746
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

## ORDER

AND NOW, this _____ day of June, 2003, it is hereby ORDERED that the Court

will conduct a conference at _____, on _____, to resolve the

outstanding Motions to Modify the Protective Order.  If the Motions are not resolved at this

conference, defendants shall file their answer to the Motions within seven (7) days thereafter.

BY THE COURT:

_____
SMITH, J.

EXHIBIT "H"

– LAW OFFICES –
# ELLIOTT REIHNER SIEDZIKOWSKI & EGAN, P.C.

UNION MEETING CORPORATE CENTER V
P.O. BOX 3010
925 HARVEST DRIVE
BLUE BELL, PENNSYLVANIA 19422

SUITE 300
400 SPRUCE STREET
SCRANTON, PENNSYLVANIA 18503
570-346-7569

GOVERNORS' ROW
P.O. BOX 1284
27 NORTH FRONT STREET
HARRISBURG, PENNSYLVANIA 17108-1284
717-234-3282

JAMES C. CRUMLISH, III
Direct Dial: 215-977-1030
Internet E-Mail: JCCrumlish@erse.com

215-977-1000
TELECOPIER: 215-977-1099

38 NORTH SIXTH STREET
READING, PENNSYLVANIA 19601
610-374-6756

June 19, 2003

**VIA FAX (215) 597-6125 and FIRST CLASS MAIL**

Honorable Charles B. Smith
United States District Court for the
Eastern District of Pennsylvania
U.S. Courthouse, Room 3006
601 Market Street
Philadelphia, PA 19106

> Re:    **The Chester County Hospital v. Independence Blue Cross, et al.**
> **U.S. District Court for the Eastern District of Pennsylvania**
> **Civil Action No. 02-CV-2746 (JRP)**

Dear Judge Smith:

I am in receipt of Paul Diamond's letter dated June 19, 2003. On behalf of Aetna, we concur that a conference with Your Honor, pursuant to Judge Padova's Orders relating to these discovery disputes, would be useful. However, contrary to Mr. Diamond's position, we believe that the Court and the non-parties would be better served if plaintiff, Chester County Hospital, and defendant, Independence Blue Cross, fully brief their respective positions, so we may find more directly the areas of agreement and focus appropriate efforts on areas of disagreement and their possible reconciliation. I believe that this is consistent with Judge Padova's Order directing party disputes, which were previously presented to the Court without a fully developed record, and which thereafter we were advised by the parties required Aetna to file the motion for protective order which is presently pending before this Court. It is my understanding, although we have not been served with additional discovery, that the parties continue to seek, *inter alia*, Aetna's confidential and proprietary trade secret information from other non-parties through discovery, notwithstanding Aetna's longstanding objection and notice to the parties of its legally protectable interest in safekeeping this information. Hopefully, all of the parties and non-parties will set forth their positions in an articulate fashion as to avoid any unnecessary waste of either the Court's or anyone else's time. We appreciate the Court's consideration of this matter.

Respectfully,

JAMES C. CRUMLISH, III

JCC:jmc

jcc: 55215v1

cc:    Honorable John R. Padova
        Paul S. Diamond, Esquire
        Lewis R. Olshin, Esquire
        Brian T. Must, Esquire
        Richard A. Feinstein, Esquire
        Kevin C. McClay, Esquire
        Katie A. Gummer, Esquire
        Robert W. Hayes, Esquire
        (All Telecopy)

EXHIBIT "I"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


THE CHESTER COUNTY HOSPITAL,
                    Plaintiff


            vs.                           02-CV-2746


INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY
KEYSTONE HEALTHPLAN EAST, and
KEYSTONE MERCY HEALTH PLAN,
                    Defendants
                                    10:00 a.m.
                                    July 7, 2003
                                    Courtroom 3-D
                                    Philadelphia, PA

_____

            Before MAGISTRATE JUDGE CHARLES B. SMITH
_____

APPEARANCES:

Lewis R. Olshin, Esq.                For the Plaintiff
H. Bruce Hanson, Esq.
Seth Goldberg, Esq.
DUANE MORRIS LLP
One Liberty Place
Philadelphia, PA  19103-7396


Richard A. Feinstein, Esq.
Daniel Kotchen, Esq.
BOIES SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, D.C.  20015


                Nancy O'Neill, OCR
                1234 U.S. Courthouse
                601 Market Street
                Philadelphia, PA  19106

APPEARANCES:   (cont'd)


Paul S. Diamond, Esq.                    For Defendants/IBC
William Leonard, Esq.
OBERMAYER REBMANN MAXWELL
  & HIPPEL LLP
One Penn Center, 19th Flr.
1617 J.F. Kennedy Blvd.
Philadelphia, PA  19103-1895


James G. Kress, Esq.
HOWREY SIMON ARNOLD & WHITE LLP
1299 Pennsylvania Ave., NW
Washington, D.C.  20004-2402


Mark J. Dianno, Esq.
IBC - Sr. Counsel


John P. Elliott, Esq.                    For Aetna, Inc.
ELLIOT REIHNER SIEDZIKOWSKI
  & EGAN, PC
Union Meeting Corp. Center V
925 Harvest Drive
Blue Bell, Pa   19422


Kevin C. Maclay, Esq.                    For CIGNA
JONES DAY
51 Louisiana Ave., NW
Washington, D.C.  20001


Katie A. Gummer, Esq.                    For Health Net
MCCARTER & ENGLISH, LLP
Mellon Bank Center
1735 Market St., Ste. 700
Philadelphia, PA  19103


Sarah E. Davies, Esq.                    For Coventry Health Care
COZEN O'CONNOR                             of Delaware
1900 Market Street
Philadelphia, PA  19103


Brian T. Must, Esq.                      For Multiplan, Inc.
METZ SCHERMER & LEWIS
11 Stanwix St., 18th Flr.

```
 1                        PROCEEDINGS
 2              THE COURT:  Good morning.  Always a pleasure
 3    to make billable hours for so many.
 4              I think I have a sense of it all, but
 5    when I'm setting the plate for another judge, I like to
 6    have everything right the first time.
 7              I will go through these motions separately,
 8    and I'm not sure whether I will necessarily rule right
 9    now or maybe reserve that.  And we will put together a
10    short memorandum opinion in a day or so, but I'm not
11    going to make it any great length.  But let me get to
12    what I see is the first issue.  Now, the willingness to
13    modify what is out, I'm given to understand, may have
14    been acceptable to some folks, and if that's the case, I
15    would like to have a sense of what more we need to do,
16    or who excepts now.
17              MR. OLSHIN:  Your Honor, maybe I can just give
18    you a brief --
19              THE COURT:  Jen, would you have everybody sign
20    in.
21              MR. OLSHIN:  We have something circulating.
22              Lewis Olshin representing Chester County
23    Hospital.  And I guess we are fortunate to be here today
24    because half of us got locked out of one Liberty Place
25    the Fourth of July weekend.
```

1          What basically took place is, as your Honor is
2     aware, we negotiated with counsel for IBC, Mr. Diamond,
3     and his colleagues an original protective order that was
4     signed by Judge Padova some time ago; and in the course
5     of discovery, as often happens, we wound up serving
6     subpoenas on various third parties.  Many of those third
7     parties are here in the courtroom today and represented.
8          Essentially, what we tried to do is meet and
9     confer with the third parties who had some concerns
10    about basically two classes of confidential information.
11    One class would be basically business plans and other
12    proprietary business information.  A second class, which
13    I guess is more sensitive to the insurers, dealt with
14    the actual rate information that they negotiated with
15    various hospitals in the Philadelphia area over
16    reimbursement rates.
17         In meeting and conferring with them, and then
18    having subsequent conversations with Mr. Diamond, we
19    tried to, I guess, compartmentalize our discussions.
20    The first issue was trying to deal with what we viewed
21    as the bigger problem of who had access to the
22    confidential information.  Then some of the third
23    parties also had some other suggested modifications to
24    the protective order which we were willing to consider.
25         In talking to Mr. Diamond about the situation,

1    he and his clients -- and I will let him speak for IBC

2    -- came forward with an attempted solution, which I

3    think he tried to zero in on the issues in <u>Pansy</u> and

4    the issues in <u>Ball Memorial Hospital</u> related to

5    whether people at IBC can be judged as competitive

6    decision-makers and whether you could carve out from

7    those competitive decision-makers someone else at IBC

8    who was not a competitive decision-maker as held by the

9    case law, and that person would then be the only one at

10   IBC who would have access to this confidential

11   information.

12          But I can let Mr. Diamond speak to that.  It

13   is his proposal.  It is one which, at least from our

14   perspective, goes a long way to try to meet the

15   requirements of the case law and also meet some of the

16   concerns as expressed by the insurers.  Although I will

17   add parenthetically, your Honor, that I believe some of

18   the insurers who are represented here today don't

19   believe Mr. Diamond's suggestions go far enough.  But

20   from the hospital's perspective, we certainly think IBC

21   has made a good faith effort to come up with a

22   compromise that sort of meets the parameters of the case

23   law.  But I will turn this over to Mr. Diamond.

24          MR. DIAMOND:  Your Honor, may I approach?

25          THE COURT:  Sure.

6

1    MR. DIAMOND: This is my proposal in my letter

2  to the court. I made it orally to all the insurance

3  counsel who would call my back.

4        And the crux of the problem is that under the

5  protective order as currently approved by Judge Padova,

6  three in-house lawyers at IBC are allowed to see highly

7  confidential documents: Mr. Dianno, who is here; Paul

8  Tufano, the general counsel; and Ms. Thompson, the head

9  of litigation. We could not represent to the other side

10  or to the insurers that they would not be involved in

11  any way in competitive decision-making. And so, what we

12  have done is we have selected a member of senior

13  management who is not in his daily activities and will

14  not be involved in competitive decision-making.

