IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL      :
                               :
        **v.**                       :
                               :     **NO. 02-CV-2746**
INDEPENDENCE BLUE CROSS,        :
QCC INSURANCE COMPANY          :     **Electronically Filed**
KEYSTONE HEALTHPLAN EAST, and :
KEYSTONE MERCY HEALTH PLAN   :
                               :

## ORDER

AND NOW, this ___ day of _____, 2003, upon consideration of Non-party Aetna Inc.'s Motion For Leave To File A Reply Memorandum in support its Appeal of the Court's July 7, 2003 and July 16, 2003 Orders modifying the January 24, 2003 Protective Order, it is hereby ORDERED that said motion is GRANTED, and the Reply Memorandum attached to said motion is deemed filed of record.

JOHN R. PADOVA
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THE CHESTER COUNTY HOSPITAL | : | |
| | : | |
| vi. | : | |
| | : | NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS, | : | |
| QCC INSURANCE COMPANY | : | Electronically Filed |
| KEYSTONE HEALTHPLAN EAST, and | : | |
| KEYSTONE MERCY HEALTH PLAN | : | |

**NON-PARTY AETNA INC'S MOTION FOR LEAVE TO FILE A REPLY IN
SUPPORT OF ITS APPEAL OF THE COURT'S JULY 7, 2003 AND JULY 16,
2003 ORDERS MODIFYING THE
JANUARY 24, 2003 PROTECTIVE ORDER**

Defendant, Aetna Inc. ("Aetna"), hereby moves for leave to file a reply memorandum responding to Independence Blue Cross Inc.'s ("IBC") Response to Aetna's Appeal of the Court's July 7, 2003 and July 16, 2003 Orders (collectively, the "Modification Orders") modifying the January 24, 2003 Protective Order.[1]  In support of this motion, Aetna incorporates the proposed Reply Memorandum attached hereto as Exhibit "A", and further states as follows:

1.  On May 30, 2003, Aetna filed a Motion to Intervene and to Modify the Protective Order ("Aetna's May 30, 2003 Motion") that this Court had entered on January 24, 2003.

---

[1]  Aetna also received the Response to its Appeal filed by Chester County Hospital ("CCH"). However, this Reply, consistent with Aetna's July 21, 2003 Memorandum in Support of its Appeal of Magistrate Judge Smith's Orders, focuses on access to Aetna's trade secrets by IBC's Controller and the use of Aetna's trade secrets at deposition, this Reply primarily focuses on IBC's Response to Aetna's July 21, 2003 Appeal.

2.    On June 3, 2003, this Court referred Aetna's May 30, 2003 Motion to Magistrate Judge Smith.

3.    Chester County Hospital ("CCH") responded to Aetna's Motion on June 6, 2003.

4.    On June 12, 2003, Magistrate Judge Smith entered an Order proposed by the parties, but on which Aetna was not consulted, setting a June 16, 2003 as the date for responding to, *inter alia*, Aetna's May 30, 2003 Motion.

5.    On June 18, 2003, Magistrate Judge Smith extended the date for responding to the pending non-party insurer's motions until June 23, 2003.

6.    On June 19, 2003, IBC's counsel, via a letter to Magistrate Judge Smith, stated "[w]ith the Court's permission, defendants propose to file our answer to all outstanding Motions promptly after the conference if the conference is not successful." See Exhibit "G" to Aetna's Memorandum in Support of its July 21, 2003 Appeal (6/19/03 letter from Paul S. Diamond, Esq. to Magistrate Judge Smith).

7.    On that same date, counsel for Aetna responded to IBC's "proposal" and informed the Court that Aetna believed the hearing would be more productive if the parties fully briefed the issues raised by the non-party insurers. See Exhibit "H" to Aetna's Memorandum in Support of its July 21, 2003 Appeal (6/19/03 letter from James C. Crumlish III to Magistrate Judge Smith).

8.    Despite Aetna's objection and no specific ratification of IBC's proposal by Magistrate Judge Smith or entry of the proposed order attached to IBC's June 19, 2003 letter, IBC did not file a response to Aetna's May 30, 2003 Motion.

9.     On July 7, 2003, Magistrate Judge Smith held what IBC's counsel described as a "conference" on the outstanding motions relating to, *inter alia,* the confidentiality concerns raised by non-party insurers. See Exhibit "G" to Aetna's Memorandum in Support of its July 21, 2003 Appeal; Exhibit "I" to Aetna's Memorandum in Support of its July 21, 2003 Appeal.

10.     At the July 7, 2003 Conference, Aetna argued that the Court should preclude IBC's employees from accessing Aetna's information produced in this litigation, information that IBC readily admits is confidential, proprietary and of the nature of a trade secret, because there is no substantial need for any such employees to have access to this most sensitive material. See Exhibit "I" to Aetna's Memorandum in Support of its July 21, 2003 Appeal at 8-11.

