IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL    :
    :
v.    :
    :
    :    NO. 02-CV-2746
INDEPENDENCE BLUE CROSS,    :
QCC INSURANCE COMPANY    :
KEYSTONE HEALTHPLAN EAST, and    :
KEYSTONE MERCY HEALTH PLAN    :
    :

## ORDER

NOW, THIS _____ day of December, 2003, in consideration of Non-Party

Aetna Inc.'s ("Aetna") Response to Defendants' December 3, 2003 Motion to Compel,

IT IS HEREBY ORDERED THAT:

    1.    Defendants' Motion to Compel is DENIED.

    2.    Defendants shall pay Aetna reasonable attorneys' fees and costs incurred

in responding to Defendants' Motion.

_____
Smith, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHESTER COUNTY HOSPITAL | : |
| | : |
| v. | : |
| | : NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS, | : |
| QCC INSURANCE COMPANY | : |
| KEYSTONE HEALTHPLAN EAST, and | : |
| KEYSTONE MERCY HEALTH PLAN | : |

## NON-PARTY AETNA INC.'S MEMORANDUM IN RESPONSE TO DEFENDANTS' DECEMBER 3, 2003 MOTION TO COMPEL

Aetna Inc. ("Aetna"), a non-party to this litigation, hereby submits the following

Memorandum of Law in Response to the Defendants' (hereinafter, collectively "IBC")

December 3, 2003 Motion to Compel Aetna, Inc. to Produce Documents ("IBC's Motion

to Compel").

## I.    INTRODUCTION

The present dispute arises as a result of Defendant IBC's July 25, 2003 issuance

of a subpoena *Duces Tecum* upon Aetna, from the District Court of Connecticut,

demanding the production of documents in Philadelphia by August 1, 2003. Although

IBC was aware that Aetna was represented by counsel in connection with this litigation,

this subpoena was delivered *ex parte* directly to Aetna's address in Connecticut. If IBC

had exercised good faith due diligence prior to issuing its Subpoena, as required by the

Federal Rules, it would have known that Aetna Inc. is Pennsylvania Corporation with

offices in this district in Blue Bell, Pennsylvania. Further this Subpoena, which

comported with almost none of the requirements of the Federal Rules of Civil Procedure,

nakedly sought the production of almost all conceivable confidential and trade secret information possessed by non-party Aetna; one of IBC's acknowledged direct competitors in this region. IBC has not exercised diligent pre-issuance research, nor has it sought to avoid burdening non-party Aetna, as required by the Federal Rules. It has also dilatorily failed to timely meet Aetna's substantive objection and dragged its feet in putting the instant matter before the Court; further suggesting not only a lack of timeliness but also a clandestine agenda. The true irony of the situation is that while IBC unjustifiably requests its competitor's confidential and trade secret information, it steadfastly protects its trade secret information from public disclosure.

In stark contrast to IBC's previous ferocious arguments in opposition to the entry of a reasonable Protective Order -- that it needed access to Aetna's rate information in order to allow IBC executives to develop discovery information and for use in conducting depositions -- IBC now seeks Aetna's trade secrets not for discovery purposes, but rather to obtain, misuse and publish Aetna's business secrets as trial evidence. IBC essentially asks this Court to endorse its attempts to use Aetna's trade secrets for its own private benefit, while its publication of that information simultaneously renders it valueless without just compensation to Aetna. The irreparable damages to Aetna by this misuse of confidential and trade secret information, as well as the collateral damage to the marketplace and consumers, would pale in comparison to the damages Plaintiff is purportedly seeking to avoid *via* its anti-trust claims.

IBC, as this Court is aware, constantly protects its own trade secrets -- sealing transcripts of open court legal arguments and numerous pleadings, including the instant Motion to Compel. Now, IBC is shamelessly attempting to plunder Aetna's trade secrets,

even though it has unequivocally conceded that the information it seeks from non-party

Aetna qualifies as Aetna's most confidential and trade secret information. Although IBC

has repeatedly acknowledged that these documents and the information they reflect are

the competitive crown jewels of Aetna, IBC seeks to use this litigation to confiscate and,

eviscerate the secrets that they themselves would refuse to produce to anyone. Aside

from the substantial and jurisdiction defects if the instant subpoena, this Court must reject

this transparently crude and unjustified attempt to abuse the confidential and trade secret

information of a non-party. IBC's Motion to Compel must be denied and this Court

should impose appropriate sanctions upon IBC, as contemplated by Federal Rules of

Civil Procedure.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On May 8, 2002, Plaintiff, the Chester County Hospital ("CCH"), initiated this

litigation against IBC alleging, *inter alia*, antitrust violations. (Dkt. Entry 1). IBC

aggressively and emphatically responded to CCH's Complaint by filing a Rule 11 Motion

seeking attorneys' fees and costs as well as an additional monetary sanction. (Dkt. Entry

15). IBC's Rule 11 Motion asserted that audited public financial documents and

integrated disclosures signed by CCH in connection with marketing a Revenue Bond

directly belie CCH's claims in the instant litigation and that CCH's financial woes are

entirely the result of its own bad judgment and management. (Id.)

On May 30, 2003, Aetna, through the undersigned counsel, filed a Motion to

Intervene and for a Protective Order for the limited purpose of objecting to IBC's

attempts to gain unrestricted access to confidential information of Aetna which was in the

custody of CCH pursuant to a contractual confidentiality agreement. (Dkt. Entry 56). On

June 7, 2003, at an argument in relation to Aetna's Motion to Intervene, IBC

unreservedly admitted to the highly confidential and trade secret nature of Aetna's

information at issue in this litigation (Exhibit "1" hereto at 8-10). Thereafter, on July 25,

2003, despite knowing that the undersigned counsel represented Aetna in this litigation,

IBC issued a subpoena upon Aetna out of the United States District Court for the District

of Connecticut directed to Aetna in Hartford, Connecticut. (Exhibit "B" to IBC's

Memorandum in Support of Their Motion to Compel Aetna, Inc. to Produce Documents

("IBC's Memorandum")). IBC's Subpoena commanded Aetna to produce an

extraordinary amount of admittedly trade secret documents at the office of Obermayer

Rebmann Maxwell and Hippel, LLP ("the Obermayer firm") in Philadelphia on August 1,

2003. (Id.) Hartford, Connecticut, is more than 100 miles from the Obermayer firm's

Philadelphia Office. (Exhibit "2" hereto). IBC did not provide Aetna with the

jurisdictionally required fee as required under the Federal Rules of Civil Procedure. IBC

has never disputed that, after it issued its Subpoena, counsel for Aetna called IBC's

counsel who confirmed that 35 Subpoenas had been issued that day to non-parties and

that, as it was merely a "savings action," IBC did not expect Aetna to meet the

Subpoena's impossible demands. See Exhibits "C" and "G" to IBC's Memorandum.

