MILLIMAN
# Hospital Efficiency Index™

## ANALYSIS BROWSER

The Analysis Browser is used to quickly find and display Hospital Efficiency Index™ subtotals for three levels of data: State, MSA, and Hospital. The Summary Group Selection tab (shown in Figure 1 below) is used to change the viewing level for the data. The data shown throughout the Browser is in sequential format. This means that to go through the successive levels, more and more specific information is selected: State, MSA, Hospital, Admission Type, Major Diagnostic Category (MDC), 3M APR-DRG*, and Severity. An example of this would be:

**State:** Pennsylvania
**MSA:** Philadelphia
**Hospital:** HOSP OF THE UNIV OF PA HLTH SYS
**Adm Type:** Medicine
**MDC:** 01 Medicine-Diseases & disorders of the nervous system
**3M APR-DRG*:** 041 Medicine-Nervous system neoplasms

The various tabs above the grid: LOS Index, Adm App (Days), Total Days Av, Adm App (Adm), Sev Ratio, and Case-Mix make all of the information easily available. No data is shown for categories with less than 11 admissions. Another Browser option is the Split Viewer--which allows for comparisons between data for any combination of two States, MSAs or Hospitals.

*All Copyrights in and to APR-DRGs are owned by 3M. All rights reserved.

FIGURE 1



MILLIMAN
# Hospital Efficiency Index™

## ANALYSIS BROWSER—QUERY VIEWER

The Query Viewer is the most powerful tool in the Analysis Browser. The Query Viewer allows the comparing, sorting and combining of all kinds of data. Any combination of groupings can be used. Comparisons between states and hospitals, MSAs and hospitals, states and MSAs or all three of the summary groups can be made. Sorting by different variables to look at data in different ways can be very useful. Combining hospitals to see their overall summarized information (this might be useful to look at information about a particular health system) is easily done. Printing the results of queries is done simply by clicking on the Print Report button. Figure 2 (below) is an example query that shows the MSAs in the Middle Atlantic Region of the US that have the highest percentage of avoidable admissions (sorted by avoidable admissions). As shown, Sharon Pennsylvania has the highest percentage at 48.67%. The Analysis Browser comes with a tutorial that guides step by step through all the different types of queries that can be run in the Query Viewer. The Query Viewer is an easy to use tool that allows a look at important information in the most useful ways.

FIGURE 2



MILLIMAN
# Hospital Efficiency Index™

## MOST EFFICIENT PRACTICE

The Analysis Browser can be used to get a listing of efficient Hospitals, MSAs and States. This is easily accessed by selecting the Best Practice tab in the Browser. Most Efficient Practice was determined by identifying statistical groupings of Hospitals, MSAs or States with the lowest severity adjusted LOS. Any hospital, MSA or State whose average length of stay (ALOS) (within a 90% confidence limit) fell within this grouping is shown. A Hospital, MSA or State shows up in the Most Efficient Practice listing if it appears as Most Efficient Practice in one or more severities. Most Efficient Practice is shown by 3M APR-DRG*. In the example below (Figure 3), Most Efficient Practice for 3M APR-DRG* 023 Spinal Procedures is shown. Hospitals appear first on the screen, but after scrolling down MSAs and States that are considered Most Efficient Practice would appear. A Report with all of this information is easily printed just by clicking on the Print Report button.

*All Copyrights in and to APR-DRGs are owned by 3M. All rights reserved.

FIGURE 3



MILLIMAN
**Hospital Efficiency Index™**

## PRINTED REPORTS AVAILABLE

**Report 1:** Report 1 shows summary Hospital Efficiency data for each hospital in a selected MSA (or each MSA in a selected State or each State in the US). It provides subtotals by Medical, Surgical, Psychiatric, Substance Abuse and Rehabilitation (plus Maternity and complicated Neo-natal admissions for Private Insured and Medicaid). A Severity Ratio and a Relative Case-Mix Ratio are also shown for each hospital (or MSA or State).

**Report 2:** Report 2 shows an analysis of the Hospital Efficiency Index™ by MDC (Major Diagnostic Category) or Specialty for a State, MSA, hospital or US Total.

**Report 3:** Report 3 shows potential days saved, sorted highest to lowest, by MDC and 3M APR-DRG* if the most efficient benchmark level can be achieved for a State, MSA, hospital or US Total. (Example for the Detroit MSA shown below in Figure 4)

**Report 4:** Report 4 shows potential days saved by 3M APR-DRG* in sequential order if the most efficient benchmark level can be achieved for a State, MSA, hospital or US Total.

**Report 4L:** Report 4L shows potential days saved by 3M APR-DRG*/Severity in sequential order based upon the LOS Efficiency Index™ for a State, MSA, hospital or US Total. Note: This Report does not contain the Admission Appropriateness part of the Hospital Efficiency Index™. It is based on LOS longer than benchmark only.

*All Copyrights in and to APR-DRGs are owned by 3M. All rights reserved.

FIGURE 4

Detroit 1998
Hospital Efficiency Index™
For Medicare Patients only

2/17/00                                                                                    MEDICARE - M99.7X.78

| MDC/3M APR-DRG | # Cases | Potential Avoidable Admissions | LOS | Adm | Total |
|---|---|---|---|---|---|
| **05 Med - Diseases & disorders of the circulatory system** | 42,770 | 34,495.21 | 38,006.66 | 98,461.27 | 136,467.93 |
| 194 Heart failure | 14,712 | 10,413.44 | 13,632.78 | 50,685.84 | 64,318.62 |
| 201 Cardiac arrhythmia & conduction disorders | 4,571 | 2,741.01 | 3,504.99 | 9,346.53 | 12,851.52 |
| 197 Peripheral & other vascular disorders | 2,254 | 1,414.55 | 1,999.92 | 8,009.60 | 10,009.53 |
| 204 Syncope & collapse | 2,778 | 2,117.10 | 1,170.58 | 7,248.41 | 8,419.00 |
| 198 Atherosclerosis | 3,478 | 1,297.51 | 2,411.18 | 5,326.38 | 7,737.57 |
| 190 Circulatory disorders w AMI | 3,786 | 0.00 | 7,308.47 | 0.00 | 7,308.47 |
| 203 Chest pain | 3,558 | 2,193.01 | 1,450.03 | 4,945.56 | 6,395.59 |
| 192 Cardiac catheterization for ischemic heart disease | 2,720 | 1,201.45 | 2,156.29 | 4,038.96 | 6,195.25 |
| 202 Angina pectoris | 1,823 | 1,297.78 | 614.67 | 3,797.62 | 4,412.28 |
| 191 Cardiac catheterization w circ disord exc ischemic heart di | 882 | 481.29 | 858.85 | 2,533.43 | 3,392.28 |
| 207 Other circulatory system diagnoses | 568 | 241.06 | 660.44 | 880.07 | 1,540.51 |
| 199 Hypertension | 557 | 418.45 | 140.02 | 1,346.48 | 1,486.50 |
| 206 Malfunction,reaction & comp of cardiac or vasc device or | 643 | 0.00 | 1,322.87 | 0.00 | 1,322.87 |
| 193 Acute & subacute endocarditis | 68 | 0.00 | 324.88 | 0.00 | 324.88 |
| 195 Deep vein thrombophlebitis | 212 | 0.00 | 311.62 | 0.00 | 311.62 |
| 200 Cardiac congenital & valvular disorders | 111 | 58.30 | 69.15 | 190.51 | 259.66 |
| 205 Cardiomyopathy | 49 | 20.28 | 69.90 | 111.87 | 181.77 |
| | | | | | |
| **04 Med - Diseases & disorders of the respiratory system** | 23,635 | 14,822.89 | 25,674.77 | 86,076.63 | 111,751.41 |
| 139 Simple pneumonia | 7,682 | 5,820.84 | 6,377.05 | 34,777.03 | 41,154.09 |
| 140 Chronic obstructive pulmonary disease | 6,954 | 5,054.63 | 4,614.60 | 24,892.96 | 29,507.56 |
| 137 Respiratory infections & inflammations | 2,547 | 1,581.20 | 4,698.55 | 13,625.99 | 18,324.54 |
| 136 Respiratory malignancy | 1,063 | 852.06 | 978.88 | 6,567.28 | 7,546.16 |
| 133 Pulmonary edema & respiratory failure | 1,202 | 0.00 | 3,481.96 | 0.00 | 3,481.96 |

REPORT 3A                        MILLIMAN & ROBERTSON, INC.                        Page:    1

MILLIMAN
## Hospital Efficiency Index™

## CONTACT INFORMATION

For more information about the Milliman Hospital
Efficiency Index™ please contact us. Direct inquiries or
comments to the Research Department at this address:

**Milliman USA, Inc.**
**259 North Radnor-Chester Road**
**Suite 300**
**Radnor, PA 19087**
**Telephone: 610 687.5644**
**Fax: 610 687.4236**

For more information, check out our web-site at:
http://www.op.net/~jcookson/

A MILLIMAN GLOBAL FIRM


**Milliman** USA
*Consultants and Actuaries*



MILLIMAN
# Health Cost Index Report



**Forecasting Health Insurer Profitability: 2001~2003 New Underwriting Cycle Report Available for Purchase**

The Blue Cross/Blue Shield system reported an underwriting gain of 0.6% for the year ending December 31, 2000. Will these gains be sustainable over the next few years? Could the cycle be reverting again to its traditional three years up and three years down or is a new underwriting cycle pattern emerging? Milliman USA's research report titled Forecasting Health Insurer Profitability: 2001-2003 answers these questions.

Milliman USA has followed the underwriting cycle for years, and has heavily invested in ongoing research on predicting future results. As shown below, this research report exploits the relationship between Blue Cross/Blue Shield underwriting results and the Health Cost Index (HCI), which facilitates the projection of Blue Cross/Blue Shield underwriting results.

▸ **Health Cost Index Report**
▸ **Research Reports**
▸ **Further Information**
▸ **Contact Us**
▸ **Home**

WHAT'S NEV

■ Forecasting He
  Profitability: 2
  New Underwri
  available for p
■ Hospital Effici
  Related Link
■ Milliman USA (

  corporate page

■ January 2001
  The PDF HCIR



**BLUE CROSS/BLUE SHIELD UNDERWRITING RESULTS
ACTUAL VS. FITTED**

This report is invaluable for health insurance professionals who are involved in the crucial decisions in today's health care marketplace. If you have any questions or would like to order this report, please contact Jay Thayakaran at (610) 687-5644.

