105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 21

argue that this presumption would advance several important societal interests. Foremost among these is public health and safety. Protective orders, it is argued, prevent disclosure of information regarding environmental hazards, harmful consumer products, and other dangers, because their issuance is generally the result of an alliance of convenience. One party seeks to hide its misconduct or prevent the encouragement of other putative litigants. The opposing party, who could reveal the dangers, often has litigation interests other than obviating a potential risk to the public -- most commonly, securing an advantageous settlement -- and it will use acquiescence to the entry of the protective order as a bargaining chip. [FN252] Busy judges, the argument concludes, are unlikely to undertake the burdens of evaluating the contents of the material to be shielded by the order unless they are directed to do so by a statute or a rule. [FN253]

One thing is apparent from the outset: the number of cases that conceivably could contain information that has any bearing on public health or safety is minuscule compared to the corpus of litigation in this country. Clearly, any argument based on these cases is a rather slim reed for supporting a global and universal right of public access to all materials produced in every docketed case.

At least two subsidiary reasons have been offered for limiting protective orders. First, proponents claim that providing universal *478 access to information generated in civil litigation will improve the system's efficiency. Preventing the disclosure of discovery materials to other attorneys, it is said, means that "each plaintiff's lawyers must reinvent the wheel." [FN254] Second, the current system allegedly creates a conflict for the attorney who is asked to agree to confidentiality to facilitate discovery or as part of a settlement, because the duty to act in the client's best interests often requires the attorney to agree to confidentiality, even though doing so may seal information that ultimately would benefit the public if released. [FN255] Each of these assertions requires closer inspection.

## A. The Impact on Public Health and Safety

The allegation that protective orders are concealing information important to public health and safety obviously should arouse concern, but its validity is doubtful. Moreover, even assuming for the moment that it is true, there are ways of dealing with the problem that are less destructive to the competing values than eviscerating the availability of protective orders.

Under current practice, a court has the power to disclose information revealed during litigation, especially to relevant governmental authorities, even after the parties have negotiated an agreement to maintain confidentiality. [FN256] In the federal courts, this power includes the ability to order that discovery material be filed with the clerk, even though the parties have not so requested. [FN257] Because the courts *479 have the authority to protect public health and safety when necessary -- and because judges seem to understand how to use their discretion to do just that [FN258] -- public health concerns do not justify curtailing the power to issue protective orders. The need for a clearly demonstrated reason for departing from the current practice is imperative, given the cascade of adverse consequences that could flow from this change. [FN259]

In addition, the courts, plaintiffs' counsel, and litigants have the power to release information to the appropriate governmental agencies or the press before any protective order is sought. This power diminishes the possibility that critical information will be withheld from the public. [FN260] Anyone who has sufficient knowledge to file a lawsuit on his or her own behalf could provide the same information, if it implicates public health or safety, to governmental agencies and to the press before or when the lawsuit is commenced. [FN261] These institutions then are free to pursue the matter as they see fit.

In any event, once an action is commenced, the complaint and all subsequent pleadings, filings, and court proceedings are open, and the public and the press can therefore obtain more information about the alleged danger as the litigation progresses. [FN262] Thus, under the present regime, those participating in the litigation have the ability to alert the public, particularly those agencies directly responsible for protecting the public, of a potential danger and the harm it allegedly causes. The participants' decision not to do so suggests that they have other

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 22

motivations or are uncertain as to their position. A decision by the relevant governmental agencies and the press not to pursue a certain matter suggests a lack of basis for doing so. In either event, the court does not then become obligated to make the disclosure. Nor should *480 a litigant's attempt to publicize the lawsuit necessarily deprive judges of their historic discretion to provide confidentiality to parties when that would serve systemic needs.

But the basic question remains. Is it true that protective orders and court seals keep information regarding public health and safety hidden? Thus far, assertions to that effect have been supported primarily by anecdotal evidence; research or statistical data is completely nonexistent. An examination of several of the stories that have surfaced during the debate demonstrates that they are of questionable content and do not support the wider assertions about protective orders; they simply do not show that these orders are being used to prevent the dissemination of vital information.

A good example is the evidence used to support the proposal to amend the New York Civil Practice Law and Rules to restrict protective orders. The focal point for those pressing the proposal was an incident involving Xerox. [FN263] The plaintiff's attorney in that case clearly refuted claims that a court seal hid information about toxic waste from the government and the public. [FN264] According to him, " w hat remains sealed, as they most certainly should be, are the medical records of the children, and those records alone." [FN265] Consequently, the "evidence" relied on by the advocates of the proposed rule did not demonstrate a nexus between public health and safety risks and the sealing of court records.

The experience in New York is not unusual. In Nevada, news reports and editorials claimed that the courts were concealing health and safety hazards from the public and that legislation was needed to protect the citizenry. One news story alleged that current law prevented a lawyer from revealing information about a secret Nevada "hazard" that kills and maims. [FN266] The next several paragraphs of the story described the same lawyer's press briefings three years earlier and articles already published on the supposedly secret hazard. Nothing crucial to the protection of the public health had been kept secret. Information about the alleged hazard was available to the public long before the lawyer voluntarily entered into a confidential settlement agreement on behalf of his client, and it continues to be available. *481 Thus, when the facts are revealed, these strident calls for "reform" demonstrate how the truth can be obscured, a non-issue sensationalized, and state legislatures and the public needlessly alarmed.

One of the most frequently used examples in the national debate regarding protective orders asserts that a court seal hid information from the public about a dangerous side effect of a particular prescription drug. A doctor, the subject of the incident, went into anaphylactic shock after taking a drug that had been prescribed in January 1983. [FN267] She claimed to have consulted the 1981 Physician's Desk Reference (PDR) (prepared and published in 1980), a professional guide to the labeling of prescription drugs, as soon as she felt ill, but she found no warning about anaphylactic shock, allegedly because the manufacturer hid this information in sealed court records. [FN268]

No apparent connection exists, however, between the sealing of any court records and the alleged failure to warn of the drug's possible side effects. All adverse reactions appear to have been reported in timely fashion by the manufacturer to the federal Food and Drug Administration. The first information about these possible adverse effects was reported publicly by that agency in mid-1981, [FN269] yet the PDR the subject claims to have consulted at the time of the incident in 1983 was published in 1980. The manufacturer issued warnings in its package inserts and in the 1982 PDR [FN270] and also sent a letter to over 100,000 physicians regarding the potential side effect. [FN271]

The information was clearly available to the subject, as well as to the public, through prescribing physicians and the contemporary PDR and package inserts. If she did not have the information, it was not because of sealed court records. In fact, no lawsuits had been filed against the manufacturer at the time of her alleged reaction. The only connection between this example and the sealing of court records is that the subject subsequently agreed to keep confidential the amount *482 of money she was paid by the manufacturer to settle her lawsuit. Even that agreement has not prevented her from publicizing the experience on several occasions in the years since the settlement. [FN272]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Proponents of reform also claim that sealed court documents prevented a woman with a defective heart valve from learning about it and seeking appropriate treatment. [FN273] As in the previous example, a review of the facts from the congressional testimony by the woman's husband leads to the conclusion that information about the problem had already been disseminated to the medical community and that this was not a case in which protective orders or sealed court documents concealed vital information. [FN274] Instead, it appears to raise questions about a possible failure to warn, but the circumstances have been reworked to suggest that the tragedy resulted from court confidentiality. The facts, however, strongly suggest that it did not.

Another frequently recounted example stems from Anderson v. Cryovac, Inc., [FN275] in which the plaintiff alleged that a manufacturer's toxic chemicals poisoned the water supply in a northeast city. Claiming that the public had a vital interest in learning about the safety of its water, the press sought access to information that had been sealed by a protective order. [FN276] If the allegations had been true, the public clearly would have had a legitimate interest in this information. The court denied access, in part because the relevant information warranted confidentiality and the court already had disclosed the possible risk to local health authorities. [FN277] Following a trial on the merits, the jury concluded that the allegations were unfounded and that, in fact, the manufacturer had not contaminated the water. [FN278]

By looking beyond each of these accusations against protective orders and court seals to the actual circumstances, one can see that either the alarms were false or the relevant information was available from other sources. None of these anecdotes reveals a cause and effect relationship between sealed court records and harm to public health or safety. Ironically, however, some of them do remind us that mere allegations of harm do not always mature into proof of it. They also suggest that the protective order may have become a convenient scapegoat for other failures in the flow of information in our society. [FN279]

## *483 B. The Impact on the Litigation System

The claim that reducing judicial discretion and creating a presumption of universal access to all litigation materials would promote overall adjudicatory efficiency also seems unfounded. Indeed, the reverse is quite likely to be true. Even if one were to assume that free access to information from earlier cases would facilitate the resolution of subsequent related cases, that does not end the inquiry. It is necessary to go further and determine the ex ante effect of sharply limiting the availability of protective orders on other facets of the civil justice system.

I. Discovery. -- The importance of protective orders lies in their usefulness in safeguarding litigants against many of the damaging side effects of discovery while still facilitating that process. Limiting the availability of protective orders makes the discovery process more contentious, protracted, and expensive. [FN280] If litigants know that compliance with a discovery request could lead to uncontrolled dissemination of private or commercially valuable information, many can be expected to contest discovery requests with increasing frequency and tenacity to prevent disclosure. [FN281] The discretion courts currently have in granting protective orders has allowed them to develop one of the most significant management tools for guiding litigants through the pretrial process with a minimum of motion practice and needless friction. Depriving courts of this tool would create particular risks for the current attempts to promote cooperative or automatic disclosure of certain information, [FN282] which parties will resist in some contexts unless they are given protection against further dissemination. In addition, more litigants would likely pursue a full adjudication of the merits, rather than agreeing to a settlement. Of many possible motivations, one certainly is to vindicate their personal or business reputations by bringing out the complete story concerning information produced in discovery and publicized out of context.

The result of either increased discovery factiousness or resistance to settlement would be the expenditure of litigants' time and money on matters that often have no bearing on the merits. In addition, the energies of that most precious systemic resource -- our judges -- would be dissipated, and their ability to handle large cases and litigation *484 involving issues of significant social importance would be compromised.

There are other potential deleterious side effects. Absent protective orders, greater incentives would exist for

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

commencing litigation and exploiting discovery for reasons other than the adjudication of disputes. Parties might well use the courts to pursue ulterior objectives, such as seeking a competitive advantage, pressing vendettas, or acquiring information for use in collateral proceedings. [FN283] Conversely, the fear of public access to sensitive information might chill the enthusiasm of legitimate claimants who fear the uncontrolled release of personal or business information. That would be a totally unjustifiable barrier to access to the nation's courts.

Finally, contrary to the hopes of the proponents of public access, the net effect of banning protective orders might well be a constriction on the flow of litigation information, not an expansion. [FN284] If courts could deny or restrict discovery more easily than they could issue protective orders, judges might choose to do the former on the assumption that denying discovery will curb abuse and prevent protracted pretrial litigation -- especially given the current pressures to reduce litigation cost and delay. A contraction in the scope of discovery would subordinate one litigant's interest in preparing her case to a hypothetical subsequent litigant's interest in ready access to the discovery material in the original case. That result would be antithetical to the very purpose of discovery. Ironically, it also would decrease the likelihood of the public gaining access to something that might be of legitimate interest.

2. Settlement. -- One aspect of the confidentiality debate concerns agreements to keep the monetary terms of a settlement confidential. [FN285] In most circumstances such agreements should be allowed. It is difficult to imagine why the general public would have anything more than idle curiosity in the dollar value of a settlement of a court dispute or its terms of payment. [FN286] These subjects have no relationship to a *485 potential public hazard or matters of public health, and unless official conduct is at issue, matters of proper governance are not involved. Thus, there is simply no legitimate public interest to be served by disclosing this information.

The parties, however, often have a compelling interest in keeping the settlement amount confidential to avoid encouraging nuisance claims and harassment of the recovering party by unscrupulous free riders. For example, when a plaintiff -- particularly a minor or other noncompetent person -- receives a substantial monetary settlement, confidentiality protects that individual from being preyed upon by hucksters and long-lost relatives or friends. Also, information that a plaintiff had settled with one defendant for a very small sum might compromise the plaintiff's ability to pursue its claims against nonsettling defendants. [FN287] From the defendant's perspective, confidentiality ensures that the settlement amount will not be used to encourage the commencement of other lawsuits that never would have been brought or as unfair leverage to extract a similar payment in subsequent suits that may be meritless.

