(Cite as: 105 Harv. L. Rev. 427)

352, 355 (11th Cir.1987) ("[P]rivate litigants have protectable privacy interests in confidential information disclosed through discovery."). Some courts have excluded nonparties and even parties from a deposition on privacy grounds. See, e.g., Galella v. Onassis, 487 F.2d 986, 997-(2d Cir.1973); Times Newspapers Ltd. v. McDonnell Douglas Corp., 387 F.Supp. 189, 197 (C.D.Cal. 1974).

There are intimations in Whalen v. Roe, 429 U.S. 589 (1977), and Nixon v. Administrator of Gen. Servs., 433 U.S. 425 (1977), that a constitutional basis may exist for a litigant's right to avoid public disclosure of private information. See Whalen, 429 U.S. at 605-06; Nixon, 433 U.S. at 457 (conceding the availability of constitutional protections for public officials in "matters of personal life unrelated to any acts done by them in their public capacity"). Several courts of appeal have relied on these Supreme Court cases to recognize a constitutional right of informational privacy. See, e.g., Mangels v. Pena, 789 F.2d 836, 839 (10th Cir.1986) (recognizing the existence of constitutional privacy rights, but holding that such rights do not require confidentiality of information regarding possession of illegal drugs); Kimberlin v. United States Dep't of Justice, 788 F.2d 434, 438 (7th Cir.) (recognizing a constitutional right to privacy, but holding that a prison inmate had no reasonable expectation of privacy regarding withdrawals made from his prison bank accounts), cert. denied, 478 U.S. 1009 (1986); United States v. Westinghouse Elec. Corp., 638 F.2d 570, 580-81 (3d Cir.1980) (holding that medical information subpoenaed in a trial falls within a constitutionally protected zone of privacy). See generally Francis S. Chlapowski, Note, The Constitutional Protection of Informational Privacy, 71 B.U.L.REV. 133, 145- 50 (1991) (outlining the treatment of informational privacy rights since Whalen v. Roe). For an extensive discussion of the subject, including the recognition of a corporation's constitutional interest in the nondisclosure of confidential discovery data, see Tavoulareas v. Washington Post Co., 724 F.2d 1010, 1019-23 (D.C. Cir.1984).

[FN200] See, e.g., United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 762-67 (1989) (protecting the privacy interest in a decade-old criminal record); Whalen v. Roe, 429 U.S. 589, 598-600 (1977) (finding a privacy right in state records regarding prescription narcotic use, but holding that the right was insufficient to prohibit disclosure of patient identity to state authorities); Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971) (holding that due process limits the government's authority to disseminate information regarding an individual's excessive drinking).

[FN201] See generally ARTHUR R. MILLER, THE ASSAULT ON PRIVACY: COMPUTERS, DATA BANKS, AND DOSSIERS (1971) (discussing the threat to individual privacy posed by ever more efficient data collection and storage systems); CRAIG T. NORBACK, THE COMPUTER INVASION (1980) (same); ALAN F. WESTIN, PRIVACY AND FREEDOM (1967) (same).

[FN202] Cf. FED. R. CIV. P. 1 ("Th[e rules] shall be construed to secure the just, speedy, and inexpensive determination of every action.").

[FN203] See Gannett Co. v. DePasquale, 443 U.S. 368, 396 (1979) (Burger, C.J., concurring) ("[D]uring the last 40 years in which the pretrial processes have been enormously expanded, it has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories were other than wholly private to the litigants."); Marcus, supra note 9, at 477-78. But see FED. R. CIV. P. 5(d) advisory committee's note (1938). Congress is more than capable of identifying those situations in which the interest in public disclosure outweighs the interest in confidentiality. For example, the antitrust statutes make pretrial antitrust proceedings presumptively public. See 15 U.S.C. §§ 1311-1314 (1988).

[FN204] Examples include the litigation over the San Juan Dupont Plaza Hotel fire and the collapse of the Washington Public Power Supply System.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 52

[FN205] See Carpenter v. United States, 484 U.S. 19, 25-26 (1987); Ruckelshaus v. Monsanto, 467 U.S. 986, 1000-04 (1984); 8 WRIGHT & MILLER, supra note 14, § 2043, at 300-08; Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 HARV.L.REV. 193, 194-95 (1890). In fact, some have even argued that a failure to protect the confidentiality of information during the pretrial process may constitute a taking of property under the Takings Clause of the Constitution. See Gregory Gelfand, "Taking" Informational Property Through Discovery, 66 WASH. U. L.Q. 703, 718-19 (1988); Note, Trade Secrets in Discovery: From First Amendment Disclosure to Fifth Amendment Protection, 104 HARV.L.REV. 1330, 1342-44 (1991).

[FN206] JOHN LOCKE, The Second Treatise of Government, in TWO TREATISES OF GOVERNMENT §§ 27-28, at 305-07 (Peter Laslett ed., 2d ed. 1967).

[FN207] 467 U.S. 986 (1984).

[FN208] 484 U.S. 19 (1987).

[FN209] See Carpenter, 484 U.S. at 25 (holding that the Wall Street Journal has a property interest in confidential business information generated by its employee); Ruckelshaus, 467 U.S. at 1003-04, 1010-13 (holding that a Fifth Amendment taking resulted from the EPA's disclosure of trade secrets obtained under a promise of confidentiality); Pamela Samuelson, Information as Property: Do Ruckelshaus and Carpenter Signal a Changing Direction in Intellectual Property Law?, 38 CATH.U.L.REV. 365, 395-96 (1989); John C. Janka, Note, Federal Disclosure Statutes and the Fifth Amendment: The New Status of Trade Secrets, 54 U.CHI.L.REV. 334, 367-68 (1987).

[FN210] Carpenter, 484 U.S. at 26 (quoting 3 WILLIAM M. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 857.1, at 260 (rev.ed. 1986)).

[FN211] See Note, supra note 205, at 1336-37.

[FN212] See Gelfand, supra note 205, at 718-19; Note, Computer Intellectual Property and Conceptual Severance, 103 HARV.L.REV. 1046, 1046 (1990); Note, supra note 205, at 1340-42.

[FN213] Samuelson, supra note 209, at 398 (citing OFFICE OF TECHNOLOGY ASSESSMENT, U.S. CONGRESS, INTELLECTUAL PROPERTY RIGHTS IN AN AGE OF ELECTRONICS AND INFORMATION 40-41 (1986)).

