IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL      :

             : 

         v.                      :

             :        NO. 02-CV-2746

INDEPENDENCE BLUE CROSS,        :

QCC INSURANCE COMPANY          :

KEYSTONE HEALTHPLAN EAST, and    :

KEYSTONE MERCY HEALTH PLAN    :

EXHIBITS TO NON-PARTY AETNA INC.'S MEMORANDUM
IN SUPPORT OF ITS OBJECTIONS TO
MAGISTRATE JUDGE SMITH'S DECEMBER 22, 2003 ORDER

EXHIBIT "1"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CHESTER COUNTY HOSPITAL,          :        NO. 2:02-cv-02746-JRP
              Plaintiff,          :
                                  :
         VS.                      :
                                  :
INDEPENDENCE BLUE CROSS, et al., :
              Defendants.         :


                        O R D E R

          AND NOW, this *22ⁿᵈ* day of *December*, 2003, upon

consideration of the Motion of Independence Blue Cross, et al.

("IBC") to Compel Aetna, Inc. ("Aetna") to produce documents, the

Response by Aetna thereto and the Reply of IBC, and upon conducting

oral argument on the issue, it is hereby ORDERED that the motion is

GRANTED IN PART and DENIED IN PART, as follows:

          1.    Within twenty (20) days of the date of this Order,
                Aetna shall produce to IBC the following documents:

                a.    Contracts with hospitals in the five-county
                      Southeastern Pennsylvania region reflecting
                      Aetna's reimbursement rates to those hospitals;

                b.    Summary level documents sufficient to
                      demonstrate Aetna's hospital reimbursement
                      rates in the Central Pennsylvania region
                      (Adams, Berks, Centre, Columbia, Cumberland,
                      Dauphin, Franklin, Fulton, Juniata, Lancaster,
                      Lebanon, Lehigh, Mifflin, Contour, Northampton,
                      Northumberland, Perry, Schuylkill, Snyder,
                      Union and York counties) broken down by
                      hospital type (community, teaching, or
                      regional) and hospital size (by licensed bed
                      counts), without prejudice to IBC's right to
                      later seek the complete hospital contracts in
                      this region, for good cause shown;

      c.   Documents reflecting Aetna's strategic planning for the healthcare insurance markets in the Southeastern Pennsylvania counties;

2.   Aetna shall not have to produce any strategic planning documents for the Central Pennsylvania counties;

3.   All documents produced pursuant to this Order shall be deemed "Highly Confidential" pursuant to the Protective Order as entered and modified by the Court.

It is so ORDERED.

BY THE COURT:


CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE


12/22/03 Copy via fax to:
See attached list

EXHIBIT "2"

**Testimony Before the House Insurance Committee in Support of Community Rating (House Bill 1891)**

*By Chris Butler, IBC Chief Marketing Officer*

Philadelphia, PA - September 24, 2003 - Good morning, Chairman Micozzie and distinguished members of the House Insurance Committee. I would also like to recognize Representative Vance and all the co-sponsors of House Bill 1891 for their leadership on this important topic. My Name is Christopher Butler. I am the Chief Marketing Officer for Independence Blue Cross (IBC). With me today is Chris Cashman, Senior Vice President, Corporate and Public Affairs, and Mary Ellen McMillen, Vice President for Legislative Policy at IBC. Thank you for the opportunity to speak on behalf of this important legislation.

And I am here to brief you on why Independence Blue Cross, even as it continues its support for this bill, has reluctantly decided it must change the way it does business in the small employer group segment.

I am here today to speak in support of House Bill 1891, which IBC believes is a truly important example of good public policy - legislation that would help keep health insurance affordable for the thousands of Pennsylvanians who need it the most.

