# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **THE CHESTER COUNTY HOSPITAL** : | |
| : | |
| **v.** : | |
| : | **NO. 02-CV-2746** |
| **INDEPENDENCE BLUE CROSS,** : | |
| **QCC INSURANCE COMPANY** : | |
| **KEYSTONE HEALTHPLAN EAST, and** : | |
| **KEYSTONE MERCY HEALTH PLAN** : | |

## <u>ORDER</u>

NOW, THIS _____ day of January, 2004, in consideration of Non-Party Aetna Inc.'s ("Aetna") Objections to the Magistrate Judge's December 22, 2003 Order, IT IS HEREBY ORDERED THAT:

1.    Aetna's Objections to the Magistrate Judge's December 22, 2003 Order are sustained and said Order is hereby set aside and vacated.

2.    Defendants' Motion to Compel is denied.

3.    Defendants shall pay Aetna reasonable attorneys' fees and costs within seven (7) days of Aetna submitting a certification of same.

_____
John R. Padova
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **THE CHESTER COUNTY HOSPITAL** | : | |
| **v.** | : | |
| | : | **NO. 02-CV-2746** |
| **INDEPENDENCE BLUE CROSS,** | : | |
| **QCC INSURANCE COMPANY** | : | |
| **KEYSTONE HEALTHPLAN EAST, and** | : | |
| **KEYSTONE MERCY HEALTH PLAN** | : | |

**NON-PARTY AETNA INC.'S OBJECTIONS TO THE**
**MAGISTRATE JUDGE'S DECEMBER 22, 2003 ORDER**

Pursuant to 28 U.S.C. § 636, Fed. R. Civ. P. 72 and E.D. Pa. Local Rule 72.1(IV), and for the reasons stated below and in the accompanying Memorandum, Aetna Inc. ("Aetna") hereby objects to the Magistrate Judge's December 22, 2003 Order.[1] The Order granted Independence Blue Cross' ("IBC") motion to force Aetna, a non-party to this litigation whom IBC concedes is its "principal competitor," to turn over, *inter alia*, all of its proprietary trade secret marketing strategies and pricing information that Aetna uses in ongoing intense market competition with IBC. Indeed, IBC's own counsel has agreed on the record that this kind of information is just like "the Coca Cola formula," and IBC "absolutely agree[s] that the information [Aetna is] seeking to protect, it is proprietary, it is trade secret." (*See* page 15 of accompanying Memorandum, and Exhibit "1" of Aetna's 12/16/03 Memorandum in Opposition to Motion to Compel, at 9-10).

---

[1] As a threshold matter, and as explained further in Nos. 9 and 11 below, this Court lacks jurisdiction over the subpoena, which was issued out of the *District of Connecticut*. *See United States v. Star Scientific, Inc.*, 205 F. Supp. 2d 482, 484 (D. Md. 2002); *Kupritz v. Savannah College of Art and Design*, 155 F.R.D. 84, 88 (E.D. Pa. 1994).

Aetna's objections to this extraordinary Order are further set forth below and in the accompanying Memorandum:

1.     IBC failed to produce any evidence or any sufficiently compelling grounds to satisfy its burden, under Rule 45 and controlling caselaw, to show that IBC has a "substantial need" to use *Aetna's* particularized trade secrets, such that without Aetna's trade secrets, IBC cannot possibly prove or disprove specific claims or defenses in this case.  To this day, IBC has not produced a shred of competent evidence -- not even an affidavit from one of the army of 13 IBC experts it claims will be using and working with Aetna's trade secrets -- purporting to articulate how and why Aetna's particularized trade secrets must be taken and used for IBC's purely private, self-serving alleged interest in defending this case.  The Magistrate Judge gave IBC full opportunity to meet this well-know burden, yet IBC chose not to produce competent evidence to do so, or none of the 13 experts are able to vouch for or explain any true "substantial need" for whatever it is they supposedly want or "need" to do with Aetna's trade secrets.

2.     The Order itself makes no findings of "substantial need," nor does it find any of the other elements required under Rule 45 and controlling cases to justify the extraordinary step of forcing Aetna to turn over trade secret marketing strategies, pricing information, and related proprietary confidential information.[2]

3.     Although IBC proffered no evidence and failed to meet its burden of proving and articulating "substantial need," even if it had met its burden, the potential

---

[2] Nor does the existence of a "confidentiality" or "protective" order relieve IBC of its burden under Rule 45 as demonstrated by the controlling caselaw cited in the accompanying Memorandum.  This is especially so, under the caselaw, where, as here, the party seeking to force disclosure of trade secrets of its "principal competitor."  Indeed, IBC itself has argued in a brief it filed in this very same case, but before the Western District, that a "protective order" in this case was not sufficient to protect information that IBC and Highmark argued was "confidential" before the Western District.  *See* Exhibit "3" (p. 8, footnote 5 of IBC's Memorandum filed in the Western District, in opposition to CCH's motion to compel certain discovery).

harm caused by the production of Aetna's trade secrets to Aetna's direct competitor – including the harm to the competition in the marketplace and to the public -- outweighs whatever private litigation interests IBC claims might be served by forcing Aetna to give IBC such information.[3]

4.    IBC's subpoena places an undue burden on non-party Aetna, because IBC can defend itself without going to the extraordinary length of forcing Aetna to divulge trade secrets.  In a case that IBC has previously certified as frivolous, IBC certainly can defend by utilizing information available elsewhere without taking a non-party's trade secrets.

5.    Moreover, non-party Aetna will be further unduly burdened if it is forced to expend significant monetary and personal resources in compiling "summary" rate information and in redacting, where possible, its strategic plans, which are prepared for the broader Mid-Atlantic region.

6.    Aetna's particularized strategic plans and pricing information are not relevant to an analysis of whether IBC's business constitutes a monopoly within the relevant markets, nor are they relevant to any other legal issues in this case.

7.    Aetna's trade secrets and rate information, in the Central Pennsylvania counties, is not relevant and IBC has no "substantial need" for it.  Plaintiff has already decided not to pursue discovery in those counties for its claims.  Also, the Court's December 22, 2003 Memorandum rejected Plaintiffs' Second Amended Complaint based

---

[3] As set forth in the accompanying Memorandum, the Court cannot ignore the context of the competition between IBC and Aetna.  At the same time IBC has been pursuing Aetna's secrets in this judicial forum, IBC has launched a massive "attack" advertising campaign against Aetna (including misleading radio ads in the media forum).  Also at this same time, IBC has been lobbying the legislative forum to enact laws against Aetna's (and other carriers') methods and competitive market and pricing strategies.  *See* accompanying Memorandum, pp. 3-4 and 7-8.  *See also* Exhibit "2" (Legislative Testimony of IBC's Chief Marketing Officer, 9/23/03).

upon IBC's averments that it would be prejudiced by extending discovery or increasing the size and scope of this litigation.

8.    Granting IBC's Motion to Compel works an unjust taking without compensation, in violation of Aetna's Fifth Amendment rights.  *See* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 468 (1991)(Exhibit "12" to Aetna's 12/16/03 Opposition.)

9.    This Court lacks jurisdiction over IBC's July 25, 2003 subpoena, which was issued out of the District of Connecticut.

10.    IBC's failure to negotiate with Aetna in good faith regarding the scope of its subpoena, and what information it genuinely "substantially needs" in order to defend against CCH's antitrust claims, excuses Aetna from complying with IBC's July 25, 2003 subpoena and requires denial of IBC's motion.

11.    IBC's July 25, 2003 subpoena was defective because it required compliance more than 100 miles from the district from which it was issued and did not include a fee, as required by the Rules.

12.    IBC's decision to serve a second subpoena upon Aetna on December 17, 2003 affirmatively supersedes and thereby moots IBC's prior July 25, 2003 *District of Connecticut* subpoena, which underlies this appeal.  *See Stewart v. Mitchell Transport*, 2002  WL 1558210 at *9, 01-CV-2456 (D.Kan. July 8, 2002) ("[b]y serving the second subpoena, Plaintiffs effectively withdrew the first subpoena, thereby rendering moot the issues raised in this first motion to quash").  The second subpoena is not before this Court, as objections thereto were served on IBC on 12/29/03, and IBC has yet to move to overrule said objections.

13.     By issuing a second subpoena, IBC effectively withdrew the first subpoena, thereby rendering moot the issue raised in its Motion to Compel.  *Stewart v. Mitchell Transport,* 2002 WL 1558210 at *9, 01-CV-2456 (D. Kan July 8, 2002). Accordingly, the December 22, 2003 Order is an unconstitutional advisory opinion.

Respectfully submitted,

OF COUNSEL:

_____/s/ Frederick P. Santarelli_____

ELLIOTT REIHNER &
  SIEDZIKOWSKI, P.C.

