EXHIBIT "3"



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHESTER COUNTY HOSPITAL<br><br>v.<br><br>INDEPENDENCE BLUE CROSS,<br>QCC INSURANCE COMPANY,<br>KEYSTONE HEALTH PLAN EAST, and<br>KEYSTONE MERCY HEALTH PLAN | CA No. 03-MC-302 (GLL) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO CHESTER
COUNTY HOSPITAL'S MOTION TO COMPEL PRODUCTION OF CERTAIN
DOCUMENTS FROM NON-PARTY HIGHMARK, INC.**

Defendant Independence Blue Cross ("IBC") respectfully submits this memorandum in opposition to Chester County Hospital's ("CCH" or the "Hospital") Motion to Compel the Production of Certain Documents from Non-Party Highmark, Inc. As to certain documents that CCH seeks from Highmark – the documents relating to the aborted merger discussions between IBC and Highmark – IBC contends that:

1. The documents at issue are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in CCH's lawsuit against IBC;

2. The documents at issue are likely to contain both IBC's and Highmark's proprietary and confidential data; and

3. The documents at issue are the subject of an identical pending discovery motion to compel IBC's production of documents relating to the same aborted Highmark-IBC merger. This motion is currently pending before Judge Padova. *See* Ex. 1 (CCH's Mot. to Compel IBC's Doc. Produc., Docket No. 63 in *Chester County Hospital v. IBC, et al.*, 2:02CV2746 (motion filed under seal June 6, 2003) (Padova, J.)).

For these reasons, as explained more fully below, IBC respectfully requests that this Court either deny CCH's motion as to its Request No. 2 (Highmark's documents related to the

Highmark-IBC merger discussions), or at least defer ruling on CCH's motion against nonparty Highmark until Judge Padova can rule on the relevancy and discoverability of the identical subject matter as between the actual "parties" to the litigation as part of CCH's motion already pending before him.

## FACTUAL BACKGROUND

CCH's Motion provides scant factual context in which to evaluate the relevancy of the categories of documents it has sought to subpoena from Highmark. In particular, IBC believes that understanding that context is critical as it relates to Category No. 2 of CCH's Motion to Compel (*i.e.*, Request No. 7 of CCH's subpoena): "Documents relating to any planned, proposed, or considered affiliation, merger or acquisition involving Highmark and [IBC]."

**CCH's Claims Against IBC**: In its lawsuit against IBC, the licensed Blue Cross affiliate serving the Greater Philadelphia area, Chester County Hospital alleges that IBC engaged in certain anticompetitive practices in pursuit of or to maintain an alleged monopoly relating to the sale of health care insurance and the purchase of hospital services under Sherman Act § 2 (Am. Compl. at ¶¶ 56-57, 69-73); made certain unlawful mergers or acquisitions of actual or potential competitors in violation of Clayton Act § 7 (*see id.* at ¶¶ 45, 56-57, 93-94); and entered into unlawful agreements in restraint of trade in violation of Sherman Act § 1. *See id.* at ¶¶ 33-37, 56-57, 74-75. As a result of this alleged unlawful conduct, CCH alleges that IBC has acquired, maintained and/or exercised "monopsony" power as a purchaser of hospital services in the Greater Philadelphia area. *See id.* at ¶¶ 56-57, 69-70.

In particular, CCH alleges that, as a seller of hospital services in the Greater Philadelphia area, it has suffered financial injury because of IBC's ability to negotiate (or "coerce") unfair or "predatory" reimbursement rates in its contracts with the Hospital. The contracts specifically at issue in this case were entered into in *1999* (1999-2000 contract period) and *2000* (2000-2004 contract period). *See* Am. Compl. at ¶¶ 21-24. Thus, while CCH alleges that IBC entered into unlawful agreements in restraint of trade with Highmark, and that IBC made an unlawful

acquisition involving Highmark or acquisitions of Highmark's assets, each of the alleged agreements complained about necessarily had been completed *years before* it entered the *1999* and *2000* contracts with IBC.

