IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

NO. 02-CV-2746

## ORDER

AND NOW this _____ day of January, 2004, in consideration of Non-Party Aetna Inc.'s ("Aetna") Objections to the Magistrate Judge's December 22, 2003 Order, and Independence Blue Cross's Memorandum of Law in opposition thereto, it is hereby ORDERED that Aetna's Objections to the Magistrate Judge's December 22, 2003 Order are DENIED.

BY THE COURT:

_____
John R. Padova
United States District Judge

509655

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

NO. 02-CV-2746

## IBC'S MEMORANDUM OF LAW IN OPPOSITION TO AETNA'S OBJECTIONS TO THE DISCOVERY ORDER OF DECEMBER 22, 2003

Defendants Independence Blue Cross, QCC Insurance Company, Keystone Health Plan

East, and Keystone Mercy Health Plan ("IBC") respectfully oppose the objections of Aetna, Inc.

("Aetna") to the December 22, 2003 Order of Magistrate Judge Smith (the "Objections"). The

December 22 Order directed Aetna to produce documents subpoenaed by IBC.

IBC served Aetna with a document subpoena on July 25, 2003. It is now January 21,

2004, and IBC has yet to receive a single document from Aetna. During the intervening months,

Aetna's obtained judicial relief strengthening the protective order, and IBC narrowed the

geographic scope and the categories of documents covered by the subpoena.[1] Because of Aetna's

continuing failure to comply with the subpoena, IBC filed a motion to compel on December 3,

2003 (the "Motion to Compel") (Dkt 173 & 174).[2] Aetna filed its response to the motion on

---

[1] IBC attempted in good faith to resolve Aetna's objections to the subpoena before filing its Motion to Compel. IBC eliminated four categories of documents and narrowed the geographic scope of the two remaining categories. See 12/16/03 Tr. at p. 25.

[2] Docket Entry 173 is the under seal version of IBC's Motion To Compel Aetna to Produce Documents, while Docket Entry 174 is the version of IBC's motion that was not filed under seal.

508836

December 16, 2003 (the "Response to Motion to Compel") (Dkt. 178).  Magistrate Judge Smith conducted a hearing on December 16, 2003.

At the hearing, IBC showed that the information it seeks from Aetna is reasonably necessary for a fair opportunity to develop and prepare its case for trial.  Aetna, on the other hand, failed to show that equivalent information was available from other sources.  In its reply brief, submitted on December 22, 2003 (the "Reply Brief") (submitted to Magistrate Judge Smith's chambers per Order dated December 16, 2003), IBC explained that its efforts to obtain rate information indirectly from hospitals instead of directly from Aetna had met with substantial resistance, organized in part by Aetna.  Thus, on December 22, 2003, Magistrate Judge Smith entered an order directing Aetna to produce the following documents within twenty (20) days:

a.  Contracts with hospitals in the five-county Southeastern Pennsylvania region reflecting Aetna's reimbursement rates to those hospitals.

b.  Summary level documents sufficient to demonstrate Aetna's hospital reimbursement rates in the Central Pennsylvania region (Adams, Berks, Centre, Colimbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northamption, Northumberland, Perry, Schuylkill, Snyder, Union and York counties) broken down by hospital type (community, teaching or regional) and hospital size (by licensed bed counts), without prejudice to IBC's right to later seek the complete hospital contracts in this region, for good cause shown;

c.  Documents reflecting Aetna's strategic planning for the healthcare insurance markets in the Southeastern Pennsylvania counties.

Magistrate Judge Smith stated in his Order that Aetna would not be compelled to produce strategic planning documents for the Central Pennsylvania counties,[3] and that all documents produced pursuant to the Order would be deemed "Highly Confidential" pursuant to the Protective Order as entered and modified by the Court. (Dkt. 121).

The twenty days allowed in the December 22, 2003 Order have come and gone. Aetna filed its Objections to the Order on January 7, 2003, but did not seek a stay of the Order and has ignored the Order even though the Order is still in effect.

IBC respectfully submits that the Order of December 22, 2003 is supported by the record and that Aetna's Objections should be denied.

### The Standard of Review for a Magistrate Judge's Discovery Order and Exclusion of Evidence Not Presented to the Magistrate Judge

A district court may reconsider a magistrate judge's non-dispositive discovery order if the order is shown to be clearly erroneous or contrary to law. 28 U.S.C. §636(b)(1)(A); Fed. R.Civ. P. 72(a); Heintz Corp. v. Judson, 1995 U.S.Dist. Lexis 16328 (E.D.Pa., November 3, 1995) (Padova, J.) The district court exercises plenary review as to matters of law, but is bound by the clearly erroneous rule in findings of fact. Haines v. Liggett Group, Inc., 975 F.2d 81, 91 (3d Cir. 1992). "Clearly erroneous" means that the reviewing court is left with the "definite and firm conviction that a mistake has been committed," i.e. the fact finder's determination is completely devoid of minimum evidentiary support or bears no rational relationship to the evidence. Haines, supra, 975 F.2d at 92. In practice, a deferential standard of review is appropriate for discovery orders, and the magistrate's determination will only be reversed for abuse of discretion. Cooper Hospital v. Sullivan, 183 F.R.D. 119, 127 (D.N.J. 1998); Scott Paper Co. v. United States, 943

---

[3] Although IBC originally sought Aetna's strategic plans for Central Pennsylvania, IBC has not objected to the portion of December 22 Order that denies IBC's request for Aetna's strategic plans for Central Pennsylvania.

