**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| THE CHESTER COUNTY HOSPITAL | : | |
| | : | |
| v. | : | |
| | : | NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS, | : | |
| QCC INSURANCE COMPANY, | : | |
| KEYSTONE HEALTHPLAN EAST, and | : | |
| KEYSTONE MERCY HEALTH PLAN | : | |

---

**NON-PARTY AETNA INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS**
**OBJECTIONS TO THE MAGISTRATE JUDGE'S DECEMBER 22, 2003 ORDER**

Aetna Inc. ("Aetna") submits this Reply Memorandum in further support of its

Objections to the Magistrate Judge's December 22, 2003 Order, and in rebuttal to the

January 21, 2004 Response submitted by Independence Blue Cross ("IBC").

**I.    INTRODUCTION**

IBC is presently attacking Aetna in misleading radio ads and in aggressive

legislative lobbying targeted at undercutting the very same strategic marketing, business

and reimbursement rate trade secrets that it seeks from Aetna through this Court.  *See*

pages 3-4 and 7-9 and Exhibit 2 of Aetna's Objections and Memorandum in support

thereof.  The only "need" IBC has for Aetna's trade secrets is ***competitive***, as IBC has

complained publicly about how it is losing customers to Aetna, and is in the midst of a

negative attack ad campaign against Aetna, trying to entice customers to "come back" to

IBC.  *Id*.  IBC's real need is plainly disclosed by the fact that IBC, despite two rounds of

briefing before the Magistrate Judge and this Court, has utterly failed to produce a single

shred of evidence from any of its army of "consultants" who supposedly "need" Aetna's

trade secrets.  *See* 12/22/03 letter of IBC's counsel to Magistrate Judge Smith, page 6;

Exhibit "6" hereto.  Incredibly, despite the fact IBC had the burden, only Aetna has submitted evidence on the issue of need, including the attached Declaration of nationally-recognized healthcare economist, Glenn Melnick, Ph.D.  Dr. Melnick's Declaration further exposes IBC's charade and establishes, among other things, that IBC has no need at all for Aetna's trade secrets in order to defend the allegations it cited to Magistrate Judge as the issues IBC "needs" to refute.  *See* Exhibit "5" (Declaration of Dr. Glenn Melnick).

Knowing it cannot and has not satisfied its burden to prove "substantial need," IBC desperately again relies upon the wrong legal standard.  Instead of addressing the "substantial need" test under the amended Rule 45 and applicable caselaw, IBC resorts to a "reasonably necessary" standard from inapplicable rules and caselaw pre-dating the amendments to Rule 45.  But Rule 45's 1991 amendments expressly raised the bar considerably for litigants, like IBC, trying to force non-party competitors to release trade secrets under the guise of "discovery."  *See* Reply Argument, *infra*, Section "III.13-14." *See also R&D Business Systems v. Xerox Corp,* 152 F.R.D. 195, 197 (D. Colo. 1993)(rejecting defendant's attempt to obtain trade secrets based on mere showing they were "relevant" and statements by counsel that it "needs" the information, and requiring that the litigant "must also show a substantial need for the information" to the defense, and show that such need outweighs the "potential harm").  *See also ACT, Inc. v. Sylvan Learning Systems, Inc.*, 1999 WL 305300 at *2, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999)(rejecting attempts of a competitor to obtain another competitor's market assessment planning information, rejecting argument, same as IBC is making here, that it

was allegedly relevant to "barriers to entry" issues). *See* Exhibit "5" (Declaration of Dr. Glenn Melnick, pp. 2-10).

IBC also resorts to misstating the allegations of CCH's Amended Complaint that it cited to Magistrate Judge Smith as the sole basis for alleging a "substantial need" to get Aetna's trade secret rates. As Dr. Melnick confirms, the paragraphs cited by IBC have nothing at all to do with ***Aetna's*** rates; rather, the allegations are that ***IBC's*** rates (not Aetna's) force hospitals to accept prices that are ***below the hospitals' costs***. *See Id.* at pp. 4-10.

IBC's conduct precipitating the Order is rendered more extraordinary and unfair because Aetna was denied not only the right to see numerous pleadings and other information that was kept "secret" from Aetna under seal *(see e.g.* Dkt Entries 174 and 190), ***but also an opportunity to see and to respond to the information that IBC submitted to Magistrate Judge Smith with its 12/22/03 letter precipitating the 12/22/03 Order.*** IBC's 12/22/03 letter with exhibits – which purportedly contains IBC's only *alleged* compliance with Rule 45's requirement to show "substantial need" – ***was never even served upon Aetna by IBC until after the Order was entered.*** Incredibly, IBC now argues that Aetna should have no opportunity to provide this Court with facts and evidence – none of which IBC disputes – in further rebuttal of IBC's submissions and arguments. IBC hides behind an incorrect statement of this Court's standard of review in making this argument. *See* Section "III.F," *infra.*

In addition to the obvious unfairness of such process, should this Court do anything but set aside the Magistrate's Order and deny IBC's motion outright for failure to meet its Rule 45 burden, then a hearing is necessary, following discovery by Aetna

into IBC's alleged "substantial need" and its alternative motives for seeking Aetna's trade secrets.  In order for Aetna to know and evaluate what IBC is saying it "substantially needs" to defend this case, and to then assert Aetna's rights under Rule 45 and the applicable law, Aetna is also entitled to know what IBC already possesses for its defense. "Need" depends not merely on IBC's motives and purposes, but on what IBC already has in its possession, and what is otherwise readily available to it from other sources.

Thus, Aetna is entitled to know what facts, information and expert opinions IBC already has regarding the allegations in this case and its defenses.  Aetna is entitled to know what facts IBC already knows about Aetna and the Aetna information it pretends to "need."  Only then will Aetna have a fair opportunity to rebut IBC's alleged "need" for Aetna's trade secrets.  Presently, Aetna continues to be denied such knowledge, including through IBC's citation to matters under seal.  Accordingly, the 12/22/03 Order must be set aside and IBC's motion must be denied on the present record.  If the motion is not denied, Aetna must be afforded discovery and an evidentiary hearing on IBC's alleged "substantial need" for Aetna's trade secrets and IBC's alternative motives and intentions.

