IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

NO. 02-CV-2746

## O R D E R

**AND NOW**, this _____ day of _____, 2004, upon consideration of

Defendants, Independence Blue Cross, QCC Insurance Company, Keystone Health Plan East,

and Keystone Mercy Health Plan's motion to compel Aetna, Inc. ("Aetna") to produce

documents, and any response thereto, it is hereby **ORDERED** and **DECREED** that:

1.     The Motion is **GRANTED.**

2.     Aetna shall (a) produce without objection all of the strategic planning documents
       and contracts with hospitals showing reimbursement rates required by Magistrate
       Judge Smith's December 22, 2003 Order, at the offices of Obermayer Rebmann
       Maxwell & Hippel LLP within ten (10) days of the date of this Order.

BY THE COURT:

_____
                                          **J.**

510902

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

NO. 02-CV-2746

## DEFENDANTS' MOTION TO COMPEL AETNA, INC. TO PRODUCE DOCUMENTS

For the reasons set forth in the accompanying memorandum of law, Defendants, Independence

Blue Cross, QCC Insurance Company, Keystone Health Plan East, and Keystone Mercy Health Plan,

submit this motion for an Order compelling Aetna, Inc. ("Aetna") to produce documents.

**WHEREFORE**, Defendants, Independence Blue Cross, QCC Insurance Company, Keystone Health

Plan East, and Keystone Mercy Health Plan, respectfully request that the Court enter an order compelling

Aetna to produce without objection all of the strategic planning documents and contracts with hospitals

showing reimbursement rates required by Magistrate Judge Smith's December 22, 2003 Order, at the offices

of Obermayer Rebmann Maxwell & Hippel LLP within ten (10) days of the date of the Court's order.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

BY: _____
         THOMAS A. LEONARD
         PAUL S. DIAMOND
         WILLIAM J. LEONARD
         RICHARD P. LIMBURG
         KENNETH L. RACOWSKI
         One Penn Center, 19th Floor
         1617 John F. Kennedy Boulevard
         Philadelphia, PA  19103
         (215) 665-3000

510902

HOWREY SIMON ARNOLD & WHITE LLP

JOHN DeQ BRIGGS
JAMES G. KRESS
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 383-7015

Attorneys for Defendants,
Independence Blue Cross,
Keystone Health Plan East,
QCC Insurance Company, and
Keystone Mercy Health Plan

Dated: January _____, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

NO. 02-CV-2746

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO COMPEL AETNA, INC. TO
PRODUCE DOCUMENTS**

Defendants, Independence Blue Cross, QCC Insurance Company, Keystone Health Plan

East and Keystone Mercy Health Plan (collectively "IBC"), respectfully submit this

memorandum of law in support of IBC's motion to compel Aetna, Inc. ("Aetna") to produce

documents.

**Preliminary Statement**

IBC served Aetna with a document subpoena on July 25, 2003 ("the July 25 subpoena"),

which was issued out of the District Court for the District of Connecticut.  On December 3, 2003,

IBC filed a motion to compel,[1] which Magistrate Judge Smith granted by Order of December 22,

2003.  Aetna filed objections to that Order on January 7, 2004.

During the December 16, 2003 hearing on IBC's December 3 motion to compel,

Magistrate Judge Smith directed IBC to issue a second subpoena out of the Eastern District of

Pennsylvania as a means of addressing Aetna's jurisdictional objections to the July 25, 2003

subpoena.  IBC did so on December 17, 2003 ("the December 17 subpoena").  A copy of IBC's

December 17, 2003 subpoena is attached hereto as Exhibit "A."

---

[1]  See Docket Entry 173 (version filed under seal) and Docket Entry 174 (version not filed under seal).

Instead of treating the December 17 subpoena as a substitute for the July 25 subpoena, Aetna has taken the position that the December 17 subpoena superseded the July 25 subpoena, mooting both IBC's December 3 motion to compel and the Order of December 22, 2003. Aetna has also refused to comply with the December 17 subpoena, raising essentially the same objections that it raised to the July 25 subpoena (with the exception of objections based on jurisdiction).

Aetna's objections to the Order of December 22, 2003 are pending before Judge Padova. IBC anticipates that the Court will reject Aetna's jurisdictional objections to the July 25 subpoena as well as Aetna's argument that the December 17 subpoena superseded the July 25 subpoena. Ordinarily, IBC would await the Court's determination before taking further action. However, the discovery deadline is about to expire. Thus, IBC is filing the present motion to compel Aetna's compliance with the December 17 subpoena as a precautionary measure, pending a decision on Aetna's objections to the Order of December 22, 2003.

