IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CHESTER COUNTY HOSPITAL | : | |
| | : | |
| v. | : | |
| | : | NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS, | : | |
| QCC INSURANCE COMPANY | : | |
| KEYSTONE HEALTHPLAN EAST, and | : | |
| KEYSTONE MERCY HEALTH PLAN | : | |

## ORDER

NOW, this ___ day of _____, 2004, upon consideration of Defendants' January 30, 2004 Motion to Compel Aetna, Inc. to Produce Documents, and non-party Aetna Inc.'s response and opposition, as well as, all other matters of record related thereto, it is hereby ORDERED that Defendants' Motion is DENIED. Defendants shall pay Aetna reasonable attorneys' fees and costs within seven (7) days of Aetna submitting a certification of same.

_____
J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CHESTER COUNTY HOSPITAL  :
:
v.  :
:  NO. 02-CV-2746
INDEPENDENCE BLUE CROSS,  :
QCC INSURANCE COMPANY,  :
KEYSTONE HEALTHPLAN EAST, and  :
KEYSTONE MERCY HEALTH PLAN  :

**NON-PARTY AETNA INC.'S RESPONSE AND OPPOSITION TO
DEFENDANTS' JANUARY 30, 2004 MOTION TO COMPEL AETNA, INC.
TO PRODUCE DOCUMENTS**

Non-party Aetna Inc. ("Aetna") submits this Response and Opposition to the

January 30, 2004 Motion filed by Defendant Independence Blue Cross and its affiliates

("IBC"), in which IBC once again burdens this Court with IBC's baseless, unsupported

and harassing requests to get Aetna's most sensitive trade secrets and proprietary

competitive information – which IBC itself has conceded is akin to "the Coca Cola

formula" for the healthcare industry, stating IBC "absolutely agree[s] that the information

[Aetna is] seeking to protect, it is proprietary, its trade secret". *See* Exhibit "1" of Aetna's

12/16/03 Memorandum in Opposition to Motion to Compel, incorporated herein by

reference (7/7/03 Transcript at 9-10).[1]

---

[1] Although there are many examples of IBC's overreaching and disingenuous flip-flopping of positions, one glaring example within this latest motion is the fact that the subpoena it seeks to compel expressly omits information requested in IBC's prior subpoena. This demonstrates that the information that IBC swore previously was "substantially needed" was never really "substantially needed" in the first place. Indeed, IBC has switched positions so many times regarding what it claims to "substantially need", that the Court cannot rely on any such representations at this point, which merely underscores the peculiar fact that not a single one of the dozen or so "consultants", whom IBC previously represented to Magistrate Judge Smith as "needing" Aetna's trade secrets, are able to stand up and vouch in a sworn declaration or at a hearing that IBC genuinely "needs" Aetna's trade secrets. As further demonstration of IBC's overreaching in this latest motion, aside from what must be IBC's umpteenth request for fees or sanctions, is IBC's proposed order purporting to compel production of information beyond anything requested in the subpoena

## I.    INTRODUCTION

Despite months and months of opportunity to do so, and numerous filings burdening this Court's already burgeoning docket, IBC has filed yet another motion in this case just under the discovery deadline.  With the discovery deadline now passed, it is now clearer more than ever that IBC has no need for Aetna's trade secrets for defending against the cited allegations of Plaintiff, the Chester County Hospital ("CCH").

Nonetheless, for reasons IBC has still failed to articulate and support with any competent evidence, IBC is pressing to use this Court and the guise of this litigation to get trade secrets of IBC's "principal competitor", Aetna, and to disclose the trade secrets irrevocably to its numerous healthcare industry "consultants", and others who "consult" for IBC and other Aetna competitors, and then, ultimately, publicly disclose and use them as evidence at trial as IBC has made clear it intends to do.

Significantly, IBC has not produced a shred of competent evidence to meet its Rule 45 burden of proving it has a "substantial need" for trade secrets of such a principal competitor as Aetna, in order to defend the allegations cited by IBC.  Indeed, the silence is deafening at this point, but very telling for showing the baselessness of IBC's position.

Clearly, the only "need" IBC possibly has for Aetna's trade secrets is ***competitive,*** a need for which it is patently improper to use this Court's subpoena power.  The Court can judicially notice IBC's continued public complaining, including in sworn testimony lobbying the Pennsylvania General Assembly, about how IBC has been losing customers

---

itself.  IBC's gamesmanship must stop.  IBC does not need Aetna's trade secrets, and the Court should not give any credence to its requests for the same.  Indeed, IBC previously asserted this case was frivolous and it needed nothing to defend against it.  If IBC's assertions about the strength of it defenses to Plaintiff's claims are to be given any credence, then it is likely this Court will enter summary judgment for IBC before there is a need to rule on this motion.

to competition by Aetna, how IBC allegedly is faced with an "actuarial death spiral" due to Aetna's recent competition in this market, and how the Aetna competition is forcing IBC to change and improve its own pricing and marketing strategies to ones copying Aetna's. *See* Exhibit "2"of Aetna's 1/7/04 Memorandum In Support Of Its Objections To The Magistrate Judge's December 22, 2003 Order, incorporated herein by reference (9/23/03 Testimony, at 4-5, of IBC Chief Marketing Officer before the Pennsylvania House Insurance Committee).

IBC's real "need" (competitive) is plainly obvious highlighted by the fact IBC, despite two rounds of briefing before the Magistrate Judge and the District Court, plus another round of briefing in a baseless "contempt" motion" it has since filed, has utterly failed to produce any evidence from any of its stable of "consultants" whom IBC has represented as supposedly "needing" Aetna's trade secrets. *See* 12/22/03 letter of IBC's counsel to Magistrate Judge Smith, p. 6.  Not a single one of IBC's dozen or so "consultants" are able to stand up and vouch for IBC's extraordinary (and patently unnecessary) but unsupported request that this Court force a "principal competitor" such as Aetna to surrender trade secrets to IBC that would, in itself, threaten to destroy the very competition that the antitrust laws are intended to protect for the public interest.

