IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CHESTER COUNTY HOSPITAL | : | |
| | : | |
| | : | |
| | : | |
| | : | NO. 02-CV-2746 |
| INDEPENDENCE BLUE CROSS, | : | |
| QCC INSURANCE COMPANY, | : | |
| KEYSTONE HEALTHPLAN EAST, and | : | |
| KEYSTONE MERCY HEALTH PLAN | : | |
| | : | |

EXHIBIT "1"

to

NON-PARTY AETNA INC.'S RESPONSE AND OPPOSITION TO
THE JANUARY 30, 2004 DEFENDANTS' MOTION TO COMPEL
AETNA, INC. TO PRODUCE DOCUMENTS

## DECLARATION OF DR. GLENN A. MELNICK

My name is Glenn A. Melnick, Ph.D. I am the Professor and Blue Cross of California Chair in Health Care Finance at the University of Southern California ("USC") and the Director of the Center for Health Financing, Policy and Management at USC. I am also a Senior Economist and Resident Consultant with the RAND Corporation in Santa Monica, California. I provide expert advice to the Federal Trade Commission and to States' Attorney Generals in the areas of health care competition and antitrust issues in the healthcare industry. My research in the area of healthcare competition is frequently cited in both legal matters and in public policy analyses of the US health care system. I am currently leading several large health care competition research projects funded by the Assistant Secretary for Planning and Evaluation (the Federal office that provides health policy advice to the White House) and The Agency on Health Care Research and Quality, with the National Institutes for Health. I have been and continue to be regularly published in the scientific literature including in the Journal of Health Economics, Journal of the American Medical Association, and Health Affairs. My editorials have appeared in the Wall Street Journal and the Los Angeles Times. A copy of my Curriculum Vitae is attached to this Declaration.

## I.    **Introduction**

I have been asked to opine on certain topics on behalf of Aetna, Inc. ("Aetna") relating to efforts by Independence Blue Cross ("IBC") to obtain via subpoena certain information which IBC claims it needs to defend itself in an anti-trust case filed against it by Chester County Hospital ("CCH"), to which Aetna is not a party. The information at issue is listed in a December 22, 2003 Order issued by Magistrate Judge Smith. IBC does not dispute that the type of information listed in that Order constitutes Aetna's trade secrets.

I have been asked to opine whether IBC has articulated a need for this information to defend itself in a case of this type. In particular, I have been asked to opine as to whether IBC has articulated a need to access Aetna's hospital reimbursement rates and strategic plans. I have also been asked to comment upon the harm which could befall Aetna, competition in the relevant markets, and consumers if IBC were to access Aetna's trade secret information. Finally, in the event it is eventually determined that any of Aetna's trade secret information must be disclosed, I have been asked to explain to the Court how a more systematic and incremental approach in addressing the disclosure of this information might avoid or mitigate the harm to Aetna, to competition in the market, and to consumers. A list of materials I have reviewed in preparing this Declaration is attached.

## II.    Summary of Key Findings

1. IBC argues that it needs to access Aetna's trade secret information regarding hospital reimbursement rates in order to defend against certain allegations of CCH. IBC cites specific allegations in its submissions to the Court as justification of a substantial need for this information. I have reviewed those specific allegations and, as I point out in detail below, it is clear that Aetna's reimbursement rates are not needed by IBC to refute these allegations of CCH.

2. Moreover, IBC has not identified or described **any** analytical approach, much less a **valid** analytical approach, that it will use in defending this case. Therefore it has not shown that Aetna's reimbursement rates are needed for the purpose of conducting any analysis. The lack of any explanation from IBC for their need to access Aetna's reimbursement rates is particularly troubling given the highly proprietary and competitively sensitive nature of the information sought from Aetna, and the potential substantial harm to Aetna, to competition in the relevant markets and consumers that could result from the disclosure of this information to IBC.

3. IBC also argues that it needs to access Aetna's trade secret strategic plans, and IBC cites specific allegations in its submissions to the Court, as the basis on which to justify a need for access to this category of trade secret information. As above, I conclude that IBC does not require access to Aetna's strategic plans to defend against these allegations. In fact, the strategic plans of a competitor are not typically used in cases such as this, as the basis to prove or disprove the kind of allegations to which IBC refers. Also, as above, I express serious concerns over the possible harm to Aetna, to healthy competition and to consumers in the relevant markets which may be caused by the disclosure of Aetna's confidential and proprietary strategic plans to IBC, Aetna's primary competitor in Southeastern Pennsylvania.

2

4. To assist the Court I include in my report a description of the very real and serious harm to competition and to consumers that may result if IBC were given access to the kind of trade secrets described in Magistrate Judge Smith's December 22, 2003 Order.

5. For the Court's benefit, I describe the benefits of a more systematic and incremental approach in determining the need for disclosure of Aetna's trade secret information to IBC. Such an approach will help to preserve healthy competition in the relevant markets, and avoid a situation that could contribute to a reduction in competition resulting in harm to the market of the very kind that CCH alleges in filing this lawsuit. The preferred approach would be to proceed on a systematic and incremental basis where the need for specific data elements was documented based on a well-developed analysis plan that meets the scientific standards for validity as established in the field.