15        This case has been going on for approximately

16  14 months. The way we negotiated the protective order,

17  the way we structured our defense is really from a due

18  process concern. We feel very strongly that somebody in

19  senior management at IBC has to be able to see this.

20  This is a case about rates. They say we created a

21  monopsony and artificially depressed rates. The rates

22  of our competitors are going to be critical in the

23  litigation. And even though this person, Jim Nolan, the

24  controller of IBC, even though he is not involved in

25  competitive decision-making, and even though he will not

1   be allowed to discuss the highly confidential documents

2   with senior management at IBC, he will be able to make

3   recommendations to them regarding the future of this

4   litigation.  We are but representatives of the client.

5   He is the client.  And we feel we have gone very, very

6   far in eliminating a third of our defense team from

7   seeing these highly critical documents by designating

8   Mr. Nolan.

9          And we didn't indicate for what period because

10  the only insurer to get back to me was Mr. Maclay

11  representing CIGNA when I proposed this.  So we really

12  don't have a sense of how long he should be excluded

13  from the competitive decision-making.  But we feel this

14  really should take the issue of somebody at IBC using

15  this to the advantage of IBC and to the detriment of our

16  competitors off the table.  He will not have the

17  opportunity through advertance or inadvertance in the

18  language of the case law.

19         And the remaining issues for the insurance

20  companies really are questions of procedure.  I believe

21  Aetna's motion is sort of in a class by itself.  I think

22  that Aetna's order really wants to make it impossible

23  for us to use any of these documents at all.  So why

24  don't I deal with the other issues first.

25         First of all, they want to shift the burden.

1    As presently written, we believe that Pansy -- and
2    we model our order on the last page of the
3    confidentiality order which Judge Padova had.  You
4    probably are passingly familiar with that, Judge.  And
5    we feel that the law requires the party advocating the
6    confidentiality order has the burden of going to the
7    court if the other side disputes that and how the order
8    is written.  The insurers want to change that.  We don't
9    think that's consistent with the case law, and so we
10   won't agree to that.  In addition, they want to have 10
11   days notice any time  -- they want paragraph 10g of the
12   protective order to apply to the third-party insurers.
13          We have approximately three dozen depositions
14   that are going to be taking place within the extended
15   discovery for 90 days.  I expect that this material is
16   going to be used in most if not all of these
17   depositions.  And I think if we have to give them 10
18   days notice every time we intend to use this
19   information, you are going to see a lot more of us and
20   it's going to be very difficult to proceed with
21   discovery.
22          Let me add in closing.  We are an insurance
23   company.  I absolutely agree that the information they
24   are seeking to protect, it is proprietary, it is trade
25   secret.  We don't want to be here.  We don't want to

1    have to look at this stuff, but we have been sued.  They

2    are seeking 20 million dollars treble and they are

3    seeking to break up the company, and we have to be able

4    to defend ourselves.  And with this compromise, it

5    allows us to defend ourselves and will adequately

6    protect their proprietary information.

7         THE COURT:  Are there persons other than

8    Paul/Ellie/Mark that they want excluded?

9         MR. DIAMOND:  Everybody will be excluded now.

10   Under the protective order, the only three people at IBC

11   who can see any highly confidential documents are Paul,

12   Ellie and Mark.

13        THE COURT:  Okay.

14        MR. DIAMOND:  And they will be able to

15   continue to see highly confidential documents under our

16   proposed order, except for the third-party insurers.

17   They will not be able to see the third-party highly

18   confidential documents.  And under this proposed order,

19   these guys can mark whatever they want highly

20   confidential and nobody at IBC can see them.  And we

21   could not legitimately oppose that, particularly given

22   our statement on the record.  We could not oppose their

23   designation in that we have exactly the same thing, that

24   our rates are proprietary.  They're absolutely right.

25   This is our formula for Coca Cola.  The rates, strategic

1    plans, they are proprietary, and they will be marked

2    highly confidential.  Only Mr. Nolan will be allowed to

3    see them.

4              THE COURT:  Um-hmm.  All right.

5              May I hear from another insurer in terms of

6    how much further you would have us go?

7              MR. ELLIOTT:  John Elliot for Aetna.

8              THE COURT:  Yes, sir.

9              MR. ELLIOTT:  It's our position --

10             THE COURT:  Why don't you come up here.  Then

11   I don't need to put on any other glasses to see you.

12             MR. ELLIOTT:  In terms of the plaintiff's

13   proposed modifications, I speak for all of the insurers

14   that we agree to the terms set forth in paragraph 2, all

15   the terms in paragraph 2 with the exception that we

16   would like to modify to encompass all the modifiers.

17   Some of them are towards Aetna.

18             THE COURT:  Okay.

19             MR. ELLIOTT:  And paragraph i states that no

20   more than three copies shall be made of documents

21   produced by Aetna, and we would like it to be all

22   documents containing confidential or proprietary

23   information.

24             THE COURT:  Let's stop right there.  Anybody

25   have a problem with that?

1           MR. DIAMOND:  I'm sorry?

2           MR. ELLIOTT:  Instead of being three documents

3   produced by Aetna, we would like it to be all documents

4   containing confidential or proprietary information.

5           MR. DIAMOND:  That's fine.

6           What is our present agreement?  Do we have

7   six?

8           MR. OLSHIN:  Six.

9           MR. DIAMOND:  Judge, if I may?

10          THE COURT:  Sure.

11          MR. DIAMOND:  Most of these are redundant of

12  what is in the protective order.  And I don't see why it

13  should be a certain number for -- on defendant's

14  documents.

15          THE COURT:  I agree.  You have six in there

16  already.  Keep it six.

17          MR. ELLIOTT:  Okay.  And then I would have to

18  agree with Mr. Diamond's characterization of our

19  position.  We don't believe that anybody at IBC should

20  have access to our rates.  He has highlighted the

21  confidential and proprietary nature of this information

22  and hasn't really articulated his reasons other than

23  general defense, how his defense would be prejudiced

24  with the controller not getting access to the

25  information.  The rates are the rates.  They have an

1    expert who is going to be defending them.  There is no

2    reason for IBC or their employees to have access to our

3    confidential and proprietary information.

4              THE COURT:  You're saying the expert's access

5    is good enough.

6              MR. ELLIOTT:  And outside counsel is more than

7    good enough to prepare the experts.  They have no

8    internal knowledge of our rates.  If they need

9    information from the controller about Blue Cross's rates

10   and how these rates were reached without discussing our

11   rates, I don't see how that would prejudice them.  They

12   don't have any specific knowledge about our rates that

13   would conceivably help prepare the expert.

14             And I would also say that the law, including

15   Dentsply and Miles vs. Boeing and

16   Ball Memorial, supports our position that they

17   shouldn't have access.

18             THE COURT:  All right.

19             Any response from counsel there?

20             MR. DIAMOND:  Our expert certainly can advise

21   us on how to defend ourselves.  Our expert cannot advise

22   the board of IBC, cannot advise the president of IBC.

23   Mr. Nolan can.  We have chosen him very deliberately as

24   senior management and the hospital board who can advise

25   them as to the progress of the litigation so that the

1    client can make a reasonably informed decision.

2    Obviously, he can't say to them Aetna's rates are lower

3    than yours, don't settle.  He can't say that.  But he

4    can advise them as to whether or not he thinks the

5    litigation is of the nature the the case should settle,

6    should seek summary judgment, if and when we proceed to

7    trial whether they have a chance of winning the trial or

8    not, all the decisions that a client has to make in a

9    case of this magnitude.

10         And this is a case in which the plaintiff is

11    really seeking to really transform the way health care

12    is provided in the Delaware Valley, and I suggest that

13    extends to the United States.

14         And Mr. Elliott I think is sort of turning a

15    blind eye to the notion that we are but representatives

16    of the client.  Just as Mr. Olshin has Mr. Vanore, a

17    numbers cruncher guy, who is going to see our highly

18    confidential documents.  But as Mr. Olshin said, this is

19    really a due process when we negotiated this protective

20    order.  We need somebody who can see this material who

21    actually is the client.  That is exactly how we feel.

22    And unlike many of the cases that have been cited to

23    your Honor, we believe this is absolutely critical

24    evidence to the case.  This is a rate case.

25         MR. ELLIOTT:  And so is the <u>Ball Memorial</u>

1    case as well.

2              MR. DIAMOND:  But not a monopsony case.

3              MR. ELLIOTT:  But it's only in the

4    introduction, not in any of the counts.

5              But I don't understand why Mr. Diamond -- or I

6    mean Mr. Nolan, I don't know what legal expertise he

7    would have that would allow him to provide counsel to

8    the firm that a member of his firm could not provide.

9              THE COURT:  I agree with both of you in a way.

10   I will take a look at that a little later then.

11             MR. ELLIOTT:  One other thing.  We would also

12   like both parties -- I know plaintiff has, I don't know

13   about defendant -- but subpoenaing hospitals and other

14   parties, non-parties for documents that contain among

15   other things our confidential proprietary information,

16   we have been asking for disclosure about what documents

17   have been produced so far in litigation that contain

18   such information and an affidavit or disclosure of who

19   those documents have been disseminated to so far.  So

20   that would be part of the request that we would be

21   seeking as well.

22             THE COURT:  Okay.  Are you getting advance

23   notice now of any such subpoenas that would be going out

24   to others?

25             MR. ELLIOTT:  No.  We have had some notice

1    after the fact, but we have not been getting

2    simultaneously -- I have been dealing with Mr. Crumlish

3    who is of Mr. Elliott's firm, who I'm told he is in

4    Ireland.

5         By the way, thank you for making yourself

6    available to us so quickly. I meant to say that at the

7    beginning.