11.     On that same date, Magistrate Judge Smith filed an Order modifying the January 24, 2003 Protective Order. See Exhibit "B" to Aetna's Memorandum in Support of its July 21, 2003 Appeal. Among other things, Magistrate Judge Smith's Order required that the non-party insurer's information produced in the above captioned litigation be produced to Joseph Nolan, IBC's controller.

12.     On July 21, 2003, Aetna filed its Appeal of the Court's July 7, 2003 and July 16, 2003 Orders (collectively, the "Modification Orders") modifying the January 24, 2003 Protective Order ("Aetna's July 21, 2003 Appeal").

13.     On July 29, 2003, IBC filed a Response to Aetna's July 21, 2003 Appeal. IBC's July 29, 2003 Response represented its first written submission or proposal in response or responding to Aetna's May 30, 2003 Motion and its July 21, 2003 Appeal.

14.    In light of IBC's finally responding to Aetna's arguments in support of its concerns relating to the Protective Orders, Aetna hereby requests the opportunity to respond to IBC's positions, including but not limited to: IBC's attacks on Aetna's motives for attempting to protect its admitted trade secrets, IBC's waiver arguments and IBC's proffered reasons for allowing its controller access to Aetna's trade secrets.

15.    Aetna therefore respectfully requests that the Court grant this motion for leave to file the attached reply memorandum, and Order that the attached reply be deemed filed of record with this Court.


OF COUNSEL:

Respectfully submitted,


/s/ JAMES C. CRUMLISH III

ELLIOTT REIHNER SIEDZIKOWSKI        JOHN M. ELLIOTT
& SIEDZIKOWSKI & EGAN, P.C.         JAMES C. CRUMLISH III
                                    JOHN P. ELLIOTT
                                    Union Meeting Corporate Center V
                                    925 Harvest Drive, Suite 300
                                    P.O. Box 3010
                                    Blue Bell, PA 19422
                                    (215) 977-1000
                                    Counsel for Non-party
                                    Aetna Inc.

DATED: July 31, 2003

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHESTER COUNTY HOSPITAL | : |
| | : |
| vii. | : |
| | : |
| | NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS, | : |
| QCC INSURANCE COMPANY | : **Electronically Filed** |
| KEYSTONE HEALTHPLAN EAST, and | : |
| KEYSTONE MERCY HEALTH PLAN | : |

## NON-PARTY AETNA INC'S MEMORANDUM IN SUPPORT OF ITS LEAVE TO FILE A REPLY IN SUPPORT OF ITS APPEAL OF THE COURT'S JULY 7, 2003 AND JULY 16, 2003 ORDERS MODIFYING THE JANUARY 24, 2003 PROTECTIVE ORDER

Non-party Aetna Inc. ("Aetna"), by and through its undersigned counsel, hereby respectfully submits this Memorandum of Law in support of its Leave to File a Reply in Support of its Appeal of the Court's July 7, 2003 and July 16, 2003 Orders (collectively, the "Modification Orders") modifying the January 24, 2003 Protective Order ("Aetna's July 21, 2003 Appeal").

As explained below, IBC's Response to Aetna's July 21, 2003 Appeal contains numerous unsustainable allegations and misrepresentations relating to Aetna's position with regard to the Protective Orders.[2] For example, ignoring its refusal to brief any of the

---

[2] IBC's Proposed Order attached to its July 29, 2003 Response seeks, *inter alia,* the following relief: "**IT IS FURTHER ORDERED THAT** Aetna and Multiplan shall produce all documents responsive to Plaintiff's and Defendants' document subpoenas within ___ days from the date of this Order." See IBC's Order attached to Its Response. Despite being carbon copied on the subpoena indicating facsimile delivery of the same, Counsel only received IBC's subpoena upon Aetna, which was dated July 25, 2003, on July 28, 2003. Aetna served its objections relating to IBC's subpoena on July 31, 2003.

issues before Magistrate Judge Smith, IBC now preposterously asserts that Aetna, a non-party that has incurred substantial expense in its attempts to properly develop and brief the issues before the Court, has somehow waived some of the arguments in its July 21, 2003 Appeal. More significantly, IBC emphatically admitted to the extremely sensitive, confidential, proprietary, trade secret nature of Aetna's information, thereby conceding that Aetna has good cause to seek protection of its trade secrets. However, IBC, seeking to distract the Court from its failure to demonstrate any substantial need for Mr. Nolan to access IBC's trade secret information, weakly argues that Aetna has not met its burden of proof. By way of further example, IBC does not proffer any justification for its proffered intent to apparently gratuitously use Aetna's trade secrets at most if not all of the depositions scheduled in this matter, but instead, again ignoring its own acknowledgements regarding the extremely sensitive nature of this information further and highlighting Aetna's concern about the misuse and exploitation of its trade secrets during this litigation, categorizes the widespread unjustified disclosure of Aetna's trade secrets to potentially every deponent in this litigation as "extremely limited."