On July 31, 2003, Aetna, pursuant to Federal Rule of Civil Procedure 45(c),

objected in writing to IBC's subpoena based upon, *inter alia*, the above referenced patent

jurisdictional deficiencies, as well as, other substantive bases, including, but not limited

to, the Subpoena's request for trade secret information, its extreme overbreadth and the

undue burden and expense the Subpoena placed upon non-party Aetna. (Exhibit "D" to

IBC's Memorandum). Nearly four weeks later, IBC, without contacting Aetna's counsel

4

to discuss the scope of IBC's Subpoena or rectifying the legally fatal deficiencies raised in Aetna's July 31, 2003 objection letter, wrote to Aetna incorrectly stating: "[a]s all of Aetna's objections regarding the confidentiality of the subpoenaed documents have been addressed, there is no longer any credible basis for delaying the production of the subpoenaed documents." (Exhibit "F" to IBC's Memorandum).[1] IBC demanded that Aetna produce documents not only from the Southeastern Pennsylvania Region, but also from New Jersey, Delaware and Pennsylvania counties well outside of Southeastern Pennsylvania, including but not limited to, Schuylkill, Franklin, Juniata, Perry and Snyder counties. (Exhibit "F" to IBC's Memorandum). IBC's August 27, 2003 letter further stated that "[t]he above list represents the <u>absolute narrowest scope</u> that could, at least for now, cover the markets that . . . CCH has put at issue in this litigation" and demanded that Aetna produce all the requested documents by September 3, 2003 or IBC would file a motion to compel. (Id.)(emphasis added).

In its September 2, 2003 response, Aetna reminded IBC of its affirmative obligation to make a good faith attempt to resolve Aetna's objections and again emphasized its valid, outstanding objections, including those relating to the outrageous

---

[1] IBC, in its Memorandum, as well as letters that it has sent to non-party hospitals, has incorrectly implied that the Court's observations at the August 8, 2003 hearing and subsequent modification of the Protective Order, peremptorily adjudicated all objections relating to the enforceability of all other outstanding subpoenas. (IBC's Memorandum at 4-5). That hearing addressed non-party insurers' objection to the production of confidential documents by CCH (and crafting a protective order that would address non-party insurers' objections to the production of confidential documents by other non-parties, such as hospitals). Stated differently, if a hospital or other non-party was refusing to produce documents solely on the basis of, for example, Aetna's confidentiality concerns, that alone was no longer a valid basis for refusing to produce such documents. However, the Court further noted that, ". . . if you have subpoenaed documents and there is nothing out – **no objection outstanding** and you haven't received those documents, then you come to the Court and we'll put teeth into that subpoena so that you do receive those documents." (Exhibit "E" to IBC's Memorandum at 36) (emphasis added). As noted above, Aetna properly objected to IBC's subpoena. <u>See</u> Fed.R.Civ.P. 45(c)(2)(B). Accordingly, the Court's entry of the Amended Protective Order did not, as IBC asserts, relieve IBC of its duty to resolve outstanding objections through good faith discussions with subpoenaed parties who raise valid objections. <u>See infra</u>, Section III.C.1. Nor did the Court's Amended Protective Order cure IBC's Subpoena's fatal procedural defects.

geographic scope of IBC's subpoena. (Exhibit "C" to IBC's Memorandum).  Instead of

responding to Aetna's request for a good faith discussion in order to avoid further

burdening the non-parties or the Court relating to IBC's Subpoena, IBC waited two more

weeks, until September 15, 2003, before responding with a new "absolute minimum"

necessary to defend itself directive. (Exhibit "G" to IBC's Memorandum).[2]  Although

IBC's unilaterally revised "absolute minimum" geographic scope now excluded its

previous requests for rate and strategic planning information from Delaware and New

Jersey, IBC still sought such information from counties outside of the geographic scope

of the relevant markets as defined in the Amended Complaint.  (Compare Exhibit "G" to

IBC's Memorandum and Dkt. Entry 37 at ¶¶ 29-31).  Two days later, on September 17,

2002, Aetna again requested that IBC initiate a good faith discussion with Aetna to reach

a compromise and to resolve Aetna's objections in good faith. (Exhibit "H" to IBC's

Memorandum).  Further, in light of IBC's arbitrary and amorphous absolutes, Aetna

requested that IBC articulate exactly why it needed all the confidential trade secret

---

[2] Contrary to IBC's allegations concerning Aetna's alleged obstructionist conduct, the exhibits attached to IBC's Memorandum demonstrate that IBC's dilatory conduct has caused any delay.  IBC waited until the end of the discovery deadline, which the Court subsequently extended twice, to serve Aetna with a Subpoena, to which Aetna objected promptly. (Exhibits "B" and "D" to IBC's Memorandum). After assuring Aetna that its Subpoena was only a "savings action" IBC then waited a month, without contacting Aetna's counsel, before demanding that Aetna produce documents. (Exhibit "F" to IBC's Memorandum). Aetna responded within a week to IBC's overreaching demand, only to have IBC delay another two weeks before sending another demand letter, which Aetna responded to two days later. (Exhibits "C," "G" and "H" to IBC's Memorandum).  After two subsequent correspondence, IBC finally called Aetna's counsel regarding the IBC Subpoena on November 4, 2003.

In total, IBC waited more than two months from its receipt of Aetna's letter seeking a dialogue, and more than four months from when Aetna objected to its Subpoena to engage Aetna in any substantive dialogue about its Subpoena.  During the November 4, 2003 telephone conference, Aetna asked IBC to determine whether it would be possible to produce rate information in a format that would allow IBC to defend itself without forcing Aetna to produce its rates with every hospital in the Southeastern Pennsylvania Region.  IBC rejected Aetna's proposal.  While Aetna expected the dialogue between the parties to continue, IBC did not engage in any further discussions but instead waited another month before filing the instant Motion to Compel on December 3, 2003.  Accordingly, any delay in discovery was caused by IBC's refusal to attempt to resolve Aetna's objections in good faith and its failure to follow up with Aetna in a timely manner.

information it was demanding. Id. Notably, IBC has never produced any analysis or expert affidavit detailing why it needs Aetna's confidential and trade secret information, what information it has already obtained from other readily available sources or how such specific information is relevant to its defense of particular elements of Plaintiff's antitrust claim (all of which is a minimum obligation IBC should have undertaken before issuance of a Subpoena to a non-party pursuant to Rule 45).[3]

After receiving Aetna's September 17, 2003 substantive correspondence, IBC inexplicably waited another three more weeks, until October 8, 2003, before writing to inquire whether Aetna would produce documents in response to CCH's subpoena. (Exhibit "I" to IBC's Memorandum). Aetna responded on October 14, 2003, *again* seeking to initiate a dialogue and asking IBC for disclosure regarding the discovery deadlines in this litigation. (Exhibit "J" to IBC's Memorandum).[4] Although Aetna sought to meet with IBC's counsel in person, the parties finally conferred briefly over the phone at the request of IBC on November 4, 2003.[5] During this phone call, IBC represented that although it was not sure of the totality of the information it had already received in response to subpoenas served upon CCH's main competitors, hospitals located in Chester

_____

[3] During the November 4, 2003 telephone call with Aetna's counsel, IBC admitted that its requests are not relevant to IBC's counterclaims against CCH.