Privacy Policy | Copyright 2002 Milliman USA | Contact Us | Site developed by NetR



MILLIMAN
# Health Cost Index Report



▶ Health Cost Index Report
▶ Research Reports
▶ Further Information
▶ Contact Us
▶ Home

The Health Cost Index Report™ (HCIR) is a quarterly newsletter that presents the latest trends and forecasts from our proprietary database of medical trends. These trends measure the market average rate of increase in medical costs for a typical $250 deductible Comprehensive Major Medical benefit package. Our database measures the growth rate in medical consumption by measuring how fast provider net revenues increase. This inherently captures price, utilization and mix/intensity of service changes (technology). The HCIR presents trends by benefit and by region of the country. The quarterly reports also contain one year forecasts and Milliman USA's latest research on medical trends.

The Health Cost Index Report is delivered electronically (email) in PDF format four times a year. To look at back issues click here

**In addition to the publication, you have the opportunity to acquire the data behind the Health Cost Index Report™ at various levels of detail.**

**Option 1:** The data for the following graphs found in the HCIR (1994-current): Health Cost Index-Trends, Health Cost Index, HCI Trend Components. Also, the current one-year Projections and the HCI vs ECI (Employment Cost Index--health insurance).

**Option 2:** All the data listed above for Option 1, plus the main benefits (Hospital Inpatient, Hospital Outpatient, Physician and Prescription Drug) that comprise the All Benefits, along with their one-year forecast.

**Option 3:** All the data listed above for Options 1 & 2, but with the forecasts extended to three years.

For the pricing on the HCIR or for any of these Options, please contact us.

WHAT'S NEW

- Forecasting He Profitability: 2 New Underwri available for p
- Hospital Effic Related Link
- Milliman USA

  corporate pag
- January 2001
  The PDF HCIR

Privacy Policy  |  Copyright 2002 Milliman USA  |  Contact Us  |  Site developed by NetF

 MILLIMAN
# Hospital Efficiency Index ™

 A MILLI
Mil

What's Available
Product Descriptions
Pricing & Ordering
News
Technical Description
Maps
Chart
Contact Us
Home

The Hospital Efficiency Index (HEI) is an invaluable consulting resource for strategic decision makers in the health care industry. These include decision makers at provider, managed care and privately insured organizations.

The HEI represents statistical/actuarial methodologies for analyzing hospital inpatient admissions, length of stay and days, as compared to benchmark most efficient practice, in order to estimate potentially avoidable admissions and days. The primary objective of the HEI is to compare any set of given hospital inpatient experience to the equivalent case-mix/severity adjusted most efficient practice found anywhere in the US. The results are all indexed to this common benchmark. (most efficient practice) to determine potentially avoidable days and admissions and to readily allow direct comparisons on a consistent basis.

The Hospital Efficiency Index is available in two formats: 1) the Analysis Browser or 2) Hard Copy Reports. In addition customized data analysis can be performed on any carrier or facility data.

Separate Hospital Efficiency models are developed for Medicare inpatient care (Medpar data based on UB-92 information) and Commercial (HMO, PPO, indemnity) and Medicaid admissions using public data from 20 states.

### Applications of the Hospital Efficiency Index

For providers, the Hospital Efficiency Index can be applied in the following areas:

- Risk or capitation evaluation
- Cost cutting/reengineering focus
- Long-term strategic planning
- Profitability of Medicare DRGs
- Acquisition/Integration/Consolidation
- Identification of most efficient practice facilities
- Determination of reasons why days are potentially avoidable

For risk takers and carriers the Hospital Efficiency Index can be used for:

- Selection/evaluation/integration of networks
- Determination of hospital efficiency adjusted charge or reimbursement levels
- Development of new reimbursement structures
- UR focus
- Negotiation of provider contracts
- Avoiding medical malpractice risk
- Determination of reasons why days are potentially avoidable
- Identification of benchmarks by DRG or specialty
- Identification of most efficient practice facilities

LOS Hospital Eff

▶ GO TO

- Articles
- Health Co
- Electronic
- Milliman L Website

Privacy Policy  |   Copyright 2002 Milliman USA   |  Contact Us  |  Site developed by NetF

# EXHIBIT "12"

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

c

Harvard Law Review
December, 1991

*427 CONFIDENTIALITY, PROTECTIVE ORDERS, AND PUBLIC ACCESS TO THE COURTS

Arthur R. Miller [FN*]

Copyright © 1991 by the Harvard Law Review Association; Arthur R. Miller

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................... 428

II. A SYNOPSIS OF THE CURRENT LAW ........................................ 432

III. THE EVOLUTION OF THE CONFIDENTIALITY-PUBLIC ACCESS DEBATE ........... 436

    A. The Constitutional Challenge to Protective Orders ................ 436

    B. The Current Attack on Protective Orders ......................... 441

IV. THE EVOLUTION OF THE DISCOVERY AND PRETRIAL MANAGEMENT PROCESSES .... 445

    A. The Changing Face of Pretrial Procedure Since 1938 .............. 447

    B. The 1970 Amendments to the Discovery Rules ...................... 450

    C. 1970-1980: The Mounting Momentum for the Reform of Discovery ..... 453

    D. The 1980 Amendments to the Discovery Rules ...................... 456

    E. 1980-1983: The Reaction to 'Tinkering Changes' .................. 457

    F. The 1983 Amendments to the Federal Rules ........................ 459

    G. Rulemaking Activity from 1983 to the Present .................... 461

    H. Summary ......................................................... 463

V. THE VALUE OF CONFIDENTIALITY AND THE HARMFUL CONSEQUENCES OF A

PRESUMPTION OF PUBLIC ACCESS ........................................... 463

    A. Privacy Rights .................................................. 464

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)                                                          Page 2

    B. Property Rights ............................................ 467

    C. The Role of Protective Orders .............................. 474

VI. EVALUATING THE POTENTIAL GAINS FROM RESTRICTING PROTECTIVE ORDERS ... 477

    A. The Impact on Public Health and Safety ..................... 478

    B. The Impact on the Litigation System ....................... 483

        1. Discovery .............................................. 483

        2. Settlement ............................................ 484

        3. The Impact on Judicial Resources ...................... 487

    C. Conflicts of Interest Facing Attorneys .................... 489

VII. BALANCING THE COMPETING INTERESTS OF CONFIDENTIALITY AND PUBLIC

    ACCESS: A PROPOSAL FOR THE REFINEMENT OF CURRENT PRACTICE .............. 490

VIII. CONCLUSION ................................................... 501

**\*428** Since the adoption of the Federal Rules of Civil Procedure in 1938, court rules and procedures have evolved to limit abuses of the judicial system's liberal discovery regime. Recently, some have feared that important information uncovered during discovery relating to public health and safety has been secreted away from the public and have claimed that the public also has a right of access to other information obtained during discovery. Within the past two years, reformers have introduced proposals in over thirty states that would revamp the current discovery regime by creating a presumption of public access to both personal and corporate information accessed via discovery and by sharply limiting judge's discretion to issue protective orders under Federal Rule of Civil Procedure 26. In this Article, Professor Miller argues against such reforms. Professor Miller details the development of the current rules of discovery and shows that judicial discretion to manage pretrial processes is a necessary response to the abuse of the liberal discovery rules. He argues that the changes advocated by reformers would wreak havoc on the efficient functioning of the litigation process, and he explores the significant privacy and property interests -- both personal and commercial -- that would be jeopardized by adopting the reforms. Finally, Professor Miller determines that the reformers have exaggerated the extent of the problems with the current system, and he concludes that conscientious utilization of the system's tools by litigants and judges can ensure that information relating to public welfare will be channelled to appropriate government agencies.

## I. INTRODUCTION

By longstanding tradition, the American public is free to view the daily activities of the courts through an expansive window that reveals both our civil and criminal justice systems. Through this window, people can watch an endless panoply of lawsuits, litigants, judges, and juries, sometimes garishly illuminated by television lights and dramatized by graphic, occasionally lurid, press reports. [FN1] Like **\*429** much of this country's judicial process, the right of public access to court proceedings and records derives from our English common law heritage. [FN2] It exists to enhance popular trust in the fairness of the justice system, to promote public participation in the workings of government, and to protect constitutional guarantees. [FN3]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)                                                      Page 3

This right of access, however, is not absolute; it has never been extended beyond the confines of the courtroom and court documents. [FN4] Consequently, there has never been a public right of access to the parties' activities, discussions, and papers, let alone to the conduct of judges and juries outside the courtroom, either during preparation of the litigation or during settlement negotiations. [FN5] Further, trial judges have had great discretion "to determine whether, to whom, and under what precautions, the revelation should be made." [FN6] Indeed, our justice system recognizes a variety of situations in which confidentiality is not only acceptable, but essential. Discovery, grand jury proceedings, settlement negotiations, and jury deliberations are conducted far from public view. Classified government information, communications between attorney and client, the identity of news sources or police informants, and proprietary data traditionally have been treated as confidential. Valid reasons exist to deny public access to this information. In each instance, confidentiality is deemed essential to accomplish fundamental goals of the justice system that are far more important than the public's need to know every detail of a given case.

However, an intense, nationwide campaign is underway to create a "presumption of public access" to all information produced in litigation that would seriously restrict the court's traditional discretion to issue protective and sealing orders shielding the litigants' documents from view. [FN7] This presumption is necessary, some say, because courts *430 have disregarded the public interest in information produced in litigation and, as a result, have concealed important information affecting *431 public health and safety from public view. Others are less discriminating and claim that all litigation materials should be available, regardless of whether they deal with health and safety, business matters -- such as company finances, marketing, or research and development -- or personal affairs. Although the boundaries of these categories are far from crystal clear and certain types of information might fall within two or more of them, there are obvious differences between and among them. Nonetheless, the more extreme proponents of increased public access seek to give the halls of justice walls of glass, so that nothing is withheld from the public eye, no matter how private, insignificant, or inaccurate it might be.