Settlement agreements also often include provisions concerning private documents or information. [FN288] These may involve the return of documents produced in the course of the litigation (which may or may not have been under a protective order), the transfer of information not disclosed prior to settlement, or obligations limiting the use of certain information in certain ways. When these settlement terms impose confidentiality on matters concerning personal privacy or commercially valuable data, no reason exists to disregard the wishes of the parties.

Nevertheless, because the public interest in disclosure of other aspects of a settlement agreement may sometimes be particularly compelling and the importance of maintaining confidentiality may be reduced, an absolute prohibition on access would be unwise. For example, public access may be important when one of the settling litigants is a governmental agency, public entity, or official, when the *486 settlement is a court-approved class settlement, or when there has been some other significant judicial participation in the process. [FN289] These considerations can be accommodated best, however, by leaving discretion with the trial court to weigh the competing interests in particular cases. [FN290]

Furthermore, whatever the value of disclosure, it should not obscure the strong public interest in, and policy objectives furthered by, promoting settlement. [FN291] Settlement not only reduces the need for further governmental involvement, but also reduces the cost of dispute resolution to the litigants and helps free valuable judicial resources and thereby promotes more efficient operation of the courts. Our civil justice system could not bear the increased burden that would accompany reducing the frequency of settlement or delaying the stage in the litigation at which settlement is achieved. [FN292]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Thus, absent special circumstances, a court should honor confidentialities that are bargained-for elements of settlement agreements. Moreover, when a confidentiality agreement facilitates settlement, [FN293] a later court should hesitate to undermine the bargain, for if the effectiveness of the protective order cannot be relied on, its capacity to motivate settlement will be compromised. The presumption in favor of the continued operability of a protective order is already *487 supported by current law, [FN294] and its continued vitality should be reaffirmed.

3. The Impact on Judicial Resources. -- Another systemic concern argues against any significant expansion of a right of public access. Because the judicial system already is unable to resolve civil disputes in an economical and timely fashion, additional burdens should not be imposed on it. [FN295] A recent report on state court statistics revealed " a strong and disturbing pattern" showing that state "courts are experiencing difficulty in keeping up with the inflow of new cases." [FN296] In many of our federal courts, the constantly expanding criminal docket has caused a restriction of the civil docket. Our judges cannot assume additional tasks [FN297] of the size that an expansion of the public's right of access would generate. Adding an information clearinghouse function (in effect, a court-administered Freedom of Information Act) to the existing judicial workload -- which is essentially what the proponents of access advocate -- is impractical, even if there are substantial reasons for doing so. [FN298] It is unrealistic to ask our judges to examine the masses of discovery materials generated in contemporary litigation to rule on access requests. It is particularly unwise to give standing to a host of nonparticipants in private litigation to challenge every proposed protective or sealing order or to seek modification of those orders already outstanding. [FN299] The Supreme Court *488 recently rejected similar efforts by the press to use an executive agency as a clearinghouse for information regarding private individuals. [FN300] Hopefully, the Court would take the same view of the judiciary becoming an information agency.

Even if the courts had the resources to assume this function, they are not the appropriate institution to perform it. Courts are designed to resolve disputes; they are not information ombudsmen. They should not be asked to resolve issues of personal privacy or business confidentially versus public interest divorced from truly adversarial disputes. Further, judges generally lack the scientific or medical expertise needed to evaluate the complex data and theories routinely implicated when scientific and technical materials are alleged to raise issues of health and safety. [FN301] Indeed, a plethora of expert executive and administrative agencies at the local, state, and federal levels already exists for precisely this purpose, and the responsibility for doing so should remain with them.

At the federal level, for example, the Food, Drug, and Cosmetic Act, [FN302] the Consumer Product Safety Act, [FN303] and the Traffic and Motor Vehicle Safety Act [FN304] all require various entities to report health and safety information relating to a tremendous array of products to federal agencies, which have the authority to investigate and provide appropriate information to the public. [FN305] Two of these acts have been strengthened significantly in recent years. In 1990, Congress amended the Food, Drug, and Cosmetic Act to apply to distributors, [FN306] and in *489 1991 the Department of Health and Human Services promulgated new regulations requiring facilities to report to the Department's Secretary the use of devices that have caused death or serious injury or illness. [FN307] Congress also amended the Consumer Product Safety Act in 1990 to require manufacturers to report to the Consumer Product Safety Commission if three or more civil actions involving a product model have resulted in a settlement or a judgment for the plaintiff within a specified twenty-four-month period. [FN308] Other than trade secrets and confidential information, [FN309] the reported data generally is available to the public. [FN310] The Freedom of Information Act [FN311] can be used by lawyers, journalists, and members of the public to tap into these information resources.

Even if the existing agencies are thought inadequate for the task, it does not follow that their responsibilities should be shifted to the courts. Any shortfall in analyzing and disseminating data for the protection of health and safety must be remedied by reinforcing the relevant agencies and facilitating public access to these information resources. Asking courts to undertake these tasks within an adversarial framework, particularly if everyone who claims to be "affected" is given standing to invoke the courts' energies, would lead to satellite litigation that would distract judges from their primary mission without any assurance of public benefit. There simply is no reason to believe that the courts are better suited to the task of managing information than the agencies that have already been given the responsibility.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 26

### C. Conflicts of Interest Facing Attorneys

It is true that attorneys frequently come into possession of information in the course of representing a client that others, perhaps the public at large, have a legitimate interest in knowing. The effect may be a personal sense of conflict. That is an inevitable aspect of our *490 adversary system and hardly is unique to protective orders. [FN312] The criminal attorney who seeks a not-guilty verdict for a client he knows to be guilty faces the same concerns. Yet that attorney is expected to defend the client without fear of being treated as an accomplice after the fact. The judgment has been made that society is benefitted if clients may rely on their lawyers not to disclose their confidences [FN313] and are assured that their lawyers' personal judgments regarding the desirability of public disclosure will not prejudice their cases. [FN314] The rules of professional responsibility on this issue are clear -- the attorney's duty is to pursue the client's best interests zealously. [FN315] If doing so creates a personal conflict of interest, the attorney should refuse to take the case [FN316] or should secure the client's informed consent to the disclosure of any matter affecting public health or safety before the question of a protective order arises. [FN317]

### VII. BALANCING THE COMPETING INTERESTS OF CONFIDENTIALITY AND PUBLIC ACCESS: A PROPOSAL FOR THE REFINEMENT OF CURRENT PRACTICE

No one doubts that a rational civil justice system should have a concern for public health and safety. It is also clear that, because there are benefits from discovery sharing, it should be allowed when sharing truly promotes fairness and efficiency. However, the civil justice system also must promote effective judicial management, efficiency in the resolution of disputes, and the preservation of confidentiality. Further, the system must not lose sight of the primary objectives *491 of discovery: "Liberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes." [FN318] Thus, the national concern for public health and safety or the openness of our courts must be addressed in a way that does not substantially hinder the achievement of these other goals.

These varied and sometimes divergent policies can be served by our civil justice process, but only by trusting trial courts to exercise their traditional discretion guided by a careful analysis of the various competing interests. No one is advocating the automatic or cavalier issuance of protective or sealing orders, let alone that they be granted without regard for substantially deleterious effects on public health and safety. But although disclosure of health and safety information is important, disclosure must be controlled, not indiscriminate. First, a neutral arbiter -- the judge and not the litigants -- must decide what information is to be revealed in the interest of public health and safety. Second, because a trial court has neither the time nor the expertise to examine carefully every claim of confidentiality that impairs legitimate and important public interests, [FN319] the process would be facilitated if, after a preliminary judicial determination that information should not be kept wholly confidential, disclosure were usually made to the appropriate governmental agency for further evaluation rather than to the public at large.

The most rational approach, therefore, is to try to accommodate the concerns raised by critics of protective orders without sacrificing the utility of protective orders themselves. Public health and safety can be promoted without resort to uncontrolled and potentially damaging public dissemination of information by the litigants. The benefits and harms of providing confidentiality or permitting disclosure can be balanced to achieve the most appropriate resolution of a particular conflict. The key, however, is retaining judicial discretion. If that discretion is constricted arbitrarily, the trial court's ability to meet the divergent goals of the pretrial process will be diminished.

Because proponents of reform have not demonstrated that significant modification of the present framework is necessary, the existing pragmatic and discretionary balancing technique should be retained. It may be true that substituting a rule that creates a presumption of access for all information, or for enumerated predetermined classes of information, would result in somewhat more predictable outcomes. Unfortunately, the results would correlate only haphazardly to notions of fairness, which are inevitably a function of the particulars of a given case. Too many relevant factors demand consideration to reduce the question of whether to grant a protective order to a simple rule or one with arbitrary criteria for disclosure or nondisclosure.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 27

**\*492** Discretion should be left with the court to evaluate the competing considerations in light of the facts of individual cases. [FN320] By focusing on the particular circumstances in the cases before them, courts are in the best position to prevent both the overly broad use of protective and sealing orders and the unnecessary denial of confidentiality for information that deserves it, whether or not the information falls within one of the classes for which confidentiality is traditionally sought. [FN321]

The existing procedural framework, however, must be applied with a heightened sense of the importance of the issues raised by both sides of the current debate. Judges must guard against any notion that the issuance of protective orders is routine, let alone automatic, even when the application is supported by all the parties. [FN322] Thus, they must look carefully at each case and tailor appropriate responses, which should take account of a kaleidoscope of factors, including the likely outcome on the merits, the value or importance of commercial or personal data, the identity of the parties and any apparent outside interests, the existence of any threat to health and safety, and the **\*493** presence of a governmental agency with primary responsibility for the subject matter of the data. The burden imposed by carefully considering requests for protective orders is justified by the importance of the competing values at stake and is an effective way to conserve judicial resources. Because the current practice has become increasingly well-adapted to controlling discovery abuses, it can be expected to be more efficient in balancing the various interests than other alternatives.

By contrast, a regime that has a public access presumption and removes judicial discretion in shaping protective orders invites exploitation of the discovery process by those primarily seeking to gather information rather than to adjudicate a dispute. Moreover, the proposed public access regime holds out pernicious incentives not only to the parties to the litigation, but also to any curious member of the general public. In addition, retaining judicial discretion only requires judges to undertake a task that is familiar and appropriate to them -- balancing the rights of the private parties before them. Shifting to a presumption of public access would require judges to assume the extrajudicial task of factoring in the interests of third parties and the public, which in turn would necessitate that judges become experts in the countless issues that come before them -- a task for which they are not necessarily equipped -- and that they reach a decision outside the confines of a fully adversarial dispute. [FN323]

Trial courts generally should require the parties to the case or third parties to submit specific, written showings of why access should be granted, and they should feel free to review the documents in camera. [FN324] Based on their careful review, courts should deny disclosure of information worthy of protection unless the party seeking it establishes relevance, demonstrates a true need for the information, and shows that this need outweighs the potential harm to the party opposing discovery. [FN325]

When the information is subject to discovery, the question then becomes whether terms and conditions should be imposed to minimize the damage public availability of the information might cause. In **\*494** considering terms and conditions, courts should pay attention to the possible existence of any specific nonparty interests or the importance of public disclosure. It would be a mistake, however, to establish an elaborate public notice and intervention procedure -- let alone provide for appellate review -- each time a protective order is sought. [FN326] These procedures would delay and distract the litigation, increase the costs to the litigants, dissipate judicial energies, and in themselves would lead to a disclosure of some or all of the information. Instead, the court usually can rely on one of the parties to represent any outside interest or to notify those persons or institutions of the proceeding so that they may seek to intervene. Moreover, the media generally have their own methods for staying abreast of potentially newsworthy cases. [FN327] When these safeguards might not be effective, the court can use its discretion to require the parties to present any public health and safety concerns to the court or appoint a third person to do so.

When a party requesting protection has made a meritorious showing regarding the need for confidentiality but the judge nonetheless decides that the public interest in some of the information precludes completely sealing the records, the court should limit the information made available to that which is critical to the perceived public interest. Clearly, any confidential information unrelated to the potential harm, such as sensitive marketing or financial data, trade secrets, personal information, and a variety of other items, could and should be protected, even when it is appropriate to make some other portion of the information available to the public.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                              Page 28
(Cite as: 105 Harv. L. Rev. 427)

Even after the information is redacted and limited to that thought relevant to the public interest, the court must consider the proper mode of its disclosure. In most cases, release to an appropriate governmental agency or a limited number of people should suffice. [FN328] This solution places the information in the hands of those best situated to evaluate it and spares the judge from undertaking a detailed and time-consuming analysis to balance the likelihood of risk to the public against the harm to the disclosing party -- an evaluation a judge is often ill-equipped to conduct. [FN329] If appropriate, further dissemination *495 by the litigants and the outside recipients of the data must be prohibited.