[FN214] The ability to avoid disclosure of a trade secret is critical to the secret's value, and the ability to control the timing and circumstances of publication lies at the heart of certain copyright values -- as the Supreme Court has recognized. See Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 549 (1985) (affirming an author's right to first publication); cf. Kenneth E. Scott, Insider Trading: Rule 10b-5, Disclosure and Corporate Privacy, 9 J. LEGAL STUD. 801, 817 (1980) ("[Rule 10b-5] helps protect investment to obtain socially productive information, the value of which would be impaired by its release before certain steps can be taken to implement the discovery.").
Consider, for example, product safety information. This material -- design specifications, performance standards, and the like -- is often among the most sensitive information a product manufacturer possesses. Especially in today's marketplace, the safer the product, the more likely that it has a significant competitive edge over its rivals.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                    Page 53
**(Cite as: 105 Harv. L. Rev. 427)**

That advantage can be maintained only if the information used to improve the product's safety is kept confidential. Under a presumption of public access, the more safety tests that a manufacturer conducts and the more research that it undertakes to improve safety, the greater the risk that information will be disclosed to plaintiffs' attorneys. The greater the disclosure, the more likely that the information will fall into the hands of a competitor, who can then replicate the design or process without making the initial investment incurred by the original manufacturer. The obvious result is a chilling effect on the willingness of manufacturers to engage in extensive initial safety testing programs.

[FN215] See Coca-Cola Bottling Co. v. Coca-Cola Co., 107 F.R.D. 288, 289 (D.Del. 1985).

[FN216] See id. at 297-99.

[FN217] See id. at 294.

[FN218] Although a business's property right in its reputation is different from its property right in trade secrets -- for example, revealing a trade secret is per se actionable, whereas damaging a company's standing is actionable only if the information is false -- reputation clearly is a property right, and it is valued and protected in both the business and the legal contexts through the concept of "good will."

[FN219] See Peter W. Huber, Manufacturing the Audi Scare, WALL ST. J., Dec. 18, 1989, at A10.

[FN220] See id.

[FN221] Cf. National Polymer Prods., Inc. v. Borg-Warner Corp., 641 F.2d 418, 424 (6th Cir.1981) (stating that courts should consider "whether disclosure will actually impair legitimate business interests of the defendants"); Tripp Baltz, Shhhh -- Confidentiality in the Courts, CHI.LAW., Jan., 1991, at 53 (discussing the debate concerning the propriety of issuing protective orders to protect industrial secrets).

[FN222] See Quinter v. Volkswagen of Am., 676 F.2d 969, 974 (3d Cir.1982) (sanctioning an expert for revealing information obtained under a protective order to unrelated counsel in another suit against the same defendant).

[FN223] Litton Indus. v. Chesapeake & Ohio Ry., 129 F.R.D. 528, 531 (E.D.Wis. 1990).

[FN224] See id.

[FN225] See, e.g., Parker v. M & T Chemicals, Inc., 566 A.2d 215, 217 (N.J.Super.Ct.App.Div. 1989).

[FN226] See FBI Stings Parts Counterfeiters, AUTOMOTIVE NEWS, Jan. 22, 1990, at 48; Michael Hoenig, Protective Confidentiality Orders, N.Y.L.J., Mar. 5, 1990, at 7.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                      Page 54.
(Cite as: 105 Harv. L. Rev. 427)

[FN227] See Hoenig, supra note 226, at 7.


[FN228] 416 U.S. 470 (1974).


[FN229] See id. at 481-82.


[FN230] See id. at 485-86.


[FN231] See, e.g., Salsbury Lab., Inc. v. Merieux Lab., Inc., 908 F.2d 706, 710 (11th Cir.1990); CVD, Inc. v. Raytheon Co., 769 F.2d 842, 850 (1st Cir.1985), cert. denied, 475 U.S. 1016 (1986); Jet Spray Cooler, Inc. v. Crampton, 385 N.E.2d 1349, 1355 (Mass. 1979); Gordon L. Doerfer, The Limits on Trade Secret Law Imposed by Federal Patent and Antitrust Supremacy, 80 HARV.L.REV. 1432, 1451, 1454 (1967); David W. Slaby, James C. Chapman & Gregory P. O'Hara, Trade Secret Protection: An Analysis of the Concept "Efforts Reasonable Under the Circumstances to Maintain Secrecy," 5 SANTA CLARA COMPUTER & HIGH TECH. L.J. 321, 321 (1989).


[FN232] See 18 U.S.C. § 1905 (1988) (prohibiting government officials from disclosing confidential information obtained in the course of their government duties); 1979 Uniform Trade Secrets Act, reprinted in 2 MELVIN F. JAGER, TRADE SECRETS LAW, at A1 (App. 1985) (adopted in 28 states); 1 JAGER, supra, at §§ 3.01-.04 (1991); 3 ROGER M. MILGRIM, MILGRIM ON TRADE SECRETS App. B (1977).


[FN233] See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1011 (1984); Kewanee Oil, 416 U.S. at 482, 485.


[FN234] See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 161 (1989). This is the critical issue in Hartman v. Remington Arms, currently sub judice before the Eighth Circuit.


[FN235] Cf. In re Richardson-Merrell, Inc., Bendectin Prods. Liab. Litig., 97 F.R.D. 481, 484 (S.D.Ohio 1983) ("Discovery is not to be used for annoying or embarrassing the opposing party.").


[FN236] See, e.g., Butkowski v. General Motors Corp., 497 F.2d 1158, 1159 (2d Cir.1974) (irrelevant design information); In re Richardson- Merrell, 97 F.R.D. at 484 (request calculated to portray defendant in a damaging light); Uitts v. General Motors Corp., 62 F.R.D. 560, 562 (E.D.Pa. 1974) (design documents for type of vehicle not at issue).
Although discovery has been conducted under the Federal Rules for more than 50 years, there is still little agreement on where the boundary lies between legitimate discovery and the illicit territory known as the "fishing expedition." The dispute reflects deep philosophical disagreement over questions such as how high the access barrier to the courts should be, at what point in a lawsuit issues and legal theories should be formulated, and whether the "notice" pleading and liberal discovery regime of modern procedure authorizes an invocation of the system or the interposition of a defense based only on the prospect that it will prove viable at some subsequent point in the litigation. Much of the debate over the current Rule II involves these issues. See, e.g., FLEMING JAMES, JR. & GEOFFREY C. HAZARD, JR., CIVIL PROCEDURE § 3.11, at 154-55 (3d ed.1985); Note, Plausible Pleadings: Developing Standards for Rule II Sanctions, 100 HARV.L.REV. 630, 634, 647 (1987); see also AMERICAN JUDICATURE SOCIETY, RULE II IN TRANSITION: THE REPORT OF THE THIRD CIRCUIT TASK FORCE ON FEDERAL RULE OF CIVIL PROCEDURE II (1988) (reporting the level of Rule II activity based on empirical studies, a comprehensive literature review, and a review of nationwide case law);

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

GEORGINE VAIRO, REPORT TO THE ADVISORY COMMITTEE ON AMENDED RULE II OF THE FEDERAL RULES OF CIVIL PROCEDURE (1987) (providing an empirical study of how Rule II has actually been used by the courts); 5A WRIGHT & MILLER, supra note 172, § 1332, at 22-44 (discussing criticisms of the 1983 amendment of Rule II).