First, some background. IBC provides health insurance coverage for over 2.8 million members in Southeastern Pennsylvania. We offer:

- Traditional Blue Cross fee for service indemnity coverage
- An HMO known as Keystone Health Plan East
- A PPO known as Personal Choice
- Medicare Supplemental Coverage known as Security 65
- Keystone 65 Medicare HMO coverage
- Personal Choice 65 Medicare PPO coverage
- Children's subsidized health insurance through CHIP and our Caring Foundation
- Adult subsidized health care coverage through our Adult Basic and Special Care programs, and
- In partnership with Mercy Health Plan, Medicaid coverage through Keystone Mercy as part of the Health Choices program.

In addition, we offer guaranteed issue coverage to individuals, and along with other PA Blue Plans, we are the only carriers to offer HIPAA Continuous Coverage products. IBC also is the only insurer in the region - and one of the very few nationally - who participate in all areas of health insurance.

We serve all constituents, remain the insurer of last resort, and subsidize many programs targeted at the disadvantaged. For example, we recently worked closely with the Pennsylvania Insurance Department to offer coverage to individuals who qualify under the Trade Adjustment Act, including the retirees of Bethlehem Steel. In an era when many Blue Cross/Blue Shield plans across the country have ended their Social Mission roles due to financial pressure, IBC remains committed to ours. Currently, we estimate that IBC subsidizes health care coverage to some 210,000 Pennsylvanians who otherwise would be counted among the state's uninsured.

One of the key reasons we have been able to operate successfully and sustain our Social Mission has been our use of Community Rating for our small business market segment.

Community Rating is a methodology that evaluates the experience of an entire pool of individuals collectively, and uses that combined experience to set rates that are the same for each member of that community. Here's how it works: Each quarter, we analyze the claims paid out on behalf of <u>all members within our small group segment,</u>

as well as the amount of premium collected on behalf of these members. Based on those overall calculations, we establish rates for our various products, which are then made available to all small employer groups - those groups that have between 2 and 99 members. In other words, each small employer pays the same amount for a like set of benefits, regardless of the actual demographic or medical profile of the group's individual employees.

It is our strong belief that this type of rating methodology provides the greatest amount of rate stability, makes health insurance affordable to the greatest number of people and is most in line with the basic principles of health insurance.

Why? Because insurance seeks to spread risk evenly across a broad population of individuals. In so doing, the premiums paid for young healthy employees help pay claims for those who are less healthy, with the understanding that at any given time, everyone will require the need for health care services. This is precisely what Community Rating accomplishes. IBC treats the entire population of its small groups - over 50,000 employers and some 275,000 employees - as one large group. In this way, small employers benefit from an even spread of risk, just like a large national employer such as IBM or Xerox.

In contrast, Demographic Rating and Medical Underwriting fragment the risk pool. They cherry-pick young, healthy risks while pricing out or refusing to offer coverage to less-healthy risk populations. The result is a rating inequity that most disadvantages the people with the greatest need for health care.

The spreading of risk associated with Community Rating is particularly important to many Association Administrators. One important reason why groups join Associations like the local Chamber of Commerce, the Bar Association or the Medical Society is to gain access to affordable health insurance. A significant portion of most Association membership has a higher than average age. If each group is rated on the demographics and medical conditions of its own employees and receives no benefit from the community population, the very existence of some Associations may be threatened.

Let me provide some specific examples of how these practices disadvantage certain individuals.

Exhibit A is a chart illustrating a typical demographic rate slope. The first obvious conclusion is that the older you are, the more you will pay. However, what may not be so obvious is that in early years and in middle age, women will pay more than men of comparable ages. When one looks at the impact of Demographic Rating on family rates (Exhibit B), one can see that it is not just older parents who are disadvantaged, but also young families - those with infants who can be expected to use more medical services.

Under a Demographic rating model, each small business quote is accompanied by a census for that group, which depicts each employee's age, sex and family status. The result of this analysis can produce significantly different rates for employers who are purchasing the same level of benefits. Employers with a workforce that is older, heavily female or with a large family component pay more than employers with younger, single, male employees.

The use of Medical Underwriting in conjunction with Demographic Rating further extends the impact of these rating practices. Exhibit C is a portion of a medical questionnaire currently used by a commercial carrier.