JOHN M. ELLIOTT
JAMES C. CRUMLISH III
FREDERICK P. SANTARELLI
JOHN P. ELLIOTT
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
P.O. Box 3010
Blue Bell, PA 19422
(215) 977-1000
Counsel for Non-party

DATED:  January 7, 2004

Aetna Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

—————————————————————— :
                                                     :
**THE CHESTER COUNTY HOSPITAL**                      :
                                                     :
**v.**                                               :
                                                     :        **NO. 02-CV-2746**
**INDEPENDENCE BLUE CROSS,**                         :
**QCC INSURANCE COMPANY**                            :
**KEYSTONE HEALTHPLAN EAST, and**                    :
**KEYSTONE MERCY HEALTH PLAN**                       :
—————————————————————— :

**NON-PARTY AETNA INC.'S MEMORANDUM
IN SUPPORT OF ITS OBJECTIONS TO THE
MAGISTRATE JUDGE'S DECEMBER 22, 2003 ORDER**

Pursuant to 28 U.S.C. § 636, Fed. R. Civ. P. 72 and E.D. Pa. Local Rule 72.1(IV), Aetna Inc. ("Aetna") submits this Memorandum in further support of its Objections to the Magistrate Judge's December 22, 2003 Order.[4]

I.    **INTRODUCTION**

Independence Blue Cross ("IBC") failed to provide any competent record evidence to support this extraordinary Order forcing a non-party to turn over its particularized confidential and proprietary business information and its trade secret marketing plans, strategies and pricing rates to a "principal competitor." This failure, in itself, requires setting aside the Order and denying IBC's Motion.

Conspicuously absent from the Order are any findings whatsoever showing that IBC met its burden under Rule 45 and controlling caselaw, of proving a "substantial need" to use *Aetna's particularized* trade secrets for IBC's private alleged interest to prove or disprove claims or defenses in this case. *See ACT, Inc. v. Sylvan Learning*

———————————————
[4] Magistrate Judge Smith's December 22, 2003 Order is attached hereto as Exhibit "1."

*Systems, Inc.*, 1999 WL 305300, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999); *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525 (D. Del. 2002); *R & D Business Systems v. Xerox Corp.*, 152 F.R.D. 195 (D. Col. 1993).

Indeed, the Order is devoid of *any* analysis, let alone the mandatory analysis articulating how or why IBC has proven the requisite "***substantial need***" to use *Aetna's particularized* trade secrets.  Under Rule 45 and the aforementioned controlling caselaw, it is not enough for IBC's litigation lawyers to simply say, through letters or briefs, that they "want" or desire to use Aetna's trade secrets, or that Aetna's trade secrets might help strengthen their defense – a defense that these same litigation lawyers previously certified was so strong that it required Rule 11 sanctions against CCH for even bringing the case.

Especially on this record (or lack of record), where IBC itself concedes the information is the trade secrets of a non-party "principal competitor," the Order cannot possibly withstand scrutiny of this or any appellate court, as a matter of clear legal error and a patent lack of evidentiary support, both of which are grounds for setting it aside. *See Heintz Corp. v. Judson*, 1995 WL 649331 at *2, No. Civ. A. 94-6916 (E.D. Pa.  Nov. 3, 1995)(Padova, J.); *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (3d Cir. 1992).

The Order is otherwise unconstitutionally confiscatory, by taking trade secrets that Aetna has created and developed through substantial investment of money and resources, allegedly for the sole benefit of some private litigant's interests, and without compensation or the due process protections inherent in Rule 45.  *See* Exhibit "12" of Aetna's 12/16/03 Opposition Memorandum (Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 468 (1991)).

This extraordinary Order also risks jeopardizing the intense competitive forces that are presently working in this market between Aetna and IBC. Forcing Aetna, in this sensitive competitive environment, to turn over its trade secret marketing and pricing strategies *to its principal competitor IBC* risks irreparably "scrambling the egg" and "ringing the bell." *See Powell v. Ridge*, 247 F3d 520, 524 (3d Cir. 2001) (absent immediate appeal of order requiring disclosure of trade secret, there is no way to "unscramble the egg scrambled by the disclosure") (*quoting In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir. 1997)); *ACT, Inc.*, 1999 WL 305300 (E.D. Pa. May 14, 1999); *Mannington Mills, Inc.*, 206 F.R.D. 525 (D. Del. 2002); *R & D Business Systems*, 152 F.R.D. 195 (D. Col. 1993); *see also PEPSICO, Inc. v. RedMond*, 1996 WL 3965, at *30, No. 94C6838 (N.D. Ill. Jan. 2, 1996) ("Just as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever and, 'since the confidentiality of this information can never be regained, the [threatened] injuries would be irreparable'" (citation and quotation omitted)).

As the foregoing cases expressly hold, "confidentiality" or "protective" orders are inadequate protection under such circumstances, because "principal competitors" have no incentive to assure protection of each other's competitive trade secrets. *Id*.

**Indeed, IBC proves this by proclaiming it intends to actually use Aetna's information at trial as evidence, a circumstance that no "protective order" can alleviate, especially for a non-party such as Aetna who has no control and no ability to assert protective objections at trial.** *Id*.

The timing of IBC's pursuit of Aetna's trade secret marketing and pricing strategies is more than curious. Although this case has been pending since May, 2002,

IBC waited more than a year, until late July, 2003, near the close of discovery, to suddenly serve the subpoena that it now pretends is so "critical" to IBC's case. IBC's sudden offensive in this litigation against Aetna comes after IBC started losing thousands of customers to Aetna. To place IBC's manipulative misconduct in context, the Court may also judicially notice IBC's radio "attack" ads against Aetna, which also occurred curiously *around the same time IBC has been pursuing this subpoena.* In IBC's recent radio ad campaign, IBC is trying to entice the thousands of customers it recently lost in market competition with Aetna to "come back" to IBC.

The Court may also judicially notice IBC's recent intense legislative lobbying efforts to change the competitive market playing field with Aetna. IBC's recent efforts in that forum are targeted specifically at undermining the Aetna marketing and pricing strategies IBC now wants to force Aetna to divulge. *See Exhibit "2"* (9/24/03 Testimony of IBC Chief Marketing Officer before the Pennsylvania House Insurance Committee). In IBC's legislative testimony, IBC complains about how the ongoing competition with Aetna and other commercial carriers is hurting IBC's customer base, is threatening to throw IBC's risk base into an "actuarial death spiral," and is forcing IBC to change its own pricing and marketing strategies to ones that copy Aetna's. *Id*. (at 4-5). The intensely competitive environment in these specific circumstances compels this Court to vigilantly enforce Rule 45's requirements, protect the rights of Aetna as a non-party, and protect the public interest in a competitive market untained by disclosure of a "principal competitor's" trade secrets.

To this day, IBC has failed to offer a single shred of competent evidence, by affidavit of an expert/consultant or otherwise, to meet its legal burden of proof

establishing that IBC has a ***"substantial need"*** for Aetna's particularized information, without which IBC cannot defend this case.  It is not enough for IBC to show a mere "want," desire or hope that its lawyers would prefer to help strengthen a defense they have already insisted is very strong.

It is telling that the sole reference by IBC to how or why it supposedly "needs" the trade secrets of its "principal competitor," Aetna, is the following conspicuously generalized, vague, unverified and unsubstantiated rhetoric in the penultimate sentence of a letter from an IBC lawyer:

> "Simply stated, IBC's consultants cannot perform any meaningful analysis of competition in the markets identified by CCH or reimbursement rates without the rates and business plans of IBC's principal competitor."

*See* IBC's 12/22/03 Letter to Magistrate Judge Smith, at 6.

This is an extraordinary concession by IBC of an inherent weakness in its case, in stark contradiction to IBC's prior certifications to this Court that CCH's case was absolutely frivolous.  Under these circumstances, where IBC certified it needed nothing to beat this "frivolous" case, the Court must exercise strict scrutiny of any statements by IBC purporting to articulate alleged "need" to get the particularized trade secrets of its "principal competitor," Aetna.  The Court must hold IBC to its burden of articulating, specifically and with proof, why all of the sudden, it cannot defend this case without forcing its "principal competitor" to give its trade secrets to IBC.

Although it may be "simple" for IBC to make such a statement, IBC clearly cannot support it.  Given the fact IBC had the clear legal burden to do so, the Court would expect to see citation to an affidavit *of the alleged "consultants*;" or, some other evidence verifying this statement; or, evidence demonstrating how and why it is

impossible for IBC to perform any meaningful analysis of competition in the market without forcing Aetna (but apparently no other competitors) to turn over Aetna's strategic business plans and rates.  IBC produced nothing of the sort, a telling fact exposing IBC's hollow rhetoric about not being able to defend this case without Aetna's particularized trade secrets.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Aetna hereby incorporates by reference its filings already of record with this Court in the proceedings before the Magistrate Judge, including Aetna's 12/16/03 Memorandum in Opposition to IBC's Motion to Compel.  We merely highlight certain facts in the following paragraphs.