**The Highmark-IBC Merger Discussions**: Unlike the conduct alleged by CCH in its Amended Complaint, the merger discussions between Highmark and IBC took place much later in time – after CCH had entered its contracts with IBC and after it had suffered its alleged injuries. Starting in approximately *December 2001*, Highmark and IBC engaged in discussions relating to a possible merger of their businesses. Such a merger would bring together the businesses of Highmark, the owner of the Blue Cross license (hospital services) for Western Pennsylvania and the owner of the Blue Shield license (physician services) for the entire Commonwealth, and IBC, the owner of the Blue Cross license (hospital services) for Southeastern Pennsylvania.

Pursuant to a Confidentiality Agreement, IBC and Highmark exchanged confidential data and engaged in negotiations and discussions regarding the possibility of such a merger in the early part of *2002*. *See* Ex. 2 (Letter Agreement between IBC and Highmark, June 1, 2001). Those discussions had terminated altogether by May 2002. Thus, as a result of those preliminary and unsuccessful negotiations, there was, by definition, no "agreement" and no "acquisition."

## ARGUMENT

I. **THE COURT SHOULD REJECT CCH'S EFFORTS TO COMPEL PRODUCTION OF DOCUMENTS RELATED TO THE ABORTED HIGHMARK-IBC MERGER DISCUSSIONS FROM A NONPARTY**

Rules 26 and 45 of the Federal Rules of Civil Procedure set forth a "three-part inquiry" for determining whether to compel the production of subpoenaed documents from a nonparty:

1. Whether the information sought is relevant under Rule 26(b)(1);

2. Whether the information is subject to protection as a trade secret or other confidential commercial information;

3. If the information is confidential, "whether the party who seeks it [CCH] has established a 'substantial need for the...material that cannot be otherwise met without undue hardship.'"

*ACT, Inc. v. Sylvan Learning Sys., Inc.*, 1999 U.S. Dist. LEXIS 7055, at *4 (E.D. Pa. May 14, 1999); *see also Mycogen Plant Science, Inc. v. Monsanto Co.*, 164 F.R.D. 623, 625-26 (E.D. Pa. 1996) (setting forth a three-part test to determine whether nonparty documents are discoverable).

Here, CCH cannot get past step 1: CCH cannot and does not demonstrate in its Motion that the materials sought regarding aborted, "post-contract" merger discussions between Highmark and IBC are relevant to its antitrust claims against IBC.[1] It is not sufficient for CCH to assert that its lawsuit involves antitrust violations stemming from IBC's acquisitions and agreements related to Highmark. *See CCPI Inc. v. Am. Premier, Inc.*, 967 F. Supp. 813 (D. Del. 1997). Antitrust plaintiffs are not exempt from the requirement to demonstrate that the discovery sought is both reasonable and relevant *to their particular antitrust claims*: "[An antitrust plaintiff] cannot simply cry 'antitrust' or 'Sherman Act' in a crowded courtroom and occupy its opponents and the Court with head-scratching attempts to peer through the smoke." *Id.* at 816. Rather, the plaintiff must tie the subject matter of the proposed discovery to the injury that they have allegedly suffered. *See Mass. Sch. of Law v. ABA*, 853 F. Supp. 837, 840 (E.D. Pa. 1994) ("It is not enough to say, however often and stridently, that the...[agreements or conduct] under attack are anticompetitive.").

---

[1] Indeed, apparently relying on what it believed was its agreement with Highmark's outside counsel, CCH does not even attempt to meet this burden. Whatever Highmark and CCH may or may not have agreed to, IBC, as a party to those merger discussions, has its own confidentiality interests in those documents relating to the potential merger. Moreover, IBC was not a party to any alleged agreement made between outside counsel for CCH and outside counsel for Highmark regarding the treatment of IBC's confidential documents. IBC did not and does not consent to Highmark's production of those documents.

Given the potential for overreaching, courts have a special duty to safeguard against discovery abuses in such cases by limiting the discovery to that necessarily relevant to the *plaintiff's alleged antitrust claims*:

> If the district court suspects that plaintiffs' antitrust allegations may be a ploy to obtain discovery unrelated to the antitrust claim, we would urge the court to assume a managerial role and to channel discovery towards determining the true facts relating to the antitrust charges.

*Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Co., S.A.*, 711 F.2d 989, 999 (11th Cir. 1983); *Wilk v. Am. Med. Ass'n*, 1979 U.S. Dist. LEXIS 12204, at *5 (N.D. Ill. May 23, 1979) ("It is appropriate for the court to step in and limit discovery when it feels that the discovery involved is cumulative, unnecessary, or only marginally relevant or important.").