F.Supp. 501, 502 (E.D.Pa. 1996); Conway v. State Farm Fire & Caualty Co., 1998 U.S.Dist. Lexis 20137 (E.D.Pa. December 10, 1998) (Kauffmann, J.) and authorities cited therein.

In reviewing a magistrate judge's discovery orders, the district court may not consider evidence that was not presented to the magistrate judge. Haines, supra, 975 F.2d 92. Here the record consists of IBC's Motion to Compel, Aetna's Response, the transcript of the December 16, 2003 hearing, and IBC's Reply Brief.

In its Objections, Aetna attempts to raise matters that it did not present to Magistrate Judge Smith, including two exhibits (Exhibit 2 and Exhibit 4) to that were not included in its Response to Motion to Compel. Under the rule in the Haines case, the Court may not consider those exhibits or the arguments based on those exhibits at pages 3-4 and pages 7-9 of Aetna's Memorandum in Support of Objections.

### The Standard for Discovery of Confidential Commercial Information under Fed.R.Civ.P. 45

Under Fed.R.Civ.P. 45(c)(3)(B)(i), the party issuing the subpoena must show that its requests are relevant to its claims or defenses. The person opposing the subpoena must show that the information is subject to a privilege or is otherwise entitled to protection. The issuing party then has the burden of showing a substantial need for the testimony or other material that cannot otherwise be met without undue hardship." Mycogen Plant Science, Inc. v. Monsanto Co., 164 F.R.D. 623, 625-626 (E.D.Pa. 1996). "Substantial need" means "reasonably necessary for a fair opportunity to develop and prepare [the] case for trial." American Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 743 (Fed.Cir. 1987); see also Mannington Mills, Inc. v. Armstrong World Industries, Inc., 206 F.R.D. 525, 532 (D.Del. 2002).

The balancing test under Rule 45 is tilted in favor of disclosure. Coca-Cola Bottling Co. v. Coca-Cola Co., 107 F.R.D. 288, 292-93 (D.Del. 1985). "[O]rders forbidding any disclosure of trade secrets or confidential commercial information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel or to the parties." Federal Open Market Committee v. Merrill, 443 U.S. 340, 362 n.24 (1979).

Courts have long-recognized that the disclosure of confidential proprietary information may be necessary during a lawsuit to enable a party to adequately defend itself. See E.I. Du Pont De Nemours Powder Company v. Masland, 244 U.S. 100, 103 (1917) (holding that it is within the court's discretion to determine whether, to whom, and under what precautions, it should become necessary for trade secrets to be revealed to experts or other witnesses during a party's preparation of its defense). Thus, trade secrets are not privileged and are not immune from discovery. Coca-Cola Bottling, supra, 107 F.R.D. at 292. In Coca-Cola Bottling, the court stated that "discovery is virtually always ordered once the movant has established that the secret information is relevant and necessary." Id.

### The Relevance of Aetna's Reimbursement Rate Information and Strategic Plans

CCH specifically alleges in its first amended complaint that IBC "leverages" its "monopoly power" to gain "monopsony power," by which it "compels" hospitals in the five-county area to accept reimbursement rates that are below competitive levels. Amended Complaint at ¶23.

CCH further alleges that the Central Pennsylvania Counties (Adams, Berks, Centre, Columbia, Cumberland, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties) constitute a "benchmark" competitive market, with which CCH seeks to compare

the Southeastern Pennsylvania Counties (Bucks, Chester, Delaware, Montgomery, and

Philadelphia counties). Amended Complaint at ¶55. CCH alleges that there is increased

competition in the Central Pennsylvania Counties and that hospital reimbursement rates have

risen, since . CCH's Motion to Compel Capital Blue Cross To Produce Documents, pp. 8-9

(Attached as Exhibit "D"); CCH's Motion For Leave to File a Second Amended Complaint, p. 8

(Dkt. Entry 99).

Based on CCH's specific allegations, the hospital reimbursement rates that insurers pay to

hospitals that compete in the five-county Philadelphia region and the twenty-two county Central

Pennsylvania region are what this case is about. Aetna competes in both Central Pennsylvania

and Southeastern Pennsylvania. Thus, Aetna's reimbursement rates are relevant to CCH's claims

that hospital reimbursement rates are higher in Central Pennsylvania than in Southeastern

Pennsylvania.

Aetna's strategic plans for Southeastern Pennsylvania are likewise relevant to CCH's

specific allegations concerning Aetna and competition the Southeastern Pennsylvania healthcare

market. See pages 11-12, below.

IBC agrees that Aetna's rate information and strategic plans are confidential commercial

information. However, that does not end the inquiry. Aetna's rate information and strategic

plans are discoverable if they are reasonably necessary for IBC's development and preparation of

its defense to CCH's claims, and the need cannot otherwise be met without undue hardship.