## II.    FACTUAL BACKGROUND REBUTTAL

### A.    IBC's Response Confirms It Produced No Evidence Showing "Substantial Need" That Justifies Forcing Aetna To Turn Over Trade Secrets To A Principal Competitor.

Neither Aetna nor Magistrate Judge Smith has been told what exactly IBC, or its "consultants," need to prove through access to Aetna's trade secrets, if anything.  The record discloses that the only thing IBC offered before the Magistrate Judge, and all it continues to argue in its response, is that Aetna's trade secrets cannot be publicly obtained.  Of course, that says nothing about, let alone prove, what is required under Rule

45 as amended. In fact, by definition, Aetna's trade secrets are secret. They are not publicly available. That is why Rule 45 requires a litigant like IBC to prove a "substantial need" if it wants to have them.

IBC's argument is entirely misdirected. Obviously, if showing "public unavailability" were all that is needed for litigants to prove a "substantial need" to force a non-party competitor to release trade secrets, trade secrets would cease to exist and Rule 45's "substantial need" requirement would be rendered utterly meaningless.[1]

IBC's decision not to produce any specific evidence of "substantial need" demonstrates its intent to fish through Aetna's trade secrets, merely to see what is there, regardless of whether it helps or hurts IBC's defense. This is clearly prohibited under Rule 45 and applicable caselaw, especially following the 1991 amendments. *See* Aetna's 1/7/04 Memorandum in Support of Objections, pp. 14-26. *See also* Section "III.A," *infra*.

Further, it is significant that the plaintiff, CCH, whose allegations IBC cites as the basis for the alleged "need" to get Aetna's trade secrets, has not moved to compel disclosure of Aetna's trade secret rates and strategies. Peculiarly, only IBC wants Aetna's trade secrets in this case, but is unwilling to say what particular points will be proven by them, or why they are needed to prove matters that have nothing to do with the cited allegations of CCH. *See* Amended Complaint, Paras. 17, 23, 29 (cited in IBC's 12/22/03 letter to Magistrate Judge, page 3, as the alleged basis for "needing" Aetna's trade secret rates). *See also*, Exhibit "5" (Declaration of Dr. Glenn Melnick).

---

[1]The *Mannington Mills* Court exposed the circuity of IBC's argument, when it rejected the very same contention IBC is making here. *Mannington Mills, Inc. v. Armstrong World Industries, Inc.,* 206 F.R.D. 525 (D. Del. 2002). IBC's response fails to offer any credible rebuttal to *Mannington Mills*. *See* Section "III. A ," *infra*.

**B.** **Dr. Melnick's Declaration Submitted By Aetna – The *Only* Expert Evidence Regarding "Substantial Need" – Further Establishes The Absence Of Any Need For Either Aetna's Rates Or Its Strategic Plans To Defend The Allegations Cited By IBC To The Magistrate Judge.**

Dr. Melnick, an expert economist who is one of the preeminent authorities in this field, shows that IBC's claimed "need," as proffered in its 12/22/03 letter to Magistrate Judge Smith, has no valid basis. *See* Exhibit "5" (Declaration of Dr. Glenn Melnick).

IBC is well aware that it has the burden to demonstrate a "substantial need" for accessing Aetna's trade secrets before such sensitive proprietary information must be disclosed. For that very reason, and at the discretion of Magistrate Judge Smith, IBC's counsel submitted a December 22, 2003 letter to Magistrate Judge Smith, purporting to detail all reasons why IBC had a "substantial need" for this kind of intrusive discovery of a non-party business competitor.

In its December 22, 2003 submission, IBC offered no reasons why it needed this discovery of Aetna at all, much less an offering of "substantial need." In the December 22, 2003 letter, IBC stated that it needed Aetna's trade secret reimbursement rates and strategic plans to refute the allegations contained in just a handful of the allegations contained in CCH's Amended Complaint – solely paragraphs 17, 23, 29, 55 and 57(a) of that pleading. In addition, IBC cites to just a portion of one other publicly available document filed by CCH; a single page from a Motion to Compel Discovery filed by CCH against Capital Blue Cross. IBC contends that it needs Aetna's trade secrets to refute these specific allegations. However, CCH's Motion to Compel, as well as CCH's Motion for Leave to File a Second Amended Complaint, both of which IBC relies upon, were both denied.

As Dr. Melnick points out in his Declaration, IBC does not need any of Aetna's trade secret information to defend against the allegations of CCH cited by IBC in its submissions to Magistrate Judge Smith. Those allegations of CCH, cited by IBC in its attempt to discharge its burden of proof on this issue, implicate IBC's own rates, IBC's dealings with other companies utilizing the "Blue Cross" or "Blue Shield" license, or whether the rates paid by IBC to hospitals like CCH truly do not cover the costs of the services provided, as alleged. Aetna's hospital reimbursement rates would have nothing to do with disproving such allegations, as IBC asserts. Exhibit "5" at 4-9.

Dr. Melnick explains in detail how Aetna's strategic plans also are not helpful at all to IBC, as it contends, to defend against CCH's allegations that IBC has erected barriers to entry or growth in the relevant market. *Id.* at 9-11. As an expert in this field, Dr. Melnick confirms that a competitor's strategic plans are typically not used to prove or disprove allegations regarding barriers to entry into a market – rather, there are publicly available surveys that IBC can easily access to reflect the relative ease with which competitors have entered or grown in a particular regional market. *Id.* IBC simply does not need, much less have a "substantial need" for, Aetna's proprietary strategic plans in relation to this issue. Indeed, whatever Aetna <u>intended</u> to do in the market at any particular time is hardly a measure of what has actually transpired in the market, over time.