In the present motion to compel, IBC makes frequent reference to previous filings, including but not limited to its December 3, 2003 Motion to Compel, and IBC's December 22, 2003 Reply Brief.

## I.      Efforts to Resolve the Discovery Dispute

IBC served a subpoena *duces tecum* on Aetna, over three (6) months ago, on July 25, 2003. (Exhibit B to IBC's 12/3/03 Motion to Compel).

Aetna responded to the July 25  Subpoena in a letter dated July 31, 2003, objecting on the grounds of, *inter alia,* confidentiality, relevance, burden and vagueness. (Exhibit D to IBC's 12/3/03 Motion to Compel). Aetna further stated that it would not produce any documents listed

in the Subpoena, characterizing the subpoena as "unnecessarily burdensome, vexatious, and harassing." Id.

Extensive litigation followed, in which Aetna was a leading participant, and culminated in the August 18th Amended Protective Order – an Order specifically entered to resolve the confidentiality issues of non-parties like Aetna. In that regard, the Court expressly advised Aetna not to obstruct discovery with additional arguments of confidentiality.

> The suggestion is that [Aetna]… go away… .
>     …
> We have addressed… [third-party insurers'] concerns and if there is nothing new with respect to the other hospitals, if there is nothing new,… – I would expect that Aetna would understand that its concerns have already been addressed and resolved.

N.T. Aug. 7, 2003, at 36-37 (Exhibit E to IBC's 12/3/03 Motion to Compel).

The Court further stated that Aetna's contracts, the rates contained in those contracts and documents exchanged between CCH and Aetna discussing rates were relevant and discoverable.

> I do see that information as either being relevant information or certainly leading to relevant information by virtue of the issues that have been raised in this lawsuit.
>
>                         . . . .
>
> [T]he information is information that's relevant to the issues in this case and will have to be reviewed and considered and perhaps part of the proof in this case as the case goes forward.

Id., at 10.

By letter dated August 27, 2003, IBC redefined the geographic scope of their July 25 subpoena to reduce the burden on Aetna. (Exhibit F to IBC's 12/3/03 Motion to Compel). IBC urged Aetna to begin producing its non-party insurer documents and requested that Aetna mark them "Highly Confidential," to assure that only outside counsel, outside counsel's experts, and the Court would have access to Aetna's highly confidential information.

By letter dated September 2, 2003, Aetna refused to produce any of the requested documents. (Exhibit C to IBC's 12/3/03 Motion to Compel). Aetna stated that despite IBC's efforts to narrow the geographic scope, the subpoena remained "outrageously broad," and in particular complained about IBC's request for information extending to certain specific counties. (Id.)

By letter dated September 15, 2003, IBC further narrowed the geographic scope of the document subpoena, eliminating eight additional counties, and explaining precisely which paragraph of the Amended Complaint necessitated discovery into the remaining counties. Defendants also otherwise simplified their document requests. (Exhibit G to IBC's 12/3/03 Motion to Compel).

Bt letter dated September 27, 2003, Aetna again refused to produce *any* documents in response to IBC's subpoena, essentially restating its arguments from its September 3 letter. (Exhibit H to IBC's 12/3/03 Motion to Compel).

Although Aetna refused to produce documents in response to IBC's subpoena, it did promise to produce documents in response to a subpoena served by CCH more than one year ago, on November 8, 2002. Specifically, Aetna's letter dated September 2, 2003, stated that it would "provide documents that are relevant, responsive and non-oppressive in response to Plaintiff's subpoena and are hopeful that such documents can be [produced] by the end of the week or shortly thereafter." (Exhibit C to IBC's 12/3/03 Motion to Compel).

By letter dated October 8, 2003, IBC again requested Aetna to produce responsive documents. (Exhibit I to IBC's 12/3/03 Motion to Compel). Aetna responded with a letter dated October 14, 2003, accusing IBC of not trying to resolve the discovery dispute, repeating its prior objections, and—for the first time—refusing to produce documents in response to the CCH

subpoena unless IBC agreed to effectively withdraw its own subpoena.  (Exhibit J to IBC's 12/3/03 Motion to Compel).