Incredibly, despite the fact *IBC* has the burden, *only Aetna* has submitted evidence on the issue of "need", including the attached Declaration of nationally-recognized healthcare economist, Glenn Melnick, Ph.D.  Dr. Melnick's Declaration further exposes IBC's charade and establishes, among other things, that IBC has no need at all for Aetna's trade secrets in order to defend the allegations it cited to Magistrate Judge as the issues IBC "needs" to refute. *See* Exhibit "5" of Aetna's 1/27/04 Reply

Memorandum in support of Aetna's Objections to Magistrate Judge's 12/22/03 Order, incorporated herein by reference, and also attached hereto for the Court's reference as Exhibit "1" (Declaration of Dr. Glenn Melnick).[2]

Knowing it cannot meet and has not satisfied its burden to prove "substantial need", IBC desperately again relies upon the wrong legal standard. This time, instead of addressing the "substantial need" test dictated by the amended Rule 45 and applicable caselaw, IBC resorts to misguiding the Court to an erroneous "reasonably necessary" standard from inapplicable rules and caselaw pre-dating the amendments to Rule 45. It is beyond cavil that Rule 45's 1991 amendments expressly raised the bar considerably for litigants, like IBC, trying to force non-party "principal competitors", like Aetna, to release trade secrets under the guise of "discovery". *See* Reply Argument, *infra*, Section "II.14-16". *See also R&D Business Systems v. Xerox Corp*, 152 F.R.D. 195, 197 (D. Colo. 1993)(rejecting defendant's attempt to obtain trade secrets based on mere showing they were "relevant" and statements by counsel that it "needs" the information, and requiring that the litigant "must also show a substantial need for the information" to the defense, and show that such need outweighs the "potential harm"). *See also ACT, Inc. v. Sylvan Learning Systems, Inc.*, 1999 WL 305300, at *2, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999)(rejecting attempts of a competitor to obtain another competitor's market

---

[2] Conspicuously absent from IBC's earlier motion and memorandum in support of its 12/3/03 motion to compel, in which IBC convinced the Magistrate Judge to compel production of trade secrets, was any proper citation to the applicable controlling law and standards under Rule 45, under which **IBC** – *not* Aetna – had the burden to prove "substantial need". IBC's motion at that time misrepresented the controlling standards to the Magistrate Judge. In any event, then as now, IBC produced no competent evidence whatsoever showing that IBC met its burden under Rule 45 and controlling caselaw, of proving a "substantial need" to use *Aetna's particularized* trade secrets for IBC's private alleged interest to prove or disprove claims or defenses in this case. *See ACT, Inc. v. Sylvan Learning Systems, Inc.*, 1999 WL 305300, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999); *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525 (D. Del. 2002); *R & D Business Systems v. Xerox Corp.*, 152 F.R.D. 195 (D. Col. 1993).

assessment planning information; rejecting argument, which IBC again raises, that it was allegedly relevant to "barriers to entry" issues). *See* Exhibit "1" hereto (Declaration of Dr. Glenn Melnick, pp. 2-10).

IBC has also resorted to actually misstating the allegations of CCH's amended complaint, which IBC previously cited to Magistrate Judge Smith as IBC's sole basis for alleging a "substantial need" to get Aetna's trade secret rates. As Dr. Melnick confirms, the paragraphs cited by IBC have nothing at all to do with *Aetna's* rates; rather, the allegations are that *IBC's* rates (not Aetna's) force hospitals to accept prices that are *below the hospitals' costs*. *See* Exhibit "1" hereto (Dr. Melnick Declaration, at pp. 4-10). To the extent this is a "rate case" at all, it is an "*IBC* rate case"—*not* an Aetna rate case.

IBC's conduct precipitating the prior Order of Magistrate Judge Smith is rendered more extraordinary and unfair, because Aetna was denied not only the right to see numerous pleadings and other information kept "secret" from Aetna under seal *(see e.g.* Dkt. Entries 174 and 190), *but also an opportunity to see and certainly to respond to the information that IBC submitted to Magistrate Judge Smith with its 12/22/03 letter precipitating the 12/22/03 Order.* IBC's 12/22/03 letter with exhibits – which purportedly contains IBC's only *alleged* compliance with Rule 45's requirements to show "substantial need" – *was never even served upon Aetna by IBC until after the 12/22/03 Order was entered.* Incredibly, IBC has since argued that Aetna should have no opportunity to provide the District Court with facts and evidence – none of which IBC disputes – in further rebuttal of IBC's submissions and arguments.

In addition to the obvious unfairness of such process, should this Court do anything but deny IBC's motion outright for failure to meet its Rule 45 burden, then a hearing is necessary, *following discovery by Aetna*. First and foremost, Aetna must be provided access to the matters that have been kept secret from Aetna and under seal, if it is to have any fair opportunity to rebut what IBC has been saying and citing to this Court. Moreover, in order for Aetna to know and evaluate what IBC is saying it "substantially needs" to defend this case, and to then assert Aetna's rights under Rule 45 and the applicable law, Aetna is entitled to know what IBC already has for defending this case. "Need" also depends on what one already has in its possession, and what is otherwise readily available to them from other sources.

Thus, Aetna is entitled to know what facts, information and expert opinions IBC already has regarding the allegations in this case and its defenses. Only then will Aetna have a fair opportunity to rebut IBC's alleged "need" for Aetna's trade secrets. Presently, Aetna continues to be denied such knowledge, including through IBC's citation to matters under seal.

Accordingly, if the motion is not denied outright, Aetna must be afforded discovery and an evidentiary hearing on IBC's alleged "substantial need" for Aetna's trade secrets.