### III.    IBC Has Shown No Need for Aetna's Trade Secret Information

In its submissions to the Court seeking to demonstrate a need for disclosure of Aetna's trade secret reimbursement rate and strategic plan information, IBC has stated that it needs Aetna's information to defend against allegations made by CCH. IBC refers to specific allegations and specific paragraphs of CCH's Amended Complaint to articulate its need for Aetna's trade secret information; for example in its purported December 22, 2003 letter to the Court. In my opinion, IBC does not need to access Aetna's reimbursement rate information in order to defend against the allegations cited.

#### A. Overview

I review below each of the allegations that IBC refers to in its Court submissions, for support of its need for Aetna's trade secret information. Specifically, each of these allegations is reviewed in an attempt to identify specific kinds of data elements that might be useful in evaluating each of the statements. The potential data identified in this process are then compared to the information sought from Aetna to determine if there is any overlap in terms of the kind of data they indicate is needed.

It is extremely important to note however, that an overlap in terms of the kinds of data needed does not necessarily prove that Aetna actually has data that would be needed by IBC to

conduct a valid analysis for the purposes of this case. In order to make that assessment, the data request would need to be tied to a *valid* analysis plan and that plan would need to be specific enough to determine *exactly* what data are needed to implement the analysis plan. For example, a simple question such what is the weather going to be tomorrow can actually be asking for very different specific kinds of information depending on who is going to use the answer and for what purpose. For many people, "sunny skies" may be sufficient to help them in their decision of whether they will need a rain coat. By contrast, space shuttle planners may need very detailed and specific weather information. Both groups use weather information but the specific pieces of information needed are quite different and are linked directly to how the information will be used.

Again, an important limitation in assessing justifications offered by IBC for needing Aetna's trade secret information is that the data request is not nearly specific enough in terms of defining the data elements needed, and IBC has not described how the information will be used. In fact, IBC has not provided *any* analysis plan in this respect, much less one which could be considered valid.

### B. Review of Specific Allegations Cited by IBC to Substantiate Need for Aetna's Trade Secret Rate Reimbursement Data

**Paragraph 17 of CCH's Amended Complaint**, cited by IBC, states:

> 17.    Due to the market dominance of the IBC Group, providers, including the hospital are required to accept reimbursement rates from the IBC Group for inpatient and outpatient services that are less than the costs of providing these services. All of the IBC Group's programs provide levels of reimbursement to the Hospital that are less than the Hospital's costs of providing the services. On information and belief, the same is true for other hospitals in Southeastern Pennsylvania.

In this allegation it appears that the implied underlying analytical model has the following potential data elements: market dominance, services to IBC subscribers,

reimbursement rates from the IBC group, hospital costs, and reimbursement rates from the IBC Group that are less than costs. As I understand this paragraph, it is generally being argued that IBC, because of its size, is forcing CCH to sell its services to IBC subscribers at prices paid by IBC that are so low that the revenue generated by CCH in serving IBC patients are below the costs of treating IBC's subscribers at the hospital. This paragraph ends with an assertion that other hospitals in Southeastern Pennsylvania are subject to this same set of facts.

The first observation is that nowhere in this paragraph are Aetna's reimbursement rates mentioned, either explicitly or implicitly. The gist of the argument is that CCH is losing money on providing services to IBC subscribers. This model appears to require an accounting methodology which would rely on accounting data at CCH to estimate their own costs as well as internal CCH accounting records regarding how much of CCH's business is accounted for by IBC and how much revenue they receive for each IBC sponsored patient. If correctly done, the proper method to address these issues is an accounting approach that would need internal accounting data from CCH initially and then the same kinds of data from other hospitals if one wanted to conduct the same analysis for other hospitals in Southeastern Pennsylvania.

In summary, there does not appear to be *any role* for Aetna trade secret rate reimbursement data in assessing the validity of this allegation.

**Paragraph 23 of CCH's Amended Complaint**, cited by IBC, states:

> 23.    For the contract beginning November 1, 2001 the Hospital proposed new rates to IBC that would have helped to stabilize the Hospitals fiscal condition. IBC refused the proposed increase and would only agree to a five year contract providing for an increase in inpatient and outpatient rates in the first year only about one third of what the Hospital requested, and increases for subsequent years that were not tied to local market indices and were inadequate to address the costs incurred by the Hospital for providing services to IBC subscribers. One set of rates was to apply for IBC's traditional indemnity health plan, and a separate set of rates to all IBC Group managed care plans, including Keystone Health Plan East's HMO

5

programs, QCC's Personal Choice PPO programs, and Keystone Mercy. Facing the alternative of immediate financial disaster if the Hospital refused to contract with the IBC Group, the Hospital has no choice but to accept the terms imposed by IBC. For fiscal year 2001 the Hospital received approximately $34 million in revenue from the IBC Group, but nevertheless sustained operating losses on IBC Group patients exceeding $8.5 million, forcing the Hospital into a negative operation position. For fiscal year 2002, the Hospital is experiencing similar losses. On information and belief, other hospitals in Southeastern Pennsylvania were similarly coerced into accepting rates from the IBC Group that do not meet their operating costs.