8         I have let Mr. Crumlish know that we intend to

9    subpoena various documents and he likely will be

10   subpoenaing some of the Aetna documents. I don't think

11   that would be a problem letting them know ahead of time

12   as soon as we know what we will be issuing. But this

13   was something Mr. Crumlish asked me fairly recently.

14        THE COURT: All right. How about telling him

15   what you have got so far.

16        MR. DIAMOND: We haven't gotten anything.

17   Everybody has been waiting for this hearing. Right now

18   there is CCH, Chester County Hospital has subpoenaed --

19   We haven't served subpoenas. These are CCH's subpoenas

20   that have triggered these proceedings. We have been

21   waiting for this proceeding before we serve our

22   subpoenas that would require the production of this kind

23   of trade secret stuff.

24        THE COURT: All right. Well, certainly if

25   there is anything out there, we want you to share. What

1    would be reasonable advance notice of any subpoenas that

2    are going out?

3               MR. ELLIOTT:   Two days --

4               MR. DIAMOND:   I think the rule says 48 hours.

5               THE COURT:   Okay.   Keep it that way then.

6               MR. MACLAY:   Your Honor, may I be heard from

7    CIGNA?

8               THE COURT:   Sure.

9               MR. MACLAY:   Your Honor, Kevin Maclay.   I have

10   the pending pro hoc motion that has been filed with the

11   clerk's office with an appropriate check, but I would

12   ask permission to speak.

13              THE COURT:   Okay.   What is this one all about?

14              MR. MACLAY:   I represent CIGNA and I want to

15   respond to counsel for IBC.

16              It is my understanding on the listing that

17   with respect to paragraph 2 of the plaintiff's proposed

18   order that all of the third-party insurers agree with

19   it, and that even IBC has only contested a subsection of

20   it.   So I would hope with the respect to the rest,

21   although I don't have prepared remarks, with respect to

22   the notice and the opportunity to object having to do

23   with the deponents, Your Honor, the problem with the

24   protective order as currently written is they have to

25   provide 10 days notice already to the deponents but not

1    to the owners of the information.  So they can take

2    CIGNA'S information, provide it to a deponent who does

3    not work for CIGNA, and not only do we not get any

4    notice, we have no opportunity under the current

5    protective order to object to that whatsoever.  And so

6    subsection 2e, given the objections -- notice to object

7    is critical because the only way that we can make sure

8    that our information is not given to non-critical

9    parties who  -- It is not just a matter of 10 days being

10   a hassle for the parties, your Honor; it's a matter of

11   there is no other way to protect the third-parties'

12   confidential information.  We need to know who is

13   getting our information.  And absent that, we wouldn't

14   have such a way.

15              THE COURT:  If we are giving notice to

16   deponents, can't we give it to anybody else?

17              MR. DIAMOND:  Your Honor, the problem is that

18   it gives them the opportunity to object, and they also

19   seek to reverse the burden.  And I suggest to your Honor

20   that we will be before your Honor every time.  It's just

21   a question of concluding discovery in this 90 days, and

22   I think it's just going to be unworkable.

23              I'm extremely sympathetic to his concerns.

24   And I would point out under the protective order under

25   paragraph 15, the witnesses can't keep documents, and

1   the depositions themselves would be designated highly

2   confidential and treated accordingly.  And I just think

3   it will be unworkable if we have to give five or six

4   companies notice.  If these documents weren't so

5   important in the case, maybe we would say something

6   else, but they're just too central to our defense.  I

7   think we will be living before your Honor if we have to

8   give them notice.

9          MR. MACLAY:  This isn't just a notice issue or

10  any of the third parties confidential information can be

11  provided to deponents free of restriction of the

12  protective order in the sense we cannot stop -- A

13  deponent could be somebody who currently already works

14  at IBC.  And under the current protective order, it's

15  possible that this would happen without us being given

16  an opportunity to know about it, much less to object.

17          And so it's not just that these third parties

18  are seeking notice before our information that we are

19  providing as third parties, who are supposedly entitled

20  to a higher degree of protection than parties.  We are

21  not just seeking notice.  We're also seeking the ability

22  to prevent disclosure when it's inappropriate, when a

23  particular deponent --

24          THE COURT:  As I see it, we have only got IBC.

25          MR. MACLAY:  I'm talking about deponents.

1       THE COURT:  You are saying they might subpoena

2  one of their own?

3       MR. MACLAY:  I'm saying that pool of potential

4  deponents.  And under the current protective order

5  anybody can see our notice and have an opportunity to

6  object.  And the deponent's counsel and the deponent get

7  notice.  We think that should be extended to the owner

8  of the information.

9       THE COURT:  All right.

10      MR. MACLAY:  With respect to the second issue,

11 your Honor, this is the burden that Mr. Diamond was

12 talking about.  Just to clarify, as I think it's pretty

13 clear on the face of the order, paragraph 2g isn't

14 talking about substantive burden; it's talking about

15 procedural burden.  In other words, if IBC does not

16 agree that certain documents produced by CIGNA, for

17 example, are highly confidential, do they need to ask

18 the court to lift the designation, or does CIGNA need to

19 move the court to protect the designation?  And I'm

20 unaware of any governing case in Pansy, or anywhere

21 else to the contrary.

22      Obviously, we don't have the benefit of any

23 briefing from IBC defendants in this matter, so we don't

24 know what they would have said if they had chosen to

25 file a brief.  As it stands now, I don't have any reason

1    to except their position, although I would like to have

2    such an opportunity.

3            MR. DIAMOND:  Had I filed a brief, I suspect I

4    would have said something that I'm saying to the court

5    now.

6            If I may just go through paragraph 2 so we are

7    absolutely clear.

8            THE COURT:  What page are you on?

9            MR. DIAMOND:  It was attached to the

10   hospital's motion.  It was attached to CIGNA'S motion.

11           THE COURT:  I have a memo here.  This covers

12   it all.  Okay.

13           MR. DIAMOND:  I think a, b, and c are not

14   necessary under our compromise.

15           I think that d is premature.  Applying this

16   order extending the protections of the protective order

17   to summary judgment is something that we just haven't

18   worked out with the other side yet.  We were very

19   careful in our dealings to exclude summary judgment and

20   trial because of all the public access concerns that

21   Pansy discusses.  That is what Mr. Maclay just

22   discussed.  And in the course of this litigation, if Mr.

23   Olshin is taking the deposition of an IBC executive and

24   wants to use CIGNA documents, if he has to give notice

25   to CIGNA 10 days in advance, and then CIGNA can say this

1  guy may be involved in competitive decision-making, we

2  don't want him to see that document.

3          So that Mr. Olshin under this scenario has the

4  burden of going before your Honor and saying we want to

5  use this document in this deposition. This is going to

6  happen again and again. The witness can't keep the

7  material. He is obligated to sign the affidavit of

8  confidentiality.

9          I recognize that they're uncomfortable. I

10  understand that. I just don't think there is any other

11  workable way. I wish there were. I sympathize

12  very much with my fellow insurance company lawyers. I

13  think this is the only way to make this case work.

14          F we don't have a problem with.

15          I believe g is inconsistent with Pansy.

16          I don't have a problem with being bound by the

17  order under h.

18          I believe we have already discussed i.

19          I would request that j be changed so that we

20  have the obligation either to destroy or return, because

21  I don't want to return stuff that may be work product.

22  We may have Aetna or CIGNA or other documents quoted in

23  some of our memoranda. I would like the opportunity to

24  simply destroy it.

25          And k, we don't want to return everybody's

1    stuff to Mr. Crumlish. Obviously, that's -- well,

2    Aetna might like it.

3         And paragraph 3, which says the January order

4    stays the same is okay with us.

5         Our position is that paragraph 1 is redundant,

6    unnecessary given our proposal of Mr. Nolan.

7         THE COURT:   Okay.

8         MR. MACLAY:   Your Honor, if I could be heard

9    again?

10        THE COURT:   Sure.

11        MR. MACLAY:   I would like to clarify one item,

12   your Honor, addressing some of Mr. Diamond's new attacks

13   on the other provisions of the order that I didn't

14   realize were an issue here.

15        If you read paragraph 2e, it doesn't have

16   anything to do with the shifting of the burdens to the

17   parties. In fact, what it says, 2e:   The insurers shall

18   have the same notice and opportunity to object to the

19   disclosure of confidential and highly confidential

20   information with respect to deponents and pretrial and

21   trial witnesses that they currently have with respect to

22   non-testifying experts.

23        We are not seeking to shift that burden.   If

24   that's Mr. Diamond's problem with 2e, I suppose it's not

25   a problem.

1          What the burden has to do with, your Honor, is

2     2g, which is whether we need designation of documents

3     that are highly confidential and they don't agree, they

4     need to move the court to change it.  It has nothing to

5     do with 2e where we have not attempted to shift the

6     burden.  We will retain that burden.  We need the

7     ability to protect that information, and there is no

8     other way to proposed by the parties.  So clearly there

9     has to be some way to protect our information.

10          With respect to a, b and c, Mr. Diamond said

11    that it's not necessary.  Given we have never seen any

12    briefing as to why they are not necessary, we believe

13    they are necessary.  The plaintiff has agreed that

14    they're necessary.  We have spent a lot of time working

15    these things through.

16          With respect to 2a, your Honor, one of the

17    reasons it's necessary is that under the current exhibit

18    A of the current protective order, these types of

19    information, and particularly strategic business plans,

20    are considered to be  --  Hold on a second, your Honor

21    -- subject to designation under paragraph 2 of the

22    protective order.