Unfortunately, despite its conduct and admissions, IBC, undisputably a direct competitor of Aetna, now repeatedly attacks Aetna's alleged motives where non-party Aetna, in conformity with the Federal Rules of Civil Procedures, has incurred substantial

---

IBC had, as of the date it filed its Response, yet to receive any objections to its July 25, 2003 subpoena. Accordingly, not only had the parties not conferred about any objections, but IBC did not even know whether Aetna would object or what, if any, objections Aetna might raise. Now, even though it has not filed a motion to compel, IBC seeks to circumvent its obligations under the Federal Rules of Civil Procedure and compel non-parties Aetna and Multiplan to produce their trade secrets by raising issues that are not even before the Court, let alone ripe for disposition. IBC's "reach" – no where in its Memorandum does it even mention Plaintiff's or Defendants' subpoenas – illustrates the true intent behind its attempts to gain access to Aetna's trade secrets.

expense in its attempt to seek appropriate protections for its trade secrets from this Court so as to avoid being placed at a competitive disadvantage.

## I.    BACKGROUND

Despite IBC's rhetoric, which is a crude attempt to distract the Court from the serious, if not catastrophic, potential competitive injury that the disclosure of Aetna's trade secrets to IBC could cause Aetna, IBC:

- admits to the sensitive confidential and proprietary, trade secret of Aetna's information – and analogizes the same to the formula for Coca Cola – that the parties seek through discovery;

- does not dispute Aetna's right to intervene;

- does not proffer a single explanation for why it needs to disclose Aetna's trade secrets to most or all of the deponents in this litigation;

- admits that it never briefed the issues before Magistrate Judge Smith;

- does not contest the potential confusion that could result from having two categories of documents designated "highly confidential," one category to which IBC's in-house counsel has access, and another group of documents to which IBC's in-house counsel is not allowed access; and,

- does not contest Aetna's request to be allowed to designate its own documents as "Highly Confidential – Non-Party."

IBC characterizes Aetna's attempts to seek protection for information IBC admits is akin to the insurance industries' "formula for Coca Cola" as "obstructive." See IBC Response at 1, 2, 7, 8; Exhibit "I" to Aetna's July 21, 2003 Memorandum. However, when Aetna proposed modifications to the Protective Order in late April and early May

3

of 2003, Plaintiff's counsel represented that such modifications were unacceptable to IBC. Moreover, IBC failed to inform the Court that it did not subpoena Aetna until July 25, 2003, after Aetna filed its Appeal of Magistrate Judge Smith's July 7, 2003 Order. Aetna's sole interest in this litigation is to ensure that its undisputed trade secrets are not inappropriately disclosed or otherwise abused by the parties.

Similarly, in an attempt to avoid the consequences of its strategic refusal to fully brief, indeed, to brief at all, the issues before Magistrate Judge Smith, IBC relies on its "proposal" to allow Mr. Nolan access to Aetna's trade secrets. See Response at 3-4. Significantly, IBC has not produce a single written correspondence that indicates the terms of its "proposal" or that further demonstrates that its "proposal" constituted an abandonment of its previously stated position, since at least May of 2003, that its in-house counsel be granted access to Aetna's trade secrets.[3] Moreover, IBC, despite its reliance on its July 19, 2003 letter to the Court, never discloses either that Magistrate Judge Smith did not enter its proposed order that would have absolved IBC of the need to respond to Aetna's Motion or that Aetna wrote to Magistrate Judge Smith on that same date informing the Court of its objections to IBC's "proposal" and urged the Court to order IBC to brief the issues relevant to the protective order and Aetna's confidentiality concerns. Compare Exhibits "G" and "H" to Aetna's July 21, 2003 Memorandum.

---

[3] As CCH's July 29, 2003 Joint Response to the Appeals of Aetna and Multiplan demonstrates, IBC refused, even in April and May of 2003, to withdraw its insistence that its in-house counsel have access to Aetna's trade secrets even though it had admitted to Plaintiff that the in-house counsel to whom it sought to disclose Aetna's trade secret information was involved in competitive decision making. See CCH's July 29, 2003 Joint Response to the Appeals of Aetna and Multiplan at 4-5 and Exhibits "C" and "D" thereto.