[4] During IBC's letter writing campaign, the Court's discovery deadline, October 1, 2003, expired. However, that deadline was subsequently extended again by the Court. (Dkt. Entries 19, 77, 82 and 144)

[5] When Aetna invited IBC's counsel to meet in person, IBC's counsel, William Pelosi, responded *via* e-mail to Aetna's counsel, James Crumlish, by asking his partner, William Leonard, if he should "walk into the spider's lair." (Id.) (Exhibit "3" hereto). Mr. Pelosi's response reveals the lack of good faith exhibited by IBC in addressing Aetna's objections to IBC's subpoena. This demeaning and unprofessional correspondence typifies IBC's approach to addressing Aetna's admittedly legitimate concerns regarding its most sensitive trade secrets. See Pennsylvania Code of Civility at §§ II.1, II.5 and II.6. Although Aetna's counsel harbors no enmity based upon this e-mail due to counsel's appropriate apology for the "shame and embarrassment" caused by this unprofessional response, this snide slur illustrates IBC's true disdainful intentions regarding its obligations to resolve Aetna's objections in good faith.

County, it was in the process of attaining the same and expected to have Aetna's contracts with these hospitals shortly. While IBC indicated that these contracts were the absolute minimum it needed, IBC intractably insisted that Aetna produce concededly its most highly confidential strategic plans, not for discovery, but rather for unrestricted disclosure at trial. Aetna countered in good faith and for purposes of compromise that it would not produce confidential strategic plans (and suggested publicly available alternatives) as they were not relevant or necessary to IBC's defense, and proposed to explore methods whereby it could produce relevant comparative rate information for IBC's experts' use in analyzing the Southeastern Pennsylvania Region in a "masked format" that would allow IBC to defend itself (by, for example, comparing rates for community hospitals similar to CCH in Philadelphia) while still protecting Aetna's individual contract's proprietary information.[6] Aetna urged IBC to review this proposal with its experts to see if it could conduct its defense in such a manner and, if not, to counter propose, at a minimum, a more reasonable geographic scope that would resolve Aetna's objections with regard to IBC's subpoena.[7] Two days later, IBC outright rejected Aetna's proposal and did not contact Aetna again. Thereafter, IBC waited a month before filing the instant Motion to Compel. (Exhibit "4" hereto; IBC's Motion to Compel).

---

[6] Aetna has never denied the relevance of its hospital contracts within Chester County. However, IBC has subpoenaed these documents from individual non-party hospitals and presumably has already received the same. Moreover IBC's truculent insistence that it would seek to compel regardless of whether Aetna produced these contracts and in effect engage in Motion practice no matter what, precluded Aetna from satisfying its obligations under IBC's subpoena by producing contracts with hospitals in Chester County pursuant to the protections of the Amended Protective Order.

[7] Aetna did not, as IBC contends, represent to IBC that it would only produce contract documents in masked form. (IBC's Memorandum at 7). Aetna only asked IBC to re-examine if there was a less intrusive way for IBC to receive the information that it claims it needs to defend against CCH's antitrust claims or to reasonably limit the geographic scope of its overbroad demands for Aetna's contracts. IBC summarily rejected all of Aetna's proposal or good faith efforts and never subsequently addressed the geographic scope of its demand for Aetna's hospital contracts.

Although IBC now asks this Court to compel production of Aetna's most sensitive trade secret and confidential information, IBC zealously protects its own similar information. For example, virtually every substantive filing or court transcript in this litigation, including this Motion to Compel, is cloaked under seal. Similarly, in other litigation in the Philadelphia Court of Common Pleas Commerce Division, IBC, the Defendant in that action, has unendingly sought court protection not only of the pleadings in that litigation, but also the settlement thereof. In fact, the protections IBC has governed for its settlement of that matter are so strict that some class member providers cannot access all of its terms or determine the factual underpinnings of the settlement. See Transcript of November 19, 2003 Hearing in DiStefano v. IBC, No. 03482, December Term 2000, First Judicial District of Pennsylvania, Civil Trial Division. Despite the draconian measures IBC takes to protect its own trade secrets and confidential information, IBC represented to Aetna that it intends to publicly publish Aetna's trade secrets at trial.

IBC's quest to attain Aetna's trade secrets is not limited to the subpoena at issue in this motion. IBC has already subpoenaed and concluded motion practice against numerous non-party hospitals. IBC has yet to disclose to Aetna exactly what it has received in response to these subpoenas. IBC has also already conducted in depositions in this litigation. Pursuant to the terms of the Amended Protective Order, IBC is required to provide Aetna notice if it either 1) issues subpoenas that seek Aetna's information and 2) if it intends to utilize Aetna's confidential information at deposition. (See Dkt. Entry 121 at ¶¶ 12.c, 12.h and 12.j). IBC has provided Aetna with no such notice. It is difficult to believe that none of the thirty-five subpoenas IBC has outstanding

implicate Aetna's information.  Moreover, if IBC has not, as it adamantly argued to the

Court that it would, utilized Aetna's hospital contract and rate information that it has

already received during the depositions of the relevant non-party hospitals already taken

in this litigation, then it would appear that IBC's primary purpose at this juncture is to

pervert this matter into an opportunity to conduct wide ranging corporate espionage and

unfairly disrupt, burden and gain advantage over the marketplace.(See Exhibit "1" at 8).[8]

III.    **LEGAL ARGUMENT**

    A.    **Standard Of Review.**

      Pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), a person commanded to

produce documents via subpoena may serve written objections upon the serving party.

Fed. R. Civ. P. 45(c)(2)(B).  "If objection is made, the party serving the subpoena shall

not be entitled to inspect and copy the materials . . . except pursuant to order of the court

by which the subpoena was issued." Id.  As other district courts in this Circuit have

noted:

> . . .  the Advisory Committee Notes recognize the intimate relationship
> between Rules 26 and 45.   They note that Rule 45(c)(1) 'gives specific
> application to the principle stated in Rule 26(g).'   The Notes recognize
> that 45(c)(3), which authorizes the quashing of a subpoena, tracks the
> provisions of Rule 26(c), which empowers the issuance of a protective
> order, and likewise, <u>protects a nonparty from undue burden by identifying</u>
> <u>circumstances where a subpoena is not allowed absent a showing of</u>
> <u>substantial need.</u>  Rule 45(c)(3)(A) identifies the circumstances where a
> subpoena must be quashed or modified:  Rule 45(c)(3)(B) is directed to
> situations where a subpoena should be quashed.  *See, Advisory Committee*
> *Notes.*   Specifically, 45(c)(3)(A)(iii) protects from disclosure privileged
> or other protected matters, while Rule  45(c)(3)(B)(i) safeguards trade
> secrets or other confidential research, development, or commercial
> information. *See, Rule* 26(c)(7).

Mannington Mills, Inc. v. Armstrong World Indus., Inc., 206 F.R.D. 525, 529 (D. Del.

---

[8] Clearly under this scenario, IBC would gladly extend discovery forever and eschew any settlement or resolution of the instant dispute with CCH while the prospect of fortuitous plunder exists.

2002)(underscore added).