Heeding these voices could lead to a fundamental transformation in the role of the courts. The traditional model of civil adjudication in this country envisions private parties bringing a private dispute to a dispassionate arbiter (a judge and sometimes a jury) for a resolution based upon neutral principles of law. [FN8] The court (or jury) considers only the evidence and arguments presented by the contestants, applies the law to the facts, and refrains from injecting personal views into the resolution of the case. The decisionmaker is also not supposed to consider interests or matters extraneous to the facts and issues of the case. Given these goals, public access to information produced in litigation has always been a secondary benefit -- a side effect -- of civil adjudication. If public access assumes an importance on a par with the system's concern for resolving disputes among the litigants, the traditional balance would be upset and the courts diverted from their primary mission.

Some have suggested that this traditional conception of the civil adjudicatory process is too narrow; in their view the courts, being public institutions, should aggressively promote broad social goals within the context of private litigation. [FN9] The current campaign to change the statutes and court rules regarding confidentiality seems to draw heavily upon the ideas advanced by these public law theorists.

This Article discusses the effects that the proposed presumption of public access could have on the judicial system and on those involved in civil litigation. It concludes that promoting increased public access to information by restricting the discretion of the courts to protect *432 confidential information is ill-advised. These restrictions run counter to important procedural trends designed to enhance judicial power to control discovery, improve efficiency, and promote settlement in the hope of reducing cost and delay. Moreover, proponents of the reforms have not demonstrated any clear need for constricting judicial discretion. This Article argues that constricting discretion would impair the fairness and efficiency of the existing system and would unduly impinge upon litigants' rights to maintain their privacy, to protect valuable property interests, and to resolve their legal disputes freely with minimal intrusion from outside forces.

Proposed changes in the current system that derive from public law theories of litigation are therefore rejected in large measure -- but not entirely. The public law model has quite properly encouraged procedural changes, such as expanded class action availability and more flexible pleading and joinder rules, that have enhanced access to the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

adjudicatory system and protected a broader range of individual and societal interests. [FN10] The current pressure to restrict judicial discretion to grant protective orders, by contrast, often seeks to promote goals unrelated to the litigation before the court, such as increased data gathering by the media and aiding third-party lawyers bringing similar suits. It does so by burdening people's use of the system rather than facilitating that use. There is an important difference between the two approaches. The public law approach promotes resort to the litigation process in certain substantive contexts -- such as discrimination, the environment, safety, and health -- to achieve change in legal doctrine and, ultimately, in certain social results. A presumption of public access alters the system itself in a way that might undermine its primary goal of providing citizens an effective truth-seeking procedure for resolving their disputes without impairing their other rights.

## II. A SYNOPSIS OF THE CURRENT LAW

The existing procedure for handling requests for protective and sealing orders seeks an accommodation of the competing interests and appears fundamentally sound. Federal courts in particular have given considerable attention to the subject of confidential information, and *433 they have gradually developed a balancing process. [FN11] Most state courts have a similar practice. [FN12]

The party opposing discovery is initially required to demonstrate that Federal Rule of Civil Procedure 26(c)(7) applies -- "that a trade secret or other confidential research, development or commercial information" is involved and that its disclosure might be harmful. [FN13] In addition, that party must show that "good cause" exists for issuing a protective order. [FN14] The "good cause" requirement is strict. Federal courts have interpreted the rule to mean that the party seeking confidentiality must make a particularized factual showing of the harm that would be sustained if the court did not grant a protective order. [FN15]

If the party opposing discovery brings itself within Rule 26(c)(7), the burden then shifts to the party seeking discovery to demonstrate that the information for which protection is sought is relevant and necessary to the action. [FN16] If the discovering party fails to establish either relevance or need, disclosure generally is denied. [FN17] But should the party seeking discovery demonstrate both of these elements, [FN18] the *434 court then must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled. [FN19] When the risk of harm to the owner of the trade secret or confidential information outweighs the need for discovery, disclosure cannot be compelled, [FN20] but this is an infrequent result.

Once the court determines that the discovery policies require that the materials be disclosed, the issue becomes whether they should "be disclosed only in a designated way," as authorized by the last clause of Rule 26(c)(7) and its state counterparts. [FN21] Whether this disclosure will be limited depends on a judicial balancing of the harm to the party seeking protection (or third persons) and the importance of *435 disclosure to the public. [FN22] Courts also have a great deal of flexibility in crafting the contents of protective orders to minimize the negative consequences of disclosure and serve the public interest simultaneously. [FN23]

Courts have limited the types of potential harm to the divulging party that they will consider in this balancing process. For example, damage to a corporation's goodwill or reputation generally is not sufficient to establish a need for confidentiality. [FN24] Nor does the possibility that the discovered information will be shared among litigants in different lawsuits necessarily constitute good cause to prevent disclosure. [FN25]

One area of controversy, however, is the amount of discretion courts have in determining whose interests in disclosure may be weighed in the balance; specifically, it is unclear to what extent courts should consider nonparty interests. These interests can take a variety of forms. As just noted, litigants in other suits against the same defendant will often seek to reduce the cost and burden of their own discovery by gaining access to previously discovered material. [FN26] The press may seek access to determine whether the discovery papers *436 contain newsworthy information. [FN27] Outside interest groups and members of the general public might seek access if they believe important health or safety information or other matters of public interest are discovered. [FN28] In

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 5

some instances, of course, their motivation may not be entirely altruistic. Finally, lawyers might seek disclosure to identify potential plaintiffs for future suits. [FN29] Under existing law, the courts have discretion to accept or reject these interests, and they exercise it on a case-by-case basis. [FN30]

### III. THE EVOLUTION OF THE CONFIDENTIALITY-PUBLIC ACCESS DEBATE

#### A. The Constitutional Challenge to Protective Orders

The current debate surrounding court confidentiality and public access is taking place in the context of a flood of proposed amendments to civil procedure codes that would restrict the power of courts to issue protective orders. [FN31] But that is not how the debate began. Prior to the Supreme Court's decision in Seattle Times Co. v. Rhinehart, [FN32] many courts and commentators argued that the First Amendment itself limited a court's power to issue a protective order, regardless of the content of the applicable procedural rules. Parties making the First Amendment argument could assert two distinct interests against the issuance of a protective order. The first, and the one more directly impaired by an order, is the litigant's interest in disseminating materials gathered or generated during the action. The second, potentially *437 broader interest is the public's right of access to those materials, particularly the fruits of discovery and settlement information.

Protective orders raised serious constitutional questions, it was argued, because they could be analogized to prior restraints on litigants' speech and were therefore subject to strict scrutiny. [FN33] Although the exact details of the analysis varied, its main thrust was that the constitutional requirements for imposing a restraint were more strict than the "good cause" standard for protective orders set out in Federal Rule of Civil Procedure 26(c): the harm posed by the dissemination must be substantial and serious, the restraining order must be drawn narrowly and precisely, and there must be no less restrictive means of protecting the public interest in maintaining confidentiality. [FN34] Further, as one commentator noted, if a party "obtains access to information disclosed during pre-trial discovery in advance of any confidentiality ruling by the court, the court should not be permitted to restrict the use of this information merely on the basis that such restrictions would aid the orderly procedures of the court." [FN35]

The Supreme Court addressed the prior restraint issue in Seattle Times. [FN36] The discovery dispute before the Court grew out of a Washington state court libel action filed against the Seattle Times by the Aquarian Foundation, a religious organization, and Rhinehart, its spiritual leader. During discovery, the newspaper requested a list of the names of the Foundation's donors and the amounts given, as well as a list of its members. The Aquarian Foundation resisted the request and asked either that discovery not be compelled or that a protective order be issued forbidding the newspaper from disseminating the information.

The trial court compelled discovery and, initially, denied the Foundation's motion for a protective order. The Foundation, however, moved for reconsideration and filed affidavits averring that making *438 the information public would reduce its membership and financial support and would subject its members to harassment and reprisals. The court issued an order prohibiting the newspaper from "publishing, disseminating, or using the information in any way except where necessary to prepare for and try the case." [FN37] The Washington Supreme Court affirmed the order. [FN38]

The United States Supreme Court upheld the Washington courts. The Court rejected the analogy to a prior restraint and concluded that protective orders are not subject to "exacting First Amendment scrutiny." [FN39] Strict scrutiny is unwarranted, reasoned the Court, because a protective order is a very limited intrusion on a litigant's ability to make information public. It forbids dissemination only of material gathered through the discovery process; if a litigant obtains the identical information through independent means, distribution is allowed. [FN40] In addition, the Court stated, a litigant's claimed right to disseminate information gathered through the discovery process is particularly weak. [FN41] Because the litigant has no independent right of access to discovery, "continued court control over the discovered information does not raise the same specter of government censorship that such control might suggest in other situations." [FN42]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

The Court stressed that the validity of protective orders must be evaluated within the entire pretrial discovery context. [FN43] According to the Court, liberal discovery exists solely to assist the resolution of disputes; unfortunately, discovery is subject to tremendous abuse, not only by promoting delay and expense, but also by furthering the incidental or purposeful damaging of a litigant's reputation and invasion of her privacy. The Court concluded that protective orders were justified because they serve the substantial governmental interest in controlling discovery abuse. [FN44]

Finally, the Court upheld Washington's procedural code under which the protective order was issued. It noted that the code conferred broad discretion on the trial court to determine when a protective order was appropriate and what type of safeguards were required. [FN45] The Court recognized the importance of discretion in the *439 pretrial context and indicated that the trial court was in the best position to evaluate "the competing needs and interests" of the litigants in discovery. [FN46] In addition, obligating a trial court to conduct a heightened First Amendment analysis for every protective order request could bring the pretrial process to a halt. [FN47] In sum, " t he unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders." [FN48]

The Court's Seattle Times opinion, although not directly on point, does bear on the question whether the public has a right of access to the pretrial discovery process. [FN49] Some courts had recognized that right, [FN50] and commentators had stressed the distinction between it and the litigant's right to disseminate discovered materials. [FN51] A constitutional right of access to materials used at trial does exist, and, went the argument, the same rationale supports a right of access to pretrial material. Seattle Times makes clear that it is not that simple.