This technique for limiting access has been used in other contexts, as when the government has a legitimate reason to intrude into the private affairs of its citizens, but the intrusion is limited to the particular persons and the purposes necessary to achieve the government's original objective. [FN330] Partial disclosure is also common practice in civil litigation when documents contain a mixture of information that falls both within and outside the work product doctrine. [FN331] Nevertheless, there may be instances when public dissemination is appropriate and no protective order should issue, although these occasions should be rare when the data is truly confidential. [FN332]

In addition, if confidential information is to be disclosed under a protective order, a court must define the terms of that release with precision. [FN333] The trial court should consider exactly who should have access to the data other than the discovering party's attorney, and for what purpose. The court must decide whether expert witnesses, support personnel, and other litigants and their attorneys are to have access. [FN334] Once again, the circumstances of the particular case should control. For example, when the litigation is between business competitors, *496 the court must take seriously the claim that disclosing research and development information to the opposing party can have serious negative marketplace consequences. It is unrealistic to believe that even well-intentioned scientists and managers can purge their minds of an opponent's commercially valuable information once it is disclosed through discovery. In some cases, it may be necessary to limit distribution to the discovering party's attorneys -- perhaps even restricting it to outside counsel -- under carefully drawn conditions. In other cases, the discovery objectives can be achieved by using a neutral third party or master to screen the material. In another group of cases, disclosure to the opposing party will not have any special adverse consequences, and these types of precautions will be unnecessary.

As already indicated, [FN335] disclosure to experts poses special difficulties and risks. If experts are to be granted access, the terms and conditions should be defined with care, and the recipients should be brought under the court's control by having them sign a pledge to adhere to the order's limitations. The court also must consider whether photocopying or computerization is to be permitted and when and on what terms the original material and any copies are to be returned to the owner. [FN336] Anyone receiving the protected data should be made responsible for maintaining its confidentiality and for impressing that obligation on their employees. The court should be especially careful when materials belonging to nonparties are involved.

In addition to minimizing the risks to the disclosing party, courts must allocate their resources wisely. To avoid increasing the court's workload unnecessarily, a determination regarding the public's interest in discovery materials or settlement terms and any supervision of the release may be obviated if the information can be procured from an alternative source in substantially equivalent form. This requirement is analogous to the practice under Federal Rule 26(b)(3) and under similar rules in most states regarding the discoverability of work product. [FN337] If the information is otherwise available, grappling with the protective order issue and imposing a supervisory burden on the courts is not justified. [FN338]

*497 Discovery sharing is a particularly interesting problem. It can take either of two forms: the discovering party seeks to share the fruits of its efforts with an outsider engaged in similar or related litigation, or an outsider tries to gain access to the fruits of discovery independent of the litigants' desires. Courts have not been consistent in their treatment of these situations; [FN339] the nature of the problem probably makes that inconsistency inevitable.

It is difficult, and indeed unwise, to have an absolute prohibition on discovery sharing, given the extraordinarily high cost of litigation and the reality that discovery accounts for the largest component of that expense in many

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                    Page 29
(Cite as: 105 Harv. L. Rev. 427)

cases. Barring sharing smacks too much of requiring each litigant to reinvent the wheel, and not surprisingly it has been rejected on that basis by some courts. [FN340] As Judge Wisdom has put it, there "is no reason to erect gratuitous roadblocks in the path of a litigant who finds a trail blazed by another." [FN341] But always permitting sharing would be a mistake as well. Once again, leaving the decision to permit or deny sharing in the judge's discretion seems the best course to follow.

Certainly, discovery sharing should not be left to the whims or private interests of individual parties. In analyzing a discovery sharing request, the court's central inquiry should be whether granting the request will actually promote litigation efficiency and fairness. Thus, the court should be particularly hesitant when the sharing seems motivated by a desire to commercialize the data by selling it to other *498 attorneys rather than by a desire to promote litigation efficiency [FN342] or when the action itself was brought to gain access to discovery. [FN343] The judge should consider whether the benefits of making the material available in other lawsuits and the economies achieved when lawyers collaborate in preparing their cases outweigh the likelihood of increasing discovery disputes in the original lawsuit and the other deleterious consequences of dissemination. For example, when a single event has given rise to complex or multidistrict litigation, the adjudicatory system will often be well-served by allowing the pooling of discovery materials in all the suits, particularly when some have been consolidated for pretrial or all purposes. [FN344] The same occurs naturally when disputes are aggregated into a class action.

The problem is somewhat more difficult when the cases in which the protected data would be used are not fused with the one in which *499 it is originally produced and the relationship is somewhat attenuated or when the cases are dispersed in multiple judicial systems. Still, a collaborative approach in handling related litigation of this type may be best. The court must scrutinize these situations with extreme care, and it should communicate with the judges in the other pending actions when that seems desirable. Of course, if confidential information is to be shared among litigants, they all should be subject to the court's restrictions on further dissemination or any other limitations it might initially have ordered. [FN345] Again, the participation of the judges handling the related cases would be desirable.

The least sympathetic case for discovery sharing is presented by a request for access on behalf of someone who is merely contemplating the commencement of litigation. The risk of a fishing expedition or some other form of mischief is greatest in this context. The safest course seems to be denial of discovery sharing until the requesting party actually has begun a lawsuit, unless he demonstrates extraordinary need. This requirement will maximize the likelihood that the sharing has a legitimate litigation purpose, that the actions have a relationship to each other so that some discovery economy actually will be achieved, and that the requester is subject to the authority of a court, which might prove valuable for sanctions purposes.

An important and related problem arises when parties seek access to material that was previously disclosed under a protective order. [FN346] Because that order presumably was issued to prevent harm to the litigants and to promote cooperation during discovery, the court should consider the overall effect of modifying or eliminating that protection. [FN347] The critical question is to what degree not giving continued effect to earlier protective orders will diminish their efficacy as a discovery management device. To the extent that the parties relied on the protective order when they freely disclosed information without *500 further contesting the discovery requests, [FN348] subsequent dissemination would be unfair. [FN349] A graphic illustration of this injustice would be a party or witness who chooses to forego a plausible claim of privilege under the assurance that a protective order will shield the communication from subsequent disclosure. [FN350] Conversely, compulsory disclosure of information to a governmental or public entity under circumstances that make it accessible to the public, a significant passage of time, or a change in other circumstances may undermine the credibility of any claim of reliance. Indeed, some of these events might vitiate the data's sensitivity to the point of assuring that its release will not cause any injury to the original parties. If the information implicates personal privacy, however, in certain circumstances the passage of time may strengthen the privacy interest and militate against modification of the protective order. [FN351]

Quite understandably, a court's reaction to a modification request should depend in part on the nature of the information and the type of modification that is sought. The protection of sensitive personal or commercial

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

information should be continued. But if the material could improve the efficiency of handling other lawsuits without jeopardizing the rights of the parties to the protective order, modification may be appropriate.

Beyond unfairness to particular parties is the reality that, the more readily protective orders are destabilized, the less confidence litigants will have in them. If protective orders are not reliable, people will be more likely to contest discovery requests when private or commercially valuable data is involved. A protective order can be effective as a management tool and as a mechanism for preventing discovery abuse only if parties believe it is credible. If the parties know that the protective order can be abrogated easily, cooperation in discovery would be compromised and one significant incentive to settle would *501 be reduced. Thus, unless strong evidence exists that a litigant did not rely on the existence of a protective order during discovery (for example, when the party continued to resist reasonable discovery requests) or that no legitimate interest exists in maintaining confidentiality, the balancing of the competing values that led the initial trial court to issue the order should not be undermined in a later proceeding. [FN352] The reality seems obvious: for protective orders to be effective, litigants must be able to rely on them. [FN353]

## VIII. CONCLUSION

When all of the elements in the confidentiality and public access debate are placed on the scales, the balance clearly favors retaining the essence of the present practice. Courts should continue to use their discretion to protect parties' legitimate litigation, privacy, and property interests, and the parties should retain their rights to negotiate protective and sealing agreements voluntarily, subject to judicial veto in the exceptional case. This practice seems wise, because it leaves our judges free to consider the public interest and to further it when circumstances so require. Moreover, on the whole, judges appear to have exercised this authority appropriately in the past, and there is no reason to believe that their performance will change, especially if they are encouraged to continue their current practices. Because the court is the only neutral participant in the litigation process, it seems appropriate to leave the decisionmaking process with it.

Further, no evidence has been presented that the current practice has created significant risks to public health or safety. At a minimum, therefore, before we rush sheeplike down the path chosen by Texas, Florida, and Virginia and create anything in the nature of a presumption of public access, we must evaluate carefully the public health and safety claims to determine whether a problem exists. Certainly, no evidence has emerged to date that comes close to justifying the fundamental changes in the process sought by those advocating them, especially when the negative effects of these changes would be *502 felt in the vast majority of civil cases, which have nothing to do with public health or safety.

Despite protestations to the contrary, the existing system gives the public, including the media, virtually unfettered access to the courts and court records. The presumption advocated by the current public access campaign undermines the greater judicial control necessary for discovery and pretrial reform, and it comes at a time when the need for treating certain types of litigation information confidentially never has been greater. It would be folly to allow undocumented claims to move our complex and integrated procedural systems in the wrong direction.

The current debate has been quite useful, however. It has called the attention of the bench and bar to the importance of the underlying issues [FN354] and has increased everyone's awareness of the importance of both confidentiality and public access. The controversy should counteract any existing tendencies by judges to issue protective and sealing orders perfunctorily or cavalierly. If that awareness is coupled with a judicial willingness to follow the procedural requirements proposed earlier for resolving clashes between confidentiality and disclosure, the debate will have served a valuable purpose.

[FN*] Bruce Bromley Professor of Law, Harvard University. I wish to thank Christopher Sipes of the Harvard Law

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

School class of 1991 for his creative thoughts and research throughout the development of this article in his capacity as research assistant. This article also was assisted by a research grant from the Product Liability Advisory Council Foundation. However, I accept full responsibility for its contents.

[FN1] The longstanding prohibition of cameras in the courtroom is largely a thing of the past. Most states now permit cameras, the federal courts are experimenting with them, and as of July 1991, a cable channel, Court-TV, devotes the great bulk of its broadcast day to live coverage of trials from various courts around the country.

[FN2] See Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-99 (1978); United States v. Corbitt, 879 F.2d 224, 228 (7th Cir.1989); In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1332-36 (D.C. Cir.1985); Publicker Indus. v. Cohen, 733 F.2d 1059, 1066-67 (3d Cir.1984); Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165, 1177-79 (6th Cir.1983), cert. denied, 465 U.S. 1100 (1984); All-Tone Communications, Inc. v. American Info. Technologies, No. 87-C2186, 1991 U.S. Dist. LEXIS 10096, at *6 (N.D.Ill. July 18, 1991).

[FN3] See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 571-72 (1980) (plurality opinion) (arguing that public access to criminal trials is essential to maintain confidence in the justice system).

[FN4] See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984).

[FN5] See In re Reporters Comm., 773 F.2d at 1333-36. A limited exception exists for court-approved settlements, such as in class actions. See FED.R.CIV.P. 23(e); infra note 289 and accompanying text. The Judicial Council of California recently proposed that statutorily mandated proceedings before private judges be open to the public. See JUDICIAL COUNCIL OF CALIFORNIA, THE REPORT AND RECOMMENDATIONS OF THE JUDICIAL COUNCIL ADVISORY COMMITTEE ON PRIVATE JUDGES 29-31 (1990).

[FN6] E.I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 103 (1917) (Holmes, J.).

[FN7] To date, legislation or court rules that modify existing law regarding protective and sealing orders, access to settlements, and confidentiality in general have been enacted in Florida, see Sunshine in Litigation Act, FLA.STAT.ch. 69.081 (1990), Texas, see TEX.R.CIV.P.r. 76a, and Virginia, see VA. CODE ANN. § 8.01-420.01 (Michie 1991). Very similar legislation and rule changes have been introduced, but not yet enacted, in Arkansas, see S.B. 698, 78th Gen.Ass., Reg.Sess. 1991 (referred on March 21, 1991 to a joint interim judiciary committee for consideration between sessions), New Jersey, see A.B. 3794, A.B. 4110, 1991 Sess., Pennsylvania, see S.B. 656, H.B. 751, H.B. 752, 1991 Leg.Sess., and Wisconsin, see S.B. 212, 1991 Reg.Sess.