[FN237] As is true of many aspects of contemporary discovery, no empirical data exists documenting how frequently discovery mechanisms are used in this way.

[FN238] See Product Liability Reform Act: Hearings on S.1400 Before the Subcomm. on the Consumer of the Senate Comm. on Commerce, Science & Transportation, 101st Cong., 2d Sess. 235-402 (1990) (statements of witnesses and Senators); PETER W. HUBER, LIABILITY: THE LEGAL REVOLUTION AND ITS CONSEQUENCES 155-61 (1988); Hoenig, supra note 226, at 3.

[FN239] See Warner v. Upjohn Co., 628 F.2d 848, 857 (4th Cir.1980) (refusing to admit evidence of later remedial measures because its admittance would discourage such improvements), cert. denied, 449 U.S. 1080 (1981); HUBER, supra note 238, at 161 (noting that liability insurance costs have virtually halted investments in small-airplane development); Hazard, supra note 97, at 2242-43 (observing the growing resentment against broad discovery in managerial circles).

[FN240] See generally CHARLES T. MCCORMICK, MCCORMICK ON EVIDENCE § 72, at 171 (3d ed.1984) (discussing the most familiar rules of privilege as well as their justifications).

[FN241] See id.

[FN242] See United States v. Reynolds, 345 U.S. 1, 11 (1953).

[FN243] See, e.g., In re Folding Cartons Antitrust Litig., 609 F.2d 867, 871 (7th Cir.1979); Campbell v. Gerrans, 592 F.2d 1054, 1056-57 (9th Cir.1979); see also WRIGHT & MILLER, supra note 14, §§ 2016-2018, at 122-53 (explaining the various privileges).

[FN244] See 8 WRIGHT & MILLER, supra note 14, § 2043, at 300.

[FN245] The common law right to inspect and copy judicial records is not absolute, particularly if these records are a source of business information that, if released, might harm a litigant's competitive standing. The determination of whether access to such records is appropriate is best left to the trial court, which exercises its sound discretion in light of the relevant facts and circumstances of each particular case. See Crain Communications, Inc. v. Hughes, 521 N.Y.S.2d 244, 244-45 (N.Y.App.Div. 1987), aff'd, 539 N.E.2d 1099 (N.Y. 1989).

[FN246] Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 (1984).

[FN247] Id. at 34-35 (citation omitted); see also Gregory Gelfand, Discovery Reform for Informational Property:

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                Page 56
(Cite as: 105 Harv. L. Rev. 427)

"Just Compensation" for Data and Intelligence, LEGAL TIMES, Mar. 5, 1990, at 26 (illustrating potential for abuse of discovery by parties primarily concerned with "taking" a company's information property for private purposes without just compensation). The threat to confidentiality from discovery abuse has also been recognized by the recently proposed amendments to the Federal Rules that enhance the trial judge's power to protect intellectual property. See supra p. 462; see also Note, supra note 205, at 1344-45 (discussing the proposed amendments).

[FN248] See Hoenig, supra note 226, at 6-7.

[FN249] See Crain Communications, 521 N.Y.S.2d at 245.

[FN250] See United States v. Reynolds, 345 U.S. 1, 11 (1953) (forbidding discovery of top secret information); see also In re Halkin, 598 F.2d 176, 195 (D.C. Cir.1979) (suggesting that, in some circumstances, "the only plausible alternative to a protective order may be the denial of discovery altogether").

[FN251] For example, the recent amendments to the Texas Rules of Civil Procedure create a presumption of openness, allow nonparties to intervene in the sealing proceedings, and allow immediate appeals "by any party or intervenor who participated in the hearing preceding issuance of such order." TEX. R. CIV. P. ANN. rr. 76a, 166(b)(5)(C) (West Supp.1991).

[FN252] See Philip H. Corboy, Masked and Muzzled, Litigants Tell No Evil: Is This Blind Justice?, LEGAL TIMES, Jan. 8, 1990, at 27, 28 ("The evil of secrecy is that those who are jeopardized are not the parties before the court, but the general public and other specific victims.").

[FN253] In Alan B. Morrison, Protective Orders, Plaintiffs, Defendants and the Public Interest in Disclosure: Where Does the Balance Lie?, 24 U.RICH.L.REV. 109 (1989), one of the nation's finest public interest lawyers describes (largely from the plaintiff's perspective) the process that often leads to a protective or sealing order. See id. at 109-13.

[FN254] Corboy, supra note 252, at 28; see also Ward v. Ford Motor Co., 93 F.R.D. 579, 580 (D.Colo. 1982) (noting that preventing the disclosure of discovery materials to other litigants promotes redundant discovery and therefore inflicts inefficiencies on all parties); Tom Riley & Mary K. Hoefer, Protective Orders: Machiavelli Would Be Pleased, 20 TRIAL 30, 32 (1984).

[FN255] See Anne-Thérèse Béchamps, Note, Sealed Out-of-Court Settlements: When Does the Public Have a Right to Know?, 66 NOTRE DAME L.REV. 117, 154-57 (1990).

[FN256] A good example is Del Monte v. Xerox Corp., No. 14121/86 (N.Y. Sup. Ct. Aug. 15, 1989), in which the court modified a confidentiality seal that had been put in place pursuant to a voluntary request made by both parties as part of a settlement agreement. See id., slip op. at 3. With the support of the defendant corporation, see id., slip op. at 2-3, the court modified the order to permit a local public health agency access to epidemiological data and other health-related studies contained in the court records, see id., slip op. at 11-12. Del Monte is not atypical of New York practice, because court proceedings are presumptively open. See, e.g., Flynn v. Doe, 553 N.Y.S.2d 288, 289 (Sup. Ct. 1990).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                    Page 57
(Cite as: 105 Harv. L. Rev. 427)

Federal practice also allows the court to refer discovery material to the proper authorities when a case raises issues of public health and safety. See Anderson v. Cryovac, Inc., 805 F.2d 1, 8 (1st Cir.1986) (holding that the release of otherwise sealed information regarding public health to a government agency does not destroy a protective order).

[FN257] The 1980 amendment of Federal Rule 5(d), which authorized local rules eliminating the filing requirement, was not intended to alter that power. See, e.g., In re "Agent Orange" Prod. Liab. Litig., 104 F.R.D. 559, 567-68 (E.D.N.Y. 1985), aff'd, 821 F.2d 139 (2d Cir.), cert. denied, 484 U.S. 953 (1987). One court, however, has held that its power to order filing ends with the final judgment. See Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 781 (1st Cir.1988), cert. denied, 488 U.S. 1030 (1989). See generally Morrison, supra note 253, at 120-21 (discussing different strategies available to federal judges to make unfiled documents accessible to the public).