Most often employees who belong to a small group must fill out this questionnaire as it relates to themselves and any dependents. In some instances - particularly in groups of 20 or more employees - the employer may even be asked to fill out a questionnaire that asks if he or she has knowledge of any employees who have specific diseases. All this is taking place in an environment of increased concern over privacy. The analysis that results from these medical questionnaires can push rates well beyond even what

the demographics may dictate. In some instances, groups which are considered bad risks will be offered rates so high that the groups are unlikely to buy it.

These examples illustrate the effects of Demographic Rating and Medical Underwriting on new business quoting. However, these practices can have an even more profound impact on a group's renewal rates. Over time, the demographics and health status of a group can change dramatically. What if a previously healthy individual develops cancer? A young single employee gets married and has a baby? An employer hires a 50-year-old diabetic? Or an employee simply celebrates a 40th birthday? Any of these events can cause a "good group" to deteriorate in the eyes of an underwriter and result in a much higher renewal rate.

Demographic Rating and Medical Underwriting favor young males over young females, single employees over those with families, younger workers over older workers and those in good health over those with health conditions. But the negative impact goes much farther. Because the cost of providing health insurance makes such a difference to a small employer's bottom line, Demographic Rating and Medical Underwriting can lead employers to base their hiring decisions on factors that will favorably affect their health care premiums - factors such as age, sex, state of health and family status.

These points are supported by national trends, which show a decline in the number of small groups purchasing health insurance. According to a recent survey by Mercer Human Resource Consulting, in 2002 just 62% of businesses employing 10 to 49 people offered health insurance, down from 66% the previous year. The national Federation of Independent Businesses estimates that 60% of the roughly 41 million Americans who lack medical insurance are members of families who own or work for small businesses.

In contrast to Demographic Rating and Medical Underwriting, Community Rating levels the playing field and removes all possibility of penalizing an individual for factors beyond their control. By pooling the entire experience of all small employers and by providing that each employer pays the same amount for the same level of benefits - regardless of the profile of their employees - Community Rating makes health insurance available and more affordable for the greatest number of small businesses and their employees.

As I said earlier, that makes for good public policy.

Some will argue, however, that Demographic Rating makes affordable health insurance available to more people. They point to the fact that Demographic Rating offers lower rates to young, healthy people who normally would not purchase health insurance because of its cost. But this argument is just plain wrong. What about the young people who belong to a small group whose overall demographics are poor? Their premium contributions will go up, perhaps high enough that they decide to drop coverage altogether. And what about the other end of the spectrum-older workers and those with health conditions whose rates increase so dramatically that they can no longer afford health insurance? These are the people who need coverage the most.

In the year 2002, when our primary competitor adopted Demographic Rating and Medical Underwriting , their block of business in Pennsylvania dropped by one-third - 33 percent. They did not make coverage available to more individuals; instead, they priced older people and people with health conditions out of their coverage.

Let's be straight about this: Commercial insurance companies do not adopt Demographic Rating to make coverage available to a wider base of people. They do it to attract the customers who use the fewest medical services and cast away those who will use the most. Their motivation is profit. It is earnings per share.

And the impact of their strategy already is apparent. Over the three-year period from 1999 through 2001, during which Demographic Rating and Medical Underwriting became more common rating methods in Pennsylvania, the number of uninsured in this state jumped from 977,000 to 1,119,000. For a state that has pointed proudly to

an uninsured rate below the national average, this is a very disturbing trend.

Finally, let me address the concerns about competition in the health insurance market place. Some organizations have argued that this bill outlawing Demographic Rating and Medical Underwriting is anti-competitive. Some have stated that IBC supports this legislation in order to protect our market share from competitors. Once again, this argument ignores the facts.

The fact is, carriers competed successfully in this state for years when everyone used Community Rating. No company demonstrates this point better than US HealthCare, which built a company so successful that Aetna paid $9 billion to buy it. And US Healthcare used Community Rating in Pennsylvania.