On July 25, 2003, more than a year after this litigation was initiated by CCH, IBC issued a subpoena upon Aetna out of the *District of Connecticut*[5] seeking the production of Aetna's trade secrets throughout Pennsylvania, New Jersey and Delaware, including but not limited to Aetna's hospital reimbursement rates and strategic plans. *See* Exhibit "B" to IBC's December 3, 2003 Memorandum in Support of Its Motion to Compel Aetna ("IBC's Memorandum").[6]

Aetna timely served objections to IBC's subpoena on July 31, 2003.  For more than two months, without conducting any genuine dialogue with Aetna's counsel, IBC

---

[5] As stated in these Objections, and in the Legal Argument below, this Court lacks jurisdiction to enforce IBC's subpoena.  In any event, IBC's motion to compel was and is wholly unsupported on the merits.

[6] CCH had previously issued a similar subpoena, also out of the *District of Connecticut*, in November of 2002.  Aetna objected to CCH's subpoena pursuant to Rule 45 on November 25, 2002, including for jurisdictional reasons.  Despite knowing of Aetna's procedural and substantive objections to CCH's subpoena, IBC knowingly issued a subpoena with the same defects *out of the District of Connecticut*.  This is merely another indication of IBC's lack of regard for the basic rules of procedure in dealing with nonparties, including IBC's disregard of its duty not to burden non-parties through the Court's subpoena power.

ignored its obligations to meet or confer in an effort to resolve Aetna's July 31, 2003 objections in good faith.  To date, IBC has still not provided any specific information or expert affidavit delineating how IBC supposedly cannot perform an appropriate market analysis without having *Aetna's particularized* marketing strategic plans, pricing rates and other trade secrets used by Aetna in competing with IBC.

It has since been discovered that, at the same time IBC was trying to obtain Aetna's marketing strategies and pricing, IBC's Chief Marketing Officer, Christopher Butler, was also testifying before the Pennsylvania House Insurance Committee about IBC's intense efforts to undercut Aetna's marketing and pricing strategies, and Aetna's competitive methods used in competing against IBC.  *See* Exhibit "2" (September 24, 2003 Testimony of Christopher Butler).

While IBC pretends, for purposes of its motion, that it "substantially needs" Aetna's strategic plans in order to defend this litigation, Mr. Butler's sworn testimony reveals that forcing Aetna to divulge these trade secrets would certainly play into IBC's ongoing efforts to undermine Aetna's competitive position in the market.  In any event, IBC's testimony also reveals it already has access to information about Aetna and competition in the market.  Regarding Aetna, he testified:

> In the year 2002, when our primary competitor adopted Demographic Rating and Medical Underwriting, [Aetna's] block of business in Pennsylvania dropped by one-third – 33 percent.  They did not make coverage available to more individuals; instead, they priced older people and people with health conditions out of their coverage.

*See* Exhibit "2" (9/24/03 Legislative Testimony of IBC's Butler, p. 3).

Mr. Butler's sworn testimony also confirms the lack of any credibility at all in IBC's assertions that it "absolutely" needs Aetna's particularized strategic plans and

pricing to demonstrate that other insurers are able to compete with IBC, or to prove the obvious point that Aetna is not barred from entry into the market. As IBC's Mr. Butler testified in the Pennsylvania General Assembly, everyone knows there is competition in this market and moreso in recent years:

> The fact is, carriers competed successfully in this state for years when everyone used Community Rating. No company demonstrates this point better than USHealthCare, which built a company so successful that Aetna paid $9 billion to buy it. And USHealthCare used Community Rating in Pennsylvania.

*See* Exhibit "2" at 4; *See also* IBC's 12/22/03 letter to Magistrate Judge Smith; IBC's Motion to Compel at 3.[7]

IBC's Butler also expressly explained -- presumably with factual basis other than Aetna's trade secrets -- the intensity of competition in the market: "[t]oday, health insurers are competing on a playing field on which every insurer – except Independence Blue Cross – has targeted one customer segment – those who use the fewest medical services;" and, therefore, IBC faces "a tremendous dilemma." *See* Exhibit "2" at 4. IBC's Butler further explained IBC's present ongoing desire to learn about and monitor its competitors' actions, so IBC can respond by competing in the marketplace:

> No insurance carrier can remain financially stable unless its book of business is balanced with good risk – and in this marketplace today, *we at IBC are watching every one of our competitors cherry-pick that good risk and destabilize our customer base.* ***We simply must respond to this marketplace, and we must respond at once***.

*Id.* at 4 (emphasis added).

---

[7] Indeed, the Court may judicially notice that the *Philadelphia Business Journal* researched publicly available information, and actually published a compilation showing a list of the many competitors engaged in healthy competition in this market. *See* Exhibit "9" to Aetna's 12/16/03 Opposition Memorandum. In view of this, and IBC's failure to offer even an affidavit of its experts/consultants, it is absolutely incredible for IBC to assert it cannot show this market to be competitive unless it has Aetna's particularized marketing and pricing trade secrets.

During this same period in which IBC has been lobbying a legislative attack on Aetna's competitive marketing and pricing strategies, and while IBC was seeking to force Aetna to divulge the same in this public judicial forum, IBC was losing thousands of customers to Aetna in the marketplace forum. IBC responded by launching a misleading radio advertising campaign attacking Aetna in the mass media forum, trying to lure back those customers it lost to Aetna. The Court can judicially notice these ads by simply listening to the radio, and hearing IBC's confirmation of intense competition between Aetna and IBC. IBC's ads target customers who had "switched health plans and aren't satisfied," and asks those same employers to consider IBC "when you're ready to come back." [8]

On November 5, 2003, in response to Aetna's counsel's efforts to explore a possible compromise or alternative to forcing Aetna to divulge the information, IBC's counsel refused all reasonable offers. *See* Aetna's 12/16/03 Opposition Memorandum at 7-8. In response, IBC's counsel stated, in conclusory fashion with no further explanation, only that ". . . **our experts** do not see how we can present our defense in the way you suggest." *Id.*; Exhibit "4" to Aetna's 12/16/03 Opposition Memorandum. Without further communication, or any counter proposal from IBC's counsel, IBC then filed its Motion to Compel on December 3, 2003.

IBC's Motion to Compel was wholly unsupported, and still failed to produce any evidence to meet its undeniable burden of proving "substantial need." Nor did IBC even

---

[8] Unlike IBC, Aetna has welcomed and embraced healthy competition in this market, while IBC seems desirous to go to extremes – even to utilize misleading advertisements and lobby the legislature to pass laws against Aetna's marketing and pricing strategies – to undermine competition. IBC's subpoena threatens to harm this ongoing marketplace competition. IBC has curiously insisted to Aetna that IBC intends to use Aetna's highly confidential strategic plans, *not merely for discovery, but rather for unrestricted disclosure at trial, which IBC knows will irreparably destroy the value of Aetna's trade secrets.*

cite the appropriate standard and burden for Rule 45 subpoenas to obtain a non-party's trade secrets. Significantly, months earlier in this case when IBC submitted a brief arguing against CCH's subpoena on a non-party aligned with IBC (Highmark), IBC's brief to that Court expressly cited to the appropriate standard and case. *Compare* IBC's 12/3/03 Memorandum at 8, with IBC's Memorandum in another discovery Motion relating to this litigation (Exhibit "3" hereto, at 3-5).

Magistrate Judge Smith heard argument relating to IBC's Motion to Compel on December 16, 2003. IBC again presented no evidence or affidavits to meet its burden of proof under Rule 45 and the caselaw. At the December 16, 2003 argument, Magistrate Judge Smith gave IBC another opportunity to submit additional support by December 22, 2003. On the next day, December 17, 2003, after it was clear IBC's subpoena was judicially and procedurally invalid, IBC served a second, new subpoena out of this District, thereby conceding the fatal defects (including the jurisdictional defect) in its July 25, 2003 subpoena. That December 17, 2003 subpoena is presently subject to objections served on December 30, 2003. IBC has yet to contact Aetna's counsel to meet and confer regarding that new, second subpoena. Thus, as a result of IBC's delays in serving that subpoena, it is not ripe under Rule 45 for any motion practice at this time.

On December 22, 2003, after being provided more time to meet its burden of proof under Rule 45, instead of submitting competent evidence, IBC's counsel sent a letter to the Magistrate Judge, which utterly failed to provide the requisite support for IBC's Motion. IBC still produced no competent evidence proving "substantial need" for Aetna's particularized trade secrets. *See* IBC's 12/22/03 Letter to Magistrate Judge Smith.