Rather, a comparison of CCH's antitrust claims and its request for discovery relating to merger discussions from nonparty Highmark reveals that those discussions: (a) commenced only *after* CCH suffered the alleged injury that is the subject of the lawsuit; (b) commenced only *after* CCH entered into the allegedly "unconscionable" 4-year reimbursement contract with IBC that is still in place; and (c) are never even mentioned in the 60-odd pages of allegations in CCH's Amended Complaint. Although certain elements of the relationship between Highmark (*i.e.*, Pennsylvania Blue Shield) and IBC (*i.e.*, Blue Cross of Southeastern Pennsylvania) are relevant to this case, the proposed merger discussions between Highmark and IBC are not.

First, the merger discussions occurred nearly one year after the conduct that is at issue in this case. In this judicial district, as elsewhere, absent specific reasons demonstrating their relevance, "[g]enerally, documents generated after the filing of a lawsuit are undiscoverable because they are irrelevant...." *R. J. Lefkowitz v. DuQuesne*, 1988 U.S. Dist. LEXIS 17251, at *6 (W.D. Pa. June 14, 1988).

Second, and perhaps more importantly, the discussions at issue were brief and in the end came to nothing: they did not result in an "agreement" and did not ripen into a merger or an acquisition – much less one that had an impact on CCH. Thus, even if Highmark and IBC had decided to proceed with their discussions and actually merge (they did not), and regardless of

whether or not that merger may have reduced competition in some relevant market (it did not), even an actual completed merger in 2002 or 2003 *could not* be the basis for CCH's claims that they were injured by IBC's "monoposony" power when contracting for the sale of hospital services in *1999 and 2000*.[2] The "hypothetical" market impact from a non-event is a blatantly insufficient reason to permit such satellite discovery, particularly from nonparties. *See ACT, Inc.*, 1999 U.S. Dist. LEXIS 7055, at *9 (discussing the use of the three-part test to *deny* any motion to compel a nonparty to produce internal documents regarding "any potential or actual acquisition, merger or other combination with [Defendant or its affiliates]" in an antitrust case). CCH's mere hope that unbridled discovery may turn-up "something"– whether or not that "something" is related in any way to CCH's claims against IBC – is the very definition of "fishing" and should be prohibited. *See, e.g., Earley v. Champion Int'l Co.*, 907 F.2d 1077, 1085 (11th Cir. 1990) ("A vague possibility that loose and sweeping discovery might turn up something...does not show particularized need and likely relevance that would require moving discovery beyond the natural focus of the inquiry."); *Mass. Sch. of Law*, 857 F. Supp. at 460 (where a law school challenged particular accreditation standards as anticompetitive, court denied discovery on "development, implementation, discussion, and debate" of other standards and limited discovery to the impact of the challenged restraint in that case).[3]

Finally, although CCH offers no explanation of relevancy in its Motion as to Highmark, according to CCH's motion against IBC, CCH contends that the documents concerning the Highmark-IBC merger discussions are relevant and discoverable because:

---

[2] *See e.g., Koch v. Koch Indus., Inc.*, 1992 U.S. Dist. LEXIS 14094, at *35 (D. Kan. Aug. 24, 1992) ("[A] court must not allow corporate defendants to be saddled with fishing expeditions....The danger of [such] expeditions is particularly acute here because of the plaintiffs' manifest desire to unearth all possible wrongdoings, whether they are the victims or not ....").

[3] *See also Mr. Frank, Inc. v. Waste Mgmt., Inc.*, 1981 U.S. Dist. LEXIS 11777, at *7 (N.D. Ill. Mar. 27, 1981) ("[T]he slim possibility that...broad discovery may prove fruitful must be balanced against the undeniable expense and inconvenience to which defendants will be put in producing the documents and information requested."); *Schmidt v. Columbia Pictures Indus.*, 1986 U.S. Dist. LEXIS 26806, at *6 (D. Nev. Apr. 14, 1986) (denying discovery in areas unrelated to claims at issue because it would raise "collateral issues which may tend to bog down the discovery process and obscure the issues which must be resolved to bring [the] case to a conclusion.").