### IBC's Need for Aetna's Reimbursement Rate Information

According to CCH, IBC has reduced reimbursement rates in southeastern Pennsylvania

below competitive levels through the exercise of monopoly power, and higher reimbursement

rates in the Central Pennsylvania market reflect competition among insurers for hospital

contracts. To defend itself against CCH's allegations and theories, IBC must analyze reimbursement rates that insurers pay to hospitals in both the Southeastern and the Central Pennsylvania counties. Aetna's position as a substantial insurer in both markets is unique. Thus, the rate information that Aetna can supply will be crucial in evaluating CCH's claims as to both the Southeastern and Central Pennsylvania markets.

Within the Southeastern Pennsylvania market, IBC intends to show that its reimbursement rates to hospitals are fair, reasonable and competitive. The only means of doing so is to compare IBC's reimbursement rates with other insurers' rates. IBC has sought rate information and strategic plans from the various insurers competing in those regions, including Aetna. Since the entry of the Amended Protective Order, all but Aetna have complied.

Significantly, Aetna concedes the relevance of its reimbursement rates in Chester County (Aetna's Response to IBC's Motion to Compel, p. 23), although it objects to producing rate information for any other counties in Southeastern Pennsylvania. Id. at pp. 23-24. However, if Aetna's rates are relevant in Chester County, they must also be relevant in any other county where Aetna competes with IBC. CCH specifically alleges that IBC "leverages" its "monopoly power" to gain "monopsony power," by which it "compels" hospitals in the "Greater Philadelphia area" to accept reimbursement rates that are below competitive levels and do not cover CCH's costs. Amended Complaint at ¶¶17, 23, 29 (emphasis supplied).[4] The Court already determined that this case is not limited to Chester County when it dismissed IBC's objection to the deposition of Grand View Hospital on the ground that Grand View Hospital could not be considered part of the same

---

[4] In its Amended Complaint, CCH defines the "relevant geographic market as the greater Philadelphia area, which includes Bucks, Chester, Delaware, Montgomery and Philadelphia counties in Pennsylvania." Amended Complaint at ¶29.

market as CCH.  Thus, IBC has a substantial need for Aetna's reimbursement rates in all five counties in the Southeastern Pennsylvania market.

IBC also needs to compare Aetna's reimbursement rates in Central Pennsylvania with Aetna's reimbursement rates in the Southeastern Pennsylvania market.  CCH has alleged that "reimbursement rates to hospitals operating in Central Pennsylvania have increased," but that hospital reimbursement rates in Southeastern Pennsylvania are artificially depressed.  CCH's Motion to Compel Capital Blue Cross To Produce Documents, p. 8 (attached to IBC's Reply Brief as Exhibit "D"); CCH's Motion For Leave to File a Second Amended Complaint, p. 8 (Dkt. 99).  The reimbursement rates of a third-party competitor in both markets, such as Aetna, are highly relevant to such allegations.

As an accommodation to Aetna, IBC indicated in its Reply Brief that, for Central Pennsylvania only, it would accept summary level documents sufficient to demonstrate Aetna's hospital reimbursement rates broken down by hospital type (community, teaching, or regional) and hospital size (by licensed bed counts) for Central Pennsylvania – rather than Aetna having to identify particular hospitals and produce contracts for all hospitals in Central Pennsylvania.  IBC assumed it would be easier and more palatable for Aetna to produce summary information.  (IBC reserved the right to seek additional information if Aetna's summary information turned out to be incomplete or if the summary information proved to be inadequate for purposes of the litigation.)  If, as Aetna now appears to complain, it is more burdensome to produce summary rate information than it is to produce detailed rate information on a hospital by hospital basis, then IBC is prepared to accept the detailed information.

**IBC's Need for Hospital Reimbursement Rate Information Cannot Be Met from Other Sources**

Individual private insurer reimbursement rates are not publicly available. Aggregate reimbursement rates are also not publicly available. The reason for this is that every private insurer requires the hospitals with which it does business to keep its rates confidential. Aetna's Response to Motion to Compel, Exhibit 5, Declaration of R. Franzoi, at ¶¶5 ("I can attest to the fact that in Aetna's industry, information such as rate schedules are uniformly considered to be proprietary and confidential.") and ¶8 ("Because such information is confidential and proprietary, Aetna always includes in its provider contracts provisions as to Confidentiality and Non-Disclosure, prohibiting direct or indirect disclosure to any third parties of, specifically, the rate schedules or other financial terms of such contracts.") See also ¶¶9, 11, 12 and 13.