Given the paltry reasons offered by IBC to engage in discovery of its non-party competitor, the only conclusion that can be reached is that IBC seeks only to gather competitively sensitive information on Aetna, not to defend itself. As Dr. Melnick points out, IBC will not even articulate the analysis it intends to engage in that requires

accessing its competitor's most sensitive trade secrets, and for that reason, it cannot establish a need or a "substantial need" for that information. *Id.* at 4-7. If IBC's experts needed Aetna's trade secrets to prepare some kind of analysis, IBC could simply describe what that analysis is to demonstrate a need for it. It is telling that IBC simply refuses to do so, a purposeful omission which speaks volumes about IBC's true motivations here. That omission, moreover, compels the legal conclusion that IBC cannot sustain its burden of providing a "substantial need" under Rule 45.

As Aetna has argued, even if IBC demonstrated a "substantial need," which it has not, this Court should still engage in a balancing of interests analysis before directing disclosure of Aetna's most sensitive trade secrets to a direct competitor. Dr. Melnick's Declaration offers substantial guidance to the Court in this regard, and makes it clear that the balance of interests falls in favor of Aetna; in favor of preserving competition in the vital healthcare market; and in favor of protecting consumers. *Id.* at 11-15.

This Court cannot turn a blind eye to the context in which IBC is using this subpoena, particularly given the harm such disclosure risks for the public marketplace and Aetna. *See* Exhibit "5" (Declaration of Dr. Glenn Melnick). In addition to explaining the utter baselessness of IBC's claimed justification, or alleged "substantial need," Dr. Melnick further establishes the irreparable harm at stake in forcing a principal competitor like Aetna to release trade secrets in this market.

III.    **REPLY ARGUMENT**

Aetna's 1/7/04 Memorandum details the many reasons for setting aside the Magistrate Judge's 12/22/03 Order.   Herein, Aetna provides more specific rebuttal demonstrating how IBC's response fails to supply any support for this Order.[2]

A.    **IBC Offers No Valid Rebuttal To The Authorities Cited By Aetna.**

IBC cannot distinguish *R&D Business Systems v. Xerox Corp.*, 152 F.R.D. 195 (D. Colo. 1993).  In order to "refute the [anti-trust] claims made by plaintiffs," Xerox, like IBC presently, served non-party competitors with broad subpoenas unsuccessfully seeking trade secrets. While Xerox, like IBC, chose only to state unsupported conclusions about its alleged inability to present a defense, the district court applied the rigid and current day Rule 45(c)(3)(B) test; holding that once it is shown the information was a trade secret, the defendant is required to show *a substantial need*.   The Court also expressly recognized that disclosure to a competitor is  more harmful than disclosure to a noncompetitor.  *Id.* at 197 (*citing Coca-Cola Bottling Co v. Coca-Cola Co.*, 107 F.R.D. 288 (D.Del. 1985)).

Similar to IBC in the instant case, Xerox insisted that a protective order could limit the harm to the non-parties.   The court rejected this proposition, restating black-letter law that the moving party must still meet the burdens of showing necessity for the

---

[2] To the extent IBC also seeks to avoid the facts, and further deprive Aetna of a fair process in which to rebut IBC's assertions by hiding behind an incorrect statement of the standard for review, Aetna provides the Court with the authorities and arguments in Section "III.F," *infra*.  In its January 7, 2004 Memorandum, Aetna set forth the applicable standard of review. *See* Aetna's January 7, 2004 Memorandum, at 13-16. IBC now wants this Court to ignore facts, arguments or evidence that would refute and further undermine the unsupported statements in IBC's December 22, 2003 letter to Magistrate Judge Smith.  As IBC knows, however, ***Aetna did not even receive the 12/22/03 letter with exhibits until after the Court had already ruled.***  It is incredible for IBC to now argue that Aetna has no right at all to provide this Court with the facts Aetna was denied any opportunity to provide to the Magistrate Judge.   Again, these matters are addressed in Section III.F, *infra*.

information sought *regardless of any protective order*.  *Id.* at 197 (*citing Micro Motion v., Inc. v.  Kane Steel Co., Inc.*, 894 F.2d 1318, 1325 (Fed. Cir. 1990)).

*R&D Business Systems* illustrates a proper application of the modern day Rule 45 "substantial need" analysis, where a defendant is confronted with antitrust claims and seeks broad trade secret discovery from a non-party competitor.  IBC's response does nothing to distinguish *R&D Business Systems*.

IBC's gratuitous attempts to distinguish *Mannington Mills*, 206 F.R.D. at 525 must also be rejected.  IBC states, in a conclusory attempt to distinguish *Mannington Mills,* that:

> [i]n this case, IBC is not obliged to establish a potential anti-trust violation in order to support its subpoena to Aetna.  It is self-evident that in order to meet CCH's allegations concerning reimbursement rates in Southeastern and Central Pennsylvania markets and CCH's specific allegations concerning barriers to Aetna's competition in the Southeastern Pennsylvania market, IBC needs to discover what the reimbursement rates and the barriers are.  Thus, no expert affidavit is required.

*See* IBC's January 21, 2004 Memorandum at 15.

Preliminarily, numerous courts have recognized that antitrust cases are, essentially, a battle of the experts. *See In re: Magnetic Audiotape Antitrust  Litigation*, 2001 WL 619305 at *5, 99-CV-1580 (S.D.N.Y. June 6, 2001)("numerous courts in antitrust actions have found that this 'battle of the experts' is properly evaluated by the jury, not by the court.") (*citing In re Visa Check/MasterMoney Antitrust Litig.,* 192 F.R.D. 68, 79, 83-85 (E.D.N.Y. 2000)); *In re Playmobil Antitrust Litigation,* 35 F. Supp. 2d 231, 247 (E.D.N.Y. 1998); *In re NASDAQ Market Makers*, 169 F.R.D. 493, 521-22 (S.D.N.Y. 1996); *In re Indus. Diamonds*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996)); *see also In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297, 311 (E.D. Mich. 2001).  This

fact is highlighted by IBC's unsupported conclusion, asserted on the page immediately following its unpersuasive attempts to distinguish Aetna's reliance on *Mannington Mills* that "[s]imply stated, **IBC's consultants** cannot perform any meaningful analysis of reimbursement rates and competition in the markets identified by CCH without the rates and business plans of IBC's competitors, including Aetna." *See* IBC's January 21, 2004 Memorandum at 16 (emphasis added).