In a final attempt to resolve the discovery dispute informally, IBC counsel, William Leonard and James Kress, conferred via telephone with Aetna counsel, James Crumlish, on November of 2003.  IBC focused the discussion on the two document categories IBC could not do without—reimbursement rates and strategic plans.  Mr. Crumlish stated unequivocally that Aetna would not produce strategic planning documents and would only produce rates for hospitals other than CCH if it could do so without identifying the hospitals to which its rates applied.  This was unacceptable to IBC.

On December 3, 2003, IBC filed a motion to compel Aetna to produce documents (Dkt. Entries 173 & 174).  IBC's motion sought to compel the following documents:

> Documents constituting or reflecting Aetna's strategic business plans that relate to the Southeastern and Central Pennsylvania Counties, including but not limited to marketing plans, business plans, and market assessments.

> Documents sufficient to demonstrate Aetna's reimbursement rates for hospital services in the Southeastern and Central Pennsylvania Counties.

Aetna answered IBC's motion to compel on December 16, 2003 (Dkt. Entry 178).  IBC and Aetna argued the motion before Magistrate Judge Smith on December 16, 2003.  (A transcript of the oral argument is attached Exhibit B to IBC's 1/16/04 Motion for an Order of Contempt and Sanctions Against Aetna as Exhibit "B").  During the oral argument, Magistrate Judge Smith directed IBC to address Aetna's procedural/jurisdictional objections to the subpoena by issuing a substitute subpoena out of the Eastern District of Pennsylvania.  See id. at 39-41.  Magistrate Judge Smith further directed IBC to file a reply brief with an affidavit discussing IBC's efforts to obtain Aetna's reimbursement rates from non-party hospitals.  See id. at 41.  As directed, IBC

issued a substitute subpoena out of the Eastern District of Pennsylvania on December 17, 2003.

(Exhibit A hereto).  IBC filed its reply brief on December 22, 2003.  (A copy of IBC's 12/22/03

Reply Brief without exhibits is attached hereto as Exhibit "B").

On December 22, 2003, Magistrate Judge Smith entered an Order (Dkt. Entry 183)

directing Aetna to produce the following documents by January 12, 2003:

> (1)    Contracts with hospitals in the five-county Southeastern Pennsylvania
>        region reflecting Aetna's reimbursement rates to those hospitals;
>
> (2)    Summary level documents sufficient to demonstrate Aetna's hospital
>        reimbursement rates in the Central Pennsylvania region (Adams, Berks,
>        Centre, Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata,
>        Lancaster, Lebanon, Lehigh, Mifflin, contour, Northampton,
>        Northumberland, Perry, Schuylkill, Snyder, Union, and York counties)
>        broken down by hospital type (community, teaching, or regional) and
>        hospital size (by licensed bed counts), without prejudice to IBC's right to
>        later seek the complete hospital contracts in this region; and
>
> (3)    Documents reflecting Aetna's strategic planning for the healthcare
>        insurance markets in the Southeastern Pennsylvania counties.

(Dkt. 183).

By letter dated December 29, 2003, Aetna objected to the substitute subpoena that

Magistrate Judge Smith had directed IBC to issue.  (A copy of Aetna's letter of December 29,

2003 is attached hereto as Exhibit "C").  In that letter, Aetna raised the same objections that it

had previously raised in its answer to IBC's motion to compel, which objections were resolved

against Aetna by the Order of December 22, 2003.  Aetna also stated in the letter that it would

not comply with the December 17 subpoena.

On January 7, 2004, Aetna filed objections to the Order of December 22, 2003 (Dkt. 186-

7), but failed to seek a stay of the Order of December 22, 2003.  On January 16, 2004, IBC filed

a Motion for an Order of Contempt and Sanctions Against Aetna, Inc.  (Dkt. 191).

The parties have spent more than a reasonable amount of time and effort attempting to resolve this discovery dispute without the intervention of the Court.  No further efforts to resolve this discovery dispute informally between the parties are possible.