## II.    FACTUAL BACKGROUND

### A.    IBC's Motion And Other Papers Previously Filed Of Record Confirm It Produced No Evidence Showing "Substantial Need" That Justifies Forcing Aetna To Turn Over Trade Secrets To A Principal Competitor.

Neither Aetna, nor District Judge Padova or Magistrate Judge Smith, have been told what exactly IBC, or its "consultants", need to prove through access to Aetna's trade

secrets, if anything.   The record discloses that the only thing IBC did before the Magistrate Judge and District Court in the earlier proceedings, and all it continues to argue in the present Motion, is say that Aetna's trade secrets cannot be publicly obtained. Of course, that says nothing, let alone prove what is required under Rule 45 as amended. In fact, *by definition Aetna's trade secrets are secret and not publicly available.*

But "public unavailability", or "inconvenience" in getting information, is certainly not a license to get a non-party principal competitor's trade secrets.  The test is "substantial need" for defending against specific allegations, not a mere want or desire because it is a secret and not available, or inconvenient to get otherwise.  IBC's entire position makes no sense at all.  Obviously, if showing mere "public unavailability" were all that is needed for litigants to establish a "substantial need" and force a non-party competitor to release trade secrets, the idea of a trade secret would cease to exist and Rule 45's "substantial need" requirement would be rendered utterly meaningless.[3]

IBC's decision not to produce any specific evidence of "substantial need" demonstrates its intent to fish through Aetna's trade secrets, merely to see what is there, regardless of whether it helps or hurts IBC's defense.  This is clearly prohibited under Rule 45 and applicable caselaw, especially following the 1991 amendments.  *See* Aetna's 1/7/04 Memorandum in Support of Objections, pp. 14-26.  *See also* Section "III.A", *infra.*

Further, it is significant that the Plaintiff, CCH, whose allegations IBC cites as the basis for the alleged "need" to get Aetna's trade secrets, has not moved to compel

---

[3]The *Mannington Mills* Court exposed the circuity of IBC's argument and rejected the very same contention IBC is making here.   *Mannington Mills*, Inc. *v. Armstrong World Industries, Inc.*, 206 F.R.D. 525 (D. Del. 2002).  IBC's Motion fails to offer any credible rebuttal to *Mannington Mills. See* Section "III. A ", *infra.*

disclosure of Aetna's trade secret rates and strategies. Peculiarly, only IBC wants Aetna's trade secrets in this case, but is unwilling to say what particular points will be proven by them, or why they are needed to prove matters that have nothing to do with the cited allegations of CCH. *See* Amended Complaint, Paras. 17, 23, 29 (cited by IBC 12/22/03 letter to Magistrate Judge, page 3, as the alleged basis for "needing" Aetna's trade secret rates).

**B.      Dr. Melnick's Declaration Submitted By Aetna – The *Only* Expert Evidence Regarding "Substantial Need" – Further Establishes The Absence Of Any Need For Either Aetna's Rates Or Its Strategic Plans To Defend The Allegations Cited By IBC To The Magistrate Judge.**

Dr. Melnick, an expert economist who is one of the preeminent authorities in the field, shows that IBC's claimed "need", as proffered in its 12/22/03 letter to Magistrate Judge Smith, has no valid basis. *See* Exhibit "1" hereto (Declaration of Dr. Glenn Melnick).

IBC is well aware that it has the burden to demonstrate a "substantial need" for accessing Aetna's trade secrets before such sensitive proprietary information must be disclosed. For that very reason, and at the discretion of Magistrate Judge Smith, IBC's counsel submitted a December 22, 2003 letter to Magistrate Judge Smith, purporting to detail all reasons why IBC had a "substantial need" for this kind of intrusive discovery of a non-party business competitor.

In its December 22, 2003 submission, IBC offered no valid reason why it needed this discovery of Aetna at all, much less an offering of "substantial need". In the December 22, 2003 letter, IBC stated that it needed Aetna's trade secret reimbursement rates and strategic plans to refute the allegations contained in just a handful of the allegations within CCH's Amended Complaint – solely paragraphs 17, 23, 29, 55 and

57(a).  In addition, IBC cites to just a portion of one other publicly available document filed by CCH; a single page from a Motion to Compel Discovery filed by CCH against Capital Blue Cross.  IBC contended that it needs Aetna's trade secrets to refute these specific allegations.

As Dr. Melnick points out in his Declaration, IBC does not need any of Aetna's trade secret information to defend against the allegations of CCH cited by IBC in its submissions to Magistrate Judge Smith.  Those allegations of CCH, cited by IBC in its attempt to discharge its burden of proof on this issue, implicate *IBC's* own rates, *IBC's* own dealings with other companies that utilize the "Blue Cross" or "Blue Shield" license, and/or whether the rates paid *by IBC* to hospitals like CCH truly do not cover the costs of the services provided, as alleged. Aetna's hospital reimbursement rates would have nothing to do with disproving such allegations.

Dr. Melnick also explains in detail how Aetna's strategic plans provide absolutely no assistance to IBC in, as it contends, defending against CCH's allegations that IBC has erected barriers to entry or growth in the relevant market.  As an expert in this field, Dr. Melnick confirms that a competitor's strategic plans are typically not used to prove or disprove allegations regarding barriers to entry into a market – rather, there are publicly available surveys that IBC can easily access to reflect the relative ease with which competitors have entered or grown in a particular regional market.  IBC simply does not need, much less have a "substantial need" for, Aetna's proprietary strategic plans in relation to this issue.  Indeed, whatever Aetna *intended* to do in the market at any particular time is hardly a measure of what has actually transpired in the market, over time.