In this paragraph it appears that the underlying model has the following implicit data elements: proposed new rates by CCH to IBC beginning in November 2001, the financial status of CCH in November 2001, five year forecast of IBC rates to be paid to CCH under the contract, amount and cost of services provided by CCH to IBC subscribers, revenue generated by CCH from serving IBC subscribers, the relationship between the rates paid to CCH by IBC and the hospital's cost of treating IBC subscribers for specific time periods, and the net impact of the IBC book of business on CCH's financial status for specific time periods.

As I understand this allegation, it is generally being argued by CCH that its financial status was deteriorating and that it proposed to IBC that it pay higher rates to CCH beginning in November 2001, but that IBC rejected this offer and instead the parties agreed upon a different (lower) set of rates. It is further argued by CCH that by accepting these lower rates from IBC, its financial status continued to deteriorate through the year due to the fact that its costs of treating IBC patients in FY 2001 were $8.5 million greater than the revenue paid by IBC to CCH. This paragraph ends with an assertion that other hospitals in Southeastern Pennsylvania agreed to contracts with IBC that included IBC reimbursement rates that did not cover the costs of treating IBC patients at those facilities.

My first observation is that nowhere in this paragraph are Aetna's reimbursement rates mentioned, either explicitly or implicitly. The gist of the argument in this paragraph is similar to the one outlined in CCH's Paragraph 17, that CCH is losing money by providing services to IBC subscribers. While there is mention of "local market indices", no additional information is provided regarding either general or specific definitions of the indices nor any discussion of what data would be needed to construct the indices.

The analytical model underlying this argument also appears to require a methodology which would rely on accounting data at CCH to evaluate their costs as well as internal CCH accounting records regarding how much of their business is accounted for by IBC and how much revenue they receive for each IBC sponsored patient. If correctly done, the proper method to address these issues is likely an accounting approach that would need internal accounting data from CCH and other hospitals. There does not appear to be *any role* for Aetna trade secret rate reimbursement data in assessing the validity of this claim.

**Paragraph 29 of CCH's Amended Complaint**, cited by IBC, states:

> 29.    For purposes of this action, a relevant geographic market is the greater Philadelphia area, including Bucks, Chester, Delaware, Montgomery and Philadelphia counties in Pennsylvania. The service area of the Hospital within Chester County or another area within the greater Philadelphia area is also a relevant geographic market or submarket.

In this paragraph, it is not really very clear what is being referred to. The geographic definition of relevant markets is an extremely important aspect of any analysis of health care competition. Because of the size of our health care system, there are numerous different health care markets. In some cases the definition of a particular market is very complex and while in other cases they are easier to define. While definition of each market depends upon the specific facts related to the market in question, there are some general characteristics of geographic

7

markets that may be relevant to this matter. In general, health insurance markets (geographic) tend to be larger than hospital markets (geographic). Research has shown that hospital markets tend to be relatively local in their reach (of course, there are exceptions), while the geographic markets for health insurance products almost always reach beyond the market of a single hospital and often include many hospitals within their relevant markets.

This paragraph appears to mix geographic markets for the different products – hospital services versus health insurance services. Further, it appears to offer different definitions within the same paragraph without indicating the relevant product market for which the geographic market is being defined.

Regardless of the final interpretation of this vaguely worded paragraph, what is clear is that there does not appear to be any *need* by IBC to access Aetna trade secret rate reimbursement data to refute any of the facts asserted here.

**Paragraph 55 of CCH's Amended Complaint**, cited by IBC, states:

> 55.    That both Highmark, Inc. and Capital Blue Cross have the ability and willingness (absent a competition-limiting agreement or combination) to compete against other Blue Cross plans in Pennsylvania is evidenced by the competition between Highmark and Capital Blue Cross in central Pennsylvania, where Highmark markets products (including hospital insurance benefits) under the Blue Shiled trademark and Capital Blue Cross trademark. Having terminated a JOA between them, Highmark and Capital Blue Cross are now competing for the purchase of hospital services as well as in selling insurance benefits to employers and other consumers. Upon information and belief, hospitals and purchasers of insurance are benefiting from this competition. In contrast, hospitals and purchasers of insurance in the greater Philadelphia area are not benefiting from such competition, at least in part because cooperative agreements and combinations-similar to the recently-terminated Highmark-Capital Blue Cross combination-between IBC and its potential competitors have precluded such competition.

In this paragraph, it appears that the issue being raised concerns competition in the health insurance market with particular reference to whether and where Highmark, Inc, and Capital

Blue Cross competes with IBC. It appears that the underlying model or theory is that in areas where these and other Blue Cross plans can compete with IBC that there is increased competition amongst plans to recruit hospitals into their competing preferred provider networks, and that this competition results in hospitals being able to charge more to these competing Blue Cross plans. Since there is no analytical plan put forth to test this model, it is not clear exactly what data would be necessary to analyze these issues.