23          Paragraph 2 of the protective order is the

24    paragraph that's deals with confidential information,

25    not highly confidential information.  And so under the

1    current protective order, your Honor, there is an

2    argument that strategic business plans are merely

3    confidential and not highly confidential and, therefore,

4    can be disclosed to IBC's in-house counsel.

5         Well, the insurer strongly would disagree with

6    that and we -- if their only objection is it's not

7    necessary, that doesn't seem like a valid objection to

8    the insurers to strike out that part of our proposed

9    order.

10         With respect to 2b, there is a provision, your

11    Honor, which is somewhat vague in current paragraph 3 of

12    the protective order, which says that notwithstanding

13    anything else in this protective order, counsel may

14    orally inform their clients of their conclusions and the

15    conclusions reached by experts provided this counsel

16    shall not disclose any highly confidential documents.

17         Now, your Honor, the reason that's important

18    is it's the one place in the protective order you will

19    see the phrase confidential documents as opposed to

20    confidential or highly confidential information.  And so

21    the concern that 2b was meant to address is that one of

22    the parties informs their expert of details, and those

23    experts for the purposes of settlement convey them on to

24    the clients because they are not confidential documents.

25    And this is meant to close that exception, and it's very

1    important and critical to the third-party insurers.

2         And then 2c, your Honor, I don't understand

3    how they could argue it's not necessary.  If you read

4    paragraph 2a, which is the paragraph of the protective

5    order that is addressed by 2c, that only protects IBC's

6    information.  It uses the word IBC in the paragraph.  Of

7    course, the third-party insurers who supposedly are

8    highly protected should at least, your Honor, be

9    accorded the same level of protection that IBC has given

10   to itself, and that is all 2c does.  So that is why it's

11   necessary.  It's critical.

12        There is no problem with h or f.  I think that

13   resolves the contested issues.

14        Thank you, your Honor.

15        MR. DIAMOND:  Your Honor, all I meant on a, b,

16   c, under our compromise a, b, and c are not necessary.

17   That is all I meant.  I'm sorry.

18        MR. ELLIOTT:  Your Honor, if I may clarify one

19   thing.  Whether or not you adopted IBC's proposed order,

20   I just note on its face, it does not specifically

21   preclude IBC's in-house counsel from access to the

22   documents.  It says employee.  I don't know what their

23   role is.

24        MR. OLSHIN:  It says only IBC officers are --

25        MR. DIAMOND:  I don't know how much clearer I

1    can make it.

2

3            Paragraph 10 of the protective order, it says

4    the only IBC officer to whom highly confidential

5    information is to be given is Jim Nolan.

6            MR. ELLIOTT:  But it doesn't specifically say

7    that the evidence is to be precluded.

8            MR. DIAMOND:  I'm happy to accommodate Mr.

9    Elliott's concern.  We don't want -- Jim Nolan is the

10   only guy at IBC who can see that stuff.

11           MR. MUST:  On behalf of Multiplan, may I be

12   heard?

13           THE COURT:  Sure.

14           MR. MUST:  I represent Multiplan, and I

15   incorporate Aetna's policy with respect to the documents

16   for IBC.

17           But one point of clarification that I just may

18   be misreading and it may render one of our motions moot.

19           We also have subpoenas from Chester County

20   Hospital asking for all of our contracts with other

21   hospitals in the area, as well as our strategic business

22   plan.

23           As I read 10b of the protective order, I'm not

24   sure, will anybody from Chester see that or just counsel

25   and the consultants?

1    MR. OLSHIN: It's only Mr. Vanore who is in a
2    basic position, although it may be another corporate --
3    Paul Vanore is sort of our Mr. Nolan under this consent
4    that Mr. Diamond has put forward. And we originally had
5    agreed that Mr. Vanore would be the only person at
6    Chester County who would have access to the IBC
7    information, but he would be restricted from certain
8    activities related to IBC in terms of renewal,
9    continuation, commencement of any contracts. And that
10    would be I guess similar for any other insurer.
11        THE COURT: All right. Does that specificity
12    help?
13        MR. MUST: Well, it helps. But when I looked
14    at this, it talked about contracts negotiated by
15    defendant. And I wasn't sure if Mr. Vanore only came in
16    the loop on other types of documents or on documents
17    where my client has negotiated with other hospitals, and
18    my understanding is that he would. So, it's the same
19    issue on both sides with respect to in-house people
20    seeing the documents from my perspective, from
21    Multiplan's perspective.
22        Thank you, your Honor.
23        THE COURT: Sure. Okay.
24        MS. DAVIES: Your Honor --
25        THE COURT: Yes.

1          MS. DAVIES:  My name is Sarah Davies and I'm

2     here on behalf of Coventry Health Care of Delaware.

3          And, your Honor, I think our proposal was

4     somewhat similar to the other insurers, although not as

5     complex.  We wouldn't have an objection to Mr. Vanore

6     and Mr. Nolan looking at documents that are highly

7     confidential with the exception of the rate information,

8     which is extremely sensitive, extremely competitive.

9          We would propose that that information only be

10    seen by outside counsel and by the experts.  That's

11    typical in these kinds of cases.  In fact, Coventry in

12    another litigation is bound by the same kind of

13    confidentiality restriction, and in-house counsel cannot

14    see the reimbursement rates of other parties.

15         So we would respectfully request that only

16    outside counsel and the experts be allowed to see the

17    rate information, and the other highly confidential

18    information we would have no objection to Mr. Vanore and

19    Mr. Nolan reviewing.

20         THE COURT:  Okay.

21         MS. GUMMER:  Briefly, Katie Gummer on behalf

22    of Health Net.

23         We are coming into this a little later than

24    some of the other folks.  I don't know who the in-house

25    folks are that they are talking about using, why they

1    have chosen them, what their roles are in the company.

2          So I think at a minimum, if your Honor is

3    letting those folks see our materials, we should know

4    more about them, we should have an affidavit, or

5    something at least on record explaining --

6          THE COURT:  What would you like to know about

7    them?

8          MS. GUMMER:  Right now, I don't know.

9          THE COURT:  What would you like to know?

10         THE COURT:  I would like to know what their

11   positions are with the company, how long they have been

12   with the company, what decision-making functions they

13   have of any kind, why they were selected to fulfill

14   these roles, what their educational backgrounds are, who

15   they report to within the company.

16         I would like to be in a position to come to

17   some conclusion as to whether or not they are truly

18   appropriately limited in what they do to fulfill this

19   role of looking at these highly confidential documents.

20         THE COURT:  All right.  Well, just for our

21   purposes here -- and I don't men to get carried away

22   with lengthy affidavits or something -- introduce your

23   representatives to all collectively if you would, who

24   are they, would do they do, how long they have been

25   there, just in terms of this room and this record that

1    we are making.

2             MR. OLSHIN:  Judge, I will try to do that.

3             I will have to say as a caveat, this is the

4    first time this issue with respect to Mr. Vanore has

5    ever been mentioned to me as long as these discussions

6    have taken place.

7             But Mr. Vanore basically is a person who does

8    not have anything to do with the negotiation of rates.

9    He basically is the controller of the hospital who

10   basically was selected for the sole purpose of really

11   advising us of what some of these issues mean in terms

12   of what do these various bundles of rates mean.  But he

13   is not a negotiator of rates.  He doesn't get involved

14   with insurers in the negotiation or removal or

15   continuation of contracts.  That's handled by three

16   other people who are not allowed to see the information.

17   And that's why Mr. Vanore was selected.

18            THE COURT:  He has been with the hospital how

19   long?

20            MR. OLSHIN:  I have to believe in excess of 10

21   years probably.

22            THE COURT:  Okay.

23            MR. OLSHIN:  It's a big institution, but not

24   as big as IBC.  There is a core group of people, and I

25   believe Mr. Vanore has probably been there 10 years in

1    the capacity as essentially the controller.

2              THE COURT:  And he reports to?

3         MR. OLSHIN:  He reports to I believe Mr.

4    Flickinger who is the vice president, executive vice

5    president.  And I assume that he probably reports at

6    times to the president, Mr. Pepper.

7              THE COURT:  Okay.

8         MR. DIAMOND:  Your Honor, Mr. Dianno who knows

9    Mr. Nolan will describe him for the court.  I would

10   point out just as a preface, I respectfully suggest that

11   whatever his duties, it doesn't matter as long as he

12   takes the affidavit to the effect -- or we represent to

13   the effect that he will be barred from competitive

14   decision-making going forward, but I will be --

15             THE COURT:  I agree.  But we will go ahead.

16        MR. DIANNO:  Mark Dianno, senior counsel for

17   IBC.

18        Joe Nolan is a vice president and controller

19   for Independent Blue Cross who answers directly to John

20   Foose who is the chief financial officer.

21        His main duties include preparation of the

22   audited financial statements.  He also is responsible

23   for preparing our federal and state filings, our tax

24   filings, some of our insurance blanks that have to be

25   filed with the insurance department.  He is also

1    responsible for accounts receivable, cash in disbursing,

2    things of that nature.

3           He is specifically not involved in any type of

4    rate negotiation for the hospital or other health care

5    provider contracting.

6           THE COURT:  Okay.  And he has been with the

7    company how long?

8           MR. DIANNO:  I believe over 10 years with Blue

9    Cross.

10          THE COURT:  All right.

11          Will that suffice?

12          MS. GUMMER:  I appreciate that, but I don't

13   see why they would object to simply putting that

14   information in an affidavit, including how they are

15   limited on a going forward basis if in fact the court is

16   going to grant the request to have those --

17          THE COURT:  Well, the affidavit does limit --

18          MR. OLSHIN:  Well, the protective order says

19   it.

20          THE COURT:  Yeah.

21          MR. OLSHIN:  It says that Mr. Vanore cannot be

22   involved in renewal, continuation or commencement of

23   contracts with respect to any other insurer to year

24   2005.