4

IBC's Response also unfairly distorts many of Aetna's positions in order to denigrate the abundantly reasonable approach that Aetna has attempted to take in its efforts to balance its confidentiality concerns against the parties' legitimate need for access to certain information which the parties' seek through discovery. For example, IBC asserts that "Aetna and MultiPlan seek to bar IBC from obtaining and using important information in this case." IBC Response Memorandum at 1. Aetna only seeks to ensure that the confidentiality of its trade secrets is appropriately protected and that such information is not abused or improperly disclosed by the parties. IBC also states that Magistrate Judge Smith's July 16, 2003 Order is not "the subject of the instant appeals," despite the fact that Aetna references the July 16, 2003 Order in its July 21, 2003 Appeal and Memorandum in support thereof. Aetna's concerns relating to two categories of "highly confidential" documents, one to which IBC's in-house counsel is allowed access and another to which in-house counsel is precluded from accessing are a direct result of the Court's July 16, 2003 Order. Finally, Aetna does not seek to approve IBC's use of Aetna's trade secrets at deposition. Id. at 7. Aetna only seeks advance notice of the parties' intent to utilize its trade secrets at deposition so that Aetna may, if appropriate, object to the use of any such documents prior to the irreversible disclosure of its trade secrets to Aetna's substantial and long term competitive disadvantage.

## II.    ARGUMENT

> **1.    Aetna has met its burden of proof by demonstrating "good cause," while IBC has failed to demonstrate any substantial need for allowing Mr. Nolan access to Aetna's trade secrets.**

This Court's Opinion in Heintz Corp. v. Judson, 1995 WL 649331 (E.D. Pa. Nov. 3, 1995)(Padova, J.), which IBC relies on, supports Aetna's position that it has met its

burden of proof and demonstrated "good cause" for the protections it seeks. In <u>Heintz</u>, the Court noted that "Under (b)(1)(A), the standard of review is circumscribed: the district court is bound by the clearly erroneous rule in findings of facts; the phrase contrary to law indicates plenary review as to matters of law." <u>Heintz</u>, 1995 WL 649331 at * 2. (internal quotations omitted; citations omitted in original). Because Magistrate Judge Smith did not make findings of fact, this Court may exercise plenary review as to the matters of law raised by Aetna in the instant appeal.

In analyzing whether "good cause" had been demonstrated in <u>Heintz</u>, this Court recognized that, applying Fed. R. Civ. P. 26(c)(7), the protection of trade secrets or other confidential commercial information constitutes "good cause" when seeking a protective order. <u>Heintz</u> at *3. In the instant case, Aetna asserts and IBC admits to the highly sensitive, proprietary, trade secret nature of Aetna's information sought in discovery. <u>See</u> Exhibit "I" to Aetna's July 21, 2003 Memorandum at 8-10; Exhibit "E" to Aetna's July 21, 2003 Memorandum at ¶¶ 4, 5, 8, 9, 11 (Declaration of Robert J. Franzoi). In addition to the undisputed trade secret nature of Aetna's information, Aetna has also shown, and the parties have also not disputed, "that disclosure will work a clearly defined and serious injury to the party seeking closure." <u>Heintz</u> at *3. Specifically, Mr. Franzoi's Declaration explains that: knowledge of Aetna's rates could be used by competitors to negotiate more favorable rates and to undermine Aetna's negotiating strategy; that medical providers could also utilize such information to negotiate more favorable rates; and that Aetna does not disclose such information to third-parties due to the extremely sensitive nature of the information at issue. <u>See</u> Exhibit "E" to Aetna's July 21, 2003 Memorandum at ¶¶ 5-9.

The parties cannot, in good faith, deny the serious injury Aetna would suffer if its trade secrets are disclosed to IBC or other hospitals.

In Heintz, the Court denied the motion for a protective order on the bases that: 1) there was no showing that the expert to whom Plaintiff wanted to disclose Defendant's trade secrets was a competitor of Defendant;[4] and 2) that the disclosure of such information would not place Defendant at a competitive disadvantage. Heintz at *3. In the instant case, it is undisputed that IBC is Aetna's direct competitor. Similarly, IBC never disputed Aetna's assertions that disclosure of its trade secrets would place it at a competitive disadvantage. See Aetna's July 21, 2003 Memorandum at 14-17; Exhibit "E" to Aetna's July 21, 2003 Memorandum; IBC's Response. Accordingly, Aetna has demonstrated good cause for the protections it seeks for its trade secrets.

Where good cause has been shown relating to protections sought for sensitive, confidential business information is sought in discovery, the party opposing the protective order bears the burden of establishing substantial need for the material that cannot be met without undue hardship. Act, Inc. v. Sylvan Learning Sys. Inc., 1999 U.S. Dist. LEXIS 7055 at *8 (E.D.Pa. May 14, 1999)(O'Neill, J.) (no discovery of confidential business information where disclosure would expose to serious commercial harm and disadvantage); see also AT&T Corp. v. Universal Communs. Network, Inc., 1999 U.S. Dist. LEXIS 5651 (E.D. Pa. April 14, 1999)(Fullam, Sr. J.). In the instant case, IBC has not demonstrated "substantial need."