Where a party like IBC seeks production from a non-party, such as Aetna, IBC faces a "burden of proof heavier than the ordinary burden imposed under Rule 26." Echostar Communications Corp. v. News Corp. Ltd., 180 F.R.D. 391, 394 (D. Col. 1998). "The fact that discovery is sought from a non-party is one factor which the Court may weigh in determining whether [IBC] is entitled to an order which requires the production of the materials or information." Id. (quoting Katz v. Batavia Marine & Sporting Supplies, Inc., 984 F.2d 422, 424 (Fed. Cir. 1993)). "Courts are required to balance the needs for discovery against the burdens imposed when parties are ordered to produce information or materials, and the status of a person or entity as a non-party is a factor which weighs against disclosure." Id. (citing American Standard Inc. v. Pfizer, Inc., 828 F.2d 734, 738 (Fed. Cir. 1987)(see also Mannington Mills, Inc., 206 F.R.D. at 531 ("Moreover, courts have traditionally recognized that disclosure to a competitor is more harmful than disclosure to a noncompetitor.")(citations omitted)).

In the instant case, it is undisputed that the information IBC seeks from Aetna constitutes trade secrets or other highly sensitive and highly confidential commercial information.[9] Once Aetna demonstrates that the information sought "is trade secret information, or otherwise confidential, the burden shifts to" IBC. Echostar Communications Corp., 180 F.R.D. at 394.[10] IBC "must establish 'that disclosure of the trade secrets is both relevant and necessary.'" Id. (citations omitted). IBC must also

---

[9] In order to resist discovery, movants must establish that the information sought is a trade secret, and demonstrate that its disclosure might be harmful." Echostar Communications Corp., 180 F.R.D. at 394.

[10] Incredibly, IBC argues, ignoring case law that it previously cited to this Court, that Aetna must meet a "heavy burden" in order to prevail on its objections to IBC's subpoena. Compare IBC's Memorandum at 8; Dkt. Entry 102 at 11-12. Clearly, given the admitted trade secret nature of the information IBC seeks, IBC has the burden of establishing substantial need. Because IBC cannot meet this burden, its motion to compel must be denied.

prove "that it has a 'substantial need' for the discovery which 'cannot be otherwise met without undue hardship. . . .' Id. (citing Fed. R. Civ. P. 45(c)(3)(B)(iii)). The Court must then "balance the need for the disclosure against the injury that would result from that disclosure." Id. (quotations and citations omitted) (See also Mannington Mills, Inc., 206 F.R.D. at 529 (D. Del. 2002) ( . . . this court is required to apply the balancing standards -- relevance, need, confidentiality and harm. And even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit." (citing Micro Motion, Inc. v. Kane Steel Co., Inc., 894 F.2d 1318, 1323 (Fed. Cir. 1990)).

**B.    IBC's Motion To Compel Must Be Denied Because IBC Failed To Attempt To Resolve Aetna's Objections In Good Faith.**

IBC's Motion to Compel must be denied because IBC failed to make a good faith attempt to resolve Aetna's objections to IBC's Subpoena. IBC ignored Aetna's repeated pleas to discuss the scope and type of information sought and, rather than engaging Aetna in a good faith dialogue about its Subpoena, instead sent Aetna correspondence arbitrarily and unilaterally changing the "absolute minimum" necessary to defend against CCH's claims and threatening immediate motion practice if Aetna did not acquiesce to its demands. After Aetna repeatedly reminded IBC of its obligations to confer in good faith under the Federal and Local Rules, IBC begrudgingly, more than four months after it received Aetna's objections, engaged in a discussion with Aetna's counsel. During this discussion, some progress was made, at least in Aetna's Counsel's mind, as to focusing IBC and which information IBC absolutely needed to defend itself. Aetna asked IBC to consult with its experts to determine if they could perform the appropriate analyses using

12

"masked rates" and, if not, to propose a more reasonable alternative proposal for its discovery.[11] Instead, IBC rejected any compromise out of hand and without explanation to Aetna (*via* e-mail) and did not attempt any further good faith discussions before filing the instant Motion to Compel. IBC's token and insincere efforts do not satisfy its obligations to confer in good faith.

Pursuant to Federal Rule of Civil Procedure 37(a), a party moving to compel discovery must certify to the Court "that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action." Further, Local Rule 26.1(f) states, "[n]o motion or other application pursuant to the Federal Rules of Civil Procedure governing discovery or pursuant to this rule shall be made unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute." E.D. Pa. R. 26.1(f). IBC's Motion to Compel should be denied because of its utter failure to engage in good faith discussions before initiating court action.

As the Third Circuit recently reaffirmed, "before moving to compel discovery, 'a party must first prove that it sought discovery from its opponent.'" Naviant Marketing Solutions, Inc. v. Larry Tucker, Inc., 339 F.3d 180, 186 (3d Cir. 2003)(quoting Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1310 (3d Cir. 1995). Here, IBC hardly even made a token effort to "go through the motions" with Aetna before filing the instant Motion. In Naviant, 339 F.3d at 186-87, the court noted that, "plaintiff's counsel refused to discuss matters on the telephone with defendant's counsel and sought the intervention of the court without first seeking to work out the conflict with defense counsel."

---

[11] Aetna also offered to have a person who compiled the "masked rates" to provide testimony regarding the methods and criteria used to compile rates into the "masked form."

Further, sending a fax demanding an immediate response and "threatening to file a motion to compel is a token effort rather than a sincere effort." Naviant, 339 F.3d at 186; see also Shuffle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 170-73 (D. Nev. 1996)(one telephone call and a couple of faxes insufficient to meet requirement of good faith conferring). Accordingly, based upon plaintiff's failure to make a good effort to confer with counsel before seeking court action, the Third Circuit held that defendant's refusal to respond to plaintiff's unreasonable demands was excused. Id. at 187.

In the instant case, despite knowing the extremely confidential trade secret nature of the information it was seeking, IBC waited four months to contact Aetna to discuss its subpoena, and then summarily rejected Aetna's good faith proposals without ever attempting to seek a resolution of Aetna's objections. The extreme overbreadth of the information IBC seeks in this motion -- including contract rates in counties well outside the relevant market as defined in the Amended Complaint -- illustrates the lack of good faith that IBC has demonstrated with regard to Aetna's trade secrets. IBC never engaged in any substantive analysis of its needs or sought to reasonably reduce the scope of its subpoena.[12] IBC went though the motions, only engaging in any dialogue after being reminded of its obligations to confer in good faith and never seeking to cure the fatal procedural defects to its subpoena,[13] before asking this Court to compel the production of

---

[12] In its Motion to Compel, IBC asserts, in an apparent attempt to demonstrate how reasonable it has been with regard to its subpoena upon Aetna, that although it now only seeks contract and rate information, it would be justified in seeking "full compliance with each of their document requests." IBC's Memorandum at 4. However, IBC fails to inform the Court that it already received the information contained in category 3 of its chart in response to subpoenas served upon brokers of health care products and that the information it seeks relating to categories 4 and 5 of its chart are available from other commercially available resources. See IBC's Memorandum at 3; Section III.C, infra.

[13] Among other asserted objections, Aetna objected to IBC's subpoena pursuant to Fed. R. Civ. P. 45 (c)(3)(A)(ii)(outside 100 miles) and Fed. R. Civ. P. 45 (b)(1)(failure to tender the required witness fee). Both of these technical deficiencies are valid bases for denying IBC's Motion to Compel.

Aetna's most confidential and valuable information. As IBC cannot prove that it attempted, in good faith, to resolve Aetna's objections, the instant Motion to Compel must be denied.