The Supreme Court has developed a two-prong analysis to determine whether and when the public has a right of access to information produced in the litigation process. [FN52] Under the first prong, the Court considers "whether the place and process have historically been open to the press and general public." [FN53] The second prong is an inquiry into "whether public access plays a significant positive role in the functioning of the particular process in question." [FN54]

The claim of a public right of access to pretrial discovery fails this test. The first prong was rejected in Seattle Times: "pretrial depositions and interrogatories are not public components of a civil trial. . . . [R]estraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information." [FN55] The second prong is not satisfied because the rationale *440 for a right of public access to information used at trial does not support a right to information or documents produced during pretrial discovery. [FN56] Discovery material generally is not considered by a court, and no court decision is based upon it. Thus, allowing access neither promotes fair and open decisionmaking by the court nor educates the public about the justice system. [FN57]

In addition, the broad scope of contemporary discovery means that much of the information generated will be of limited relevance to the issues in controversy. Accordingly, public access to pretrial material is not well suited to the objective of facilitating the openness of the trial itself, although the access argument is somewhat stronger when discovery material is used in connection with a motion, particularly a dispositive one. [FN58]

Alternatively, a right of access to pretrial materials might be seen not as an extension of the right of access to trials, but rather as an independent access right. This argument is somewhat strained. As *441 the Court stated in Zemel v. Rusk, [FN59] " t he right to speak and publish does not carry with it the unrestrained right to gather information." [FN60] Thus, the public has no right to gather information by piggybacking on the discovery process engaged in by private litigants. [FN61] Nor does the mere use of governmental processes to gather information generally create a First Amendment right of public access to the information collected. [FN62]

Seattle Times makes clear that neither a litigant's interest in dissemination nor the public's interest in access justifies a constitutional restriction on the issuance of protective orders. But a constitutional claim of a right of access to limited types of information might survive the decision. It is conceivable that the character of certain information discovered during the pretrial process might be such that it would be beyond the power of a court to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                    Page 7
(Cite as: 105 Harv. L. Rev. 427)

prevent public access. As one commentator has suggested, some information might be "so significant to the preservation of the process of self-governance . . . that it would violate the [first] amendment to keep the press and public from that knowledge." [FN63]

Even this limited restriction, however, must be evaluated in light of two important caveats. First, the function of the judicial system is to resolve private disputes, not to generate information for the public. [FN64] Second, the smooth functioning of the pretrial process should not be impaired by subjecting pretrial management to cumbersome or repeated First Amendment review. [FN65] Any theory of access must accommodate the Supreme Court's warning that, " b ecause of the liberality of pretrial discovery . . . it is necessary for the trial court to have the authority to issue protective orders." [FN66]

### B. The Current Attack on Protective Orders

The Supreme Court's broad rejection of a right to public access did not slow the impetus to restrict protective orders; if anything, the *442 movement has accelerated and shifted gears from pressing for a constitutional interpretation to advocating procedural revision. [FN67] The most relentless attack on protective orders has come from the plaintiffs' bar, which, through the Association of Trial Lawyers of America (ATLA), has pledged that stopping what it characterizes as "secrecy" in the courts will be its highest priority. [FN68] According to ATLA, protective orders and sealed court records are being used with increasing frequency to hide deadly product defects or other "public hazards" from the public. [FN69] In the name of protecting the public, ATLA has pressed for legislation prohibiting courts from entering orders that would have the effect of "concealing public hazards." [FN70] In addition, ATLA has sought a presumptive right of access to all information produced in litigation, including everything exchanged in discovery but not used at trial, as well as the contents of settlement agreements. [FN71]

Enlisting the aid of both the print and electronic media, who clearly have a substantial interest in expanding their right of access to information to fill their pages and air time, [FN72] ATLA began its efforts in the Florida and Texas legislatures. When efforts to enact a statute in Texas reached an impasse, the legislature referred the matter to the Texas Supreme Court to see if the objective could be achieved by amending the Texas Rules of Civil Procedure. [FN73]

After extensive hearings at which strong opposition to a rule change was expressed, the Texas Supreme Court adopted Rule 76a *443 by a five to four vote, with an unprecedented dissent by Justices Hecht and Gonzalez. [FN74] Rule 76a creates a presumption that court records are open to the public; defines court records to include unfiled discovery materials and settlement agreements that have a "probable adverse effect on public health or safety"; allows the sealing of information only upon a showing that serious, substantial harm could result from disclosure and a finding that the interest in sealing the information clearly outweighs any public interest in access; and gives third parties, such as the press, a perpetual right to intervene in any matter to oppose the sealing of -- or propose the unsealing of -- any records. [FN75]

In the Florida legislature, a bill called the Sunshine in Litigation Act, which prohibits courts from entering orders that might have the effect of concealing "public hazards" or any information that may be useful to the public in protecting against "public hazards," [FN76] sailed through both houses and was signed by the Governor in a matter of days. [FN77] So swift was its passage, in fact, that apparently no one paused to consider whether the Act might violate the state constitution. After some time for reflection, concern surfaced that the enactment exceeded the legislature's authority, because the Florida Constitution vests exclusive authority over matters of civil practice and procedure in the state's Supreme Court. To prevent nullification of the Act in a constitutional challenge, the plaintiffs' bar asked the Florida civil procedure advisory committee to consider incorporating the statute's provisions into the Florida court rules. [FN78] The committee rejected the proposal as unnecessary. [FN79]

*444 ATLA also has had partial success in Virginia, [FN80] but subsequent efforts in twenty-five other states were not as successful. [FN81] These setbacks undoubtedly reflect the emergence of strong opposition from the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

defense bar. New York declined the local ATLA organization's invitation to adopt a rule similar to that in Texas. Instead, it adopted a modest provision that conditions the sealing of court records on a finding of good cause -- essentially codifying existing practice. [FN82] The presiding justices of New York took this step even though the New York State Bar Association voted overwhelmingly against adoption of any rule on the subject and voiced its preference that the matter of sealing court records be left to the discretion of the trial judge. [FN83] In Rhode Island, the Governor vetoed a bill that would have made it extremely difficult for manufacturers in that state to protect trade secrets and other proprietary information; he cited the anti-business climate the bill would create. [FN84] And in Louisiana, Governor Roemer recently vetoed similar legislation as an unnecessary interference with judicial authority. [FN85]

*445 In Alaska, Arkansas, Colorado, Connecticut, Idaho, Iowa, Kansas, Maine, Massachusetts, Mississippi, New Mexico, New York, Oregon, and Virginia, protective order legislation was not reported out of committee. [FN86] In California, Hawaii, and Minnesota, legislation was withdrawn by the sponsors. [FN87] In Illinois, Nevada, New Hampshire, and Washington, legislation passed one house of the legislature but was defeated or died in the other chamber. In Montana and South Dakota, similar legislation was defeated on the floor of the chamber of introduction. [FN88] Legislative and rulemaking proposals remain pending in a few states, and the battle undoubtedly will be rejoined when legislatures next reconvene. [FN89]

There has also been activity on the federal level. In 1990, the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice held hearings on "Court Secrecy." [FN90] A large number of witnesses gave testimony reflecting many different points of view. No legislative proposal has emerged, however. In August 1991, a report of the President's Council on Competitiveness, which reflects the work of the Office of the Vice President and the Department of Justice, recommended that the subject of protective orders be left to trial court discretion. [FN91] It is extraordinary that all of this federal and state activity has transpired since ATLA's call to arms less than two years ago.

## IV. THE EVOLUTION OF THE DISCOVERY AND PRETRIAL MANAGEMENT PROCESSES

The shift in the public access campaign from constitutional challenge to procedural modification has transformed the debate into one of policy: what should the practice regarding protective orders be rather than what must it be. Although both sides of the controversy *446 are motivated by a range of important interests and values (as well as enlightened self-interest), any inquiry into what a good procedure would be must take into account the degree to which each side's view can be assimilated successfully into the modern conception of a healthy adjudicatory system.

Each aspect of the Federal Rules of Civil Procedure (or any state code of procedure) is part of a complex, highly interdependent system that collectively governs the litigation process. Any alteration of one structure inevitably affects the functioning of the others, which, in turn, affects the entire process. It would be a mistake to view the protective order as a disembodied device that can be modified without any effect on other elements of the system -- particularly the discovery regime. Nor can the discovery rules be viewed simply as a series of self-contained devices. Discovery is, instead, "an integrated mechanism for narrowing the issues and ascertaining the facts." [FN92] which is itself part of a larger integrated system.

The role that judicial discretion to issue a protective order plays in this "integrated mechanism" reflects two different litigation realities. The first, and more general, is the need for effective tools of pretrial management. Protective orders are one of several different techniques a judge may employ to ensure the efficiency and fairness of the discovery process. Issuance of a protective order (or for that matter its denial), no less than the imposition of a sanction for misconduct, can promote orderly compliance with discovery requests and minimize the amount of procedural maneuvering.

The second, more specific reality is that the protective order is a tool particularly well-adapted to minimize discovery abuse. [FN93] The dissemination of private or valuable information generated during discovery may

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 9

produce serious harm, both to society and to litigants. A fear of that harm may chill a claimant's willingness to resort to the courts or encourage either party to settle for reasons and on terms unrelated to the merits of the underlying claim. The protective order guards against these harms without impairing the flow of information to the litigants.

*447 A. The Changing Face of Pretrial Procedure Since 1938

An examination of the evolution of civil procedure since 1938 demonstrates the need for active judicial management of pretrial discovery and shows that retaining judicial discretion to grant protective orders is consistent with that active management. Indeed, viewed in the context of actual experience, the calls for change in protective order practice appear to be based on a counterfactual view of contemporary litigation that bears little relation to what pretrial practice is and demands.