Efforts to change the law regarding court confidentiality thus far have failed in the federal system and in the states of Alabama, see H.B. 518, S.B. 204, S.B. 320, S.B. 328, 1991 Leg.Sess. (all bills died in committee), Alaska, see H.B. 171, 17th Leg., 1st Sess. 1991 (died in committee when the legislature adjourned on May 21, 1991, but will carry over to the next legislative session), California, see S.B. 711, 1991 Leg.Sess. (withdrawn from the Senate calendar by its sponsor on June 13, 1991, but will carry over to the next legislative year), Colorado, see H.B. 1060, 58th Gen.Ass., 1st Reg.Sess. 1991 (defeated in committee on February 18, 1991), Connecticut, see A.B. 7304, 1991 Leg.Sess. (defeated in committee on April 29, 1991), Hawaii, see H.B. 2019, 16th Leg., 1991 Leg.Sess. (withdrawn in the Senate on March 25, 1991, but will carry over to the next legislative session), Idaho (draft circulated but never introduced), Illinois, see H.B. 276, 87th Gen.Ass., 1991 Leg.Sess. (defeated in Senate committee on June 12, 1991); S.B. 245, 87th Gen.Ass., 1991 Leg.Sess. (not reported out of committee by the deadline of May 8, 1991), Iowa, see H. Stud. B. 294, 1991 Leg.Sess. (not reported out of committee by the deadline of March 22, 1991, but will carry over to the next legislative year), Kansas, see S.B. 104, 1991 Leg.Sess.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(defeated in committee on February 18, 1991), Louisiana, see H.B. 301, Reg.Sess. 1991 (passed by the legislature on July 7, 1991, but vetoed by the governor on July 26, 1991), Massachusetts, see S.B. 778, 1991 Leg.Sess. (defeated in committee on May 15, 1991), Minnesota, see S.F. 1229, 1991 Leg.Sess. (withdrawn from committee agenda on April 11, 1991, but will carry over to the next legislative session); H.F. 1434, 1991 Leg.Sess. (had not been acted on when the legislature adjourned May 22, 1991, but will carry over to the next legislative session), Mississippi, see H.B. 87, 1991 Reg.Sess. (defeated in committee on February 5, 1991), Montana, see H.B. 473, 52nd Leg., 1991 Sess. (defeated in full House on February 26, 1991), Nevada, see S.B. 373, 66th Leg., 1991 Reg.Sess. (defeated in Senate on April 30, 1991); A.B. 769, A.B. 814, 66th Leg., 1991 Reg.Sess. (died in committee when the legislature adjourned June 30, 1991), New Hampshire, see S.B. 91, 1991 Leg.Sess. (defeated in the full House on April 30, 1991), New Mexico, see H.B. 865, 39th Leg., 2nd Sess. (defeated in the House Judiciary Committee on March 16, 1991), New York, see A.B. 8347, 214th Leg., 1991 Reg.Sess. (died in the Assembly Judiciary Committee upon adjournment on July 3, 1991, but will carry over to the next legislative year), Oregon, see S.B. 579, S.B. 580, 66th Leg.Ass., 1991 Reg.Sess. (died in the Senate Judiciary Committee when the legislature adjourned on June 30, 1991), Rhode Island, see H. 5987, Jan. Sess. 1991 (left in the Senate Judiciary Committee on May 28, 1991, but may carry over to the next legislative year); South Dakota, see H.B. 1252, 65th Sess., 1991 Leg.Ass. (defeated in the House on February 19, 1991), Virginia, see H.B. 1205, 1991 Gen.Ass.Sess. (stricken from Court of Justice Committee's docket on February 2, 1991), and Washington, see H.B. 1320, 52d Leg., 1991 Reg.Sess. (died in the House Rules Committee on April 5, 1991).

In New York, a rule was adopted that required a showing of good cause prior to sealing court records, which is essentially a codification of existing practice. See Daniel Wise, Court Rule Adopted On Sealing Records, N.Y.L.J., Feb. 5, 1991, at 1. The rule does not affect discovery or the rule regarding protective orders. See id. at 3. In 1990-91, protective order legislation was introduced in 30 state legislatures but was rejected in 25 of them. Legislation was enacted in Louisiana but was vetoed by Governor Roemer. See Veto Message Regarding H.B. 301 from Governor Roemer to the Honorable Alfred Speer (July 26, 1991).

[FN8] See generally Lon L. Fuller, The Forms and Limits of Adjudication, 92 HARV.L.REV. 353 (1978)(arguing that courts are best suited to the resolve private disputes between private litigants).

[FN9] See, e.g., Abram Chayes, The Role of the Judge in Public Law Litigation, 89 HARV.L.REV. 1281, 1313-16 (1976); Owen M. Fiss, The Supreme Court, 1978 Term -- Foreword: The Forms of Justice, 93 HARV.L.REV. 1, 29 (1979). As applied to the present context, the argument is that, although the dispute is private, public resources are being expended and therefore everything related to the litigation should be disclosed. The position has a certain price-tag-of-admission flavor. It is rebutted in Richard L. Marcus, The Discovery Confidentiality Controversy, 1991 U.ILL.L.REV. 457, 470-73.

[FN10] I have been extremely supportive of these developments over the years. See, e.g., Arthur R. Miller, Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 HARV.L.REV. 664 (1979)(defending Rule 23). Currently I am serving as the Reporter to the American Law Institute Project on Complex Litigation, which has been developing procedures to expand transfer and consolidation to maximize the efficiency of the courts in handling a wide array of complex cases.

[FN11] A good survey of the federal case law can be found in Richard P. Campbell, The Protective Order in Products Liability Litigation: Safeguard or Misnomer?, 31 B.C.L.REV. 771, 775-85 (1990). For a review of the law and underlying policy considerations governing confidentiality orders, see FRANCIS H. HARE, JR., JAMES L. GILBERT & WILLIAM H. REMINE, CONFIDENTIALITY ORDERS (1988).

[FN12] See HARE, GILBERT & REMINE, supra note 11, § 7.17, at 238.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                              Page 33
(Cite as: 105 Harv. L. Rev. 427)

[FN13] FED.R.CIV.P. 26(c)(7).

[FN14] See, e.g., Harris v. Amoco Prod. Co., 768 F.2d 669, 683-84 (5th Cir.1985), cert. denied, 475 U.S. 1011 (1986); Wauchop v. Domino's Pizza, Inc., No. S90-496(RLM), 1991 U.S. Dist. LEXIS 11694, at *3 (N.D.Ind. Aug. 6, 1991); Ohm Resource Recovery Corp. v. Industrial Fuels & Resources Inc., No. S90-511, 1991 U.S. Dist. LEXIS 10297, at *12 (N.D.Ind. July 24, 1991); see also HARE, GILBERT & REMINE, supra note 11, § 6.1, at 114-17 (describing the basis upon which a good cause determination is made); 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2035, at 264-65 (1970)("[T]he rule requires that good cause be shown for a protective order."). Some have suggested that protective orders be limited to trade secrets. See HARE, GILBERT & REMINE, supra note 11, § 6.1, at 115. The position seems to be rejected by the very language of rules such as Rule 26(c)(7), by the decided cases, and by sound policy. See generally Marcus, supra note 9, at 488-93 (discussing the standards for issuing a protective order).

[FN15] See, e.g., Smith v. BIC Corp., 869 F.2d 194, 201 (3d Cir.1989); Cipollone v. Liggett Group, Inc. 822 F.2d 335, 343 (3d Cir.), cert. denied, 484 U.S. 976 (1987); General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1212 (8th Cir.1973), cert. denied, 414 U.S. 1162 (1974); Ohm Resource, 1991 U.S. Dist. LEXIS 10297, at *12; Nestle Foods Corp. v. Aetna Casualty & Surety Co., 129 F.R.D. 483, 484 (D.N.J. 1990).

[FN16] See, e.g., American Standard Inc. v. Pfizer Inc., 828 F.2d 734, 741 (Fed.Cir.1987); Centurion Indus. v. Warren Steurer, 665 F.2d 323, 325 (10th Cir.1981); Hartley Pen Co. v. United States Dist. Court, 287 F.2d 324, 331 (9th Cir.1961); 4 JAMES WM. MOORE, JO D. LUCAS & GEORGE J. GROTHER, JR., MOORE'S FEDERAL PRACTICE ¶ 26.60[4], at 26-211 (2d ed. 1991); 8 WRIGHT & MILLER, supra note 14, § 2043, at 301-02.

[FN17] See, e.g., American Standard, 828 F.2d at 743; Centurion, 665 F.2d at 325; Hartley Pen, 287 F.2d at 331.

[FN18] It is worth noting that one cannot assume the relevance of the material sought in confidentiality disputes, as one can in general discovery requests. At a minimum, courts have stated that the standards of Rule 26(b)(1) should be applied strictly in this context. See, e.g., American Standard, 828 F.2d at 741, 743; Centurion, 665 F.2d at 325; Hartley Pen, 287 F.2d at 331. A number of courts have insisted that the party seeking discovery of confidential information must satisfy an even higher standard; mere relevance to the subject matter of the action is not enough. For example, in addressing a request for discovery of trade secret material, the court in Duplan Corp. v. Deering Milliken Inc., 397 F.Supp. 1146 (D.S.C. 1975), explained that this higher standard requires parties to make a clear showing that the trade secret information is relevant to the issues involved in the litigation:

Once the [trade secret] privilege is asserted by the owner, the party seeking discovery must make a clear showing that the documents are relevant to the issues involved in this litigation. In doubtful situations, production will not be ordered. The court is aware that this standard is higher than the hurdle for discovery of unprivileged but relevant documents but this court considers such a higher standard necessary in order to guard against the possible use of doubtfully relevant trade secrets by the opposing parties for their own business ends.

Id. at 1185 (emphasis in original).

Similarly, the Federal Circuit held in American Standard that the party seeking discovery of confidential sales data to help prove the commercial success of a patented invention (evidence of nonobviousness) must show "some relationship between the claimed invention and the information sought." 828 F.2d at 742. Based on its application of Rule 26(b)(1), the court required the party seeking discovery to show that the information sought would be admissible on the issue of nonobviousness of the patented invention. Comparably high standards of relevance also have been imposed by other courts as a prerequisite to discovery of trade secret material. See, e.g., Eutectic Corp. v. Co-Ordinated Indus., 183 U.S.P.Q. (BNA) 751, 752 (W.D. Pa. 1974); International Nickel Co. v. Ford Motor Co., 15 F.R.D. 357, 358 (S.D.N.Y. 1954); Wagner Mfg. Co. v. Cutler-Hammer, Inc., 10 F.R.D. 480, 485

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 34

(S.D.Ohio 1950).

[FN19] See, e.g., Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556, 559 (7th Cir.1984); Centurion, 665 F.2d at 325; Empire of Carolina, Inc. v. Mackle, 108 F.R.D. 323, 326 (S.D.Fla. 1985); Cleo Wrap Corp. v. Elsner Eng'g Works, Inc., 59 F.R.D. 386, 388 (M.D.Pa. 1972); De Long Corp. v. Lucas, 138 F.Supp. 805, 808 (S.D.N.Y. 1956).

[FN20] See, e.g., Empire of Carolina, 108 F.R.D. at 327 (denying a motion to compel production because the materials sought were "at best of limited relevance" and their disclosure "presented . . . the spectre of catastrophic harm"); Cleo Wrap, 59 F.R.D. at 388 (denying discovery of a pending patent application because "the defendant's interest in keeping its application secret" outweighed "[w]hatever slight value the patent application may have to the plaintiff"); De Long, 138 F.Supp. at 808-09; see also Litton Indus. v. Chesapeake & Ohio Ry., 129 F.R.D. 528, 530-31 (E.D.Wis. 1990) (quashing the discovery subpoenas of relevant confidential information from nonparties).

[FN21] FED.R.CIV.P. 26(c)(7).

[FN22] See In re Knoxville News-Sentinel Co., 723 F.2d 470, 474 (6th Cir.1983) (finding the district court's decision to seal a portion of the record to be discretionary and subject to appellate review for abuse).