[FN258] See cases discussed supra note 256.

[FN259] The importance of privacy and property rights is discussed in Part V, see supra pp. 463-74, and the damage to the litigation system is discussed in section B of this Part, see infra pp. 483-89.

[FN260] See, e.g., Drug Maker Liable in $77.8 Million Verdict, 18 Prod. Safety & Liab. Rep. (BNA) 1309, 1309 (Nov. 30, 1990) (reporting that the plaintiffs' bar issued a public alert regarding an allegedly unsafe product).

[FN261] In a related vein, the government may not prevent anyone from disclosing information that was acquired independently merely because that individual took part in a judicial proceeding. See Butterworth v. Smith, 110 S.Ct. 1376, 1381 (1990).

[FN262] In some jurisdictions, such as New York, the filing requirement is not automatically triggered by commencement of the action. See N.Y. CIV. PRAC. L. & R. 304 (McKinney 1990) (Method of Commencing Action or Special Proceeding); id. 3012 (Service of Pleading and Demand for Complaint).

[FN263] See Robert Abrams, Hidden Dangers: Xerox Case Shows Public Has Right to Know, ROCHESTER DEMOCRAT & CHRON., July 27, 1990, at 7A (column by the New York state attorney general); Letter from Chief Judge Sol Wachler to John Bauman (Nov. 2, 1989) (on file at the Harvard Law School Library).

[FN264] See Robert L. Beck, Xerox Case Was No Secret, ROCHESTER DEMOCRAT & CHRON., Aug. 9, 1990, at A11; Roy L. Reardon, Court Confidentiality Debate's Rhetoric, N.Y.L.J., Oct. 16, 1990, at 2.

[FN265] Beck, supra note 264, at A11.

[FN266] See Ed Vogel, Lawyer Says Fatal Hazard Exists in LV, LAS VEGAS REVIEW-JOURNAL, Apr. 4, 1991, at A1, B3.

[FN267] See FDA's Regulation of Zomax: Hearings Before a Subcomm. of the House Comm. on Gov't Operations,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                  Page 58
**(Cite as: 105 Harv. L. Rev. 427)**

98th Cong., 1st Sess. 3-5 (1983) (testimony of Dr. Devra Davis); KEEPING SECRETS: JUSTICE ON TRIAL 13-15 (1990) (report of a conference sponsored by the Society of Professional Journalists and the Association of Trial Lawyers of America). As legal editor for Good Morning America, I had the opportunity to interview Dr. Davis about her experience with this drug, which appeared in a segment regarding court seals and confidentiality in litigation. See Good Morning America (ABC television broadcast, Sept. 4, 1990).

[FN268] See Court Secrecy: Hearings Before the Subcomm. on Courts & Administrative Practice of the Senate Comm. on the Judiciary, 101st Cong., 2d Sess. 17-24 (1990) [hereinafter Senate Hearings] (statement and testimony of Dr. Devra Davis).

[FN269] See DIVISION OF DRUG EXPERIENCE, FOOD & DRUG ADMIN., ADVERSE DRUG HIGHLIGHTS, NO. 8116 (1981).

[FN270] See PHYSICIANS' DESK REFERENCE 1165-66 (36th ed. 1982).

[FN271] See Letter from McNeil Pharmaceutical to "Prescribing Physicians" (Apr. 9, 1982) (on file at the Harvard Law School Library).

[FN272] See, e.g., sources cited supra note 267.

[FN273] See Senate Hearings, supra note 268, at 5 (statement and testimony of Frederick R. Barbee).

[FN274] See id.

[FN275] 805 F.2d I (1st Cir.1986).

[FN276] See id. at 8.

[FN277] See id.

[FN278] See Anderson v. Cryovac, Inc., 862 F.2d 910, 914 (1st Cir.1988).

[FN279] Once these anecdotes reach the press, they seem to permeate even the "academic" literature without further critical examination. See, e.g., John J. Watkins, Expanding the Public's Right to Know: Access to Settlement Records Under the First Amendment 2-3 (Harvard Univ. School of Gov't, Discussion Paper D-7, Dec. 1990) (on file at the Harvard Law School library).

[FN280] See, e.g., Anderson, 805 F.2d at 12 (finding public access to the discovery process detrimental because it can be expected to make discovery "more complicated and burdensome than it already is").

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

Page 59

[FN281] See Marcus, supra note 9, at 485 ("[G]eneral public access would tend to disrupt the cooperative exchange of information between the parties."). A similar effect would be felt in a regime that permitted protective orders but made their subsequent modification or elimination relatively easy. See infra pp. 499-501.

[FN282] See supra pp. 462-63.

[FN283] See, e.g., International Union v. Garner, 102 F.R.D. 108, 109-10 (M.D. Tenn. 1984) (extending suspension of discovery based on a finding that discovery processes were used primarily to develop information for a National Labor Relations Board proceeding).

[FN284] Compare In re Halkin, 598 F.2d 176, 195 (D.C. Cir.1979) ("The only plausible alternative to a protective order may be the denial of discovery altogether.") with Vollert v. Summa Corp., 389 F.Supp. 1348, 1351 (D.Haw. 1975) (allowing discovery because other methods for protecting the defendant's legitimate interest in confidentiality were available).

[FN285] Although settlement agreements and judicial determinations both resolve a controversy, this does not mean that both should be publicly available. In fact, because settlements are agreements undertaken between and among private parties and do not involve the state, settlements should not be considered part of the public record. Settlements are more properly viewed as part of the class of private information -- along with pretrial discovery materials -- in which the litigation system has a limited interest.

[FN286] Cf. Dawson v. White & Case, N.Y.L.J., Apr. 25, 1991, at 26 (N.Y. Sup. Ct. Apr. 24, 1991) (allowing the sealing of an accounting of a partnership interest in a law firm because the public's legitimate interest in the material was limited and the law firm's privacy interest was great). Those contemplating or involved in similar litigation obviously would have a great interest in the terms of settlement. But that does not justify denying confidentiality.

[FN287] See, e.g., John McShain, Inc. v. Cessna Aircraft Co., 563 F.2d 632, 634-35 (3d Cir.1977) (finding that the admission into evidence of the small size of a settlement agreement led the jury to discount the testimony of the expert witnesses who worked for the settling defendant as biased in favor of the plaintiff); see also Wayne D. Brazil, Protecting the Confidentiality of Settlement Negotiations, 39 HASTINGS L.J. 955, 971-72 (1988) (arguing that information about a small-sum settlement with one of the codefendants may lead the jury to conclude that the plaintiff does not believe in his claim against the remaining defendants).