The issue is not about competition, but about the playing field upon which carriers compete.

It's not about fostering healthy competition, but about competing to cover healthy people. Today, health insurers are competing on a playing field on which every insurer - except Independence Blue Cross - has targeted one customer segment - those who use the fewest medical services. Today, we are competing on a playing field in which every other insurer is willing to leave IBC with the job of covering the most vulnerable members of our community - those who need health coverage the most and can least afford it. For decades, we have demonstrated our concern for these residents of our region by spending millions of dollars through our Social Mission to make coverage available to them.

But now we face a tremendous dilemma. Our ability to support that Social Mission depends entirely upon the financial stability of our company - and an essential ingredient in that financial stability is the health of our risk pool.

No insurance carrier can remain financially stable unless its book of business is balanced with good risk - and in this marketplace today, we at IBC are watching every one of our competitors cherry-pick that good risk and destabilize our customer base. We simply must respond to this marketplace, and we must respond at once.

That is why we announced last week that effective January 1, 2004, we will begin to establish rates for our small group customers using a Demographic Rating model.

Let me emphasize that we have made this decision with great reluctance. We have worked hard to support House Bill 1891 and its companion, Senate Bill 671. We have reached out to our customers and educated them on this issue. Many of our brokers and association business partners have expressed support for this legislation, as they understand the impact to many of their clients. Most recently, we sent letters to over 50,000 small group customers, asking them to support this legislation and almost 8,000 of them took the time to respond with their support.

And we are here today to tell you that we continue to strongly support the passage of legislation that would require all health insurance carriers in Pennsylvania to use Community Rating for the small group market. Enact this legislation - level this playing field - and IBC will resume Community Rating with pleasure.

But in the meantime, while we await a legislative solution, we must move on. It is tempting to say that we had no choice but to make this decision. But the truth is, we have a choice. We could continue as the only carrier in our market using Community Rating and watch as the promise we make to our millions of members is destroyed along with our risk pool.

That's the same choice that faced the other Pennsylvania Blue Plans who, over the past few years, abandoned their long-standing use of Community Rating in order to level the playing field with commercial carriers who were interested in covering only the best risk groups.

If we were to take no action, our community-rated pool would be left with an older, less healthy population. The natural spreading of risk that is achieved through Community Rating would be lost. Rates would increase dramatically -- to the point where even more customers are priced out of the market, resulting in a situation known in the insurance industry as an "actuarial death spiral."

We acknowledge that our decision to adopt Demographic Rating will have significant impact on many small employers, just as it did in the central part of the state, which is what prompted Representative Vance to sponsor this legislation.

Exhibit D demonstrates the impact Demographic Rating will have on our "Under-100 PPO" block of business. In this exhibit, a value of 1.0 represents the average community rate increase, which has been 12% - 15% over the past few years. Groups to the right, shown in red, will receive additional increases beyond trend, while groups to the left will experience rates below trend. As you can see, roughly half of our PPO groups will receive increases above trend. Note that over 5,000 groups will receive increases of 35% above trend. This will translate into actual rate increases of over 50%. Those who purchase our HMO products will experience a very similar impact.

In total, roughly half of our small employer groups, 25,000 in all, covering nearly 250,000 employees and their dependents, will receive rate increases beyond normal trends. In an already difficult economy, the ability of a small business to absorb these costs will be difficult. And keep in mind that these employers are getting such significant increases because their employee population either is older or heavily skewed to females and/or families. These are the people who have been shown statistically to utilize more health care services. These are the people who need health insurance the most.

But remember, this will not be the first time that a decision to adopt Demographic Rating had a negative impact. Recall that in 2002, following the introduction of Demographic Rating and Medical Underwriting, Aetna's membership in Pennsylvania decreased by more than 30%. And who were those former Aetna customers? Aetna proudly told Wall Street that they were the company's poor risk customers, and that shedding them had cleaned up Aetna's book of business.