With this 12/22/03 letter, IBC attached an "affidavit" of one of its litigation attorneys, H. David Seidman, Esquire. Unfortunately, Aetna had no opportunity to rebut that 12/22/03 "affidavit," which contained several incorrect statements, because the Order was entered that very same day, before Aetna's counsel even saw the affidavit or related exhibits. In any event, Mr. Seidman incorrectly stated therein that Aetna previously had represented to the Court that Aetna's reimbursement rates are publicly available; and, that Aetna supposedly represented that its reimbursement rate information is contained in the exhibits that Aetna attached to its Opposition to IBC's Motion to Compel.[9]

Significantly, Mr. Seidman does not disclose that IBC subscribes to at least one of the publicly available reimbursement information that was actually being referenced by Aetna's counsel. He does not disclose whether IBC made any effort to determine if any of these information sources would be sufficient to enable IBC to defend the case. Mr. Seidman says nothing at all about how or why *Aetna's particularized* rate and strategic information -- as opposed to generalized commercially available market-wide information -- are matters without which IBC cannot prove its case. Nor does the Seidman "affidavit" detail what information IBC has already received in connection with

---

[9] A review of the subsequently transcribed notes of the December 16, 2003 Argument (at which Mr. Seidman apparently claims such representations were made), as well as Aetna's Memorandum in Opposition to IBC's Motion to Compel, establishes that Aetna never stated *Aetna's particularized* rates were available through these sources. Nonetheless, the commercially available resources that were being referenced by Aetna do contain market analyses, including average reimbursement rates by service by hospital with total number of patients and average number of bed days. IBC utterly failed to show it even considered using this information or other similarly available information for its defense before forcing Aetna to turn over its proprietary trade secrets. Although being afforded another opportunity by Magistrate Judge Smith, IBC chose not to do so, and thus failed again to demonstrate the requisite "substantial need" required by Rule 45 and controlling caselaw.

other non-party subpoenas, so as to reveal what more may be "substantially needed" from Aetna.[10]

Indeed, throughout this litigation, IBC has not only vacillated with regard to what information it "substantially needs for purposes of proving or disproving claims and defenses," but it has also taken contradictory positions, where convenient, and made self-serving representations to the Court that have distorted or greatly exaggerated its alleged "needs." For example, at the July 7, 2003 hearing relating to Aetna's Motion to Intervene, IBC told the Court, in an attempt to avoid the protections that non-party Aetna was seeking at that time when IBC was seeking to get information from CCH, that:

> [w]e have approximately three dozen depositions that are going to be taking place within the extended discovery for 90 days. **I expect that this material is going to be used at most, if not all of these depositions**. And I think that if we have to give them 10 days notice every time we have to use this information, you are going to see a lot more of us and it is going to be very difficult to proceed with discovery.

*See* Exhibit "1" to Aetna's 12/16/03 Opposition Memorandum, at 8.

To date, Aetna has not received a single notice, as required by the Amended Protective Order ultimately entered in August 2003, that the information IBC received as a result of that hearing was or is being used at any of the "three dozen depositions" that, according to IBC's counsel's statements to the Court, he intended to use the information. Clearly, IBC was either exaggerating then (as it is now) about its alleged need to use such

---

[10] Ironically, the Seidman Affidavit's stated "need" is based upon the truism that *Aetna's trade secrets* are only available from Aetna. Trade secrets are, by definition, not publicly available except through the owner. Under the illogic of the Seidman Affidavit, all trade secrets would be automatically discoverable, and the protections afforded a non-party by Rule 45 would be meaningless, because trade secrets are generally never publicly available. *See SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1256 (3d Cir. 1985) (explaining factors to be considered in determining whether information constitutes trade secrets, including: 1) "extent to which information is known outside of owner's business," and 6) "the ease or difficulty with which the information could be properly acquired or duplicated."). Contrary to the misinformed Seidman Affidavit, the mere "unavailability" of trade secrets does not render them "substantially needed" by a litigant.

information; or, IBC has already violated the Amended Protective Order, which would further confirm the caselaw holding "confidentiality" or "protective" orders do not give adequate protection where the non-party is a competitor and the information is trade secret. *See*, *e.g.*, *Mannington Mills*, 206 F.R.D. at 530 (it would be "divorced from reality to believe that either party here would serve as the champion of its competitor . . . to maintain the confidentiality designation or to limit public disclosure . . . during trial").

## III.    LEGAL ARGUMENT

### A.    Standard Of Review From A Magistrate Judge's Order.

This Court has explained the standard and procedure for reviewing a Magistrate Judge's Order:

> "Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order . . . . The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a). The district court may reconsider any pretrial matter under subparagraph (A) of 28 U.S.C.A. § 636 where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *Haines v. Liggett* Group, Inc., 975 F.2d 81, 91 (3d Cir. 1992). "The matters handled by magistrate judges under subparagraph (A) are generally described as 'non-dispositive.'" *Id.* (citation omitted) . . . . "Under (b)(1)(A), the standard of review is circumscribed: 'the district court is bound by the clearly erroneous rule in findings of facts; the phrase contrary to law indicates plenary review as to matters of law.'" *Id.* (citations omitted).

*Heintz Corp. v. Judson*, 1995 WL 649331 at *2, No. Civ. A. 94-6916 (E.D. Pa. Nov. 3, 1995)(Padova, J.)(footnotes omitted).

After having already been afforded substantial opportunity to meet its burden before the Magistrate Judge, IBC cannot now attempt to backfill the record it failed to produce below in order to meet its burden of proof: "[i]n reviewing a magistrate judge's factual determinations, a district court may not consider any evidence which was not

presented to the magistrate judge." *Cooper Hospital/University Medical Center v. Sullivan*, 183 F.R.D. 119. 127 (D.N.J. 1998)(*citing Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir. 1992)).[11]

Knowing full well it had this burden, IBC must be deemed to have chosen not to meet it, or otherwise, deemed unable to meet it. In either event, this Court should deny IBC's motion without further protractions. Aetna should not be required to incur more cost and expense to protect its trade secrets. Rule 45 and the controlling caselaw already gives Aetna this protection. This Court must enforce the law, stop IBC's harassment of its "principal competitor," and prevent IBC from further attempting to fish through Aetna's proprietary and confidential information.

**B.    Burden Of Proof Under Rule 45 To Obtain Trade Secrets Of A Non-Party Competitor.**

Where a party such as IBC seeks production from a *non-party*, such as Aetna, the party faces a "burden of proof heavier than the ordinary burden imposed under Rule 26." *Echostar Communications Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 394 (D. Col. 1998). "The fact that discovery is sought from a non-party is one factor which the Court may weigh in determining whether [IBC] is entitled to an order which requires the production of the materials or information." *Id. (quoting Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)). The burden should be more strictly enforced where, as here, the non-party is the "principal competitor" of the party seeking to force disclosure of the trade secrets.

"Courts are required to balance the needs for discovery against the burdens

---

[11] *See also* Dkt. Entry 103 (IBC's Memorandum in Support of Magistrate Smith's July 7 and July 16, 2003 Orders) at 6-7.

imposed when parties are ordered to produce information or materials, and the status of a person or entity as a non-party is a factor which weighs against disclosure." *Id. (citing American Standard Inc. v. Pfizer, Inc.*, 828 F.2d 734, 738 (Fed. Cir. 1987)(*see also Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 531 (D. Del. 2002)("Moreover, courts have traditionally recognized that disclosure to a competitor is more harmful than disclosure to a noncompetitor.")(citations omitted)).

IBC readily concedes Aetna is not only "a" competitor, but is "IBC's principal competitor." *See* IBC's counsel's 12/22/03 letter to Magistrate Judge Smith, p.6. IBC has also readily conceded that, like IBC's own information, Aetna's marketing and pricing strategies and information constitute trade secrets or other highly sensitive and highly confidential commercial information, whose disclosure would harm Aetna and the market. *See* IBC's Memorandum at 8-9 ("The proprietary nature of Aetna's documents is acknowledged"); *see also* Exhibit "1" to Aetna's 12/16/03 Opposition Memorandum (Transcript of 7/7/03 hearing) at 8 ("I absolutely agree that the information they are seeking to protect, it is proprietary, it is trade secret."); *Id.* at 9 (". . . our rates are proprietary. They are absolutely right. This is our formula for Coca Cola."). *Id.* at 9-10.[12]

Once it is conceded or otherwise shown that the information sought "is trade secret information, or otherwise confidential, ***the burden shifts*** to" IBC. *Echostar Communications Corp.*, 180 F.R.D. at 394 (emphasis added). IBC "must establish 'that disclosure of the trade secrets is both relevant and necessary.'" *Id.* (citations omitted). IBC must also prove "that it has a 'substantial need' for the discovery which 'cannot be

---

[12] As noted in Aetna's 12/16/03 Opposition, IBC zealously guards its own trade secrets, while simultaneously seeking to exploit Aetna's. *See* Aetna's 12/16/03 Opposition Memorandum at 9.

otherwise met without undue hardship. . . .' *Id.* (citing Fed. R. Civ. P. 45(c)(3)(B)(iii)). [13]

The Court must also "balance the need for the disclosure against the injury that would result from that disclosure." *Id.* (quotations and citations omitted) (*See also Mannington Mills, Inc.*, 206 F.R.D. at 529 (". . . this court is required to apply the balancing standards -- relevance, need, confidentiality and harm. And even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit.") (*citing Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990)).