> the documents relate to: (1) the Joint Operating Agreement (JOA) between IBC and Highmark; (2) communications between IBC and Highmark regarding their business relationship; (3) the strategic plans of a merged IBC/Highmark, and the necessity to coordinate with other "Plans" in Pennsylvania (presumably Capital Blue Cross and Blue Cross of Northeastern Pennsylvania) to the extent the merged entity expands geographically in the state; and (4) IBC's profits and revenues.

*See* Ex. 1 at 6 (CCH Mot. to Compel IBC's Doc. Produc. in 2:02CV2746).

Thus, even assuming, *arguendo*, that CCH reasons for seeking these documents *from IBC*, as set forth above, makes them arguably relevant, CCH does not and cannot show a "substantial need" for these documents *from Highmark*.[4] As to reasons 1 and 2, both IBC and Highmark have produced numerous documents relating to the "JOA" and their "business relationship" (note: a "merger" would make the Joint Operating Agreement ("JOA") a nullity by combining the venture partners' businesses for all reasons). Similarly, CCH's third rationale is a mere attenuated "hypothetical," the relevance of which would depend on: (a) the merger being consummated, and then (b) "to the extent the merged entity expands geographically in the state." *Id.* Lastly, IBC, not Highmark, is the better source of information on IBC's business, profits and revenues. *See ACT, Inc.*, 1999 U.S. Dist. LEXIS 7055, at *10-11 (***denying*** a motion to compel a nonparty to produce documents analyzing the defendant-competitor or its market where no "substantial need" existed because those materials were available from other sources including experts, the defendants, and other third-party information sources).

II.    **THIS COURT SHOULD DEFER RULING ON CCH'S MOTION AGAINST NONPARTY HIGHMARK TO ALLOW THE TRIAL JUDGE TO RULE ON THE DISCOVERABILITY OF THIS SUBJECT MATTER AS PART OF CCH'S PENDING MOTION AGAINST IBC**

In the alternative, this Court should at least defer ruling on Category 2 of CCH's Motion (the Highmark-IBC merger discussions) until after Judge Padova, the trial judge, addresses the exact same discovery issue with respect to the same category of documents (the Highmark-IBC

---

[4] As to the second prong, there can be no legitimate dispute that aborted merger discussions are, at least, confidential commercial information sufficient to satisfy the second part of the three-part test set forth *supra* Part I at 3-4.

merger documents), as part of CCH's motion against IBC now pending before him. As the trial judge who has handled the case since it was filed in May 2002, Judge Padova is uniquely knowledgeable about the parties, their claims and the appropriate scope of discovery.[5] As the *Mycogen Plant Science* court held in ruling on the relevance of discovery sought by a nonparty subpoena in connection with complex litigation pending in another district court:

> A district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment in what constitutes relevant evidence thereunder....The ancillary court should take its law of the case from the non-ancillary court and should avoid influencing that court's view of the legal issues.

164 F.R.D. at 627 (citation omitted).

Moreover, deferring a ruling as to nonparty Highmark is especially warranted in this case because Judge Padova will have the opportunity to address CCH's stated reasons for compelling production of this same category of merger discussion documents from IBC *on the same schedule* as a resolution of this ancillary dispute. Indeed, IBC has agreed to accelerate the date of its Opposition to CCH's pending motion against it, in part, to avoid any delay of the resolution of this issue. In short, IBC stands ready and willing to have Judge Padova's ruling as to CCH's motion to compel the Highmark merger documents applied to CCH's subpoena against Highmark for its documents on the identical subject matter. CCH, however, should not be entitled to manipulate its motion practice against a nonparty to get two bites at the apple.

---

[5] In addition, for reasons of which Chester County Hospital and Judge Padova are well aware, IBC is not confident that its legitimate confidentiality interests in documents related to its aborted merger discussions with Highmark are sufficiently protected simply because a Protective Order was entered by the Court. On the contrary, counsel for CCH has already demonstrated, on two separate occasions, an unwillingness or inability to abide by the terms of the existing Protective Order. Because motions to amend the Protective Order are now pending before Judge Padova, who is familiar with CCH's earlier violations of the Protective Order, IBC believes that any issues about the document production relating to the aborted merger discussions should be resolved as part of the pending motions before Judge Padova.