IBC has no other means of acquiring Aetna's rate information, except by serving every hospital in Southeastern and Central Pennsylvania with a subpoena requesting disclosure of their contracts with Aetna. In fact, IBC has sought rate information (including but not limited to Aetna rates) from a number of CCH's closest competitors in Chester, Montgomery, and Delaware Counties. Half of them raised relevancy objections, asserted contractual obligations not to disclose the rates, and ultimately forced IBC to file motions to compel. See the Affidavit of H. David Seidman, Esquire (Exhibit "E" to IBC's Reply Brief). Indeed, Riddle Memorial Hospital ("Riddle") stated in its Responses to IBC's Motion to Compel that it "had been notified by counsel for insurers, including Aetna . . ., cautioning Riddle against production of its contract materials." Riddle's Response, p. 2 (Exhibit "E" to IBC's Reply Brief).[5] At the November 13, 2003 hearing on IBC's motions to compel, Riddle reiterated this concern: "The other major concern . . . is that

---

[5]  IBC incorrectly identified and labeled Riddle's Response as Exhibit E in its Reply Brief. Riddle's Response is the second Exhibit E. The first Exhibit E is the Affidavit of David Seidman.

we — as with other hospitals — have been quite frankly, threatened with litigation by other insurers. . . ." 11/13/03 Tr. at p. 36 (Exhibit "F" to IBC's Reply Brief). Paoli Memorial Hospital received the very same threat: [Aetna] . . . holds the confidentiality agreement and we have been directed in writing by them that we are at risk of liability if we produce them." 11/13/03 Tr. at p. 10 (attached as Exhibit "F" to IBC's Reply Brief). If IBC must subpoena individual hospitals for reimbursement rate information, instead of getting that information from insurers directly, history suggests that nearly half of the hospitals will object to IBC's request, refuse to provide reimbursement rate information, burden the parties and the Court with motion practice, and make it all but impossible for the parties to discover critical data.

In its Response to the Motion to Compel, Aetna suggested that IBC could adequately defend itself using published information that Aetna attached to its Response. Exhibit 7 to Aetna's Response to Motion to Compel consisted of two pages from a website maintained by HealthLeaders Research. The website purports to provide data concerning health plans in 22 states, including Pennsylvania. However, there is no reference to data concerning hospital reimbursement rates either on a statewide basis or on a regional basis within particular states. Exhibit 8 consisted of four pages advertising a subscription database service maintained by InterStudy Publications. The second page refers to data concerning HMO enrollment by product, number of physician and hospital contracts, HMO contact information, hospital utilization indicators, reimbursement methods for primary and specialty care physicians, market composition and characteristics. There is no reference to data concerning hospital reimbursement rates by insurer or otherwise. Exhibit 9 was a page from the Philadelphia Business Journal ranking twenty-three HMOs by number of local members. This page contains no information concerning hospital reimbursement rates by insurer or otherwise. Exhibit 10

included pages 29-45 of the Pennsylvania Health Care Cost Containment Council's publication entitled "Financial Analysis 2002." The Financial Analysis 2002 displays net patient revenue, the Medicare and Medical Assistance share of net patient revenue, the operating margins and total margins, the operating income and total income, and the total operating revenues for individual hospitals. However, the Financial Analysis 2002 displays no information concerning hospital reimbursement rates paid by private insurers. Exhibit 11 consisted of 8 pages describing Milliman's Hospital Efficiency Index. The Hospital Efficiency Index purports to present actuarial analysis of hospital inpatient admissions, length of stay and days. There is no reference to hospital reimbursement rates paid by private insurers. Exhibit 11 also contained two pages from two websites maintained by Milliman, one concerning the Hospital Efficiency Index and the other concerning the Health Cost Index Report, which discusses trends in the market average rate of increase in medical costs for a typical health insurance package. Again, there is no reference to any hospital reimbursement rates by insurer or otherwise.

During the December 16, 2003 hearing, IBC's counsel challenged Aetna's counsel to show which, if any, of Exhibits 7 through 11 contain any hospital reimbursement information. Aetna's counsel failed to do so. (12/16/03 Tr. at pp. 35-36) Thus, Aetna failed to show that IBC could obtain reimbursement information from any published sources.

**IBC's Need for Aetna's Strategic Plans**

CCH alleges in its first amended complaint that IBC has erected barriers that caused Aetna to reduce its presence in Southeastern Pennsylvania. Specifically, CCH alleges, "In the relevant market(s), [IBC has erected] significant barriers to entry and/or expansion by new or smaller managed care and health benefits companies that might seek to compete with IBC." (Amended Complaint at ¶31) In support of its claim, CCH states that "[t]his is evidenced by …

the reduced presence of IBC's largest competitor, Aetna." (Amended Complaint at ¶31). CCH further alleges, that "[a]s a result of [IBC's] ... conduct, ... [c]ompetitors of ... IBC have been and will be hindered and obstructed in their ability to compete in the relevant market(s), as IBC activities ... have had the effect of either increasing rivals' costs or providing incentives for potential competitors not to enter the market." (Amended Complaint at ¶57a).

Taken together, these allegations state that IBC hindered Aetna's ability to compete in the Southeastern Pennsylvania market by either increasing Aetna's costs or providing incentives for Aetna to leave the market. Thus, Aetna's strategic plans for the Southeastern Pennsylvania market are essential for IBC to prepare a response to CCH's specific allegations concerning Aetna.

IBC must also prepare to refute CCH's overall analysis of the Southeastern Pennsylvania market. CCH has characterized the Southeastern Pennsylvania market for commercial payors as a duopoly controlled by IBC and Aetna. (Exhibit "A" to IBC's Motion To Compel Aetna to Produce Documents With Exhibit "A") (Dkt. 173) (excerpts from CCH internal presentations, filed under seal). Thus, any analysis of the market without Aetna's strategic plans would be incomplete for purposes of addressing CCH's allegations and theories.