What is self-evident is that IBC seeks to compel its principal competitor, Aetna, to produce its most confidential trade secrets where plaintiff, CCH, who will have the ultimate burden of proof in this litigation, has not sought the same.  Equally as self-evident is the fact IBC's purported need has continually evolved throughout this litigation, without explanation, including, but not limited to, its failure to object to Magistrate Judge Smith's December 22, 2003 Order where that Order denied its request for Aetna's strategic plans in Central Pennsylvania.  IBC had told the Court that very same day that IBC "must" have the Central Pennsylvania strategic plans in order to effectively respond to CCH's claims.  By not objecting to the Magistrate Judge's Order, however, IBC concedes the baselessness of its statements about alleged "need."

Moreover, IBC has never disclosed, to Aetna or the Court, what information it has already received from other non-parties.  IBC does not need Aetna's most sensitive trade secrets to demonstrate either that Aetna, or its predecessor, has competed in this market for almost thirty years or that Aetna has recently enrolled tens of thousands of former IBC enrollees.  Presumably, IBC consulted one of its stable of experts before it rejected Aetna's inquiries regarding the possibility of utilizing masked rates by stating "**our experts** do not see how we can present our defense in the way you suggest," and, again,

before it inexplicably reversed course and represented to the Court that it could accept summary reimbursement rate information. *Compare* Exhibit "4" to Aetna's December 16, 2003 Opposition to IBC's Motion to Compel (emphasis added); IBC's December 22, 2003 Letter to Magistrate Judge Smith at 5.

Additionally, IBC has never explained why, if it can utilize summary rate information for Central Pennsylvania, as it has most recently asserted, that it cannot utilize similar information to analyze Southeastern Pennsylvania. Indeed, the only facts that are self-evident are that IBC has played "fast and loose" with its alleged "need," that the disclosure of Aetna's trade secrets to its principal competitor will irreparably harm both Aetna and the health care market in Southeastern Pennsylvania, and that, therefore, IBC has not met its burden of demonstrating "substantial need." *See also*, Exhibit "5" (Declaration of Dr. Glenn Melnick at pp. 1-16).

Finally, IBC takes an equally unpersuasive swing at distinguishing *ACT, Inc. v. Sylvan Learning Systems, Inc.*, 1999 WL 305300, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999). *See* IBC's January 21, 2004 Memorandum at 15-16; Aetna's January 7, 2004 Memorandum at 19-22. Among other things, ACT sought to compel one of its competitors to provide "evaluations of competitive conditions [and] analyses of barriers to entry" to support its antitrust claims. *See* IBC's January 21, 2004 Memorandum at 16; *ACT*, 1999 WL 305300 at *1.

As was the case in *ACT*, IBC has not rebutted Aetna's contentions that IBC does not need Aetna's trade secrets, nor has it illustrated why Aetna's perception of the market would be relevant, let alone needed, instead relying upon a self-serving, conclusory affidavit of one of the associates assigned to the case, rather than the stable of experts that

it has paid to defend against claims that it previously claimed violated Rule 11. *See, e.g.,* Exhibit "6."

Indeed, a review of the "Seidman Affidavit" shows only that Aetna's trade secrets are, as all trade secrets are by definition, unavailable from anyone other than entity that possesses the trade secret(s), and that IBC is seeking to avoid valid objections from hospitals in response to further subpoenas upon such non-parties.

ACT offered evidence from **an expert** showing that the information was the "type of information upon which experts such as himself rely in analyzing antitrust issues, such as those ACT raises" and still failed to demonstrate substantial need. *ACT,* 1999 WL 305300 at *2. IBC has not attempted to offer even a conclusory expert analysis, let alone an expert opinion detailing why it needs the information.

Clearly, here, as in *ACT*, IBC has failed to demonstrate the requisite "substantial need."

**B.    IBC's Cited Authority Regarding The Applicable Burden Under Rule 45 Is Inapposite, And Otherwise Supports Aetna's Position.**

In its January 21, 2003 Memorandum, IBC finally acknowledges the burden that it failed to articulate or meet before Magistrate Judge Smith. *Compare* IBC's January 21, 2004 Memorandum at 4-5; IBC's December 3, 2003 Motion to Compel at 8. However, IBC resorts to manipulating quotation marks around the words "substantial need," to make it appear that the *American Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 743 (Fed. Cir. 1987) case actually defined the "substantial need" standard of Rule 45. *See* IBC's January 21, 2004 Memorandum at 4. IBC is simply wrong. The *American Standard* opinion **never** specifically defined, nor did it refer to, "substantial need." 828 F.2d 734.

The *American Standard* Court could not possibly have defined the Rule 45 "substantial need" standard, which was not enacted until four years after that opinion. The *American Standard* Court instead articulated a "reasonably necessary" standard, and relied upon *Heat Control, Inc. v. Hester Industries, Inc.*, 785 F.2d, 1017, 1024 (Fed. Cir. 1986), which in turn relied upon the advisory committee notes to the **1983** *amendment to Rule 26(b)(1)*. However, as clearly provided by the advisory committee notes to the ***1991 amendment to Rule 45***, as well as the plain language of Rule 45, "[s]ubparagraph (c)(B)(3) identifies circumstances in which a subpoena ***should*** be quashed unless the party serving the subpoena shows a ***substantial need*** *and* the court can devise an appropriate accommodation to protect the interests of the witness." (all emphasis added).