## II.    The Standard for Discovery of Confidential Commercial Information under Fed.R.Civ.P. 45

Under Fed.R.Civ.P. 45(c)(3)(B)(i), the party issuing the subpoena must show that its requests are relevant to its claims or defenses.  The person opposing the subpoena must show that the information is subject to a privilege or is otherwise entitled to protection.  The issuing party then has the burden of showing a substantial need for the testimony or other material that cannot otherwise be met without undue hardship."  Mycogen Plant Science, Inc. v. Monsanto Co., 164 F.R.D. 623, 625-626 (E.D.Pa. 1996).  "Substantial need" means "reasonably necessary for a fair opportunity to develop and prepare [the] case for trial."  American Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 743 (Fed.Cir. 1987); see also Mannington Mills, Inc. v. Armstrong World Industries, Inc., 206 F.R.D. 525, 532 (D.Del. 2002).

The balancing test under Rule 45 is tilted in favor of disclosure.  Coca-Cola Bottling Co. v. Coca-Cola Co., 107 F.R.D. 288, 292-93 (D.Del. 1985).  "[O]rders forbidding any disclosure of trade secrets or confidential commercial information are rare.  More commonly, the trial court will enter a protective order restricting disclosure to counsel or to the parties."  Federal Open Market Committee v. Merrill, 443 U.S. 340, 362 n.24 (1979).

Courts have long-recognized that the disclosure of confidential proprietary information may be necessary during a lawsuit to enable a party to adequately defend itself.  See E.I. Du Pont De Nemours Powder Company v. Masland, 244 U.S. 100, 103 (1917) (holding that it is within the court's discretion to determine whether, to whom, and under what precautions, it should become necessary for trade secrets to be revealed to experts or other witnesses during a party's

preparation of its defense).  Thus, trade secrets are not privileged and are not immune from

discovery.  Coca-Cola Bottling, supra, 107 F.R.D. at 292.  In Coca-Cola Bottling, the court

stated that "discovery is virtually always ordered once the movant has established that the secret

information is relevant and necessary."  Id.

## III.   The Relevance of Aetna's Reimbursement Rate Information and Strategic Plans

CCH specifically alleges in its first amended complaint that IBC "leverages" its

"monopoly power" to gain "monopsony power," by which it "compels" hospitals in the five-

county area to accept reimbursement rates that are below competitive levels.  Amended

Complaint at ¶23.

CCH further alleges that the Central Pennsylvania Counties (Adams, Berks, Centre,

Columbia, Cumberland, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon,

Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and

York Counties) constitute a "benchmark" competitive market, with which CCH seeks to

compare the Southeastern Pennsylvania Counties (Bucks, Chester, Delaware, Montgomery, and

Philadelphia counties).  Amended Complaint at ¶55.  CCH alleges that there is increased

competition in the Central Pennsylvania Counties and that hospital reimbursement rates have

risen.  CCH's Motion to Compel Capital Blue Cross To Produce Documents, pp. 8-9 (Attached

to IBC's Reply Brief as Exhibit "D"); CCH's Motion For Leave to File a Second Amended

Complaint, p. 8 (Dkt. Entry 99).

Based on CCH's specific allegations, the hospital reimbursement rates that insurers pay

to hospitals that compete in the five-county Philadelphia region and the twenty-two county

Central Pennsylvania region are what this case is about.  Aetna competes in both Central

Pennsylvania and Southeastern Pennsylvania.  Thus, Aetna's reimbursement rates are relevant to

CCH's claims that hospital reimbursement rates are higher in Central Pennsylvania than in Southeastern Pennsylvania.

Aetna's strategic plans for Southeastern Pennsylvania are likewise relevant to CCH's specific allegations concerning Aetna and competition the Southeastern Pennsylvania healthcare market.  See pages 14-15, below.

IBC agrees that Aetna's rate information and strategic plans are confidential commercial information.  However, that does not end the inquiry.  Aetna's rate information and strategic plans are discoverable if they are reasonably necessary for IBC's development and preparation of its defense to CCH's claims, and the need cannot otherwise be met without undue hardship.

### A.    IBC's Need for Aetna's Reimbursement Rate Information

According to CCH, IBC has reduced reimbursement rates in southeastern Pennsylvania below competitive levels through the exercise of monopoly power, and higher reimbursement rates in the Central Pennsylvania market reflect competition among insurers for hospital contracts.  To defend itself against CCH's allegations and theories, IBC must analyze reimbursement rates that insurers pay to hospitals in both the Southeastern and the Central Pennsylvania counties.  Aetna's position as a substantial insurer in both markets is unique.  Thus, the rate information that Aetna can supply will be crucial in evaluating CCH's claims as to both the Southeastern and Central Pennsylvania markets.