Given the paltry reasons offered by IBC to engage in discovery of its non-party competitor, the only conclusion that can be reached is that IBC seeks only to gather competitively sensitive information on Aetna, not to defend itself. As Dr. Melnick points out, IBC will not even articulate the analysis it intends to engage in which apparently requires accessing its competitor's most sensitive trade secrets, and for that reason, it cannot establish a need or a "substantial need" for that information. If IBC's experts needed Aetna's trade secrets to prepare some kind of analysis, IBC could simply describe what that analysis is in trying to demonstrate a need for it. It is telling that IBC simply refuses to do so, a purposeful omission which speaks volumes about IBC's true motivations here. This omission compels the legal conclusion that IBC cannot sustain its burden of providing a "substantial need" under Rule 45.

As Aetna has argued, even if IBC demonstrated a "substantial need", which it has not, this Court should still engage in a balancing of interests analysis before directing disclosure of Aetna's most sensitive trade secrets to a direct competitor. Dr. Melnick's Declaration offers substantial guidance to the Court in this regard, and makes it clear that the balance of interests falls in favor of Aetna; in favor of preserving competition in the vital healthcare market; and, in favor of protecting consumers.

This Court cannot turn a blind eye to the context in which IBC is using this subpoena, particularly given the harm such disclosure risks for the public marketplace and for Aetna. *See* Exhibit "1" hereto (Declaration of Dr. Glenn Melnick). In addition to explaining the utter baselessness of IBC's claimed justification, or alleged "substantial need", Dr. Melnick further establishes the irreparable harm at stake in forcing a principal competitor like Aetna to release unretractable trade secrets in this market.

## III.    ARGUMENT

### A.    Aetna' Prior Filings Refute All Of IBC's Arguments.

Aetna's 1/7/04 Memorandum, which supports the Objections to the prior Magistrate Judge's 12/22/03 Order, details the many arguments for denying IBC's request to snatch trade secrets. Aetna's 1/27/04 Reply Memorandum further states the many reasons. Additionally, Aetna's 1/30/04 Response to IBC's Motion for Contempt sets forth even more arguments refuting the relief requested by IBC in this motion.

All of the foregoing filings by Aetna, as well as Aetna's December 16, 2003 opposition to IBC's earlier motion to compel, are incorporated herein by reference, rather than burdening the Court and the docket with repetition from all of them herein. Suffice to say, however, that the very fact that IBC has chosen to file the instant motion further establishes that it concedes the lack of merit in any of its prior positions. The fact that IBC saw fit to file the instant motion to compel undermines all of IBC's prior arguments and representations to this Court. In doing so, IBC has also required Aetna to once again file responsive papers and IBC should be ordered to pay Aetna's counsel fees and costs in this matter.

In Aetna's prior filings, Aetna showed how the law clearly compels denial of IBC's motion. IBC does and says nothing new in its latest motion that is not already refuted by Aetna in those prior filings incorporated herein. Where a party such as IBC seeks production from a *non-party*, such as Aetna, the party faces a "burden of proof heavier than the ordinary burden imposed under Rule 26". *Echostar Communications Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 394 (D. Col. 1998). "The fact that discovery is sought from a non-party is one factor which the Court may weigh in determining whether

11

[IBC] is entitled to an order which requires the production of the materials or information". *Id. (quoting Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)). The burden should be more strictly enforced where, as here, the non-party is the "principal competitor" of the party seeking to force disclosure of the trade secrets.

"Courts are required to balance the needs for discovery against the burdens imposed when parties are ordered to produce information or materials, and the status of a person or entity as a non-party is a factor which weighs against disclosure". *Id. (citing American Standard Inc. v. Pfizer, Inc.*, 828 F.2d 734, 738 (Fed. Cir. 1987)(*see also Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 531 (D. Del. 2002)("Moreover, courts have traditionally recognized that disclosure to a competitor is more harmful than disclosure to a noncompetitor.")(citations omitted)).

IBC readily concedes Aetna is not only "a" competitor, but is "IBC's principal competitor". *See* IBC's counsel's 12/22/03 letter to Magistrate Judge Smith, p.6. IBC has also readily conceded that, like IBC's own information, Aetna's marketing and pricing strategies and information constitute trade secrets or other highly sensitive and highly confidential commercial information, whose disclosure would harm Aetna and the market. *See* IBC's Memorandum at 8-9 ("The proprietary nature of Aetna's documents is acknowledged"); *see also* Exhibit "1" to Aetna's 12/16/03 Opposition Memorandum (Transcript of 7/7/03 hearing) at 8 ("I absolutely agree that the information they are seeking to protect, it is proprietary, it is trade secret."); *Id.* at 9 (". . . our rates are proprietary. They are absolutely right. This is our formula for Coca Cola."). *Id.* at 9-

10.[4]

Once it is conceded or otherwise shown that the information sought "is trade secret information, or otherwise confidential, *the burden shifts* to" IBC. *Echostar Communications Corp.*, 180 F.R.D. at 394 (emphasis added). IBC "must establish 'that disclosure of the trade secrets is both relevant and necessary.'" *Id.* (citations omitted). IBC must also prove "that it has a 'substantial need' for the discovery which 'cannot be otherwise met without undue hardship. . . .'" *Id. (citing* Fed. R. Civ. P. 45(c)(3)(B)(iii)).[5]

The Court must also "balance the need for the disclosure against the injury that would result from that disclosure." *Id.* (quotations and citations omitted) (*See also Mannington Mills, Inc.*, 206 F.R.D. at 529 (". . . this court is required to apply the balancing standards -- relevance, need, confidentiality and harm. And even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit.") (*citing Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990)).

IBC's purported "need" and representations about "need" have continually evolved throughout this litigation, without explanation, including but not limited to its failure to object to Magistrate Judge Smith's December 22, 2003 Order where that Order denied its request for Aetna's strategic plans in Central Pennsylvania. IBC had told the

---

[4] As noted in Aetna's 12/16/03 Opposition, IBC zealously guards its own trade secrets, while simultaneously seeking to exploit Aetna's. *See* Aetna's 12/16/03 Opposition Memorandum at 9.