However, what is clear in this paragraph is that Aetna is not even mentioned in this paragraph and, further, there does not appear to be need for Aetna trade secret rate reimbursement data in relation to this paragraph. The argument, as laid out in this paragraph, revolves around differences in contractual arrangements and behavior by the Blue Cross and Highmark Plans including IBC in different geographic areas depending on the nature of operating agreements between these specific plans. These can be evaluated without access to Aetna's trade secret rate reimbursement information.

IBC also cites allegations asserted in a portion of a Motion to Compel Discovery filed by CCH, as evidencing IBC's need for Aetna's reimbursement rates. The assertions by CCH that are cited, however, are essentially the same in substance and subject matter as paragraph 55 of CCH's Amended Complaint. For the same reasons outlined above, these assertions by CCH also do not give rise to a need by IBC to access Aetna's reimbursement rates.

### C.    Review of Specific Paragraphs Cited by IBC to Substantiate Need for Aetna's Trade Secret Strategic Plans

To justify its need for Aetna's strategic plans, IBC has also invoked Paragraph 55 of CCH's Amended Complaint, and the same excerpts from CCH's Motion to Compel that are described above. For the same reasons as described above, Aetna's strategic rates are not needed by IBC to defend against these allegations by CCH. The argument laid out in these allegations

9

revolves around differences in contractual arrangements and behavior by the Blue Cross,

Highmark Plan and IBC in different geographic areas. As noted above, a direct test of these

issues could begin with data from the parties specifically referred to in the paragraph; IBC,

Highmark, Inc, and Capital Blue Cross. This can be done without access to Aetna's trade secret

strategic plan information.

**Paragraph 57a of CCH's Amended Complaint**, cited by IBC, states:

> 57a.    Competitors and potential competitors of the IBC Group have
> been and will be hindered and obstructed in their ability to compete in
> the relevant market (s), as the IBC Group activities have been intended
> to increase and have had the effect of either increasing rivals' costs or
> providing incentives for the potential competitors not to enter the
> market.

In this paragraph, it appears that the issue being raised concerns competition in the health

insurance markets with particular reference to whether certain alleged behavior by the IBC

Group has had the effect of creating barriers to entry. It appears that the underlying model or

theory is that in areas where IBC undertakes certain unspecified alleged behavior, the

competition amongst health plans **has been** and **will continue to be reduced.** Since there is no

conceptual or analytical plan put forth to provide a valid test of the allegations, it is not clear

exactly what data would be necessary to properly analyze the issues described here.

In the absence of an analytical plan that could be evaluated in advance to determine the

need for any specific data element, I can suggest some publicly available data that might be used,

and are usually used by economists, in assessing the patterns of entry and exit of health insurance

plans in different geographic markets. There are a number of publicly available data sources that

track entry and exit of health plans into and out of different geographic areas in the US. For

example, Interstudy gathers comprehensive enrollment data on HMOs across the country and has

been producing this data for public use for many years. Similarly, the SMG, Inc. group has

collected, formatted and sold similar data for PPOs and other health plans over the years.
Another potential source is a recently completed national study of health insurance markets in
the US conducted by the American Medical Association. The following, taken from the AMA
website http://www.ama-assn.org/ama/pub/category/9573.html, provides additional details on
this potentially relevant data source for this matter:

> **Second Edition - *Competition in Health Insurance: A
> Comprehensive Study of US Markets:*** The second edition of the very
> successful Competition in Health Insurance: A Comprehensive Study
> of US Markets provides an even more comprehensive look at health
> insurance market concentration. The study provides market
> concentration and health insurer market share information for 48 states
> and 70 metropolitan areas (compared to 46 states and 40 metropolitan
> areas in 2001). The goal of the AMA study is to obtain a real measure
> of health insurer market power and market concentration in order to
> get a better picture of the competitiveness (or lack thereof) of health
> insurance markets. To order a copy of the **Second Edition,
> *Competition in Health Insurance: A Comprehensive Study of US
> Markets*** (OP# - 427103); $50 for AMA Members, and $100 for
> Nonmembers.

Again, since a specific analytical plan has not been supplied, it is not possible to
determine the extent to which such publicly available information, by itself or in combination
with other publicly available data sources, would be sufficient to meet IBC's purported need for
such data. However, it is clear that there are publicly available data sources that should be
evaluated before forcing the disclosure of trade secret information that could result in serious
harm to competition in the market under study. In fact, the strategic plans of a competitor are not
typically used in cases such as this, as the basis to prove or disprove the kind of allegations to
which IBC refers.

## IV.    The Harm Caused By Disclosure Of Aetna's Trade Secret Information

### A.    The Evolution and Importance of Protecting Competitive Markets and Price Competition in the US Health Care System.

The economic basis of the US Healthcare system has evolved over the last 15-20 years into one that can be characterized as market based and price competitive. The restructuring of the health care system to one that relies on price competition and competitive markets to improve efficiency and control cost increases is the result of a combination of a long term trend of rising health care expenditures in the US and the failure of direct government regulation and voluntary controls, implemented in the 1970s and 1980s. For much of the late 1980s and 1990s health care cost and price increases were held in check as a result of health plans and health care providers operating under competitive conditions. Health expenditures in the US will approach $1.5 trillion for 2003, making it the largest single component of our overall economy (15%). As such, even small reductions in the rate of increase in health care costs have enormous budgetary and efficiency implications in our economy.