25          MR. OLSHIN:  I said IBC, and by extension by

1    agreement to the other insurers, and is also required to

2    execute --

3            THE COURT:  We will make that change.

4            MR. OLSHIN:  He is also required to execute

5    exhibit B to the protective order if and when he is

6    shown any confidential rate information.

7            MS. GUMMER:  And that isn't in there with

8    respect to Mr. Nolan.

9            MR. DIAMOND:  But the order we have given your

10   Honor would keep him from competitive decision-making

11   and he would have to sign exhibit B.  I don't see a need

12   for an affidavit.

13           THE COURT:  We can live with what we have

14   here.

15           MS. GUMMER:  With respect to Mr. Vanore, I

16   guess it is being raised because the way I read the

17   protective order, and apparently the way some of my

18   colleagues read the protective order, is that no one at

19   Chester County would see these materials except for

20   Chester County Hospital.  So I think that is a new

21   issue.  And counsel has indicated they would intend to

22   have Mr. Vanore look at our documents and he -- as well

23   as IBC's documents, and that is news to us.

24           THE COURT:  Okay.

25           MS. GUMMER:  Thank you, your Honor.

1              THE COURT:  Before leaving this, is there

2       anyone else that would speak to this issue?

3              MR. OLSHIN:  Judge, I'm sorry.  There is one

4       housekeeping issue.  I think in the papers there is

5       mention of returning some information.

6              THE COURT:  Okay.

7              MR. OLSHIN:  And that has been taken care of.

8       And I wanted to mention that, that the material was

9       returned so that there is no longer an issue before the

10      court.

11             THE COURT:  All right.  In terms of still our

12      protective order, how about Aetna?  Did I hear if Aetna

13      -- are they here?

14             MR. OLSHIN:  That was Mr. Elliott.

15             THE COURT:  What do you say about Duane Morris

16      and inside/outside and Mr. Loder?

17             MR. ELLIOTT:  I think that the proposals by

18      plaintiff to the protective order satisfy our concerns

19      about that.  If it's just going to be the people who, at

20      Duane Morris, who have access aren't going to be

21      involved with any kind of work of negotiating rates,

22      kind of the same distinction they have for IBC, that

23      satisfies the requirements.

24             MR. DIAMOND:  Your Honor, the Aetna order,

25      although it's not argued in their papers, the Aetna

1   order would limit disclosure of the insurance companies

2   documents only to Obermayer.  There is no mention of

3   Simon, and outside counsel is outside counsel.

4            THE COURT:  Yeah.  Outside is outside.

5            THE COURT:  All right.

6            How about  -- and again, if any of you that

7   are here as intervenors don't have any interest in the

8   rest of these issues, certainly you are free to move on,

9   but we are happy to have you.

10           All right.  How about the geographic scope --

11  which is where I'm taking this now -- in terms of

12  plaintiff's motion to compel?

13           MR. DIAMOND:  Your Honor, that is,

14  respectfully, that's a sealed motion.  I would request

15  that the insurers be --

16           THE COURT:  All right.  Thank you.  Good I

17  didn't say more.

18           MR. ELLIOTT:  Your Honor, if I may.  We

19  discussed it before, and it doesn't involve any of our

20  confidential and proprietary information apparently.  If

21  we could get a statement to that effect on the record

22           MR. OLSHIN:  This motion is directed to IBC

23  only.

24           THE COURT:  Okay.

25           MR. MACLAY:  To clarify something else.  To

1    the extent that Mr. Vanore's ability to accept documents

2    is established, and to the extent he is IBC's

3    controller, we would request that it's made clear in

4    that one-page order there is a period of time,

5    potentially three years, in which he cannot return to

6    competitive decision-making, and represenatative not

7    only by him or --

8             THE COURT:  We had 2005, did we not, on the

9    IBC, and your names will will be included.

10            MR. OLSHIN:  Respecting the renewal or

11   commencement of any contract.

12            MR. MACLAY:  Although the reason for the time

13   period is that when IBC's contracts run out.  I do not

14   know that all of Aetna's contracts run out at the same

15   time.  So I would ask a slightly shorter period.  It

16   just precludes potential problems.  It wasn't briefed.

17            MR. ELLIOTT:  We did add that as a footnote.

18            MR. OLSHIN:  It is three years, your Honor, or

19   two years at this point.  It seems to me I think in the

20   Ball Memorial case there was a period of 18 months,

21   so this is even more expansive than that.

22            THE COURT:  All right.  Well, we will rule on

23   that.  And we look through the whole plan here --

24            MR. MACLAY:  And also to say it for the

25   record, I believe there is case law for the proposition

1    that before inside people can see  -- and I think this

2    actually extends to inside counsel -- that they're

3    typically required to sign an affidavit, because

4    otherwise it's unclear to me how a third-party insurer

5    could proceed against IBC, for example, if in fact this

6    person does have some competitive decision-making.  It

7    would be more clear if it were imported into the order.

8                (A group of people left the courtroom.)

9                THE COURT:  I have two interns in the back if

10    you are worried about who they are.

11                All right.  Let's talk about Puerto Rico and

12    some of those other places that there seems to be a

13    interest in.

14                MR. FEINSTEIN:  Good morning, your Honor.

15    Richard Feinstein also representing the plaintiff.

16                With respect to that issue, your Honor we have

17    attempted to propound a relatively narrow request for

18    information about IBC's information outside the

19    five-county area.  It would be focused on only financial

20    performance and the reasons for entering or exiting

21    those other areas.

22                The reasons that we are seeking that document

23    -- and let me state parenthetically the fact that that

24    is not perfectly consistent with the geographic market

25    in this case.  I believe it's quite well established

EXHIBIT "J"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL    :    CIVIL ACTION
                             :    NO. 02-2746
       v.              :
                             :

INDEPENDENCE BLUE CROSS,    :
QCC INSURANCE COMPANY,    :
KEYSTONE HEALTH PLAN EAST, and    :
KEYSTONE MERCY HEALTH PLAN    :

## AFFIDAVIT OF JOSEPH F. NOLAN

Joseph F. Nolan, being duly sworn according to law, deposes and says:

1.    I, Joseph F. Nolan, am currently Vice President Controller of Independence Blue Cross.

2.    I take this affidavit in accordance with the Order of July 7, 2003 of United States Magistrate Judge Charles B. Smith (the "Order").

3.    In accordance with paragraph 10 J of the Protective Order, I agree that to the extent I am given access to any highly confidential information as defined by the Protective Order, I will only use the highly confidential information for purposes of the current litigation.

4.    Further, I am not involved in "competitive decision making" as that term is defined in the Order and I agree not to be involved in participating or advising in any or all of Independence Blue Cross's decisions made in light of the highly confidential information I receive in this litigation about a competitor for a period of 2 years from the date of the Order.

_____
Joseph F. Nolan

July 10, 2003

EXHIBIT "K"



## Corporate Mission

The corporate mission of Independence Blue
Cross and its affiliates is to contribute to the
good health of our members through financing
the delivery of quality health care and allied
services, effectively and efficiently managing
the care provided to our members, and actively
participating in shaping the evolution of the
health care system.

The IBC Family of Companies will fulfill its
overall corporate mission through the following:

- Maintaining long-term financial stability.

- Increasing the number of people, regions
  and markets served.

- Continuing our commitment to high-quality
  service to our partners.

- Partnering with a full spectrum of
  providers committed to improving the quality
  of the health care services delivered to
  our members.

- Assuring continued commitment to the social
  aspects of our mission.

# 2002: An Incredible Balancing Act

## Message from the President

Visit any department here at Independence Blue Cross, and ask someone how the company performed during 2002. Their answers tell the story of an impressive balancing act.

They will talk about IBC's 15th consecutive year of adding to our surplus, so that our members and providers can be assured that IBC will be able to pay their claims in the uncertain world we face today.

They will talk about new arrangements with hospitals, about 27 successfully renegotiated hospital contracts and about IBC's bold new incentive plan to reward hospitals for improving the quality of patient care.

They will recall how IBC responded to the medical malpractice insurance crisis and other cost pressures on physicians with the third major increase in fee schedules in 19 months. And they will stress that even such significant increases cannot begin to replace the urgent need for long-term tort reform.

They will explain—and perhaps boast just a little—about successes in technology and e-commerce, and dazzle you with Operations statistics, like this one: IBC handled more than 40.5 million claims, phone calls and enrollment transactions in 2002. That's 780,000 every week. That's six transactions every second.



G. Fred DiBona, Jr.
President & CEO

**2**  Independence Blue Cross 2002 Annual Report

*...Social Mission that made possible the enrollment of more than 16,000 uninsured adults during the first six months of Pennsylvania's new adultBasic program.*

They will speak of efforts to build a new model for managed care and point to their company's continued support for a Social Mission that made possible the enrollment of more than 16,000 uninsured adults during the first six months of Pennsylvania's new adultBasic program.

They will tell you that 2002 was a very good year for IBC. And they are right. The results were impressive.

They appear even more impressive when one considers the environment in which they were achieved. 2002 was a difficult year, peppered with challenges—stiff competition, an uncertain economy, continued escalation in medical costs, the malpractice crisis and a host of new government regulations and requirements.

It was a year in which the health care cost crisis worsened, forcing the number of uninsured Americans beyond 41 million. It was a year in which more and more employers responded to higher health care premiums by reducing benefits and shifting more costs to their workers. It was a year in which some media, class action attorneys and legislators created the myth that IBC's surplus was excessive, a position that was refuted by experts who understand that an insurance company needs a surplus sufficient to pay its members' claims in an emergency. And it was a year in which the skyrocketing cost of medical malpractice insurance threatened to deprive our members of good physicians who were deciding whether to abandon Pennsylvania or quit medicine altogether.