---

[4] Contrary to the facts set forth in Heintz, Aetna does not dispute the appropriateness of disclosure of its trade secrets to the parties' experts (opining on the antitrust issues), the parties' outside counsel or the Court, subject to the existing provisions of the Protective Order.

Indeed, IBC's recitation and analysis of the issues and defenses central to this litigation demonstrate that access to Aetna's trade secrets, including but not limited to its rates, should be extremely narrowly tailored. See IBC's Response at 12-13. IBC's primary defense to Plaintiff's claims involves claims made in CCH's Bond Prospectus. Id. IBC claims it needs to review Aetna's rates with CCH in order to examine the truthfulness of that Prospectus.[5] Id. Aetna has never denied the relevance of its contracts with CCH to the claims at issues in this litigation and only seeks proper protections to ensure that its trade secrets are not improperly disclosed or otherwise abused. The irony of IBC's stated position is that but for its refusal to withdraw its insistence on providing Mr. Nolan with Aetna's trade secrets, IBC would probably already have the information that it claims is "critically important" to its defense. Id.

IBC's only articulated "substantial need" for disclosing Aetna's trade secrets, including but not limited to Aetna's rates, to Mr. Nolan involves an alleged need to have Mr. Nolan report to IBC's Board of Directors about the status of this litigation. See IBC Response at 13-15.[6] Despite its general allegations relating to the need for a Senior

---

[5] IBC also contends, based upon an assertion that Plaintiff's have alleged a "monopsony" claim, that it needs access to Aetna's rates throughout the relevant market. See IBC Response at 13. However, Aetna notes that the antitrust Counts advanced by CCH both relate to Section 2 of the Sherman Act, and are therefore, not monopsony claims. See Amended Complaint at ¶¶ 69-73. Accordingly, it appears that IBC is attempting to define Plaintiff's claims, at this stage of the litigation, in a manner that would allow broader discovery of Aetna's trade secrets.

[6] IBC refers to Mr. Nolan as a "trusted" member of IBC's Senior Management, notes that Mr. Nolan reports to IBC's Chief Financial Officer and describes him as someone with a "firm grasp on the financial operations" of IBC. See IBC's Response at 5, 14. Mr. Nolan is also a vice president at IBC. See Exhibit "I" to Aetna's July 21, 2003 Memorandum at 31. As someone involved in the preparation of audited financials, Mr. Nolan is also presumably involved in utilizing audited financials to prepare business plans or projected financials. In this role, Mr. Nolan could, for example, simply by adjusting certain projections discretely disclose certain services or hospitals where Aetna may have

Executive to report to the Board, IBC **never specifically articulates how it would be prejudiced if Mr. Nolan is not granted access to Aetna's trade secrets.** Id. For example, how will Mr. Nolan, who by the express terms of the Protective Order is precluded from discussing the specifics of Aetna's trade secrets with the Board, be better able to inform IBC's Board about the status of this litigation if he is granted access to Aetna's trade secrets? Stated differently, why would Mr. Nolan be any less able to inform the Board about this litigation if he only had access to IBC's expert's conclusions or general information relating to Aetna's rates,[7] rather than the specific rate information? Further, how does Mr. Nolan's alleged "firm grasp on the financial operations" of IBC translate into an ability to inform the Board about complicated antitrust matters? Even a superficial review of IBC's proffered "substantial need" demonstrates that IBC will not be prejudiced if Mr. Nolan is not allowed access to Aetna's trade secrets.

The transparency of IBC's proffered "substantial need" is further illustrated by Mr. Nolan's lack of legal training and supports Aetna's concerns relating to the use of its trade secrets by IBC. IBC has never asserted that Mr. Nolan has any type of legal

---

negotiated favorable rates. Significantly, Aetna does not know how Mr. Nolan's compensation is determined or what financial incentives Mr. Nolan may realize for either raising revenue, meeting the projection he prepares or simply by increasing IBC's overall financial performance. Accordingly, despite his stated lack of involvement in "competitive decision making," Mr. Nolan may have other incentives of which Aetna and the Court are not aware, which could lead to the inappropriate use of Aetna's trade secrets.