**C.    IBC Has Not Met Its Burden To Compel Production Of Aetna's Confidential Or Trade Secret Information.**

As noted, <u>supra</u>, once Aetna demonstrates that the information IBC seeks to compel is confidential and/or trade secret information, the distribution of which will cause Aetna or the competitive marketplace irreparable harm, IBC must prove not only that the information that it seeks is relevant, but also that it has a substantial need for such information and that it cannot attain the information that it seeks, or other similar information, without undue hardship. <u>See</u> Aetna's Memorandum at Section III.A, <u>supra</u>. In the instant case, IBC cannot, and does not even attempt to, meet its burden.

**1.    The Information IBC Seeks From Aetna Is Undeniably Trade Secret And/Or Confidential Information And The Disclosure Of Such Information Will Necessarily And Irreparably Harm Aetna.**

IBC does not deny that all of the information that it seeks constituted Aetna's confidential, trade secret information. <u>See</u> IBC's Memorandum at 8-9 ("The proprietary nature of Aetna's documents is acknowledged"); <u>see also</u> Exhibit "1" (Transcript of 7/7/03 hearing) at 8 ("I absolutely agree that the information they are seeking to protect, it is proprietary, it is trade secret."); <u>Id.</u> at 9 (". . . our rates are proprietary. They are absolutely right. This is our formula for Coca Cola."). <u>Id.</u> at 9-10.

Moreover, as noted in the declarations of Robert Franzoi, attached hereto as Exhibits "5" and "6," IBC operates a managed care company in the Commonwealth of Pennsylvania that directly competes with Aetna. In fact, as Plaintiff alleges in the

Amended Complaint, and Defendants cannot in good faith deny, IBC and Aetna are direct competitors. See e.g. HealthLeaders Research, "Pennsylvania Health Plan Data – 2 – HMO Financials (January 1 – September 20, 2002) copyright 2003 HealthLeaders, Inc.; (Dkt. Entry 37 at ¶ 31). As Aetna's direct competitor, IBC also engages in contracting with providers and hospitals. If Aetna's independently negotiated rates with these hospitals are disclosed to IBC, "it could use that information to negotiate more favorable rates, and undermine Aetna's negotiating strategies." See Exhibit "5" at ¶ 6. Accordingly, Aetna always provides for the confidentiality of its contract terms and rates in its contracts and prohibits the dissemination of any such material to any third party except for a third-party administrator designated by Aetna. Id. at ¶ 8.

Aetna never discloses its strategic plans to any third party. See Exhibit "6"; (Supplemental Declaration of Robert Franzoi). Additionally, Aetna does not maintain strategic plans in a format limited to the geographic scope of the markets at issue in this litigation. Accordingly, Aetna's strategic plans would include confidential and proprietary information not relevant to this litigation. Moreover, "[t]he disclosure of Aetna's strategic plans to IBC, or to providers such as Plaintiff in this action, would cause irreparable harm to Aetna and to the regional healthcare market by allowing IBC insight into Aetna's strategies, for example, products and contracting. Similarly, if individual hospitals, or the Hospital Association of Pennsylvania, had access to Aetna's contracting strategies, the strategies themselves would be rendered useless, effectively removing any value from the thousands of people hours and resulting unique and substantial value Aetna invested to create and evaluate these plans." Id.

However, despite the admitted confidentiality of the information it seeks, IBC disingenuously asserts that the Amended Protective Order entered by the Court "resolved Aetna's confidentiality based objections," and, therefore, "Aetna has no credible basis for continuing to refuse to produce the subpoenaed documents." (IBC's Memorandum at 7-9). Contrary to IBC's self-serving position regarding the effect of the Amended Protective Order, "**the plain language of Rule 45(c)(3)(B) requires the 'substantial need' showing be made as a threshold matter regardless of the terms under which the materials would be produced if production were ordered.**" <u>ACT, Inc. v. Sylvan Learning Systems, Inc.</u>, 1999 WL 305300 at \*2 n.5, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999)(emphasis added); <u>Mannington Mills, Inc.</u>, 206 F.R.D. at 530 ("[a] protective order which limits to whom information may be disclosed does not eliminate the requirement of relevance and need . . . . .") (internal quotations and citations omitted). IBC has failed to allege, let alone demonstrate, a substantial need for any of the documents it now seeks to compel. Moreover, the potential harm to Aetna, as well as the regional healthcare market, if this highly confidential and proprietary trade secret information is disclosed is both certain, incalculable and potentially devastating.

IBC specifically told Aetna that it intends to use, and therefore disclose, the information it now seeks at trial. As one district court noted, "[w]hat happens with any information disclosed by" Aetna "in response to" IBC's "subpoena, particularly at trial, is anyone's guess." <u>Mannington Mills, Inc.</u> 206 F.R.D. at 530 (D. Del. 2002). As with that case, in the instant case, it would be "**divorced from reality to believe that either party here would serve as the champion of its competitor . . . .to maintain the**

**confidentiality designation or to limit public disclosure . . . . during trial.**" <u>Id.</u>
(internal quotations and citations omitted, emphasis added).

        2.      **Aetna's Strategic Plans.**

      As noted above, IBC provides no expert or cogent analysis of what information it
"needs" to defend against CCH's antitrust claims. Given the amorphous and ever
changing nature of the "absolute minimum" needs IBC asserted in correspondence with
Aetna, it would appear that these "needs" were mere bootstrapping to disguise this
"smash and grab" strategy rather than a substantive analysis of the evidence needed to
defend against CCH's claims; claims so legally feeble in IBC's mind that IBC has
already asserted they violate Rule 11. IBC now baldly asserts that it "needs" Aetna's
confidential strategic plans because such information: 1) "[d]emonstrates that another
large insurer has no factual basis to regard IBC as a monopolist or monopsonist; 2)
[d]emonstrates that another large insurer makes competitive analysis in the same fashion
as IBC; and 3) [d]emonstrates that another large insurer has not experienced any barriers
to entry and has competed successfully against Aetna." IBC Memorandum at 3-4. IBC's
proffered "needs" in no way articulate why Aetna's strategic plans for the "central
Pennsylvania area," are even tangentially relevant to this litigation and its sanctionable
attempt to utilize the Court's inherent powers to compel Aetna to produce these highly
sensitive and confidential documents for which it articulates no need must be denied.[14]

---

[14] IBC's entire rational relating to the relevance of the "central Pennsylvania counties" is mere rhetoric that
does not withstand even mild scrutiny. First, IBC contends that CCH intends to compare market data of
that region to the Philadelphia five-county area. However, Paragraph 55 of the Amended Complaint, upon
which IBC relies, addresses the effect of competition between Blue Shield (Highmark) and Capital Blue
Cross in central Pennsylvania on hospitals and purchasers of insurance. (Dkt. Entry 37 at ¶ 55).
Preliminarily, IBC does not assert that it has attempted to get such information from Highmark or Capital
Blue Cross, or whether it has performed its own internal analyses of the effects of similar competition in
the Philadelphia region. Moreover, CCH, who made the averments in Paragraph 55 under "information
and belief," has not provided Aetna with any notice, as required by Amended Protective Order, that it has

Moreover, its other unsupported claims do not demonstrate relevance, let alone "substantial need."