The adoption of the Federal Rules of Civil Procedure in 1938 fundamentally changed in American procedure. In particular, the discovery system in Rules 26 through 37 revolutionized pretrial preparation. The prior system had limited a litigant's ability to acquire information largely to what was admissible at trial; since 1938, a litigant has been able to secure the production of information on a vastly broadened scale -- essentially, any information that conceivably could be of help in preparing the case. [FN94] At the same time that the litigant's ability to acquire information was enhanced, new limitations were developed to control the use of the discovered information both before and at trial. [FN95]

The goals underlying the expansion of the discovery process were to facilitate preparation, to avoid surprise at trial, and to promote the resolution of cases on their merits -- not to enlarge the public's access to information. [FN96] Nonetheless, the expanded scope of discovery under the Federal Rules and the increased amounts of information they generated created side effects outside the adjudicatory system -- it posed a threat to privacy and confidentiality. [FN97] To meet this new problem, the discovery rules contain provisions, such as the authorization for protective orders in Rule 26(c), to limit the discovering party's use of information beyond the litigation context.

The Federal Rules have undergone almost continual evolution since 1938 to maintain a balance among a litigant's ability to compel *488 production of information, the court's capacity to protect confidentiality and prevent misuse of the information, and the court's ability to prevent abuse of the procedural system. When the discovery regime was originally promulgated, the expectation was that it would operate party-to-party and not require significant court intervention. [FN98] But increased numbers of cases, the broad dimension of some of the litigation, the enormous economic or philosophic stakes of some contemporary cases, and a growing loss of civility within the practicing bar have made a self-executing discovery system impossible; the process undoubtedly requires some judicial management.

Before proceeding to the details of the discovery regime's evolution, however, it is worth noting that the movement toward active judicial involvement in pretrial matters is not unique to discovery. The erosion of the original theory began in 1951, when a committee of five circuit judges and five district court judges appointed by Chief Justice Fred M. Vinson and chaired by Judge E. Barrett Prettyman issued a report calling for active management by the trial judge of pretrial procedures in complex cases. [FN99] The so-called Prettyman Report was adopted by the Judicial Conference of the United States in 1951. [FN100] In the forty years since then, a continous pattern of attention to pretrial management has extended and elaborated the ideas in the Prettyman Report.

The appearance of an increasing number of complex and protracted cases [FN101] coincide with the initial period of concern about judicial management. One of the earliest and best known examples is the electrical equipment cases, which provided much of the impetus for the judicial management movement. [FN102] In the early 1960s, a conspiracy among electrical equipment manufacturers in violation of *449 the antitrust laws spawned a massive set of civil damage actions: more than 1800 separate lawsuits were filed in thirty-three different federal district courts. [FN103] To resolve the litigation fairly and efficiently, the courts established coordinated

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 10

pretrial proceedings under the aegis of a group of specially selected district judges, a system of national depositions involving selected lead counsel, and a central document depository containing over one million documents that was made available to all the parties. [FN104] In addition, a special panel called the Coordinating Committee for Multiple Litigation of the United States District Courts was established. [FN105] The litigation was resolved by 1968, far earlier than anticipated. [FN106] Experience with the electrical conspiracy cases and other complicated disputes created an environment of procedural experimentation in which the development of pretrial management mechanisms became central. [FN107]

The most significant by-product of the electrical conspiracy cases was the creation of the Judicial Panel on Multidistrict Litigation in 1963 [FN108] and the introduction of the Manual for Complex and Multidistrict Litigation [FN109] in the same year. The Panel legitimized the notion of aggregating multiple federal cases, wherever located, that had sufficiently overlapping characteristics to warrant the appointment of a single supervising district judge. The Manual and its successors, the Manual for Complex Litigation [FN110] and the Manual for Complex Litigation, Second, [FN111] have articulated the increased awareness of the need for tighter judicial control of the pretrial process and have tried to describe and propagate the constantly advancing art of trial management.

Moreover, since its creation, the Federal Judicial Center has recognized the need for increased judicial involvement in the pretrial process. Much of its research is devoted to the subject. The Center also conducts a variety of seminars for district court judges and magistrates *450 advancing case management procedures that "continue to challenge the assumption that only the lawyers, not the judge, should control the progress of a case." [FN112]

Thus given impetus and momentum, the judicial management movement has gained adherents and has become increasingly sophisticated. The most recent, and in some ways the most dramatic, development was Congress's decision in the Judicial Improvements Act of 1990 [FN113] to require every district court to develop a management plan to promote efficiency and reduce cost and delay. [FN114] Section 473(a)(1) of the act calls for each district to consider "systematic, differential treatment of civil cases that tailors the level of individualized and case specific management" to the need of each case. [FN115]

Since 1970, the Federal Rules of Civil Procedure relating to pretrial practice have undergone a transformation that very much mirrors the events just described. Understanding the past two decades of rule changes and the drafters' quest to cabin the pretrial process and prevent abuse clarifies why increasing public access and reducing judicial discretion would be counterproductive.

## B. The 1970 Amendments to the Discovery Rules

The 1970 amendments to the Federal Rules significantly strengthened district judges' ability to control the pretrial process by enhancing the existing management tools and encouraging their use. Additionally, by centralizing the general principles governing discovery in Rule 26 and making them applicable to all the devices, the amendments reflected and encouraged a view of pretrial as being an integrated process subject to overarching control by the trial court.

The amendments transferred the governance of protective orders from Rule 30(b) to Rule 26(c) and made protective orders applicable to all forms of discovery. [FN116] To "reflect existing law," [FN117] the rulemakers *451 also added a specific reference to "trade secret s or other confidential research, development, or commercial information." [FN118] The new protective order provision articulated the growing understanding that the Federal Rules provide for broad discovery and rely on the district court's discretion to decide whether protective restrictions are necessary in a particular case. [FN119]

The amendments also sought to "encourage more frequent imposition of sanctions in cases in which there has been an abuse of the discovery rules" [FN120] by strengthening judges' power to sanction. To eliminate the

requirement of willfulness, the title of Rule 37 was changed from "Refusal to Make Discovery: Consequences" to "Failure to Make Discovery: Sanctions," and "refusal" was replaced with "failure" throughout the rule. [FN121] Similarly, the amended rule stated that evasive or incomplete answers constituted a "failure" to respond to a discovery request. [FN122] The amendments also eliminated the Rule 37(a) requirement that, to merit the awarding of fees, a refusal must be "without substantial justification." [FN123] The range of sanctions available to a district judge was expanded to provide "greater flexibility as to sanctions which the cases show is needed." [FN124] To this end, Rule 37(d) was amended to provide for "reasonable expenses, including attorney's fees," in addition to other sanctions already available under Rule 37 for certain violations. [FN125]

The 1970 amendments also strengthened the district court's discretion regarding the timing of discovery. They eliminated the common practice of automatically conferring priority in the sequence of discovery *452 on the party, typically the defendant, who first serves notice of a deposition. This change was achieved by adding subdivision (d) to Rule 26, which gave the trial court plenary discretion to control the timing and order of discovery. The purpose was "to make clear and explicit the court's power to establish priority by an order issued in a particular case." [FN126] The change gave the district judge greater ability to custom-tailor the discovery program to the needs of individual cases and further reduced the lawyers' ability to control the progress and development of the litigation.

The amendments also rearranged the rules governing the use of the various discovery devices. Additionally, several provisions were added that increased judicial management over discovery and set the tone for the more significant changes that would be made in 1980 and 1983. Subdivisions of then-existing Rule 26, which had governed only depositions, were moved to various subdivisions of Rules 30, 31, and 32. Rule 26 became the centerpiece of the system because it contained the general principles governing all discovery devices. [FN127]

This rearrangement was more than an attempt to create logical symmetry among the rules. The Advisory Committee thought it "very desirable, even necessary, that the discovery rules contain one rule addressing itself to discovery generally." [FN128] Consolidation of the general discovery principles can be understood as a recognition of the growing need to manage the process more effectively. It was in 1970 that devices such as protective orders and sanctions were transformed from mere limitations on particular discovery techniques to mechanisms for controlling the entire discovery process [FN129]--and the amendments put those mechanisms squarely in the hands of the judges.

### *453 C. 1970-1980: The Mounting Momentum for the Reform of Discovery

Although the 1970 amendments were significant, they neither satisfied the critics of the discovery process nor ended the evolution of the Federal Rules. Indeed, in the period between the promulgation of the 1970 and 1980 amendments, sentiment grew strongly among judges, lawyers, and commentators that stricter control of the discovery process was necessary and that the abuses in the discovery process necessitated more effective judicially applied remedies.

This discontent with the pretrial process was articulated in 1976 at the National Conference on the Causes of Popular Dissatisfaction with the Administration of Justice, known as the Pound Conference. [FN130] The keynote speaker at the conference, Chief Justice Burger, stated that one of the major problems of the judicial system was "misuse of pretrial procedures." [FN131] Although reformers most fervently criticized discovery procedures for encouraging unnecessarily lengthy and costly litigation, they also complained that the general abuse of discovery jeopardized the confidentiality of information that merited privacy. For example, Judge Simon H. Rifkind, another participant at the 1976 conference, echoed Chief Justice Burger's complaint and added that " a foreigner watching the discovery proceedings in a civil suit would never suspect that this country has a highly-prized tradition of privacy enshrined in the fourth amendment." [FN132] Abuse was rampant, continued Judge Rifkind, because "discovery proceeds with no attempt at serious regulation." [FN133] Reflecting on these problems, the *454 Chief Justice expressed the belief that what was needed was "fundamental changes and major overhaul rather than simply 'tinkering.'" [FN134]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 12

The concern with discovery abuse and the call for increased judicial control expressed at the Pound Conference intensified the demand for reform. Attorney General Griffin Bell argued that "a high priority should be given to eliminating abuses in the use of pretrial discovery procedures." [FN135] Various commentators advocated the increased use of case management techniques to control discovery excesses. [FN136] "The leadership of the American Bar Association, determined that the Pound conference would not be simply another exhortation of the Bench and Bar to improve its standards to be then quickly forgotten," quickly formed a task force to prepare a follow-up report on the Pound Conference. [FN137] The task force submitted its report to the Board of Governors of the ABA in August 1976. [FN138] The document focused on the correction of discovery abuses and noted that "o rdeal by pretrial procedures, it has been said, awaits the parties to a civil lawsuit." [FN139] The Report called on the ABA's Section of Litigation to "accord a high priority to the problem of abuses in the use of pretrial procedures." [FN140]