[FN23] See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 598 (1st Cir.1980); see also 8 WRIGHT & MILLER, supra note 14, § 2043, at 305-07 (listing examples of specially tailored protective orders). The classic statement is by Justice Holmes: "It will be understood that if, in the opinion of the trial judge, it is or should become necessary to reveal the secrets to others, it will rest in the judge's discretion to determine whether, to whom, and under what precautions, the revelation should be made." E.I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 103 (1917).

[FN24] See, e.g., Brown & Williamson Tobacco Co. v. FTC, 710 F.2d 1165, 1179 (6th Cir.1983), cert. denied, 465 U.S. 1100 (1984); Wauchop v. Domino's Pizza, Inc., No. S90-496(RLM), 1991 U.S. Dist. LEXIS 11694, at *10 (N.D.Ind. Aug. 6, 1991); Smith v. BIC Corp., 121 F.R.D. 235, 242-43 (E.D.Pa. 1988). But see Cipollone v. Liggett Group, Inc., 106 F.R.D. 573, 577 (D.N.J. 1985) (holding that a protective order may be justified simply because discovery material is embarrassing and incriminating), rev'd on other grounds, 785 F.2d 1108, 1121 (3d Cir.1986), cert. denied, 479 U.S. 1043 (1987).

[FN25] See, e.g., Wauchop, 1991 U.S. Dist. LEXIS 11694, at *10; Ward v. Ford Motor Co., 93 F.R.D. 579, 580 (D.Colo. 1982); Patterson v. Ford Motor Co., 85 F.R.D. 152, 154 (W.D.Tex. 1980).

[FN26] See, e.g., Paul D. Rheingold, The MER/29 Story -- An Instance of Successful Mass Disaster Litigation, 56 CAL.L.REV. 116, 127- 30(1968) (describing extensive discovery sharing among plaintiffs in related products liability cases). This interest is strong enough to have fostered the development of a discovered materials market, although the sale of these materials has had a mixed reception in the courts. Compare In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig., 81 F.R.D. 482, 485 (E.D.Mich. 1979) (approving the sale of discovered materials under court supervision), aff'd, 664 F.2d 114 (6th Cir.1981) with Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 630, 631 (8th Cir.1984) (holding plaintiff's attorney in contempt for violating the district court's protective order by selling discovered information to plaintiffs in other toxic shock syndrome cases while the initial case was on appeal).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                      Page 35
(Cite as: 105 Harv. L. Rev. 427)

[FN27] See Alan B. Morrison, Protective Orders, Plaintiffs, Defendants and the Public Interest in Disclosure: Where Does the Balance Lie?, 24 U. RICH.L.REV. 109, 118 (1990).

[FN28] See Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 258-(7th Cir.1975) ("[M]any important social issues become entangled to some degree in civil litigation. . . . [Litigation] often exposes the need for governmental action or correction. Such revelations should not be kept from the public."), cert. denied, 427 U.S. 912 (1976); Philippines v. Westinghouse Elec. Corp., No. 88-5150, 1991 U.S. Dist. LEXIS 14978, at *1 (D.N.J. Oct. 18, 1991).

[FN29] See John C. Coffee, Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 COLUM.L.REV. 669, 681 & n.36 (1986); Recent Case, 103 HARV.L.REV. 1187, 1191 n.32 (1990) (noting that some lawyers act as "bounty hunters" who search for legal violations and then find a client on whose behalf to bring the suit").

[FN30] Compare, e.g., Scott v. Monsanto Co., 868 F.2d 786, 792 (5th Cir.1989) (holding that the entry of a protective order restricting plaintiff's use of materials to the present litigation was not an abuse of discretion despite plaintiff's inability to share and compare information with plaintiffs in other products liability cases) with Allen v. G.D. Searle & Co., 122 F.R.D. 580, 582-83 (D.Ore. 1988) (holding that the manufacturer of the CU-67 contraceptive was not entitled to a protective order prohibiting plaintiff from disclosing or disseminating the title pages of depositions in other CU-67 lawsuits against the manufacturer that covered issues directly related to plaintiff's case).

[FN31] The current legislative and rule-changing efforts are listed above in note 7.

[FN32] 467 U.S. 20 (1984).

[FN33] See, e.g., In re Halkin, 598 F.2d 176, 183-86 (D.C. Cir.1979); Michael Dore, Confidentiality Orders -- The Proper Role of the Courts in Providing Confidential Treatment for Information Disclosed Through the Pre- trial Discovery Process, 14 NEW ENG.L.REV. 1, 10-14 (1978); Note, Access to Pretrial Documents Under the First Amendment, 84 COLUM.L.REV. 1813, 1829-33 (1984); Comment, Protective Orders Prohibiting Dissemination of Discovery Information: The First Amendment and Good Cause, 1980 DUKE L.J. 766. Some courts rejected the application of First Amendment principles. See, e.g., International Prods. Corp. v. Koons, 325 F.2d 403, 407 (2d Cir.1963). An extensive discussion of the subject written immediately before the decision in Seattle Times appears in Tavoulareas v. Washington Post Co., 724 F.2d 1010, 1025-29 (D.C. Cir.1984).

[FN34] See In re Halkin, 598 F.2d at 191, 193-96; see also United States v. Exxon Corp., 94 F.R.D. 250, 251 (D.D.C. 1981) (accepting the Halkin standard when a protective order restricts expression).

[FN35] Dore, supra note 33, at 13.

[FN36] See 467 U.S. 20, 22 (1984) ("This case presents the issue whether parties to civil litigation have a First Amendment right to disseminate, in advance of trial, information gained through the pretrial discovery process.").

[FN37] Id. at 27.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

[FN38] See Rhinehart v. Seattle Times Co., 654 P.2d 673, 691 (Wash. 1982), aff'd, 467 U.S. 20 (1984).

[FN39] Seattle Times, 467 U.S. at 33.

[FN40] See id. at 34; see also In re San Juan Star Co., 662 F.2d 108, 118-19 (1st Cir.1981) (finding that documents obtained independent of the court process are not subject to Rule 26); Butterworth v. Smith, 110 S.Ct. 1376, 1381 (1990) (prohibiting the state from silencing a grand jury witness with regard to his testimony and to information he had prior to testifying).

[FN41] See Seattle Times, 467 U.S. at 32.

[FN42] Id.

[FN43] See id. at 34 ("Rule 26 . . . must be viewed in its entirety.").

[FN44] See id. at 35.

[FN45] See id. at 35-36.

[FN46] Id. at 36.

[FN47] See id. at 36 n.23.

[FN48] Id. at 36.

[FN49] See Katherine W. Pownell, The First Amendment and Pretrial Discovery Hearings: When Should the Public and Press Have Access?, 36 UCLA L.REV. 609, 622 (1989).

[FN50] See, e.g., In re Continental Ill. Sec. Litig., 732 F.2d 1302, 1308-10 (7th Cir.1984) (noting that the presumption in favor of public access is of constitutional strength); cf. Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165, 1177-81 (6th Cir.1983) (recognizing a public right of access to administrative proceedings).

[FN51] See, e.g., Note, Rule 26(c) Protective Orders: First Amendment Scrutiny and the Good Cause Standard, 21 SUFFOLK U.L.REV. 909, 915 (1987).

[FN52] See Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (1986); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 575-81 (1980); see also In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1334 (D.C.Cir.1985) (discussing Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978)).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

[FN53] Press-Enterprise, 478 U.S. at 8; see also Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605 (1982) (arguing that the tradition of public access to criminal trials is a factor in the decision to uphold a First Amendment right to that access).

[FN54] Press-Enterprise, 478 U.S. at 8.

[FN55] Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984).

[FN56] See Katie Eccles, Note, The Agent Orange Case: A Flawed Interpretation of the Federal Rules of Civil Procedure Granting Pretrial Access to Discovery, 42 STAN.L.REV. 1577, 1614-19 (1990).

[FN57] See id.; cf. In re Alexander Grant & Co. Litig., 820 F.2d 352, 355 (11th Cir.1987) ("[T]he press and public jointly possess a common-law right to inspect and copy judicial records and public documents . . . [but] private documents collected during discovery are not 'judicial records.'" (citations omitted)); Oklahoma Hosp. Ass'n v. Oklahoma Publishing Co., 748 F.2d 1421, 1425 (10th Cir.1984) (holding that a news agency had no standing to challenge a protective order, in part because the public has no right of access to information produced during pretrial discovery); Mokhiber v. Davis, 537 A.2d 1100, 1110 (D.C. 1988) ("Public access to discovery materials . . . would focus attention not at all on the courts, but solely on the presumptively private affairs of the parties."); Cowley v. Pulsifer, 137 Mass. 392, 394 (1884) (Holmes, J.) (holding that no right of access to pretrial documents exists because knowledge of them "throws no light upon the administration of justice. Both form and contents depend wholly upon the will of a private individual . . . .").

[FN58] The cases are in some disarray. Access generally is granted when the material is used in a summary judgment motion. See, e.g., Rushford v. The New Yorker Magazine, Inc., 846 F.2d 249, 252 (4th Cir.1988); In re Continental Ill. Sec. Litig., 732 F.2d 1302, 1316 (7th Cir.1984); see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F.Supp. 866, 905-08 (E.D.Pa. 1981) (allowing access to pretrial exhibits used in connection with proceedings open to the public). But see In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1330-40 (D.C.Cir.1985) (deciding that the withholding of summary judgment documents until the end of the case did not violate the First Amendment). Access has been denied with regard to materials on nondispositive motions in some cases, see Anderson v. Cryovac, Inc., 805 F.2d 1, 13-14 (1st Cir.1986), and granted in others, see In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 101 F.R.D. 34, 44 (C.D.Cal. 1984); Mokhiber v. Davis, 537 A.2d 1100, 1117 (D.C. 1988) (remanding to allow a reporter's intervention to determine if the public interest in disclosure is greater than the parties' interest in secrecy). Access has been allowed to discovery materials filed with the court. See In re "Agent Orange" Prod. Liab. Litig., 821 F.2d 139, 145-48 (2d Cir.), cert. denied, 484 U.S. 953 (1987); see also Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 789-92 (1st Cir.1988) (allowing the modification of a protective order to grant a public interest group access to discovery documents), cert. denied, 488 U.S. 1030 (1989).

[FN59] 381 U.S. 1 (1965).

[FN60] Id. at 17.

[FN61] See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 (1984).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 38

[FN62] See Nixon v. Warner Communications, Inc., 435 U.S. 589, 594-98 (1978).


[FN63] Anne E. Cohen, Note, Access to Pretrial Documents Under the First Amendment, 84 COLUM.L.REV. 1813, 1833 (1984).


[FN64] See Seattle Times, 467 U.S. at 34 ("Liberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes.").


[FN65] See id. at 36 n.23.


[FN66] Id. at 34. The Court had earlier stated in Herbert v. Lando, 441 U.S. 153 (1979):
There have been repeated expressions of concern about undue and uncontrolled discovery, and voices from this Court have joined the chorus. But until and unless there are major changes in the present Rules of Civil Procedure, reliance must be had on what in fact and in law are ample powers of the district judge to prevent abuse.
Id. at 176-77.


[FN67] See, e.g., HARE, GILBERT & REMINE, supra note 11 (suggesting arguments and approaches that plaintiffs' attorneys can take to counter defendants' confidentiality requests). Several commentators, however, have resisted the pressure and objected to restrictions on protective orders. Important articles in this regard are Campbell, supra note 11; Marcus, supra note 9; and Richard L. Marcus, Myth and Reality in Protective Order Litigation, 69 CORNELL L.REV. 1 (1983).


[FN68] Board of Governors, Ass'n of Trial Lawyers of Am., Resolution on Protective Orders (May 6, 1989); see also Marcus, supra note 9, at 463 ("The most vigorous attacks on . . . protective orders come from plaintiff lawyers.").


[FN69] See, e.g., Russ Herman, No More Dirty Secrets in the Courts, ATLA ADVOCATE, Oct. 1989, at 4. But see John F. Rooney, Issue of Sealed Files, Secrecy in the Courts Won't Be Swept Under the Rug, CHI. DAILY L. BULL., Apr. 20, 1991, at 1 (reporting that judges feel that comparatively few sealing orders are issued).


[FN70] See, e.g., Sunshine in Litigation Act, FLA.STAT.ANN. § 69.089 (West Supp.1991) (prohibiting courts from concealing "public hazards").