[FN288] See, e.g., Wilson v. Wilson, No. 89-C9620, 1991 U.S. Dist. LEXIS 10992, at *4 (N.D.Ill.Aug. 2, 1991).

[FN289] See, e.g., In re Franklin Nat'l Bank Sec. Litig., 92 F.R.D. 468, 471-72 (E.D.N.Y. 1981) (allowing intervention by the Public Interest Research Group to challenge a protective order sealing the settlement terms between Ernst & Ernst and the FDIC, but refusing to modify the protective order); Katie Eccles, Note, The Agent Orange Case: A Flawed Interpretation of the Federal Rules of Civil Procedure Granting Pretrial Access to Discovery, 42 STAN.L.REV. 1577, 1616-17 (1990) (suggesting that public access to settlement agreements may be warranted in class action cases).

[FN290] A number of courts have recognized a common law right of access when there has been judicial

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                              Page 60
**(Cite as: 105 Harv. L. Rev. 427)**

participation in the settlement process, but they have given it extremely different applications. Compare Minneapolis Star & Tribune Co. v. Schumacher, 392 N.W.2d 197, 206 (Minn. 1986) (emphasizing the traditional privacy of settlements and the policy favoring settlements) with Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 345 (3d Cir.1986) (stating that court approval of a settlement is something the public has a right to know about and evaluate) and Shenandoah Publishing House, Inc. v. Fanning, 368 S.E.2d 253, 256 (Va. 1988) ("The public has a societal interest in learning whether compromise settlements are equitable and whether the courts are administering properly the powers conferred upon them.").

[FN291] See, e.g., Autera v. Robinson, 419 F.2d 1197, 1199 (D.C. Cir.1969); Minneapolis Star, 392 N.W.2d at 205. But see Owen M. Fiss, Against Settlement, 93 YALE L.J. 1073, 1075 (1984) ("[S]ettlement is a capitulation to the conditions of mass society and should be neither encouraged nor praised.").

[FN292] See Brazil, supra note 287, at 959 ("[I]f a large percentage of our cases did not settle, the backlog in our courts would become totally intolerable."); cf. Edward Felsenthal & Wade Lambert, Workloads of State Courts in U.S. Surged by 98 Million Cases in 1988, WALL ST. J., May 31, 1990, at B11 (calling the workload of state courts "astonishing").

[FN293] For example, a party's reluctance to settle without the sealing order would be strong evidence of reliance.

[FN294] See, e.g., Palmieri v. New York, 779 F.2d 861, 862 (2d Cir.1985) ("[A]bsent an express finding by the district court of improvidence in the magistrate's initial grant of the protective order or of extraordinary circumstances or compelling need by the State for the information protected thereunder, it was error for the district court to modify the magistrate's orders."); Martindell v. ITT Corp., 594 F.2d 291, 294-95 (2d Cir.1979); Ropfogel v. Wise, No. 83 Civ. 2837(mp), 1991 U.S. Dist. LEXIS 11738, at *5- 6 (S.D.N.Y. Aug. 22, 1991); see also City of Hartford v. Chase, No. 91-7074, 1991 U.S.App. LEXIS 18995, at *10-12 (2d Cir.Aug. 14, 1991) (extending the scope of a protection order to all documents relating to the settlement).

[FN295] See generally JUDICIAL CONFERENCE OF THE UNITED STATES, supra note 91 (discussing the judicial crisis and suggesting reforms to reduce the burdens imposed on the federal court system); CONFERENCE OF STATE COURT ADM'RS, STATE JUSTICE INST. & NAT'L CTR. FOR STATE COURTS, STATE COURT CASELOAD STATISTICS: ANNUAL REPORT 1988 (1990) (presenting empirical information concerning the current workloads of state courts).

[FN296] CONFERENCE OF STATE COURT ADM'RS, STATE JUSTICE INST. & NAT'L CTR. FOR STATE COURTS, supra note 295, at 17.

[FN297] See, e.g., Felsenthal & Lambert, supra note 292, at B11.

[FN298] As the First Circuit said in Anderson v. Cryovac, Inc., 805 F.2d 1 (1st Cir.1986):
The public's interest is in seeing that the [discovery] process works and the parties are able to explore the issues fully without excessive waste or delay. But rather than facilitate an efficient and complete exploration of the facts and issues, a public right of access would unduly complicate the process. It would require the court to make extensive evidentiary findings whenever a request for access was made, and this could in turn lead to lengthy and expensive interlocutory appeals . . . .
Id. at 12.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Page 62 of 68
Case 2:02-cv-02746-JP    Document 178-7    Filed 12/16/2003    Page 11 of 17

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)
Page 61

[FN299] But cf. Sunshine in Litigation Act, FLA. STAT. ANN. § 69.081 (1990). The Florida Statute, signed into law on June 1, 1990, voids all contracts and agreements that have the effect of concealing a "public hazard," id. § 69.081(4), and allows any "substantially affected person," including members of the media, id. § 69.081(6), to request the court to conduct an in camera review of all documents for which a confidentiality designation has been requested, see id. § 69.081(7). This statute may cause a significant increase in the workload of the Florida courts.

[FN300] See United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 780 (1989) ; see also Wyeth Labs. v. United States Dist. Court, 851 F.2d 321, 324 (10th Cir.1988) (holding that the district court had no authority to establish a courthouse DTP vaccine litigation library).

[FN301] See E. Donald Elliott, Toward Incentive-Based Procedure: Three Approaches for Regulating Scientific Evidence, 69 B.U.L.REV. 487 (1989) (discussing options for improving use of scientific and other highly technical information in the litigation process).

[FN302] 21 U.S.C. §§ 301-393 (1988).

[FN303] 15 U.S.C. §§ 2051-2083 (1988).

[FN304] 15 U.S.C. §§ 1381-1431 (1988).

[FN305] See, e.g., 15 U.S.C. § 1411 (1988); 49 C.F.R. § 573.5 (1990) (requiring reports of defective vehicles to be made to the Secretary of Transportation); 21 C.F.R. § 803.24 (1991) (requiring reports of malfunctioning medical devices to be made to the Food and Drug Administration); 16 C.F.R. § 1115.10 (1991) (requiring reports of products that fail to meet safety standards or that contain a defect that could create a hazard or risk of injury or death to the Consumer Product Safety Commission); see also 15 U.S.C. §§ 1395, 1401 (1988) (giving the Secretary of Transportation power to conduct research and testing and to investigate accidents); 15 U.S.C. § 2054(a)-(b) (1988) (giving the Consumer Product Safety Commission responsibility to research and investigate consumer product safety).

[FN306] See 21 U.S.C.A. § 360i(a)(6) (West Supp.1991) (as amended by Pub.L.No. 101-629, 104 Stat. 4511, 4514 (1990)).