In 2002, of course, former Aetna members in Southeastern Pennsylvania had a guardian angel. IBC, standing by with its policy of Community Rating, absorbed the poor risk customers. But we cannot continue to do this. As IBC moves to Demographic Rating there will be no Community Rated pool to absorb these groups. There will be nowhere to turn except to government-funded programs.

So take one last look at the health insurance marketplace in which all carriers will compete this fall:

- The playing field will be level again.
- Armed with Demographic Rating, carriers will compete aggressively for groups with favorable demographics and unfortunately, compete just as aggressively to avoid poorer risk groups.
- More and more employers will decide they no longer can afford health insurance for their employees' families, and some will decide to drop coverage for their employees altogether.
- The number of Pennsylvanians without private health insurance will grow even higher, putting still more pressure on a revenue-strapped state government to provide more money for publicly-funded coverage.

This is bad public policy. But it does not have to be this way. In House Bill 1891 and the companion Senate Bill 671, the Legislature has the chance to return to sound fundamentals and address this issue before it becomes another crisis.

Remember, one big fundamental is this: Insurance is built on the principle that risk should be spread evenly and managed to stay that way. Community Rating achieves

this concept. Demographic Rating and Medical Underwriting are designed to avoid risk altogether. But make no mistake: the word "risk," in this case, is just a conveniently antiseptic word for "people." Demographic Rating and Medical Underwriting succeed when real, live, vulnerable people are erased from a company's books like mistakes never to be repeated. At a time when our health care system already faces a cost crisis that is making health insurance more and more expensive, we need to take steps that give more people - not fewer people - access to coverage. In fact, we believe that every health insurance company in Pennsylvania should adopt a business philosophy that seeks to provide quality health insurance to the greatest number of individuals.

That would be good public policy. That would be government and business working together to provide Pennsylvanians with protection they might not be able to afford - but should never be without. This is a chance for us to stand up for thousands of employers and many thousands of employees whose "mistake" was turning 40 or having a family or developing Diabetes. Have we become a state that labels such people as "Bad Risks" to be avoided? Or are we determined to hold on to the ideal that all citizens of Pennsylvania - no matter what their age, sex or family status - should have access to affordable health care?

House Bill 1891 and Senate Bill 671 invite us to make that choice. On behalf of Independence Blue Cross, I urge you to choose on behalf of all Pennsylvanians - no matter what kind of risk they are. Because one thing we know for sure, all of us here in Harrisburg and across this Commonwealth will need medical services at some point in our lives. The question is, will we be able to afford it?

Please vote for Community Rating. It's good public policy.

Thank you, and I will be happy to answer any questions you may have.



Exhibit A

Single Demographic Rate Slope



Exhibit B

Family Demographic Rate Slope

Legend: Male, Female

# Exhibit C

### F. Dependent Information

| | |
|---|---|
| Does any dependent listed in Section C live at another address? If Yes, who and what address?  ☐ Yes ☐ No | Explain the circumstances. |
| | If any dependent's last name differs from yours, explain the circumstances. |

### G. Other Insurance

| | |
|---|---|
| If you have checked "Yes" to Other Health Coverage (Section C), provide name and policy number of insurance carrier, HMO, or other source; a copy of the insurance card, and the start date of coverage. | **PROOF OF PRIOR COVERAGE - IMPORTANT**  *(Required)* *Proof of coverage must accompany this enrollment form for pre-existing condition credit.* **Acceptable forms of proof are:** |
| If you have checked "Yes" to Other Dental Coverage (Section C), provide name and policy number of insurance carrier, HMO, or other source; a copy of the insurance card, and the start date of coverage. | 1. Certificate of Creditable Coverage from prior carrier, or 2. Copy of ID card or most recent payroll stub showing medical coverage deduction, or 3. Copy of most recent medical premium bill from prior carrier. |
| Is your Spouse Employed?  If "Yes," provide name and address of spouse's employer. ☐ Yes ☐ No | Failure to provide Proof of Prior Coverage may subject you or a family member to the full pre-existing conditions limitation with no credit for prior coverage. You may request a Certificate of Creditable Coverage from your prior carrier. |

### H. Health Questionnaire for Groups Enrolling 2 - 9 Employees

**Health History for Individuals and Their Dependents.** *The following information is confidential and will not be seen by or given to your employer.*
- ALL of the questions must be answered by you and your dependents or the enrollment form will be returned.
- Incomplete enrollment forms may delay the effective date of your coverage.