### C. The Court's December 22, 2003 Order Is Clearly Erroneous And Contrary To Law.

#### 1. IBC Has Not Demonstrated The "Substantial Need" Required To Compel Production Of Aetna's Confidential And Proprietary Trade Secret Information.

As pointed out in the foregoing section, IBC has already conceded that the information it seeks from Aetna is confidential, trade secret information. Moreover, the undisputed evidence before the Magistrate Judge establishes this fact. Aetna provided evidence, in the form of declarations, detailing the confidential and proprietary, trade secret nature of the information IBC seeks to compel from Aetna, as well as the potential harm associated with the disclosure of such information. *See* Aetna's Opposition Memorandum at 15-16; Exhibits "5" and "6" to Aetna's Opposition Memorandum (declarations of Robert Franzoi). "Courts have presumed that disclosure to a competitor

---

[13] In its Motion to Compel before the Magistrate Judge, IBC misstated the applicable law by arguing that *Aetna* must meet a "heavy burden" in order to prevail on its objections to IBC's subpoena. *See* IBC's Memorandum at 8; Dkt. Entry 102 at 11-12. Clearly, IBC knows the law establishing the burden was on *IBC*. In fact, IBC filed briefing in this same case, but before another district court, in which IBC itself expressly cited the law as stated in the ACT case. *See* Exhibit "3" hereto (IBC's 06/11/03 Memorandum in W.D. Pa., at pp. 3-5).

is more harmful than disclosure to a noncompetitor." *R&D Business Systems v. Xerox Corp.*, 152 F.R.D. 195, 197 (D. Col. 1993) (*citing Coca-Cola Bottling Co. v. Coca-Cola Co.*, 107 F.R.D. 288 (D. Del. 1985)).

To the extent IBC attempted to submit any "evidence," it was merely the belated 12/22/03 "affidavit" from one of its litigation lawyers, which Aetna never even received until after entry of the 12/22/03 Order. In any event, the Seidman affidavit was obviously deficient because it was misdirected to showing the public "unavailability" of Aetna's particularized trade secret information. That misses the point. Everyone agrees Aetna's trade secrets are not publicly available. That is why they are trade secrets. The Seidman Affidavit is useless for meeting IBC's burden here. It says nothing at all to verify why IBC has a "substantial need" for the specific particularized Aetna trade secrets (as contrasted with verifying the mere "unavailability" of Aetna's trade secrets), for the purpose of proving or disproving specific facts without which IBC is unable to defend the case. In *Mannington Mills, Inc.*, 206 F.R.D. at 532, the Court rejected the exact same "circular argument" where the party showed mere "unavailability" of trade secret information, as opposed to "substantial need" for it. The relevant inquiry is not whether Aetna's particular trade secrets are available or unavailable publicly; rather, the question is whether Aetna's particularized trade secrets are "substantially needed," such that IBC cannot defend the case without them. Even then, however, the further question is whether that need outweighs the harm and loss to Aetna and the public's interest in untainted competition in the market.

Thus, IBC's lone attorney affidavit, which does not allege, even in conclusory fashion, that IBC cannot defend itself against CCH's claims absent Aetna's particularized

trade secrets, fails to even address, let alone meet, IBC's heavy burden.  Indeed, other courts have found that where the moving party went so far as to offer an *expert* affidavit stating that the type of "information sought is the type of information upon which experts such as himself rely in analyzing antitrust issues," the movant still had "wholly failed to show 'substantial need.'" *ACT, Inc. v. Sylvan Learning Systems, Inc.*, 1999 WL 305300 at *2  n.5, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999).  S*ee also Mannington Mills, Inc.*, 206 F.R.D. at 528-32 (affidavits of President and CEO not sufficient to demonstrate substantial need).

IBC again completely misses the point when it argues that the Amended Protective Order "resolved Aetna's confidentiality based objections," and, therefore, "Aetna has no credible basis for continuing to refuse to produce the subpoenaed documents." (IBC's Memorandum at 7-9).   IBC continued to advance this nonsensical position in its December 22, 2003 letter to the Magistrate Judge, in which IBC stated, "Aetna's substantive objections were met through judicial relief strengthening the protective order . . ."  IBC's 12/22/03 Letter to Magistrate Judge Smith at 1.[14]

IBC's argument that the "protective order" resolves Aetna's rights has been resoundedly rejected by courts:  "the plain language of Rule 45(c)(3)(B) requires the 'substantial need' showing be made as a threshold matter ***regardless of the terms under which the materials would be produced if production were ordered.***" *ACT, Inc*, 1999 WL 305300 at *2  n.5 (emphasis added); *Mannington Mills, Inc.*, 206 F.R.D. at 530 ("[a]

---

[14] Significantly, when Aetna sought to intervene in regard to CCH's production of documents to IBC, IBC had yet to even subpoena Aetna and Aetna had, obviously, yet to file its Rule 45 objections that are presently at issue.  Despite this temporal deficiency to IBC's position, IBC, ignoring the legal precedent set forth in Aetna's 12/16/03 Opposition Memorandum below, continued to assert that the Amended Protective Order somehow adjudicated a subpoena which was issued after Aetna had briefed its appeal of Magistrate Judge Smith's July Orders, an assertion that this Court already explicitly rejected.  *See* Dkt. Entry 95; IBC's Motion to Compel, Exhibit "E" at 36; Aetna's Opposition Memorandum at 5, n. 1.

protective order which limits to whom information may be disclosed ***does not eliminate the requirement of relevance and need*** . . . . .") (internal quotations and citations omitted) (emphasis added); Aetna's 12/16/03 Opposition at 5, n. 1. *See also R&D Business Systems*, 152 F.R.D. at 198 ("Xerox's argument that the Protective Order requires that the information sought cannot be used to the detriment of movant is unconvincing.  Even if the Protective Order adequately protected movants' interests, and the Court is not convinced that it does, ***Xerox must still meet the burden of showing necessity for the information sought***.")(citations omitted)(emphasis added).   A protective order simply does not enable a party such as IBC to escape its burden to show "substantial need."  Again, IBC fails to even address, let alone meet, the relevant points it had the burden to prove below.

IBC's attempt to skirt its burden by pointing to the "protective order" is exposed as baseless also because IBC has already stated its intention to publish Aetna's trade secrets ***at trial***.   As one district court noted, "[w]hat happens with any information disclosed by [the non-party] in response to [a party's] subpoena, particularly at trial, is anyone's guess." *Mannington Mills, Inc.*, 206 F.R.D. at 530.  As with that case, in the instant case, it would be "**divorced from reality to believe that either party here would serve as the champion of its competitor . . . . to maintain the confidentiality designation or to limit public disclosure . . . . during trial**." *Id.* (internal quotations and citations omitted) (emphasis added).

*ACT, Inc.* controls this dispute.  It is telling that IBC never credibly rebutted its application here.  Nor does IBC even attempt to claim *ACT, Inc.* was wrongly decided.[15]

---

[15] Indeed, in another brief authored by IBC's counsel in connection with an unrelated motion, IBC cited *ACT, Inc.* as providing the controlling standard.  *See* Exhibit "3."

In *ACT, Inc.*, as here, a subpoena was served upon ASI, a non-party to that litigation, which sought to compel ASI to produce, *inter alia*:

> (I) all documents reflecting ASI's history in the delivery of computer-based testing to date, including ASI's efforts to enter the computer-based testing market, perspectives of the players in that market, assessment of potential and existing competitors, evaluations of competitive conditions, discussions of the risks of entering into the market, and analyses of the barriers to entering that market, including any communications reflecting the volume of testing hours and number of centers needed to compete effectively in that market.

*See* 1999 WL 305300, at *1.

In *ACT, Inc.*, as in the instant matter, the party issuing the subpoena conceded that the information was confidential commercial information. The Court, therefore, was forced with the same question as here: "the crux of the issue before the court is whether ACT has established a *substantial need* for the information it requests that cannot otherwise be met without undue hardship." *Id.* at *2. In opposing production of its trade secrets and proprietary information, ASI argued:

> (1)    disclosing this information to its much larger competitors would cause it serious commercial harm and allow its direct competitors to free ride on its own investment in assessing the [] market; and,
>
> (2)    market assessment information such as that sought from it should be easily available to ACT ***from its own internal research, from Sylvan, and from the same third-party researchers with whom ASI has contracted at considerable expense***.