## CONCLUSION

For all of the foregoing reasons, this Court should deny CCH's motion to compel the production of documents from Highmark as it relates to Category 2 of its subpoena (documents relating to the aborted merger discussions between Highmark and IBC). In the alternative, this Court should, at a minimum, allow the trial judge to resolve the issue of discoverability on CCH's motion against IBC, already pending before him.

Respectfully submitted,

J. Benjamin Yeager
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
US Steel Tower, Suite 5240
600 Grant Street
Pittsburgh, PA 15219-2801
(412) 566-1500

Thomas A. Leonard
Paul S. Diamond
William J. Leonard
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
(215) 665-3000

John DeQ. Briggs
James G. Kress
HOWREY SIMON ARNOLD & WHITE LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 383-7015

Dated: June 11, 2003

EXHIBIT "4"

Case 2:02-cv-02746-JP   Document 187-3   Filed 01/08/2004   Page 11 of 13

# PHILADELPHIA BUSINESS JOURNAL

## EXCLUSIVE REPORTS

### HealthAmerica buys into area

John George
Staff Writer

HealthAmerica, a Harrisburg-based HMO, continued its expansion into the Philadelphia region by signing a new two-year agreement with Doylestown Hospital.

The move is part of the company's expansion into the eastern part of the state, which is, in turn, part of a strategy to become a statewide managed-care company. The Doylestown pact also covers members of HealthAssurance, HealthAmerica's PPO affiliate.

"We've been working on our network development for about 11 months," said Francis S. Soistman Jr., president and CEO of HealthAmerica and HealthAssurance. "The process is still evolving and will continue to do so for the next year to 18 months."

In addition to more than two dozen hospitals, the company has signed up more than 1,000 local primary-care doctors and specialists for its network.

Other hospitals and medical centers in its network include: Thomas Jefferson University, Abington, Albert Einstein, Brandywine, Chestnut Hill, Central Montgomery Medical Center, Frankford, Holy Redeemer, Lankenau, Mercy Suburban, Nazareth, Paoli Memorial, Pottstown Memorial, St. Luke's Quakertown, St. Agnes and St. Mary.

Soistman said HealthAmerica and HealthAssurance are getting ready to accelerate their member recruitment activities.

"Come the first of the new year, sales and market activity in selected areas will increase," he said. "Because the development of our network is still a work in progress, we will focus around ZIP codes where we have hospitals under contracts."

Soistman said the company will initially focus on small and midsize businesses while it continues to expand the geographic reach of its network. He also envisions opportunities to add larger employers that have employees across the state and want to do business with a single insurer.

Health America and Health Assurance are part of Coventry Health Care Plans.

Coventry Health Care Inc., a publicly traded company based in Bethesda, Md., has 3.1 million members in managed-care plans in 14 markets throughout the Midwest, Mid-Atlantic and Southeastern states.

HealthAmerica and Health Assurance have more than 670,000 members in Pennsylvania and Ohio. In addition to its Harrisburg headquarters, the plan has offices in Pittsburgh, State College and Erie.

It has also opened up a temporary office in Berwyn, with 14 employees, to serve clients in this region. Kendall Marcocci, the company's director of communications, said HealthAmerica is identifying permanent office space for its Philadelphia-area staff.

"This is a logical extension of our business model," Soistman said. "We have a strong local presence in Lancaster and Berks counties, and we recently expanded into the Lehigh Valley area. We've already gotten some spillover business in Chester and Montgomery counties."

Soistman said he has no magic formula for competing with Independence Blue Cross and Aetna, the Philadelphia region's two largest health insurers.

"That's the multimillion-dollar question, isn't it?" he said. "Certainly, we respect what IBC has done; they have about 70 percent of the market share. Both IBC and Aetna have done a very good job growing their business.

"One of the keys to the success we've had growing our business is having products that respond to our customers' needs and serving them better than our competitors," he said. "We have to offer an expensive product continuum and an expansion pricing continuum because everybody's needs are different."

Soistman said his company plans on making a long-term commitment to the Philadelphia region.

"This is not a short-term strategy," he said. "This expansion is not different from what we've done in other counties during our 26 years. When you expand you make progress inch by inch."

*John George can be reached at jgeorge@bizjournals.com.*

© 2003 American City Business Journals Inc.

⇢ Web reprint information

*All contents of this site © American City Business Journals Inc. All rights reserved.*