**IBC's Need for Aetna's Strategic Plans Cannot Be Met from Other Sources**

By its own declaration, Aetna's strategic plans are not publicly available and can only be obtained from Aetna. Aetna's Response to Motion to Compel, Exhibit 6, Supplemental Declaration of R. Franzoi, at ¶5 ("Because [Aetna's strategic plans] are so sensitive, Aetna never reveals this information to third parties, directly or indirectly.") Thus, IBC has a substantial need for Aetna's strategic plans that cannot otherwise be met.

**The December 22, 2003 Discovery Order Is Not Clearly Erroneous or Contrary to Law**

The record in this case supports the issuance of Magistrate Judge Smith's December 22, 2003 Order. IBC demonstrated that hospital reimbursement rate information, including but not limited to Aetna's rates, is reasonably necessary for a fair opportunity to develop and prepare its case for trial. IBC demonstrated that hospital reimbursement rate information, including but not limited to Aetna's rates, is not publicly available. IBC further demonstrated that obtaining rate information from the hospitals themselves would be unduly burdensome to the hospitals, the Court, and IBC.[6] Thus, Magistrate Judge Smith did not abuse his discretion in issuing the December 22, 2003 Order. See FTC v. Lonning, 539 F.2d 202 (U.S.App.D.C. 1976) (allowing discovery of individual brand cost data subject to a protective order); Heat & Control, Inc. v. Hester Industries, Inc., 785 F.2d 1017, 1025 (Fed.Cir. 1986) (discovery of trade secrets allowed subject to a protective order). As the Court of Appeals sated in the Heat & Control case: "When a court is confronted with a motion to quash, its duty is not to deny discovery altogether, but to reduce the demand to a reasonable level, considering the parties' concerns."

Aetna relies on three cases that it believes require the December 22, 2003 Order to be reversed. All three cases are distinguishable from this case.

In R&D Business Systems v. Xerox Corporation, 152 F.R.D. 195 (D.Colorado 1993), Xerox was accused of monopolizing the market for high volume copier and printer parts and services. Xerox served broad document requests on non-party, competing parts suppliers. In consideration of their objections, Xerox agreed to limit its document requests. Xerox then sought to depose officers of the competing parts suppliers concerning matters previously

---

[6] With respect to the burden of obtaining Aetna's rates indirectly from the hospitals in Southeastern and Central Pennsylvania, see the 12/16/03 Transcript at pages 29, 30-32, 33-34, 36-37.

excluded from the document production by agreement, including certain trade secrets such as parts and supplies source, research and development efforts, market strategy and customer lists. The court ruled that Xerox must limit its deposition questions in accordance with the agreements reached on the limits to document production. Id. at 198. The court reasoned that if the documents were unnecessary, the testimony would also be unnecessary. Id. at 197. The court also noted that the competing parts suppliers only sold 300 parts out of a total of 172,000 parts needed for a copy machine. Thus, even if all the requested discovery were produced, Xerox would only be able to show an alternative supply for a fraction of a percent of the parts necessary to operate a copy machine. Id. at 197.

R&D Business essentially stands for the proposition that discovery agreements regarding the scope of document production by a non-party will also apply to depositions of the non-party. That proposition is not applicable in this case, because IBC is not trying to back away from any discovery agreement. R&D Business could also stand for the proposition that trade secrets need not be disclosed if the information would be immaterial from an economic point of view. In this case, however, Aetna's role in the Southeastern and Central Pennsylvania markets is substantial and is not economically immaterial.

In Mannington Mills, Inc. v. Armstrong World Industries, Inc., 206 F.R.D. 525 (D.Del. 2002), Mannington alleged that Armstrong infringed Mannington's patents on resilient vinyl flooring. Armstrong asserted that the patents were invalid. Armstrong subpoenaed Congoleum to produce samples of its resilient vinyl flooring products. Mannington then subpoenaed Congoleum to produce documents relating to its sales, market share, profits, and product testing. Mannington asserted that Congoleum's products also infringed its patents and that the subpoenaed information was relevant to the nonobviousness of Mannington's patents and their

commercial value. Mannington relied on an expert affidavit, which stated that three floor samples produced by Congoleum potentially violated Mannington's patents but did not address any of Congoleum's hundreds of other products that were included in the scope of Mannington's subpoena. Moreover, the expert did not comment on whether Congoleum's products were successful due to the merits of Mannington's claimed invention. Thus, the court concluded that Mannington failed to show any relationship between its patents and Congoleum's confidential financial, marketing and sales data. Finally, the court noted that Mannington was suing two of its three primary competitors on similar grounds, and that Mannington would be able to obtain financial, marketing and sales information from them.

Mannington based its need for Congoleum's confidential commercial information on the premise that Congoleum's products infringed Mannington's patents. That premise was a matter for expert opinion, and thus an expert affidavit was required. In this case, IBC is not obliged to establish a potential anti-trust violation in order to support its subpoena to Aetna. It is self-evident that in order to meet CCH's allegations concerning reimbursement rates in the Southeastern and Central Pennsylvania markets and CCH's specific allegations concerning barriers to Aetna's competition in the Southeastern Pennsylvania market, IBC needs to discover what the reimbursement rates and the barriers are. Thus, no expert affidavit is required.