Accordingly, although some courts have *in dicta* referred to the "reasonably necessary" standard mentioned in *American Standard*, there is no doubt that IBC must demonstrate a "substantial need," which is more akin to the standard set forth in *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985)("[t]he level of necessity that must be shown is that the information must be necessary for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories.") (citation omitted); *see also Cash Today of Texas, Inc. v. Greenberg*, 2002 WL 31414138 at * 3, No. 02-MC-77 (D. Del. Oct. 23, 2002)("[d]isclosure of the evidence is considered necessary when the information is ***required*** "for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories." (*quoting Coca-Cola*, 107 F.R.D. at 293)).[3]

---

[3] While the "substantial need" standard was incorporated into Rule 45 in 1991, parties seeking to compel the production of **work product material** pursuant to Rule 26(b) have been required to demonstrate "substantial need" since at least 1970. *See* 6 James W. Moore et al., Moore's Federal Practice, ¶ 26 App. 05[1] (3d. Ed. 2003); 9 Moore's Federal Practice, ¶ 45 App. 08[1] (3d. Ed. 2003). Under Rule 26, in

The other cases relied upon by IBC are equally unpersuasive. *FTC v. J.E. Lonning*, 539 F.2d 202 (U.S.App. D.C. 1976) concerned the enforcement of a subpoena in an administrative proceeding. The FTC was investigating a "shared" monopoly among four leading manufacturers of ready to eat breakfast cereals under its broad powers to investigate unfair methods of competition. *Id.* at 202. Here, Aetna is not being investigated for any wrongdoing, and the FTC's ability to subpoena discovery from Aetna is irrelevant to this proceeding. Moreover, unlike IBC's glaring inability to show "substantial need," the pertinent administrative order in *J.E.Lonning* was rendered only after all contentions were "exhaustively" discussed in extensive position papers and numerous oral arguments and after the FTC filed a detailed statement why Kellogg's alternative substitute information was inadequate. *See Id.* at 207-08, 210.

In *E.I. Dupont De Nemours Powder Company v. Masland*, 244 U.S. 100, 102 (1917), the Supreme Court actually reversed a circuit court's order which permitted defendant to disclose plaintiff's alleged trade secrets during discovery to all experts and witnesses. While the trade secret protection given to plaintiff could be revisited by the trial judge subsequently, the power of a trial judge to review discovery orders is not in dispute here and, without more, IBC's decision to cite authority protecting trade secrets from disclosure actually refutes, rather than promotes, its position. *See Id.* at 103.

---

connection with seeking work product, "substantial need . . . is demonstrated by establishing that the facts contained in the requested documents are ***essential elements of the requesting party's prima facie case."*** 9 Moore's Federal Practice, ¶ 26.070[5][c] at 26-222.5 (emphasis added). IBC has not even attempted to demonstrate that the information contained in the trade secrets it requests from Aetna is "essential" to any identified elements of its defenses to the cited allegations in CCH's Amended Complaint. Indeed, as Dr. Melnick confirms, there is no need at all, let alone any "essential" or "substantial" need, for Aetna's trade secrets in order to defend those allegations. *See* Exhibit "5" at 1-11.

In *Heat & Control v. Hester Industries, Inc.*, 785 F.2d 1017 (Fed.Cir. 1986), the Circuit Court allowed appeal of the district court's order quashing a subpoena under the collateral order doctrine. *Id.* at 1020-21. The Circuit Court vacated the order because, while the court considered the hardship to the defendant, "it erred in not assessing its relevance and Heat and Control's need for the information," and remanded to the district court in order to have the proper pre-1991 standard law applied. *See Id.* at 1024. In reality, *Heat & Control* stands for the proposition that disclosure of a trade secret is not *per se* unreasonable and oppressive. *See Id.* at 1025. Indeed, Aetna has never waivered from this fundamental proposition, but has steadfastly maintained that IBC must demonstrate a "substantial need" for Aetna's trade secrets.

In citing *Coca-Cola Bottling Company of Schreveport v. The Coco-Cola Company*, 107 F.R.D. 288, 292-93 (D.Del. 1985), IBC takes liberties in stating that "the balancing test under Rule 45 is tilted in favor of disclosure." *See* IBC's Response at p. 5. The case merely holds that discovery is possible, but only "**once relevance and necessity have been shown**." *Id.* at 293. Currently, the Rules require a higher showing of substantial need under Rule 45. As IBC has utterly failed to demonstrate a substantial need, *Coca-Cola* directs that the discovery be denied. *Id.* at 293 (*citing Cleo Wrap Corp v. Elsner Engineering Works, Inc.*, 59 F.R.D. 386, 388 (M.D.Pa. 1972) (discovery denied where relevance slight, need small, and harm great); *see also Id.* at 290 (court must remain cognizant that the disclosure of trade secrets in litigation, even with use of a protective order, could "become by indirection the means of ruining an honest and profitable enterprise.")

Moreover, in balancing the harm of disclosure against the need for Coca-Cola's

trade secrets, the Court determined "virtually all of that harm can be eliminated with stringent protective orders and other safeguards. Because plaintiffs are Coca-Cola bottlers, they will have an incentive to keep the formula secret. The likelihood of harm is less than if defendant's trade secrets were disclosed in litigation to competitors." *Id.* at 299 (internal citations omitted).

Here, the opposite scenario exists. There is no possible protective order that can prevent harm to non-party Aetna once its trade secrets are order produced to lawyers and consultants working for its chief competitor. There is no incentive for either party to protect **Aetna's** interests.

### C.    Contrary To IBC's Suggestion, The Harm To Aetna Is Not Premature, But Imminent And Irreparable.

IBC's response provides absolutely no legal rebuttal at all to the cases cited by Aetna establishing that once disclosed – even under the auspices of a "protective order" – trade secrets are irreparably harmed. All that IBC's response does is repeat the same argument that these cases expressly rejected—*i.e.* that Aetna will have to wait until trial, but in the meantime be content with the "protective order." IBC's inability to say anything more than this further confirms it has no rebuttal to Aetna's legal argument and factual contentions in this regard.

The cases agree that harm to Aetna is imminent and irreparable once this sensitive trade secret information is out of Aetna's exclusive control. *See Powell v. Ridge*, 247 F.3d 520, 524 (3d Cir. 2001) (absent immediate appeal of order requiring disclosure of trade secret, there is no way to "unscramble the egg scrambled by the disclosure") (*quoting In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir. 1997)); *ACT, Inc.*, 1999 WL 305300 (E.D. Pa. May 14, 1999); *Mannington Mills, Inc.*, 206 F.R.D. 525 (D. Del. 2002);

*R & D Business Systems*, 152 F.R.D. 195 (D. Col. 1993); *see also PEPSICO, Inc. v. RedMond*, 1996 WL 3965, at *30, No. 94C6838 (N.D. Ill. Jan. 2, 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever and, 'since the confidentiality of this information can never be regained, the [threatened] injuries would be irreparable.'" (citation and quotation omitted)).