Within the Southeastern Pennsylvania market, IBC intends to show that its reimbursement rates to hospitals are fair, reasonable and competitive.  The only means of doing so is to compare IBC's reimbursement rates with other insurers' rates.  IBC has sought rate information and strategic plans from the various insurers competing in those regions, including Aetna.  Since the entry of the Amended Protective Order, all but Aetna have complied.

Significantly, Aetna has conceded the relevance of its reimbursement rates in Chester County (Aetna's Response to IBC's 12/3/03 Motion to Compel, Dkt. 178, p. 23), although it objects to producing rate information for any other counties in Southeastern Pennsylvania. Id. at pp. 23-24. However, if Aetna's rates are relevant in Chester County, they must also be relevant in any other county where Aetna competes with IBC. CCH specifically alleges that IBC "leverages" its "monopoly power" to gain "monopsony power," by which it "compels" hospitals in the "Greater Philadelphia area" to accept reimbursement rates that are below competitive levels and do not cover CCH's costs. Amended Complaint at ¶¶17, 23, 29 (emphasis supplied).[2] The Court already determined that this case is not limited to Chester County when it dismissed IBC's objection to the deposition of Grand View Hospital on the ground that Grand View Hospital could not be considered part of the same market as CCH. Thus, IBC has a substantial need for Aetna's reimbursement rates in all five counties in the Southeastern Pennsylvania market.

IBC also needs to compare Aetna's reimbursement rates in Central Pennsylvania with Aetna's reimbursement rates in the Southeastern Pennsylvania market. CCH has alleged that "reimbursement rates to hospitals operating in Central Pennsylvania have increased," but that hospital reimbursement rates in Southeastern Pennsylvania are artificially depressed. CCH's Motion to Compel Capital Blue Cross To Produce Documents, p. 8 (Exhibit D to IBC's 12/22/03 Reply Brief); CCH's Motion For Leave to File a Second Amended Complaint, p. 8 (Dkt. 99). The reimbursement rates of a third-party competitor in both markets, such as Aetna, are highly relevant to such allegations.

As an accommodation to Aetna, IBC indicated in its 12/22/03 Reply Brief that, for Central Pennsylvania only, it would accept summary level documents sufficient to demonstrate

---

[2] In its Amended Complaint, CCH defines the "relevant geographic market as the greater Philadelphia area, which includes Bucks, Chester, Delaware, Montgomery and Philadelphia counties in Pennsylvania." Amended Complaint at ¶29.

Aetna's hospital reimbursement rates broken down by hospital type (community, teaching, or regional) and hospital size (by licensed bed counts) for Central Pennsylvania – rather than Aetna having to identify particular hospitals and produce contracts for all hospitals in Central Pennsylvania.  IBC assumed it would be easier and more palatable for Aetna to produce summary information.  (IBC reserved the right to seek additional information if Aetna's summary information turned out to be incomplete or if the summary information proved to be inadequate for purposes of the litigation.)  If, as Aetna now appears to complain, it is more burdensome to produce summary rate information than it is to produce detailed rate information on a hospital by hospital basis, then IBC is prepared to accept the detailed information.

**B.    IBC's Need for Hospital Reimbursement Rate Information Cannot Be Met from Other Sources**

Individual private insurer reimbursement rates are not publicly available.  Aggregate reimbursement rates are also not publicly available.  The reason for this is that every private insurer requires the hospitals with which it does business to keep its rates confidential.  Aetna's Response to 12/3/03 Motion to Compel, Dkt. 178, Exhibit 5, Declaration of R. Franzoi, at ¶¶5 ("I can attest to the fact that in Aetna's industry, information such as rate schedules are uniformly considered to be proprietary and confidential.") and ¶8 ("Because such information is confidential and proprietary, Aetna always includes in its provider contracts provisions as to Confidentiality and Non-Disclosure, prohibiting direct or indirect disclosure to any third parties of, specifically, the rate schedules or other financial terms of such contracts.")  See also ¶¶9, 11, 12 and 13.

IBC has no other means of acquiring Aetna's rate information, except by serving every hospital in Southeastern and Central Pennsylvania with a subpoena requesting disclosure of their contracts with Aetna.  In fact, IBC has sought rate information (including but not limited to Aetna rates) from a number of CCH's closest competitors in Chester, Montgomery, and Delaware

Counties.  Half of them raised relevancy objections, asserted contractual obligations not to

disclose the rates, and ultimately forced IBC to file motions to compel.  <u>See</u> the Affidavit of H.