[5] In its Motion to Compel before the Magistrate Judge, IBC misstated the applicable law by arguing that *Aetna* must meet a "heavy burden" in order to prevail on its objections to IBC's subpoena. *See* IBC's Memorandum at 8; Dkt. Entry 102 at 11-12. Clearly, IBC knows the law establishing the burden was on *IBC*. In fact, IBC filed briefing in this same case, but before another district court, in which IBC itself expressly cited the law as stated in the *ACT* case. *See* Exhibit "3" hereto (IBC's 06/11/03 Memorandum in W.D. Pa., at pp. 3-5).

Court that very same day that IBC "must" have the Central Pennsylvania strategic plans in order to effectively respond to CCH's claims. By not objecting to the Magistrate Judge's Order, however, IBC concedes the baselessness of its statements about alleged "need".

Moreover, IBC has never disclosed, to Aetna or the Court, what information it has already received from other non-parties. IBC does not need Aetna's most sensitive trade secrets to demonstrate either that Aetna, or its predecessor, has competed in this market for almost thirty years and that Aetna has recently enrolled tens of thousands of former IBC enrollees. Presumably, IBC consulted one of its stable of experts before it rejected Aetna's inquiries regarding the possibility of utilizing masked rates by stating "**our experts** do not see how we can present our defense in the way you suggest", and before it inexplicably reversed course and represented to the Court that it could accept summary reimbursement rate information. *Compare* Exhibit "4" to Aetna's December 16, 2003 Opposition to IBC's Motion to Compel (emphasis added); IBC's December 22, 2003 Letter to Magistrate Judge Smith, at 5.

Additionally, IBC has never explained why, if it can utilize summary rate information for Central Pennsylvania, as it has most recently asserted, that it cannot utilize similar information to analyze Southeastern Pennsylvania. Indeed, the only facts that are self-evident are that IBC has played "fast and loose" with its alleged "need", that the disclosure of Aetna's trade secrets to its principal competitor will irreparably harm both Aetna and the health care market in Southeastern Pennsylvania, and that, therefore, IBC has not met its burden of demonstrating "substantial need".

14

Finally, IBC has been simply unable to distinguish *ACT, Inc. v. Sylvan Learning Systems, Inc.*, 1999 WL 305300, No. Civ. A. 99-63 (E.D. Pa. May 14, 1999). *See* IBC's January 21, 2004 Memorandum at 15-16; Aetna's January 7, 2004 Memorandum at 19-22. Among other things, Plaintiff ACT sought to compel one of its competitors to provide "evaluations of competitive conditions [and] analyses of barriers to entry" to support its antitrust claims. *See* IBC's January 21, 2004 Memorandum at 16; *ACT*, 1999 WL 305300 at *1.

As was the case in *ACT*, IBC has not rebutted Aetna's contentions that IBC does not need Aetna's trade secrets, nor has it illustrated why Aetna's perception of the market would be relevant, let alone needed, choosing to rely upon a self-serving, conclusory affidavit of one of the <u>associates</u> assigned to the case, rather than the stable of experts that it has paid to defend against claims that it previously claimed violated Rule 11. Indeed, a review of the "Seidman Affidavit", the only "evidence" submitted with IBC's 12/22/03 letter to Magistrate Judge Smith, shows only that Aetna's trade secrets are, as all trade secrets are by definition, unavailable from anyone other than the entity that possesses the trade secret(s), and that IBC is seeking to avoid valid objections from hospitals in response to further subpoenas upon such non-parties.

Even in failing to meet its burden, ACT offered evidence from ***an expert*** purporting to show that the information was the "type of information upon which experts such as himself rely in analyzing antitrust issues, such as those ACT raises". *ACT,* 1999 WL 305300 at *2. IBC has not attempted to offer even a conclusory expert analysis, let alone an expert opinion detailing why it needs the information. Clearly, here, as in *ACT*, IBC has failed to demonstrate the requisite "substantial need".

**B.**    **IBC's Cited Authority Regarding The Applicable Burden Under Rule 45 Is Inapposite, And Otherwise Supports Aetna's Position.**

In a January 21, 2004 Memorandum relating to Aetna's Objections to an earlier Magistrate Judge's Order, IBC finally acknowledged the burden that it failed to articulate or meet before Magistrate Judge Smith. *Compare* IBC's January 21, 2004 Memorandum at 4-5; IBC's December 3, 2003 Motion to Compel at 8. However, IBC resorted to manipulating quotation marks around the words "substantial need", to make it appear that the *American Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 743 (Fed. Cir. 1987) case actually defined the "substantial need" standard of Rule 45. *See* IBC's January 21, 2004 Memorandum at 4. IBC is simply wrong. The *American Standard* opinion **never** specifically defined, nor did it refer to, "substantial need". 828 F.2d 734.

The *American Standard* Court could not possibly have defined the Rule 45 "substantial need" standard, which was not enacted until four years after that opinion. The *American Standard* Court instead articulated a "reasonably necessary" standard, and relied upon *Heat Control, Inc. v. Hester Industries, Inc.*, 785 F.2d, 1017, 1024, which in turn relied upon the advisory committee notes to the *1983 amendment to Rule 26(b)(1)*. However, as clearly provided by the advisory committee notes to the *1991 amendment to Rule 45*, as well as the plain language of Rule 45, "[s]ubparagraph (c)(B)(3) identifies circumstances in which a subpoena *should* be quashed unless the party serving the subpoena shows a *substantial need and* the court can devise an appropriate accommodation to protect the interests of the witness". (all emphasis added).