In recent years, we have seen health care costs begin to accelerate at rates in excess of overall economic inflation. A number of experts have suggested that a primary cause of these increases is the loss of competitiveness in provider markets that is allowing hospitals and doctors to reduce their focus on price competition and to raise their prices to health plans. As such, there is growing interest and concern by policy makers and the courts in maintaining the underlying competitive structure of health care markets.

It is becoming increasingly clear that in order for US consumers to continue to benefit from price competition in the health care sector, that the underlying competitive structure of health care markets must be maintained and ultimately protected by regulatory agencies and the courts. Indeed, the Director of the US Federal Trade Commission has announced that his agency will play a greater role in maintaining and protecting price competition in the health care system in the US than it has in the past.

With this as background, it is important that the Court recognize the critical role that competition plays in our health care system. In rendering its decisions regarding the release of confidential or trade secret information, the Court may wish to consider the potential harm to current and future competition in the markets, in relation to the extent to which IBC actually needs the information to defend itself in this case.

**B.      Structure of Competitive Markets in Health Care and the Importance of Protecting Competition in the Health Insurance/Health Plan Market**

The US health care system is characterized by a series of separate but interlinked markets. For example, hospitals and doctors both operate within the overall health care market but generally do not compete directly with one in another except in limited cases. Generally, doctors compete against other doctors while hospitals compete against other hospitals. To the extent that the underlying competitive structure of physician markets or hospital markets is healthy, we observe lower prices and lower price increases for their respective services. Similarly, health plans generally compete with other health plans. To the extent that the underlying competitive structure of the health plan or health insurance market is also healthy, we will observe lower health insurance premiums being charged to employers for their workers or to individuals who purchase health insurance directly.

For consumers to receive the maximum benefit from price competition in health care, it is valuable to have healthy competition in all of the separate health care markets that make up the overall health care system. Of particular importance is the competitiveness of health insurance or health plan markets. Because of the special intermediary role that health plans play in the financing of health care, their performance and ability to compete may have a disproportionate effect on consumer welfare, since health plan markets can influence health insurance premiums directly. It is possible to have highly competitive hospital and doctor markets that generate

13

lower medical prices but still have relatively high health insurance premiums charged to local residents. This can occur if there is not sufficient competitive pressure amongst health plans to force them to compete as vigorously on the prices they charge for their services. Consequently, one can observe highly efficient prices due to competitive hospital and doctor markets that are not passed on to consumers in the form of lower health insurance premiums, if the health insurance or health plan market is not sufficiently competitive to force health plan participants to compete on the price of health insurance.

### C.    Danger and Potential Harm to Consumers of Requiring a Health Plan (Aetna) to Reveal Trade Secrets to Competitors

Given the special importance of the health insurance markets to consumer welfare in health care, it is important to recognize the potential harm to the market and ultimately to consumers of requiring a competing health plan to reveal trade secrets to a competitor, especially one that has been characterized as dominant. One the most important protections that consumers have in terms of maintaining competitive markets is the ability of competitors to enter or expand in a market. Entry and exit from markets is one of the most powerful and important features of a competitive market.

One of the costs of entering any market is the undertaking of detailed, often expensive, data collection, analysis, assessment and strategic planning that precedes the decision to enter (or expand). The decision to enter into or expand within a market is often followed by significant capital and marketing expenditures. One of the ways that competitors attempt to control their costs of entry is by keeping their plans secret from existing or potential competitors. If their plans were to become known by their competitors, it is possible that their competitors could undertake actions that would make entry or expansion more difficult, time-consuming, complex, costly and ultimately more risky and potentially less profitable. By revealing trade secrets of this

14

nature, their release could have a negative or chilling effect on entry, thereby weakening the competitive structure of the market in question. This is a particular concern to the extent that there is a dominant competitor in the market already, in which case entry or expansion is likely to be more difficult in the first place.

### D.   Danger and Potential Harm to Consumers of Requiring Health Plan to Reveal Trade Secrets to Other Participants in the Market

The potential harm to competition in health care of requiring release of Aetna's trade secrets is not limited to its impact on the health insurance market and the competitive prices of health insurance. Another important aspect of the way competitive health care markets function in the US concerns the way that health plans contract with hospitals to provide services to their members. An important element of the competitive health care market is the formation of preferred hospital networks by health plans. In forming these preferred networks, which they make available to their subscribers on a more or less exclusive basis, health plans seek to control the costs hospitals charge.  Hospitals run the risk that if they charge too much relative to their competitors in the market, that they will be excluded from the preferred network by the health plan and will suffer a loss of business.

An important element of this process is the confidential nature of the prices that are negotiated between the hospitals and the health plans. It is standard practice in the industry for health plans to require hospitals to not divulge the prices they charge the health plans (for some period of time).   By employing this kind of blind auction technique health plans are better able to stimulate price competition amongst hospitals in local markets and generate savings for their health plans and their consumers.