2002 was a good year and a difficult year, one that demanded each day that we successfully balance a host of competing interests and demands.

↗ Hospitals want higher reimbursements.

↗ Physicians want higher fees.

↗ Members want more benefits.

↗ Employers want lower premiums.

↗ Everyone wants the best in medical care, including the latest technology and new drugs.

Throughout 2002, IBC faced this balancing act and responded creatively and conscientiously, guided by one overriding goal:

**Keep the Promise.**

And we did. For another year, IBC kept the promise we make every day to our members— to be there when they need us the most.

As we look back at how we kept that promise in 2002, let us rededicate ourselves to that same overriding goal for 2003, recalling the millions of people who depend on us to achieve it.

G. Fred DiBona, Jr.
President & CEO

# Financial Performance



PA 5-COUNTY INFORCE MEMBERS

| 98 | 2,633,124 |
| 99 | 2,716,985 |
| 00 | 2,812,750 |
| 01 | 2,861,196 |
| 02 | 2,929,046 |

As we reach the end of 2002, Independence Blue Cross stands on solid financial ground.

For the 15th consecutive year, we added to our surplus—the funds set aside to pay unexpected claims and a crucial measure of an insurance company's financial stability. As of Dec. 31, 2002, IBC's statutory surplus again satisfied the requirements of the Pennsylvania Insurance Department and the national Blue Cross Blue Shield Association.

The increase in surplus was fueled by more than $8.4 billion in underwriting revenue. Every underwriting target for the year was exceeded. Every line of insurance business for IBC and its affiliates—in Pennsylvania, New Jersey, Delaware, Jamaica and Puerto Rico—was profitable, contributing to our mission.

This is, indeed, an impressive financial model. Highly successful subsidiaries such as QCC Insurance Company, the company that offers Personal Choice®, our preferred provider organization product, and Keystone Health Plan East, our health maintenance organization product, produce the revenues which flow back to the "non-profit" parent, IBC, thereby enabling it to continue its mission as insurer of last resort.

The success of this performance, however, must be balanced with the enormity of the financial responsibility we bear on behalf of our members. During 2002, IBC paid nearly $7.4 billion in claims on behalf of our members and customers—that's more than $617 million in claims each month.

Therein lies a sobering fact about the health care crisis we face:

*Despite adding to our surplus in 2002, IBC actually has fewer days of claims in reserve than at the end of 2001.*

That's right—we ended 2001 with enough statutory surplus to pay our members' claims in an emergency for 42.9 days. We finished 2002 with only 40.4 days of claim payments in reserve.

Why? Because in 2002, we paid more claims, and far more expensive claims, on behalf of more members.

And so, even as our critics attack our surplus as excessive, we renew the vow we made to the Pennsylvania's Insurance Department during an informational hearing in September:

**We will add to our surplus again in 2003**—because we take seriously our financial responsibilities to our members.

It is part of the balancing act, part of keeping the Promise.

PA 5-COUNTY MANAGED CARE
INFORCE MEMBERS

| Year | Members |
|------|---------|
| 98 | 1,820,181 |
| 99 | 1,933,241 |
| 00 | 2,127,219 |
| 01 | 2,265,089 |
| 02 | 2,396,978 |

*Over a 12-month period stretching back to late 2001, IBC successfully renegotiated 27 hospital contracts.*

You also can see the balancing act at work in our relationships with hospitals and physicians during 2002.

Over a 12-month period stretching back to late 2001, IBC successfully renegotiated 27 hospital contracts. In each of those negotiations, IBC met the same difficult challenge: How to address the needs of hospitals while preserving our commitment to deliver access to health care to our members at the most affordable cost possible.

Yes, the balancing act is difficult.

Physicians, too, faced increased financial pressures during 2002, partly as the result of skyrocketing premiums for medical malpractice insurance. As the crisis worsened, the threat grew that good physicians would retire or leave Pennsylvania. In December, IBC responded to the situation with the third increase in its physician fee schedule in just 19 months. With the latest increase, scheduled for March 2003, IBC's annual reimbursements to physicians will have risen by more than $300 million since August 2001. While these significantly higher reimbursements will not pay for all of the increases in malpractice insurance premiums that physicians in the high-risk specialties are incurring, IBC and its customers cannot possibly shoulder such increases alone. Pennsylvania needs a long-term solution to the medical malpractice insurance crisis.

looking forward to 2003, the challenge will grow. Medical costs continue to significantly outpace the rate of inflation, and this region's utilization of medical services remains among the nation's highest. Consider that Pennsylvania has:

⁵ The second highest rate of inpatient hospitalization among the nation's major markets (846 days per 1,000 insured residents).

⁶ An outpatient surgery rate (84.2 per 1,000 insured residents) that is 44 percent higher than the U.S. average.

⁷ A rate of physician visits (7.06 per insured resident per year) that is 27 percent higher than the U.S. average.

In recognition of the cost pressures that physicians and hospitals were experiencing, we assumed a leadership role during 2002 in the debate over how to address the medical malpractice insurance crisis. We lobbied for several reforms enacted during 2002, and pressed for Pennsylvania to follow the lead of states that have capped jury awards for non-economic damages. In addition, we took part in the public debate by placing newspaper ads and presenting opinion articles to generate public support for meaningful tort reform.



PA 5-COUNTY PERSONAL CHOICE®
INFORCE MEMBERS

| 98 | 851,492 |
| 99 | 955,118 |
| 00 | 1,040,327 |
| 01 | 1,123,936 |
| 02 | 1,148,283 |

*We have urged media, public officials and other health care institutions to acknowledge the complexity of this crisis and to collaborate on the search for solutions.*

Similarly, we attempted to raise the level of public discussion on the cost crisis that threatens the stability of our health care system—and the need to address this crisis at once. In a variety of forums this year—from opinion articles written for newspapers to meetings with legislators to public appearances— we have urged media, public officials and other health care institutions to acknowledge the complexity of this crisis and to collaborate on the search for solutions.

## Membership

All of the ingredients were present in 2002 for IBC to experience declining enrollment in our products. Consider:

✔ Driven by continued double-digit inflation in medical costs, premiums rose again, and significantly, on most contracts.

✔ A stagnant local economy, which cost Philadelphia 24,000 private sector jobs in the second quarter of 2002 alone, caused employers to even more closely scrutinize health coverage costs.

✔ The competition pursued our business with a variety of new strategies and products.

Efforts by some media, legislators and class action lawyers to mischaracterize our surplus as "excessive" invariably led to questions about whether our premium increases were justified.

Despite this difficult marketing environment, IBC's membership continued to grow—and in 2002, the growth exceeded all expectations.

The highlights:

☞ In the first quarter alone, IBC added almost 93,000 new members in Pennsylvania and more than 37,000 new members elsewhere in the U.S. It was one of the best first quarters in IBC history.

☞ Enrollment in Pennsylvania exceeded 3 million members for the first time.

☞ At year's end, total enrollment for the IBC Family of Companies stood at 4,053,389.

☞ 2002 represented the most successful gross enrollment year in the history of the Medicare+Choice (M+C) program. There were 49,891 new M+C members enrolled!

☞ Keystone Health Plan East became IBC's top product, with a net gain of 110,000 members; Personal Choice® added 19,000 members and we added 25,000 members in New Jersey.

☞ Keystone HMO and Personal Choice® exceeded 1 million members each.

PA 5-COUNTY KEYSTONE HEALTH PLAN EAST INFORCE MEMBERS

| 98 | 945,845 |
| 99 | 1,002,804 |
| 00 | 1,060,508 |
| 01 | 1,117,235 |
| 02 | 1,226,987 |

Once again, the marketplace spoke loudly and clearly—more and more people bought IBC's products.

Despite these successes, however, an extremely difficult marketing environment still exists for 2003. Continued growth in medical expenses is causing premiums to increase, the economy continues to stagger and our competition is growing more aggressive each day.

## Technology

An important component of our effort to keep health insurance as affordable as possible is our determination to control our own administrative costs—one of the few factors in the health care cost equation that IBC can directly control. IBC's selling and administrative costs—as a percentage of revenues—are almost 15 percent below the national average for major health plans. Our 2003 plan calls for IBC to continue the progress we have made in recent years in significantly reducing the growth in administrative costs.

To do that, we must continue to invest in technology that changes the way we do business, reducing the paperwork and redundancy involved in managing health care coverage for millions of members. We are confident that the investments we made in 2002 are helping us to achieve those goals of reducing administrative costs and making it easier for our members and customers to do business with us.

Four strategic initiatives anchor our technology strategy:

§ **e-Commerce** 2002 was a year of accomplishment for our electronic business strategy. We introduced *ibxpress*® and our subsidiary, AmeriHealth, introduced *AmeriHealth Express*™ to groups and members, and they responded by conducting

2.7 million transactions with us electronically. Our goal in 2003 is to double that number. We also continued to rollout our NaviNet portal for providers, and by year's end, 30 percent of physician referrals and 35 percent of emergency room notifications were being submitted online to IBC.

§ **MHS** During 2002, the records of more than 1 million Keystone members—that represents 23,000 groups—were transferred successfully to the new Power MHS system. As a result, our entire HMO business now resides on one common processing platform. The benefit? By year's end, over half of Keystone's claims were "auto-adjudicated"—received, processed and paid without being touched by human hands. By the end of 2003, our goal is to auto-adjudicate 70% of Keystone's claims.