[7] Outside counsel could presumably inform "Senior Management," without disclosing specific rate information or areas of services, about the status and/or merits of claims involved in this litigation. By way of hypothetical examples, counsel could state: "generally our rates and Aetna's rates are within 5% of each other, accordingly, as our expert concluded, Plaintiff's claims lack merit"; or "generally, our rates are 10-20 % lower that Aetna's, which could provide Plaintiff with the ability, at a minimum, to survive summary judgment and to proceed to trial."

training that would provide him the expertise necessary to inform the Board about the issues involved in this litigation. Nor has IBC alleged that if the court precludes Mr. Nolan from accessing Aetna's trade secrets, IBC's ability to prepare for trial will be impaired. Moreover, as argued in Aetna's July 21, 2003 Memorandum, Thomas Leonard, counsel of record for IBC is a member of IBC's Board, and would therefore, presumably be in the best position to inform the Board about the status of this litigation. IBC seeks to distance itself from counsel's position on the Board by asserting "Mr. Leonard is, first and foremost, an advocate here." See IBC's Response at 14. Presumably, as an advocate, Mr. Leonard would, as required by Rule of Professional Conduct 1.4, be able to "explain a matter to the extent necessary to permit the client to make an informed decision." Moreover, while IBC asserts that "Mr. Leonard is himself advised by IBC's Senior Management," it would seem more likely that, at least with regards to litigation involving IBC for which he is counsel of record, Mr. Leonard is advising Senior Management about the status of such matters.

Finally, Magistrate Judge Smith, IBC and CCH all appear to rely on Mr. Nolan's alleged non-involvement in business decision making as the basis for allowing Mr. Nolan access to Aetna's trade secrets. See Exhibit "B" to Aetna's July 21, 2003 Memorandum; IBC's Response at 5; CCH Response at 13-14. However, the "decision maker" test is typically applied to in-house counsel, not employees of a party. See U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984). Typically, with regard to employees, a party contesting a protective Order must, after the opposing party demonstrates "good cause," show a "substantial need" for the employee in question to have access to the confidential, trade secret information at issue. See Aetna's July 21, 2003 Memorandum at

15.   As noted above, although Mr. Nolan does not have responsibilities relating to contracting *per se*, he could still place Aetna at a competitive disadvantage by virtue of his employment responsibilities, his firm grasp on the financial operations of IBC and any financial incentives that he may have that could conflict with his obligations under the Protective Order.[8]   Accordingly, Mr. Nolan's alleged non-involvement with decision making responsibilities is an erroneous basis for granting him access to Aetna's most sensitive and confidential trade secrets.

> **2.**   **While IBC may have waived the arguments it now asserts as the result of its failure to brief the issues before Magistrate Judge Smith, Aetna did not waive the issues it asserts in its July 21, 2003 Appeal.[9]**

IBC's desperate contention that Aetna waived its "*demands for relief*" not only disregards the law, but demonstrates IBC's utter inability to genuinely rebut Aetna's appeal <u>on the merits</u>.  The issue on appeal, just as it was before Magistrate Judge Smith, is whether Aetna is entitled to a protective order to prevent the disclosure of its highly sensitive, trade secret information to its direct competitor IBC.

IBC's argument is premised upon case law purportedly holding that *legal issues* not raised before a Magistrate Judge are waived on appeal.  IBC's meritless attempt to shoehorn this case into the narrow confines of that case law fails.  Even according to

---

[8] Additionally, as noted in Aetna's May 30, 2003 Memorandum in Support of its Motion to Intervene and to Modify the Protective Order, allowing IBC to designate a "non-decision maker" via affidavit deprives Aetna of the ability to determine the validity of any such assertions contained in an affidavit. <u>See</u> Aetna's May 30, 2003 Memorandum at 16, n. 10.

[9] IBC's gratuitous ad hominem contention that Aetna "will manufacture entirely new issues" is unseemly and puzzlingly inconsistent with the collegial conversations counsel has had with IBC's counsel. <u>See</u> IBC's Response at 8; Pennsylvania Rules of Civility, Article II.

IBC,[10] Aetna's appeal indisputably does not raise a single new legal issue. Aetna also relies upon the same evidence, including Mr. Franzoi's uncontested Affidavit. If anything, Aetna slightly modified the nature of the *relief* sought to respond to unforeseeable developments such as Magistrate Judge Smith's July 7, 2003 and July 16, 2003 Orders.

The inapposite case law IBC cited further exposes the unabashed frivolity of its gossamer waiver argument. In Cooper Hosp./Univ. Med. Ctr. v. Sullivan, 183 F.R.D. 135 (D.N.J. 1998), the court found waiver where plaintiff failed to appeal the Magistrate Judge's denial of the protective order and instead filed a second, separate motion for a protective order that was based upon grounds not advanced before the Magistrate Judge.[11] Id. at 140. Cooper is fundamentally distinguishable, just like the few other cases IBC cited, because Aetna explicitly raised the trade secret protection issue before Magistrate Judge Smith. Aetna also timely filed this appeal.