ACT, Inc., supra, controls this dispute. There, like here, the subpoena was served upon ASI, who was neither a party to the foreign suit nor the subject of any of ACT's claims and sought to compel ASI "and its affiliated or related companies" to produce, inter alia:

> (I) all documents reflecting ASI's history in the delivery of computer-based testing to date, including ASI's efforts to enter the computer-based testing market, perspectives of the players in that market, assessment of potential and existing competitors, evaluations of competitive conditions, discussions of the risks of entering into the market, and analyses of the barriers to entering that market, including any communications reflecting the volume of testing hours and number of centers needed to compete effectively in that market.

See 1991 WC 305300, at *1. Also, like the instant matter, ACT conceded that the information was confidential commercial information, leaving the Court to identify "the crux of the issue before the court is whether ACT has established a substantial need for the information it requests that cannot otherwise be met without undue hardship." Id. at *2.

In opposing production of its trade secrets and propriety information, ASI argued:

(1)  disclosing this information to its much larger competitors would cause it serious commercial harm and allow its direct competitors to free ride on its own investment in assessing the [] market; and,

(2)  market assessment information such as that sought from it should be easily available to ACT **from its own internal research, from Sylvan, and from the same third-party researchers with whom ASI has contracted at considerable expense.**

---

served subpoenas seeking such information; indicating that it does not intend to complicate its case with analyses of different markets. (Id.)  Additionally, IBC, as alleged in the Amended Complaint, cannot operate outside of its specifically delineated geographic territory. (Id. at ¶¶ 48-49).  Finally, IBC's rationale, if accepted, would open the door to discovery of competitors across the country, or at least anywhere a plaintiff vaguely asserts increased competition outside of the relevant market.

Id. The Court agreed that ACT wholly failed to show a "substantial need," noting both that ACT did "not deny that similar market research is available from its own resources, from [plaintiff], and from third parties" and that Act offered no "argument for why ASI's perspective on the market in particular is relevant or necessary to ACT's claims." Id. See also Mannington Mills, Inc., 206 F.R.D. at 532 (denying discovery when need is not established because, "[a]lthough the financial, marketing and sales data of [subpoenaed party] is "unique" in the sense that it is information about [subpoenaed party], financial, marketing and sales information is not uniquely available from [subpoenaed party], the party from whom the information is sought"). (underscore added).

Here, like ACT, Inc. and regardless of the relevance of the information IBC seeks to compel from Aetna, IBC cannot demonstrate substantial need because the information that it seeks is readily available from other, more comprehensive commercial sources. By way of example only, *HealthLeaders Research* "delivers the insights you need on over 900 of the nation's top health plans as well as 75 major metropolitan markets. Our analysts identify key trends and gather state – and local – data critical to your business." (Exhibit "7" hereto). Another commercial and publicly available research and data resource publication, *Interstudy*, provides detailed information on health maintenance organizations ("HMO's), including HMO enrollment by Product; Number of Physician and Hospital Contracts; Three years of Enrollment Data; Non-HMO Managed Care Products; Regional Market Analysis; Aggregate HMO Penetration; Metrics of Competition; Population by Metropolitan Statistical Area ("MSA"); Hospital Utilization Indicators; Total HMO Enrollment and Penetration Rates by MSA; Financial Premiums and Revenue and Reimbursement Methods for Primary and Specialty Care Physicians.

(Exhibit "8" hereto). Additionally, other publications, such as the *Philadelphia Business Journal* compile health care statistics from other publicly available sources. (Exhibit "9" hereto). IBC is tellingly silent as to whether it subscribes to any of these commercial data services or that it has requested PHC4, census and other public filings.[15]

Given all of the publicly available information available to IBC and the information that it has already received from other non-party providers, IBC cannot demonstrate, as it must, "substantial need" for the documents it now seeks.[16] Moreover, in light of the harm that disclosure of its trade secrets could cause Aetna, IBC's failure to seek good faith resolution of Aetna's substantive objections or cure the Subpoena's procedural deficiencies, as well as the information IBC has already attained in this litigation and the wealth of information publicly available to IBC, any analysis that balances IBC's need for the requested disclosures against the injuries that would result from the same mandate the denial of IBC's Motion to Compel.

Additionally, Aetna's "perception" of whether IBC is a monopolist or monopsonist is most likely inadmissible and irrelevant to the factual determination and expert analyses that may, if this case proceeds to trial, eventually determine whether CCH's antitrust claims have merit. If perceptions were the benchmark, IBC would already be guilty of antitrust violations by virtue of CCH's perceptions as memorialized in the allegations pled in this litigation. A marketplace analysis performed by the parties'

---

[15] See Exhibit "10" hereto, PHC4 "Data Request" Applications and publicly available hospital data. Also, note the financial information regarding hospitals and that the information IBC seeks from the Central Pennsylvania counties is, according to PHC4, several regions away from the counties contiguous to Philadelphia.

[16] By way of further example, see Millman USA's "Hospital Efficiency Index," attached hereto as Exhibit "11," which can be used, among other things, for: Risk or Capitation Evaluation; Profitability of Medical DRG's; Identification of Most Efficient Practice Facilities; Development of New Reimbursement Structures, and Identification of Benchmarks by DRG or Specialty.

experts and other antitrust tests, not Aetna's perception of IBC, will aid the Court and the

trier of fact in determining the validity of those claims. As the <u>ACT</u> Court noted, IBC

does not "offer any argument for why [Aetna's] 'perspective' on the market in particular

is relevant or necessary to [IBC's] claims." <u>ACT</u>, 1999 WL 305300 at *2; <u>Staff Builders

of Phila. v. Koschitzki</u>, 1989 WL 46284 (E.D. Pa. 1989)(where relevance is dubious,

non-party need not disclose confidential information).

Similarly, IBC's assertion that Aetna's strategic plans demonstrate that Aetna

makes competitive analysis "in the same fashion" as IBC is irrelevant.  It is axiomatic

that all insurers, not just IBC and Aetna, make strategic competitive analysis.  However,

whether Aetna's competitive analysis is the same as, or radically different than, IBC's

analysis is in not relevant to the merits of CCH's claim.[17]

Finally, IBC contends that Aetna's strategic plans will demonstrate that Aetna has

not experienced barriers to entry and has competed successfully against IBC.  CCH has

admitted as much by asserting that Aetna is IBC's largest competitor in the alleged

market. Dkt. Entry 37 at ¶ 31.  Moreover, as other publicly available information

---

[17] IBC's reliance on <u>United States Football League v. National Football League</u>, 605 F. Supp. 1448, 1461 (S.D.N.Y. 1985), is misplaced at best.  First, the Court's analysis in that action was in the context of a motion to disqualify counsel who had represented both parties, not discovery sought from a non-party. <u>Id.</u> at 1455-60.  Even if it had dealt with discovery issues, that opinion was issued before Rule 45 was amended.  As other courts analyzing antitrust discovery disputes have noted:

> Financial information of non-parties in a lawsuit has been held by
> courts to be private and not routinely available for discovery.  'The
> right of privacy and the right to keep confidential one's financial affairs
> is well-recognized' when the information involves non-parties, even
> though they may be allied to the parties. <u>See Hecht v. Pro-Football
> Inc.</u>, 46 F.R.D. 605, 607 (D.D.C. 1969); <u>see also Zenith Radio Corp. v.
> Matsushita Elec. Indus. Co.</u>, 529 F. Supp. 866, 890 (E.D. Pa. 1981).
> Courts have shown even more reluctance to force disclosure of
> financial information when it may be revealed to business rivals,
> especially when the information would be collateral and not direct
> proof of the plaintiff's claims. <u>See Berrie v. Berrie</u>, 188 N.J. Super.
> 274, 457 A.2d 76, 81-82 (N.J. Super. Ct. Ch. Div. 1983).