In response to the task force recommendations, the Section on Litigation formed a "Special Committee for the Study of Discovery *455 Abuse." The Special Committee issued a report in October 1977 that recommended a number of reforms, most notably a narrowing of the scope of permissible discovery to the "issues" in a case instead of its "subject matter," [FN141] the institution of a discovery conference whenever requested by a party, [FN142] and changes to Rule 37 that would provide greater flexibility to judges in issuing sanctions through "a general grant of power which would enable the court to deal summarily with discovery abuses." [FN143] The proposals were considered by the Advisory Committee on Civil Rules of the United States Judicial Conference, and in March 1978, the Conference circulated a preliminary draft of proposed amendments that incorporated several of the ABA recommendations. [FN144] However, most of those proposals ultimately were deleted from the final version of the 1980 amendments, largely because they were considered too inconsistent with the basic discovery philosophy of the Rules. [FN145]

Even before formal changes were made in the Federal Rules, however, the judicial interpretation of the existing rules began to reflect the concerns expressed at and following the Pound Conference. Specifically, a number of courts strengthened the limits on discovery to deter abuse. In National Hockey League v. Metropolitan Hockey Club, Inc., [FN146] for example, the Supreme Court upheld the trial court's dismissal of an antitrust action under Rule 37(b)(2) for plaintiff's failure to answer interrogatories, and it explicitly authorized the use of sanctions as a deterrent to discovery abuse. [FN147] Commentators greeted this shift away from judicial tolerance with widespread approval. *456[ FN148] Thus, the 1970s were marked by increasing judicial involvement in the pretrial process.

D. The 1980 Amendments to the Discovery Rules

The final version of the Federal Rule amendments proposed by the Advisory Committee in 1980 did not respond to Chief Justice Burger's call for a "major overhaul." Rather, the amendments reflected a judgment that the primary problem with discovery resulted from a judicial hesitancy to seize control of the process and not from a lack of tools with which to do so. [FN149] The Committee wrote that
abuse of discovery, while very serious in certain cases, is not so general as to require such basic changes in the rules that govern discovery in all cases. . . . In the judgment of the Committee abuse can best be prevented by intervention by the court as soon as abuse is threatened. [FN150]

Because of this belief, and because opposition to any significant constriction of discovery had developed, the 1980 amendments did not include the ABA's central proposals to narrow the scope of discovery and to limit the number of interrogatories that could be propounded to parties. [FN151]

The principal change affecting discovery in the 1980 amendments was the incorporation in Rule 26(f) of the ABA proposal for a discovery conference at the request of either party. [FN152] The device gave district judges another means to guide and control discovery to prevent abusive behavior; it reflected the Committee's belief that the fundamental change needed was to motivate judges to undertake responsibility for correcting discovery problems. The device was intended to counter judicial hesitancy to become involved in the process by providing that "counsel

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 13

who has attempted without success to effect with opposing counsel a reasonable program or plan for discovery would be entitled to the assistance of the court." [FN153]

*457 The Advisory Committee tempered its enthusiasm for the procedure by commenting that "[i]t is not contemplated that requests for discovery conferences will be made routinely." [FN154] However, as the Fifth Circuit noted recently, "the discovery conference is not limited to massive class actions or complex litigation; nor must it be used only as a last-ditch effort to put discovery on track." [FN155] The discovery conference provision has been well received by the courts, [FN156] although its function has been superseded by the 1983 amendment to Rule 16 and its elimination has been proposed by the Advisory Committee. [FN157]

### E. 1980-1983: The Reaction to "Tinkering Changes"
The failure to subject the discovery regime to a major overhaul met with vigorous dissent and disappointment. Critics were not dissatisfied with the 1980 changes themselves; rather, they believed that the revision should have gone much further and, specifically, should have given district judges more power. This attitude reached all the way to the Supreme Court. Justice Powell, joined by Justices Stewart and Rehnquist, wrote a sharp dissent to the Court's authorization of the 1980 amendments:
The present Rules . . . invite discovery of such scope and duration that district judges often cannot keep the practice within reasonable bounds . . . .
I do not dissent because the modest amendments recommended by the Judicial Conference are undesirable. I simply believe that Congress'*458 acceptance of these tinkering changes will delay for years the adoption of genuinely effective reforms. [FN158]

Although Chief Justice Burger did not join the dissent, he had declared earlier that year, in his Annual Report on the State of the Judiciary, that "[t]he responsibility for control [of pretrial processes] rests on both judges and lawyers. Where existing rules and statutes permit abuse, they must be changed. Where the power lies with judges to prevent or correct abuse and misuse of the system, judges must act." [FN159] Some of the sentiments of these Justices seem to be foreshadowings of the opinion in Seattle Times. [FN160]

In the period immediately following the promulgation of the 1980 amendments, a chorus of voices called for the more comprehensive reforms advocated by the ABA, the dissenting Justices, and commentators. For example, the ABA Section of Litigation responded sharply to the failure of the 1980 amendments to incorporate the reforms it had proposed. It called the amendments "an insufficient response to a serious problem" and proposed new amendments. [FN161] One study of trial judges and lawyers involved in complex cases found that both believed the system would benefit from "greater judicial involvement in the framing and control of discovery, including resolution of discovery disputes." [FN162] Other studies published in 1979 and 1980 indicated a need for discovery reform. [FN163] Professor Maurice Rosenberg, who at that time was the Assistant Attorney General in charge of the Office for Improvements in the Administration of Justice, and Warren King, his Attorney Advisor, advocated the adoption of the ABA proposals to "reduce unnecessary duplication and repetition in discovery" that had been spurned in the 1980 amendments. [FN164] Numerous other articles advocated increasing the power of judges to control discovery abuse. [FN165] Given the unremitting pressure to go *459 beyond the 1980 changes, it is not surprising that the Rules were amended again only three years later.

### F. The 1983 Amendments to the Federal Rules
The 1983 amendments incorporated a number of the revisions that Justice Powell and others had been insisting were necessary to control discovery. A basic shift in discovery philosophy was evidenced by the elimination of the sentence in Rule 26(a) stating that "the frequency of use of [the discovery] methods is not limited." [FN166] To reverse the message previously projected by the dropped sentence, a paragraph was added to Rule 26(b)(I) listing the grounds on which a court is obliged to limit discovery: if the discovery is duplicative or obtainable at lesser cost from another source, if "the party seeking discovery has had ample opportunity by discovery to obtain the information sought," or if the burden of discovery is disproportionate to the needs of the case. [FN167] As an additional signal of the change in attitude, the title of subdivision (b) was changed from "Scope of Discovery" to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

"Discovery Scope and Limits." [FN168]

The new Rule 26(b)(I) also gives the court power to limit discovery on its own initiative, as well as on a party's request. The Advisory Committee noted that "[t]he rule contemplates greater judicial involvement in the discovery process and thus acknowledges the reality that it cannot always operate on a self-regulating basis." [FN169] The Committee also observed that the grounds for limiting discovery set out in the amended rule "reflect ed the existing practice of many courts in issuing protective orders under Rule 26(c)," but it added that most district *460 judges "have been reluctant to limit the use of the discovery devices." [FN170]

Rule 26 also was amended in 1983 by adding subdivision (g), which requires attorneys or unrepresented parties to sign and thereby certify the legitimacy of all discovery requests, responses, or objections. The Committee noted that "[c]oncern about discovery abuse has led to widespread recognition that there is a need for more aggressive judicial control and supervision." [FN171] The obligation parallels that imposed by the 1983 amendments to Rule II [FN172] and was designed to give judges more power to control discovery and prevent misuse of the system. [FN173]

The 1983 amendments also transformed Rule 16 from a provision describing an eve-of-trial conference to a general validation of ongoing judicial management throughout the pretrial phase. The purpose was to "shift[] the emphasis away from a conference focused solely on the trial and toward a process of judicial management that embraces the entire pretrial phase, especially motions and discovery." [FN174] This revision codified many of the more effective judicial practices that had emerged prior to the 1983 amendments using pretrial conferences to rule on discovery motions, to compel further discovery, or to limit or structure the discovery process. [FN175] It also reflected the approach of both the first and second editions of the Manual for Complex Litigation, which focused on the pretrial conference as the key device available to the trial court to achieve control over complex litigation. [FN176]

*461 Rounding out the 1983 pretrial procedure amendments is the total revision and enhancement of sanction practice effected by changes in Rules 7 and II and the addition of Rule 26(g). As a result, every signature on a pleading, motion paper, or discovery document represents a certification as to its contents that subjects lawyers and their clients to potentially significant sanctions for violation of the prescribed standard. [FN177] The effect of increasing the availability of sanctions, of course, is to magnify even further the district judge's power over cases during pretrial stages. [FN178]


## G. Rulemaking Activity from 1983 to the Present

The 1983 amendments relating to judicial management and discovery have been well received by many commentators as an important step in controlling discovery abuse, but many insist that further reform is necessary. [FN179] Members of the judiciary also have responded favorably. The First Circuit, for example, has praised the "transformed conception of adjudication where judicial initiative and governance play major roles in shaping the progress and extent of pretrial activity," [FN180] which led to the amendments of the Federal Rules that "address the reality of modern litigation." [FN181]

The Supreme Court has acknowledged the conceptual shift effected by the Federal Rules amendments concerning discovery. In Société Nationale Industrielle Aérospatiele v. United States District Court, [FN182] the Court held that a district judge has discretion in deciding whether to apply the Hague Evidence Convention or the Federal Rules in cases involving discovery in a foreign nation. Justice Blackmun, in an opinion concurring in part and dissenting in part that was joined by three other justices, noted that the Convention requires a court to give closer scrutiny to requests for evidence than is normal in discovery in the United States. He added, however, that this heightened *462 scrutiny of discovery requests "is not inconsistent with recent amendments to the Federal Rules of Civil Procedure that provide for a more active role on the part of the trial judge as a means of limiting discovery abuse." [FN183]


Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)                                                    Page 15

The need to provide judges with sufficient tools to prevent misuse of the discovery regime continues to be an Advisory Committee priority. In August 1991, the Supreme Court approved a number of amendments proposed by the Committee, including a revision of Rule 45 authorizing courts to impose costs on a party seeking to require a nonparty witness to produce materials or travel more than 100 miles to attend trial. [FN184] Another proposed amendment to Rule 45 [FN185] would give the district judge greater latitude to protect "the intellectual property of a non-party witness." [FN186] Unless Congress takes affirmative action, the amended rule will become effective on December 1, 1991. [FN187]

More recently, in response to numerous proposals to reform the discovery regime, [FN188] the Committee has drafted a set of extensive amendments that would impose on parties a significant obligation to make automatic disclosure of certain categories of information at various stages of litigation. [FN189] The proposal would also establish presumptive *463 limitations on the number and length of depositions and the number of interrogatories, but it would permit a court to order additional discovery. [FN190] The Standing Committee of the Rules of Practice and Procedure has authorized the distribution of these proposals to the bench and bar for comment. [FN191]


H. Summary


This review of the evolution of the pretrial process in recent decades reveals several clear trends: 1) a recognition that the discovery regime cannot operate on a self-executing basis; 2) the growing acceptance of judicial management and the need for increasing its intensity; 3) increased pressure to streamline discovery and some acceptance of cooperative or automatic discovery; and 4) a congressional expectation, expressed in the Judicial Improvements Act of 1990, [FN192] that judges will develop differential management plans.