[FN71] See generally Paul M. Barrett, Protective Orders Come Under Attack: Plaintiffs Get Judges to Open Court Files, WALL ST. J., Aug. 31, 1988, at 27 (describing the current controversy over blanket protective orders); Gail D. Cox, Sunshine in San Diego for ATLA, NAT'L L.J., July 30, 1989, at 3, 29 (discussing ATLA's plans to discuss "court secrecy" at their upcoming national convention).


[FN72] Cf. Marcus, supra note 9, at 478-79 (discussing the interests of the press in the protective order debate).


[FN73] See TEX.GOV'T CODE ANN. § 22.010 (West Supp.1991) (directing the Supreme Court of Texas to adopt rules establishing guidelines regarding the sealing of court records).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                                          Page 39
(Cite as: 105 Harv. L. Rev. 427)

[FN74] See Chuck Herring, Sealing Court Records: Unanswered Questions and Unsolved Problems, TEX. LAW., May 21, 1990, at 24.

[FN75] TEX.R.CIV.P.ANN. r. 76a (West Supp.1991). The rule also provides for a hearing, for public notice of the sealing motion indicating that anyone may intervene and be heard, and for an opinion stating the reasons for the sealing. See id. See generally Lloyd Doggett & Michael J. Mucchetti, Public Access to Public Courts: Discouraging Secrecy in the Public Interest, 69 TEX.L.REV. 643, 643-89 (1991) (discussing the history and purpose of Texas Rule of Civil Procedure 76a).

[FN76] FLA.STAT.ANN. § 69.081 (West Supp.1991). The statute defines "public hazards" to include literally anything, including a person or a condition of a person, "that has caused and is likely to cause injury." Id. § 69.081(2); see also infra note 198 (noting the implications of this definition).

[FN77] See Joint Legis. Mgmt. Comm., Fla. Legislature: Final Legislative Bill Information, S. 278 Legis. Hist., 1990 Reg. Sess. One local attorney to whom I spoke attributed this swift success tongue-in-cheek to the Florida legislature's decided preference for any bill that has the word "sunshine" in the title.

[FN78] See Letter from Raymond Booth to Members of the Subcomm. on Sunshine in Litigation Act (Dec. 10, 1990) (on file at the Harvard Law School Library).

[FN79] See Letter from J. Richard Caldwell, Esq., state legislator, to Alfred W. Cortese, Jr., Esq., lobbyist (Mar. 18, 1991) (on file at the Harvard Law School Library).

[FN80] See VA. CODE ANN. § 8.01-420.01 (Michie Supp.1991) (limiting further disclosure of discoverable materials and information). The Virginia statute only deals with the sharing of discovery materials that are subject to a protective order with attorneys in similar or related matters. See generally Morrison, supra note 27, at 122-23 (discussing the ambiguities of the Virginia information sharing bill).

[FN81] Many of the current legislative and rulemaking proposals are cited above in note 7.

[FN82] See Daniel Wise, Court Rules Adopted on Sealing Records, N.Y.L.J., Feb. 5, 1991, at I.

[FN83]. See Gary Spencer, State Bar Votes to Oppose Court Rule on Sealing Files, N.Y.L.J., Jan. 28, 1991, at I. The Judiciary Committees of the New York State Senate and Assembly held joint hearings on the subject on May 7, 1991. It is not clear whether further legislative activity is planned.
The new New York rule provides:
Sealing of Court Records.
(a) Except where otherwise provided by statute or rule, a court shall not enter an order in any action or proceeding sealing the court records, whether in whole or in part, except upon a written finding of good cause, which shall specify the grounds thereof. In determining whether good cause has been shown, the court shall consider the interests of the public as well as of the parties. Where it appears necessary or desirable, the court may prescribe appropriate notice and opportunity to be heard.
(b) For purposes of this rule, "court records" shall include all documents and records of any nature filed with the clerk in connection with the action. Documents obtained through disclosure and not filed with the clerk shall

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

remain subject to protective orders as set forth in CPLR 3103(a).
N.Y. COMP. CODES R. & REGS. tit. 22, § 216.1(1991).
In the first two reported cases under the New York rule, the courts found good cause to seal financial information in actions for accountings of law firm profits. See Dawson v. White & Case, N.Y.L.J., Apr. 25, 1991, at 26 (N.Y.Sup.Ct.Apr. 24, 1991); Feffer v. Goodkind, Wechsler, Labaton & Rudolph, N.Y.L.J., Feb. 19, 1991, at 25 (N.Y.Sup.Ct.Feb. 15, 1991).

[FN84] See Veto Message from Governor DiPrete to the Speaker of the House of Representatives Regarding H.B. 8522 (July 11, 1990). Another proposal, see H. 5987, Jan. Sess. 1991, was defeated in committee on June 16, 1991, but it will carry over to the next legislative year.

[FN85] See Veto Message Regarding H.B. 301 From Governor Roemer to the Honorable Alfred Speer (July 26, 1991).

[FN86] See, e.g., David Heckelman, Bills to Modify Repose, Restrict Protective Orders May Be Revived, CHI.DAILY L.BULL., Aug. 6, 1991, at 3; see also supra note 7 (listing the status of legislation in each state).

[FN87] See Heckelman, supra note 86, at 3.

[FN88] See id.

[FN89] See Heckelman, supra note 86; see also supra note 7.

[FN90] See Court Secrecy: Hearing Before the Subcomm. on Courts & Administrative Practice of the Senate Comm. on the Judiciary, 101st Cong., 2d Sess. (1990). A year earlier, a bill was introduced in the House that was designed to restrict the use of protective orders in products liability cases. See H.R. 129, 101st Cong., 1st Sess. (1989), listed in 135 CONG.REC. H49 (daily ed. Jan. 4, 1989). The bill was not reported out of committee.

[FN91] See PRESIDENT'S COUNCIL ON COMPETITIVENESS, REPORT: AGENDA FOR CIVIL JUSTICE REFORM IN AMERICA 19 (1991). The same conclusion had been reached a year earlier by the Federal Courts Study Committee appointed by the Chief Justice. See JUDICIAL CONFERENCE OF THE UNITED STATES, REPORT OF THE FEDERAL COURTS STUDY COMMITTEE 102-03, 176 (1990).

[FN92] 8 WRIGHT & MILLER, supra note 14, § 2001, at 16; see also Hickman v. Taylor, 329 U.S. 495, 505 (1947)(noting that "[t]he deposition-discovery rules create integrated procedural devices").

[FN93] No definition or concept of "abuse" commands universal acceptance. Because it largely lies in the eye of the beholder, abuse is occasionally referred to as what a lawyer finds an opponent doing to him. See, e.g., ARTHUR R. MILLER, THE AUGUST 1983 AMENDMENTS TO THE FEDERAL RULES OF CIVIL PROCEDURE: PROMOTING EFFECTIVE CASE MANAGEMENT AND LAWYER RESPONSIBILITY 31 (1984). The absence of an accepted definition means that, despite years of heated debate, discovery abuse has yet to be quantified. "Abuse" is used in this article to refer collectively to all forms of activity, whatever the motivation, that represent a use of the system that does not serve a legitimate discovery function.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                          Page 41
(Cite as: 105 Harv. L. Rev. 427)

[FN94] See James A. Pike & John W. Willis, The New Federal Deposition- Discovery Procedure: I, 38 COLUM.L.REV. 1179, 1186-98 (1938) [hereinafter Pike & Willis (pt. I)]; James A. Pike & John W. Willis, The New Federal Deposition-Discovery Procedure: II, 38 COLUM.L.REV. 1436, 1436-43 (1938) [hereinafter Pike & Willis (pt. 2)]. See generally 8 WRIGHT & MILLER, supra note 14, § 2002, at 21-22 (describing the history of the Federal Rules discovery provisions).

[FN95] See Eccles, supra note 56, at 1597-98; Pike & Willis (pt. I), supra note 94, at 1187-88; Pike & Willis (pt. 2), supra note 94, at 1444.

[FN96] See Marcus, supra note 67, at 6-7 (1983).

[FN97] See Geoffrey C. Hazard, Jr., Discovery Vices and Trans-Substantive Virtues in the Federal Rules of Civil Procedure, 137 U.PA.L.REV. 2237, 2242-43 (1989) (arguing that the fundamental source of discontent regarding federal discovery is the sense that one's privacy has been violated when documents that were expected to remain confidential must be produced).

[FN98] With the exception of physical examinations under Federal Rule 35, all of the discovery devices are still invoked by a simple party-initiated notice, rather than by motion and court order. See, e.g., FED. R. CIV. P. 30(b).

[FN99] See PAUL R. CONNOLLY, EDITH A. HOLLEMAN & MICHAEL J. KUHLMAN, JUDICIAL CONTROLS AND THE CIVIL LITIGATION PROCESS: DISCOVERY 14-15 (1978) (citing COMMITTEE OF THE JUDICIAL CONFERENCE OF THE UNITED STATES, REPORT ON PROCEDURE IN ANTI-TRUST AND OTHER PROTRACTED CASES (1951), reprinted in Leon R. Yankwich, "Short Cuts" in Long Cases: A Commentary on the Report Entitled Procedure in Anti-Trust and Other Protracted Cases, 13 F.R.D. 41, 62 (1953)).

[FN100] See id. at 15.

[FN101] See 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3861, at 498-99 (2d ed. 1986).

[FN102] Extensive examinations of this litigation are found in CHARLES A. BANE, THE ELECTRICAL EQUIPMENT CONSPIRACIES -- THE TREBLE DAMAGE ACTIONS (1973); and Phil C. Neal & Perry Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B.A.J. 621 (1964). Congressional reaction to the electrical equipment cases can be seen in H.R.REP. NO. 1130, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 1898. A description of their impact on the Federal Rules is found in 15 WRIGHT, MILLER & COOPER, supra note 101, § 3861, at 324-25.

[FN103] See H.R.REP. NO. 1130, supra note 102, at 1-2, reprinted in 1968 U.S.C.C.A.N. at 1898-99.

[FN104] See id.

[FN105] See id.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                    Page 42
(Cite as: 105 Harv. L. Rev. 427)

[FN106] See 15 WRIGHT, MILLER & COOPER, supra note 101, § 3861, at 324.


[FN107] See, e.g., MANUAL FOR COMPLEX LITIGATION xx (1977) ("This Manual is designed . . . to stimulate the devising of procedures appropriate in solving new problems as they arise. It is intended to be a living document into which desirable techniques proved by experience will be incorporated in the future.").


[FN108] See generally 15 WRIGHT, MILLER & COOPER, supra note 101, §§ 3861- 67, at 320-85 (discussing the history, development, and procedures of multidistrict litigation).


[FN109] MANUAL FOR COMPLEX AND MULTIDISTRICT LITIGATION (1963). The manual superseded the Judicial Conference of the United States' Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351 (1960). See CONNOLLY, HOLLEMAN & KUHLMAN, supra note 99, at 15.


[FN110] MANUAL FOR COMPLEX LITIGATION (1977).


[FN111] MANUAL FOR COMPLEX LITIGATION (2d ed. 1985).


[FN112] CONNOLLY, HOLLEMAN & KUHLMAN, supra note 99, at 15. A similar emphasis is found in the National College of the State Judiciary programs for trial judges. See Francis E. McGovern, Toward a Functional Approach for Managing Complex Litigation, 53 U.CHI.L.REV. 440, 440 n.2 (1986).


[FN113] Pub.L.No. 101-650, 104 Stat. 5089 (to be codified at 28 U.S.C. §§ 471-482).


[FN114] The act requires each federal district court to implement a "civil justice expense and delay reduction plan" within three years of the act's enactment. Id. § 103(b), 104 Stat. at 5096. Certain "early implementation" districts will have their plans in place before the end of 1991.


[FN115] Id. § 463(a)(1), 104 Stat. at 5091.


[FN116] Protective orders originally were available only with regard to depositions under Rule 30(b) and depositions on written questions under Rule 31(d). In 1948, Rules 33 and 34 were amended to allow protective orders to be issued for requests for written interrogatories and requests for admissions. See 8 WRIGHT & MILLER, supra note 14, § 2035, at 260-61.


[FN117] FED.R.CIV.P. 26(c) advisory committee's note (1970), reprinted in Judicial Conference of the United States, Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 485, 505 (1970) [hereinafter 1970 Amendments]. For examples of the pre-existing law, see Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 999 (10th Cir.), cert. denied, 380 U.S. 964 (1965); and Julius M. Ames Co. v. Bostitch, Inc., 235 F.Supp. 856, 857 (S.D.N.Y. 1964).