[FN307] See 21 U.S.C.A. § 360i(b)(I)(A)-(B) (West Supp.1991) (as amended by Pub.L.No. 101-629, 104 Stat. 4511, 4511 (1990)).

[FN308] See Act of Nov. 16, 1990, Pub.L. 101-608, Title I, § 112(b), 104 Stat. 3115 (codified at 15 U.S.C.A. § 2084 (West Supp.1991)).

[FN309] See, e.g., Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1418(a)(2)(A)-(B) (1988) (trade secrets); Consumer Product Safety Act, 15 U.S.C. § 2055(a)(2) (1988) (trade secrets); Food, Drug, and Cosmetic Act, 21 U.S.C. § 360j(c) (1988) (trade secrets); 21 C.F.R. § 803.9 (1991) (trade secrets and privacy); 16 C.F.R. § 1115.15 (1991) (product identification).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

[FN310] See, e.g., 15 U.S.C. § 1395(c) (1988) (granting public access to highway safety research); 15 U.S.C. § 1414(c) (1988) (requiring the disclosure of product defect and planned remedy); 15 U.S.C. § 2054(d) (1988) (requiring that consumer product safety information be made available to the public); 21 U.S.C. § 360h(a) (1988) (requiring notice by Secretary of Health and Human Services of an unreasonable risk of substantial harm); 21 C.F.R. § 803.9 (1991) (granting public access to reports under the Food, Drug, and Cosmetic Act).

[FN311] 5 U.S.C. §§ 552-559 (1988).

[FN312] See MODEL CODE OF PROFESSIONAL RESPONSIBILITY Canon 4 (1986) ("A Lawyer Should Preserve the Confidences and Secrets of a Client."); MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.6 cmt. [4] (1983) ("A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation. The client is thereby encouraged to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter.").

[FN313] See Stephen L. Pepper, The Lawyer's Amoral Ethical Role: A Defense, a Problem, and Some Possibilities, 1986 AM. B. FOUND. RES. J. 613, 617 (arguing that to find in lawyers "a moral obligation to refuse to facilitate that which the lawyer believes to be immoral, is to substitute lawyers' beliefs for individual autonomy and diversity. Such a screening submits each to the prior restraint of the judge/facilitator and to rule by an oligarchy of lawyers.").

[FN314] See MODEL RULES OF PROFESSIONAL CONDUCT Rule 3.6 (1983) (advising that a lawyer should not make extrajudicial statements that may be disseminated to the public if it will materially prejudice the adjudicative process).

[FN315] See MODEL CODE OF PROFESSIONAL RESPONSIBILITY Canon 7 (1986).

[FN316] See MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7 (1983) (instructing that a lawyer should not represent a client if representation will be limited by the lawyer's own or another client's interests).

[FN317] Because, in reality, disclosure will often weaken the plaintiff's bargaining position for securing the defendant's acquiescence in discovery of certain materials and also damage the plaintiff's ability to maximize the settlement value, the client's informed consent is critical.

[FN318] Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34 (1984).

[FN319] See Marcus, supra note 9, at 472.

[FN320] A court has broad discretion under Federal Rule 26(c), for example, to shape a protective order to the needs of a specific case. See Tahoe Ins. Co. v. Morrison-Knudsen Co., 84 F.R.D. 362, 364 (D.Idaho 1979); 8 WRIGHT & MILLER, supra note 14, § 2036, at 269; see also Lewis R. Pyle Memorial Hosp. v. Superior Court, 717 P.2d 872, 876 (Ariz. 1986) ("The good cause standard gives courts very broad discretion to tailor protective provisions to fit the needs of the case.").

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

[FN321] For example, the Texas rule requires public notice of every request to seal court records. See TEX.R.CIV.P.ANN. r. 76a(3) (West Supp.1991). Requests have been made to seal a wide variety of information. In a wrongful death case, the defendant sought confidentiality for an employee handbook that contained a pizza recipe. See DePriest v. Pizza Management Inc., No. 483, 464 (Travis County Dist. Ct., 53rd Jud. Dist., Tx. Sept. 17, 1990). In a malpractice action, the plaintiff sought confidentiality for personal bank account statements, personal income tax returns, real estate deeds, certificates of stock ownership, and certificates of title to motor vehicles. See McGowen v. Jones, No. 141-126533-90 (Tarrant County Dist. Ct., 141st Jud. Dist., Tx. Sept. 21, 1990). In a personal injury action, defendant sought confidentiality for design and sales information about a popular athletic shoe. See White v. Reebok Int'l, Ltd., No. 88-45391 (Harris County Dist. Ct., 125th Jud. Dist., Tx. Nov. 26, 1990). In another case involving a counterclaim for breach of contract and deceptive trade practices, the counter-plaintiff sought a court seal for records concerning the price and intended use of property involved in the contract dispute. See Lindsay v. Jacobs, No. 90- 06657 (Harris County Dist. Ct., 165th Jud. Dist., Tx. Oct. 24, 1990).

[FN322] When all the parties support the protective order or seal, as often is the case when the defendant seeks confidentiality and the plaintiff wants to facilitate its own access to discovery materials, the court is faced with an essentially non-adversarial situation and must assume the duty of making an independent inquiry. A useful analogue is the "fiduciary" burden assumed by federal judges in evaluating a proposed class action settlement under Federal Rule 23(e). See generally 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1797.1, at 378-416 (2d ed. 1986) (detailing the issues a judge should consider). This seems to have been the approach taken in City of Hartford v. Chase, No. 91-7074, 1991 U.S.App. LEXIS 18995 (2d Cir. Aug. 14, 1991), which spoke of the court's "larger role" in this context. See id. at *15-16.

[FN323] See supra pp. 487-88.

[FN324] See generally G. I. Fodier, Annotation, In Camera Trial or Hearing and Other Procedures to Safeguard Trade Secrets or the Like Against Undue Disclosure in Course of Civil Action Involving Such Secret, 62 A.L.R.2d 509, 516-33 (1958) (discussing a procedure that could be used to protect trade secrets from public or other disclosure). Even the disclosures that occur in the process of adjudicating the protective-order question pose risks that must be guarded against. See generally Michael A. Pope, William R. Quinlan & Thomas L. Duston, Protecting a Client's Secret Data, NAT'L L.J., July 8, 1991, at 15 (emphasizing the importance of developing sophisticated judicial approaches to discovery that can protect confidential business secrets).

[FN325] It would be more difficult for third parties to satisfy the first two requirements than it would be for parties to the action. This outcome is both sensible and consonant with current law.

[FN326] One of the least desirable aspects of some of the public access proposals is that they are heavily weighted with procedural requirements such as public notice, waiting periods, intervention proceedings, and rights to appeal. See, e.g., TEX.R.CIV.P.ANN. r. 76a (West Supp.1991).