In the past five (5) years, has any person listed on the enrollment form seen a health care provider(s), had treatment recommended, received treatment, including prescription medications or been hospitalized for any of the following conditions listed below?

| | | Yes | No |
|---|---|---|---|
| 1. | Heart attack, heart murmur, stroke, chest pain, high blood pressure, anemia, varicose veins or other disorders of the heart, blood, blood vessels or high cholesterol? | ☐ | ☐ |
| 2. | Ulcer, colitis, gallstones or any other disorder of the stomach, intestines, rectum, pancreas, liver or Hepatitis B/C? | ☐ | ☐ |
| 3. | Cancer, cyst or tumor? | ☐ | ☐ |
| 4. | Disorders of the kidneys, adrenal glands, thyroid glands, urinary systems, male or female organs, infertility, menstrual dysfunction or sexually transmitted disease (except AIDS/ARC)? | ☐ | ☐ |
| 5. | Asthma, emphysema, tuberculosis or any other disorders of the lungs or respiratory system? | ☐ | ☐ |
| 6. | Migraines, fainting spells, epilepsy, mental or nervous conditions, depression, paralysis or any disorder of the brain or nervous system? If epileptic, date of last seizure:  __/__/__  (month/day/year) | ☐ | ☐ |
| 7. | Lupus, arthritis, back trouble or any other disorder of the joints, muscles or bones, including prosthetic device or implants? | ☐ | ☐ |
| 8. | Any physical deformity, defect or congenital problem? | ☐ | ☐ |
| 9. | Has any person to be covered had or has been told they have an immune disorder, AIDS, or AIDS-Related Complex? | ☐ | ☐ |
| 10. | Has any person been treated for alcoholism, other drug or substance abuse, including use of any illegal or controlled drugs, or been advised to seek treatment for the same? | ☐ | ☐ |
| 11. | Has any person been diagnosed with diabetes? If yes, list date of diagnosis:  __/__/__  (month/day/year) Insulin dependent? ____ Non-insulin dependant? ____ | ☐ | ☐ |
| 12. a. | Is any female to be covered currently pregnant? If yes, list due date:  __/__/__  (month/day/year ) | ☐ | ☐ |
| b. | Have there been any complications thus far? | ☐ | ☐ |
| c. | Are multiple births expected? | ☐ | ☐ |
| d. | If you are a male listed on this enrollment form, are you expecting a child with anyone, even if the mother is not listed on this enrollment form? | ☐ | ☐ |
| 13. | Has any applicant taken any prescribed medications in the past 12 months? If yes, list below. | ☐ | ☐ |
| 14. | Has any applicant had an abnormal physical exam or been advised to undergo further testing, surgery or treatment? | ☐ | ☐ |
| 15. | Has any applicant been a patient in a hospital, clinic, surgical center, sanatorium or medical facility as an outpatient or inpatient (excluding childbirth)? | ☐ | ☐ |
| 16. | Does anyone named on this enrollment form use tobacco products, including cigarette, pipe, cigar, or chewing tobacco? | ☐ | ☐ |
| 17. | Has any applicant had any medical condition or symptom not listed on this enrollment form? | ☐ | ☐ |

IF YOU ANSWERED "YES" TO ANY OF THE QUESTIONS ABOVE (EXCEPT QUESTION 9), YOU MUST COMPLETE SECTION J ON THE FOLLOWING PAGE.

*If you are providing additional sheets, check here  ☐  and insert the sheets before sealing this Enrollment form.*

2