*Id.* (emphasis added).

The Court agreed that ACT wholly failed to show a "substantial need," noting both that ACT did "not deny that similar market research is available from its own resources, from [plaintiff], and from third parties" and that ACT, like IBC in the instant case, offered no "argument for why ASI's perspective on the market in particular is relevant or necessary to ACT's claims." *Id. See also Mannington Mills, Inc.,* 206 F.R.D.

20

at 532 (denying discovery when need is not established because, "[a]lthough the financial, marketing and sales data of [subpoenaed party] is "unique" in the sense that it is information about [subpoenaed party], financial, marketing and sales information is not uniquely available from [subpoenaed party], the party from whom the information is sought"). (underscore added).[16]

As in *ACT, Inc.*, IBC cannot demonstrate "substantial need" here because information about rates and competition in this market is readily available from other, more comprehensive commercial sources that do not force the taking of a private non-party's trade secrets. In its 12/16/03 Opposition Memorandum, Aetna provided the Court with numerous examples of commercially available resources that could provide IBC with substantial information about rates and competition in the relevant markets. *See* Aetna's 12/16/03 Opposition Memorandum at 20-23; Exhibits "7-11" to Aetna's Opposition Memorandum. IBC was tellingly silent as to whether it subscribes to any of these commercial data services, or whether it or its "experts" had even requested "PHC4" census and other publicly available information.

We have since learned, however, that in a November 13, 2003 hearing before Magistrate Judge Smith, at which Aetna was not present, IBC's counsel admitted that

---

[16] In its 12/22/03 letter to the Magistrate Judge, IBC did nothing to distinguish *ACT, Inc.* other than a lame attempt to say the party seeking enforcement in that case was a "plaintiff," and IBC is a "defendant." *See* IBC's 12/22/03 letter to Magistrate Judge Smith at 5-6. Clearly, it is IBC's status as a **party** to the litigation -- not its status as a certain type of party -- that triggers the applicability of Rule 45 and IBC's obligations and burdens thereunder. *See ACT*, 1999 WL 305300 at *1. ("whether *the party* who seeks [trade secret information] has established a 'substantial need' for the material . . .") (*quoting* Fed. R. Civ. P. 45(c)(3)(B) (emphasis added)). *See also R&D Business Systems*, 152 F.R.D. at 195 (Xerox, **defendant** in an antitrust action, failed to demonstrate necessity of information sought) (emphasis added). Moreover, even though Aetna's trade secrets are not publicly available, IBC has failed to articulate, let alone demonstrate, that it has a "substantial need" for Aetna's trade secrets – *i.e.* – that absent Aetna's trade secrets, it will not be able to defend itself against CCH's claims. *See In re: Silicone Gel Breast Implants Products Liability Litigation (MDL 926)*, 1996 WL 1358526, No. CV 92-P-100005 (N.D. Ala., April 11, 1996) (even though plaintiff demonstrated unavailability of confidential research and need for same, harm of disclosure outweighs any need).

IBC did, in fact, subscribe to "PHC4," and that IBC's counsel would contact the organization about using such information in this litigation. *See* Exhibit "E" (transcript) to IBC's 12/22/03 letter to Magistrate Judge Smith, at 22-23.    Notably, the Seidman Affidavit does not deny IBC was able to get that information, nor does the affidavit otherwise address any efforts to use it, or disclose why IBC cannot use it.   There is absolutely no indication -- in the Seidman Affidavit or elsewhere in the record for this Motion -- that IBC cared to make any genuine effort to defend itself by exploring use of such information.  Instead, for reasons IBC refuses to disclose, IBC still insists on getting access only to the particularized trade secrets and marketing strategies of its "principal competitor," Aetna.

IBC also fails to articulate, through any expert affidavit or otherwise, why or how Aetna's trade secrets, which may contain Aetna's "perception" or "beliefs" of whether IBC is a monopolist or monopsonist, is "substantially needed" to prove or disprove specific issues in this case.   Aetna's "perception" or "beliefs" about IBC or the market, as may be reflected in trade secret documents and which IBC may have a desire to know, is clearly not "substantially needed" for defending this case, and would likely not even be relevant or admissible.  As the *ACT* court noted, also in the context of an antitrust case, IBC does not "offer any argument for why [Aetna's] 'perspective' on the market in particular is relevant or necessary to [IBC's] claims." *ACT*, 1999 WL 305300 at *2; *Staff Builders of Phila. v. Koschitzki*, 1989 WL 46284, No. Civ. A. 88-6103 (E.D. Pa. 1989)(where relevance is dubious, non-party need not disclose confidential information).[17]

---

[17] Similarly, IBC's assertion that Aetna's strategic plans demonstrate that Aetna makes competitive analysis "in the same fashion" as IBC, is irrelevant.  It is axiomatic that all insurers, not just IBC and Aetna, make

Finally, IBC contends that Aetna's particularized strategic plans will demonstrate that Aetna has not experienced barriers to entry and has competed successfully against IBC. Clearly, IBC has no need for Aetna's trade secrets to prove that. In fact, CCH has admitted that Aetna has not experienced any barriers to entry, by asserting that Aetna is IBC's largest competitor in the alleged market. Dkt. Entry 37 at ¶ 31. Moreover, other facts about competitors entering this market are in the newspapers all of the time. A recent article in the *Philadelphia Business Journal* shows that Health America has "continued its expansion into the Philadelphia region," which illustrates that Aetna and other insurers are able to enter and compete in the Philadelphia region. *See* Exhibit "4" hereto.

By way of further example, the October 31, 2003 *Philadelphia Business Journal* published a list ranking local health insurance companies' enrollment in the Philadelphia region, demonstrating that neither Aetna, with over 500,000 local commercial members, nor the numerous other listed insurers, have experienced "entry barriers" in this region. *See* Exhibit "9" to Aetna's 12/16/03 Opposition Memorandum. The *Philadelphia Business Journal* compiled that list from publicly available sources. *Id.*

Other more comprehensive publicly available information that IBC could access and likely already has purchased, such as *HealthLeaders Research,* provide comprehensive enrollment data and market analyses throughout the Commonwealth of Pennsylvania. *See* Aetna's 12/16/03 Opposition at 20-23; Exhibits "7" through "11" to Aetna's 12/16/03 Opposition Memorandum. It is not Aetna's burden to show that IBC is

---

strategic competitive analysis. We do not need to force private nonparties to give trade secrets to competitors in order to prove the obvious. However, whether Aetna's competitive analysis is the same as or radically different than IBC's analysis, is not relevant to the merits of CCH's claim.

able to prepare its defense, nor is it Aetna's burden to show IBC how to defend this case. But these readily available examples, and IBC's failure to rebut any of them with any competent evidence of any of its numerous experts, demonstrate that IBC is not making any good faith efforts to meet its burden to prove "substantial need." IBC has not demonstrated any effort to research or find a unique and "substantial need" for Aetna's particularized strategic plans, and has not even disclosed under Rule 45 what, if any, efforts it made.

Even if IBC's defense is predicated upon comparing its rates to the *market*, then why are *Aetna's* particularized rates, which make up only a portion of the market, "substantially necessary"? What about the rates of all of the other insurers in the region? *See* Exhibit "9" to Aetna's 12/16/03 Opposition Memorandum. Is IBC seeking to take their trade secrets as well? If not, why not? Or, is IBC pursuing the trade secrets only of the "principal competitor," to whom IBC happens to be losing thousands of customers, and against whom IBC is running "attack" ads. Why does IBC not seek to compare its rates to *market* average reimbursement rates by hospital, by service, as compiled by commercially available products – an analysis that would effectively juxtapose IBC's rates against the *market*, rather than against only the "particularized rates" of its "principal competitor"? No expert/consultant -- or anyone for that matter -- has come forward to give testimony answering or addressing any of these reasonable questions on behalf of IBC.

The absence of true "need" is shown also by the fact IBC reversed course after its initial demands about what it "absolutely" needed, and then accepted a proposal for less, which Aetna made a month before IBC filed its Motion to Compel. IBC thereby

admitted it can perform the market and rate analyses at least by utilizing only summary rate information for Central Pennsylvania, rather than specific particularized rates of Aetna. If IBC can utilize summary rate information, why can it not use market rate information by hospital, by service? Why, if IBC can use summary rate information in Central Pennsylvania, can IBC not use similar summary information for the Philadelphia region?

These many unanswered questions demonstrate IBC's utter failure to articulate any need, let alone a "substantial need." Further, IBC must also demonstrate, as it has yet to do, that it has not already received the information it now seeks in response to subpoenas issued to other non-party providers.