Moreover, IBC is not suing or being sued by the insurers with whom it competes. Thus, unlike Mannington, IBC is not in a position to collect relevant market information from discovery against parties against whom it is litigating.

In ACT v. Sylvan Learning, 1999 U.S. Dist. LEXIS 7055 (E.D.Pa. 1999), ACT alleged that Sylvan Learning Centers tortiously interfered with several existing or prospective contracts between ACT and potential clients in an effort to monopolize the market for computer based

testing. ACT proceeded to request documents from ASI, the third largest competitor in the market, which was not a party to the case. In part, ACT sought evaluations of competitive conditions, analyses of barriers to entry, and discussions of the number of testing centers and the volume of testing hours needed to compete. Id. at *2 -*3. ASI objected that ACT could obtain market assessment information. ACT did not deny or attempt to rebut ASI's contentions from its own internal research, from the defendant and from commercial researchers. Therefore, the court did not enforce this part of ACT's subpoena. However, the court did not quash the subpoena and allowed ACT seek additional enforcement under appropriate circumstances.

In this case, unlike the situation in the ACT case, the hospital reimbursement rate information and strategic plans that IBC seeks from competing insurers (including but not limited to Aetna) is not available from IBC's own resources, from CCH, or from any other commercial/public source. See Affidavit of H. David Seidman, Esquire (attached as Exhibit "E" to IBC's Reply Brief). There is no substitute for Aetna's actual reimbursement rates or strategic plans. Id. Simply stated, IBC's consultants cannot perform any meaningful analysis of reimbursement rates and competition in the markets identified by CCH without the rates and business plans of IBC's competitors, including Aetna. It is worth noting that other insurers have produced confidential commercial information, including reimbursement rates and strategic plans, to IBC under the terms of the Amended Protective Order.

### The Risk of Harm to Aetna Is Small

Aetna essentially complains of two disclosure risks. The first is disclosure of its confidential commercial information to IBC. This risk has already been addressed in the amendments to the Protective Order. Under the terms of the Amended Protective Order, IBC executives and employees will have no access to Aetna's confidential proprietary information.

All non-party insurer-related documents will be marked "non-party highly confidential."
Marking the documents in this manner will assure that only outside counsel, outside counsel's
experts, and the Court will have access prior to trial.  In <u>FTC v. Lonning</u>, 539 F.2d 202
(U.S.App.D.C. 1976) it was held that it was not an abuse of discretion to allow the disclosure of
individual brand cost data, provided disclosure was limited to counsel of record.

The second risk is disclosure of Aetna's confidential commercial information to the
public if its information is used at trial.  This concern is premature, because the case may never
go to trial.  The Court expressly reserved for further consideration the issue of how confidential
information will be protected upon completion of discovery.  The controlling Protective Order
states:  "The procedures for handling Litigation Materials at the time a summary judgment
motion is filed and at the time of trial in this matter are not within the scope of this Order and
will be addressed in a future Order of the Court."  Amended Protective Order, p. 1 (Dkt. Entry
121).

Some courts have indicated that a non-party who produces confidential commercial
information may be unfairly at risk of disclosure, if it is excluded from deliberations on the use
of such material at trial.  <u>Micro Motion, Inc. v. Kane Steel Co., Inc.</u>, 894 F.2d 1318, 1325
(Fed.Cir. 1990); <u>Mannington Mills, Inc. v. Armstrong World Industries, Inc.</u>, 206 F.R.D. 525,
530-531 (D.Del. 2002).  That is not the case here.  First, Aetna has already been granted
intervention with respect to the Protective Order and will be able to participate in setting the
procedures for use of its confidential information at trial.  Second, the <u>Micro Motion</u> case
involved the enforcement of a subpoena in a court other than the court where the main action was
pending and where the protective order was entered.  Here, the protective order and the discovery

order both emanate from the Eastern District of Pennsylvania, the court in which Aetna prefers to litigate these matters.

### The July 25, 2003 Subpoena Was Not Issued Out of the Wrong Court

IBC's original July 25, 2003 subpoena was properly issued from the District Court for the District of Connecticut and served on Aetna's national headquarters, with a facsimile copy to Aetna's local counsel.

Aetna's national headquarters has possession, custody, or control of the information that IBC is seeking. Courts have long-recognized that a corporate parent may be held responsible for producing documents of its wholly-owned or controlled subsidiaries on the ground that such documents are within the possession, custody, or control of the parent. Camden Iron and Metal v. Marubeni America Corporation, 138 F.R.D. 438, 441 (D. N.J. 1991) (noting that when determining which entity has control over documents the court measures the degree of ownership and control exercised by the parent over the subsidiary); E.I. Dupont De Nemours & Company v. Phillips Petroleum Company, 621 F. Supp. 310, 311 n.3 (D. De. 1985) (stating that a 'parent company must produce documents, pursuant to a Fed. R. Civ. P. 34 request, of a wholly-owned subsidiary even though the subsidiary is not a party to the action') (citations omitted). Cf. Uranium Antitrust Litigation, 480 F. Supp 1138, 1152 (N.D. Ill. 1979) (corporate parent held responsible for producing the documents of its wholly-owed subsidiaries but not the documents of its 43.8%-owned subsidiary which separately conducted its business affairs).