While IBC's stated intention to publish Aetna's trade secrets at trial will irreparably harm Aetna and the market, that harm is not solely predicated upon such a disclosure.  As one district court noted, "[w]hat happens with any information disclosed by [the non-party] in response to [a party's] subpoena, particularly at trial, is anyone's guess." *Mannington Mills, Inc.*, 206 F.R.D. at 530.  As with that case, in the instant case, it would be "***divorced from reality to believe that either party here would serve as the champion of its competitor . . . . to maintain the confidentiality designation or to limit public disclosure . . . . during trial***." *Id.* (internal quotations and citations omitted) (emphasis added).  Indeed, not only does IBC have no interest in protecting Aetna's trade secrets at trial, but it would, in this sensitive competition environment, reap incalculable competitive benefits from the disclosure of the same.

IBC's new found confidence in the Amended Protective Order directly contradicts its statements in other pleadings where it stated "IBC is ***not confident that its legitimate confidentiality interests in documents relating to its aborted merger discussions with Highmark are sufficiently protected simply because a Protective Order was entered by the Court.***" *See* Exhibit "3" to Aetna's January 7, 2004 Memorandum at 8, n.5.  Indeed, IBC's representations in its January 21, 2004 Response demonstrate that IBC will offer

any position, even those that contradict its prior filings in connection with this litigation, which were verified pursuant to the protections contemplated pursuant to Rule 11, in order to fabricate "protections" supporting its otherwise factually and legally untenable attempts to compel the production of its competitor's trade secrets.

IBC's apparent handling of Aetna's trade secrets in response to subpoenas served upon other non-party providers, raises serious concerns regarding IBC's alleged "need" for Aetna's trade secrets. IBC previously represented to the Court that it would utilize Aetna's trade secret information at "most, if not all" of the depositions in this matter. Although the parties are required to give Aetna notice of their intent to utilize such information at depositions as required pursuant to the Amended Protective Order, Aetna has yet to receive any such notification. *See* Aetna's January 7, 2004 Memorandum at 12-13.

Additionally, it is virtually impossible for IBC's experts to ignore the knowledge they will attain if they are provided access to Aetna's trade secrets. *See* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 468 (1991)(Exhibit "12" to Aetna's December 16, 2003 Opposition Memorandum) (It is doubtful that experts "will be able to . . . compartmentalize all he or she has learned and not use any of the information obtained [in the instant litigation.]"  *Id.* at 471 (citations omitted); danger inherent in disclosure of trade secrets because "[t]he loss of confidentiality, the *sine qua non* of a trade secret, robs the owner of any advantage the secret may have provided." *Id.* at 473 (citation omitted)).

Clearly, Aetna and the market will suffer irreparable and incalculable harm if Aetna is compelled to produce its most sensitive trade secrets to its principal competitor,

especially where IBC stated, in sworn testimony that "**[w]e simply must respond to this marketplace, and we must respond at once**." *See* Exhibit "2" to Aetna's January 7, 2004 Memorandum at 4.

**D.    IBC Fails To Rebut The Law Establishing It Withdrew The Subpoena.**

IBC withdrew its original subpoena to Aetna by issuing a new one purportedly for the same information. Now, IBC cites an inapposite footnote in *Gross v. G.D. Searle & Co.*, 738 F.2d 600, 602 n.4 (3d Cir. 1984), in hopes of retracting its admission. But *G.D. Searle* does nothing to save IBC's position.

In *G.D. Searle,* the plaintiff served a subpoena and then 4 days later*, after realizing it inadvertently failed to attached the Rider which listed the specific requests to the subpoena*, plaintiff mailed the Rider. After Eyelab ignored the subpoena, without filing objections or a motion to quash, plaintiff was forced to move for compliance, contempt and for sanctions. Eyelab claimed the failure to originally attach the Rider excused all obligations thereafter, which the Court rejected. *Id.* at 602, n.4.

The *G.D. Searle,* opinion does not even contain the word "withdraw' or "supercede," and IBC's comparison of the inadvertently omitted "Rider" to its extraordinary broad and strategically served Connecticut subpoena is without any merit.[4] Since IBC offers no other basis for rebutting the argument that it withdrew the subpoena, it must be deemed withdrawn and no longer operative. Similarly, IBC's legally deficient

---

[4] Similarly, IBC's contention that the District of Connecticut "essentially" transferred this dispute to this Court ignores the facts IBC created. *Compare* IBC's January 21, 2004 Memorandum at 19; Aetna's January 7, 2004 Memorandum at 27-29. IBC's cited authority supports the conclusion that it cannot, even with Aetna's consent, deprive the District of Connecticut of jurisdiction over a subpoena that IBC chose to issue therefrom. IBC's January 21, 2004 Memorandum at 19 ("[i]f the recipient of a subpoena so desires the Court will **normally** transfer . . ." indicating that the issuing Court has discretion over such matters.) (Emphasis added). Moreover, once Aetna objected to IBC's subpoena, IBC had the burden to move to compel pursuant to Rule 45.

subpoena out of the District of Connecticut has placed IBC in a procedural box where it must argue, on the one hand, that it has cured the jurisdictional deficiencies of its July 25, 2003 subpoena, while simultaneously arguing that that subpoena has not been withdrawn, because there is no way that its December 17, 2003 subpoena, which was issued after it filed the instant Motion to Compel, could be the subject of that Motion or Magistrate Judge Smith's Order. *See* IBC's January 21, 2003 Memorandum at 20.  Accordingly, IBC essentially admits that it now seeks to enforce its jurisdictionally and substantively defective July 25, 2003 subpoena.