David Seidman, Esquire (Exhibit E to IBC's 12/22/03 Reply Brief).  Indeed, Riddle Memorial

Hospital ("Riddle") stated in its Response to a motion to compel by IBC that it "had been notified

by counsel for insurers, including Aetna . . ., cautioning Riddle against production of its contract

materials."  Riddle's Response, p. 2 (Exhibit E to IBC's 12/22/03 Reply Brief).[3]  At the November

13, 2003 hearing on IBC's motions to compel, Riddle reiterated this concern: "The other major

concern . . . is that we — as with other hospitals — have been quite frankly, threatened with

litigation by other insurers. . . ."  11/13/03 Tr. at p. 36 (Exhibit F to IBC's 12/22/03 Reply Brief).

Paoli Memorial Hospital received the very same threat: "[Aetna] . . . holds the confidentiality

agreement and we have been directed in writing by them that we are at risk of liability if we

produce them."  11/13/03 Tr. at p. 10 (Exhibit F to IBC's 12/22/03 Reply Brief).  If IBC must

subpoena individual hospitals for reimbursement rate information, instead of getting that

information from insurers directly, history suggests that nearly half of the hospitals will object to

IBC's request, refuse to provide reimbursement rate information, burden the parties and the Court

with motion practice, and make it all but impossible for the parties to discover critical data.

    In its Response to the 12/3/03 Motion to Compel, Aetna suggested that IBC could

adequately defend itself using published information that Aetna attached to its Response.

Exhibit 7 to Aetna's Response to IBC's 12/22/03 Motion to Compel consisted of two pages from

a website maintained by HealthLeaders Research.  The website purports to provide data

concerning health plans in 22 states, including Pennsylvania.  However, there is no reference to

data concerning hospital reimbursement rates either on a statewide basis or on a regional basis

---

[3] IBC incorrectly identified and labeled Riddle's Response as Exhibit E in its Reply Brief.  Riddle's Response is the
second Exhibit.  The first Exhibit E is the Affidavit of David Seidman.

within particular states.  Exhibit 8 consisted of four pages advertising a subscription database service maintained by InterStudy Publications.  The second page refers to data concerning HMO enrollment by product, number of physician and hospital contracts, HMO contact information, hospital utilization indicators, reimbursement methods for primary and specialty care physicians, market composition and characteristics.  There is no reference to data concerning hospital reimbursement rates by insurer or otherwise.  Exhibit 9 was a page from the Philadelphia Business Journal ranking twenty-three HMOs by number of local members.  This page contains no information concerning hospital reimbursement rates by insurer or otherwise.  Exhibit 10 included pages 29-45 of the Pennsylvania Health Care Cost Containment Council's publication entitled "Financial Analysis 2002."  The Financial Analysis 2002 displays net patient revenue, the Medicare and Medical Assistance share of net patient revenue, the operating margins and total margins, the operating income and total income, and the total operating revenues for individual hospitals.  However, the Financial Analysis 2002 displays no information concerning hospital reimbursement rates paid by private insurers.  Exhibit 11 consisted of 8 pages describing Milliman's Hospital Efficiency Index.  The Hospital Efficiency Index purports to present actuarial analysis of hospital inpatient admissions, length of stay and days.  There is no reference to hospital reimbursement rates paid by private insurers.  Exhibit 11 also contained two pages from two websites maintained by Milliman, one concerning the Hospital Efficiency Index and the other concerning the Health Cost Index Report, which discusses trends in the market average rate of increase in medical costs for a typical health insurance package.  Again, there is no reference to any hospital reimbursement rates by insurer or otherwise.

During the December 16, 2003 hearing, IBC's counsel challenged Aetna's counsel to show which, if any, of Exhibits 7 through 11 contain any hospital reimbursement information.

Aetna's counsel failed to do so.  (See 12/16/03 Tr. at pp. 35-36, attached as Exhibit B to IBC's

1/16/04 Motion for an Order of Contempt and Sanctions Against Aetna)  Thus, it is evident that

Aetna cannot obtain reimbursement information from any published sources.

### C.    IBC's Need for Aetna's Strategic Plans

CCH alleges in its first amended complaint that IBC has erected barriers that caused

Aetna to reduce its presence in Southeastern Pennsylvania.  Specifically, CCH alleges, "In the

relevant market(s), [IBC has erected] significant barriers to entry and/or expansion by new or

smaller managed care and health benefits companies that might seek to compete with IBC."