Accordingly, although some courts have *in dicta* referred to the "reasonably necessary" standard mentioned in *American Standard*, there is no doubt that IBC must demonstrate a "substantial need". This is more akin to the standard set forth in *Coca-*

*Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985)("[t]he level of necessity that must be shown is that the information must be necessary for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories.") (citation omitted)); *see also Cash Today of Texas, Inc. v. Greenberg*, 2002 WL 31414138 at *3, No. 02-MC-77 (D. Del. Oct. 23, 2002)("[d]isclosure of the evidence is considered necessary when the information is **required** "for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories.") (*quoting Coca-Cola*, 107 F.R.D. at 293)).[6]

The other cases relied upon by IBC are equally unpersuasive. *FTC v. J.E.Lonning*, 539 F.2d 202 (U.S.App. D.C. 1976) concerned the enforcement of a subpoena in an administrative proceeding. The FTC was investigating a "shared" monopoly among four leading manufacturers of ready to eat breakfast cereals under its broad powers to investigate unfair methods of competition. *Id.* at 202. Here, Aetna is not being investigated for any wrongdoing, and the FTC's ability to subpoena discovery from Aetna is irrelevant to this proceeding. Moreover, unlike IBC's glaring inability to show "substantial need", the pertinent administrative order in *J.E.Lonning* was rendered only after all contentions were "exhaustively" discussed in extensive position papers and

---

[6] While the "substantial need" standard was incorporated into Rule 45 in 1991, parties seeking to compel the production of *work product material* pursuant to Rule 26(b) have been required to demonstrate "substantial need" since at least 1970. *See* 6 *James W. Moore et al.*, Moore's Federal Practice, ¶ 26App..05[1] (3d. Ed. 2003); 9 Moore's Federal Practice, ¶ 45.App.08[1] (3d. Ed. 2003). Under Rule 26, in connection with seeking work product, "substantial need . . . is demonstrated by establishing that the facts contained in the requested documents are *essential elements of the requesting party's prima facie case*". 9 Moore's Federal Practice, ¶ 26.070[5][c] at 26-222.5 (emphasis added). IBC has not even attempted to demonstrate that the information contained in the trade secrets it seeks Aetna to surrender is "essential" to any identified elements of its defenses to the cited allegations in CCH's Amended Complaint. Indeed, as Dr. Melnick confirms, there is no need at all, let alone any "essential" or "substantial" need, for Aetna's trade secrets in order to defend those allegations.

numerous oral arguments and after the FTC filed a detailed statement why Kellogg's alternative substitute information was inadequate. *See Id.* at 207-08, 210.

In *E.I. Dupont De Nemours Powder Company v. Masland*, 244 U.S. 100, 37 S.Ct. 575 (1917), the Supreme Court actually reversed a circuit court's order which permitted defendant to disclose plaintiff's alleged trade secrets during discovery to all experts and witnesses. *See Id.* at 102. While the trade secret protection given to plaintiff could be revisited by the trial judge subsequently, the power of a trial judge to review discovery orders is not in dispute here and, without more, IBC's decision to cite authority protecting trade secrets from disclosure actually refutes, rather than promotes, its position. *See Id.* at 103.

In *Heat & Control v. Hester Industries, Inc.*, 785 F.2d 1017 (Fed.Cir. 1986), the Circuit Court allowed appeal of the district court's order quashing a subpoena under the collateral order doctrine. *Id.* at 1020-21. The Circuit Court vacated the order because, while the court considered the hardship to the defendant, "it erred in not assessing its relevance and Heat and Control's need for the information", and remanded to the district court in order to have the proper law applied. *See Id.* at 1024. In reality, *Heat & Control* stands for the proposition that disclosure of a trade secret is not *per se* unreasonable and oppressive. *See id* at 1025. Indeed, Aetna has never waivered from this fundamental proposition, but has steadfastly maintained that IBC must demonstrate a "substantial need" for Aetna's trade secrets.

In citing *Coca-Cola Bottling Company of Schreveport v. The Coco-Cola Company*, 107 F.R.D. 288, 292-93 (D. Del. 1985), IBC takes liberties in stating that "the balancing test under Rule 45 is tilted in favor of disclosure". *See* IBC's Response at p. 5.

The case merely holds that discovery is possible, but only "**once relevance and necessity have been shown**". *Id.* at 293.  Currently, the Rules require a higher showing of substantial need.  *See* Fed. R.Civ.P. 45.  IBC has utterly failed to demonstrate a substantial need and under such circumstances, *Coca-Cola* directs that the discovery be denied.  *Id.* at 293 (*citing Cleo Wrap Corp v. Elsner Engineering Works, Inc.*, 59 F.R.D. 386, 388 (M.D.Pa. 1972) (discovery denied where relevance slight, need small, and harm great); *see also Id.* at 290 (court must remain cognizant that the disclosure of trade secrets in litigation, and with use of protective order, could become by indirection the means of ruining an honest and profitable enterprise.").

Moreover, in balancing the harm of disclosure against the need for *Coca-Cola's* trade secrets, the Court determined "virtually all of that harm can be eliminated with stringent protective orders and other safeguards.  Because plaintiffs are Coca-Cola bottlers, they will have an incentive to keep the formula secret.  The likelihood of harm is less than if defendant's trade secrets were disclosed in litigation to competitors".  *Id.* at 299 (internal citations omitted).

Here, the opposite scenario exists.  There is no possible protective order that can prevent harm to non-party Aetna once its trade secrets are ordered produced to lawyers and consultants working for its chief competitor and other competitors.  There is no incentive for either party or their consultants to protect *Aetna's* interests.

### C.    Contrary To IBC's Suggestions, The Harm To Aetna Is Not Premature, But Imminent And Irreparable.

IBC's motion provides absolutely no legal rebuttal at all to the cases previously cited by Aetna establishing that once disclosed – even under the auspices of a "protective order" – trade secrets are irreparably harmed.  All that IBC's response does is repeat the

same argument that these cases expressly rejected—*i.e.* that Aetna will have to wait until trial, but in the meantime be content with the "protective order". IBC's inability to say anything more than this, further confirms it has no rebuttal to Aetna's legal argument and factual contentions in this regard.