The importance of this practice is reflected in government mandated regulations, such as in California, whereby the State prohibits the release of negotiated prices between the state

Medicaid health insurance plan (Medi-Cal, California Medical Assistance Commission) and contracted hospitals for a period of at least three years. Preventing release of these government health plan trade secrets is deemed so important to ensure the effective functioning to competitive hospitals markets, that the government prohibits the release of hospital rate or reimbursement data to anyone. This prohibition even extends to freedom of information requests by researchers and other disinterested parties.  Likewise, the importance of maintaining the confidentiality of Aetna's hospital rate reimbursement information is reflected in the fact that Aetna routinely includes confidentiality/non-disclosure language pertaining to reimbursement rates in its contracts with hospitals.  In this respect, the Supplemental Declaration of Mr. Robert Franzoni, submitted by Aetna to the Court, correctly underscores how damage to current and future competition in the market could occur if the confidentiality of such trade secret information was compromised.

E.    **Why the Court Should Proceed Cautiously, Systematically and
      Incrementally in Requiring the Release of Any of Aetna's Trade Secrets**

There are always costs and benefits of acquiring different data elements in the course of

any analytic exercise.  As such, the definition and determination of what data are required, for

what purpose, and at what time in the process is often a central element of most scientific

research proposals. The process by which these data collection decisions are made has evolved

into a fairly standard one, involving careful assessment of the costs and benefits of the data as

specified and the timing of when specific data elements are needed. This scientific model may

provide the court with an efficient framework for evaluating the need and timing of the data

requested in this case.

It is not uncommon for scientific projects to be organized into phases, where the results

from an early phase provide the necessary information to estimate the costs and benefits of

incurring the costs associated with the second phase of data collection. That is, the key questions

of the research are identified and sorted whereby the answer to the first question informs the

question of whether the research needs to proceed to the next phase and what additional data are

absolutely necessary before incurring the costs.

In this case, the data costs, while difficult to quantify, are none-the-less real and

potentially quite significant. Such costs would accrue not only to Aetna but to health care

consumers within Pennsylvania.  IBC is arguing that its defense can only be mounted by

acquiring the trade secrets of a direct competitor in the market, but as described above, the

potential costs of releasing such information to a direct competitor can result in undermining the

competitive dynamics in the very market that the court is seeking to protect. It is possible that by

requiring Aetna to release the requested trade secret data, that any plans that they may have to

enter into or expand in the relevant markets could be negated and that IBC, if it does not already

17

have monopoly power in the health plan market, could acquire such power. Should this outcome occur, health care consumers would likely end up paying substantially more for their health insurance in the future than they are now. Thus, not only would Aetna suffer harm but as a result consumers in the market that the court seeks to protect would be inadvertently harmed both in the short run and possibly in the long run, if entry into this market is made more difficult. Further, since the geographic markets for health insurance products tend to be much larger than those for hospital services, the possibility is that far more consumers are at risk if there is damage to competition in the health insurance market, than are at risk in CCH's more limited market (should the allegations be proven).

Therefore, the Court might consider approaching the need for disclosure of Aetna's trade secrets on an incremented basis. For example, IBC has requested certain trade secret information from Aetna on the basis that data are needed for all the hospitals in "the market". However, the definition of the relevant geographic market in antitrust cases requires careful and detailed analysis. In reviewing the materials for this case, I found nothing approaching the analytical standard necessary to reach a valid determination of the relevant market or markets in this case. As such, it is premature for IBC to request data for specific hospitals, on the basis that such hospitals are in the relevant "market," when the market has not yet even been defined. It is entirely possible that the Court could conclude that the relevant market in this case is different from the one that is being asserted at this time, and that the release of potentially market damaging data was, in fact, not necessary after all.

A preferred approach would be to proceed on a systematic and incremental basis where the need for specific data elements was documented based on a well-developed analysis plan that meets the scientific standards for validity as established in the field. In the materials I have reviewed I have not seen an attempt by IBC at this kind of specificity. For example, IBC has

requested entire copies of all of Aetna's trade secret strategic plans on the basis that such documents **may** contain (as yet, unspecified) needed information. This is akin to requesting a complete set of medical records for a person to determine whether they have high blood pressure, rather than simply asking for the specific measurements related to their blood pressure. While the medical records may contain such information, it also contains many other confidential pieces of information that have nothing to do with the motivating question.

Dated: 1/26/2004

_____
Glenn A. Melnick

19

## MATERIALS REVIEWED

1.    Amended Complaint

2.    Answer to Amended Complaint With Affirmative Defenses and Counterclaims

3.    IBC's December 22, 2003 letter to Magistrate Judge Smith

4.    Seidman Affidavit

5.    Franzoi Declaration

6.    Franzoi Supplemental Declaration

7.    IBC's July 25, 2003 Subpoena to Aetna

8.    IBC's December 17, 2003 Subpoena to Aetna

9.    Excerpts From "HealthLeaders" Research Web Site

10.    Summary Document Re: "InterStudy" (Competitive Edge 13.1)

11.    Excerpted Pennsylvania Health Care Cost Containment Council ("PHC4") Documents

12.    PHC4 3 Page Cardio Vascular Rate Document

13.    Milliman USA Hospital Efficiency Index

14.    Objections Filed by Aetna, Setting Forth Arguments (With Exhibits)

15.    Published List of Competitors in the Relevant Market, With Market Shares Shown

16.    IBC's Memorandum of Law in Opposition to Aetna's Objections to the Discovery Order of December 22, 2003

17.    Exhibit D to IBC's 12-22-03 Letter Brief to Magistrate Smith (CCH's Motion to Compel Capital Blue Cross to Produce Documents)