PA 5-COUNTY MEDICARE RISK
INFORCE MEMBERS

98   99   00   01   02

121,570
137,132
191,765
142,128
166,735

# The Customer Comes First

*In 2002, we processed more than 40.5 million transactions, four million more than in 2001.*

Earlier in this report, reference was made to the nearly $7.4 billion in claims that were paid to meet the health costs incurred by our members during 2002. The administrative and operational effort required to pay those claims in an efficient and accurate manner is also enormous. In 2002, we processed more than 40.5 million transactions, four million more than in 2001. Those 40.5 million transactions included:

☞ 31.5 million claims processed

☞ 5.8 million member phone calls

☞ 3.1 million enrollment transactions

☞ **Corporate Data Warehouse** A critical part of managing our business is having accurate information. Toward that end, we met all of the milestones during 2002 that allowed us to populate our "warehouse" with three years of historical data on 70 million claims for Keystone members.

☞ **HIPAA** During 2002, IBC met all deadlines for compliance with new federal privacy regulations concerning transactions and code sets, and is now capable of sending and receiving transactions from members and customers that comply with HIPAA regulations. Our 2003 efforts are focused on privacy and security compliance.

Or, to put it another way, that is:

☞ More than 3.3 million transactions a month
☞ nearly 780,000 a week
☞ more than 162,000 per day
☞ nearly 21,600 per hour
☞ more than 360 a minute
☞ and 6 in every second

## Quality

The marketplace was not alone in reaffirming the quality of our products in 2002. IBC again earned the highest possible rating by the National Committee for Quality Assurance (NCQA) for its commercial and Medicare HMO and PPO products.

NCQA is a nationally recognized, independent organization dedicated to measuring the quality of America's managed care plans, preferred provider organizations, and other health-related organizations.

In its evaluation, the NCQA gave Keystone a near-perfect score and a designation of "Excellent." It marked the fourth consecutive time that Keystone has received the NCQA's top accreditation for both its Commercial and Medicare product lines. Personal Choice® was awarded



PA 5-COUNTY MEDICAID RISK
INFORCE MEMBERS

98   228,897
99   220,036
00   221,419
01   240,683
02   248,697

"Full" accreditation for both its commercial and Medicare products for the second consecutive time. Personal Choice® is the only PPO plan in Pennsylvania to earn NCQA's highest rating and one of the first in the nation to do so.

Also during 2002, IBC launched an important new initiative designed to improve the quality of hospital care for our members.

Our new Hospital QIPS (Quality Incentive Payment System) is designed to provide a financial incentive to hospitals for enhanced quality of care and improved patient safety. Generally, under the program, hospitals agree to base part of their annual rate increases on their performance against agreed-upon quality parameters, such as readmission and mortality rates, nurse-to-patient ratios or installation of

computerized physician order entry systems to reduce prescription errors.

Throughout 2002, hospitals whose contracts were due for renegotiations were offered the opportunity to take part in the Hospital QIPS program. By year's end, a total of 15 hospital contracts included Hospital QIPS, and other hospitals expressed interest for a later time.

In addition, IBC collaborated with the Delaware Valley Healthcare Council (DVHC) on a project to enhance medication safety at area hospitals. IBC contributed $750,000 to DVHC's Health Care Improvement Foundation to support the completion of DVHC's Regional Medication Safety Program for Hospitals, which has been recognized as one of the top five collaborative patient safety programs in the United States.

Our involvement with the good health of our members extended into many other areas:

☞ More than 166,000 newborn, pediatric and adolescent immunization reminders were sent to members, reminding them of the immunizations their children require, from birth to their 13th birthdays. This includes more than 10,000 calls made to parents of 9-month-old children—a 2002 enhancement to our pediatric immunization program.

☞ More than 250,000 adult immunization reminders were sent to members 65 years of age and older, as well as members with medical conditions placing them at high risk for complications of influenza.

☞ 512,732 mammography birthday card reminders were sent to women 40 years of age and older.

☞ 256,348 female members received pap smear reminders under our cervical cancer prevention program.

☞ 119,977 calls were made to members 50 years of age and older without a record of having received a cholesterol screening within the past 5 years.

*Personal Choice®*
*is the only PPO plan*
*in Pennsylvania*
*to earn NCQA's*
*highest rating*
*and one of the first*
*in the nation to do so.*

**16** Independence Blue Cross 2002 Annual Report

*Almost $4 million*
*was paid to nearly*
*27,000 members who*
*...made at least 120*
*visits in a year*
*to their health club.*

☞ Almost $4 million was paid to nearly 27,000
members who took advantage of our Fitness
Reimbursement program and made at least
120 visits in a year to their health club.

☞ More than 28,000 mailings, which included
educational materials and discount offers,
were sent to enrollees in our Baby
BluePrints® program.

Did these efforts make a difference in the lives
of our members? Consider the communications
we received last year:

☞ The mother of a baby with a genetic disorder
wrote to say, "Who would have thought my
insurance case worker would be the one
person to help me the most during this whole
ordeal? I did not, but I am most grateful...to
Blue Cross for having her."

☞ The daughter of a member suffering from
lung cancer expressed her appreciation for
"all that you did to enable him to receive the
care he needed to keep him comfortable and
maintain his dignity."

# A Good Corporate Citizen

In addition to the responsibility we accept on behalf of our members, Independence Blue Cross and its associates also take seriously our membership in the community we serve.

During 2002, IBC and its associates participated in the community in a variety of ways—from financially supporting hundreds of important community projects and causes to partnering with agencies and groups that share our desire to improve the quality of life in the region.

*...Independence Blue Cross and its associates also take seriously our membership in the community we serve.*

☞ A member who spoke to two Member Services representatives found that "they are hardly the typical cookie cutter insurance person you expect to find on the other end of the phone. They're two exceptional people."

☞ A New Jersey woman diagnosed with ovarian cancer spoke with a Member Services representative and found that her fears "were greatly assuaged by her professionalism every time we spoke."

☞ A member who received assistance from Member Services to fill a prescription wrote to say, "I will never, ever forget your thoughtfulness, professional, thoughtful, caring way you listened to and acted on [my] plight. May God bless you."

IBC joined with the Pennsylvania Medical Society and a number of other groups in a statewide campaign effort led by the Council for Affordable Quality Healthcare to raise public awareness about the overuse of antibiotics—which results in antibiotic resistance. The Centers for Disease Control and Prevention (CDC) estimates that more than 50 percent of all antibiotics prescribed are unnecessary.

Meanwhile, 88 percent of our associates participated in the United Way's "Be A Hometown Hero" campaign with more than $1.8 million donated, including our corporate match.

In addition to their financial contributions to the United Way, many IBC associates volunteer their time and talents to the region's health, educational, civic and cultural programs. During 2002, more than 900 "Blue Crew" volunteers (including associates and family members) donated 3,751 hours to the projects of 34 different agencies, including Habitat for Humanity, Philabundance, the National Adoption Center and United Cerebral Palsy.

Blue Crew volunteers traveled each month to MANNA, where they prepared meals for delivery to homebound HIV patients, and to the Ronald McDonald House in West Philadelphia, where they cooked for the families of patients at Children's Hospital.

IBC's sponsorships also have had an important impact on the life of this community. The Blue Cross Broad Street Run has become one of America's premier 10-mile races, and an important entry on the region's civic calendar of events. In 2002, more than 9,000 runners participated in the 23rd annual race. Also in 2002, we continued our support for the Urban League of Philadelphia and its critically important mission, and became involved for the first time in a lead role with Philadelphia Safe and Sound, a program dedicated to improving the health and well-being of at-risk children. IBC also continued to support the staff and students at Sheppard Elementary School, our official adopted school for the past six years. The relationship has provided for the initial purchase for school uniforms for all the students, turkeys for the annual turkey trot, savings bonds for graduation day awards, School Fairs, support for Sheppard Stars/Good Skates Program at Blue Cross' RiverRink, and volunteers for clean-up days and reading days.

As part of the Philadelphia Reads program, students from Sheppard traveled weekly to IBC's headquarters, where they worked with Blue Crew volunteer reading tutors. And in December, elves from Independence Blue Cross accompanied Santa on a visit to Sheppard to help distribute presents to children as part of The Giving Tree for Sheppard School, an associate-driven project here at IBC.

**20** Independence Blue Cross 2002 Annual Report

*...the number of medical services provided by the Caring Foundation to underprivileged children since its founding in 1990 neared 1.5 million.*

## New Approaches to Old Relationships

In July of 2002, the Independence Blue Cross and Pennsylvania Blue Shield Caring Foundation for Children began a new chapter in its proud history of providing health care coverage to the uninsured. Working with the Commonwealth to administer the new adultBasic program for uninsured adults, the Foundation helped more than 16,000 uninsured Pennsylvanians obtain health insurance coverage through Keystone Health Plan East. And the number of medical services provided by the Caring Foundation to underprivileged children since its founding in 1990 neared 1.5 million.

Looking back on 2002, it is clear that our business environment has changed dramatically. Additional legislative mandates, increased litigation and public opinion have combined to completely change the face of managed care. IBC must continue to evaluate new approaches to helping members manage their care—and to help control their health care costs.

Looking ahead to 2003, IBC will continue to expand and implement new approaches with members and providers, while preserving our responsibility to control costs whenever possible. We will expand our Hospital QIPS program, which focuses on the quality of care a hospital offers our members. We also will introduce a major new initiative designed to help our

members manage the treatment of chronic illnesses and other significant health conditions. The Connections Health Management Program focuses on five diseases that, together, account for more than 50 percent of IBC's overall medical costs. Those diseases are: asthma, diabetes, congestive heart failure, chronic obstructive pulmonary disease and coronary artery disease. In addition, the program offers support for members facing decisions related to significant health conditions such as back pain, arthritis, prostate disease and breast cancer.

Through a system of coordinated interventions and communications for those members, the Connections Health Management Program has been shown to help people with chronic diseases avoid worsening complications of their conditions, and to help people make more informed decisions about their care.