---

[10] IBC characterizes Aetna's appeal papers as making new "demands for relief," *i.e.*, seeking new protections, not raising any new legal theories. Indeed, Aetna tailored its appeal papers to address the overly broad scope of the disclosure of Aetna's trade secrets granted by Magistrate Judge Smith's Order, but Aetna's legal theory did not change. Both here and before Magistrate Judge Smith, Aetna's entire argument is premised upon the protections afforded trade secrets under Pennsylvania law. IBC's disingenuous attempt to obfuscate the elemental difference between raising a new legal argument, where in certain circumstances waiver may apply, versus Aetna's objection to the scope of the Court's Order based upon the very same legal theory advanced before the magistrate judge is a patently meritless attempt to distract this Court from the obvious competitive disadvantage Aetna will suffer if its trade secrets are disclosed to any of IBC's employees.

[11] Indeed, the plaintiff argued before *Magistrate Judge* that the subject document contained "commercially sensitive material" whereas the plaintiff exclusively argued before the district court that the document should not be produced to protect the plaintiff "'from a sensationalistic and untimely trial in the press which may undermine public confidence.'" Significantly, Cooper was not an appeal from a Magistrate Judge's Order, which is yet another salient distinction from the instant case.

Even had Aetna raised new grounds for the protective order on appeal, which it did not, IBC's waiver argument still would have failed under the facts of this case. As Aetna established in its opening appeal brief, IBC strategically chose not to respond to Aetna's motion for a protective order. IBC gained a significant tactical advantage by concealing the scope and nature of its intended disclosure of Aetna's trade secrets. Aetna advanced its trade secret argument in its moving papers; however, IBC thwarted Aetna from fully addressing the harm threatened by the disclosure of Aetna's confidential, proprietary and trade secret information to particular individuals, such as Joseph Nolan, and from seeking specific forms of relief sought, such as appearing at depositions where Aetna's trade secret information would be central.

Where, as here, the respondent adopts a position after briefing concludes, thereby depriving the petitioner from fully addressing all of the legal issues raised before a Magistrate Judge, the district court is "free to consider on plenary review[12] the legal implications of all aspects of the issue before it" and the waiver doctrine is inapplicable. C.P. Kelco U.S. Inc. v. Pharmacia Corp., 213 F.R.D. 176, 178 (D. Del. 2003); id. (emphasis added) ("Since the letter briefing on CP Kelco's motion to compel was submitted *__before__* the October 2, 2002 summary judgment report and recommendation *and therefore __before__ Pharmacia claimed a shift in status for its expert Mr. Schnaf* [internal citation omitted], *the fact that alternative theories of relevance were not advanced is neither surprising nor a point in Pharmacia's favor.*").

---

[12]This Court's review is plenary because Judge Smith ruled upon a purely legal issue. See  C.P. Kelco, 213 F.R.D. at 178 (citing Haines, 975 F.2d at 91); Heintz, 1995 WL 649331 at * 2.

Accordingly, Aetna did not, and indeed could not, waive the tailored relief it seeks from this Court on appeal.

> **3.    IBC never justified why it must disclose Aetna's trade secrets in "most if not all" of the depositions in this matter, thereby demonstrating that it has no valid basis for utilizing Aetna's trade secrets in such a manner and justifying the relief that Aetna seeks.**

As noted in Aetna's July 21, 2003 Memorandum, at the July 7, 2003 conference, IBC represented to the Court that "[w]e have about three dozen depositions that are going to be taking place within the extended discovery for 90 days. I expect that this material is going to be used in most if not all of these depositions." See Aetna's July 21, 2003 Memorandum at 17-18; Exhibit "I" to Aetna's July 21, 2003 Memorandum at 8. IBC, instead of asserting a legitimate need for using Aetna's trade secrets on such a wide spread basis, where most of the deponents have no first hand knowledge about Aetna's rates, attempts to minimize this widespread abuse of the protections afforded by the Protective Order by characterizing the same as "the extremely limited disclosure of its documents . . . ." See Id.; IBC's Response at 8. IBC has admitted to the extremely confidential and proprietary, trade secret nature of Aetna's information. See Exhibit "I" to Aetna's July 21, 2003 Memorandum at 8-10. Accordingly, any inappropriate disclosure of Aetna's trade secrets is not "extremely limited," but instead, irreversible and is likely to cause irreparable harm to Aetna. Accordingly, the Court should grant Aetna some means, such as access to expedited transcripts of all depositions, to monitor the use of its trade secrets at deposition in this litigation.[13]

---

[13] Contrary to IBC's assertion, Aetna does not seek to become a "permanent fixture" at every deposition in this case, Aetna only seeks an appropriate means to monitor the parties use of Aetna's trade secrets at deposition. See IBC Response Memorandum at 7.

14

**4.    Aetna should be afforded the other protections that it seeks which IBC does not contest.**

IBC does not dispute Aetna's request to review and designate documents containing its confidential and proprietary, trade secret information. Although CCH does assert that such a process would be costly and time consuming, Aetna believes that it can, within a short time period such as a couple of days, review and designate such documents.[14]    While in theory, having the parties automatically designate such documents as "highly confidential" would appear to offer Aetna some protection, given the parties' previous handling of highly sensitive documents, where IBC's trade secrets were provided to counsel for Aetna and where more than 150 pages of documents, containing, *inter alia*, Aetna's rates, were not marked as confidential, let alone "highly confidential," Aetna requests some mechanism to monitor how the parties are designating its confidential and highly sensitive trade secrets.    Disclosure of these trade secrets through inadvertent designation will place Aetna at a competitive disadvantage in the same manner as would any other inappropriate disclosure of the same.

Finally, neither of the parties dispute that there is a high likelihood of confusion, and therefore, inappropriate or inadvertent disclosure of Aetna's trade secrets, due to the current existence of two categories of "highly confidential" documents; one category to which IBC's in-house counsel has access and another, identically designated category, to

---

[14] CCH contends that this issue was not raised before Magistrate Judge Smith. See CCH's Response at 11.  Preliminarily, Aetna did raise the issue of the confidentiality of its documents that may be produced by other parties. See Exhibit "I" to July 21, 2003 Memorandum at 10-11.  Moreover, the language at issue was not incorporated into the Protective Order until Magistrate Judge Smith filed his July 7, 2003 Order. See Exhibit "B" to Aetna's July 21, 2003 Memorandum; Aetna's July 21, 2003 Memorandum at 18-19.

which IBC's in-house counsel is precluded from accessing. <u>See</u> Aetna's July 21, 2003 Memorandum at 19-20.    Accordingly, Aetna requests that the Court create a second category of "highly confidential" documents that could be designated "Highly Confidential – Non-Party," which would help eliminate any potential confusion with regard to who should be granted access to certain categories of documents.

## III.    <u>CONCLUSION</u>

Accordingly, Aetna respectfully submits that this Court must enter a protective order prohibiting the disclosure of Aetna's confidential and proprietary information to IBC's controller.    Aetna further requests the protection from inappropriate disclosure during depositions, an opportunity to make sure that depositions are not used for improper means, the ability to review and designate its own trade secrets as "Highly Confidential – Non-Party" and any other relief the Court deems appropriate.

OF COUNSEL:

Respectfully submitted,


/s/ JAMES C. CRUMLISH III
ELLIOTT REIHNER SIEDZIKOWSKI          JOHN M. ELLIOTT
& SIEDZIKOWSKI & EGAN, P.C.          JAMES C. CRUMLISH III
                                    JOHN P. ELLIOTT
                                    Union Meeting Corporate Center V
                                    925 Harvest Drive, Suite 300
                                    P.O. Box 3010
                                    Blue Bell, PA 19422
                                    (215) 977-1000
                                    Counsel for Non-party
DATED: July 31, 2003                Aetna Inc.

16

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day a copy of the foregoing is being served upon the person and in the manner indicated below:

### VIA FIRST CLASS MAIL

Honorable Charles B. Smith
United States District Court for the
Eastern District of Pennsylvania
U.S. Courthouse, Room 3006
601 Market Street
Philadelphia, PA 19106

**Attorneys for The Chester County Hospital**
Lewis R. Olshin, Esquire
Duane, Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396

Daniel A. Kotchen, Esquire
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

**Attorneys for Independence Blue Cross, QCC Insurance Company, Keystone
Health Plan East, and Keystone Mercy Health Plan**
William J. Leonard, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895

Howard T. Rosenblatt, Esquire
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

**Attorneys for Capital Blue Cross**
Mark J. Oberstaedt, Esquire
Archer & Greiner PC
One S. Broad Street
Suite 1620
Philadelphia, PA 19107

**Attorneys for Highmark, Inc.**
Natalie Chetlin Moritz, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

**Attorneys for Blue Cross of Northeastern Pennsylvania**
Melanie A. Miller, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103-3508

**Attorneys for Wellspan Health System**
Neil C. Schur, Esquire
Stevens & Lee
111 N. 6th Street
P. O. Box 679
Reading, PA 19603

**Attorneys for CIGNA**
Kevin C. McClay, Esquire
Jones Day
51 Louisiana Avenue, NW
Washington, DC 19103

**Attorneys for Health Net**
Katie A. Gummer, Esquire
McCarter & English, LLP
Mellon Bank Center
1735 Market Street, Ste 700
Philadelphia, PA 19103

**Attorneys for Coventry Health Care of Delaware**
Robert W. Hayes, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

**Attorneys for Multiplan, Inc.**
Brian T. Must, Esquire
Metz Schermer & Lewis
11 Stanwix St., 18th Floor
Pittsburgh, PA 15222


/s/ JOHN P. ELLIOTT
JOHN P. ELLIOTT


DATED:     July 31, 2003