<u>United States v. Federation of Physicians and Dentists, Inc.</u>, 63 F. Supp. 2d 475, 479 (D. Del. 1999). Aetna's strategic plans contain, <i>inter alia</i>, a variety of financial information and analyses.

illustrates that Aetna and other insurers compete in the Philadelphia Region, IBC has no substantial need for such information. For example, the October 31, 2003 *Philadelphia Business Journal* ran a list ranking local HMO enrollment in the Philadelphia region. Exhibit "9" hereto. A preliminary analysis of this "list" demonstrates that neither Aetna, with over 500,000 local members, nor the numerous other listed insurers, have experienced "entry barriers" in this region. Moreover, the *Philadelphia Business Journal* compiled that list from publicly available sources. Id. Further, other more comprehensive publicly available information that IBC could, and likely already has purchased, such as *HealthLeaders Research,* provide comprehensive enrollment data throughout the Commonwealth of Pennsylvania. IBC has not demonstrated any effort to research or find a unique and substantial need for Aetna's strategic plans.

### 3. Aetna's Contracts.

As noted above, Aetna does not contest the relevance of Aetna's contracts with hospitals in Chester County, Pennsylvania, or IBC's substantial need for the same in connection with this litigation. However, especially in light of the incredible geographic scope of IBC's requests, Aetna asked IBC to demonstrate its need for contracts outside of Chester County. Specifically, Aetna's concerns were based on the numerous characteristics, aside from geographic concerns, that contribute to the unique nature of each individual hospital. For example, hospitals can be distinguished from each other based upon: 1) whether they are community, teaching or regional hospitals; 2) whether they are network or non-network, affiliated or non-affiliated; and 3) whether they provide specialty services, including but not limited to oncology, pediatric, trauma, cardiac and/or cancer services.

IBC is a community hospital in Chester County. Accordingly, Aetna sought clarification regarding the relevance or substantial need, for example, of a hospital within a network in Philadelphia. Additionally, in light of all of the publicly available commercial information accessible to IBC referenced above, IBC cannot demonstrate any substantial need for Aetna's contracts other than those it has already procured. IBC has not demonstrated the relevance of, nor any substantial need for, any of the hospital contracts within "the greater Philadelphia area," let alone those outside the Philadelphia region. Therefore, its Motion to Compel must be denied. Further, IBC must also demonstrate that it has not already received the information it now seeks in response to subpoenas issued to other non-party providers.

### D.    Jurisdiction.

In a good faith attempt to resolve its objections to IBC's subpoena, Aetna proposed that any outstanding discovery motions be heard before this Court. (Exhibit "C" to IBC's Memorandum). Although IBC never responded to this proposal in any of its subsequent correspondence, Aetna still believes that this Court, based upon its knowledge of the issues implicated by Plaintiff's claims, knowledge of this geographic region and its management of the numerous disputes between the parties themselves and the parties and non-parties, is best situated to determine the validity of IBC's overbroad and fatally deficient Subpoena. However, regardless of Aetna's belief in the Court's ability to fairly adjudicate the instant dispute, applicable case law indicates that this Court does not have jurisdiction at this stage of the proceeding.

Federal Rule of Civil Procedure 45(c)(2)(B) states that: "[i]f objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials . . .

**except pursuant to an order of the court by which the subpoena was issued."**
(emphasis added).  As other district courts have noted, "[t]he language of Rule 45 clearly
contemplates that the court enforcing a subpoena will be the court that issued the
subpoena." United States v. Star Scientific, Inc., 205 F. Supp. 2d. 482, 484 (D. Md.
2002).  The Star Scientific Court further noted that "[t]he practice commentaries to the
rule explain that a motion to compel under Rule 45(c)(2)(B) should, like the motion to
quash or modify . . ., be made to the court from which the subpoena issued, which will
presumably be a court in a district convenient to the nonparty since it is of course the
nonparty whose convenience Rule 45 is most concerned about protecting." Id. at 484-85
(internal quotations omitted).  However, because "a court issuing a subpoena also has a
strong interest in the enforcement of its subpoenas . . . a nonparty could never seek
transfer of a discovery dispute as a matter of right, over the objection of the court that
issued the subpoena." Id. at 485 n.3. See also Kupritz v. Savannah College of Art and
Design, 155 F.R.D. 84, 88 (E.D. Pa. 1994)(district court lacked jurisdiction to compel
compliance with Rule 45(e) subpoena where that subpoena was issued out of the
Southern District of Georgia).

In the instant case, IBC strategically chose to issue its defective Subpoena upon
Aetna out of the District of Connecticut, despite knowing that it sought information
relevant to markets within the Eastern District of Pennsylvania and despite knowing that
the undersigned counsel represented Aetna in connection with this litigation.[18]  Neither

---

[18] As other district courts have explained, "Rule 26(g) specifically requires that the party or his attorney
seeking discovery must *certify* that he has made a "reasonable inquiry" that the request is warranted.  This
"reasonable inquiry" is also imposed by Rule 11. See Fed.R.Civ.P. 11, Notes of Advisory Committee on
Rules--1983 Amendment ("Discovery motions, however, fall within the ambit of Rule 11.");  see also
Apex Oil Co. v. Belcher Co., 855 F.2d 1009, 1015 (2d Cir. 1988)(noting that Rule 26(g) "imposes a more
stringent certification requirement than Rule 11" because a discovery request usually pertains to more
specific subject matter than that covered under Rule 11"). Micro Motion, Inc., 894 F.2d at 1323; see also

IBC, nor Aetna for that matter, can now unilaterally divest that Court of its jurisdiction over the Subpoena that IBC issued out of that Court. If IBC properly brought its motion in the district from which it decided to issue its Subpoena, that Court could decide, for example, that IBC's Subpoena is unenforceable due to it substantive and procedural defects. As IBC chose to utilize the inherent power of that court to compel production of Aetna's most vital trade secrets, IBC must now allow the United States District Court for the District of Connecticut to exercise its discretion in determining whether to transfer IBC's motion to this Court.

**E.    A Ruling Granting IBC's Motion To Compel Would Constitute An Unlawful Taking Of Aetna's Confidential And Trade Secret Information.**

IBC's instant attempts to compel the production of Aetna's admitted trade secrets and confidential information amounts to "a taking of private property in violation of the Fifth Amendment." See Arthur R. Miller, Confidentiality, Protective Orders, and Public Access to the Courts, 105 Harv. L. Rev. 427, 468 (1991)(attached hereto as Exhibit "12"). Professor Miller noted that the Supreme Court has "declared that confidential information . . . is a species of property to which the corporation has the exclusive right and benefit" Id. (quoting Carpenter v. U.S., 484 U.S. 19, 26 (1987)). Professor Miller's analysis further explained that the disclosure of confidential and proprietary information, such as the compensation received by IBC's executives, by parties to a litigation, illustrates "the concern in the business community that even the most protective court

---

Dkt. Entry 15. In the instant case, a "reasonable inquiry" would have revealed that "Aetna Inc." was a Pennsylvania Corporation with no offices in Connecticut. IBC's attempt to enforce its defective subpoena is sanctionable. Olagues v. Schmidt, 1990 WL 25710 at *3 (9th Cir. 1990)("In this case, it is clear that Olagues' motion for contempt was not 'substantially justified.' Not only was he aware that the subpoenas had not been served, but the subpoenas were invalid on their faces, because they stated that no fees were tendered with service of the subpoenas." Id. at *2-3 (quoting C.F. & I. Steel Corp. v. Mitsui & Company, 713 F.2d 494, 496 (9th Cir. 1983)).

cannot prevent the spread of information beyond the confines of a lawsuit." Id. at 470.

Similarly, it is doubtful that even where the information sought will be disclosed to

experts, that the expert "will be able to . . . be able to compartmentalize all he or she has

learned and not use any of the information obtained [in the instant litigation.]" Id. at 471

(citations omitted). Moreover, the inherent danger of disclosing trade secret information

is obvious because "[t]he loss of confidentiality, the *sine qua non* of a trade secret, robs

the owner of any advantage the secret may have provided." Id. at 473 (citation omitted).

Accordingly, Professor Miller noted that "[g]overnment disclosure of information in

which parties have a property right . . . might amount to a taking of private property in

violation of the Fifth Amendment." Id. (citations omitted).

Professor Miller's observations relating to potential violations of the Fifth

Amendment are even more applicable to the instant case, where Aetna, a non-party, now

seeks protection for its trade secrets. The Federal Rules of Civil Procedure recognize that

the trade secrets of non-parties should be afforded a higher level of protection than those

of parties to a litigation, as required by the requisite showing of substantial need for the

trade secrets of non-parties pursuant to Rule 45. Compare Fed. R. Civ. P 26(b) and Fed.

R. Civ. P. 45. Additionally, not only has IBC failed to demonstrate any substantial need

for the documents it requests, but it has also certified, in its Rule 11 Motion filed against

CCH, that CCH's claims are utterly devoid of any merit. (Dkt. Entry 15). This filing

alone illustrates that IBC's crusade to attain Aetna's trade secrets amounts to nothing

more than an information grab, designed to disclose Aetna's trade secrets and enhance

IBC's competitive position. If such disclosure is mandated, Aetna may be forced to

pursue its Fifth Amendment rights and seek just compensation for IBC's taking of

Aetna's regional trade secrets; compensation that may properly be measured by the fair market value of such information, as demonstrated by the almost $9 billion that Aetna paid to acquire U.S. Healthcare in 1996.

## IV.    CONCLUSION

For the foregoing reasons, IBC's Motion to Compel should be denied and this Court should award Aetna reasonable attorneys fees incurred in responding to IBC's attempts to compel compliance with its procedurally and substantively defective subpoena.

Respectfully submitted,

OF COUNSEL:

ELLIOTT REIHNER &
  SIEDZIKOWSKI, P.C.

JOHN M. ELLIOTT
JAMES C. CRUMLISH III
JOHN P. ELLIOTT
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
P.O. Box 3010
Blue Bell, PA 19422
(215) 977-1000
Counsel for Non-party
Aetna Inc.

DATED: December 16, 2003

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day a copy of the foregoing is being served upon the person and in the manner indicated below:

### VIA HAND DELIVERY

Honorable Charles B. Smith
United States District Court for the
Eastern District of Pennsylvania
U.S. Courthouse, Room 3006
601 Market Street
Philadelphia, PA 19106

Honorable John R. Padova
United States District Court for the
Eastern District of Pennsylvania
6614 U.S. Courthouse, 601 Market Street
Philadelphia, PA 19106

Lewis R. Olshin, Esquire
Duane, Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396

William J. Leonard, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895

**VIA FIRST CLASS MAIL**

Daniel A. Kotchen, Esquire
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

Howard T. Rosenblatt, Esquire
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

JOHN P. ELLIOTT

DATED:        December 16, 2003

# EXHIBIT "1"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL,
                    Plaintiff

        vs.                                02-CV-2746

INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY
KEYSTONE HEALTHPLAN EAST, and
KEYSTONE MERCY HEALTH PLAN,
                    Defendants

                                10:00 a.m.
                                July 7, 2003
                                Courtroom 3-D
                                Philadelphia, PA

---

Before MAGISTRATE JUDGE CHARLES B. SMITH

---

APPEARANCES:

Lewis R. Olshin, Esq.                  For the Plaintiff
H. Bruce Hanson, Esq.
Seth Goldberg, Esq.
DUANE MORRIS LLP
One Liberty Place
Philadelphia, PA  19103-7396

Richard A. Feinstein, Esq.
Daniel Kotchen, Esq.
BOIES SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, D.C.  20015

                Nancy O'Neill, OCR
                1234 U.S. Courthouse
                601 Market Street
                Philadelphia, PA  19106

1    As presently written, we believe that <u>Pansy</u> -- and

2    we model our order on the last page of the

3    confidentiality order which Judge Padova had. You

4    probably are passingly familiar with that, Judge. And

5    we feel that the law requires the party advocating the

6    confidentiality order has the burden of going to the

7    court if the other side disputes that and how the order

8    is written. The insurers want to change that. We don't

9    think that's consistent with the case law, and so we

10   won't agree to that. In addition, they want to have 10

11   days notice any time -- they want paragraph 10g of the

12   protective order to apply to the third-party insurers.

13        We have approximately three dozen depositions

14   that are going to be taking place within the extended

15   discovery for 90 days. I expect that this material is

16   going to be used in most if not all of these

17   depositions. And I think if we have to give them 10

18   days notice every time we intend to use this

19   information, you are going to see a lot more of us and

20   it's going to be very difficult to proceed with

21   discovery.

22        Let me add in closing. We are an insurance

23   company. I absolutely agree that the information they

24   are seeking to protect, it is proprietary, it is trade

25   secret. We don't want to be here. We don't want to

1    have to look at this stuff, but we have been sued.  They

2    are seeking 20 million dollars treble and they are

3    seeking to break up the company, and we have to be able

4    to defend ourselves.  And with this compromise, it

5    allows us to defend ourselves and will adequately

6    protect their proprietary information.

7          THE COURT:  Are there persons other than

8    Paul/Ellie/Mark that they want excluded?

9          MR. DIAMOND:  Everybody will be excluded now.

10   Under the protective order, the only three people at IBC

11   who can see any highly confidential documents are Paul,

12   Ellie and Mark.

13         THE COURT:  Okay.

14         MR. DIAMOND:  And they will be able to

15   continue to see highly confidential documents under our

16   proposed order, except for the third-party insurers.

17   They will not be able to see the third-party highly

18   confidential documents.  And under this proposed order,

19   these guys can mark whatever they want highly

20   confidential and nobody at IBC can see them.  And we

21   could not legitimately oppose that, particularly given

22   our statement on the record.  We could not oppose their

23   designation in that we have exactly the same thing, that

24   our rates are proprietary.  They're absolutely right.

25   This is our formula for Coca Cola.  The rates, strategic