In this environment, any curtailment of judicial discretion or restrictions on protective orders would be highly counterproductive. Indeed, restrictions of this type undoubtedly would increase resistance to cooperative or automatic disclosure. Judges must be encouraged to facilitate pretrial activity, and they must be given the discretion and the procedural tools necessary to do so effectively. The need for judicial involvement and control fully applies to the dissemination of discovery and settlement materials. If left unconstrained, discovery could be seriously abused and could damage litigants, the civil justice system, and society as a whole. The protective order is a particularly valuable judicial instrument to prevent this abuse.


V. THE VALUE OF CONFIDENTIALITY AND THE HARMFUL CONSEQUENCES OF A PRESUMPTION OF PUBLIC ACCESS


The protective order is a uniquely effective management tool to prevent the unbridled dissemination of litigation information when that dissemination might be abusive and might interfere with the *464 court's ability to resolve the case before it promptly. [FN193] Furthermore, the current availability of protective orders reflects the values served by confidentiality and the degree to which these values are likely to be impaired in a litigation world in which protective orders are largely unavailable. Therefore, when evaluating proposals to restrict protective orders, one must critically examine not only the alleged harms of secrecy, but also the potential benefits of confidentiality.

A strong, symbiotic relationship exists between procedural rules and substantive rights -- the former exist to give effect to the latter. For example, procedural rules governing service of process protect substantive rights under the Due Process Clause. [FN194] Judicial protection of various types of information to ensure that it is used solely for legitimate litigation purposes also protects the substantive rights of the parties -- rights that may be jeopardized quite unintentionally by the discovery process's goals of ensuring each party's access to relevant information and their ability to prepare effectively. [FN195] Some of these rights have a constitutional dimension.


Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

### A. Privacy Rights

One of the substantive rights that only confidentiality can protect is the right to privacy. In the discovery context, the privacy interest is "the individual interest in avoiding disclosure of personal matters." [FN196] Privacy can be a matter of concern to the plaintiff, the defendant, and nonparties in a wide array of lawsuits. [FN197] As pointed out in a recent article by a member of the plaintiffs' bar, the plaintiff in a personal injury action is often asked to expose his or her private life to intense scrutiny. [FN198] These requests frequently require the plaintiff *465 to seek protection from the court to prevent public disclosure of embarrassing or sensitive private facts.

The Supreme Court has indicated that litigants have privacy interests in the information produced during discovery and that courts should protect those interests by ensuring confidentiality when good cause for doing so is shown. [FN199] The Court has also recognized a broader right of privacy that limits the government's authority to disclose intensely personal information to the general public or the media. [FN200] This limitation is only proper. A legal system that does not recognize the right to keep private matters private raises images of an Orwellian society in which Big Brother knows all. [FN201] Although *466 proponents of increased public access may not have that result in mind, there is no doubt that unfettered authority to collect and disseminate private information through the judicial process could lead to that end. Indeed, statutes and court rules restricting a court's discretion to protect privacy -- especially those that impose an affirmative duty to disclose private information to the public -- could violate the constitutional rights of the private individuals involved.

Litigants do not give up their privacy rights simply because they have walked, voluntarily or involuntarily, through the courthouse door. Yet precisely such a surrender of privacy can often result from litigation. The mere payment of a filing fee entitles a plaintiff to compel production of intensely personal and confidential information, such as medical records, marital information, religious documents, financial records, and even trade secrets or intellectual property. The defendant, of course, can respond in kind. The loss of privacy through litigation is compounded when the information is disclosed to the media, competitors, political adversaries, and even curious members of the public.

The rulemakers who crafted our broad discovery regime to promote the disposition of civil disputes on their merits never intended that rights of privacy or confidentiality be destroyed in the process. The broad discovery procedures in the Federal Rules were designed solely to improve the dispute resolution system. [FN202] The drafters had no intention of using these procedures to undermine privacy; nor were they expanding discovery in the name of promoting public access to information. [FN203]

Therefore, it is consistent with the underlying goals of the Rules that the litigation system's sensitivity to privacy considerations be heightened, given today's unparalleled capacity to record, retrieve, and transfer data, as well as the range of decisions made about people on the basis on files, records, dossiers, and data banks. The informational facts of life are that institutions in this country now capture more data about more aspects of personal and organizational life regarding more people and entities than anyone thought possible only *467 a few years ago. This societal phenomenon is reflected in the civil litigation taking place in both state and federal courts, in which the scale of discovery, particularly in larger cases, seems to expand ever wider. Indeed, the discovery in many complex cases is so massive that litigants commonly establish computerized data centers to store and retrieve the material. [FN204] The need to protect some of this data from disclosure has never been greater.

A presumption of public access would mistakenly undervalue these concerns about privacy by requiring the "public interest" to be considered every time a request to seal a court record is made; indeed, the process itself would undermine any attempt to assure confidentiality. Moreover, such a presumption essentially assumes that the public has some meaningful interest in all litigation. This implausible proposition ignores the range of information captured in the course of discovery. The vast majority of litigation is quite mundane, is exceedingly complex and technical, or deals exclusively with the application of arcane principles of law in factual situations far removed from daily life. These types of cases rarely evoke any interest from the public or media or generate any information that has any "public interest" whatsoever. The current public access proposals will simply impose a superfluous and inordinate work burden on courts and generate a risk of privacy-invading disclosure each time a request for a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

protective order is made.

Even when some "public interest" in the litigation exists, one must distinguish between the types of interest that range from curiosity and voyeurism, such as that aroused when a lawsuit involves a celebrity or titillating gossip or scandal, to interest in matters of legitimate public concern, such as that involving the administration of public office or matters affecting public health and safety. The proposals to create a presumptive right of access draw no distinction between these two very different aspects of "public interest." Yet it is inappropriate as well as unseemly for courts to refuse to seal court records merely to provide the public with information comparable to that found in a supermarket tabloid.

## B. Property Rights

Another substantive right jeopardized by the unfettered dissemination of litigation materials -- particularly research and development and financial information -- is the litigants' right to the exclusive use of private property. In today's business world, commercial information often has a value that is tangible enough to be bought and sold for huge sums of money, and extraordinary efforts are expended to *468 control it and to maintain its security and confidentiality. It is not surprising, then, that our legal system considers information to be property. [FN205]

According to John Locke's Two Treatises of Government, [FN206] we protect the exclusive rights of property owners to encourage individual members of society to expend the labor needed to gather or produce that property. In fact, the English government's abuse of personal property rights in the American colonies fueled this country's drive for independence. The reaction to these practices is reflected in the provisions of the federal and state constitutions that recognize the right to own and enjoy property and protect it against government abuse or appropriation without compensation. These provisions demonstrate how well-established Locke's propositions have become.

Recent Supreme Court decisions reinforce the status of confidential information as property. Indeed, the Court's recognition of the importance of protecting confidentiality has never been stronger. In Ruckleshaus v. Monsanto Co. [FN207] and Carpenter v. United States, [FN208] the Court significantly enlarged the protections due trade secrets and other confidential information [FN209] and declared that "' c onfidential information . . . is a species of property to which the corporation has the exclusive right and benefit.'" [FN210] Government disclosure of information in which parties have a property right -- which is what some of the public access legislation requires -- might amount to a taking of private property in violation of the Fifth Amendment. [FN211]

*469 This expanded protection for commercial information reflects a growing awareness that the legal system's recognition of the property status of such information promotes socially useful behavior. [FN212] Businesses may be as creative with their intellectual property and proprietary data as with their tangible assets, especially given "the great extent to which the economy now depends on the production and sale of information." [FN213] Their willingness to produce information in litigation often depends heavily on the court's ability to keep the information confidential. [FN214]

A few examples will make this clear. The pretrial disclosure of trade secrets and other proprietary information sometimes is essential to the resolution of a lawsuit and cannot be avoided. An excellent illustration of this is a case involving the Coca-Cola Corporation, whose formula for Coke is perhaps the best protected trade secret in the world and certainly among the most valuable. The underlying litigation concerned a labor dispute in which the rights of the employees were tied to the processes by which the soft drink was made. [FN215] The lawsuit could be resolved only if the secret processes were revealed, and the court accordingly ordered disclosure to the plaintiff. [FN216] The decision makes clear that the court was acutely aware *470 of the risk its order posed for Coca-Cola and that the court intended to protect the secret formula from secondary disclosure to the fullest extent of its authority. [FN217] Nonetheless, rather than reveal these secret processes, Coca-Cola settled the dispute privately and thereby relinquished its right to seek complete vindication.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

This decision to forfeit legal rights in order to protect a trade secret exemplifies the transcendent value of certain commercial information. It also implicitly reveals the concern in the business community that even the most protective court cannot prevent the spread of valuable information beyond the confines of a lawsuit. The case further illustrates that, when the only way of getting to the heart of a legal dispute is through pretrial disclosure of a trade secret, the information generally will have to be divulged. The competing interests of commercial privacy and the efficiency of the justice system have been balanced in favor of the latter. A business entity caught up in litigation simply must assume the risk of disclosure; its best -- indeed, its only -- hope of protecting its property is the court's willingness to exert its full authority to prevent further dissemination of the information.

Another risk that businesses face in litigation, especially as defendants in product liability cases, is that the disclosure of unsubstantiated information could unjustifiably damage the reputation, profitability, and conceivably the viability of a product or even the enterprise itself. This risk exists due to a combination of two factors: the growing competition among of the media for the latest "news," and the broad access that the public and the media already have to the courts and the information filed with them.

In some instances, products have had their reputations severely damaged by the premature release of untested information, even when the courts or further studies later showed that the information was false. [FN218] The Audi 5000 automobile is a prime example of this phenomenon. The media, led by CBS television's "60 Minutes," claimed that the car was responsible for the injury and death of numerous people due to a defect that caused the car to accelerate suddenly. [FN219] Plaintiffs filed a number of lawsuits against the manufacturer, and as a result of the extensive adverse publicity in the national media, Americans all but stopped buying the Audi 5000. Painstaking studies by governmental agencies in Japan and Canada and by the U.S. National *471 Highway Transportation Safety Administration, however, made clear that the sudden acceleration was caused by driver error and not by a defect in the car. [FN220] Nonetheless, the publicity given to unsubstantiated claims severely damaged the United States market for a product that had previously enjoyed an excellent reputation. Audi has now gone to great lengths attempting to reestablish its former status as a producer of high quality cars. But because little can be done to prevent the media from propagating unproven allegations -- other than to demand responsible reporting -- other products undoubtedly will suffer a similar fate.

Yet another risk stems from the fact that some businesses may file lawsuits simply to gain access to confidential information produced in litigation. [FN221] Litigation dangers exist even when the court has attempted to prevent the damaging dissemination of information. In some instances, experts hired to testify at trial have misused or redistributed information given to them for the sole purpose of assisting their preparation in the initial case. [FN222] This risk of disclosure stems not only from intentional wrongdoing. As one federal judge recognized: Even with stern sanctions for unauthorized disclosure, how does one practically police a protective order? If the expert is called upon two years after [the] litigation to assist a potential competitor . . . will he really be able to compartmentalize all he or she has learned and not use any of the information obtained [in the instant litigation]? [FN223]

A constant danger inheres in the disclosure of confidential information, even when done under a protective order. [FN224] Courts have sometimes erroneously released confidential corporate information to competitors when that information had been initially produced under a protective order in litigation that did not even involve the competitors. [FN225]

The loss of confidentiality poses a serious threat to businesses in the United States today. Many commercial enterprises face significant *472 losses from industrial espionage and a growing network of "bogus" parts and knock-offs. [FN226] One particularly striking problem provides a good example of the need for protective orders to reduce the fear that information produced in litigation will be disseminated improperly or otherwise misused. In a Kafkaesque bit of irony, businesses from whom confidential designs, blueprints, and other product information have been misappropriated have been sued for injuries caused by the bogus parts and knock-offs made from these stolen documents. [FN227] In some cases, these enterprises have been able to prove that the products were counterfeit; they have narrowly escaped liability only after investing considerable time and money in their defense. Some businesses have not been as fortunate. Allowing judges to retain their ability to issue orders protecting the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 19

types of commercial information most easily misappropriated at least increases the courts' ability to avoid becoming unwitting contributors to this unsavory activity.

Obviously, uncontrolled dissemination of discovery materials undermines the confidentiality of research and development and threatens its investment value. In Kewanee Oil Co. v. Bicron, [FN228] the Supreme Court stressed that research and development is absolutely essential to the innovation and development of new products. [FN229] It went on to state that investment in research and development depends on maintaining the confidentiality of the resulting information, most of which would be classified as trade secrets. [FN230] Indeed, protection of trade secrets is universally recognized as necessary to foster innovation. [FN231] Federal law and the substantive law in every state recognize the importance of providing strong legal protection for trade secrets. [FN232] Availability of this mechanism for keeping information confidential is *473 vital to all American businesses, particularly in the high-technology sectors of our economy.

The policies long underlying trade secret protection are especially relevant today. The ability of American business to compete effectively in the global marketplace depends on continued innovation and on meaningful protection for intellectual property and research and development. If incentives to experiment and develop new products, technologies, and services are undermined, American companies will be unable to compete against foreign businesses even in the United States, let alone abroad. Many believe American competitiveness already teeters on the brink of crisis.

The disclosure of sensitive business information in litigation thus significantly endangers continued innovation and competitiveness. First, the increasing frequency of discovery requests for access to valuable information has substantially magnified the risks of disclosure to competitors and of dedication to the public domain. The loss of confidentiality, the sine qua non of a trade secret, robs the owner of any advantage the secret may have provided. [FN233] Moreover, even a significant increase in the risk of disclosure of the property undermines a business's willingness to incur the often enormous expenses of developing information-based assets. This is especially true when manufacturers are threatened with disclosure during the research and development stage -- before the product has been marketed. [FN234]

Second, a growing number of litigants are demanding access to trade secrets or private information regardless of whether they truly need it to prepare for trial. In the most extreme cases, plaintiffs seek an order compelling disclosure of commercially valuable data as a "bludgeon" to force a favorable settlement. This gambit is no less offensive when a defendant tactically requests sensitive or embarrassing personal information about the plaintiff with a similar objective in mind. [FN235] More benignly, some litigants use wide-angle discovery to conduct a private fishing expedition, hoping to find information that might be "useful" or otherwise "helpful" in building a theory, even though the material clearly is inadmissible. [FN236]

*474 These practices are creating an especially severe problem for confidential information relating to the design of new products. Plaintiffs routinely seek disclosure without regard to whether the research was conducted long after the product involved in the suit was manufactured, whether a new product ever was created, or whether the new research and the original product have any relationship to each other. [FN237] If one accepts the proposition that product liability actions already threaten to undermine innovation and competitiveness, then one legitimately can be concerned that the potential disclosure during litigation of developmental research dramatically compounds the chilling effect. [FN238] A manufacturer not only risks completely losing an expensive investment through disclosure of its product development plans; its very willingness to conduct such research may be used against the manufacturer even if it decides not to go forward with the new product. [FN239]

## C. The Role of Protective Orders

The privacy and value of information produced during the discovery process need not be jeopardized. In other contexts involving comparably sensitive information, when courts and legislatures have concluded that the costs to society of disclosure are too great, they *475 have recognized very strong privileges against disclosure in private

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 20

litigation. [FN240] For example, confidentiality has been extended to foster certain relationships and to promote communications that are deemed critically important, such as those between husband and wife, attorney and client, priest and penitent, and doctor and patient. [FN241] Information that the government designates as a state secret is also protected from disclosure in discovery, even if the privileged designation requires dismissal of a lawsuit. [FN242] In the constitutional context, courts have recognized privileges against the discovery or use of certain information under the Fourth, Fifth, and Sixth Amendments, because the underlying interest in protecting individual rights is considered sufficiently important or the risks of disclosure or abuse are so great. [FN243]

Although an unqualified privilege generally has not been extended to trade secrets or other types of highly sensitive personal or proprietary information, [FN244] the information's value and the need to protect privacy and confidentiality demand that disclosure be prevented when it is not absolutely necessary. Unlike tangible property, which can change hands without necessarily diminishing in value, information can never again be in the exclusive possession of its original owner once it is disclosed. Thus, courts traditionally and justifiably have issued protective orders to prevent outsiders from gaining gratuitous access to private or proprietary information to the detriment of a litigant. [FN245]

Privacy and property ownership are among the most fundamental rights that we have as citizens of this country. Governmental intrusion on either right runs counter to our tradition of protecting those rights; therefore, it should be prohibited except under the most compelling circumstances. Totally unconstrained discovery, especially when it has little or no value in determining the merits of a lawsuit, provides a widespread and serious threat to these rights. In Seattle Times, the Supreme Court noted that litigants commonly abuse today's wide-ranging discovery by "obtain[ing] -- incidentally or purposefully -- *476 information that not only is irrelevant but if publicly released could be damaging to reputation and privacy." [FN246] The Court stated: "It is clear from experience that pretrial discovery by depositions and interrogatories has a significant potential for abuse. This abuse is not limited to matters of delay and expense; discovery also may seriously implicate privacy interests of litigants and third parties." [FN247]

The protective order is an ideal mechanism for minimizing the negative side effects of modern discovery without eviscerating the value of the process. When the resolution of a lawsuit would be furthered by requiring a party to reveal either sensitive or private information or commercially valuable data, such as a trade secret that was costly to develop and would have enormous value to competitors and others who may or may not be involved in the lawsuit, [FN248] protection is necessary. A well-drafted protective order that limits access to and the use and dissemination of the information is the most effective means of preserving an individual's privacy or the commercial value of the data while making it available for legitimate litigation purposes. [FN249] That is precisely the type of discretionary judicial management modern procedure has been trying to attain for over twenty years and provides the best reason why the protective order should not be emasculated.

Indeed, if judges' discretion to issue protective orders is undercut, the courts' only means of maintaining privacy might be to deny discovery altogether. [FN250] Such a result would not only frustrate reformers' efforts to promote public access, but also would impair the primary goal of liberal discovery -- giving each litigant equal access to all relevant data in furtherance of the "just, speedy and inexpensive" resolution of disputes called for by Federal Rule I. Thus, those advocating restrictions on the availability of protective orders bear a heavy burden. They not only must demonstrate that the potential gains to society of greater public access outweigh the inevitable deleterious *477 effects on the effective operation of the civil justice process and the protection of valuable personal and property rights; they must also show convincingly that judges' instincts to protect privacy and property rights will not prompt the bench to increase its denial of discovery motions altogether.

VI. EVALUATING THE POTENTIAL GAINS FROM RESTRICTING PROTECTIVE ORDERS

The proposals for creating a presumption of public access to litigation materials would sharply curtail judicial discretion and would mandate that great weight be accorded to the interests of nonparties. [FN251] Proponents

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works