[FN118] FED.R.CIV.P. 26(c)(7).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

[FN119] See Chemical & Indus. Corp. v. Druffel, 301 F.2d 126, 129 (6th Cir.1962) ("Under the rules, the extent of discovery and the use of protective orders is clearly within the discretion of the trial judge."); Allen v. First Nat'l Bank, 169 F.2d 221, 224 (5th Cir.1948); Times Newspapers, Ltd. v. McDonnell Douglas Corp., 387 F.Supp. 189, 196 (C.D.Cal. 1974); 8 WRIGHT & MILLER, supra note 14, § 2036, at 267-68.

[FN120] 8 WRIGHT & MILLER, supra note 14, § 2281, at 311 (Supp.1991).

[FN121] FED.R.CIV.P. 37 advisory committee's note (1970), reprinted in 1970 Amendments, supra note 117, at 538.

[FN122] FED.R.CIV.P. 37(a)(3); see also FED.R.CIV.P. 37(a)(3) advisory committee's note (1970) (explaining the change), reprinted in 1970 Amendments, supra note 117, at 539.

[FN123] FED.R.CIV.P. 37(a)(4) advisory committee's note (1970), reprinted in 1970 Amendments, supra note 117, at 539.

[FN124] FED.R.CIV.P. 37(d) advisory committee's note (1970), reprinted in 1970 Amendments, supra note 117, at 541.

[FN125] FED.R.CIV.P. 37(d) (authorizing sanctions for failure to attend a deposition, answer interrogatories, or respond to an inspection request). Rule 37(b)(2)(E) also was amended to allow the awarding of expenses and fees for failure to comply with an order for examination under Rule 35(a). See FED.R.CIV.P. 37(b) advisory committee's note (1970), reprinted in 1970 Amendments, supra note 117, at 540.

[FN126] FED. R. CIV. P. 26(d) advisory committee's note (1970), reprinted in 1970 Amendments, supra note 117, at 506; see also 8 WRIGHT & MILLER, supra note 14, § 2046, at 1315 (discussing the 1970 amendment's elimination of the priority rule).

[FN127] Thus, for example, the broad scope of discovery that Rule 26(b) previously had given to depositions, and that had been applied to other devices in piecemeal fashion by the courts and various amendments to the Federal Rules, was applied expressly to all discovery devices. In practice, most courts had already applied the broad scope of Rule 26(b) to other discovery devices. See 8 WRIGHT & MILLER, supra note 14, § 2007, at 36-37. This practice was partially codified in 1948 when Rule 33, on interrogatories to parties, and Rule 34, on production of documents, were amended to incorporate the broad discovery scope of Rule 26(b) by reference. See id.

[FN128] FED. R. CIV. P. advisory committee's explanatory statement concerning amendments of the discovery rules (1970), reprinted in 1970 Amendments, supra note 117, at 490; see also 8 WRIGHT & MILLER, supra note 14, § 2003, at 22-24 (discussing the 1970 rearrangement of the discovery rules).

[FN129] Indeed, the addition of the discovery conference to Rule 26 in the 1980 amendments, discussed below, was facilitated conceptually by the consolidation of the basic discovery principles into one rule in 1970. It was not until 1980 that provision for a specific conference on discovery was instituted, see FED. R. CIV. P. 26(f), and not until 1983 that the scope and nature of the pretrial conference provided for in Rule 16 was expanded and clarified.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                      Page 44
(Cite as: 105 Harv. L. Rev. 427)

However, despite the limited language of the original Rule 16, many courts had been using the pretrial conference as a means of managing and limiting discovery. See 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1528, at 293 n.1 (2d ed. 1990); see also Freehill v. Lewis, 355 F.2d 46, 48 (4th Cir.1966) (calling an inquiry into the complexity of the issues and the time reasonably required to complete discovery "appropriate in a pretrial hearing"); Goldberg v. Ann-Vien, Inc., 29 F.R.D. 6, 7 (N.D.Ga.1961) ("Some Federal Courts, for many years, have made it a practice of using the pretrial conference as a method for shortening the process of discovery."); New Dyckman Theatre Corp. v. Radio-Keith-Orpheum Corp., 20 F.R.D. 36, 37 (S.D.N.Y. 1955) ("A proper use of pre-trial procedure should make it possible to restrict and limit interrogatories and depositions to matters which are directly relevant to the amended complaint and the answers.").

[FN130] See Addresses Delivered at the National Conference on the Causes of Popular Dissatisfaction with the Administration of Justice, 70 F.R.D. 79 (1976). The Pound Conference was held in St. Paul, Minnesota on April 7-9, 1976, and was sponsored by the Judicial Conference of the United States, the Conference of Chief Justices, and the American Bar Association. Its popular name-derives from an address on the same topic given by Roscoe Pound in 1906. See Roscoe Pound, The Causes of Popular Dissatisfaction with the Administration of Justice, 29 A.B.A.REP. 395 (1906), reprinted in 35 F.R.D. 241, 273 (1964).

[FN131] Warren E. Burger, Agenda for 2000 A.D. -- A Need for Systematic Anticipation, 70 F.R.D. 83, 95-96 (1976).

[FN132] Simon H. Rifkind, Are We Asking Too Much of Our Courts?, 70 F.R.D. 96, 107 (1976).

[FN133] Id.; see also Francis R. Kirkham, Complex Civil Litigation -- Have Good Intentions Gone Awry?, 70 F.R.D. 199, 202-04 (1976) (arguing that "discovery knows no bounds" in complex litigation and that one result is "a massive unequalled invasion of privacy and business records").

[FN134] Burger, supra note 131, at 93.

[FN135] Griffin B. Bell, The Pound Conference Follow-Up: A Response from the United States Department of Justice, 76 F.R.D. 320, 328 (1978). Attorney General Bell also wrote, in a letter to Judge Roszel C. Thomsen, who was chairman of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States: "It has been my experience as a judge, practicing lawyer and now as Attorney General that the scope of discovery is far too broad . . . ." Letter from Attorney General Griffin Bell to Judge Roszel C. Thomsen (June 27, 1978), quoted in ACF Indus. v. EEOC, 439 U.S. 1081, 1087 (1979) (Powell, J., dissenting from denial of certiorari).

[FN136] See, e.g., CONNOLLY, HOLLEMAN & KUHLMAN, supra note 99, at 77 ("The benefits that can flow from judicial control of discovery time can be fully realized only through a comprehensive case management system governing every stage of the litigation process."); STEVEN FLANDERS, CASE MANAGEMENT AND COURT MANAGEMENT IN UNITED STATES DISTRICT COURTS, 25-29, 35-37 (1977); Wayne D. Brazil, The Adversary Character of Civil Discovery: A Critique and Proposals for Change, 31 VAND.L.REV. 1295, 1348-61 (1978); NATIONAL COMM'N FOR THE REVIEW OF ANTITRUST LAWS AND PROCEDURES, REPORT TO THE PRESIDENT AND THE ATTORNEY GENERAL (1979), reprinted in 80 F.R.D. 509, 525 (1979) ("Virtually all our recommendations for expediting potentially protracted cases require strong judicial control.").

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 45

[FN137] William J. Manning, Report to the Bench and Bar, Preface to AMERICAN BAR ASS'N, REPORT OF THE SPECIAL COMM. FOR THE STUDY OF DISCOVERY ABUSE (1977), reprinted in 92 F.R.D. 149, 151 (1981).

[FN138] See id; AMERICAN BAR ASS'N, REPORT OF THE POUND CONFERENCE FOLLOW-UP TASK FORCE (1976), reprinted in 74 F.R.D. 159 (1976).

[FN139] AMERICAN BAR ASS'N, supra note 138, reprinted in 74 F.R.D at 192.

[FN140]. Id.

[FN141] AMERICAN BAR ASS'N, supra note 137, reprinted in 92 F.R.D. at 157.

[FN142] See id., reprinted in 92 F.R.D. at 159-62. This proposed amendment to Rule 26 included a provision for the imposition of sanctions for failure to cooperate in the framing of a discovery plan. See id., reprinted in 92 F.R.D. at 159.

[FN143] Id., reprinted in 92 F.R.D. at 179. For general discussions of the Committee Report, see William H. Erickson, The Pound Conference Recommendations: A Blueprint for the Justice System in the Twenty-First Century, 76 F.R.D. 277, 288-94 (1978); and Bell, supra note 135, at 328-29.

[FN144] See Committee on Rules of Practice & Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure, 77 F.R.D. 613 (1978); id. at 626 (advisory committee note); 8 WRIGHT & MILLER, supra note 14, § 2002, at 21-22.

[FN145] See Committee on Rules of Practice & Procedure of the Judicial Conference of the United States, Revised Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure, 80 F.R.D. 323 (1979); see also infra pp. 456-57 (discussing the 1980 amendments). For criticisms of the ABA report and the Advisory Committee proposals, see William H. Becker, Modern Discovery: Promoting Efficient Use and Preventing Abuse of Discovery in the Roscoe Pound Tradition, 78 F.R.D. 267, 267 (1978); and Charles Alan Wright, DICTA: New Civil Discovery Rules -- "No" Vote, VA. LAW WEEKLY, Oct. 13, 1978, at 1, 3-4. For a favorable view, see Weyman I. Lundquist & H. Stephen Schechter, The New Relevancy: An End to Trial by Ordeal, 64 A.B.A.J. 59 (1978).

[FN146] 427 U.S. 639 (1976) (per curiam).

[FN147] Id. at 643.

[FN148] See, e.g., Note, The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions, 91 HARV.L.REV. 1033, 1055 (1978).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                      Page 46
(Cite as: 105 Harv. L. Rev. 427)

[FN149] Others also had recognized an unwillingness on the part of judges to control discovery. For example, one survey conducted in Chicago found that lawyers had the perception that many judges believed discovery disputes did not belong in the courtroom. See Wayne D. Brazil, Views From the Front Lines: Observations by Chicago Lawyers About the System of Civil Discovery, 1980 AM. B. FOUND. RES. J. 219, 250-51.

[FN150] FED. R. CIV. P. 26(f) advisory committee's note (1980), reprinted in Amendments to the Federal Rules of Civil Procedure, 85 F.R.D. 521, 526 (1980) [hereinafter 1980 Amendments].

[FN151] See id.

[FN152] See 8 WRIGHT & MILLER, supra note 14, § 2051, at 179 (Supp.1991).

[FN153] FED. R. CIV. P. 26(f) advisory committee's note (1980), reprinted in 1980 Amendments, supra note 150, at 526.

[FN154] Id., reprinted in 1980 Amendments, supra note 150, at 527. The practice under Rule 26(f) indicates that this prediction was correct. A court surveying the reported cases in 1987 found that "less than fifty cases have resorted to [Rule 26(f)]." Union City Barge Line, Inc. v. Union Carbide Corp., 823 F.2d 129, 134 (5th Cir.1987). The court noted, however, that an accurate count is impossible because, "[t]hankfully, most of the mountainous volume of the District Courts' pre-trial activity never reaches the pages of a reporter or the files of a computer." Id. at 134 n.10. Although the Rule states that the court "shall" hold a discovery conference, the district court has some discretion to deny a motion for a discovery conference. See 8 WRIGHT & MILLER, supra note 14, § 2051, at 179 (Supp.1991).

[FN155] Union City Barge Line, 823 F.2d at 134 (holding the district court in error for failure to conduct a discovery conference in an action for illegal commercial bribery, interference with a contractual relationship, and wrongful termination of a contract).

[FN156] See, e.g., In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1011-12 (1st Cir.1988) ("With [the discovery procedure] at hand, the trial judge was considerably better equipped to set a course plotted to meet the idiosyncratic needs of any pending piece of litigation."); Poulis v. State Farm Fire & Casualty Co., 747 F.2d 863, 870 n.5 (3d Cir.1984) ("We note the commendable procedure followed by [the district judge] . . . under Rule 26(f) [that] has substantially reduced the need for discovery."); Jaquette v. Blackhawk County, 710 F.2d 455, 463 (8th Cir.1983) ("[C]onferences at the pleading stage . . . have proven successful.").

[FN157] See Committee on Rules of Practice & Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, 137 F.R.D. 53, 97-98, 105 (1990) [hereinafter 1991 Amendments] (proposed Rule 26(f) and advisory committee's note).

[FN158] Order Prescribing Amendments to the Federal Rules of Civil Procedure, 446 U.S. 995, 999-1000 (1980) (Powell, J., dissenting) (footnote omitted).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

[FN159] Warren Burger, Address on the State of the Judiciary to the American Bar Association Mid-Year Meeting (Feb. 3, 1980), quoted in Order Prescribing Amendments to the Federal Rules of Civil Procedure, 446 U.S. at 999 n.4 (Powell, J., dissenting).

[FN160] See supra pp. 436-41.

[FN161] American Bar Ass'n, Second Report of the Special Committee for the Study of Discovery Abuse, 92 F.R.D. 137, 137 (1980).

[FN162] GORDON BERMANT, JOE S. CECIL, ALAN J. CHASET, E. ALLAN LIND & PATRICIA A. LOMBARD, PROTRACTED CIVIL TRIALS: VIEWS FROM THE BENCH AND THE BAR 56 (1981).

[FN163] See, e.g., C. RONALD ELLINGTON, A STUDY OF SANCTIONS FOR DISCOVERY ABUSE (1979); Wayne D. Brazil, Civil Discovery: Lawyers' Views of Its Effectiveness, Its Principal Problems and Abuses (part 2), 1980 AM. B.FOUND.RES.J. 789, 789-902.

[FN164] Maurice Rosenberg & Warren R. King, Curbing Discovery Abuse in Civil Litigation: Enough is Enough, 1981 B.Y.U.L.REV. 579, 588.

[FN165] See, e.g., Wayne D. Brazil, Improving Judicial Controls over the Pretrial Development of Civil Actions: Model Rules for Case Management and Sanctions, 1981 AM.B.FOUND.RES.J. 873; Frank F. Flegal, Discovery Abuse: Causes, Effects, and Reform, 3 REV.LITIG. 1, 48 (1982); Arthur R. Miller, The Adversary System: Dinosaur or Phoenix, 69 MINN.L.REV. 1, 19-22 (1984) ( "Even attorneys, usually seen as jealous guardians of control over their cases, are not averse to a stronger judicial hand."). Compare Judith Resnik, Managerial Judges, 96 HARV.L.REV. 374, 445 (1982) ("[M]anagerial judges are changing the nature of their work . . . . [J]udges [should] balance the scales, not abandon them altogether in the press to dispose of cases quickly.") with Steven Flanders, Blind Umpires -- A Response to Professor Resnik, 35 HASTINGS L.J. 505, 507 (1984) ("Resnik exagerates the extent of any judicial activity that is inconsistent with due process.").

[FN166] 1983 Amendments, Federal Rules of Civil Procedure, 97 F.R.D. 165, 214 (1983) [hereinafter 1983 Amendments]. For an overview of the 1983 amendments, see ARTHUR R. MILLER, THE AUGUST 1983 AMENDMENTS TO THE FEDERAL RULES OF CIVIL PROCEDURE: PROMOTING EFFECTIVE CASE MANAGEMENT AND LAWYER RESPONSIBILITY 32-33 (1984). I was the Reporter to the Advisory Committee on Civil Rules throughout the period during which the 1983 amendments were formulated and moved through the approval process.

[FN167] FED.R.CIV.P. 26(b)(1), reprinted in 1983 Amendments, supra note 166, at 214-15. Note that the Committee chose to proscribe discovery activity that generally was regarded as indefensible, rather than narrow the scope of the discovery standard generally.

[FN168] Id.

[FN169] FED.R.CIV.P. 26(b) advisory committee note (1983), reprinted in 1983 Amendments, supra note 166, at

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

218. See generally MILLER, supra note 166, at 32-36 (explaining the power granted judges to limit discovery on their own initiative).

[FN170] FED.R.CIV.P. 26(b) advisory committee note (1983), reprinted in 1983 Amendments, supra note 166 at 217; see also 8 WRIGHT & MILLER, supra note 14, §§ 2036-2040, at 267-95 (Supp.1991) (describing the discretion allowed judges in issuing protective orders under the old Rule 26(c)).

[FN171] FED.R.CIV.P. 26(g) advisory committee note (1983), reprinted in 1983 Amendments, supra note 166, at 220. The advisory committee note cites ACF Indus. v. EEOC, 439 U.S. 1081 (1979), which is cited above in note 135.

[FN172] See FED.R.CIV.P. 26(g) advisory committee note (1983), reprinted in 1983 Amendments, supra note 166, at 219; see also FED.R.CIV.P. 11 advisory committee note (1983), reprinted in 1983 Amendments, supra note 166, at 198-201; 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §§ 1333-1335, at 44-92 (2d ed. 1990) (describing the scope of application of Rule 11); Arthur R. Miller, The New Certification Standard Under Rule 11, 130 F.R.D. 479 (1990) (discussing the 1983 amendment to Rule 11).

[FN173] Indeed, the Committee stressed that Rule 26(g) should serve as a deterrent. See FED.R.CIV.P. 26(g) advisory committee note (1983), reprinted in 1983 Amendments, supra note 166, at 220 (citing NHL v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643 (1976)). The NHL case is discussed above at p. 455.

[FN174] FED.R.CIV.P. 16(a) advisory committee note (1983), reprinted in 1983 Amendments, supra note 166, at 207; see also MILLER, supra note 166, at 19-22 (describing the amended Rule 16 as a response to the recognized need for increased judicial management).

[FN175] See MILLER, supra note 166, at 19-22.

[FN176] See MANUAL FOR COMPLEX LITIGATION § 21.2, at 29 (2d ed. 1985); see also 6A WRIGHT & MILLER, supra note 129, § 1530, at 302-06 (describing judicial management of the "big case" through the use of pretrial conferences).

[FN177] See 5A WRIGHT & MILLER, supra note 172, §§ 1333-1335, at 55-57.

[FN178] Rule 11 has provoked an enormous amount of controversy and a burgeoning literature. See, e.g., 5A WRIGHT & MILLER supra note 172, § 1332, at 22-44. In response, the Advisory Committee on Civil Rules has conducted public hearings, commissioned a study by the Federal Judicial Center, and is now proposing a series of amendments to the Rules. See infra pp. 462-63.

[FN179] See, e.g., Edward D. Cavanagh, The August 1, 1983 Amendments to the Federal Rules of Civil Procedure: A Critical Evaluation and A Proposal for More Effective Discovery Through Local Rules, 30 VILL.L.REV. 767, 778-99 (1985); George K. Walker, The Other 1983 Amendments to the Federal Rules of Civil Procedure -- Pleadings and Motions; Pretrial and Discovery; U.S. Magistrate Cases, 20 WAKE FOREST L.REV.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(Cite as: 105 Harv. L. Rev. 427)

819, 849-51 (1984); Margaret L. Weissbrod, Comment, Sanctions Under Amended Rule 26 -- Scalpel or Meat-ax?: The 1983 Amendments to the Federal Rules of Civil Procedure, 46 OHIO ST. L.J. 183, 201 (1985).

[FN180] In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1012 (1st Cir.1988).

[FN181] Id. at 1011.

[FN182] 482 U.S. 522 (1987).

[FN183] Id. at 565 n.23 (Blackmun, J., concurring in part and dissenting in part). Justice Blackmun agreed with the majority's holding that the non- mandatory language of the Hague Convention should not deprive a federal court of its discretion to apply the Federal Rules to foreign discovery requests. He disagreed with the majority that the Convention is "optional," however, and he argued that a district court should be required to look first to the Convention, then have discretion to apply the Federal Rules if employing the Convention would be futile. See id. at 548-49; see also Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34-35 (1984) (arguing that the liberality of discovery requires active control from trial judges to limit abuse).

[FN184] See Committee on Rules of Practice & Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Appellate Procedure and the Federal Rules of Civil Procedure, 127 F.R.D. 237, 348 (1990) [hereinafter 1990 Amendments] (proposed Rule 45(c)(3)(B)(iii); id. at 354 (proposed Rule 45(c)(3)(B)(iii) advisory committee's note) (explaining that the new clause "protects non-party witnesses who may be subjected to considerable burden in performing their duty to supply pertinent information").

[FN185] See id. at 348 (proposed Rule 45(c)(3)(B)(ii)).

[FN186] Id. at 353 (proposed Rule 45(c)(3)(B)(ii) advisory committee's note); see Gregory Gelfand, Discovery Reform for Informational Property: "Just Compensation" for Data and Intelligence, LEGAL TIMES, Mar. 5, 1990, at 26.

[FN187] See H.R.DOC.NO. 77, 102d Cong., 1st Sess. 1 (1991) (communication from the Chief Justice of the United States to Congress of the proposed amendments to the Federal Rules of Civil Procedure).

[FN188] See, e.g., Brazil, supra note 136, at 1349; William W. Schwarzer, The Federal Rules, the Adversary Process, and Discovery Reform, 50 U.PITT.L.REV. 703, 721 (1989).

[FN189] The obligations would include disclosure at the outset of the litigation of certain information that would be helpful to the opposing party's discovery efforts, disclosure at least 90 days before the trial date of expert testimony to be offered at trial, and disclosure at least 30 days before trial of information concerning witnesses and exhibits to be offered at trial. See 1991 Amendments, supra note 157, at 87-106 (proposed Rule 26(a) and advisory committee's note).
The concept of automatic disclosure is also appearing in some Expense and Delay Reduction Plans being prepared under Title 1 of the Judicial Improvements Act of 1990, Pub.L.No. 101-650, 104 Stat. 5089 (to be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                    Page 50
(Cite as: 105 Harv. L. Rev. 427)

codified at 28 U.S.C. §§ 471-482). See, e.g., Civil Justice Reform Committee, Expense and Delay Reduction Plan for the United States District Court for the District of Massachusetts §§ 2.01-2.05, at 48-64 (preliminary draft, Oct. 21, 1991).

[FN190] See 1991 Amendments, supra note 157, at 87-106 (proposed Rule 26(a) and advisory committee's note).

[FN191] The proposed revision of the discovery rules has already engendered significant controversy. Despite the recognized need for change, some segments of the bar perceive the proposals as unduly favorable to other segments. The President's Council on Competitiveness recommends mandatory disclosure of "core-information" followed by presumptive quantitative limits on discovery with a "market-based framework." See PRESIDENT'S COUNCIL ON COMPETITIVENESS, AGENDA FOR CIVIL JUSTICE REFORM IN AMERICA 16-17 (1991).

[FN192] Pub.L.No. 101-650, 104 Stat. 5089 (to be codified at 28 U.S.C. §§ 471-482).

[FN193] Of course, protective orders will have some utility as long as dissemination is desired or opposed by some of the litigants, because awareness of the availability of these orders may modify attorney behavior and encourage cooperation. Protective orders will be unique and well-suited to pretrial management, however, only to the degree that dissemination is in itself undesirable.

[FN194] See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

[FN195] See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 (1984) (observing that litigants have the opportunity to obtain information that, if publicized, could damage reputations and violate privacy interests).

[FN196] Whalen v. Roe, 429 U.S. 589, 599 (1977); see LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW §§ 15-16, at 1389-1400 (2d ed. 1988); Gary R. Clouse, Note, The Constitutional Right to Withhold Private Information, 77 NW.U.L.REV. 536, 537 (1982).

[FN197] See, e.g., In re American Tobacco Co., 880 F.2d 1520, 1530 (2d Cir.1989) (holding that a protective order was necessary to protect the anonymity of patients who participated in medical research); Cantor v. Toyota Motor Sales, USA, Inc., 546 So. 2d 766, 767-68 (Fla.Dist.Ct.App. 1989) (holding that conversations with a psychologist are protected by the doctor- patient privilege when the patient's mental condition is not an issue in the case).

[FN198] See Leonard W. Schroeter, Privacy Rights Can Limit Discovery, TRIAL, Nov. 1990, at 49, 52-53. The privacy implications of the new Florida statute, see supra p. 443, are enormous, because the statute provides for the disclosure of information regarding a "public hazard" and then defines the term to include a "person," thereby making anyone a potential "public hazard." As Professor Richard Marcus has pointed out, the statute's definition embraces anyone with AIDS. See Marcus, supra note 9, at 482-83; see also infra pp. 484-87 (discussing the confidentiality of settlement terms).

[FN199] See Seattle Times, 467 U.S. at 34-35. The Court stated that the protection of privacy is "implicit in the broad purpose and language of [Rule 26(c)]." Id. at 35 n.21; see also In re Alexander Grant & Co. Litig., 820 F.2d

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works