[FN327] See, e.g., City of Hartford v. Chase, No. 91-7074, 1991 U.S.App. LEXIS 18995, at *4-5 (2d Cir. Aug. 14, 1991).

[FN328] See, e.g., Anderson v. Cryovac, Inc., 805 F.2d 1, 8 (1st Cir.1986) ("In a case involving allegations that a city's water supply had been poisoned by toxic chemicals, the public interest required that information bearing on

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

this problem be made available to those charged with protecting the public's health.").

[FN329] See supra pp. 488-90.

[FN330] Cf. WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 4.5(b), at 236-37 (1985) (stating that the government must minimize the scope of intrusion during authorized electronic surveillance). Some information privacy statutes limit access to personal information on a need-to-know basis. See, e.g., Federal Fair Information Practices Act, 5 U.S.C. § 552a (1988); Federal Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (1988).

[FN331] See, e.g., Upjohn Co. v. United States, 449 U.S. 383, 400 (1981).

[FN332] Cf. Note, supra note 205, at 1348-49 (proposing that, although failure to provide a protective order for trade secrets generally would work a taking under the Fifth Amendment, a narrow "nuisance" exception should apply to "allow public disclosure . . . only if limiting access would significantly endanger the public").

[FN333] Courts have great flexibility to shape protective orders in order to meet the needs of a particular case. See 8 WRIGHT & MILLER, supra note 14, § 2043, at 305-08. A good example of this flexibility is Maritime Cinema Serv. Corp. v. Movies en Route, Inc., 60 F.R.D. 587 (S.D.N.Y.1973), which allowed the plaintiff to compel the defendant to answer certain interrogatories only on condition that the answers be seen by plaintiff's counsel but not by the plaintiff itself. See id. at 589-90.

[FN334] A number of courts have limited disclosure to parties' counsel and sometimes their expert witnesses. See, e.g., Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 999 (10th Cir.), cert. denied, 380 U.S. 964 (1965); General Elec. Co. v. Allinger, No. 91-316-FR, 1991 U.S.Dist. LEXIS 10878, at *4 (D.Or.Aug. 1, 1991); Ohm Resource Recovery Corp. v. Industrial Fuels & Resources, Inc., No. S90-511, 1991 U.S.Dist. LEXIS 10297, at *14 (N.D. Ind. July 24, 1991); Coca-Cola Bottling Co. v. Coca-Cola Co., 107 F.R.D. 288, 300 (D.Del. 1985). Courts have also prevented a governmental agency from using discovery material for purposes outside the litigation, see Harris v. Amoco Prod. Co., 768 F.2d 669, 686 (5th Cir.1985), cert. denied, 475 U.S. 1011 (1986), and have prevented a state from divulging information to the public and to government employees other than designated workers who signed confidentiality affidavits, see New York v. United States Metal Ref. Co., 771 F.2d 796, 805 (3d Cir.1985).

[FN335] See supra p. 471.

[FN336] See, e.g., Allinger, 1991 U.S.Dist. LEXIS 10878, at *4.

[FN337] See Upjohn v. United States, 449 U.S. 383, 400 (1981).

[FN338] See City of Hartford v. Chase, No. 91-7074, 1991 U.S.App. LEXIS 18995, at *16 (2d Cir.Aug. 14, 1991) (concluding that a confidentiality order should only be issued after a careful, particularized review); cf. United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 761 (1989) (arguing that, if federal agencies were required to disseminate information to the public about private individuals merely because

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427
(Cite as: 105 Harv. L. Rev. 427)

the information was contained in public records, the government would be "transformed in one fell swoop into the clearinghouse for highly personal information, releasing records on any person, to any requestor, for any purpose").

[FN339] The cases allowing sharing include Wilk v. AMA, 635 F.2d 1295 (7th Cir.1980); Wauchop v. Domino's Pizza, Inc., No. S90-496(RLM), 1991 U.S. Dist. LEXIS 11694 (N.D. Ind. Aug. 6, 1991); Nestle Foods Corp. v. Aetna Casualty & Sur. Co., No. 89-1701(CSF), 1990 U.S. Dist. LEXIS 12137 (D.N.J. Jan. 25, 1990); United States v. Kentucky Utils. Co., 124 F.R.D. 146 (E.D. Ky. 1989); and Deford v. Schmid Prods. Co., 120 F.R.D. 648 (D. Md. 1987). Cases denying sharing include Scott v. Monsanto Co., 868 F.2d 786 (5th Cir.1989); Palmieri v. New York, 779 F.2d 861 (2d Cir.1985); and Mampe v. Ayerst Labs., 548 A.2d 798 (D.C. 1988). See generally Gary L. Wilson, Note, Seattle Times: What Effect on Discovery Sharing?, 1985 WIS.L.REV. 1055 (arguing that the use of Seattle Times as a legal support against discovery sharing is improper); Thomas M. Fleming, Annotation, Propriety and Extent of State Court Protective Order Restricting Party's Right to Disclose Discovered Information to Others Engaged in Similar Litigation, 83 A.L.R. 4TH 987 (1991) (analyzing cases that have considered protective orders for the disclosure of discovered material to similarly situated litigants and observing that state courts generally disapprove of categorical prohibitions on disclosure but are willing to impose restrictions to protect trade secrets). The new Virginia statute expressly authorizes the sharing of discovery materials that are under a protective order. See VA. CODE ANN. § 8.01- 420.01 (Michie Supp.1991).

[FN340] See, e.g., Wauchop v. Domino's Pizza, Inc., No. S90-496(RLM), 1991 U.S. Dist. LEXIS 11694, at *13 (N.D. Ind. Aug. 6, 1991); Ward v. Ford Motor Co., 93 F.R.D. 579, 580 (D.Colo. 1982); Patterson v. Ford Motor Co., 85 F.R.D. 152, 153-54 (W.D. Tex. 1980); see also Baker v. Liggett Group, Inc., 132 F.R.D. 123, 126 (D.Mass. 1990) (issuing a protective order authorizing disclosure of confidential materials to other tobacco tort litigants, under appropriate restraints).

[FN341] Wilk v. AMA, 635 F.2d 1295, 1301 (7th Cir.1980).

[FN342] In Campbell, supra note 11, the author suggests that there are financial rewards in vending discovery materials. See id. at 774; see also Brad N. Friedman, Note, Mass Products Liability Litigation: A Proposal for Dissemination of Discovered Material Covered by a Protective Order, 60 N.Y.U. L.REV. 1137, 1155-58 (1985) (discussing the ethical implications of compensation raised by information markets in discovered material). Although the commercialization of discovery material cannot be condoned, particularly when it contains proprietary data, it may be appropriate to allow a plaintiff to recoup the costs incurred in developing the information. See Marcus, supra note 9, at 498-99; cf. Edward F. Sherman & Stephen O. Kinnard, Federal Court Discovery in the 80's -- Making the Rules Work, 95 F.R.D. 245, 289 (1982) (proposing the imposition of a duty on the plaintiff to make discovery available to others without "undue" profit). Unfortunately, only the court is in a position to make a neutral judgment as to what is reasonable, and requiring courts to make those judgments would divert scarce judicial resources.

[FN343] See generally Wilk, 635 F.2d at 1300-01 (implying that a party bringing suit solely to obtain discovery material would not be entitled to a "day in court"); Wauchop, 1991 U.S. Dist. LEXIS 11694, at *15 (recognizing that a different result would be appropriate "if litigation was commenced solely for purposes of engaging in discovery"); Patterson, 85 F.R.D. at 154 (allowing the full use of information in other forums absent a showing that the "discovering party is exploiting the instant litigation solely to assist litigation in a foreign forum").

[FN344] See, e.g., In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig., 81 F.R.D. 482, 484 (E.D. Mich. 1979) (vacating a protective order and thereby allowing state court plaintiffs to share discovery information with consolidated federal multidistrict litigation plaintiffs), aff'd, 664 F.2d 114 (6th Cir.1981).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                                                          Page 66
(Cite as: 105 Harv. L. Rev. 427)

Numerous proposals in recent years suggest that a substantial increase in the aggregation of related lawsuits is likely in the future. See, e.g., 136 CONG. REC. H3116-19 (daily ed. June 5, 1990) (voting to pass the Multiparty, Multiforum Jurisdiction Act of 1990, H.R. 3406, 101st Cong., 2d Sess.); AMERICAN BAR ASS'N, REPORT OF THE COMMISSION ON MASS TORTS (1989); JUDICIAL CONFERENCE OF THE UNITED STATES, supra note 91, at 44-45 (proposing an amendment to a multidistrict litigation statute to permit consolidated trials as well as pretrial proceedings); American Law Inst., Complex Litigation Project (Tentative Draft No. 4) §§ 4.01-.02, at 25-92 (Sept. 19, 1991) (providing for the transfer of related cases from federal to state court as well as from state to state); American Law Inst., Complex Litigation Project (Tentative Draft No. 2) §§ 3.01-.10, at 1-26 (Apr. 6, 1990) (proposing federal intrasystem consolidation and transfer, including trial); id. §§ 5.01-.05, at 33-129 (discussing a proposed complex litigation statute for federal-state intersystem consolidation); National Conference of Comm'rs of Uniform State Laws, Transfer of Litigation Act (July 1991).

[FN345] See, e.g., United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1428 (10th Cir.1990) (allowing discovery sharing but imposing on the third party "the restrictions on use and disclosure contained in the original protective order"), cert. denied, 111 S.Ct. 799 (1991).

[FN346] Requests for modification of protective orders are relatively common and are subject to varying treatment by courts. See, e.g., Westchester Radiological Ass'n P.C. v. Blue Cross/Blue Shield of Greater New York, Inc., No. 85-CV-2733(KMW), 1991 U.S. Dist. LEXIS 9216 (S.D.N.Y. July 3, 1991); see also HARE, GILBERT & REMINE, supra note 11, § 6.11, at 144 (discussing cases on order modification); 8 WRIGHT & MILLER, supra note 14, § 2042, at 299 n.13 (1970 & Supp.1991) (same); Robin C. Larner, Annotation, Modification of Protective Order Entered Pursuant to Rule 26(c), Federal Rules of Civil Procedure, 85 A.L.R. FED. 538 (1987 & Supp.1990) -(same).

[FN347] See Béchamps, supra note 255, at 130 (1990); see also Grundberg v. Upjohn Co., No. C-89-2746, 1991 U.S. Dist. LEXIS 14991 (D.Utah Oct. 4, 1991) (considering all relevant factors to determine whether changed circumstances warranted the modification of a protective order); All-Tone Communications, Inc. v. American Info. Technologies, No. 87-C-2186, 1991 U.S. Dist. LEXIS 10096, at *6 (N.D.Ill. July 18, 1991) (adopting the view that a court should consider the circumstances leading up to production prior to releasing judicial records).

[FN348] See, e.g., H.L. Hayden Co. v. Siemens Medical Sys., 130 F.R.D. 281, 282 (S.D.N.Y.1989); Tavoulareas v. Washington Post Co., 111 F.R.D. 653, 658-59 (D.D.C.1986); In re Consumers Power Co.Sec.Litig., 109 F.R.D. 45, 55 (E.D. Mich. 1985).

[FN349] See, e.g., Martindell v. ITT Corp., 594 F.2d 291, 295-96 (2d Cir.1979); see also Westchester, 1991 U.S. Dist. LEXIS 9216, at *17 (modifying a confidentiality order to permit the disclosure of documents and testimony given before an order was in place). One court has suggested that "some element of a breach of faith" is involved. In re Coordinated Pretrial Proceedings in Western Liquid Asphalt Cases, 18 Fed.R.Serv. 2d (Callaghan) 1251, 1252 (N.D.Cal.1974).

[FN350] The unfair consequences are not limited to the parties. Indeed, a nonparty who testifies under the aegis of a protective order only to have his guarantee of confidentiality eliminated by a modification of the order quite properly can feel aggrieved.

[FN351] For example, in United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749 (1989), the Court refused to require that the press be given access to ten-year-old criminal records; it found

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

105 HVLR 427                                                          Page 67
(Cite as: 105 Harv. L. Rev. 427)

that any public interest in the criminal activity had been vitiated by the passage of time and that the subject of the record now had a protectable privacy interest that did not exist at the time the criminal act originally took place. See id. at 762-71.

[FN352] See Palmieri v. New York, 779 F.2d 861, 862 (2d Cir.1985) ( "[A]bsent an express finding by the district court of improvidence in the magistrate's initial grant of the protective orders or of extraordinary circumstances or compelling need by the State for the information protected thereunder, it was error for the district court to modify the magistrate's orders."); New York v. United States Metals Ref. Co., 771 F.2d 796, 805 (3d Cir.1985) (concluding that the district court did not abuse its discretion by including a report under a protective order on the basis of irreparable harm to defendant and the absence of public welfare concerns).

[FN353] See generally Richard L. Marcus, Myth and Reality in Protective Order Litigation, 69 CORNELL L.REV. 1, 18 (1983) (questioning whether litigants can still rely on protective orders).

[FN354] See, e.g., John F. Rooney, Issue of Sealed Files, Secrecy in the Courts Won't Be Swept Under the Rug, CHI.DAILY L.BULL., Apr. 20, 1991, at 1 (chronicling the increase in judicial sensitivity toward sealing orders).

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works