> **2.    Even If IBC Could Possibly Meet Its Burden Of Proving Relevance And "Substantial Need," A Balancing Of IBC's Alleged "Need" Against The Potential Harm To Aetna And The Market, Mandates Protecting Aetna's Trade Secrets And Denying IBC's Motion.**

Because the undisputed record establishes that the harm to Aetna (and the public) from disclosure of its trade secrets greatly outweighs any alleged "substantial need" benefiting IBC's personal interests in this case, disclosure of Aetna's trade secrets cannot be allowed. *See Manning Mills, Inc.*, 206 F.R.D. at 529, 532; *R&D Business Systems*, 152 F.R.D. at 197; *In re Silicone Gel Breast Implants*, 1996 WL 1358526; *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318 (Fed. Cir. 1990).

In the instant case, the competitive landscape of the health insurance industry in the Philadelphia market, as demonstrated by the "tremendous dilemma" IBC claims it is now facing in the competitive arena due to its business failures to timely implement demographic rating strategies (*see* Exhibit "2," legislative testimony of IBC's Chief

Marketing Officer, p. 4), illustrates the competitive harm Aetna and the market could suffer from forcing Aetna to turn over trade secrets to a "principal competitor."  Also, the uncontradicted declarations of Aetna's Robert J. Franzoi establish the specific harm Aetna will suffer if its trade secrets are given to IBC or the hospitals with whom Aetna must negotiate contracts.  Indeed, granting IBC access to Aetna's trade secrets will cause or further exacerbate the alleged "monopolistic" harm that CCH alleges.

By comparison, while the harm to Aetna is imminent and extraordinary, especially where IBC has stated its intention *to publish Aetna's trade secrets at trial*, IBC has been unable, for over four months, to articulate or demonstrate any "substantial need" for Aetna's particularized trade secrets.  If IBC truly needed Aetna's confidential information, as it alleges, it would, at a minimum, have either specifically articulated that need or provided an expert affidavit detailing something other than Aetna appropriately protects its trade secret information.  Instead, IBC has ignored and misstated its burden.

The fact that IBC waited until the end of discovery, more than a year after this litigation was commenced, to issue what it now characterizes as a critical subpoena, demonstrates that IBC does not "substantially need" Aetna's trade secrets in order to defend against CCH's antitrust claims.  IBC's counsel certainly would not have delayed until the end of discovery to obtain such supposedly "critical" evidence that they allege they badly need to defend their client, IBC.

Again, the timing is such that IBC is pursuing this information only after losing customers to Aetna, and only after failing in its efforts to have the legislature foreclose Aetna from using its marketing plans and pricing strategies.  IBC's attempts to "respond to this marketplace" by stealing Aetna's trade secrets must be rejected.

26

> **3.     This Court Lacks Jurisdiction To Enforce A Subpoena Issued Out Of The District Of Connecticut.**

Federal Rule of Civil Procedure 45(c)(2)(B) provides: "[i]f objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials . . . ***except pursuant to an order of the court by which the subpoena was issued***." (emphasis added).    As other district courts have noted, "[t]he language of Rule 45 clearly contemplates that the court enforcing a subpoena will be the court that issued the subpoena." *United States v. Star Scientific, Inc.*, 205 F. Supp. 2d. 482, 484 (D. Md. 2002).  *See also Kupritz v. Savannah College of Art and Design*, 155 F.R.D. 84, 88 (E.D. Pa. 1994)(district court lacked jurisdiction to compel compliance with Rule 45(e) subpoena where that subpoena was issued out of the Southern District of Georgia).

The *Star Scientific* court noted that "[t]he practice commentaries to the rule explain that a motion to compel under Rule 45(c)(2)(B) should, like the motion to quash or modify . . . be made to the court from which the subpoena issued, which will presumably be a court in a district convenient to the non-party since it is of course the non-party whose convenience Rule 45 is most concerned about protecting." *Id.* at 484-85 (internal quotations omitted).  However, because "a court issuing a subpoena also has a strong interest in the enforcement of its subpoenas . . . a non-party could never seek transfer of a discovery dispute as a matter of right, over the objection of the court that issued the subpoena." *Id.* at 485 n.3.

In the instant case, IBC strategically chose to issue its defective subpoena upon Aetna out of ***the District of Connecticut***, despite knowing it sought information relevant to markets within the Eastern District of Pennsylvania, and despite knowing the undersigned counsel represented Aetna in connection with this litigation.  That was IBC's

strategic choice, and its delays thereafter should not burden Aetna or this Court any longer.[18]

Neither IBC, nor Aetna for that matter, can now unilaterally divest that Court of its jurisdiction over the subpoena that IBC issued out of that Court. If IBC properly brought its motion in the district court from which it decided to issue its subpoena, that court could decide, for example, that IBC's subpoena is unenforceable due to its substantive and procedural defects, including but limited to failing to tender a service fee and requiring production more than 100 miles from the issuing court. As IBC chose to utilize the inherent power of that court to compel production of Aetna's most vital trade secrets, IBC should have allowed the United States District Court for the District of Connecticut to exercise its discretion in determining whether to decide or transfer IBC's motion to this Court.

The Magistrate Judge, apparently recognizing the jurisdictional deficiencies of IBC's July 25, 2003 subpoena, acknowledged that IBC should issue a new subpoena out of this Court. IBC thereafter issued a new subpoena, on December 17, 2003. Aetna filed its Rule 45 objections to that subpoena on December 29, 2003. Other than IBC's unilateral, unsolicited modification of the subpoena contained in its December 22, 2003

---

[18] As other district courts have explained, "Rule 26(g) specifically requires that the party or his attorney seeking discovery must *certify* that he has made a "reasonable inquiry" that the request is warranted. This "reasonable inquiry" is also imposed by Rule 11. *See* Fed.R.Civ.P. 11, Notes of Advisory Committee on Rules--1983 Amendment ("Discovery motions, however, fall within the ambit of Rule 11."); *see also Apex Oil Co. v. Belcher Co.*, 855 F.2d 1009, 1015 (2d Cir. 1988)(noting that Rule 26(g) "imposes a more stringent certification requirement than Rule 11" because a discovery request usually pertains to more specific subject matter than that covered under Rule 11"). *Micro Motion, Inc.*, 894 F.2d at 1323; *see also* Dkt. Entry 15. In the instant case, a "reasonable inquiry" would have revealed that "Aetna Inc." was a Pennsylvania Corporation with no offices in Connecticut. IBC's attempt to enforce its defective subpoena is sanctionable. *Olagues v. Schmidt*, 1990 WL 25710 at *3 (9th Cir. 1990)("In this case, it is clear that Olagues' motion for contempt was not 'substantially justified.' Not only was he aware that the subpoenas had not been served, but the subpoenas were invalid on their faces, because they stated that no fees were tendered with service of the subpoenas." *Id.* at *2-3 (*quoting C.F. & I. Steel Corp. v. Mitsui & Company*, 713 F.2d 494, 496 (9th Cir. 1983)).

Letter to Magistrate Judge Smith, IBC has not contacted Aetna about compliance with that new December 17, 2003 subpoena.

As IBC filed its Motion to Compel before it issued a second subpoena upon Aetna, it cannot contend it now seeks to compel compliance with the second subpoena, which did not even exist when it filed its Motion to Compel.

As both IBC and the Magistrate Judge have recognized the jurisdictional defects fatal to IBC's July 25, 2003 subpoena -- defects that were of IBC's making and which IBC never cared to timely remedy -- this Court must address its lack of jurisdiction over IBC's Motion to Compel as grounds for sustaining Aetna's Objections and denying IBC's Motion.

## 4.    IBC Failed To Attempt To Resolve Aetna's Objections In Good Faith.

IBC failed to make a good faith attempt to resolve Aetna's objections to IBC's July 25, 2003 subpoena *before* filing its motion to compel on December 3, 2003.  IBC ignored Aetna's repeated requests to discuss the scope and type of information sought. Rather than engaging Aetna in a good faith dialogue about its subpoena, IBC instead sent Aetna correspondence arbitrarily and unilaterally changing the alleged "absolute minimum" IBC claimed was necessary to defend against CCH's claims, and threatening Aetna with immediate motion practice if Aetna did not acquiesce to IBC's demands.

After Aetna repeatedly reminded IBC of its obligations to confer in good faith under the Federal and Local Rules, IBC begrudgingly, more than four months after it received Aetna's objections, engaged in a discussion with Aetna's counsel.  During this discussion, although it appeared some progress was being made, at least in Aetna's

counsel's mind, in focusing IBC to determine which information IBC absolutely needed to defend itself, IBC subsequently reverted to its uncompromising tactics.

Aetna asked IBC to consult with its experts to determine if they could perform the appropriate analyses using "masked rates" that would not divulge Aetna's particularized rates; and, if not, to propose a more reasonable alternative proposal for its discovery.[19] IBC has identified at least 13 expert consultants who are working for IBC, and intending to analyze Aetna's trade secrets. Apparently, not one of IBC's 13 experts are willing to vouch for and explain why they and IBC have a "substantial need" for Aetna's trade secrets, and cannot give opinions without them.

IBC rejected any compromise out of hand and without explanation to Aetna, allegedly on the advice of its experts, and did not attempt any further good faith discussions before filing the instant Motion to Compel.[20]

Pursuant to Federal Rule of Civil Procedure 37(a), a party moving to compel discovery must certify to the Court "that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action." Further, Local Rule 26.1(f) states, "[n]o motion or other application pursuant to the Federal Rules of Civil Procedure governing discovery or pursuant to this rule shall be made unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute." E.D. Pa. R. 26.1(f).

---

[19] Aetna also offered to have a person who compiled the "masked rates" to provide testimony regarding the methods and criteria used to compile rates into the "masked form."

[20] Remarkably, after IBC filed and argued its Motion to Compel, IBC inexplicably reversed course, and agreed to accept summary reimbursement rate information *for Central Pennsylvania*. IBC's sudden and unsolicited "accommodation" is an admission that it did not, before filing its Motion to Compel, consider Aetna's now admittedly reasonable proposal in good faith.

As the Third Circuit recently reaffirmed, "before moving to compel discovery, 'a party must first prove that it sought discovery from its opponent.'" *Naviant Marketing Solutions, Inc. v. Larry Tucker, Inc.*, 339 F.3d 180, 186 (3d Cir. 2003)(*quoting Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995)).  Here, IBC hardly even made a token effort to "go through the motions" with Aetna before filing the instant Motion.  In *Naviant*, 339 F.3d at 186-87, the court noted that, "plaintiff's counsel refused to discuss matters on the telephone with defendant's counsel and sought the intervention of the court without first seeking to work out the conflict with defense counsel."

Further, sending a fax demanding an immediate response and "threatening to file a motion to compel is a token effort rather than a sincere effort." *Naviant*, 339 F.3d at 186; *see also Shuffle Master, Inc. v. Progressive Games, Inc.*, 170 F.R.D. 166, 170-73 (D. Nev. 1996)(one telephone call and a couple of faxes insufficient to meet requirement of good faith conferring).  Based upon plaintiff's failure to make a good effort to confer with counsel before seeking court action, the Third Circuit held that defendant's refusal to respond to plaintiff's unreasonable demands was excused. *Naviant*, 339 F.3d. at 186-87.

This Court should reach the same result here.

**5.**    **Granting IBC's Motion To Compel Would Constitute An Unlawful And Unconstitutional Taking Of Aetna's Confidential And Trade Secret Information.**

Compelling Aetna to give its proprietary trade secrets to IBC (or to anyone else for that matter, but especially to a competitor such as IBC) amounts to "a taking of private property in violation of the Fifth Amendment."   *See* Arthur R. Miller,

*Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 468 (1991)(*See* Exhibit "12" to Aetna's 12/16/03 Opposition Memorandum.).

Professor Miller noted that the United States Supreme Court has "declared that confidential information . . . is a species of property to which the corporation has the exclusive right and benefit" *Id. (quoting Carpenter v. U.S.*, 484 U.S. 19, 26 (1987)). Professor Miller's analysis further explained that the disclosure of confidential and proprietary information, such as the compensation received by IBC's executives, *by parties to a litigation*, illustrates "the concern in the business community that even the most protective court cannot prevent the spread of information beyond the confines of a lawsuit." *Id.* at 470.

Similarly, it is doubtful that even where the information sought will be disclosed in this case to at least thirteen experts, that the experts "will be able to   . . . compartmentalize all he or she has learned and not use any of the information obtained [in the instant litigation.]"  *Id.* at 471 (citations omitted).  Moreover, the inherent danger of disclosing trade secret information is obvious because "[t]he loss of confidentiality, the *sine qua non* of a trade secret, robs the owner of any advantage the secret may have provided." *Id.* at 473 (citation omitted).[21]   Accordingly, Professor Miller noted that "[g]overnment disclosure of information in which parties have a property right . . . might amount to a taking of private property in violation of the Fifth Amendment." *Id.* (citations omitted).

---

[21] *See also Settle Times Co. v. Rhinehart*, 467 U.S. 20, 34-35 (1984)(litigants may - "incidentally or purposefully" - obtain information that not only is irrelevant but which could damage a party or non-party's privacy; courts have strong interest in preventing this sort of abuse).

The Federal Rules of Civil Procedure recognize that the trade secrets of non-parties must be afforded a higher level of protection than those of parties to a litigation, as required by the requisite showing of substantial need for the trade secrets of non-parties pursuant to Rule 45. *Compare* Fed. R. Civ. P 26(b) and Fed. R. Civ. P. 45.

Not only has IBC failed to demonstrate any substantial need for the documents it requests, but it has also certified, in its Rule 11 Motion filed against CCH, that CCH's claims are utterly devoid of any merit. (Dkt. Entry 15). This filing alone illustrates that IBC's crusade to attain Aetna's trade secrets amounts to nothing more than an information grab, designed to disclose Aetna's trade secrets and enhance IBC's competitive position.

As the Court noted in *In re: Silicone Gel Implants*, 1996 WL 1358526 at *2, allowing plaintiff access to the non-party hospital's confidential research would "effectively be appropriating research data collected . . . at great expense over a twenty year period." That Court further noted that "[a]ny monetary compensation for such a use should be measured not by the relatively small cost of preparing a computer tape containing a subset of the database, but rather by the long-term costs incurred in creating and preserving the . . . database or by the replacement cost – if indeed, that were possible."

Similarly, in the instant case, at a minimum, if Aetna's trade secrets are obtained by IBC, then IBC must compensate Aetna for its substantial investment of money, as well as employee time and resources in developing its trade secret information, so that it can be justly compensated for its loss. The value of this information is reflected by the $9

billion Aetna paid to acquire U.S. Healthcare in 1996.  *See* Exhibit "2" at 4 (Legislative Testimony of IBC's Chris Butler).

Accordingly, if the Court mandates that Aetna must produce its trade secrets, Aetna will be forced to pursue its Fifth Amendment rights and remedies for IBC's taking of Aetna's trade secrets.

> **6.    By Serving A Second Subpoena, IBC Has Effectively Withdrawn Its July 25, 2003 Subpoena, Thereby Rendering Moot Its Motion To Compel.**

IBC's decision to serve a second subpoena upon Aetna on December 17, 2003 affirmatively supersedes and thereby moots IBC's prior July 25, 2003 subpoena, which underlies this appeal.  *See Stewart v. Mitchell Transport*, 2002 WL 1558210 at *9, 01-CV-2456 (D. Kan. July 8, 2002) ("[b]y serving the second subpoena, Plaintiffs effectively withdrew the first subpoena, thereby rendering moot the issues raised in this first motion to quash").

Indeed, when IBC voluntarily withdrew its first subpoena, the issues facing both the Magistrate Judge and this Court became a legal nullity and no case or controversy existed any longer.  Accordingly, the Magistrate Judge's December 22, 2003 Order, which post-dates IBC's re-issued December 17, 2003 subpoena, became an invalid advisory opinion that must be reversed, or, minimally, vacated by this Court.  *See Donovan v. Punxsutawney Area School Board*, 336 F.3d 211, 216 (3d Cir. 2003) (a case becomes moot when the issues are no longer "live" and court can no longer grant relief) (citations omitted); *Bryan v. All Out Die Cutting, Inc.*, 2002 WL 451809 at *1, No. 01-2227 (3d Cir. 2002) (when actual case or controversy ceases to exist, district court no longer has jurisdiction and should close the case).

IV.    **CONCLUSION**

For the foregoing reasons, Aetna's Objections to Magistrate Judge Smith's December 22, 2003 Order must be sustained, the Order set aside and vacated, and IBC's Motion to Compel denied. The Court should also award Aetna its reasonable attorneys' fees and costs.

Respectfully submitted,

OF COUNSEL:

/s/ Frederick P. Santarelli

ELLIOTT REIHNER &
  SIEDZIKOWSKI, P.C.

JOHN M. ELLIOTT
JAMES C. CRUMLISH III
FREDERICK P. SANTARELLI
JOHN P. ELLIOTT
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
P.O. Box 3010
Blue Bell, PA 19422
(215) 977-1000
Counsel for Non-party
Aetna Inc.

DATED:  January 7, 2004

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day a copy of the foregoing is being served

upon the persons and in the manner indicated below:

## VIA FIRST CLASS MAIL

Lewis R. Olshin, Esquire
Duane, Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396

William J. Leonard, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895

Daniel A. Kotchen, Esquire
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

Howard T. Rosenblatt, Esquire
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004


                              /s/ John P. Elliott
Dated:  January 7, 2004       JOHN P. ELLIOTT