IBC's July 25, 2003 subpoena was not defective, because Aetna was served within 100 miles of the issuing court and IBC stated that it would inspect Aetna's documents at a mutually convenient location. Contrary to Aetna's allegations, the subpoena did not require Aetna to produce documents beyond the 100 mile limit. In fact, IBC sought production either at

Obermayer Rebman Maxwell and Hipple LLP's offices or at a mutually agreed upon location, i.e., within one hundred miles of the issuing court in Connecticut. Nothing precluded Aetna from choosing a location in the District of Connecticut.

Aetna asserts that only the District Court for the District of Connecticut can enforce a subpoena issued there. However, Aetna itself showed no desire to litigate in Connecticut. Aetna had the right to file a motion to quash or for a protective order in the District of Connecticut. U.S. v. Star Scientific, 205 F.Supp.2d 482, 485 (D. Md. 2002) (noting that a non-party has several options: (1) file a motion to quash or modify the subpoena; (2) seek a protective order; or (3) object to production by opposing a motion to compel). Instead, Aetna chose to file a motion to intervene in the Eastern District of Pennsylvania to participate in the process of amending the protective order entered in the Eastern District, which Aetna contends applies to IBC's subpoena

Moreover, IBC filed the Motion to Compel in the Eastern District by agreement with Aetna's local counsel. Aetna agreed to argue any discovery motions concerning IBC's subpoena in the District Court for the Eastern District of Pennsylvania by letter dated September 2, 2003 correspondence. (attached to IBC's Motion to Compel Aetna to Produce Documents as Exhibit "C") (Dkt. 173 & 174). If the recipient of a subpoena so desires, the court where the subpoena was issued will normally transfer any discovery dispute to the court where the main action is pending. United States v. Star Scientific, Inc., 205 F.Supp.2d 482 (D.Maryland 2002); see also Central States, Southeast and Southwest Areas Pension Fund v. Quickie Transport Company, 174 F.R.D. 50, 52 n.4 (E.D.Pa. 1997). That is essentially what happened here, without the formality of a motion to transfer. Aetna should be estopped from arguing otherwise. IBC could easily have filed the Motion to Compel in the District of Connecticut; however, IBC relied on Aetna's agreement when it filed its Motion to Compel in the Eastern District of Pennsylvania.

Moreover, any possible jurisdictional issues are now moot, because IBC, at Magistrate Judge Smith's direction, re-issued its document subpoena from the Eastern District of Pennsylvania, on December 17, 2003, and served it on Aetna at 980 Jolly Road, Blue Bell, Pennsylvania 19422, well within the 100 mile limit.

### IBC Did Not Withdraw the July 25, 2003 Subpoena When It Issued a Modified Subpoena on December 17, 2003

Aetna relies upon Stewart v. Mitchell Transport, Civ. A. No. 01-2546, 2002 U.S. Dist. LEXIS 12958, *29 (D.Kan. July 11, 2002) for the proposition that the issuance of a second subpoena has the effect of withdrawing the first subpoena. In that case, the plaintiff served a subpoena on a non-party who objected that service was improper. The plaintiff proceeded to re-serve the subpoena on that non-party. The Court concluded without explanation or authority that the first subpoena was withdrawn. The only explanation for the Court's ruling seems to be that the Court interpreted plaintiff's voluntary reissuance of the subpoena as an admission that the first subpoena was improperly served.

The Court of Appeals for the Third Circuit has ruled that issuing a modified subpoena does not withdraw the original subpoena. In Gross v. Searle, G.D., & Co., 738 F.2d 600, 601-602 (3d Cir. 1984), the Third Circuit found "no merit" in appellant's argument that it should be excused from its failure to comply with defendant's original subpoena due to the issuance of a modified subpoena following appellant's deposition.

Here, IBC served a modified version of its original subpoena on December 17, 2003. Thus, under Searle, the original subpoena remains in effect. Moreover, IBC issued the modified subpoena at the oral direction of Magistrate Judge Smith. (12/16/03 Tr. at 38-40, 42) Thus, IBC's action cannot be construed as a voluntary admission.

### Neither IBC's Subpoena Nor the December 22 Order Constitutes an Unconstitutional Taking of Aetna's Property

IBC's request for production of Aetna's reimbursement rate and strategic planning documentation for the purpose of defending itself in this lawsuit does not constitute a taking of private property in violation of the Fifth Amendment.

The Fifth Amendment prohibits the taking of private property for public use without due process of law and just compensation. The takings clause only proscribes takings by the government for public use. Yee v. City of Escondido, 503 U.S. 519, 522 (1992); Bennett v. White, 865 F.2d 1395, 1406 (3d Cir. 1989). "In general, it may be said that a public use is one which concerns the general public, or a portion thereof, as distinguished from particular individuals. . . . use is public if it is a public benefit, utility or advantage." In re United States, 28 F.Supp. 758, 761 (W.D. N.Y. 1939) (citations omitted). Thus, the Fifth Amendment has no applicability in this case, because no government actor is taking Aetna's property for a public use. Rather, IBC, which is a private entity and not a government actor, is seeking discovery from Aetna for the private purpose of defending itself against charges that its rates are not competitive or even anti-competitive.[7]

Further, Aetna's trade secrets produced for use during this lawsuit will not enter the public domain. In fact, confidentiality concerns regarding public dissemination raised by non-party insurers, including Aetna, led this Court to amend the Protective Order, thereby extending extraordinary protections for the confidential information produced by third parties. Under the terms of the Amended Protective Order, neither members of the public nor IBC executives nor

---

[7] By contrast, a compensable governmental taking of trade secrets occurred in Amchem Products v. Costle, 481 F.Supp. 195, 198-199 (S.D. NY 1979), where the Environmental Protection Agency, a federal agency, disclosed Amchem's trade secrets to competing pesticide manufacturers for the purpose of lessening the likelihood that commerce in pesticides would harm the public.

employees will have access to Aetna's confidential proprietary information. Accordingly, all non-party insurer-related documents will be marked "non-party highly confidential." Marking the documents in this manner will assure that only outside counsel, outside counsel's experts, and the Court will have access. Because Aetna's property will not be used for some public purpose but will rather be strictly limited to use in this private lawsuit, Aetna's property rights have not been extinguished and thus, compelling Aetna's compliance with IBC's document requests do not amount to a taking under the Fifth Amendment.

Aetna's due process rights have not been violated, inasmuch as Aetna has been afforded both notice and the opportunity to be heard on IBC's Motion to Compel. Aetna was also a leading participant in the designing of the Amended Protective Order.

Finally, Aetna has no claim that it is not being justly compensated, because IBC has already agreed to pay the reasonable costs Aetna incurs in responding to IBC's document discovery, namely the reasonable copying, Bates labeling, and shipping charges. IBC, however, is under no obligation to compensate Aetna for the value of any confidential information ordered disclosed, because IBC is not seeking Aetna's confidential information for its own, private business use, but rather for the limited purpose of defending itself against plaintiff's allegations. Under the terms of the Amended Protective Order, neither members of the public nor IBC executives nor employees will have access to Aetna's confidential proprietary information. All non-party insurer-related documents will be marked "non-party highly confidential," ensuring that only outside counsel, outside counsel's experts, and the Court will have access to such information.

Aetna's reliance on Arthur R. Miller, <u>Confidentiality, Protective Orders, and Public Access to the Courts</u>, 105 Har. L. Rev. 427, 468 (1991), is misplaced. The article does not

support the proposition that compelling a party to comply with a discovery order amounts to a taking of private property in violation of the Fifth Amendment. Rather, the article concerns whether the disclosure of confidential commercial information by a government agency, as required under some of public access legislation, <u>may</u> amount to a taking of private property in violation of the Fifth Amendment. The only other relevant statement appears in a parenthetical in note 332, where the author characterizes a second article as stating that the "failure to provide a protective order for trade secrets would generally work a taking under the Fifth Amendment." <u>Id</u>. at 495, n. 332. Given that a Protective Order has been entered in this case, however, no Fifth Amendment violation has occurred.

## CONCLUSION

For all of the foregoing reasons, IBC respectfully requests Aetna's Objections to the

Order of December 22, 2003 be denied, along with Aetna's request for attorney fees.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

BY: _Richard P Limburg_
THOMAS A. LEONARD
PAUL S. DIAMOND
WILLIAM J. LEONARD
RICHARD P. LIMBURG
WILLIAM K. PELOSI
H. DAVID SEIDMAN
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
(215) 665-3000

HOWREY SIMON ARNOLD & WHITE LLP

JOHN DeQ BRIGGS
JAMES G. KRESS
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 383-7015

Attorneys for Defendants,
Independence Blue Cross,
Keystone Health Plan East,
QCC Insurance Company, and
Keystone Mercy Health Plan

Dated: January 21, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CHESTER COUNTY HOSPITAL<br><br>v.<br><br>INDEPENDENCE BLUE CROSS,<br>QCC INSURANCE COMPANY,<br>KEYSTONE HEALTH PLAN EAST, and<br>KEYSTONE MERCY HEALTH PLAN | CA No.  2:02CV2746 |

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Defendants' Memorandum Of Law In

Opposition To Aetna's Objections To The Discovery Order Of December 22, 2003 was served,

this 21st day of January 2004 as follows:

**VIA EMAIL &**
**FEDERAL EXPRESS**
James C. Crumlish, III, Esquire
Union Meeting Corporate Center V
P.O. Box 3010
925 Harvest Drive
Blue Bell, PA  19422
Email: JCC@erse.com
*Counsel for Aetna, Inc.*

**VIA HAND DELIVERY**
Lewis R. Olshin, Esquire
Duane Morris, LLP
One Liberty Place, Suite 4200
Philadelphia, PA 19103-7396
*Counsel for Plaintiff,*
*Chester County Hospital*   .

**VIA EMAIL & FEDERAL EXPRESS**
Richard A. Feinstein, Esquire (rfeinstein@bsfllp.com)
Daniel A Kotchen, Esquire (dkotchen@bsfllp.com)
Boies, Schiller & Flexner, LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC 20015
Facsimile No. (202) 237-6131
*Counsel for Plaintiff,*
*Chester County Hospital*

_____
RICHARD P. LIMBURG