### E.    The Standard Of Review.

Aetna's 1/7/04 Memorandum sets forth the applicable standard of review. *See* Aetna's January 7, 2003 Memorandum at 13-16.  IBC now wants this Court to ignore facts, arguments or evidence by arguing the Court should not consider certain materials that further refute and undermine the unsupported statements in IBC's December 22, 2003 letter to Magistrate Judge Smith.  As IBC knows, however, Aetna did not even receive IBC's counsel's letter with exhibits until ***after*** the Court had already ruled. *See* IBC's January 21, 2004 Memorandum at 4; Aetna's January 7, 2004 Memorandum at 11, 17.

In any event, the record here contains no support for IBC's burden to prove "substantial need."  Thus, under IBC's view, IBC is bound by the only arguments it raised before Magistrate Judge Smith, and cannot now "backfill" that burden with arguments not cited to Magistrate Judge Smith.

In *Haines v. Liggett Group, Inc.*, 975 F.2d 81 (3d Cir. 1992), the Third Circuit held that the district court erred when reviewing and reversing a Magistrate Judge's order

21

under section 636(b)(1)(A), finding documents protected from discovery under the attorney-client privilege, based on the crime-fraud exception, when it ordered, *four months after the appeal was taken, that the parties produce documentation from another* case for its consideration on appeal. *Id.* at 92-94. That case simply provides no legitimate comparison to this matter, where IBC's letter with exhibits, purporting to justify the Court's extraordinary order compelling the production of admitted trade secrets, was submitted ***apparently hours*** before the Magistrate Judge entered his ultimate recommendation.

The need and validity of the evidence Aetna submits in these Objections is better understood in the content of *C.P. Kelco U.S. Inc. v. Pharmacia Corp.*, which repeatedly cites to *Haines*. 213 F.R.D. 176, 177-78 (D. Del. 2003) (under *Haines* review of magistrate's rulings of law are plenary). In *CP Kelco*, the defendant, Pharmacia, attempted to change designee of an expert witness in hopes of saving attorney-client document discovery, which the magistrate ordered produced after any privileged was waived. When, on review, CP Kelco argued various theories of relevance to the district court, Pharmacia claimed waiver. *Id.* at 178. The court summarily dismissed this argument. *Id.*

Where, as here, the respondent adopts a position after briefing concludes, thereby depriving the petitioner from fully addressing all of the legal issues raised before a Magistrate Judge, the district court is "free to consider on plenary review the legal implications of all aspects of the issue before it" and the waiver doctrine is inapplicable. *Id.* at 178 (D. Del. 2003); *Id.* (emphasis added) ("Since the letter briefing on CP Kelco's motion to compel was submitted ***before*** the October 2, 2002 summary judgment report

and recommendation ***and therefore before Pharmacia claimed a shift in status for its*** ***expert Mr. Schnaf*** [internal citation omitted], ***the fact that alternative theories of*** ***relevance were not advanced is neither surprising nor a point in Pharmacia's favor***.").

To the extent IBC attempts to limit the record before the district court, there are numerous reasons to reject that position.  There is no dispute that the district court's December 5, 2003 referring order to the Magistrate Judge does not delineate whether the assignment is made under section 636 (b)(1)(A) or section 636(b)(1)(B).  *See* Dkt Entry 175.  Neither does the Order limit the Magistrate Judge's role to only non-dispositive motions.  Rather, the Order states that "all motions pertaining to discovery matters" are referred to the Magistrate Judge.  *Id*.

Accordingly, in non-party Aetna's situation, because the Magistrate Judge's decision is dispositive of all of Aetna's claims and/or defenses, it is appealable under section 636(b)(1)(A).  Moreover, even if the Magistrate Judge's decision could be properly characterized as non-dispositive, this Court maintained discretion to refer such non-dispositive matters to the Magistrate Judge for recommendation only.  Under either possibility, the Court is confronted with the Magistrate Judge's recommendation only, and is not limited in the scope of evidence it may consider on the instant appeal.

A plain reading of section 636(b)(1)(B) also allows the district court to consider all relevant evidence. Sections 636(b)(1)(B) and (C) read, in pertinent part:

> (B) A judge any also designate a magistrate to conduct hearings, including evidentiary hearings, ***and to submit to a*** ***judge of the court proposed finding of fact and*** ***recommendations for disposition***, by a judge of the court, of any motion excepted in subparagraph (A), of applications for postrial relief made by individual convicted of cranial offenses and or prisoner petitions challenging conditions of confinement.

(C) the magistrate shall file his proposed finding and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. ***A judge of the court shall make de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made***. A judge of the court may accept, reject or modify in whole or part, the findings or recommendations made by the magistrate. ***The judge may also receive further evidence or recommit the matter to the magistrate with instructions.***

Section 636(b)(1)(A) (emphasis added)

In *Gross v. G.D. Searle & Co.*, a non-party, Eyelab, appealed from a district court's affirmance of a Magistrate Judge's Order compelling the production of sensitive information.   738 F.2d 600, 601-02 (3d Cir. 1984).   The district court had affirmed the magistrate's order finding it neither clearly erroneous nor contrary to law.  *See Id.* at 602. Eyelab appealed to the circuit court contending that the district court was obliged to review *de novo* the magistrate's proceedings and determinations under section 636(b)(1)(B) that dispositively determined that a non-party witness must comply with a subpoena.   The Third Circuit dismissed the appeal, for want of jurisdiction.  *See Id.* at 602-04.  However, in closing, the Circuit Court stated, "[w]e therefore expressly intimate no views as to Eyelab's claim which challenges the proper scope of review to be accorded by the district court to a magistrate's discovery order concerning a non-party witness."  *See Id.* at 606.  Thus, the Third Circuit recognized Eyelab's argument as a non-party witness.  *See Dixon v. Pine Street Corporation*, 516 F.2d 1278 (2d Cir. 1975) (since New York City was a non-party to action, the district court's denial of motion to quash

subpoena in underlying wrongful death action could be deemed final as to the city and therefore appealable) (*comparing United States v. Nixon*, 418 U.S. 683, 690-92, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).

Indeed, Aetna, a non-party, will *not* be a litigant at trial, rendering the "pretrial matters" phrase in section 636(b)(1)(A) inapplicable to non-party Aetna. More importantly, in substance, the Magistrate Judge's order preliminarily disposed of Aetna's entire case and controversy and would effectively terminate the proceedings *vis-à-vis* Aetna. As to non-party Aetna, unless and until objections are filed, the Magistrate Judge's ruling functions the same as a ruling granting summary judgment or other final judgment on the merits. Without *de novo* review upon objection of a dispositive decision, the Magistrate Judge rather than aiding the trial judge, becomes the trial judge, which is inconsistent with the intent of the Magistrate's Act.

Even if characterized as a non-dispositive motion, the district court maintained the discretion to refer this matter for a recommendation. In *Delco Wire & Cable, Inc. v. Weinberger*, defense contractors brought suit against the Secretary of Defense and Defense Logistics Agency over the government's disbarment of the contractors from governmental contracting. 109 F.R.D. 680 (E.D.Pa. 1986). During discovery, the contractors filed motions to compelling discovery. The United States Magistrate Judge recommended that most of the sought discovery be produced. *Id.* at 685. The defendants appealed the recommendation to district court and sought *de novo* review. *Id.* The contractor plaintiffs argued that the district court was required to approve the magistrate's report under a clearly erroneous standard, alleging, "[i]n essence, plaintiffs argue that these provisions preclude a judge from referring a non-dispositive pretrial matter to a

magistrate for a report and recommendation rather than for determination by the magistrate subject only to review under the clearly erroneous standard." *See Id.* at 685.

The court expressly disagreed:

> *that certain case dispositive matters must always be referred for recommendations rather than determination does not mandate the converse, i.e., that nondispositive matters must always be referred for determination rather then recommendations* . . . it is evident from the Act's legislative history that the purpose of the Act's referral and review provisions is to define the limits of the powers which a court may allows a magistrate to exercise, not to restrict the ultimate authority of an Article III court over a case pending before it…*Therefore, I conclude that court retains the discretion to refer a non-dispositive pretrial matter for report and recommendation and to consider objections filed thereto.*

*Id.* at 685 (*citing Societa Anomima Lucchese Olii E. Vini v. Catania Spagna Corp.*, 440 F.Supp. 461, 462063 (D.Mass. 1977) (remaining citations and footnote omitted); *see also Pauley v. United Operating Compan*y, 606 F.Supp. 520 (E.D.Mich. 1985) (allowing district court to amend its previous order of reference to magistrate judge *nunc pro tunc* to provide for report and recommendation under 28 U.S.C. § 636(b)(1)(B)).

Like a recommendation under section 636(b)(1)(A), when a District Judge sends a matter to Magistrate Judge for recommendation, "even though the matter could have been referred for determination," review is plenary. *See Howe Investment, Ltd. v. Perez Y Cia. De Puerto Rico, Inc.*, 96 F.Supp.2d 106 (D.Puerto Rico. 2000) ("to the extent a district court concerned about the possibility that assigning a nondispositive matter to the magistrate will confine his power to revise the outcome, a reference directing the magistrate to make recommendations is possible.") (citation omitted).

Regardless of whether the Magistrate Judge's underlying decision is dispositive in nature, permitting the Magistrate Judge to render a recommendation under section 636(b)(1)(A) only, or whether the district court merely sought the Magistrate Judge's recommendation on a non-dispositive motion, the end result is the same – the court may consider all relevant evidence. Indeed, when reviewing a Magistrate Judge's recommendation, the district court makes a *de novo* determination and may consider additional or further evidence. *Griego v. Padilla*, 64 F.3d 580, 584 (10th Cir. 1995); *National Grange Mutual Insurance Co. v. Sharp Equipment Co. of Reading*, 2002 WL 442823 (E.D.Pa. 2002) (*quotin*g Fed.R.Civ.P. 72(b)); *First Savings Bank v. U.S. Bancorp*, 184 F.R.D. 363 (D. Kan. 1998) (*citing* 28 U.S.C. § 636(b)(1)(C); Fed. R.Civ.P. 72(b)); *Bowen v. Blaine*, 243 F.Supp.2d 296 (E.D.Pa. 2003) (same*)*.

IV.    **CONCLUSION**

Based on the foregoing, and all of the reasons set forth in Aetna's 1/7/04 Objections and Memorandum, the Court must set aside the Magistrate Judge's 12/22/03 Order. IBC has simply failed to meet its burden, and thus the Magistrate Judge and this Court are left with no record that could possibly enable the 12/22/03 Order to withstand scrutiny.

Inasmuch as IBC has strategically chosen not to produce any evidence to meet its burden, the Motion should be denied in its entirety with prejudice. However, if and to the extent the Court does anything other than deny the Motion outright, Aetna is entitled to discovery and an evidentiary hearing on whether IBC has a "substantial need" to use Aetna's trade secrets, and on IBC's alternative motives for using this subpoena to obtain Aetna's trade secrets.


                                        Respectfully submitted,

OF COUNSEL:
                                        /s/ Frederick P. Santarelli
ELLIOTT REIHNER &                       JOHN M. ELLIOTT
  SIEDZIKOWSKI, P.C.                    JAMES C. CRUMLISH III
                                        MARK J. SCHWEMLER
                                        FREDERICK P. SANTARELLI
                                        JOHN P. ELLIOTT
                                        Union Meeting Corporate Center V
                                        925 Harvest Drive, Suite 300
                                        P.O. Box 3010
                                        Blue Bell, PA 19422
                                        (215) 977-1000
                                        Counsel for Non-party
                                        Aetna Inc.
DATED:  January 27, 2004

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day a copy of the foregoing is being served

upon the persons and in the manner indicated below:

## VIA FIRST CLASS MAIL

Lewis R. Olshin, Esquire
Duane, Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396

William J. Leonard, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895

Daniel A. Kotchen, Esquire
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

Howard T. Rosenblatt, Esquire
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004


                                          /s/ John P. Elliott
Dated:  January 27, 2004            JOHN P. ELLIOT