(Amended Complaint at ¶31)  In support of its claim, CCH states that "[t]his is evidenced by …

the reduced presence of IBC's largest competitor, Aetna." (Amended Complaint at ¶31).  CCH

further alleges, that "[a]s a result of [IBC's] … conduct, … [c]ompetitors of … IBC have been

and will be hindered and obstructed in their ability to compete in the relevant market(s), as IBC

activities … have had the effect of either increasing rivals' costs or providing incentives for

potential competitors not to enter the market."  (Amended Complaint at ¶57a).

Taken together, these allegations state that IBC hindered Aetna's ability to compete in the

Southeastern Pennsylvania market by either increasing Aetna's costs or providing incentives for

Aetna to leave the market.  Thus, Aetna's strategic plans for the Southeastern Pennsylvania

market are essential for IBC to prepare a response to CCH's specific allegations concerning

Aetna.

IBC must also prepare to refute CCH's overall analysis of the Southeastern Pennsylvania

market.  CCH has characterized the Southeastern Pennsylvania market for commercial payors as

a duopoly controlled by IBC and Aetna.  (Exhibit A to IBC's 12/3/03 Motion to Compel Aetna

to Produce Documents) (Dkt. 173) (excerpts from CCH internal presentations, filed under seal).

Thus, any analysis of the market without Aetna's strategic plans would be incomplete for purposes of addressing CCH's allegations and theories.

### D.    IBC's Need for Aetna's Strategic Plans Cannot Be Met from Other Sources

By its own declaration, Aetna's strategic plans are not publicly available and can only be obtained from Aetna. Aetna's Response to 12/3/03 Motion to Compel, Exhibit 6, Supplemental Declaration of R. Franzoi, at ¶5 ("Because [Aetna's strategic plans] are so sensitive, Aetna never reveals this information to third parties, directly or indirectly.") Thus, IBC has a substantial need for Aetna's strategic plans that cannot otherwise be met.

## IV.    The Court Should Compel Aetna to Produce the Documents Sought by IBC

Aetna's principle "justification" for not producing the subject documents is that they are of a highly confidential nature, contain trade secrets, and should not be turned over to competitors. The proprietary nature of Aetna's documents is acknowledged. It was acknowledged months ago when Aetna brought the *exact same issue* before Judge Padova — then in the context of Aetna's efforts to prevent hospitals from disclosing reimbursement rates. At that juncture it was acknowledged that such information was highly proprietary — but also highly relevant and subject to discovery. (Discussion, *supra,* at pp. 4-5.) Accordingly, the Court crafted a modification to the Protective Order so that the proprietary materials of Aetna and other non-parties would receive protections above and beyond the protections given to the proprietary materials of the parties. (Amended Protective Order, entered on August 18, 2003, Docket No. 121.)

Because this issue was fully adjudicated, with Aetna's participation, and ruled on by the Court, Aetna's objections to the December 17 subpoena based on confidentiality should be overruled.

IBC has substantial need for Aetna's reimbursement rates in Central and Southeastern Pennsylvania and Aetna's strategic plans in Southeastern Pennsylvania. CCH has alleged that IBC is a monopolist, that it has no significant competitors, and that there are barriers to entry in the health care insurance market in the Southeastern Pennsylvania Counties. It is difficult to conceive of evidence more closely related to these allegations than the analyses and business plans of IBC's competitors and would-be competitors—let alone IBC's largest competitor, Aetna—with respect to these counties. United States Football League v. National Football League, 605 F.Supp. 1448, 1461 (S.D.N.Y. 1985) (business plans, economic organization, and prospective market position are particularly relevant in antitrust cases). Similarly, CCH has alleged that IBC's "monopsony" has caused a region-wide depression in reimbursement rates (Amended Complaint at ¶¶ 17, 23, 43). In these circumstances, IBC must be able to compare its rates to those of its competitors throughout the Delaware Valley. "The price data are unquestionably relevant, and parties are entitled to information as important as this was." Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1347 (7th Cir. Ind. 1986) (citing Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556 (7th Cir. 1984) (antitrust action brought by hospitals to enjoin implementation of Blue Cross Blue Shield PPO).

Aetna's objections based on burdensomeness should also be overruled. Merely stating, in response to a subpoena, that the request for discovery is "overly broad, burdensome, or oppressive" is not adequate to voice a successful objection to discovery. "The onus is on the party alleging that the subpoena violates Rule 45. Moreover, that party must establish the burden with specificity. Merely asserting that a party will suffer an undue burden without 'specific estimates of staff hours needed to comply' will be 'categorically rejected.'" Gabe Staino Motors v. Volkswagen of Am., 2003 U.S. Dist. LEXIS 3194, 5-6 (E.D. Pa. 2003) (quoting Association

of Am. Physicians & Surgeons v. Clinton, 837 F. Supp. 454, 458 n. 2 (D.D.C. 1993) (citations

omitted).  Even aside from the fact that Aetna did not state adequate objections, IBC submits that

seeking Aetna's reimbursement rate information indirectly from the hospitals, instead of getting

that information from Aetna directly, will unnecessarily burden the hospitals, IBC and the Court.

Based on IBC's experience in seeking reimbursement rates from hospitals, roughly half of the

hospitals will object to IBC's request, refuse to provide reimbursement rate information, burden

the parties and the Court with motion practice, and make it all but impossible for the parties to

discover critical data.  It is far less burdensome for Aetna to produce the information than it is to

require the many hospitals with whom Aetna contracts to produce it.

## CONCLUSION

For the foregoing reasons, IBC requests the entry of an Order compelling Aetna, within

ten (10) days of the Court's Order, to produce, without objection all of the strategic planning

documents and contracts with hospitals showing reimbursement rates required by Magistrate

Judge Smith's December 22, 2003 Order, at the offices of Obermayer Rebmann Maxwell &

Hippel LLP.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

BY: _____

THOMAS A. LEONARD
PAUL S. DIAMOND
WILLIAM J. LEONARD
RICHARD P. LIMBURG
KENNETH L. RACOWSKI
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103
(215) 665-3000

510902                                    17

HOWREY SIMON ARNOLD & WHITE LLP

JOHN DeQ BRIGGS
JAMES G. KRESS
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 383-7015

Attorneys for Defendants,
Independence Blue Cross,
Keystone Health Plan East,
QCC Insurance Company, and
Keystone Mercy Health Plan

Dated: January ___, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE CHESTER COUNTY HOSPITAL** <br><br> **v.** <br><br> **INDEPENDENCE BLUE CROSS,** <br> **QCC INSURANCE COMPANY,** <br> **KEYSTONE HEALTH PLAN EAST, and** <br> **KEYSTONE MERCY HEALTH PLAN** | **CA No.  2:02CV2746** |

### CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Defendants' Motion To Compel Aetna, Inc. To

Produce Documents and Memorandum of Law in support thereof was served, this _____ day of January

2004 as follows:

### VIA FACSIMILE & FEDERAL EXPRESS

James C. Crumlish, III, Esquire
Union Meeting Corporate Center V
P.O. Box 3010
925 Harvest Drive
Blue Bell, PA  19422
*Counsel for Aetna, Inc.*

<table>
<tr><td>

**VIA HAND DELIVERY**

Lewis R. Olshin, Esquire
Duane Morris, LLP
One Liberty Place, Suite 4200
Philadelphia, PA 19103-7396
*Counsel for Plaintiff,*
*Chester County Hospital*

</td><td>

**VIA FIRST CLASS MAIL**

Richard A. Feinstein, Esquire
Daniel A Kotchen, Esquire
Boies, Schiller & Flexner, LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC 20015
Facsimile No. (202) 237-6131
*Counsel for Plaintiff,*
*Chester County Hospital*

</td></tr>
</table>

_____
WILLIAM J. LEONARD

510902

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL

v.

INDEPENDENCE BLUE CROSS,
QCC INSURANCE COMPANY,
KEYSTONE HEALTH PLAN EAST, and
KEYSTONE MERCY HEALTH PLAN

NO. 02-CV-2746

## CERTIFICATION PURSUANT TO LOCAL
## RULE OF CIVIL PROCEDURE 26.1(f)

I do hereby certify that after reasonable efforts, the parties are unable to resolve the

discovery dispute addressed in the attached Motion to Compel Aetna, Inc. to Produce

Documents.

OBERMAYER REBMANN MAXWELL & HIPPEL LLP


BY: _____
        WILLIAM J. LEONARD

Dated: January ___, 2003