The cases agree that harm to Aetna is imminent and irreparable once this sensitive information is out of Aetna's exclusive control. *See Powell v. Ridge*, 247 F.3d 520, 524 (3d Cir. 2001) (absent immediate appeal of order requiring disclosure of trade secret, there is no way to "unscramble the egg scrambled by the disclosure") (*quoting In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir. 1997)); *ACT, Inc.*, 1999 WL 305300; *Mannington Mills, Inc.*, 206 F.R.D. 525 (D. Del. 2002); *R & D Business Systems*, 152 F.R.D. 195 (D. Col. 1993); *see also PEPSICO, Inc. v. RedMond*, 1996 WL 3965, at *30, No. 94-C-6838 (N.D. Ill. Jan. 2, 1996) ("Just as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever and, 'since the confidentiality of this information can never be regained, the [threatened] injuries would be irreparable'" (citation and quotation omitted)).

While IBC's stated intention to publish Aetna's trade secrets at trial will irreparably harm Aetna and the market, that harm is not solely predicated upon such a disclosure. As one district court noted, "[w]hat happens with any information disclosed by [the non-party] in response to [a party's] subpoena, particularly at trial, is anyone's guess". *Mannington Mills, Inc.*, 206 F.R.D. at 530. As with that case, in the instant case, it would be "*divorced from reality to believe that either party here would serve as the champion of its competitor . . . . to maintain the confidentiality designation or to limit public disclosure . . . . during trial.*" *Id.* (internal quotations and citations omitted)

(emphasis added). Indeed, not only does IBC possess no interest in protecting Aetna's trade secrets at trial, but it would reap incalculable competitive benefits from disclosure of the same.

IBC's new-found confidence in the Amended Protective Order directly contradicts its statements in other pleadings where it stated "IBC is *not confident that its legitimate confidentiality interests in documents relating to its aborted merger discussions with Highmark are sufficiently protected simply because a Protective Order was entered by the Court*". *See* Exhibit "3" to Aetna's January 7, 2004 Memorandum at 8, n.5. Indeed, IBC's representations in its January 21, 2004 Response to Aetna's Objections demonstrate that IBC will offer any position, even those that contradict its prior filings in connection with this litigation which were verified pursuant to the protections contemplated pursuant to Rule 11, in order to fabricate "protections" in support of its otherwise factually and legally untenable attempts to compel the production of its competitor's trade secrets.

IBC's apparent handling of Aetna's trade secrets in response to subpoenas served upon other non-party providers, raises serious concerns regarding IBC's alleged "need" for Aetna's trade secrets. IBC previously represented to the Court that it would utilize such information at "most, if not all" of the depositions in this matter, and are required to give Aetna notice of their intent to utilize such information at depositions as required pursuant to the Amended Protective Order. *See* Aetna's January 7, 2004 Memorandum at 12-13. Aetna has not received such notice.

Additionally, as explained in Dr. Melnick's Declaration, human nature dictates that it is virtually impossible for IBC's experts to ignore the knowledge they will attain if

they are provided access to Aetna's trade secrets. *See* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 468 (1991) (Exhibit "12" to Aetna's December 16, 2003 Opposition Memorandum.) (It is doubtful that experts "will be able to . . . compartmentalize all he or she has learned and not use any of the information obtained [in the instant litigation.]" *Id.* at 471 (citations omitted); Danger inherent in disclosure of trade secrets because "[t]he loss of confidentiality, the *sine qua non* of a trade secret, robs the owner of any advantage the secret may have provided". *Id.* at 473 (citation omitted)).

Clearly, Aetna and the market will suffer irreparable and incalculable harm if Aetna is compelled to produce its most sensitive trade secrets to its principal competitor; especially where IBC stated, in sworn testimony that "*We simply must respond to this marketplace, and we must respond at once*". *See* Exhibit "2" to Aetna's January 7, 2004 Memorandum at 4.

### D.    IBC's Motion Must Be Denied Because IBC Failed To Attempt To Resolve Aetna's Objections In Good Faith.

As it has with respect to seemingly every discovery motion it has filed against non-parties in this case, prior to filing its instant Motion IBC failed to make any good faith attempt to resolve Aetna's objections to the subpoena at issue. Here, IBC did nothing regarding Aetna's objections to the 12/17/03 subpoena that is at issue in this motion.

As IBC concedes, it filed this motion apparently merely because it wanted it "on the record" before the discovery deadline expired. Such action and motives for filing discovery motions, especially where IBC had Aetna's objections in-hand for a month before filing the motion, flies in the face of the requirements of the rules. IBC admittedly

22

rushed, and took no time despite much opportunity, to simply pick up a phone and talk to Aetna's counsel about its objections to the 12/17/03 subpoena before filing the instant motion. That alone, along with the many other reasons stated herein, requires that IBC's motion be denied.

Pursuant to Federal Rule of Civil Procedure 37(a), a party moving to compel discovery must certify to the Court "that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action". Further, Local Rule 26.1(f) states, "[n]o motion or other application pursuant to the Federal Rules of Civil Procedure governing discovery or pursuant to this rule shall be made unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute". E.D. Pa. R. 26.1(f).

As the Third Circuit recently reaffirmed, "before moving to compel discovery, 'a party must first prove that it sought discovery from its opponent'". *Naviant Marketing Solutions, Inc. v. Larry Tucker, Inc.,* 339 F.3d 180, 186 (3d Cir. 2003) (*quoting Petrucelli v. Bohringer & Ratzinger,* 46 F.3d 1298, 1310 (3d Cir. 1995). Here, IBC did not even make an effort to "go through the motions" with Aetna before filing the instant motion. In *Naviant,* 339 F.3d at 186-87, the court noted that, "plaintiff's counsel refused to discuss matters on the telephone with defendant's counsel and sought the intervention of the court without first seeking to work out the conflict with defense counsel". *See Id.* at 186; *see also Shuffle Master, Inc. v. Progressive Games, Inc.,* 170 F.R.D. 166, 170-73 (D. Nev. 1996)(one telephone call and a couple of faxes insufficient to meet requirement of good faith conferring). Accordingly, based upon plaintiff's failure to make a good effort

23

to confer with counsel before seeking court action, the Third Circuit held that defendant's refusal to respond to plaintiff's unreasonable demands was excused. *Id.* at 187.

The same result should obtain here.

**E.    A Ruling Granting IBC's Motion To Compel Would Constitute An Unlawful Taking Of Aetna's Confidential And Trade Secret Information.**

IBC's instant attempts to compel the production of Aetna's admitted trade secrets and confidential information amounts to "a taking of private property in violation of the Fifth Amendment". *See Arthur R. Miller, Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L. Rev. 427, 468 (1991) (attached as Exhibit "12" to Aetna 12/16/03 Opposition). Professor Miller noted that the Supreme Court has "declared that confidential information . . . is a species of property to which the corporation has the exclusive right and benefit". *Id.* (*quoting Carpenter v. U.S.,* 484 U.S. 19, 26 (1987)).

Professor Miller's analysis further explained that the disclosure of confidential and proprietary information, such as the compensation received by IBC's executives, by parties to a litigation, illustrates "the concern in the business community that even the most protective court cannot prevent the spread of information beyond the confines of a lawsuit". *Id.* at 470. Similarly, it is doubtful that even where the information sought will be disclosed to experts, that the expert will be able to compartmentalize all he or she has learned and not thereafter use any of the information obtained during the litigation. *Id.* at 471 (citations omitted).

Moreover, the inherent danger of disclosing trade secret information is obvious because, as explored *supra.* at 22, "[t]he loss of confidentiality, the *sine qua non* of a

24

trade secret, robs the owner of any advantage the secret may have provided". *Id.* at 473 (citation omitted). Accordingly, Professor Miller noted that "[g]overnment disclosure of information in which parties have a property right . . . might amount to a taking of private property in violation of the Fifth Amendment". *Id.* (citations omitted).

Professor Miller's observations relating to potential violations of the **Fifth Amendment** are even more applicable to the instant case, where Aetna, a non-party, now seeks protection for its trade secrets. The Federal Rules of Civil Procedure recognize that the trade secrets of non-parties should be afforded a higher level of protection than those of parties to a litigation, as required by the requisite showing of substantial need for the trade secrets of non-parties pursuant to Rule 45. *Compare* Fed. R. Civ. P 26(b) and Fed. R. Civ. P. 45. Additionally, not only has IBC failed to demonstrate any substantial need for the documents it requests, but it has also certified, in its Rule 11 Motion filed against CCH, that CCH's claims are utterly devoid of any merit. (Dkt. Entry 15).

This filing alone illustrates that IBC's crusade to attain Aetna's trade secrets amounts to nothing more than an information grab, designed to disclose Aetna's trade secrets and enhance IBC's competitive position. If such disclosure is mandated, Aetna may be forced to pursue its Fifth Amendment rights and seek just compensation for IBC's taking of Aetna's regional trade secrets; compensation that may properly be measured by the fair market value of such information, as demonstrated by the almost $9 billion that Aetna paid to acquire U.S. Healthcare in 1996.

**F.      The Subpeona Is Otherwise Unduly Burdensome, Imprecise, And Overly Broad.**

As stated in prior filings and hearings regarding IBC's requests to obtain trade secrets from Aetna under the guise of this litigation, IBC's requests are otherwise

improper in that they are woefully overbroad, imprecise, and would require an extraordinary burden for Aetna to even respond in a reasonable fashion that might possibly eliminate the harm of losing trade secrets. The phrasing of the requests in such broad terms further confirms that this is a fishing expedition by IBC to rummage through files of its principal competitor looking for things it does not even know to exist, simply to see what is there and how it might possibly be useful.

Especially in a situation such as this, in which there is sought trade secret information of a "principal competitor", and in accordance with all of the caselaw establishing the burdens and protections under Rule 45, the subpoena should be quashed and IBC's motion denied in its entirety. IBC is fishing not for evidence that it believes will help its defense; rather, it is fishing for secrets that will result in harm to Aetna and thereby improve its competitive position, which IBC has so often complained is diminishing as it loses more and customers to Aetna.

IV.    **CONCLUSION**

For the foregoing reasons, and the reasons set forth in the prior filings of Aetna in opposing IBC's attempts to compel production of Aetna's trade secrets, IBC's Motion should be denied in its entirety. If the motion is not denied outright, Aetna must be afforded discovery and an evidentiary hearing on IBC's alleged "substantial need" for Aetna's trade secrets. Further, the Court should award Aetna reasonable attorneys fees incurred in responding to IBC's attempts to compel production of trade secret information, and such other relief favorable to Aetna as is appropriate.

Respectfully submitted,

OF COUNSEL:

/s/ Frederick P. Santarelli

ELLIOTT REIHNER &
  SIEDZIKOWSKI, P.C.

JOHN M. ELLIOTT
JAMES C. CRUMLISH III
MARK J. SCHWEMLER
FREDERICK P. SANTARELLI
JOHN P. ELLIOTT
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
P.O. Box 3010
Blue Bell, PA 19422
(215) 977-1000
Counsel for Non-Party
Aetna Inc.

DATED: February 17, 2004

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day a copy of the foregoing is being served upon the persons and in the manner indicated below:

### Via First Class Mail

Lewis R. Olshin, Esquire
Duane, Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396

William J. Leonard, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895

Daniel A. Kotchen, Esquire
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

Howard T. Rosenblatt, Esquire
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

/s/ Frederick P. Santarelli
FREDERICK P. SANTARELLI

Dated:  February 17, 2004