# GLENN ALAN MELNICK

## EDUCATION

University of Michigan, Ph.D., Urban and Regional Planning - Emphasis in Health Economics (1983)
University of Michigan, M.A.E., Applied Economics (1977)
University of Michigan, M.H.S.A., Health Services Administration (1977)
University of Massachusetts, B.A., Economics, cum laude (1974)

## PROFESSIONAL EXPERIENCE

1996-present -- Professor and Blue Cross of California Chair in Health Care Finance, School of Policy, Planning and Development, University of Southern California.

1984-present --  Resident Consultant, RAND, Santa Monica, California.

1992- 1998 -- Expert Witness, Federal Trade Commission, Washington DC.

1992- 1999 -- Expert Witness, Attorneys General, Texas, Florida

1982-1996 -- Associate Professor, Department of Health Services, School of Public Health, University of California, Los Angeles.

1992-1996 -- Director, International Program for Health Financing and Policy, University of California Los Angeles, School of Public Health.

1981-1982 and 1978-1979 -- Research Associate, Department of Hospital Administration, School of Public Health, University of Michigan.

1977-1982 -- Vice President and Principal, Applied Statistics Laboratory, Inc., Ann Arbor, Michigan.

1976 -- Reimbursement Policy Analyst, Blue Cross of Michigan, Reimbursement Policy Unit.

1975 -- Health Planning Associate, Blue Cross of Massachusetts, Office of Health Planning.

1974-1975 -- Research Analyst, Massachusetts Department of Public Health, Office of Health Facilities.

## Publications

Melnick G., Nawathe A, Bamezai A, Green L, "Emergency Department Capacity and Access in California, 1990-2001: An Economic Analysis," *Health Affairs*, 2003 (under review)

Shen, Y, Melnick, G, "The effects of HMO ownership on hospital costs and revenues: Is there a difference between for-profit and not-for-profit plans?" *Inquiry*, 2003 (under review)

Dhanani N, O'Leary J, Keeler E, Bamezai A, Melnick G, "The Effect of HMOs on Inpatient Utilization of Medicare Beneficiaries," *Health Services Research* (under review)

Hongjun K, Goldman D, Keeler E, Dhanani N, Melnick G," An Analysis of Unobserved Selection in an Inpatient Diagnostic Cost Group Model," *Health Services and Operations Research Methodology* (under review)

Bamezai, A., Melnick, G.A., Mann, J., and Zwanziger, J. "Hospital Selective Contracting in the Absence of Consumer Choice: What Can We Learn from Medi-Cal," *Journal of Policy Analysis and Management*, 2003 Winter; 22(1): 65-84.

Zwanziger, J., Melnick, G.A., and Bamezai, A. "The Effect of Selective Contracting on Hospital Costs and Revenues" *Health Services Research*, October, 2000.

Zwanziger, J., Melnick, G.A., and Bamezai, A. "Can Cost Shifting Continue in a Price Competitive Market" *Health Economics*, April 2000.

Melnick, G., Keeler, E., and Zwanziger, J. "Market Power and Hospital Pricing: Are Nonprofits Different*?" Health Affairs*, May/June 1999.

Bamezai, A., Zwanziger, J., Melnick, G.A., Mann, J. "Price Competition and Hospital Cost Growth in the United States (1989 – 1994)." *Health Economics*, 8, 1999.

Keeler, E.B., Melnick, G.A., and Zwanziger, J. "The Changing Effects of Competition on Non-Profit and For-Profit Hospital Pricing Behavior." *Journal of Health Economics*, 18(1):51-73, 1999.

Mann J, Melnick G.A., Bamezai A, and Zwanziger J. "Hospital Uncompensated Care: Are Safety Net Providers at Risk from Increased Managed Care and Price Competition?" *Health Affairs*, July/August 1997.

Zwanziger, J., Melnick, G.A., and Simonson, L. "Differentiation and Specialization in the California Hospital Industry 1983-1988." *Medical Care*, 34(4):361-372, 1996.

Zwanziger, J., and Melnick, G.A. "Can Managed Care Plans Control Health Care Costs." *Health Affairs*, 15(2):185-199, 1996.

Melnick, G.A. and Zwanziger, J. "State Health Care Expenditures under Competition and Regulation, 1980 through 1991." *American Journal of Public Health*, 85(10):1391-1396, October 1995.

Mann, J. M., Melnick, G.A., Bamezai, A., and Zwanziger, J. "Uncompensated Care: Hospitals' Responses to Fiscal Pressures." *Health Affairs*, 14(1):263-270, Spring 1995.

Mann, J.M., Melnick, G.A., Bamezai, A., Zwanziger, J. "Managing the Safety Net: Hospital Provision of Uncompensated Care in Response to Managed Care," *Advances in Health Economics and Health Services Research,* 15, 1995.

Serrato, C.A. and Melnick, G.A. "The Indonesian Family Life Survey: Overview and Descriptive Analysis of the Population, Health and Education Data, *RAND Report*, October 1995.

Zwanziger, J., Melnick, G.A., Simonson, L., Mann, J. "How Hospitals Practice Cost Containment with Selective Contracting & Medicare Prospective Payment System." *Medical Care*, 32(11):1153-1162, 1994.

Zwanziger, J., Melnick, G.A., Bamezai, A. "Costs and Price Competition in California Hospitals, 1980-1990." *Health Affairs*, 13(4):118-126, Fall 1994.

Zwanziger, J., Melnick, G.A., Eyre, K. "Hospitals and Antitrust: Defining Markets, Setting Standards" *Journal of Health Politics, Policy and Law*, 19(2):423-447, Summer 1994.

Zwanziger, J., Melnick, G.A. "The Effects of Competition on the Hospital Industry: The Evidence from California," *Competitive Approaches to Health Care Reform*, R.J. Arnould, R.F. Rich, and W.D. White eds., *The Urban Institute Press*, 1993.

Zwanziger, J., Melnick G., Bamezai, A. "Providers Adjust to Increasing Price Competition," in *Health Policy Reform: Competition & Controls,*" 241-258, 1993.

Melnick, G.A. "and Managed Competition Works" Wall Street Journal (op-ed), June 2, 1993.

Melnick, G.A., Zwanziger, J., Bamezai, A., and Pattison, R. "The Effects of Market Structure and Bargaining Position on Hospital Prices," *Journal of Health Economics.*, 11:217-233, 1992.

Melnick, G.A. "California Hospitals Compete by Lowering Costs," *California Hospitals, California Association of Hospitals and Health Systems*, January/February 1992.Mann, J.M., Melnick, G.A. "Selective contracting revisited: California's legacy," *Journal Ambulatory Care Management*, 14(3):14-27, 1991.

Zwanziger, J., Melnick, G.A., and Mann, J.M. "Measures of Hospital Market Structure: A Review of the Alternatives and a Proposed Approach," *Socio-Economic Planning Sciences*, 24(2):81-95, Summer 1990.

Melnick, G. A. and Mann, J. M. "Are Medicaid Patients More Expensive? A Review and Analysis," *Medical Care Review*, 46(3):229-253, Fall 1989.

Melnick, G. A., Zwanziger, J., and Bradley, T. "An Update on Hospital Behavior Under Competition and Cost Containment Policies in California: 1980 - 1987," *Health Affairs*, 8(2):129- 139, Summer 1989.

Melnick, G. A., Zwanziger, J. and Verity-Guerra, A. "The Growth and Effects of Hospital Selective Contracting," *Health Care Management Review*, 14(3):57-64, Summer 1989.

Carter, G.M., and Melnick, G.A. "Patterns of Resource Use Within Medicare Hospital Stays," *RAND R Series*, June 1989.

Roberts, N. K., and Melnick, G. A. "Medical Director: The Evolving Role in the Medical Group," *Physician Executive*, 15(3):18-21 May-June 1989.

Melnick, G. A., Serrato, C. A. and Mann, J. M. "Prospective Payments to Hospitals: Should Emergency Admissions Have Higher Rates?," *Health Care Financing Review*, 10(3):29-39, Spring 1989.

Melnick, G. A., Mann, J. M. and Golan, I. "Uncompensated Emergency Care in Hospital Markets in Los Angeles County," *American Journal Public Health,* 79(4):514-516, April 1989.

Zwanziger, J. and Melnick, G. M. "The Effects of Hospital Competition and the Medicare PPS Program on Hospital Cost Behavior in California," *Journal of Health Economics.*, 7:301-320, January 1989.

Melnick, G. A., and Zwanziger, J. "Hospital Behavior under Competition and Cost Containment Policies: The California Experience," *Journal of the American Medical Association*, November 11:260, 1988.

Melnick, G. A., Mann, J. M. and Serrato, C. A. "Hospital Costs and Patient Access Under the New Jersey Hospital Rate-Setting System," *RAND R Publication Series*, September 1988.

Melnick, G.A., Zwanziger, J. "Competition and Hospital Costs" *Journal of the American Medical Association* (letter), 262(4), 1989.

Zwanziger, J and Melnick, G. A. "A Dangerous Concentration in Hospital Markets" *Wall Street Journal* (op-ed), June 19 1989.

Feldstein, P. J. and Melnick, G. A.  "Congressional Voting Behavior on Hospital Legislation: An Exploratory Study," *Journal Health Politics, Policy and Law*, 8(4):686-701, 1984.

Feldstein, P.J. and Melnick, G. A.  "Political Contributions by Health PACs to the 96th Congress," *Inquiry,* 19:283-294, 1982.

Melnick, G. A., Wheeler, J.R.C. and Feldstein, P. J.  "Effects of Rate Regulation on Selected Components of Hospital Expenses," *Inquiry*, 18:240-246, 1981.