As with Hospital QIPS, the Connections Health Management Program holds the potential to achieve that all-important balance—better care for our members and control of costs. After all, higher quality care not only benefits patients but also tends to be less expensive in the long run.

*This work has helped Pennsylvania maintain one of the lowest rates of uninsured residents in the nation.*

New approaches such as these also could help IBC and the other participants in the health care system improve the relationships that for years have polarized discussions about health care reform. Indeed, if we are to find solutions to this cost crisis, all parties with an interest in health care's future must sit at the same table and seek solutions. The time for collaboration is now.

At risk is this: We are becoming a country in which more and more health care is being provided to fewer and fewer of our citizens. And unless we find a way to arrest this cost crisis, this tragic and divisive trend will continue.

Finding a solution to this crisis in health care costs is a crucial part of keeping the Promise we make to our members. For more than a decade, addressing the plight of uninsured adults and children has been the cornerstone of our Social Mission. This work has helped Pennsylvania maintain one of the lowest rates of uninsured residents in the nation. Still, much needs to be done if we are to provide quality, affordable health care coverage to as many residents of Southeastern Pennsylvania as possible, regardless of their means.

Meeting that goal is a huge challenge. Keeping our Promise to our members in 2002 also was a huge challenge.

But we kept our Promise in 2002, and we intend to keep it again in 2003.

# Independence Blue Cross and Subsidiaries
## Consolidated Financial Summary, 2002

| | |
|---|---|
| Premiums | 8,451,801 |
| Claims Incurred | 7,398,594 |
| Investment Income | 38,006 |
| Taxes Paid | |
| Premium Taxes | 42,916 |
| Income Taxes | 79,330 |
| Total Taxes Paid | 122,246 |
| Net Income | 120,171 |
| Cash and Investments | 1,981,151 |
| Total Assets | 3,175,211 |
| Unallocated Reserves | 893,240 |

$ in thousands

# Board of Directors

as of May 1, 2003

**Robert H. Young,** Esq.
Chairman

**Robert W. Sorrell**
Vice Chairman

**G. Fred DiBona, Jr.**
President and
Chief Executive Officer

Salvatore J. Barbuto
Joseph A. Barbietti
Carol G. Carroll
William B. Christy
Edward S. Cooper, M.D.
Edward Coryell
A. Bruce Crawley
Walter D'Alessio
John J. Dougherty
Patrick D. Finley
Hon. Vincent J. Fumo
Dr. Vall P. Garvin
Patrick B. Gillespie
Nicholas A. Giordano
Warren P. Higgins
Anne Kelly King
Hon. James F. Kenney
Thomas A. Leonard, Esq.

Andrew L. Lewis, IV
Dan M. McGill, Ph.D.
Hon. Michael D. Marino
Phyllis L. Mekel
William A. Murray
Alan Paul Novak, Esq.
Deborah R. Parks
Charles P. Pizzi
Henry H. Reichner, Jr.
William R. Sautter
Gerald S. Segal, Esq.
James C. Schwartzman, Esq.
Frederick C. Tecce, Esq.
Margery S. Wolf

Christie W. Hastings
Director Emeriti

Freda J. Millar
Director Emeriti

# Officers of the Corporation

as of May 1, 2003

**G. Fred DiBona, Jr.**
President and
Chief Executive Officer

**Christopher D. Butler**
Chief Marketing Executive

**Christopher Cashman**
Senior Vice President,
Corporate and Public Affairs

**John A. Daddis**
Senior Vice President,
Managed Care and Operations

**Robert J. Fascia**
Senior Vice President and Assistant
to the President

**John G. Foos**
Chief Financial Officer

**Joseph A. Frick**
Senior Vice President,
Human Resources
and Administration

**Richard J. Neeson**
Senior Vice President

**Paul A. Tufano**
Senior Vice President,
General Counsel and
Corporate Secretary

**Michael A. Green**
Senior Vice President, Processing
and Information Services

**Daniel C. Lyons, M.D.**
Senior Vice President,
Government Programs

**Robert A. McKeown**
Senior Vice President



**Thomas F. Pappalardo**
Senior Vice President,
Finance/CFO (CFE)

**Rosemary Park**
Senior Vice President,
Underwriting and Rating

**J.Steven Udvarhelyi, M.D.**
Senior Vice President and
Chief Medical Officer

**John C. Zanzow**
Senior Vice President,
Contracting and
Provider Networks

**Yvette D. Bright**
Vice President,
e-Commerce

**Royal E. Brown**
Vice President,
Treasury Services

**Leo M. Carey**
Vice President,
Business Systems
Development and Operations

**Robert E. Croner**
Vice President,
Human Resources

**Jeff B. Danilo**
Vice President,
Provider Contracting

**Mary Elizabeth (Liz) Dunlavey**
Vice President,
Enrollment Services

**Karen W. Estridge**
Vice President,
Processing Services

**Kathryn M. Farley**
Vice President,
Processing Services

**Sharon Galup**
Vice President,
Provider and Member Services

**Joseph P. Henry**
Vice President,
Corporate Planning

**William Kerr, M.D.**
Vice President,
Professional Networks

**Karen G. Lessin**
Vice President,
Internal Audit and
Corporate Compliance Officer

**Kathleen Lister**
Vice President,
Corporate Communications

**Carolyn W. Luther**
Vice President,
Information Services

**Lorina Marshall-Blake**
Vice President,
Government Relations

**Mary Ellen McMillen**
Vice President,
Legislative Policy

**Edward H. Morris, Jr.**
Vice President,
Investments and Cash Management

**Joseph F. Nolan**
Vice President,
Controller

**Gary M. Owens, M.D.**
Vice President,
Patient Care Management

**Robert M. Poore**
Vice President,
Marketing

**R. Scott Post**
Vice President,
Marketing Administration

**Lynne Rothney-Kozlak**
Vice President,
Health Services Operations

**Robert E. Sekkes**
Vice President, Marketing

**Richard L. Snyder, M.D.**
Vice President, Quality Management

**William J. (Butch) Ward**
Vice President,
Corporate and Public Affairs



Independence
Blue Cross

1901 Market Street
Philadelphia, PA 19103
www.ibx.com

Independence Blue Cross offers products directly, through its subsidiaries Keystone Health Plan East and QCC Ins. Co.,
and with Highmark Blue Shield—independent licensees of the Blue Cross and Blue Shield Association.

05/03 (2003-0090i)

EXHIBIT "L"

LAW OFFICES

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

ONE PENN CENTER - 19TH FLOOR

1617 JOHN F. KENNEDY BOULEVARD

PHILADELPHIA, PA 19103-1895

(215) 665-3000
FAX (215) 665-3185

PAUL S. DIAMOND
DIRECT DIAL (215) 665-3224
EMAIL PAUL.DIAMOND@OBERMAYER.COM

July 11, 2003

**VIA FACSIMILE**

The Honorable Charles B. Smith
UNITED STATES DISTRICT COURT
U.S. Courthouse, Room 3006
601 Market Street
Philadelphia, PA  19106

     Re:    Chester County Hospital v. Independence Blue Cross et al.
           Case No. 02-CV-2746

Dear Judge Smith:

     I have enclosed a form of Order that both CCH and IBC ask the Court to enter to clarify Your Honor's July 7th Order in this matter. Under the Protective Order entered by Judge Padova, IBC in-house counsel were permitted to review all "highly confidential" documents; CCH Controller Vanore was permitted to review certain "highly confidential" documents. The insurance companies asked Your Honor to limit only who at IBC and CCH could review documents deemed highly confidential by the insurance companies. Under Your Honor's July 7th Order, it is no longer clear whether IBC in-house counsel and Mr. Vanore are permitted to review highly confidential documents that have nothing to do with the insurance companies.

     The proposed clarification provides that the only individuals at IBC and CCH who may see third party insurer information are Messrs. Nolan and Vanore. It clarifies that Paragraph 10(b) of the Protective Order continues to govern who at IBC and CCH may see all other "highly

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

The Honorable Charles B. Smith
Page 2
July 11, 2003

confidential'" documents that do not contain third party insurer information.  This clarification is
critical to both CCH and IBC; it in no way changes the substance of the July 7th Order respecting
the protections afforded the insurance companies and their highly confidential documents.

Respectfully,

*Paul S. Diamond*

PAUL S. DIAMOND

PSD/jrm
cc:     Honorable John R. Padova (facsimile.)
        Lewis R. Olshin, Esquire (facsimile)
        James C. Crumlish, III, Esquire (facsimile)
        Brian T. Must, Esquire (facsimile)
        Richard A. Feinstein, Esquire (facsimile)
        Kevin C. McClay, Esquire (facsimile)
        Katie A. Gummer, Esquire (facsimile)
        Robert W. Hayes, Esquire (facsimile)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,                    NO. 02-CV-2746
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

## ORDER

AND NOW this _____ day of _____, 2003, the Court clarifies its July 7, 2003 Order in

this matter as follows:

10(j).    The only IBC employee or officer to whom highly confidential information of

insurers other than IBC may be disclosed is Joseph Nolan. The only Chester

County Hospital employee or officer to whom highly confidential information of

insurers other than IBC may be disclosed is Paul Vanore. Neither Mr. Nolan nor

Mr. Vanore will be involved in "competitive decision making" for a period of two

years from the date of this Order. For purposes of this paragraph, "competitive

decision making" shall mean participating or advising in any or all of IBC's or

Chester County Hospital's decisions made in light of information about a

competitor. Both Mr. Nolan and Mr. Vanore shall submit an affidavit within five

(5) days from the date of this Order stating that they shall use the highly

confidential information in no way other than for purposes of the current

litigation. The restrictions in paragraph 10(b) otherwise remain unchanged.


_____
CHRARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE